SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 GROVERS MILL ROAD, SUITE 200
LAWRENCEVILLE, NEW JERSEY 08648
BY: Arnold C. Lakind, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 THIRD AVE., 13TH FLOOR
NEW YORK, NEW YORK 10022
BY: Moshe Maimon, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BORIS GOLDENBERG, as representative of a class of similarly situated persons and on behalf of THE INDUCTOTHERM COMPANIES MASTER PROFITS SHARING PLAN #001, | **Hon.** <br><br> **Docket No.** |
| Plaintiffs, | |
| vs. | **Civil Action** |
| INDEL, INC., individually and a/k/a INDUCTOTHERM INDUSTRIES, INC. and INDUCTOTHERM CORPORATION; AMERICAN INTERNATIONAL GROUP; FSC SECURITIES CORPORATION; FINANCIAL SERVICE CORPORATION; SUNAMERICA ASSET MANAGEMENT CORP.; SUNAMERICA CAPITAL SERVICES, INC.; SUNAMERICA FUND SERVICES, INC.; WHARTON BUSINESS GROUP; HENRY M. ROWAN, JOHN H. MORTIMER, DAVID L. BRADDOCK, THOMAS P. | **CLASS ACTION COMPLAINT AND JURY DEMAND** |

529508.1

MCSHANE, MANNING J. SMITH,
LAURENCE A. KRUPNICK, AND
HARRY G. TREFZ, as Trustees
to the Inductotherm
Companies Master Profit
Sharing Plan #001; JOHN
DOES 1-25 (Individuals
Serving on the Board of
Directors of Indel, Inc.
whose names are not
currently known); JOHN DOES
26-50 (Individuals Serving
on the Board of Directors
of Inductotherm Industries
Inc. whose names are not
currently known); JOHN DOES
51-75 (Individuals Serving
on the Board of Directors
of Inductotherm Corporation
whose names are not
currently known); JOHN DOES
75-125 (Members of the
Committee for the
Inductotherm Companies
Master Profit Sharing Plan
#001, whose names are not
currently known); and John
Does 126-200 (Other
fiduciaries for the
Inductotherm Companies
Master Profit Sharing Plan
#001 and parties whose
names and identities are
not presently known to
Plaintiffs that were
enriched by the receipt of
the Plan's assets),

     Defendants.

## I.  NATURE OF ACTION

1.  This action involves the Inductotherm Companies Master Profit Sharing Plan #001 (the "Plan"), which is sponsored by

Indel, Inc., a/k/a Inductotherm Industries, Inc. and Inductotherm Corporation. Plaintiff, Boris Goldenberg, alleges, on behalf of himself, similarly situated participants of the Plan and the Plan, that Defendants, through their collective actions, (A) violated provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, B) violated provisions of the Securities Exchange Act of 1934 ("Exchange Act"), (C) violated provisions of the Securities Act of 1933 ("the 1933 Act"), (D) violated provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (E) violated provisions of the New Jersey Uniform Securities Law ("Uniform Securities Law"), (F) committed common law torts; and (G) committed a civil conspiracy.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiffs' claims that arise under ERISA pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

3. This Court has jurisdiction over the Plaintiffs' claims that arise under the Exchange Act pursuant to 28 U.S.C. §1331 and Exchange Act, 15 U.S.C. §78aa.

4. This Court has jurisdiction over the Plaintiffs' claims that arise under the 1933 Act, pursuant to 28 U.S.C. §1331 and the 1933 Act, 15 U.S.C. §77v.

5. This Court has jurisdiction over Plaintiffs' claims

that arise under RICO pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964.

6.    This Court has jurisdiction over all of Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a) because they form part of the same case or controversy as the federal claims and are ancillary to the Federal claims.

7.    This Court has personal jurisdiction over the Defendants because this Court has subject matter jurisdiction under ERISA.

8.    Venue with respect to this action lies in the District of New Jersey pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2).

### III.    THE PARTIES

#### A.    Plaintiffs

9.    Plaintiff and all Class members are participants in the Plan within the meaning of ERISA §3(7), 29 U.S.C. §1002(7), and beneficiaries within the meaning of ERISA §3(8), 29 U.S.C. §1002(8).

10.    Plaintiff resides at 12342 Heritage Circle, Feasterville, Pennsylvania, 19053-7677.

11.    The principal place of business of the Plan is 10 Indel Drive, Rancocas, New Jersey 08073-0157.

#### B.    Defendants

12.    Indel, Inc., a/k/a Inductotherm Industries, Inc. and

Inductotherm Corporation ("Inductotherm"), is a privately owned company that acts as the management service company for a group of engineering and technology-based companies. These companies are located at various locations throughout the world. The principal place of business of Indel, Inc., a/k/a Inductotherm Industries, Inc. and Inductotherm Corporation is 10 Indel Drive, Rancocas, New Jersey 08073-0157.

13. The names of the individuals serving on Inductotherm's Board of Directors (the "Board of Directors Defendants"), are not currently known to the Plaintiffs.

14. The individuals serving on the Inductotherm Companies Profit Sharing Plan #001's Committee (the "Committee Defendants"), are appointed by Inductotherm's Board of Directors to manage the administration of the Plan. The names and addresses of the Committee Defendant members are not currently known to the Plaintiffs.

15. Henry M. Rowan, John H. Mortimer, David L. Braddock, Thomas P. McShane, Manning J. Smith, Laurence A. Krupnick and Harry G. Trefz (the "Trustee Defendants"), serve as Trustees to the Inductotherm Companies Profit Sharing Plan #001 ("the Plan"). On information and belief, Henry M. Rowan is the president of Inductotherm. On information and belief, John H. Mortimer serves as a president of one of Inductotherm's engineering or technology-based companies. On information and belief, David L.

529508.1                                      -5-

Braddock serves as a vice president of one of Inductotherm's engineering or technology-based companies. On information and belief, Laurence A. Krupnick is Secretary and Corporate Counsel to Indel, Inc. On information and belief, Manning J. Smith and Harry G. Trefz are employees and officers of one or more Inductotherm companies. On information and belief, Thomas P. McShane is an employee of Inductotherm. The addresses of the Trustee Defendants are not presently known, however, they are believed to be in business at 10 Indel Drive, Rancocas, New Jersey 08073-0157.

16. American International Group, Inc. ("AIG") is a Delaware corporation with its principal place of business located at 70 Pine Street, New York, New York, 10270.

17. The Financial Service Corporation is a wholly owned subsidiary of AIG. The Financial Service Corporation is a Delaware corporation. The Financial Service Corporation makes no Securities and Exchange Commission ("SEC") filings, is not licensed to transact business in the State of New Jersey and its only function appears to be that as parent of its 100% owned subsidiary of the FSC Securities Corporation. The principal place of business of Financial Service Corporation is unknown.

18. FSC Securities Corporation is a wholly owned subsidiary of AIG. FSC Securities Corporation is a Delaware corporation with its principal place of business located at 2300 Windy Ridge

Parkway, Suite 1100, Atlanta, Georgia, 30339.

19.   The Wharton Business Group is a branch office of FSC Securities Corporation.  The Wharton Business Group is a Pennsylvania corporation with its principal place of business located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341.

20.   SunAmerica Asset Management Company is a wholly owned subsidiary of AIG.  SunAmerica Asset Management Corp., is a Delaware corporation with its principal place of business located at Harborside Financial Center, 3200 Plaza 5, Jersey City, New Jersey.  Prior to April 1, 2009, Defendant SunAmerica Asset Management Corp., was named AIG SunAmerica Asset Management Corp.

21.   SunAmerica Capital Services, Inc. is a wholly owned subsidiary of AIG.  SunAmerica Capital Services, Inc., is a Delaware corporation.  On information and belief, SunAmerica Capital Services, Inc.'s principal place of business is located at 21650 Oxnard Street, Woodland Hills, California 91367.

22.   SunAmerica Fund Services, Inc., is a wholly owned subsidiary of AIG.  Prior to March 17, 2009, SunAmerica Funds Services Inc. was named AIG SunAmerica Fund Services, Inc. On information and belief, SunAmerica Funds Services, Inc.'s principal place of business is located at 330 W 9th Street, Kansas City, Missouri, 64105.

23.   JOHN DOES 1-25 are individuals serving on the Board of

Directors of Inductotherm Corporation whose names and addresses are not currently known.

24.   JOHN DOES 26-50 are individuals serving on the Board of Directors of Inductotherm Industries Inc., whose names and addresses are not currently known.

25.   JOHN DOES 51-75 are individuals serving on the Board of Directors of Inductotherm Corporation whose names and addresses are not currently known.

26.   JOHN DOES 75-125 are members of the Committee for the Inductotherm Companies Master Profit Sharing Plan #001 whose names and addresses are not currently known.

27.    JOHN DOES 126-200 are other fiduciaries to the Plan and parties whose names and addresses are not currently known who were enriched by the receipt of the Plan's assets.

## IV.   BACKGROUND

### A.   ERISA

28.   The Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. §1001, *et seq.*, was enacted, in part, to ensure "the soundness and stability of plans with respect to adequate funds to pay promised benefits." ERISA §2(a), 29 U.S.C. §1001(a). In order to protect pension investments, ERISA requires that those who manage plan assets to act (A) with loyalty to the interests of plan participants, (B) prudently, (C) to diversify plan investments so as to minimize

the risk of large losses and (D) in accordance with plan documents. See ERISA §§404(a)(1)(A), (B), (C) and (D), 29 U.S.C. §§1104(a)(1)(A), (B), (C) and (D). Additionally, under ERISA §406, 29 U.S.C. §1106, those who manage plan assets must refrain from engaging in transactions with related parties, known as "prohibited transactions."

29. Pursuant to ERISA §402(a)(b), 29 U.S.C. §1102(b), all ERISA plans must (A) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of Title I of ERISA and (B) describe any procedure for the allocation of responsibilities for the operation and administration of the plan.

30. Pursuant to ERISA §405, 29 U.S.C. §1105, a co-fiduciary to a plan may be liable for another fiduciary's violations if such co-fiduciary participates in, or knows of, the other fiduciary's violations.

31. Pursuant to ERISA §502(a)(3), 29 U.S.C. 1132(a)(3), a civil action may be maintained against a non-fiduciary that participates in a fiduciary's violation.

32. When ERISA's strict standards are not met, plan participants have the authority to seek relief under ERISA §§409 and 502(a)(2) and (3), 29 U.S.C. §§1109 and 1132(a)(2) and (3), to redress violations and restore plan losses. Participants may

also seek injunctions to prevent those who have violated ERISA in the past from managing or providing services to an employee benefit plan in the future.

**B. The Securities Exchange Act of 1934 ("the Exchange Act")**

33.   The Exchange Act, 15 U.S.C. §78c(a)(4), empowers the SEC with broad authority over all aspects of the securities industry. This includes the power to register, regulate, and oversee brokerage firms, transfer agents, and clearing agencies as well as the nation's securities self regulatory organizations. The Act also identifies and prohibits certain types of conduct in the markets.

34.   The Exchange Act, §3(a)(4)(A), 15 U.S.C. §78c(a)(4), defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."

35.   According to the Exchange Act §15(a)(1), 15 U.S.C. §78o(a)(1), investment advisers and financial consultants who fall within the Exchange Act's definition of "broker" must register with the SEC.

36.   Registered brokers, among other things, are subject to regulations meant to protect their clients, including being required to conduct proper books and records maintenance and risk assessment requirements.  Registered brokers are also subject to periodic review by the SEC to ensure that they are in compliance with the regulatory requirements of the Exchange Act.  Therefore,

anyone operating as an unregistered broker has never been reviewed by the SEC.

37.  The Exchange Act, §10(b), 15 U.S.C. §78j(b), and its implementing regulation Rule 10b-5, 17 C.F.R. 240.10b-5, prohibit any person from employing any device, scheme or artifice to defraud, making an untrue statement of material fact, or engaging in any practice which operates as a fraud upon any person in connection with the purchase or sale of any security.

38.  The Exchange Act permits a private plaintiff to bring an action against the person perpetrating the fraud to recover for his or her losses. Exchange Act, §10(b), 15 U.S.C. §78j(b).

**C.  The Securities Act of 1933 ("the 1933 Act")**

39.  Pursuant to the 1933 Act, §12(a)(2), 15 U.S.C. § 77*l*(a)(2), a person may also be held liable for making a false and/or misleading statement of a material nature in a prospectus used to sell securities.

40.  Specifically, the 1933 Act, §12(a)(2), 15 U.S.C. §77*l*(a)(2), provides that any person who offers or sells a security by the use of any means or communication in interstate commerce or by use of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact, or fails to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading, shall be liable to the person

purchasing such security from him.

41. Pursuant to the above provision, as well as the 1933 Act, §11(a), 15 U.S.C. §77k(a), any person acquiring such a security shall be able to sue those who prepared, signed, certified or underwrote such a statement, and those persons who are directors or partners of the issuer.

**D. RICO**

42. The Racketeering Influenced and Corrupt Organization Act ("RICO"), codified in 18 U.S.C. §§1961, *et seq.*, provides both civil and criminal remedies to combat the conduct of an enterprise that causes injury to the business or property of another through a pattern of racketeering.

43. RICO, 18 U.S.C. §1962(c), declares that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

44. A RICO "'person' includes any individual or entity capable of holding a legal or beneficial interest in property . . .." 18 U.S.C. §1961(3).

45. A RICO "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and

any union or group of individuals associated in fact although not a legal entity . . .." 18 U.S.C. §1961(4).

46.  To establish a civil RICO violation under §1962(c), Plaintiffs must show that the RICO "enterprise" engaged in a "pattern of racketeering activity consisting of at least two predicate acts of racketeering activity occurring within a ten-year period." 18 U.S.C. §1961(5).

47.  18 U.S.C. §1961(1) defines "racketeering activity" and lists what are commonly referred to as "predicate acts" that must be alleged to sustain a RICO complaint.  The "predicate acts" include, among others "(B) any act which is indictable under any of the following provisions of title 18, United States Code: . . section 664 (relating to embezzlement from pension and welfare funds) . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . . sections 2314 and 2315 (relating to interstate transportation of stolen property)."

48.  RICO, 18 U.S.C. §1964(c), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee . . .."

**E.  The New Jersey Uniform Securities Laws**

49.  The State of New Jersey defines an investment adviser

to include: (i) any person who, for direct or indirect compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, selling or holding securities, or who, for compensation and as a part of a regular business, issues or promulgates analyzes or reports concerning securities; and (ii) any financial planner and other person who provides investment advisory services to others for compensation and as part of a business or who holds himself out as providing investment advisory services to others for compensation. See N.J.S.A. 49:3-49(g).

50. Investment advisers without an office located within the State of New Jersey, but who do business with more than five New Jersey clients in a given year, must be registered with the State of New Jersey. See N.J.S.A. 49:3-56(g)(2).

51. In the context of New Jersey's Uniform Securities Laws, fraud is not limited to its common-law definition but rather is defined more expansively and specifically to include: "any misrepresentation by word, conduct or in any manner of any material fact, either present or past, and any omission to disclose such fact," as well as "generally any course of conduct or business which is calculated or put forward with intent to deceive the public or the purchaser or any security or investment advisory services as to the nature of any transaction or the

value of any security" or "any artifice, agreement, device or scheme to obtain money, profit or property by any of the means herein set forth or prohibited by this act." See <u>N.J.S.A.</u> 49:3-49(e)(1),(4) and (5).

52. Such a fraud is actionable where any promise, representation, misrepresentation or omission made by the Defendant was made with knowledge and with intent to deceive or with reckless disregard for the truth and results in a detriment to the purchaser or client of the investment adviser. See <u>N.J.S.A.</u> 49:3-49(e).

**F.    Common Law Torts**

53. The common law of New Jersey recognizes causes of action in fraudulent concealment and negligent misrepresentation as well as a tort for civil conspiracy.

**V.    STATEMENT OF FACTS**

**A.   The Plan in General**

54. The Plan is a defined contribution pension plan designed to provide retirement benefits to Inductotherm employees.  Under the terms of the Plan, participants can contribute up to 10% of their salary and Inductotherm may make discretionary employer contributions.

55. Plan participants generally receive their benefit upon retirement; however, they may receive their benefit prior to retirement by any of the following means (A) by rolling over

their benefit to an eligible retirement plan (as defined in the Plan), (B) if the participant is age 55 or over, by withdrawing up to 15% of their benefit annually, (C) by making an emergency withdrawal (as defined in the Plan) or (D) for purchasing the participant's first principal residence.

56. Inductotherm is the "plan sponsor" of the Plan pursuant to ERISA §3(16)(B), 29 U.S.C. §1002(16)(B). Further, as an entity (A) responsible for selecting, monitoring and removing fiduciaries of the Plan, (B) that is a "named fiduciary" of the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (C) that is the "administrator" of the Plan within the meaning of ERISA §3(16)(A)(ii), 29 U.S.C. §1002(16)(A)(ii), (D) with the discretion to make any amendments to the Plan or its trust agreement, (E) that is responsible for ensuring that all employer contributions are provided to the Trustee and (F) with the discretion to terminate the Plan, Inductotherm is a fiduciary of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

57. Since the Board of Directors Defendants are (A) responsible for selecting, monitoring and removing fiduciaries of the Plan, (B) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a)(1), (C) responsible for providing all employer contributions to the Trustee, the Board of Directors Defendants are fiduciaries of the Plan pursuant to

ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

58.   Since the Committee Defendants are (A) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (B) responsible for directing all employee and employer contributions to any of the accounts available under the Plan's trust agreement, (C) responsible for establishing, designating and implementing the Plan's funding and investment policies with the Plan's trustees and investment managers, (D) the "administrators" of the Plan within the meaning of ERISA §3(16)(A)(i), 29 U.S.C. §1002(16)(A)(i), responsible for issuing directions to the Trustees regarding the payment of benefits under the Plan, the Committee Defendants are fiduciaries of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

59.   Since the Trustee Defendants are (A) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (B) responsible for receiving all employee and employer contributions and depositing such contributions into the trust that holds the Plan's assets, (C) responsible for the management of the assets held under the Plan's trust agreement, (D) responsible for implementing the Committee's investment policies and (E) responsible for executing the Committee's directions with respect to the payment of benefits under the Plan, the Trustee Defendants are fiduciaries of the Plan pursuant

529508.1

-17-

to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

60.  The Plan refers to a "Trust Agreement."  The Plan provides that the investment of Inductotherm's and Plaintiffs' contributions under the Plan will be governed by the "Trust Agreement." The Plan provides that, to the extent permitted by the "Trust Agreement," the Committee Defendants and Inductotherm shall direct Plaintiffs' and Inductotherm's contributions to any accounts available under the "Trust Agreement."  The Plan provides that any losses, income or expenses to the Plaintiffs' accounts are to be determined in accordance with the "Trust Agreement."  The Plan provides the Committee Defendants with the right to designate funding and investment policies under the Plan's "Trust Agreement." The Plan states that, as provided in the "Trust Agreement," the Trustee Defendants shall have the sole responsibility for the administration of the "Trust Agreement" and the management of the assets held under the "Trust Agreement." The Plan provides that Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants are responsible for the proper exercise of their duties, responsibilities and obligations under the "Trust Agreement."  According to a letter dated August 19, 2009, on Inductotherm letterhead and signed by Trustee Defendant/Inductotherm employee Thomas McShane, a Trust Agreement does not exist.

529508.1

-18-

61. Under ERISA §§101 and 103, 29 U.S.C. §§1021 and 1023, Inductotherm is required to file for the Plan an annual return/report (IRS Form 5500) that has attached separate schedules that reflect, among other things, the following Plan information (A) a statement of the assets and liabilities of the Plan, (B) a statement or receipts and disbursements that occurred during the Plan year, (C) a schedule of all investments held by the Plan, which shall include a notation if the investment is with a party in interest, (D) a schedule of each transaction involving a person known to be a party in interest, (E) a schedule of all loans that are in default, (F) a list of all leases that are in default, (G) if any of the Plan's assets were held in a common or collective trust of a bank during the Plan year, the annual statement of the collective trust and (H) each reportable transaction as defined under ERISA §103(b)(3)(H), 29 U.S.C. §1023(b)(3)(H).

62. Schedule C of the Form 5500/Annual Report specifically requires a plan sponsor to disclose, among other things, the companies that provide services to the Plan, the services such companies provide, and the compensation such companies receive for their services.

63. Pursuant to ERISA §103, 29 U.S.C. §1023, Inductotherm must include with the Plan's annual report and attached schedules, a separate financial statement for the Plan prepared

by a qualified certified/licensed independent public accountant.

64. Pursuant to ERISA §103, 29 U.S.C. §1023, the certified/licensed qualified independent public accountant retained by Inductotherm is required to conduct an examination of any financial statements of the Plan, and of other books and records of the Plan, as the accountant may deem necessary, to enable the accountant to form an opinion as to whether the financial statements and schedules required to be included with the Plan's annual report are presented fairly in conformity with generally accepted accounting principles. This opinion of the independent qualified certified/licensed public accountant is included in the Plan's annual report.

65. Inductotherm retained Certified Public Accountant, Thomas W. Hartman (Hartman), on behalf of the Plan, to render the opinion described in the preceding paragraph and to prepare the Plan's financial statements that were submitted in conjunction with the Plan's annual reports for the Plan years ending on December 31, 2005, December 31, 2006, and December 31, 2007.

66. On December 26, 2006, Hartman was fined $7,000 by the New Jersey Office of the Attorney General for misrepresenting, on his certified public accountant license renewal application, that for the period from January 1, 2003 through December 31, 2005, that he had completed his required one hundred and twenty hours of continuing education courses when in fact, he had completed

none of the required hours. This record of Hartman's misrepresentation is available to the public by contacting the New Jersey State Board of Accountancy.

67. Plaintiffs have copies of pages of the Form 5500's for Plan years 2005 thru 2007, but do not have the Form 5500 for the 2008 Plan year.

68. The Form 5500's for Plan years 2005 and 2006 list the Plan's fiscal "plan year" as the 12 month period commencing on January 1 and ending on December 31. Contrary to the Form 5500 for Plan years 2005 and 2006, according to the Plan document, the "plan year" is the 12 month period commencing on May 1 and ending on April 30. On the Form 5500 for the 2007 Plan year, Inductotherm failed to specify the "plan year."

69. An Investment Manager is defined under the Plan as an investment advisor, bank or insurance company meeting the requirements of ERISA §3(38), 29 U.S.C. §1002(38).

70. ERISA §3(38), 29 U.S.C. §1002(38), provides:

The term "investment manager" means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title)--

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who (i) is registered as an investment adviser under the Investment Advisers Act of 1940; (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act, is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the

registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary; (iii) is a bank, as defined in that Act; or (iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

**B. Payment to Charlotte Capital, LLC, the December 2005 Liquidation Event, Financial Service Corporation/FSC Securities Corporation, AIG and SunAmerica Facts**

**1. 2005 Payment to Charlotte Capital, LLC and December 2005 Liquidation Event**

71. On the Plan's Form 5500 for the plan year commencing on January 1, 2005 and ending on December 31, 2005, Inductotherm reported on Schedule C, among other things, the following:

| Service Provider | Fees and Commissions Paid by Plan | Official Plan Position |
| --- | --- | --- |
| Hewitt Investment Group | $66,345 | Investment Advisory |
| Hewitt Investment Group | $66,345 | Investment Advisory |
| Charlotte Capital, LLC | $49,283 | Investment Management |
| Charlotte Capital, LLC | $49,283 | Investment Management |
| State Street Global Advisors | $11,528 | Investment Management |
| State Street Global Advisors | $11,528 | Investment Management |

72. Pursuant to ERISA §103, 29 U.S.C. §1023, this Schedule C should have been reviewed and confirmed by Inductotherm.

Plaintiffs believe, but cannot confirm, that the duplicate listing of each service provider and duplicate payment listing of the fees paid to each of the service providers is a typographical error that was not corrected by Inductotherm, the Board of Directors Defendants, the Committee Defendants, the Trustee Defendants or Thomas W. Hartman.

73. Based on the financial statement, included with the Form 5500 for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, the Plan's assets were invested as follows as of December 31, 2004 and December 31, 2005:

| Assets/Investments | 12/31/05 | 12/31/04 |
|---|---|---|
| Vanguard-S&P 500 Index Fund | $        0 | $10,088,601 |
| Vanguard High Yield Corp. Bond Fund | $        0 | $ 2,128,504 |
| PIMCO-Low Duration Bond Fund | $        0 | $14,400,816 |
| SSgA-Russell 1000 Index Fund | $        0 | $16,572,680 |
| Templeton-Emerging Equity Fund | $        0 | $ 2,426,370 |
| Legg Mason – Value Fund | $        0 | $11,235,646 |
| Charlotte Capital | $        0 | $ 5,491,717 |
| Common Stocks | $   264,068 | $    174,650 |
| AIG Securities | $64,503,027 | $         0 |
| Total | $64,767,095 | $62,518,984 |

74. Based on the information in a table from the Plan's financial statement for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, and the Schedule C attached to the Form 5500 for that Plan year, in 2005, Inductotherm, the

Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants authorized the payment of $49,283 to Charlotte Capital, LLC, from Plan assets for managing $5,491,717 of the Plan's assets. For the 2005 Plan year, $5,491,717 represented approximately 10% of the Plan's total assets.

75. During that same year, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants authorized combined payments totaling to $77,873 to the Hewitt Investment Group and State Street Global Advisors for managing $57,027,267 of the Plan's assets. For the 2005 Plan year, $57,027,267 represented approximately 90% of the Plan's total assets.

76. Therefore, for managing approximately 10% of the Plan's assets, Charlotte Capital, LLC was paid a fee from the Plan's assets that was no less than 63% of the combined fees that were paid to the Hewitt Investment Group and State Street Global advisors for managing approximately 90% of the Plan's assets. In the event that the duplicate service provider and fee listings in Schedule C of the Form 5500 for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, were not typographical errors, the percentages listed in the previous sentence are still the same.

77. According to the financial statement for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, as of December 31, 2005, $64,767,095 of the Plan's assets were

529508.1

-24-

invested in "AIG Securities" and the remaining $264,068 were invested in "Common Stocks."

78.  Sometime between January 1, 2005 and December 31, 2005, all of the Plan's investments in the following funds were liquidated: the Vanguard-S&P 500 Index Fund, Vanguard High Yield Corp. Bond Fund, PIMCO-Low Duration Bond Fund, SSgA-Russell 1000 Index Fund, Templeton-Emerging Equity Fund and Legg Mason - Value Fund.  The Plan's investment with Charlotte Capital, LLC, was also liquidated.  The assets from these liquidations were then invested in "AIG Securities."

79.  On December 12, 2005, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants caused an investment policy to be executed with the Wharton Business Group, which, is a branch office of FSC Securities Corporation.  FSC Securities Corporation is a wholly owned subsidiary of AIG.  The liquidations described in the preceding paragraph occurred after the execution of the investment policy described herein.

> 2.  **Retention of the Financial Service Corporation/FSC Securities Corporation in Late 2005/Early 2006**

80.  On the Form 5500 for the Plan year commencing on January 1, 2006 and ending on January 31, 2006, the only service provider listed on Schedule C is the Financial Service Corporation. The Financial Service Corporation is listed as

529508.1

-25-

holding the position of Investment Management and receiving a fee in the amount of $61,245. Despite executing an investment policy with the Wharton Business Group on December 12, 2005, there is no mention of the Wharton Business Group on Schedule C of the Form 5500 for the Plan year commencing on January 1, 2006 and ending on January 31, 2006. There is no disclosure of any fees being paid to the Wharton Business Group.

81.    All of the entities that were providing services to the Plan during the 2005 Plan year – Hewitt Investment Group, Charlotte Capital LLC and State Street Global Advisors – were terminated from providing services to the Plan.

82.    Financial Service Corporation is a fiduciary to the Plan pursuant to ERISA §§3(21) and 3(38), 29 U.S.C. §§29 1002(21) and 1002(38).

83.    Exhibit 21 to AIG's 2008 Annual Report (10-K) filed with the SEC on March 2, 2009, lists a number of AIG's wholly owned subsidiaries ("Exhibit 21 to AIG's 10-K"). According to Exhibit 21 to AIG's 10-K, Financial Service Corporation is a wholly owned subsidiary of AIG.

84.    According to Exhibit 21 to AIG's 10-K, Financial Service Corporation owns, as its only subsidiary, 100% of FSC Securities Corporation.

85.    According to Exhibit 21 to AIG's 10-K, FSC Securities Corporation is a wholly owned subsidiary of AIG.

86.    Financial Service Corporation is not registered with

529508.1

-26-

the SEC, makes no filings with the SEC, and is not registered to transact business within the State of New Jersey. FSC Securities Corporation, which is Financial Service Corporation's 100% owned subsidiary (and its only subsidiary), is registered with the SEC as a broker dealer and a registered investment advisor and is also licensed by the self regulating agency of the Financial Industry Regulatory Authority ("FINRA"). Further, FSC Securities Corporation is licensed to transact business in all fifty states. A web search of the term "Financial Service Corporation" results in a return of FSC Securities Corporation's homepage.

87. As the Financial Service Corporation is not a licensed entity with the SEC or licensed to transact business within the State of New Jersey, Financial Service Corporation, with respect to the management of the Plan's assets, transacts such business through FSC Securities Corporation and therefore FSC Securities Corporation is an entity that acts as the investment manager to the Plan and thus is a fiduciary to the Plan pursuant to ERISA §§3(21), 3(38), 29 U.S.C. §§29 1002(21), 1002(38).

88. Investment managers, such as FSC Securities Corporation, use Form ADV to register as an investment adviser with the SEC.

89. The Form ADV is publicly available.

90. FSC Securities Corporation filed an ADV with the SEC.

91. The Financial Service Corporation has not filed an ADV with the SEC.

-27-

92.  FSC Securities Corporation's Form ADV, dated July 20, 2009, contained affirmative responses to the following questions asked in the form's Disciplinary Section:

> a.  Has the SEC or the Commodity Futures Trading Commission (CFTC) ever found that you **[FSC Securities Corporation]** or any advisory affiliate made a false statements or omission?  **Yes.**

> b.  Has the SEC or the CFTC ever found that you **[FSC Securities Corporation]** or any advisory affiliate to have been involved in a violation of SEC or CFTC regulations or statutes?  **Yes.**

> c.  Has the SEC or the CFTC ever entered an order against you **[FSC Securities Corporation]** or any advisory affiliate in connection with investment related activity? **Yes.**

> d.  Has the SEC of the CFTC ever imposed a civil money penalty on you **[FSC Securities Corporation]** or any advisory affiliate, or ordered you **[FSC Securities Corporation]** or any advisory affiliate to cease and desist from any activity? **Yes.**

> e.  Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[FSC Securities Corporation]** or any advisory affiliate to have made a false statement or omission, or been dishonest, unfair, or unethical? **Yes.**

> f.  Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[FSC Securities Corporation]** or any advisory affiliate to have been involved in a violation of investment related regulations or statutes? **Yes.**

> g.  Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority in the past ten years, entered an order against you **[FSC Securities Corporation]** or an advisory affiliate in connection with an investment-related activity? **Yes.**

h. Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever denied, suspended, or revoked your **[FSC Securities Corporation]** or any advisory affiliate's registration or license, or otherwise prevented you **[FSC Securities Corporation]** or any advisory affiliate, by order, from associating with an investment-related business or restricted you **[FSC Securities Corporation]** or any advisory affiliate's activities? **Yes.**

i. Has any self regulatory organization or commodities exchange ever found you **[FSC Securities Corporation]** or any advisory affiliate to have been involved in a violation of its rules (other than a violation designated as a "minor violation" under a plan approved by the SEC)? **Yes.**

j. Has a domestic or foreign court in the past ten years, enjoined you **[FSC Securities Corporation]** or any advisory affiliate in connection with any investment-related activity? **Yes.**

k. Has any domestic or foreign court ever found that you **[FSC Securities Corporation]** or any advisory affiliate were involved in a violation of investment-related statutes or regulations? **Yes.**

l. Has any domestic or foreign court ever dismissed, pursuant to a settlement agreement, an investment related civil action brought against you **[FSC Securities Corporation]** or any advisory affiliate by a state or foreign regulatory authority? **Yes.**

93. Prior to Inductotherm's, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' retention of FSC Securities Corporation, according to Schedule C of the Form 5500 for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, the "Hewitt Investment Group" provided investment advisory services to the Plan. The Hewitt Investment Group, LLC, which is the Hewitt

entity referred to on Schedule C of the Plan's 2005 Form 5500, filed an ADV form with the SEC. In the Disciplinary Section of its ADV, with respect to the questions listed above, unlike FSC Securities Corporation, Hewitt Investment Group, LLC, responded in the negative to all of the questions that FSC Securities Corporation answered in the affirmative.

94. Prior to Inductotherm's, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' retention of FSC Securities Corporation, according to Schedule C of the Form 5500 for the Plan year commencing on January 1, 2005 and ending on December 31, 2005, "State Street Global Advisors" provided investment management services to the Plan. State Street Global Advisors Limited is the State Street Global Advisors entity referred to on Schedule C of the Plan's 2005 Form 5500 filed an ADV form with the SEC. In the Disciplinary Section of its ADV, with respect to the questions listed above, unlike FSC Securities Corporation, State Street Global Advisors Limited responded in the negative to all of the questions that FSC Securities Corporation answered in the affirmative.

### 3. 2006 Plan Year Investments

95. According to the financial statement for the Plan year commencing on January 1, 2006 and ending on December 31, 2006, as of December 31, 2006, all of the Plan's $69,269,681 assets were invested in "AIG Securities." FSC Securities Corporation, the

wholly owned subsidiary of AIG, was the Plan's sole investment manger during the 2006 Plan year.

96. Section 5 of the financial statement for the plan year commencing on January 1, 2006 and ending on December 31, 2006 listed all investment changes that occurred during the 2006 Plan year that involved more than 5% of the Plan's assets. It provided the following:

|  | 12/31/06 | 12/31/05 |
|---|---|---|
| Sun America Money Market Fund | $      0 | $7,252,555 |
| Vanguard Prime Money Market Fund | $8,262,500 | $      0 |

### 4. 2007 Plan Year Investments

97. On the Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, the Financial Service Corporation is the only entity listed on Schedule C; it is listed as holding the position of Investment Management and receiving a fee in the amount of $64,865.

98. As the Financial Service Corporation is not a licensed entity with the SEC or licensed to transact business within the State of New Jersey, Financial Service Corporation, with respect to the management of the Plan's assets, transacts such business through FSC Securities Corporation and therefore FSC Securities Corporation is an entity that acts as the investment manager to the Plan and thus is a fiduciary to the Plan pursuant to ERISA §§3(21), 3(38), 29 U.S.C. §§1002(21) and 1002(38).

99. As Financial Service Corporation is listed as the

investment manager to the Plan, Financial Service Corporation is a fiduciary to the Plan pursuant to ERISA §§3(21) and 3(38), 29 U.S.C. §§1002(21) and 1002(38).

100.  On Schedule H of the Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, various entries were redacted and new entries were handwritten into various cells within that schedule.

101.  According to the financial statement for the Plan Year commencing on January 1, 2007 and ending on December 31, 2007, all of the Plan's $76,776,257 assets were invested in "AIG Securities."

102.  Section 5 of the financial statement for the Plan year commencing on January 1, 2007 and ending on December 31, 2007 listed all investment changes that occurred in the 2007 Plan year that involved more than 5% of the Plan's assets.  It provided the following:

|  | 12/31/07 | 12/31/06 |
|---|---|---|
| Sun America Money Market Fund | $  8,412,993 | $ 0 |
| Vanguard Prime Money Market Fund | $  0 | $ 8,262,500 |
| Hussman Atrategic [sic] Growth Fund | $  4,317,675 | $ 0 |

a.  **SunAmerica and Hussman Investments**

i.  **Comparison of mutual fund fees charged on two 2007 investments versus multiple 2004 investments**

103.  Sometime in 2007, the Financial Service Corporation,

FSC Securities Corporation and the Wharton Business Group liquidated the Plan's investment in the Vanguard Prime Money Market Fund and invested $8,412,993 of Plan assets into the Sun America Money Market Fund and $4,317,675 of Plan assets into the Hussman Strategic Growth Fund. This totals to a combined investment of approximately $12.7 million. For Plan year ending December 31, 2007, the Plan had approximately $76.8 million in assets. The remaining approximately $64.1 million ($76.8 million – $12.7 million) of Plan assets for 2007, based on the Plan's financial statement, was invested in "AIG/FSC Securities."

104. Mutual fund companies charge multiple fees on investments in their funds. The total fees charged by mutual funds are generally based on a size of the investor's investment into the fund. For example, if an investor were to make a $100 investment and the fund charged fees totaling 1%, the fee paid by the investor would be $1.00. Commonly, the fees charged by mutual funds are expressed as basis points ("bps"). 100 bps is the equivalent of 1%.

105. The SunAmerica Money Market Fund has four classes of shares that funds may be invested in. Plaintiffs cannot determine at this time in which of the four classes of SunAmerica Money Market Funds the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group invested the Plan's assets. The lowest fee charged by any fund class is 80 bps while the highest fee is 178 bps.

106. The Hussman Strategic Growth Fund charges fees totaling to 115 bps. There are no separate classes within this fund.

107. Weighted average expense ratio is defined to equal the sum of total bps charged for each mutual fund times the assets invested in that respective fund, divided by the total assets invested in the funds.

108. As of December 31, 2004, which is prior to the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group assuming the role of the Plan's investment manager, the Plan's then investment managers invested approximately $56.7 million of the Plan's assets in various mutual funds. The weighted average expense of that $56 million investment totaled to 36 bps. Thus, prior to the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's involvement with the Plan, under the prior investment managers guidance, as of December 31, 2004, the Plan's weighted average expense on the $56.7 million dollar investment in various mutual funds equaled 36 bps, or approximately $204,120 ($56,700,000 x .0036).

109. Under the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's management, as of December 31, 2007, the Plan's weighted average expense on an approximately $12.7 million investment (i.e., approximately only 22% of $56.7 million dollars) in the two

presently identifiable mutual funds equaled at a minimum, 91.8 bps, or approximately $115,600. This calculation assumes that the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's investment of approximately $8.4 million in the SunAmerica Money Market Fund was allocated to the lowest charging fund class. If the $8.4 million investment was allocated to the highest charging fund class, then the weighted average expense on an approximately $12.7 million investment equaled 121.2 bps, or approximately $153,924. These fee calculations are based on how $12.7 million of the Plan's assets were invested since Plaintiffs do not know of other fees that may have been charged on the investment of the remaining balance of approximately $64.1 million in "AIG/FSC" securities. Based on the known information, under the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's management, the Plan was paying 57% ($115,600/$204,100) of the prior fee level for the management of only 22% ($12,700,000/$56,700,000) of the assets.

> ii. **Specific details of the Financial Service Corporation's FSC Securities Corporation's and the Wharton Business Group's investment of Plan assets into the SunAmerica Money Market Fund**

110. Sometime in 2007, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group liquidated the Plan's investment of $8,262,500 in the Vanguard Prime Money Market Fund and invested approximately $8,421,993 of

Plan assets into the Sun America Money Market Fund.

111. The Vanguard Prime Money Market Fund charged fees totaling to 13 bps.

112. The fees charged to the Plan on account of the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's investment of Plan assets into the SunAmerica Money Market Fund were, at a minimum 80 bps, and at a maximum of 178 bps.

113. The returns on investments in the Vanguard Prime Money Market Fund for 2006, 2007 and 2008 were 5.08%, 5.30% and 2.93%, respectively. The SunAmerica Money Market Fund has four classes. Those classes are identified as A, B, C and I. Plaintiffs have only been able to locate in the public filings for this fund prior years' returns for classes A and I. According to the fund's Quarterly Report, the returns on investments in class A of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.22%, 4.32%, 1.84%, respectively. According to the fund's Quarterly Report, the returns on investments in class I of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.31%, 4.43%, 1.98%, respectively. The SunAmerica Money Market Fund prospectus or Quarterly Report does not disclose the returns on the class B and C shares.

114. SunAmerica Money Market Funds, Inc., is an open ended investment company organized as a Maryland corporation and consists of two investment funds, one of which is the SunAmerica

Money Market Fund.

115. According to Exhibit 21 to AIG's 10-K, SunAmerica Asset Management Corp., is a wholly owned subsidiary of AIG.

116. SunAmerica Asset Management Corp. provides SunAmerica Money Market Funds, Inc., with office space, administers its corporate affairs, maintains certain of its books and pays the salaries and expenses of all of its employees, some, if not all, of whom are also employees of SunAmerica Asset Management Corp., or its affiliates.

117. SunAmerica Asset Management Corp. is responsible for the continuous supervision of SunAmerica Money Market Funds, Inc.'s two funds, which includes the SunAmerica Money Market Fund.

118. SunAmerica Money Market Funds, Inc., lists its address with the SEC as Harborside Financial Center, 3200 Plaza 5, Jersey City, New Jersey 07311. This is the same address that SunAmerica Asset Management Corp., lists with the SEC as its address.

119. SunAmerica Asset Management Corp.'s Senior Vice President John T. Genoy is designated with the Securities and Exchange Commission as the agent for service for SunAmerica Money Market Funds, Inc.

120. Peter A. Harbeck, the President and CEO of SunAmerica Asset Management Corp., signed the shareholder letter that is contained in SunAmerica Money Market Funds, Inc., June 2009 Semi-Annual report, which is filed with the SEC as Form N-CSR.

121. SunAmerica Asset Management Corp., files an ADV with the SEC.

122. SunAmerica Asset Management Corp.'s Form ADV, dated July 20, 2009, contained affirmative responses to the following questions:

> a. In the past ten years, have you **[SunAmerica Asset Management Corp.]** or any advisory affiliate been convicted of or plead guilty or nolo contendere in a domestic, foreign, or military court to any felony? **Yes.**
>
> b. In the past ten years have you **[SunAmerica Asset Management Corp.]** or any advisory affiliate been charged with a felony? **Yes.**
>
> c. Has the SEC or the CFTC ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have made a false statements or omission? **Yes.**
>
> d. Has the SEC or the CFTC ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of SEC or CFTC regulations or statutes? **Yes.**
>
> e. Has the SEC or the CFTC ever entered an order against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate in connection with investment related activity? **Yes.**
>
> f. Has the SEC of the CFTC ever imposed a civil money penalty against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate, or ordered you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to cease and desist from any activity? **Yes.**
>
> g. Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have made a false statement or omission, or been dishonest, unfair, or unethical? **Yes.**

h. Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of investment related regulations or statutes? **Yes.**

i. Has any self regulatory organization or commodities exchange ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of its rules (other than a violation designated as a "minor violation" under a plan approved by the SEC)? **Yes.**

j. Has a domestic or foreign court in the past ten years, enjoined you **[SunAmerica Asset Management Corp.]** or any advisory affiliate in connection with any investment-related activity? **Yes.**

k. Has any domestic or foreign court ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate were involved in a violation of investment-related statutes or regulations? **Yes.**

l. Has any domestic or foreign court ever dismissed, pursuant to a settlement agreement, an investment related civil action brought against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate by a state or foreign regulatory authority? **Yes.**

123. SunAmerica Asset Management Corp. receives fees from all investments in the SunAmerica Money Market Fund; therefore, SunAmerica Asset Management Corp. received, and continues to receive, fees on account of the Financial Service Corporation's FSC Securities Corporation's and the Wharton Business Group's investment of Plan assets in the SunAmerica Money Market Fund. The Financial Service Corporation and FSC Securities Corporation and SunAmerica Asset Management Corp. are wholly owned subsidiaries of AIG. The Wharton Business Group is a branch

office of FSC Securities Corporation.

124. According to Exhibit 21 to AIG's 10-K, SunAmerica Capital Services, Inc. is a wholly owned subsidiary of AIG.

125. SunAmerica Capital Services, Inc. received, and continues to receive fees, from all investments in the SunAmerica Money Market Fund; therefore, SunAmerica Capital Services, Inc. receives fees on account of the Financial Service Corporation's FSC Securities Corporation's and the Wharton Business Group's investment of Plan assets in the SunAmerica Money Market Fund. Both FSC Securities Corporation and SunAmerica Capital Services, Inc. are wholly owned subsidiaries of AIG. The Wharton Business Group is a branch office of FSC Securities Corporation.

126. According to the Sun America Money Market Funds, Inc. Certified Shareholder Report of Registered Investment Management Companies, dated June 30, 2009 (Form N-CSR), SunAmerica Fund Services, Inc.'s ultimate parent is AIG.

127. SunAmerica Fund Services, Inc. receives fees from all investments into the SunAmerica Money Market Fund; therefore, SunAmerica Fund Services, Inc. receives fees due to the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's investment of Plan assets in the SunAmerica Money Market Fund. Both FSC Securities Corporation and SunAmerica Fund Services, Inc., are wholly owned subsidiaries of AIG. The Wharton Business Group is a branch office of FSC Securities Corporation.

128.  As AIG is a holding company, it receives dividends, distributions and other payments from its subsidiaries. Therefore, AIG was enriched by the fees that were received from the Plan's assets by SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc. and any other John Doe Defendants that received fees from the Plan's assets and are wholly owned subsidiaries of AIG.

129.  Page twenty-three of the SunAmerica Money Market Fund prospectus discloses a servicing agent fee that is not disclosed on the fee table on page six of the April 30, 2009 SunAmerica Money Market Fund Prospectus.  The fee table on page six of the prospectus purports to describe "the fees and expenses you may pay if you buy and hold shares of the funds." However, page twenty three of the Prospectus notes the following:

> Servicing Agent.  SunAmerica Fund Services, Inc.
> ("SAFS" or the "Servicing Agent") assists the Funds'
> Transfer Agent in providing shareholder services.  The
> Servicing Agent, a SunAmerica affiliate, is paid a
> monthly fee by each Fund for its services at the annual
> rate of 0.22% of the average daily net assets of the
> Funds.

This additional monthly fee paid by each Fund for its services at the annual rate of 0.22% of the average daily net assets of the Funds is conspicuously absent from the Prospectus fee table on page six.  Thus, the total fee paid to the servicing agent is misleading.

### iii. Specific details of FSC Securities Corporation investment of Plan assets into the Hussman Strategic Growth Fund

130. Sometime in 2007 the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group invested $4.3 million of Plan assets into the Hussman Strategic Growth Fund.

131. The Hussman Strategic Growth Fund is characterized by Morningstar as a "long-short" fund, an investment style akin to a hedge fund. This means that the fund is capable, and does, engage in leverage, taking both long and short positions in stock and stock index securities.

132. Leveraging, by taking both long and short positions, is sometimes done for the purpose of hedging, or lowering the risk of the portfolio. However, that is not uniformly the case with respect to the Hussman Strategic Growth Fund.

133. The investment policy executed with the Wharton Business Group on December 12, 2005, provides that the specific asset allocation will be in the following asset categories: Money Markets/Ultra Short-Term Bonds, Short-Term Bonds, Limited-Term Bonds, Intermediate Bonds, Other Income, US Large Value Stocks, US Large Core Stocks, US Large Growth Stocks, Global/International Stocks, US Mid-Small Stocks, Selected Sectors and Emerging Markets.

134. The investment policy does not list "long-short" funds as one of the specific asset allocations in which the Wharton

Business Group is authorized to invest.

135.  According to the prospectus for the Hussman Strategic Growth Fund, "the Fund may use options to increase its investment exposure to the market":

> Specific strategies for 'leveraging' or increasing stock market exposure include buying call options on individual stocks or market indices and writing put options on stocks which the Fund seeks to own.

The prospectus goes on to further state,

> [t]he maximum exposure of the Fund to stocks, either directly or through purchases of stock or indirectly through options positions, will be limited to 150% of its net assets.

136.  The investment policy executed with the Wharton Business Group provides for the following in the Restricted Investments section:

> ....no options and futures (except for hedging) shall be purchased. There shall be no purchase of securities on margin and no short sales.

137.  Any investment in Hussman Strategic Growth Fund was inconsistent with the investment policy of the Wharton Business Group.

138. In 2006, the year prior to when the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group caused the Plan to invest $4,317,675 of Plan assets into the Hussman Strategic Growth Fund, it performed in the bottom 85th percentile of all "long short" funds. Morningstar benchmarks this fund's performance against both the Standard and Poors 500 ("S & P 500)" and the Merrill Lynch Constant Maturity Index. For 2006

the Hussman Strategic Grown Fund underperformed the S & P 500 by
12.28% and the Merrill Lynch Constant Maturity Index by 1.58%.
For 2007, the Hussman Strategic Growth Fund was ranked in the
bottom 64th percentile of all long short funds and underperformed
the S & P 500 by 1.33% and the Merrill Lynch Constant Maturity
Fund by 1.48%.

    **C.**    **The Wharton Business Group/FSC Securities
Corporation/Inductotherm Communications**

        **1.**    **Retention of the Wharton Business Group
and Communications to Plaintiffs**

139. On December 12, 2005, Inductotherm executed with the
Wharton Business Group the "Inductotherm, Inc. Profit Sharing
Plan Investment Policy." This investment policy provided the
Wharton Business Group with responsibility for management of the
Plan's assets.

140.  In 2006, Inductotherm, the Board of Directors
Defendants, the Committee Defendants, and the Trustee Defendants
began sending Plaintiffs letters/communications which stated that
the Wharton Business Group provided investment
advisory/management services to the Plan.  None of these
communications mentioned the Financial Service Corporation, FSC
Securities Corporation, any other AIG entity or any non-AIG owned
entity.

141.  In March 2006, Inductotherm, the Board of Directors
Defendants, the Committee Defendants, and the Trustee Defendants
sent to Plaintiffs a communication that reflected their account

balances and stated:

> These funds are invested in diversified mutual funds that are recommended by the Wharton Business Group, a company which monitors to a high degree of precision the various investment opportunities.

These letters were signed by Henry M. Rowan "[f]or the Trustees." All of the Trustee Defendants were specifically listed in this letter immediately below the line that stated "for the Trustees." These letters were printed on Inductotherm letterhead.

142. In February 2008, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants sent Plaintiffs a letter that reflected their account balances and stated:

> These funds are invested in various funds and equities that are recommended by the Wharton Business Group, a company which monitors to a high degree of precision the various investment opportunities.

These letters were signed by Henry M. Rowan "[f]or the Trustees." All of the Trustee Defendants were specifically listed on this letter immediately below the line that stated "[f]or the Trustees," with the exception of Harry G. Trefz. These letters were printed on Inductotherm letterhead.

143. In February 2009, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants sent Plaintiffs a letter that reflected their account balances and stated:

> These funds are invested in various funds and equities that are recommended by the Wharton Business Group, a company which monitors to a high degree the precision the various

527344.1

-45-

> investment opportunities. Only by keeping these funds
> invested in the good times and the bad times have we been
> able to grow your nest egg to its present level.

These letters were signed by Henry M. Rowan "[f]or the Trustees."
All of the Trustee Defendants were specifically listed on this
letter immediately below the line that stated "[f]or the
Trustees," with the exception of Harry G. Trefz. These letters
were printed on Inductotherm letterhead.

144. Inductotherm, the Board of Directors Defendants, the
Committee Defendants, and the Trustee Defendants sent/posted
between April 16, 2008 and January 21, 2009, Quarterly Reports of
the Plan's 2008 performance. All of these letters stated that
the Wharton Business Group provided investment services to the
Plan. Defendant Trustee, Thomas P. McShane, was the signatory to
all of these Quarterly Reports. Defendant Trustee John H.
Mortimer, was copied on all of these Quarterly Reports. All of
these Quarterly Reports were on Inductotherm letterhead.

145. Inductotherm, the Board of Directors Defendants, the
Committee Defendants, and the Trustee Defendants stated in a
letter dated August 19, 2009, in response to Plaintiff's Boris
Goldenberg's August 5, 2009 letter requesting information how the
Plan's assets were invested, the following:

> I have in fact provided you with the Inductotherm Profit
> Sharing Plan financial statements as you have indicated.
> You state unfortunately these documents only provide
> information regarding how a fraction of the Plan's assets
> are invested. That is not correct. It shows you an
> audited financial statement of the entire plan. For
> example, it shows that the investments totaled for

12/31/07 were $74,077,184 out of total assets (which are specifically enumerated) of $76,776,257. Members Equity, which is the total of all participants' accounts, is also shown on that statement.

Concerning your request as to how the Plan assets were invested, the Plan is invested in accordance with the adopted investment policy statement between the Trustees and their professional investment advisor, the Wharton Business Group. For your added edification we are providing you a copy of that investment policy.

Lastly, you've asked for a copy of the Trust Agreement. There is no separate document entitled Trust Agreement. The Plan that you received is the complete document.

146. The letter referred to above was signed by Defendant Trustee Thomas P. McShane (McShane). With respect to McShane's statement, that the audited financial statements for the entire Plan shows how $74,077,184 of the Plan's assets were invested, the financial statement he is referring to represents that, as of December 31, 2007, $74,077,184 of the Plan's assets were invested in "AIG/FSC Securities." This letter was on Inductotherm letterhead.

147. The December 12, 2005 investment policy, referred to in the August 19, 2009 letter, was signed on behalf of the Wharton Business Group by Billy Joe Webster and Marc Hembrough The signature of the individual who signed on behalf of Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants is not legible. According to the Wharton Business Group's website, both Messrs. Webster and Hembrough continue to be "associates" of the Wharton Business Group.

148.  Under this investment policy, the Wharton Business Group, among other things, is responsible for the following with respect to the Plan's assets (A) ensuring that 5% of the portfolio is invested in cash or ultra short term bonds, (B) ensuring that no equity manager or firm manages more than 15% of the Plan's total portfolio, (C) ensuring that no one stock sector would comprise more than 30% of the total stock held by the Plan, (D) rebalancing the portfolio and (E) ensuring that none of the Plan's assets are invested in private placements, registered or unregistered stock, options and futures.  Under this policy, the Wharton Business Group is also obligated to identify the Plan's portfolio's needs, set long term investment objectives, determine the asset mix appropriate to maximizing the Plan's objectives, monitor and replace poorly performing asset managers and provide detailed reports regarding the performance of the Plan's investments.  For all of the foregoing reasons, the Wharton Business Group is a fiduciary to the Plan pursuant to ERISA §3(21), 29 U.S.C. §29 1002(21).

149. The Wharton Business Group has two electronic web pages:

> http://www.robertgueriera.com/
>
> http://www.whartonbusinessgroup.com/

150.  The Wharton Business Group's electronic web page located at http://www.robertgueriera.com/ states, with respect to this group, among other things:

> Our competitive advantage is our ability to design and implement a financial roadmap that is consistent with our client's values. This written financial strategy will become the blueprint for living the life you have always dreamed.

151. The Wharton Business Group's electronic web page at http://www.whartonbusinessgroup.com/ states, among other things, that it is engaged in the business of providing "investment advisory services," and "business advisory/brokerage services," among other "fee based advisory services." Further, this electronic webpage advertises that the Wharton Business Group provides these services to the following types of clients: business owners, affluent families, corporate funds/retirement plans, hospital foundation and endowment funds, and educational and fraternal organizations.

152. While the Wharton Business Group conducts business with Inductotherm, a New Jersey client, it does not have an office located within the State of New Jersey.

153. Upon information and belief, the Wharton Business Group has provided investment advisory services to more than five clients in the State of New Jersey in the past twelve months.

   2.   **The Wharton Business Group's Registration Status**

154. Both of the Wharton Business Group's electronic web pages contain the exact same business address, telephone number and fax number:

> 740 Springdale Drive, Suite 208
> Exton, PA 19341

527344.1

-49-

Phone: (610) 594-7205
Fax: (610) 594-9105
http://www.robertgueriera.com/

740 Springdale Drive, Suite 208
Exton, PA 19341

Phone: (610) 594-7205
Fax: (610) 594-9105
http://www.whartonbusinessgroup.com/

155. On November 16, 2006 the State of New Jersey revoked the license of the Wharton Business Group of Pennsylvania, Inc. (with the associated name of the Wharton Business Group, Inc.), located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341, to transact business in the State of New Jersey. The license was revoked for failing to file an annual report for two consecutive years.

156. Inductotherm is located in New Jersey and the Plan provides retirement benefits to employees that work at Inductotherm's New Jersey location.

157. The Wharton Business Group was required to be registered with the State of New Jersey while it was providing investment services to Inductotherm.

158. According to FINRA's publicly available electronic webpage, the Wharton Business Group has not registered as a "broker," as defined under 1934 Act §3(a)(4)(A), 15 U.S.C. §78c(a)(4).

159. According to the SEC's publicly available electronic

-50-

webpage, the Wharton Business Group has not registered with the SEC as an "investment advisor," as defined under 1940 Act §202(a)(11), 15 U.S.C §80b-2(a)(11).

160. According to the publicly available Central Registration Depository ("CRD") Report (operated by FINRA) for the Wharton Business Group, LLC, which was issued to the Pennsylvania Securities Commission and publicly available, the Wharton Business Group, LLC, has as the managing member Billy Joe Webster, (who is currently listed as an associate by the Wharton Business Group), and a principal office located at

> 740 Springdale Drive, Suite 208
> Exton, Pennsylvania 19341

161. The CRD Report states that the Wharton Business Group had its registration status with the SEC was terminated on September 21, 2005.

162. The Wharton Business Group's electronic webpage, with the address of http://www.robertgueriera.com/, contains the following statement "[a] Registered Broker/Dealer, Member FINRA and SIPC."

### 3. "Aig" Letters on the Wharton Business Group's electronic web pages

163. Numerous pages on the Wharton Business Group's website with the address of http://www.whartonbusinessgroup.com/, contain in the corners of such pages the letters of "Aig."

164. The computer source code for the Wharton Business Group website, with the address of http://www.whartonbusinessgroup.com/, contains the letters of "Aig."

165. Numerous pages on the Wharton Business Group website, with the address of http://www.robertgueriera.com/ contain in the corners of such pages the letters of "Aig."

166. The computer source code for the Wharton Business Group website, with the address of http://www.robertgueriera.com/, contains the letters of "Aig" and the "Wharton Business Group."

### 4. FSC Securities Corporation Registration Status

167. In Item 1, part F, of its ADV, FSC Securities Corporation stated that its principal office is located at: 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia, 30339.

168. Based on information on FINRA's publicly available electronic webpage and contained in FSC Securities Corporation's ADV, FSC Securities Corporation appears to be registered with the SEC as a registered investment advisor and a broker-dealer.

169. FSC Securities Corporation is a wholly owned AIG subsidiary.

### 5. Associates of the Wharton Business Group and their reported place of employment as FSC Securities Corporation

170.  The Wharton Business Group's electronic webpage of http://www.whartonbusinessgroup.com/ states that it employs the following associates: Matthew Delaney, John Morgenthaler, Billy Joe Webster, Tony Delromano, Robert Gueriera and Marc Hembrough.

171.  Only Messrs. Delaney, Morgenthaler, Gueriera, Hembrough and Webster are registered brokers.

172.  Messrs. Hembrough, Morgenthaler, Gueriera, Delaney and Webster are all currently employed at:

> FSC Securities Corporation
> 2300 Windy Ridge Parkway
> Suite 1100, Atlanta, Georgia, 30339
> CRD#7461

173.  Messrs. Hembrough, Morgenthaler, Gueriera, Delaney and Webster are all also currently employed at:

> FSC Securities Corporation
> 740 Springdale Drive, Suite 208
> Exton, Pennsylvania 19341
> CRD# 7461

174.  The Exton, Pennsylvania address is the address that the "Wharton Business Group" lists on both of its electronic web pages as its location and is also the address the Wharton Business Group filed as its location with the New Jersey Secretary of State, Division of Corporations and with the Pennsylvania Department of State.

175. The FSC Securities Corporation located at 740

527344.1

-53-

Springdale Drive, Suite 208, Exton, Pennsylvania, 19341, is a
branch office location of the FSC Securities Corporation that is
headquartered in Atlanta.

176.  Mark Hembrough's 10 year employment history is as
follows:

| HEMBROUGH, Mark Alexander | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 7/2003 to Present | FSC Securities Corp. | Exton, PA |
| 3/1999 to Present | Princor Financial Ser. Corp. | Malvern, PA |
| 6/1992 to Present | Principal Life Insurance Co. | Des Moines, IA |
| 5/1992 to Present | Wharton Business Group | Malvern, PA |
| 5/1992 to 07/2003 | FSC Securities Corporation | Malvern, PA |

177.  John Morgenthaler's 10 year employment history is as
follows:

| MORGENTHALER, John Joseph | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 2/2005 to Present | FSC Securities Corp., Inc. | Drowingtown, PA |
| 2/2005 to Present | Principal Life Insurance Co. | Exton, PA |
| 2/2005 to Present | Princor Financial Services Corp. | Exton, PA |
| 5/1992 to Present | Wharton Business Group | Exton, PA |

| MORGENTHALER, John Joseph | | |
|---|---|---|
| 5/1992 to 2/2005 | FSC Securities Corp., Inc. | Drownington, PA |
| 3/1999 to 3/2004 | Princor Financial Services Corp. | Malvern, PA |
| 6/1992 to 3/2004 | Principal Life Insurance Co. | Des Moines, IA |
| 7/2003 to 8/2003 | FSC Securities Corp. | Exton, PA |
| 5/1992 to 7/2003 | FSC Securities Corp. | Malvern, PA |

178. Robert Gueriera's 10 year employment history is as follows:

| GUERIERA, JR, Robert Charles | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 7/1998 to Present | FSC Securities Corp. | Exton, PA |
| 3/1998 to Present | Wharton Business Group | Exton, PA |
| 8/1992 to Present | Principal Mutual Ins. Co. | Des Moines, IA |
| 5/1989 to Present | Union Central Life Insurance co. | Bala Cynwyd, PA |
| 3/1999 to 12/2001 | Princor Financial Services Corp. | Malvern, PA |
| 8/1992 to 1/2001 | Princor Financial Services | Des Moines, IA |
| 8/1992 to 1/2001 | Princor Financial Services Corp. | Media, PA |

179. Matthew Delaney's (Delaney) 10 year employment history is as follows:

| DELANEY,<br>Matthew Sullivan | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 7/2003 to Present | FSC Securities Corp. | Exton, PA |
| 10/1997 to 7/2003 | FSC Securities Corp. | Malvern, PA |

180. Billy Joe Webster's 10 year employment history is as follows:

| WEBSTER,<br>Billy Joe | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 2/2005 to Present | Wharton Business Group, LLC | Exton, PA |
| 7/2003 to Present | FSC Securities Corporation | Exton, PA |
| 10/1988 to Present | Connecticut General Life Ins. Co. | Cherry Hill, NJ |
| 5/1992 to 7/2003 | FSC Securities Corp. | Malvern, PA |

181. The electronic webpage of Registered REP lists the top "50 independent advisors in America...." Delaney is number three on that list and lists his firm/broker-dealer as the "Wharton Business Group/FSC Securities" located in "Exton, Pennsylvania." On that webpage, Delaney's business description states: "[i]ndependent consultant to business owners, endowments, foundations and hospitals."

182. According to the CRD Reports, of both the New Jersey

Bureau of Securities and the publicly available e Pennsylvania Securities Commission, Messrs. Delaney's, Morgenthaler's, Webster's, Gueriera's and Hebrough's "current employer" is FSC Securities Corporation with its main address at:

> 2300 Windy Ridge Parkway, Suite 100
> Atlanta, Georgia 30339;

Further, their "office of employment " is listed as

> 740 Springdale Drive, Suite 208
> Exton, Pennsylvania, 19341.

### 6. FSC Securities Corporation prior practices of transacting business through unregistered branch offices

183. The FSC Securities Corporation located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341, is a branch office location of the FSC Securities Corporation that is headquartered in Atlanta.

184. The Wharton Business Group is not registered with the SEC or with any other State. FSC Securities Corporation's CRD Report, which is publicly available from the New Jersey Bureau of Securities, reflects multiple prior violations on the part of FSC Securities Corporation:

> In 1998 the Florida Division of Securities and Investor Protection initiated a regulatory action against FSC Securities Corporation for conducting securities business in the State of Florida through one or more branch offices without the benefit of lawful registration. The resolution to this action resulted

in a stipulation and consent order. Pursuant to that stipulation and consent (where FSC Securities Corporation neither admitted or denied the allegations against it), a cease and desist order was issued and FSC Securities Corporation agreed to pay a monetary fine.

In 1999 the State of Connecticut Department of Banking initiated an action against FSC Securities Corporation for transacting business in the State of Connecticut from an unregistered office in violation of the Connecticut Uniform Securities Act. The resolution to this action resulted in a consent order. Pursuant to that consent order, FSC Securities Corporation paid a monetary fine, agreed to disgorge any profits that were earned during the unregistered period and agreed to implement revised supervisory and compliance procedures.

In 1998 the SEC initiated an action against FSC Securities Corporation for failing to reasonably supervise one of its branch offices. According to the SEC, as a result of its inadequate supervision, the principal of that branch allegedly defrauded his customers by engaging in mutual fund switching, by recommending unsuitable securities and by failing to inform his customers of material facts when selling them mutual funds. The resolution to this action resulted in a decision and offer of settlement. Pursuant to this resolution, FSC Securities Corporation agreed to pay a monetary fine, agreed to be censured and agreed to retain an independent consultant.

### 7. Concealment by Inductotherm, the Board of Director Defendants, the Trustee Defendants and the Committee Defendants from Plaintiffs of the involvement of wholly owned AIG subsidiaries

185. Form 5500's are signed under the penalty of perjury.

186. While Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants represented to Plaintiffs that the Wharton Business Group was providing

investment services to the Plan in 2006, 2008 and 2009, and executed an investment policy with the Wharton Business Group in December 2005, that Inductotherm claimed on August 19, 2009, was still in effect, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants thus far have never listed the Wharton Business Group on Schedule C (the schedule where service providers to the Plan are to be listed) to the Plan's Form 5500's nor has it ever disclosed any compensation that is paid to the Wharton Business Group.

187. The Plan's Form 5500, for Plan year commencing on January 1, 2006 and ending on December 31, 2006, which lists on Schedule C Financial Service Corporation as the Plan's only service provider (in the capacity of investment manager) for that Plan year, was signed, under the penalty of perjury, by Inductotherm employees/Trustee Defendants Thomas P. McShane and David L. Braddock.

188. The Plan's Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, which lists on Schedule C Financial Service Corporation as the Plan's only service provider (in the capacity of investment manager) for that Plan year, was signed, under the penalty of perjury, by Inductotherm employee/Trustee Defendant David L. Braddock.

189. Both Messrs. McShane and Braddock, in their capacity as Plan Trustees were listed as signatories to communications to

participants which stated that the Wharton Business Group acted as the Plan's outside investment advisor.

190. None of the communications from Messrs. McShane or Braddock which referred to the Wharton Business Group made any reference to the Financial Service Corporation, FSC Securities Corporation, any other AIG entity or any other non-AIG entity.

### D. Inductotherm's 2008 Quarterly Reports

#### 1. Classification of investment strategy as "conservative"

191. Between April 16, 2008 and January 21, 2009, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants sent out four Quarterly Reports regarding the Plan's 2008 performance. All of the Quarterly Reports were signed by Trustee Defendant, Thomas P. McShane. Trustee Defendant, John Mortimer, was copied on all of these quarterly reports. Further, all of the Quarterly Reports were printed on Inductotherm letterhead.

192. The April 16, 2008 Quarterly Report stated:

The first quarter of this year has resulted in losses for all of the major stock indexes and the Profit Sharing Trust. For the three months ended 3/31/08 the Dow Jones was down 7.55%, the S&P 500 was down 9.92%, the Russell 2000 was down 10.19% and the NASDAQ was down 14.07%.

The results of the Profit Sharing Trust are as follows:

1st Quarter (January-March 2008)   Loss       (2.95%)

527344.1

-60-

We continue to be conservatively invested using the
Wharton Business Group as our outside advisors.
Hopefully the stock markets will improve and we will
have better results to report at the end of the next
quarter.

193.  The July 16, 2008 Quarterly Report stated:

The second quarter of this year has resulted in losses
for all of the major stock indexes.  Fortunately our
overall investments did not experience losses and I am
pleased to report a modest gain for the second quarter.
For the six months ended 6/30/08 the Dow Jones was down
14.4%, the S&P 500 was down 12.8%, the Russell 2000 was
down 9.9% and the NASDAQ was down 13.6%.

The results of the Profit Sharing Trust are as follows:

| | | |
|---|---|---|
| 1st Quarter (January-March, 2008) | Loss | (2.95%) |
| 2nd Quarter (April-June, 2008) | Gain | 1.68% |
| 6 Months Ending June 30, 2008 | Loss | (1.27%) |

We continue to be conservatively invested using the
Wharton Business Group as our outside advisors.
Hopefully the stock markets will improve and we will
have better results to report at the end of the next
quarter.

194.  The October 9, 2009 Quarterly Report stated:

The third quarter of this year has resulted in losses
for all of the major stock indexes.  For the nine
months ended 9/30/08 the Dow Jones was down 18.2%, the
S&P 500 was down 20.7%, the Russell 2000 was down 11.3%
and the NASDAQ was down 21.5%.

The results of the Profit Sharing Trust are as follows:

| | | |
|---|---|---|
| 1st Quarter (January-March, 2008) | Loss | (2.95%) |
| 2nd Quarter (April-June, 2008) | Gain | 1.68% |
| 3rd Quarter (July-September, 2008) | Loss | (13.85%) |

9 Months ending September 30, 2008      Loss      (15.12%)

We will continue to be conservatively invested using the Wharton Business Group as our outside advisors. Hopefully the stock markets will improve and we will have better results to report at the end of the next quarter.

195.  The January 21, 2009 Quarterly Report stated:

The fourth quarter of this year has resulted in losses for all of the major stock indexes.  For the year ended 12/31/08 the Dow Jones was down 33.8%, the S&P 500 was down 38.5%, the Russell 2000 was down 34.8% and the NASDAQ was down 40.5%

The results of the Profit Sharing Trust are as follows:

| | | |
|---|---|---|
| 1st Quarter (January-March, 2008) | Loss | (2.95%) |
| 2nd Quarter (April-June, 2008) | Gain | 1.68% |
| 3rd Quarter (July-September, 2008) | Loss | (13.85%) |
| 4th Quarter (October-December, 2008) | Loss | (12.45%) |
| 12 Months Ending December 31, 2008 | Loss | (27.57%) |

We will continue to be conservatively invested using the Wharton Business Group as our outside advisors. Hopefully the stock markets will show improvement in 2009 from their slow start and will have better results to report at the end of the next quarter.

**2.  Misrepresentation that Plan's assets were "conservatively invested" in the Quarterly Reports/ Investment Strategy**

196.  All of the 2008 Quarterly Reports stated that the Plan's assets were "conservatively invested."

197.  The investment policy entered into with the Wharton Business Group on December 12, 2005 identifies as a benchmark and

risk target consistent with a portfolio that is 20% invested in fixed income and 80% invested in domestic and foreign entities.

198.  It is widely recognized among experts in the investment management field that asset allocation is the most important factor in determining how to construct a portfolio. The level of risk is a far greater determinant of future returns than the actual investments selected.

199.  According to Morningstar, an independent mutual fund research company, for 2008, of the 186 balanced funds that were classified as "conservative," 99.5% of those funds held fixed income holdings over 20% and 95% held fixed income holdings over 46%.  Further, the average fixed income weighting of the mutual funds in the "conservative" category was 61%. The average fixed income allocation in the category of balanced mutual funds characterized as "moderate" was 38% and of this group, only 5% held more than 80% of their assets in equity.

200.  In addition to tracking "balanced funds," Morningstar also tracks "Target Date Funds," which are primarily used for retirement investments. These funds are divided into three categories based on proximity to retirement. The most conservative grouping is called "Target Date 2000-2014" and tracks funds that are designed for investors retiring (or who have retired) between 2000 and 2014.  These funds have an average fixed income allocation of 53%.  The next category is called

"Target Date 2015-2029" and tracks funds that are designed for investors retiring between 2015 and 2029. These funds have an average fixed income allocation of 30%. The average allocation to fixed income, among all Target Date fund categories, 37% is 30%.

### 3. Comparison of Plan's 2008 Performance

201. The Quarterly Reports compared the Plan's 2008 investment performance to equity indices. The final Quarterly Report for year end 2008, dated January 21, 2009, stated "[f]or the year ended 12/31/08 the Dow Jones was down 33.8%, the S&P 500 was down 38.5%, the Russell 2000 was down 34.8% and the NASDAQ was down 40.5%"

202. The final Quarterly Report for year end 2008, dated January 21, 2009, reported that for 2008 the Plan suffered a 27.57% decline in asset value.

203. While the reported 2008 performance compares favorably to the indices shown, this is misleading, as described above, the Plan was intended to be, and should have been, conservatively invested and was therefore never designed to assume as much risk as the indices listed in the Quarterly Reports.

204. The 2008 return of approximately, a loss of 27.6%, was poorer than 97% of conservative allocation mutual funds.

205. The investment selection was not conservative and failed to consider the age of the Plan participants.

### E. Boris Goldenberg's Form Release

206.  In 2009, Boris Goldenberg retired from Inductotherm after 21 years of service.

207.  Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants required Mr. Goldenberg to sign the following release, on January 30, 2009, to receive his vested benefit under the Plan:

> I undersigned, Boris Goldenberg joined Inductotherm on 10-3-88 and have served the company loyally and faithfully for a period of 21 year(s) ended 1-30-09....
>
> I hereby acknowledge that I am familiar with the Trust Agreement and am eligible for payment of the 100% vested interest in this account.  In payment of this percentage of $202,722.49, I hereby release and surrender all rights of interest or claim of any sort insofar as the Inductotherm Profit Sharing Trust or its designated Trustees are concerned.

208.  The release stated that it was for the purposes of releasing a vested benefit.

209.  Under the terms of the Plan, Boris Goldenberg's benefit was 100% vested.

210.  No consideration was provided in exchange for this release.

211.  Boris Goldenberg was not advised to consult an attorney before signing this release.

212.  Boris Goldenberg did not consult an attorney before signing this release.

213. After signing this release, Boris Goldenberg was not provided with an additional opportunity to revoke this release.

214. With regard to the release, Boris Goldenberg was not given a time period to consider and deliberate about the release before signing it.

215. Boris Goldenberg was not given an opportunity to negotiate the terms of the release.

216. Boris Goldenberg spent his entire twenty-one year career at Inductotherm at its New Jersey location.

217. Boris Goldenberg was not adequately informed of his rights upon signing this release.

218. The release refers to a "Trust Agreement," which Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants, in a letter from Thomas P. McShane, acknowledged does not exist.

219. The release refers to the Inductotherm Profit Sharing Trust, which is not named in the Plan document or on any of the Form 5500's for Plan years.

220. The release purports to release a 100% vested benefit.

221. The release does not contain a list of the claims released.

222. The release does not specifically refer to ERISA, RICO, or any other federal act or any state law.

223.   The bottom of the release stated that approval for the Trustees is requested for disbursement of Boris Goldenberg's account.

224.   The release had signature lines for all of the Trustee Defendants, except for Harry G. Trefz.

225.   Defendant Trustee, Henry M. Rowan, never signed this release.

226.   Defendant Trustee, Henry M. Rowan, was the signatory "for the Trustees" on the letters that were sent to the Plaintiffs in 2006, 2008 and 2009, which informed them of the value of their benefit and stated that: "[t]hese funds are invested in diversified mutual funds that are recommended by the Wharton Business Group which monitors to a high degree of precision the various investment opportunities."  All of the Trustee Defendants were specifically listed on these letters immediately below the line that stated "[f]or the Trustees," with the exception of Harry G. Trefz. Harry G. Trefz was only listed on the 2006 letter.

227.  Trustee Defendants, Thomas P. McShane and David L. Braddock, are the same Inductotherm employees/Trustee Defendants who were signatories to the Plan's Form 5500 for the Plan year commencing on January 1, 2006 and ending on December, 31, 2006, that listed on Schedule C the Financial Service Corporation as the sole service provider to the Plan and made no mention of the

Wharton Business Group.

228. Trustee Defendant, David L. Braddock, is the same Inductotherm employee/Trustee Defendant who was the signatory to the Plan's Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, that listed on Schedule C the Financial Service Corporation as the sole service provider to the Plan and made no mention of the Wharton Business Group.

229. Trustee Defendant, Thomas P. McShane, is the same Inductotherm employee/Trustee Defendant who sent Boris Goldenberg a letter on August 19, 2009, stating that there was no "Trust Agreement" and that the Plan's assets are invested in accordance with the investment advice of the Wharton Business Group.

230. Trustee Defendant, Thomas P. McShane, is the same Inductotherm/Trustee Defendant who was the signatory on the Quarterly Reports that were sent to Plaintiffs on April 16, 2008, July 16, 2008, October 9, 2008, and January 21, 2009, that stated that the plan's assets were conservatively invested using the Wharton Business Group as the outside investment advisor.

**F.   The Concerted Action**

231. The combined actions of Inductotherm, the Board of Directors Defendants, the Trustee Defendants, the Committee Defendants, Certified Public Accountant Thomas Hartman, the Wharton Business Group, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp.,

SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., and any other AIG company that received fees or money from the Plan's assets, amounted to fraud and conspiracy to commit fraud because such actions were meant to disguise an unlawful transfer of assets and resulted in a "kickback scheme."

232.   This fraud deprived Boris Goldenberg of the full amount of the benefit that he should have received under the Plan.

233.   Inductotherm, the Board of Directors Defendants, the Trustee Defendants, the Committee Defendants, Certified Public Accountant Thomas Hartman, the Wharton Business Group, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., and any other AIG company that received fees or money from the Plan's assets, worked in a concerted effort to disguise their fraudulent actions so that Boris Goldenberg would have had no way of knowing of the Defendants actions when he signed his release.

**G.   Damages to Plaintiffs/Plan**

234.   The combined actions of Inductotherm, the Board of Directors Defendants, the Trustee Defendants, the Committee Defendants, the Wharton Business Group, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica

Fund Services, Inc., (aig), and any other AIG company that received fees or money from the Plan's assets, caused the Plan and the participants to suffer substantial losses commencing sometime in 2005 and through to the present date.

## VI. CLASS ALLEGATIONS

235. Plaintiff, Boris Goldenberg, brings this action as representative of a class consisting of those individuals who were and are participants and beneficiaries of The Inductotherm Companies Master Profits Sharing Plan #001, at any time on or after January 1, 2006 (the "Class"), and on behalf of The Inductotherm Companies Master Profits Sharing Plan #001.

236. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice or judicial officer presiding over this matter and the members of their judicial staff.

237. The proposed Class is so numerous that individual joinder of all of its members is impracticable. The total number of Class members is at least 200 individuals.

238. There are questions of law and fact common to the Class, among them the following:

a.  Which of the Defendants were fiduciaries responsible for selecting, evaluating, and monitoring the investments of the plan;

b.  Whether Inductotherm, the Board of Directors Defendants, the Committee Defendants and the Trustee Defendants failed to adopt a Trust Agreement, as required by the Plan;

c.  Whether Inductotherm, the Board of Directors Defendants, the Committee Defendants and the Trustee Defendants paid excessive fees to Charlotte Capital, LLC;

d.  Whether the Financial Services Corporation, FSC Securities Corporation and the Wharton Business Group engaged in a "prohibited transaction" by causing the Plan to invest assets in the Sun America Money Market Fund;

e.  Whether the Financial Services Corporation, FSC Securities Corporation and the Wharton Business Group breached their fiduciary duty by causing the Plan to invest assets in the Sun America Money Market Fund;

f.  Whether the Financial Services Corporation, FSC Securities Corporation and the Wharton Business Group breached their fiduciary duty by causing the

Plan to invest assets in the Hussman Strategic
Growth Fund;

g.   Whether the Financial Services Corporation, FSC
Securities Corporation and the Wharton Business
Group breached their fiduciary duty by employing
an imprudent investment strategy;

h.   Whether Inductotherm, the Board of Directors
Defendants, the Committee Defendants and the
Trustee Defendants misrepresented the
"conservativeness" of the Plan investments;

i.   Whether the Financial Services Corporation, FSC
Securities Corporation and the Wharton Business
Group knowingly participated in breaches of
fiduciary duties and prohibited transactions;

j.   Whether Inductotherm, the Board of Directors
Defendants, the Committee Defendants and the
Trustee Defendants employed the requisite level of
care, skill prudence and diligence and/or violated
their fiduciary duty when selecting the Plan's
investment manager;

k.   Whether Inductotherm, the Board of Directors
Defendants, the Committee Defendants and the
Trustee Defendants breached their co-fiduciary
duties by knowingly participating in the

concealment of prohibited transactions by the Financial Services Corporation, FSC Securities Corporation and the Wharton Business Group.;

l.   Whether the fiduciaries properly allocated responsibilities for the operation and administration of the Plan;

m.   Whether Defendants' conduct constitutes a violation of the Racketeer Influence and Corrupt Organizations Act;

n.   Whether any of the Defendants violated the Exchange Act, the 1933 Act, and/or the New Jersey Securities Law;

o.   Whether Defendants caused the Plan to pay excessive and unreasonable fees to AIG subsidiaries and affiliates;

p.   Whether AIG, its subsidiaries or affiliates are liable to disgorge fees collected from the Plan and profits earned thereon;

q.   Whether the Plan and its participants suffered losses as a result of the Defendants fiduciary breaches.

239. The claims and defenses of the representative party are typical of the claims and defenses of the Class.   The

529471.1

-73-

representative party has no interests that are antagonistic to the claims of the Class, and understands that this matter cannot be settled without the Court's approval.

240. The representative party will fairly and adequately protect the interests of the Class, and is committed to a vigorous prosecution of this case.

241. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants.

242. The parties opposing the Class have acted on grounds generally applicable to the Class thereby making appropriate final injunctive relief or corresponding declaratory relief.

243. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

244. The Defendants were obligated to treat all Class members similarly as Plan participants under written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications.

245. Since the damages suffered by each Class member may be relatively small, the expense and burden of individual litigation makes it impractical for class members to separately seek redress.

246. The Class suffered, and will continue to suffer, harm as a result of Defendants' conduct.

247. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical.

248. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.

249. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.

250. The Class action device allows a single Court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.

251. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members. For many, if not most, class members, a class action is the only feasible mechanism that

allows them an opportunity for legal redress and justice.

252.  This Class may be certified under Rule 23(b).

A.   23(b)(1).  As an ERISA breach of fiduciary duty
     action and one alleging prohibited transactions
     and violations of RICO and various securities
     laws, this action is a classic 23(b)(1) class
     action.  Prosecution of separate actions by
     individual members would create the risk of (a)
     inconsistent or varying adjudications with respect
     to individual members of the Class that would
     establish incompatible standards of conduct for
     the Defendants opposing the Class, or (b)
     adjudications with respect to individual members
     of the Class that would, as a practical matter, be
     dispositive of the interests of the other members
     not parties to the adjudication or substantially
     impair or impede their ability to protect their
     interests.

B.   23(b)(2).  This action is suitable as a class
     action under 23(b)(2) because the Defendants have
     acted or refused to act on grounds generally
     applicable to the Class as a whole, thereby making
     appropriate final injunctive, declaratory or other
     appropriate equitable relief with respect to the

Class.

C.    23(b)(3).  This action is suitable to proceed as a
      class action under 23(b)(3) because questions of
      law and fact common to the members of the Class
      predominate over individual questions, and a class
      action is superior to other available methods for
      the fair and efficient adjudication of this
      controversy.  Given the nature of the allegations,
      no class member has an interest in individually
      controlling the prosecution of this matter, and
      Plaintiff is aware of no difficulties likely to be
      encountered in the management of this matter as a
      class action.

## VII. ERISA CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duty by Failing to Abide by Plan Documents**

**(Violation of ERISA §404(a), 29 U.S.C. §1104(a))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3.  Pursuant to ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan.

4.  The Plan refers to a "Trust Agreement." The Plan provides that the investment of Inductotherm's and Plaintiff's contributions under the Plan will be governed by the "Trust Agreement." The Plan provides that, to the extent permitted by the "Trust Agreement," the Committee Defendants and Inductotherm shall direct Plaintiffs' and Inductotherm's contributions to any

accounts available under the "Trust Agreement." The Plan provides that any losses, income or expenses to the Plaintiffs' accounts are to be determined in accordance with the "Trust Agreement." The Plan affords the Committee Defendants with the right to designate funding and investment policies under the Plan's "Trust Agreement." The Plan states that, as provided in the "Trust Agreement," the Trustee Defendants shall have the sole responsibility for the administration of the "Trust Agreement" and the management of the assets held under the "Trust Agreement."

5. The Plan provides that Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants are responsible for the proper exercise of their duties, responsibilities and obligations under the "Trust Agreement."

6. The release signed by Boris Goldenberg, dated, March 18, 2009, refers to a "Trust Agreement."

7. In response to Boris Goldenberg's August 2009 letter requesting a copy of the "Trust Agreement," Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants, in a letter from Thomas P. McShane, stated that a Trust Agreement does not exist.

8. By failing to adopt a trust agreement Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the

Trustee Defendants operated the Plan without any investment guidelines with respect to contributions.

9.  By failing to adopt a trust agreement the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants failed to provide the Committee Defendants and Inductotherm with a methodology for directing contributions under the Plan to accounts available under a trust agreement.

10.  By failing to adopt a trust agreement, the Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants failed to adopt any guidelines to be followed by the Trustee Defendants in managing/investing the Plan's assets.

11.  By failing to adopt a trust agreement, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants were unable to know/allocate their duties, responsibilities and obligations under the "Trust Agreement."

12.  By failing to adopt a Trust Agreement, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breached their fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to act solely in the interest of participants to the Plan and by failing to discharge their duties in accordance with the documents and instruments governing the Plan.

13.  As a direct and proximate result of Inductotherm's,

the Board of Directors Defendants', the Committee Defendants',
and the Trustee Defendants' breaches of fiduciary duties, in
failing to discharge their duties in accordance with Plan
documents, inappropriate investment strategies and inappropriate
investments were undertaken with respect to the Plan's assets and
excessive fees were charged that resulted in millions of dollars
in losses to the Plaintiffs and the Plan.

14.   Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C.
§§1109 and 1132(a)(2), Inductotherm, the Board of Directors
Defendants, the Committee Defendants, and the Trustee Defendants
are liable to Plaintiffs for all losses suffered by the Plan as a
result of their failure to operate the Plan in accordance with
the Plan's documents.

### COUNT II

**Breach of Fiduciary Duty by Causing the Plan
to Pay Excessive Fees to Charlotte Capital,
LLC, which Caused Losses to the Plan**

**(Violation of ERISA §404(a), 29 U.S.C. §1104(a))**

1.   Plaintiffs incorporate the allegations contained in the
previous paragraphs of this Complaint as if fully set forth
herein.

2.   At all relevant times, Inductotherm, the Board of
Directors Defendants, the Committee Defendants, and the Trustee
Defendants acted as fiduciaries to the Plan pursuant to ERISA
§§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3. Pursuant to ERISA §404(a), 29 U.S.C. §1104(a), in their selection of plan service providers, fiduciaries must act prudently and solely in the interest of plan participants. Further, the Department of Labor counsels fiduciaries that they should "[c]ompare all services to be provided with the total costs for each provider." *Managing Your Fiduciary Responsibilities* (available at http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html ).

4. For the Plan year commencing on January 1, 2005 and ending on December 31, 2005, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants authorized the payment of $49,283 to Charlotte Capital, LLC, from Plan assets for managing $5,491,717 of the Plan's assets. For the 2005 Plan year, $5,491,717 represented approximately 10% of the Plan's total assets.

5. During that same year, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants authorized combined payments totaling $77,873 to the Hewitt Investment Group and State Street Global Advisors for managing $57,027,267 of the Plan's assets. For the 2005 Plan year, $57,027,267 represented approximately 90% of the Plan's total assets.

6. By causing the Plan to pay excessive fees to Charlotte

Capital, LLC, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breached their fiduciary duties under ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), by failing to act solely in the interest of participants to the Plan and by failing to exercise the required skill, prudence and diligence in selecting and compensating a service provider to the Plan.

7.  As a direct and proximate result of Inductotherm's, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' breaches of fiduciary duties, in permitting the Plan to be charged excessive fees, the Plan suffered losses.

8.  Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants are liable to Plaintiffs for all losses suffered by the Plan as a result of the excessive fees paid to Charlotte Capital, LLC.

### COUNT III

**Engaging in Prohibited Transactions by Causing
the Plan to Invest in the SunAmerica Money Market Fund**

**(Violation of ERISA §§406(b)(1),(2) and(3) and 29 U.S.C.
§§1106(b)(1),(2) and(3))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

529471.1

-83-

2.   Pursuant to ERISA §406(b), 29 U.S.C. §1104(b), fiduciaries are prohibited from engaging in certain self dealing transactions.

3.   On Schedule C of the Form 5500 for the Plan year commencing on January 1, 2006 and ending on December 31, 2006, Financial Service Corporation is the only service provider listed serving in the official plan position of "Investment Management."

4.   On Schedule C of the Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, Financial Service Corporation is the only service provider listed serving in the official plan position of "Investment Management."

5.   The Financial Service Corporation transacts all of its investment business through its 100% wholly owned subsidiary of FSC Securities Corporation.  Both the Financial Service Corporation and FSC Securities Corporation are wholly owned subsidiaries of AIG.

6.  At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

7.  According to the Plan's financial statement for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, as of December 31, 2006, approximately $8,262,500 million of Plan assets was invested in the Vanguard Prime Money Market

529471.1

-84-

Fund.

8.  Sometime after December 31, 2006 the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group liquidated that investment and as reflected on the Plan's financial statement for the 2007 Plan year, invested $8,412,993 of Plan assets into the SunAmerica Money Market Fund.

9.  The following wholly owned AIG subsidiaries received, and continues to receive, fees on account of that investment: SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc.

10. Since SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc and SunAmerica Fund Services, Inc. are AIG subsidiaries and AIG receives payments from such subsidiaries, AIG is enriched by the fees received from such subsidiaries.

11. By investing Plan assets in the SunAmerica Money Market Fund, which resulted in the payment of fees to multiple wholly owned AIG subsidiaries and payment to AIG, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group committed a prohibited transaction in violation of ERISA §§406(b)(1),(2) and (3), 29 U.S.C. §§1106(b)(1),(2) and (3).

12. The actions of Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group have been classified as prohibited transactions by the Department of Labor ("DOL") in DOL Adv. Op. 2003-09A.

529471.1                          -85-

13. DOL regulation, 29 C.F.R. 2550.408b-2(e)(1), classifies actions, such as those committed by the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group as a prohibited transaction under §§406(b), 29 U.S.C. 1106(b).

14. The actions of the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are not protected by any of the regulatory exemptions (i.e., the prohibited transaction exemptions) issued by the DOL pursuant to ERISA §408(a), 29 U.S.C. §1108(a) or any of the statutory exemptions contained within ERISA §408, 29 U.S.C. §1108.

15. As a direct and proximate result of this prohibited transaction, the Plan paid, and continues to pay, fees that are prohibited by ERISA and suffered and suffers monetary losses.

16. Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses on account of the prohibited transactions.

529471.1

-86-

## COUNT IV

**Engaging in Prohibited Transactions by
Causing the Plan to Invest in the SunAmerica
Money Market Fund**

**(Violation of ERISA §406(a)(1)(A),(C) and (D)
and 29 U.S.C. §§1106(a)(A),(C) and (D))**

1. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2. Pursuant to ERISA §406(a), 29 U.S.C. §1106(a), a fiduciary shall not engage in certain transactions with parties in interest. Specifically, pursuant to ERISA §406(a)(1)(A),(C) and (D), 29 U.S.C. §1106(a)(1)(A),(C) and (D), a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect:

> (A) sale or exchange, or leasing of any property between the plan and a party in interest;
>
>     *       *       *       *
>
> (C) furnishing of goods, services or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

3. At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

4. At all relevant times SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc. and SunAmerica Fund Services, Inc. were parties in interest to the Plan.

5. SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc. and SunAmerica Fund Services, Inc. are wholly owned AIG subsidiaries and provided services to the SunAmerica Money Market Fund and received fees from investments into such fund, including fees from the Plan's investment into such fund.

6. The Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group, by causing the Plan to invest $8,412,992 in the SunAmerica Money Market Fund sometime in 2007, and causing the Plan to pay fees to, and have service provided by, the following parties in interest, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc and SunAmerica Fund Services, Inc., knew or should have known that these acts constituted (A) sales or exchange of property between the Plan and parties in interest, (B) the furnishing of services by parties in interest to the Plan and (C) the transfer, or use by or for the benefit of a party in interest, assets of the Plan, in violation of ERISA §406(a)(1)(A),(C) and (D), 29 U.S.C. §1106(a)(1)(A),(C) and (D).

7. The actions of the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are not protected by any of the regulatory exemptions (i.e., the

prohibited transaction exemptions) issued by the DOL pursuant to ERISA §408(a), 29 U.S.C. §1108(a) or any of the statutory exemptions contained within ERISA §408, 29 U.S.C. §1108.

8.  As a direct and proximate result of this prohibited transaction, the Plan paid, and continues to pay, fees that are prohibited by ERISA and suffers monetary losses.

9.  Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses on account of these prohibited transactions.

### COUNT V

**Breach of Fiduciary Duty by Causing the Plan to Invest in the SunAmerica Money Market Fund**
**(Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3.  Sometime between January 1, 2007 and December 31, 2007 the Financial Service Corporation, FSC Securities Corporation

and/or the Wharton Business Group liquidated the Plan's $8,262,500 investment in the Vanguard Prime Money Market Fund and invested $8,412,992 of Plan assets into the SunAmerica Money Market Fund.

4. The returns on investments in the Vanguard Prime Money Market Fund for 2006, 2007 and 2008 were 5.08%, 5.30% and 2.93%, respectively.

5.   As described above, the SunAmerica Money Market Fund has four fund classes.  Those classes are labeled A, B, C and I. Plaintiffs have only been able to locate, in the public filings, this fund prior years' returns for classes A and I.  According to the fund's Quarterly Report the returns on investments in class A for 2006, 2007 and 2008 were, 4.22%, 4.32% and 1.84%, respectively.  According to the fund's Quarterly Report, the returns on investments in class I of the SunAmerica Money Market Fund for 2006, 2007 and 2008 were 4.31%, 4.43%, and 1.98%, respectively. The SunAmerica Money Market Fund prospectus and Quarterly Report do not disclose the returns on the class B and C shares; however, as the fees on those shares are 178 bps and 172 bps, respectively, while the fee charged by the Vanguard Prime Money Market Fund is only 13 bps, the returns for the class B and C shares were likely also lower than the returns posted by the Vanguard Prime Money Market Fund.

6.  Prior to, and during the Plan's investment in the

SunAmerica Money Market Fund, the SunAmerica Money Market Fund underperformed the Vanguard Prime Money Market Fund.

7.    The SunAmerica Money Market Fund charges fees that are, at a minimum, approximately 6 times, and at a maximum 13 times, greater, than the fees charged by the Vanguard Prime Money Market Fund.

8.    Information regarding the SunAmerica Money Market Fund's and the Vanguard Prime Money Market Fund's performance and fees was, and continues to be, publically available and could have been discovered by the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group through a minimal investigation.

9.    SunAmerica Asset Management Corp. is responsible for the continuous supervision of the SunAmerica Money Market Fund.  The SunAmerica Money Market Fund, Inc. (A) is provided office space by SunAmerica Asset Management Corp., (B) has certain of its corporate books maintained by SunAmerica Asset Management Corp., (C) has all of its employees' salaries and expenses paid by SunAmerica Asset Management Corp., (D) is staffed by some, if not all, employees of SunAmerica Asset Management Corp. or its affiliates, (E) lists with the SEC as its principal office the address that the SunAmerica Asset Management Corp. lists with the SEC as its principal office address.

10.   SunAmerica Asset Corp.'s Senior Vice President, John T.

Genoy, is listed with the SEC as the agent for service for
SunAmerica and the President and CEO of SunAmerica Asset
Management Corp., Peter A. Harbeck, signed the shareholder letter
that is contained in the SunAmerica Money Market Funds, Inc. June
2009 semi-annual report.

11.  According to SunAmerica Asset Management Corp.'s ADV,
which is publically available and easily accessible from the
SEC's electronic homepage, SunAmerica Asset Management Corp.
and/or its affiliates have committed multiple violations of the
law, including the commission of a felony.

12. By investing in the SunAmerica Money Market Fund, a fund
that (A) prior to such investment underperformed the Vanguard
Prime Money Market Fund (B) charged excessive fees, and (C) was
closely affiliated with SunAmerica Asset Management Corp., an
entity and/or its advisory affiliates, that committed multiple
violations of the law, the Financial Service Corporation, FSC
Securities Corporation and the Wharton Business Group breached
their fiduciary duty pursuant to ERISA §404(a)(1)(B), 29 U.S.C.
§1104(a)(1)(B), by failing to exercise the level of care, skill,
prudence and diligence that a prudent individual acting in like
circumstances would have exercised.

13.  As a direct and proximate result of these breaches of
fiduciary duty, the Plan, and indirectly the Plaintiffs suffered
losses due to the (A) excessive fees and (B) inferior returns.

14.   Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

### COUNT VI

**Breach of Fiduciary Duty of Loyalty and Prudence by Causing the Plan to Invest in the SunAmerica Money Market Fund**

**(Violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A))**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and §402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3.   The Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group, by their actions and omissions in authorizing and causing the Plan to invest in the SunAmerica Money Market Fund and to pay fees to AIG wholly owned subsidiaries, put their and AIG's financial interests ahead of the Plan's and the Plaintiffs interest and breached their duty of loyalty and prudence pursuant to § 404(a)(1)(A), 29 U.S.C.

§1104(a)(1)(A).

4.    As a direct and proximate result of these breaches of
fiduciary duty, the Plan, and indirectly the Plaintiffs, suffered
losses on account of excessive fees and inferior returns.

5.    Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C.
§§1109 and 1132(a)(2), Financial Service Corporation, FSC
Securities Corporation and the Wharton Business Group are liable
to Plaintiffs for all losses on account of their breach of
fiduciary duty.

### COUNT VII

**Breach of Fiduciary Duty by Failing Abide by
Plan Documents By Investing in the Hussman
Strategic Growth Fund**

**(Violation of ERISA §404(a), 29 U.S.C.
§1104(a))**

1.    Plaintiffs incorporate the allegations contained in the
previous paragraphs of this Complaint as if fully set forth
herein.

2.    At all relevant times, the Financial Service
Corporation, FSC Securities Corporation and the Wharton Business
Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21)
and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3. Pursuant to ERISA §404(a)(1)(D), 29 U.S.C.
§1104(a)(1)(D), fiduciaries must discharge their duties with
respect to a plan solely in the interest of the participants and

beneficiaries and in accordance with documents and instruments governing the plan.

4. The Hussman Strategic Growth Fund buys call options on individual stocks and writes put options on stocks which the fund seeks to own.

5. The investment policy executed with the Wharton Business Group on December 12, 2005 (a branch office of FSC Securities Corporation) prohibits investment in funds such as the Hussman Strategic Growth Fund. The investment policy provides that, except for hedging, no options shall be purchased and that there shall be no purchase of securities on margin and no short sales. The policy also listed the specific asset categories that the Plan's funds may be invested in. The policy does not authorize investments in "long short funds."

6. By investing in the Hussman Strategic Growth Fund, a fund which was prohibited, due to its characteristics, by the investment policy, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group breached their fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to discharge their duties in accordance with the documents and instruments governing the Plan.

7. As a direct and proximate result of the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's breaches of fiduciary duties, in failing

to discharge their duties in accordance with Plan documents, inappropriate investments were undertaken that resulted in inferior returns and therefore losses to the Plan.

8.  Pursuant to §§409 and 502(a)(2) of ERISA, 29 <u>U.S.C.</u> §§1109 and 1132(a)(2), the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses suffered by the Plan as a result of their failure to operate the Plan in accordance with the Plan's documents.

### COUNT VIII

**Breach of Fiduciary Duty by Causing the Plan to Invest in the Hussman Strategic Growth Fund**

**(Violation of ERISA §404(a)(1)(B), 29 <u>U.S.C.</u> §1104(a)(1)(B))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein

2.  At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 <u>U.S.C.</u> §§1002(21) and 1102(a).

3.  Sometime between January 1, 2007 and December 31, 2007, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group caused the Plan to invest $4,317,675 in the Hussman Strategic Growth Fund.

4. In 2006, the year prior to the Financial Service
Corporation, FSC Securities Corporation and the Wharton Business
Group, LLC causing the Plan to invest $4,317,675 of Plan assets
into the Hussman Strategic Growth Fund, it performed in the
bottom 85th percentile of all "long short" funds. Morningstar
benchmarks this fund's performance against both the Standard and
Poors 500 ("S & P 500") and the Merrill Lynch Constant Maturity
Index. For 2006 the Hussman Strategic Grown Fund underperformed
the S & P 500 by 12.28% and the Merrill Lynch Constant Maturity
Fund by 1.58%. For the 2007, the Hussman Strategic Growth Fund
was ranked in the bottom 64th percentile of all long short funds
and underperformed the S & P 500 by 1.33% and the Merrill Lynch
Constant Maturity Fund by 1.48%.

5. By investing in the Hussman Strategic Growth Fund, a
fund that had a record of poor performance prior to such
investment, the Financial Service Corporation, FSC Securities
Corporation and the Wharton Business Group breached their
fiduciary duty pursuant to ERISA §404(a)(1)(B), 29 U.S.C.
§1104(a)(1)(B) by failing to exercise the level of care, skill,
prudence and diligence that a prudent individual acting in like
circumstances would have exercised.

6. As a direct and proximate result of these breaches of
fiduciary duty, the Plan, and indirectly the Plaintiffs suffered
losses due to the fund's inferior returns.

7. Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## COUNT IX

### Breach of Fiduciary Duty For Following an Imprudent Investment Strategy
### (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2. At all relevant times, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3. Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting an investment strategy of a plan.

4. The investment policy executed with the Wharton Business Group provided for a portfolio allocation of the Plan's assets

equal to 80% in equities and 20% in fixed income.

5.    The portfolio allocation resulted in an excessive concentration in equities when compared to properly managed balanced and target date funds, especially considering the ages of the Plan participants.

6.    The investment strategy undertaken by the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group assumed risk in excess of what was reasonable, and did not take into account the age of the Plan's participants.

7.    The Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting an investment strategy for the Plan.

8.    As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs suffered damages and losses.

9.    Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

529471.1

-99-

## Count X

**Breach of Fiduciary Duty by Misrepresenting
to Plaintiffs "Conservativeness" of the
Plan's Investment Strategy and the Plan's
True Investment Manager**

**(Violation of ERISA §404(a), 29 U.S.C.
§1104(a))**

1. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2. Pursuant to ERISA §404(a), 29 U.S.C. §1104(a), fiduciaries have a duty to ensure that their communications convey complete and accurate information.

3. At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

4. Inductotherm, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' misrepresented to the Plaintiffs, through the 2088 Quarterly Reports, on April 16, 2008, July 16, 2008, October 9, 2008 and January 21, 2009 that the Plan's assets were conservatively invested, when such assets were not conservatively invested.

5. The Quarterly Reports misrepresented the Plan's 2008 investment performance by comparing its performances to equity indices. While the reported 2008 performance compared favorably

to the indices shown, this is misleading because the Plan was intended to be, and should have been, conservatively invested and was therefore never designed to assume as much risk as the indices listed in the Quarterly Reports.

6.    The Plan's 2008 return of approximately, negative 27.6% was worse than 97% of conservative allocation mutual funds.

7.    Communications sent to Plaintiffs, including the Quarterly Reports, during 2008 and 2009 when AIG was, and continues to be, in financial turmoil:

    a)    only stated that the Wharton Business Group was the outside investment advisor and made no references to the fact that this entity is a branch office of an AIG wholly owned subsidiary; and

    b)    ommitted the names of all of the other AIG wholly owned subsidiaries that were involved in managing the Plan's assets.

8.    Early withdrawals, prior to retirement, are permissible under the Plan.

9.    If the Plaintiffs had accurate information regarding the Plan's investment advisors, investment strategy and investment performance during the 2008 Plan year, they would have been able to make an informed decision as to whether to withdraw their benefits from the Plan.

10.  By misrepresenting that the Plan's assets were conservatively invested, misrepresenting the Plan's 2008 performance, concealing that AIG owned entities were the true investment managers, Inductotherm, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' breached their fiduciary duty under ERISA §404(a), 29 U.S.C. §1104(a), to ensure that their communications convey complete and accurate information.

11.  As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs suffered millions of dollars in losses.

12.  Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

### COUNT XI

**SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG Violated ERISA by Knowingly Participating in Breaches of Fiduciary Duty and Prohibited Transactions**

**(Violation of ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

2. At all relevant times SunAmerica Asset Management Corp.; SunAmerica Capital Services, Inc.; Sunamerica Fund Services, Inc.; the Financial Service Corporation; and FSC Securities Corporation were all wholly owned subsidiaries of AIG.

3. At all relevant times AIG was a holding company that received dividends, distributions and other payments from its subsidiaries, and therefore was enriched by any payments received by SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and Sunamerica Fund Services, Inc.

4. SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG by their actions in participating in and abetting fiduciary breaches and prohibited transactions, caused the Plan to invest in the SunAmerica Money Market Fund and pay fees/payments to such parties in connection therewith.

5. As a direct and proximate result of SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG improper receipt of fees/payments, the Plaintiffs suffered losses.

6. Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG are liable to disgorge all fees/payments received from the Plan and any earnings thereon.

529471.1

-103-

## COUNT XII

**Breach of Fiduciary Duty For Not Selecting
the Plan's Investment Manager, With the
Required Care, Skill, Prudence and Diligence**

**(Violation of ERISA §404(a)(1)(B), 29 U.S.C.
§1104(a)(1)(B))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3.  Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries in selecting plan service providers must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised.  The Department of Labor requires that the fiduciary

> must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of the services offered, and the reasonableness of the fees charged in light of the services provided .... such process should be designed to avoid self dealing, conflicts of interests or other improper influence.

DOL Field Assistance Bulletin 2002-3 (November 5, 2002).

4.  On Schedule C to the Form 5500 for Plan years 2006 and

529471.1                                    -104-

2007 the Financial Service Corporation is listed as the only service provider to the Plan, in the position of "investment management." The Financial Service Corporation is therefore a fiduciary to the Plan pursuant to ERISA §§3(21), 3(38), 29 U.S.C. §§1002(21), 1002(38)

5. Financial Service Corporation is not registered with the SEC, makes no filings with the SEC and is not registered to transact business within the State of New Jersey.

6. FSC Securities Corporation, which is Financial Service Corporation's 100% owned subsidiary (and its only subsidiary), is registered with the SEC as a broker dealer and a registered investment advisor and is also licensed by the self regulating agency of the Financial Industry Regulatory Authority ("FINRA").

7. FSC Securities Corporation is licensed to transact business in all fifty states.

8. A web search of the term the "Financial Service Corporation" results in a return of FSC Securities Corporation's homepage.

9. As the Financial Service Corporation is not a licensed entity with the SEC or licensed to transact business within the State of New Jersey, Financial Service Corporation, with respect to the management of the Plan's assets, transacts such business through FSC Securities Corporation and therefore FSC Securities Corporation is an entity that acts as the investment manager to

the Plan and thus is a fiduciary to the Plan pursuant to ERISA §§3(21), 3(38), 29 U.S.C. §§29 1002(21), 1002(38).

10. According to FSC Securities Corporation's ADV, it has previously committed multiple violations of the law and has been the subject of orders by the Florida Division of Securities, the State of Connecticut Department of Banking and the SEC.

11. Records of these administrative findings are publicly available and could have been obtained by Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants prior to appointing FSC Securities Corporation the Plan's investment manager.

12. Prior to 2006, Hewitt Investment Group LLC and State Street Global Advisors Limited served the Plan in the position of "investment management" and "investment advisory", respectively. Both entities also file ADVs and their ADVs reflect that they have not committed violations of the law.

13. By retaining the Financial Service Corporation and FSC Securities Corporation as the Plan's investment advisor, an entity that had previously committed multiple violations of the law, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like

circumstances would have exercised.

14.  The Financial Service Corporation/FSC Securities Corporation breaches of fiduciary duties and other wrongs described above and the prohibited transaction described above resulted in millions of dollars in losses to the Plaintiffs.

15.  As a direct and proximate result of Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breach of fiduciary duty the Plaintiffs suffered millions of dollars in losses.

### COUNT XIII

**Breach of Fiduciary Duty For Not Selecting the Plan's Investment Manager, With the Required Care, Skill, Prudence and Diligence**

**(Violation of ERISA §404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3.  Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries in selecting plan service providers must exercise the level of care, skill, prudence and diligence

that a prudent individual acting in like circumstances would have exercised.

4. On December 12, 2005, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants executed an investment policy with the Wharton Business Group that provided such entity with various investment responsibilities.

5. Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants then stated that the Plan's assets were conservatively invested using the Wharton Business Group and that the Plan's assets are invested in diversified mutual funds that are recommended by the Wharton Business Group, a company which monitors to a high degree of precision various investment opportunities.

6. The Wharton Business Group acted as a service provider to the Plan and was a fiduciary to the Plan.

7. The Wharton Business Group's SEC license was terminated on September 21, 2005. The Wharton Business Group's license to transact business in the State of New Jersey was revoked On November 16, 2006. The Wharton Business Group is not registered with the New Jersey Bureau of Securities and, according to the New Jersey Bureau of Securities, based on their CRD review, is not registered with any other State. The Wharton Business Group has never been registered with FINRA.

8.   The Plan defines "investment manager" as an entity, among other things, that is registered with the SEC or with the State in which it maintains its principal office.

9.   The Wharton Business Group satisfies neither of these requirements. The Wharton Business Group is a branch office of FSC Securities Corporation, an entity that has committed multiple violations of the law.

10.   The Wharton Business Group's breaches of fiduciary duties described above and the prohibited transactions described above resulted in millions of dollars in losses to the Plaintiffs.

11.   By retaining the Wharton Business Group to provide investment advisory services to the Plan, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised.

12.   As a direct and proximate result of Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breach of fiduciary duty the Plaintiffs suffered losses and damages.

## COUNT XIV

**Breach of Co-Fiduciary Duty By Knowingly Participating and/or Concealing the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's Breaches of Fiduciary Duties and Prohibited Transaction**

**(Violation of ERISA §405, 29 <u>U.S.C.</u> §1105)**

1.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.    At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 <u>U.S.C.</u> §§1002(21) and 1102(a).

3.    Pursuant to ERISA §405(a), 29 <u>U.S.C.</u> §1105(a), a fiduciary, with respect to a plan is liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

    (a) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

    (b) if, by his failure to comply with section ERISA §404(a)(1), 29 U.S.C §1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

4.  Communications directed to Plaintiffs only referenced the Wharton Business Group as serving in an investment advisory capacity and did not make any references to the investment management services provided by the Financial Service Corporation and FSC Securities Corporation.

5.  These communications were made with the intent to conceal the existence of FSC Securities Corporation from the Plaintiffs.

6.  Information regarding the Financial Services Corporation/FSC Securities Corporation was only listed on Schedule C of the Form 5500's for Plan years 2006 and 2007. The Wharton Business Group was not listed on either Schedule C.

7.  Inductotherm, the Board of Directors Defendants, the Trustee Defendants and the Committee Defendants, through communications to Plaintiffs, misrepresented: that the Plan's assets were conservatively invested; the favorable level of the Plan's 2008 performance; and that the Wharton Business Group monitored to a high degree of precision various investment opportunities.

8.  Between 2008 and 2009, during AIG's financial turmoil, such Defendants concealed from Plaintiffs the investment management activities of FSC Securities Corporation, a wholly owned AIG subsidiary.

9.  Inductotherm, the Board of Directors Defendants, the

Trustee Defendants and the Committee Defendants by its actions and ommissions knowingly participated in and/or attempted to conceal the breaches of fiduciary duties on the part of the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group described above and the prohibited transaction set forth above.

10.  Had the Plaintiffs been provided true and accurate information, Plaintiffs may have withdrawn their assets from the Plan.

11.  As a direct and proximate result of these breaches of duty on the part of Inductotherm, the Board of Directors Defendants, the Trustee Defendants and the Committee Defendants, the Plan, and indirectly the Plaintiffs, lost millions of dollars on account of fees/payments to AIG's wholly owned subsidiaries and AIG, and as a result of investment losses.

12.  Pursuant to ERISA §§405(a), 409 and 502(a)(2), 29 U.S.C. §§1105(a), 1109, and 1132(a)(2), Inductotherm, the Board of Directors Defendants, the Trustee Defendants and the Committee Defendants are liable to restore all losses suffered by the Plan, and indirectly the Plaintiffs, caused by their breaches.

## COUNT XV

**Failure to Allocate Responsibilities for the Operation and Administration of the Plan**

**(Violation of ERISA §402(b)(2), 29 U.S.C. §1102(b)(2))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  Pursuant to ERISA §402(b)(2), 29 U.S.C. §1102(b)(2), every employee benefit plan shall describe any procedure under the Plan for the allocation of responsibilities for the operation and administration of the plan.

3. Pursuant to the Plan, a fiduciary shall only have those specific powers, duties, responsibilities and obligations as are specifically given him under this Plan or "Trust Agreement."

4.  Fiduciary is defined under the Plan to include Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants.

5.  The Plan does not sufficiently designate responsibilities among the fiduciaries for the efficient and lawful operation of the Plan, and a Trust Agreement does not exist.

6.  This lack of allocation of responsibility has caused the Plan to suffer losses.

529471.1

-113-

7.   Pursuant ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), Plaintiffs ask this Court to award equitable relief in the form of an order requiring Inductotherm to amend the Plan to sufficiently allocate responsibilities among the Plan's fiduciaries an to restore all losses suffered by the Plan.

**COUNT XVI**

**General Award of Equitable Relief Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3)**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   Pursuant to  ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), Plaintiffs ask that this Court order the:

   a)   permanent removal of the Board of Director Defendants, the Committee Defendants and the Trustee Defendants from any positions of trust with respect to the Plan;

   b)   appointment of independent fiduciaries to administer the Plan;

   c)   rescission of any contracts that may have been entered into on behalf of the Plan with the Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp.,

SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., The SunAmerica Money Market Fund, Inc., the Wharton Business Group and any other AIG subsidiary; and

d) an order enjoining Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants from contracting or investing, on behalf of the Plan with AIG or any AIG wholly owned subsidiary, and enjoining all of the Defendants from any further violations of ERISA fiduciary responsibilities, obligations and duties.

## VIII. COMMON LAW COUNTS
### COUNT XVII
**Fraudulent Concealment Against All Defendants'**

1. Plaintiff repeats and incorporates herein the allegations of this Complaint, as if fully set forth herein at length.

2. Defendants Inductotherm, the Board of Directors Defendants, the Trustee Defendants, the Committee Defendants, the Wharton Business Group, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc. and SunAmerica Fund Services, Inc. fraudulently concealed or failed to disclose to the

Plaintiffs and members of the Plan:

- a) that by transferring assets in 2007 from the Vanguard Prime Money Market Fund to the SunAmerica Money Market Fund, the fees charged to the Plan would be excessive;

- b) the relationship among the various AIG entities;

- c) the true risk of the investments in the Plan;

- d) appropriate benchmarks by which to monitor Plan performance;

- e) the violations of law committed by the various AIG affiliates; and

- f) the true identity of persons responsible for Plan management.

3. The aforesaid Defendants had a duty to disclose this information.

4. This information was material to the Class.

5. The failure to disclose this information injured the Plaintiffs.

6. Defendants are jointly and severally liable for these failures to disclose.

## COUNT XVIII

### Fraudulent Concealment Against Defendant
### Wharton Business Group

1.    Plaintiff repeats and incorporates herein the allegations of this Complaint, as if fully set forth herein at length.

2.    Defendant Wharton Business Group, who was and continues to be the Investment Advisor for the Plan, fraudulently concealed or failed to disclose to the Plaintiffs that:

     a)    it is not a licensed broker-dealer authorized to transact business in New Jersey;

     b)    it is not a member of FINRA and SIPC; and

     c)    it was the subject of several regulatory violations issued by public authorities.

3.    The aforesaid Defendant had a duty to disclose this information.

4.    This information was material to the Class.

5.    The failure to disclose this information injured the Plaintiffs and members of the Plan.

## IX. SECURITIES LAWS CLAIMS FOR RELIEF

### COUNT XIX

**Violations of the 1933 Act Against Defendant
SunAmerica Capital Services, Inc. For Fraud
In the Sale of a Security (15 U.S.C. §
77$l$(a)(2))**

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  Defendant SunAmerica Capital Services, Inc., and any other wholly owned AIG subsidiary that is herein a named defendant or John Doe Defendants that are found to have contributed to the drafting of the SunAmerica Money Market Funds April 30, 2009 prospectus, violated the Securities Act of 1933, §12(a)(2), 15 U.S.C. §77$l$(a)(2), by engaging in fraud in connection with such prospectus.

3.  Defendant SunAmerica Capital Services, Inc., and any other wholly owned AIG subsidiary that is herein a named Defendant or John Doe Defendants that are found to have contributed to the drafting of the SunAmerica Money Market Funds April 30, 2009 prospectus, purported to disclose on page six of the prospectus "the fees and expenses you may pay if you buy and hold shares of the funds." Page twenty three of the prospectus notes the following additional fee:

Servicing Agent.  SunAmerica Fund Services, Inc.
("SAFS" or the "Servicing Agent") assists the Funds'
Transfer Agent in providing shareholder services.  The
Servicing Agent, a SunAmerica affiliate, is paid a
monthly fee by each Fund for its services at the annual
rate of 0.22% of the average daily net assets of the
Funds.

4.  Defendant SunAmerica Capital Services, Inc., and any

other AIG subsidiary that is herein a named Defendant or John Doe

Defendants that are found to have contributed to the drafting of

the SunAmerica Money Market Funds April 30, 2009 prospectus,

failed to include the .22% servicing fee, in the fee table to its

SunAmerica Money Market Fund April 30, 2009 prospectus.

5.  As a result, Defendant SunAmerica Capital Services,

Inc. and any other AIG subsidiary that is herein named, failed to

disclose a material fact necessary to make the statements not

misleading, in light of the circumstances.

**COUNT XX**

**Violations of Rule 10b-5 of the Securities
Exchange Act of 1934, Against Defendant
Wharton Business Group**

1.  Plaintiffs incorporate the allegations contained in the

previous paragraphs of this Complaint as if fully set forth

herein.

2.  The Wharton Business Group violated The Securities

Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R.

§ 240.10b-5, by engaging in acts, practices and business which

are manipulative and deceptive and which were performed in an effort to deceptively obtain clients for its brokerage and investment advisory services business which is engaged in the purchase and sale of securities.

3. These manipulative and deceptive acts include the Wharton Business Group, LLC's claim to the class, that it is a "Registered Broker/Dealer, Member FINRA and SIPC" when it is not registered with the SEC as a broker, investment adviser or registered in any capacity whatsoever with the SEC.

4. By and through the making of this false statement, the Defendant Wharton Business Group, LLC, has directly or indirectly, in connection with the purchase and sale of securities made, by the use of the means and instrumentalities of interstate commerce and by use of the mails (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons. Exchange Act §10(b), 15 U.S.C. §78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5.

5. The Wharton Business Group proclaims that it provides "investment advisory services," and "business advisory/brokerage

services," and despite that it qualifies as both a "broker" under The Exchange Act and an "investment adviser" under the Investment Advisor's Act, and under the requirements of both acts was required to register with the SEC (see the Exchange Act §15(a)(1), 15 U.S.C. §78(o); and Section 203 of the Investment Adviser's Act of 1933, 15 U.S.C. §80b-3 respectively), the Wharton Business Group is not and has never been registered.

6.  This constitutes a material misstatement and/or omission made by the Defendant, Wharton Business Group, to the investing public in contravention of its obligations both to register and to not to deceive the investing public as to its true status as an unregistered broker and investment adviser.

7.  Upon information and belief, the Wharton Business Group made these material misrepresentations with the knowledge of their falsity or in reckless disregard thereof.

8.  Upon information and belief, the Wharton Business Group's intention was to mislead the investing public as to its status seeking to induce reliance and trust in an overall effort to garner profit.

9. Plaintiffs reasonably and justifiably relied on these material misstatements and engaged the services of the Wharton Business Group, entered into contracts, and purchased and sold securities relying on the Wharton Business Group's material misstatements.

10. As a result of the reasonable and justifiable reliance, the Plaintiffs have suffered damages.

### COUNT XXI

**Fraud Under the New Jersey Uniform Securities Laws**
**(Violation of N.J.S.A. 49.3-49(e) Against the Wharton Business Group)**

1. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2. The Wharton Business Group, LLC, committed fraud by engaging in acts, practices and businesses which were manipulative and deceptive and which were performed in an effort to deceptively secure clients for its brokerage and investment advisory services business, that is engaged in the purchase and sale of securities.

3. Defendant, the Wharton Business Group, LLC. represents that it provides "investment advisory services," and "business advisory/brokerage services," and qualifies as an "investment adviser" under New Jersey's Uniform Securities Law.

4. The Wharton Business Group, LLC, is not and has never been registered with the State of New Jersey as an investment advisor.

5. With certain limited exceptions not here relevant, New

Jersey law requires investment advisers doing business in the State to be registered. See <u>N.J.S.A.</u> 49:3-56(g)(2).

6.   The Wharton Business Group, LLC's failure to register is a material misrepresentation and omission made to the Plaintiffs. See <u>N.J.S.A.</u> 49:3-49(e)(1).

7.   The Wharton Business Group, LLC engaged in a course of conduct calculated or put forth with the intent to deceive the Plaintiffs, the investing public, or the purchaser of any security or investment advisory services, as to the unregistered status of the Wharton Business Group, LLC. See <u>N.J.S.A.</u> 49:3-49(e)(4).

8.   Upon information and belief, Defendant made these misrepresentations and omissions with the knowledge and intent to deceive or with reckless disregard for the truth and results. See <u>N.J.S.A.</u> §49:3-49(e).

9.   Plaintiffs reasonably and justifiably relied on the material misrepresentations and omissions made by the Defendant, the Wharton Business Group, and engaged its services, entered into contracts, and purchased and sold securities relying on the Wharton Business Group, LLC's material misstatements.

### RICO CLAIMS FOR RELIEF

### COUNT XXII

### VIOLATIONS OF RICO §§1962(c) AND 1962(d)

1.   Plaintiffs incorporate the allegations contained in the

previous paragraphs of this Complaint as if fully set forth herein.

2.    At all times relevant to this action, Boris Goldenberg, and each similarly situated member of the Plan, is and has been a "person" as that term is defined in RICO §1961(3), 18 U.S.C. §1961(3).

3.    At all times relevant to this class action, all Defendants were a "person" as that term is defined in RICO §1961(3),18 U.S.C. §1961(3).

4.    In violation of RICO §§1962(c) and (d), 18 U.S.C. §§1961(c) and (d), Defendants conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of the Defendants' RICO "enterprise's" affairs through a pattern of racketeering activity, thereby proximately causing injury to Plaintiffs' and Class members' business or property.

5.    Each Defendant knew the essential nature and scope of the enterprise that he, she or it was employed by or associated with, and each of the Defendants intended to participate in the affairs of the RICO "enterprise."

6.    In accordance with Fed.R.Civ.P. 8(e)(2), there has existed an associated-in-fact "enterprise" comprised of each and every Defendant, as that term is defined in RICO §1961(4), 18 U.S.C. §§1961(4), and the defendants committed, aided and abetted, and/or conspired to commit violations of Section 1962(c) and (d).

7.    Defendants Inductotherm, the Board of Directors Defendants, the Trustee Defendants, the Committee Defendants, the Wharton Business Group, LLC, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., and any other AIG Company that received fees or money from the Plan's Assets engaged in a RICO "enterprise", as defined in Section 1961(4) of RICO.

8.    The RICO "enterprise" committed fraud through a pattern of racketeering activities to disguise the unlawful transfer of the Plan's assets, which was done to facilitate a "kickback" scheme to the members of the RICO "enterprise".

9.    By liquidating and reinvesting the Plan's assets, a greater amount of fees were realized and distributed to members of the "enterprise".

10.   The Defendants' engaged in activity to conceal the unlawful activities of the "enterprise" from Plaintiffs, and conceal the true nature of the investments and affiliation with AIG.

11.   By concealing the true nature of the RICO "enterprise" and the Defendants' investment of the Plan in what has been represented as "AIG Securities" and "AIG/FSC Securities", as well as Sun American Money Market Fund that is wholly-owned by AIG, the Defendants' deprived Plaintiffs of information critical to the

evaluation of the Plan and its holdings.

12.  At all relevant times, AIG was a holding company that received dividends, distributions and other payments from its subsidiaries, and therefore was enriched by any payments received by SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc.

13.  In violation of RICO §§ 1341 and 1342, Defendants engaged in a pattern of racketeering committed and/or aided and abetted by the Defendants through the use of United States mail and/or interstate wire facilities in furtherance of their unlawful scheme to utilize the Plan's assets for the benefit of the Defendants, which injured the Plaintiffs.

14.  The Defendants, Inductotherm, the Board of Directors Defendants, the Trustee Defendants, and the Committee Defendants perpetuated and concealed the fraudulent and unlawful activities of the RICO "enterprise" and allowed the remainder of the Defendants to continue their unlawful activities by using the United States mail and/or interstate wire facilities to misrepresent that the Plan's assets were conservatively invested, a statement that is fraudulent.  Between April 16, 2008 and January 21, 2009, Defendants' Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants sent four quarterly reports improperly claiming that the Plan was "conservatively invested".  Instead, the portfolio was

aggressively positioned and held risk in excess of what was
reasonable and what was communicated to Plan participants.

15. The Defendants, Inductotherm, the Board of Directors
Defendants, the Trustee Defendants, and the Committee Defendants
perpetuated the fraudulent and unlawful activities of the RICO
enterprise and allowed the remainder of the Defendants to continue
their unlawful activities by using the United States mail and/or
interstate wire facilities to conceal Defendant AIG's involvement
with Defendants Wharton Business Group, LLC, Financial Service
Corporation, FSC Securities Corporation, SunAmerica Asset
Management Corp., SunAmerica Capital Services, Inc., SunAmerica
Fund Services, Inc., and any other AIG Company that received fees
or money from the Plan's Assets.

16. The Defendants, Inductotherm, the Board of Directors
Defendants, the Trustee Defendants, and the Committee Defendants
perpetuated the fraudulent and unlawful activities of the RICO
"enterprise" and allowed the remainder of the Defendants to
continue their unlawful activities by using the United States mail
and/or interstate wire facilities to fraudulently communicate on
numerous occasions to the Plan's participants that the Wharton
Business Group, LLC, was responsible for investments. While
Defendants represented that Wharton Business Group, LLC, was
providing investment services to the Plan in 2006, 2008, and 2009,
and executed an investment policy with the Wharton Business Group,

LLC, in 2005, Defendants have never listed the Wharton Business Group, LLC, on Schedule C to the Plan's form 5500 for the corresponding years.  Instead, the Plan lists Financial Services Corporation as the only service provider.  Form 5500's are submitted to the Internal Revenue Service and the Department of Labor under penalty of perjury.

17.   The Defendants, Inductotherm, the Board of Directors Defendants, the Trustee Defendants, and the Committee Defendants perpetuated the fraudulent and unlawful activities of the RICO "enterprise" by using the United States mail and/or interstate wire facilities by representing that Wharton Business Group, LLC, was and continues to be the Investment Advisor for the Plan.  To support the representation, Wharton Business Group, LLC, fraudulently represented on its website that it is a licensed broker dealer and member of FINRA and SIPC.

18.   Defendants engaged in a pattern of Racketeering that allowed the RICO "enterprise" to benefit in the form of fees or money from the Plan's assets that resulted from the reallocation of investments of the Plan.

19.   Section 664 of RICO makes it a crime whenever any person embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or the use of another, any of the moneys, funds, securities, premiums, credits, property or other assets of any employee welfare benefit plan or employee pension benefit

plan, or any fund connected therewith and repeated acts are violations of 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud).

20. According to the Plan's financial statement for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, as of December 31, 2006, approximately $8,262,500 of Plan assets was invested in the Vanguard Prime Money Market Fund. Sometime after December 31, 2006, the Financial Service Corporation, FSC Securities Corporation, the Wharton Business Group, LLC, liquidated the investment, and, as reflected on the Plan's financial statement for the 2007 Plan year, invested $8,412,993 of Plan assets into the SunAmerica Money Market Fund. The following wholly owned AIG subsidiaries received, and continue to receive, fees on account of that investment: SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc. Since SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc., are AIG subsidiaries and AIG receives payments from its subsidiaries, AIG is enriched by the fees it received from the above subsidiaries.

21. Prior to, and during the Plan's investment in the SunAmerica Money Market Fund, the SunAmerica Money Market Fund underperformed the Vanguard Prime Money Market Fund. The SunAmerica Money Market Fund charges fees that are, at a minimum,

approximately 6 times, and at a maximum 13 times, greater, than the fees charged by the Vanguard Prime Money Market Fund. Information regarding the SunAmerica Money Market Fund's and the Vanguard Prime Money Market Fund's performance and fees was, and continues to be, publicly available and could have been discovered by the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group, LLC, through a basic investigation. Each and every transfer of the assets of members of the Plan or fees paid to Defendants constituted and continues to constitute a violation of 18 U.S.C. §664.

22. In violation of 18 U.S.C. §2314 and §2315, the Defendants committed, aided and abetted and/or conspired to commit interstate transportation offenses. Defendants, the Wharton Business Group, LLC, Financial Service Corporation, FSC Securities Corporation, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., have business addresses and are incorporated in states other then New Jersey.

23. Defendants Inductotherm, the Board of Directors Defendants, the Trustee Defendants, and the Committee Defendants are headquartered in New Jersey and the administration of the Plan occurred and continues to occur in New Jersey.

24. In order for the out-of-state Defendants to invest the assets of the Plan, it must be transported across state lines.

25. Defendants violated 18 U.S.C. §2314 and §2315, by

transmitting or transferring in interstate commerce, and/or receiving money, of the value of $5,000 or more, knowing the same to have been converted or taken by fraud, consisting of the Plan's participants' contributing to the Inductotherm Companies Master Profits Sharing Plan #001 and/or investment in stock offered by the Plan. Each such transfer, transmittal, and/or receipt of funds constitutes a separate violation of 18 U.S.C. §2314 and §2315.

26. Plaintiff and members of the Class are persons who are or have been injured in their business and/or property by reason of Defendants' violations of Section 1962(c) and (d) of RICO, as set forth in this Complaint. Pursuant to Section 1964(c) of RICO, Plaintiff and members of the Class are entitled to assert this claim and to recover threefold damages sustained and the costs of bringing suit, including reasonable attorney's fees.

27. Defendants' violations of 18 U.S.C. §§664, 1341, 1343, 2314 and 2315, constituted and continues to constitute a "pattern of racketeering activity" as that term is defined in Section 1961(1) and (5) of RICO, because the acts were related to each other and had continuity. As alleged herein, Defendants' violations of these Federal statutes had the same or similar purposes, results, participants, victims or methods of commission; they were interrelated and not isolated events. Defendants' commission of the offenses and the "pattern of racketeering"

529548.1                     -131-

continue today and are likely to continue in the future. Defendants' actions have proximately caused injuries to the Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that this Court:

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2) and 23(b)(3);

B.    Declare that Defendants Inductotherm, the Board of Directors Defendants, the Committee Defendants, the Trustee Defendants, the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group committed multiple breaches of their fiduciary duties pursuant to ERISA §§404(a)and 405(a), 29 U.S.C. §§1104(a) and 1105(a), and order such Defendants, pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 and 1132(a)(2), to restore the losses suffered by the Plan and Class on account of their breaches;

C.  Declare that Defendants the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group engaged in transactions that violated ERISA §§406(a) and (b), 29 U.S.C. §§1106(a) and (b), which resulted in the charging of impermissible fees and order such Defendants, pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 and 1132(a)(2), to restore to the Plan and the Class all fees that were charged on account of such transactions;

D.   Declare that Defendants SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., and AIG by their actions knowingly participated in, and assisted, breaches of fiduciary duties and prohibited transactions on the part of the Financial Service Corporation, FSC Securities Corporation and the Wharton Business Group and were enriched by such breaches and prohibited transactions and order such Defendants, pursuant to ERISA §502(a)(3) and (b), 29 U.S.C. §§1132(a)(3), to disgorge all monies received from the Plan and any earnings thereon and pay such monies to the Plan and Class;

E.   Order, pursuant to ERISA §502(a)(3) and (b), 29 U.S.C. §§1132(a)(3), that the Financial Service Corporation, FSC Securities Corporation, the Wharton Business Group, AIG and any other wholly owned AIG subsidiary that received monies from the Plan disgorge all such monies, and any earnings thereon, and refund such monies to the Plan and the Class;

F.   Enjoin, pursuant to  ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants from contracting or investing, on behalf of the Plan with AIG or any of its wholly owned subsidiaries;

G.   Order that Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants, immediately and accurately inform all Plan participants of the

level of risk assumed in Plan investments and of their ability to immediately withdraw their benefit from the Plan;

H.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the permanent removal of the Board of Director Defendants, the Committee Defendants and the Trustee Defendants from any positions of trust with respect to the Plan;

I.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the appointment of independent fiduciaries to administer the Plan;

J.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), rescission of the Plan's investments into the SunAmerica Money Market Fund and the Hussman Strategic Growth Fund, at a time deemed prudent by the newly appointed independent fiduciaries, and any contracts that may have been entered into on behalf of the Plan with the Financial Service Corporation, FSC Securities Corporation, the Wharton Business Group, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., SunAmerica Money Market Fund, Inc., AIG and any other wholly owned AIG subsidiary;

K.   Order, pursuant to ERISA §402(a)(2), 29 U.S.C. §1132(a)(2), that the newly appointed fiduciaries amend the Plan in such a manner that it provides for the specific allocation of responsibilities, among persons chosen by the new fiduciaries (none of such selected individuals shall be a Defendant), for the

operation and administration of the Plan;

L.    Order that each of the Defendants is jointly and severally liable to the Plan for violating the duties, responsibility and obligations imposed upon them as fiduciaries and co-fiduciaries and otherwise by ERISA;

M.    Order SunAmerica Capital Services, Inc., and any other named Defendant involved in the creation of the April 30, 2009, SunAmerica Money Market Funds Prospectus, to pay to the Plan and the Class the consideration paid for such security, with interest thereon, less the amount of any income received thereon upon the tender of such security, pursuant to §12 of the Securities Act, 15 U.S.C. §77*l*;

N.    Order Defendant the Wharton Business Group to pay the Plaintiffs the difference between the actual value of the securities and their purchase price and any consequential damages proximately resulting from their fraudulent acts in connection with the purchase and sale of securities pursuant to Rule 10b-5, 17 C.F.R. §240.10b-5 and compensatory damages pursuant to N.J.S.A. 49.3-49(e);

O.    Order Defendants to pay an amount equal to three times the damages caused to the Plan and the Class by Defendants racketeering activity, pursuant to 18 U.S.C. §§1962(c)and(d), 18 U.S.C. §1964;

P.    Enjoin each of the Defendants from engaging in further racketeering pursuant to 18 U.S.C. §1964;

Q.    Order that Defendants jointly and severally pay to the Plan and the Class compensatory and punitive damages;

R.    Order Defendants to make equitable restitution and other appropriate equitable monetary relief as the Court deems just;

S.    Order the Defendants to pay damages to the Plan and to Plaintiffs in an amount sufficient to restore them to the position they would have been in had the wrongs alleged herein not been committed.

T.    That Plaintiffs be paid reasonable costs and attorneys fees, pursuant to ERISA §502(6)(g), 29 U.S.C. §1132(g) and RICO §1964(c).

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.

Arnold C. Lakind

Date:     October 9, 2009