IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BORIS GOLDENBERG, REINALDO PACHEDO, ANDREW LEOW, AND GERALD COMEAU, AS REPRESENTATIVE OF A CLASS OF SIMILARLY SITUATED PERSONS AND ON BEHALF OF THE INDUCTOTHERM COMPANIES MASTER PROFITS SHARING PLAN #001, | ) ) ) ) ) ) ) ) | HONORABLE JEROME B. SIMANDLE |
| PLAINTIFFS, | ) ) ) ) | |
| VS. | ) ) | CASE NO. 1:09-cv-05202-JBS-AMD |
| INDEL, INC., INDIVIDUALLY AND A/K/A INDUCTOTHERM INDUSTRIES, INC. AND INDUCTOTHERM CORPORATION, ET AL., | ) ) ) ) | |
| DEFENDANTS. | ) ) | |

## APPENDIX OF UNPUBLISHED AUTHORITIES

1.   A true and correct copy of *In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, No. 08-md-1919, 2009 WL 3246994 (W.D. Wash. Oct. 5, 2009) is attached hereto as Appendix "1."

2.   A true and correct copy of *Jones v. Harris Assocs. L.P.*, __ U.S. __, No. 08-586, 2010 WL 1189560 (Mar. 30, 2010) is attached hereto as Appendix "2."

3.   A true and correct copy of *Leber v. CitiGroup Inc.*, No. 07-CV-9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) is attached hereto as Appendix "3."

4.   A true and correct copy of *Pietrangelo v. NUI Corp.*, No. 04-3223, 2005 WL 1703200 (D.N.J. July 20, 2005) is attached hereto as Appendix "4."

Respectfully submitted,

**ALSTON & BIRD LLP**

s/ Craig Carpenito
Craig Carpenito (CC-1686)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Phone: (212) 210-9400
Fax: (212) 210-9444
Email: craig.carpenito@alston.com

Theodore J. Sawicki, Esq. (*pro hac vice*)
H. Douglas Hinson, Esq. (*pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree St.
Atlanta, GA 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
Email: tod.sawicki@alston.com
Email: doug.hinson@alston.com

**Counsel for FSC Defendants:** Financial Service
 Corporation, FSC Securities Corporation, and
 "Wharton Business Group"

1

Westlaw.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

**H**

United States District Court, W.D. Washington,
at Seattle.
In re WASHINGTON MUTUAL, INC. SECURI-
TIES, DERIVATIVE & ERISA LITIGATION.
In re Washington Mutual, Inc. Erisa Litigation.
This Document Relates to: All Cases.
**No. 2:08-md-1919 MJP.**
**Lead Case No. C07-1874 MJP.**

Oct. 5, 2009.

West KeySummary
**Labor and Employment 231H ⟜491(2)**

231H Labor and Employment
 231HVII Pension and Benefit Plans
  231HVII(C) Fiduciaries and Trustees
   231Hk487 Investments and Expenditures
    231Hk491 Investments in Securities or
Property of Sponsor
     231Hk491(2) k. Employee Stock
Ownership Plans. Most Cited Cases
It was a plausible claim that members of a pension
investment committee were fiduciaries with the dis-
cretion to remove an employer's common stock secu-
rities from the menu of investment options. The
committee had argued that an employee stock owner-
ship program was designed primarily to invest in
qualifying employer securities. However, the lan-
guage creating the program was not enough to im-
munize the committee from any potential liability as
fiduciaries. Rather, the relevant question was whether
the committee had discretionary authority to remove
the employer securities option after it had been cre-
ated and prior to the employer filing for bankruptcy.
Employee Retirement Income Security Act of 1974,
§ 3(2)(A). (¶24.), 29 U.S.C.A. § 1002(2)(A). (¶24.);
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTIONS TO DIS-
MISS**

MARSHA J. PECHMAN, District Judge.

**\*1** This matter comes before the Court on Defen-

dants' four motions to dismiss Plaintiffs' Second
Amended ERISA Complaint. (Dkt. No. 223 [FN1] (here-
inafter "Compl." or "¶ ").) Motions to dismiss have
been filed by: (1) Defendant JPMorgan Chase, Na-
tional Association (Dkt. No. 260); (2) Defendant
Kerry Killinger (Dkt. No. 262); (3) Defendants Ste-
ven Chazen, Stephen Frank, Charles Lillis, Phillip
Matthews, Margaret Osmer-McQuade, James Stever,
and Willis Wood (collectively, the "Director Defen-
dants" or "HR Committee") (Dkt. No. 258); and (4)
Defendants Todd Baker, Melissa Ballenger, David
Beck, Deborah Bedwell, John Berens, Curt Brouwer,
Tom Casey, Ron Cathcart, Daryl David, Michele
Grau-Iversen, Pia Jorgenson, Suzanne Krahling, Wil-
liam Longbrake, Michelle McCarthy, Robert Wil-
liams, and John Woods (collectively, the "Committee
Defendants") (Dkt. No. 265).

 FN1. All citations to entries or filings on the
 docket refer to case number 2:08-md-1919
 MJP.

Having reviewed the motions, Plaintiffs' omnibus
response (Dkt. No. 288), Defendants' reply briefs in
support of their motions (Dkt.Nos.302, 303, 304,
305), and all papers submitted in support thereof, and
having heard oral argument from the parties on Au-
gust 6, 2009 (see Dkt. No. 328), the Court makes the
following rulings:

 1. The Committee Defendants' motion (Dkt. No.
 265) is DENIED with respect to Count One,
 GRANTED IN PART AND DENIED IN PART
 with respect to Count Four, and GRANTED with
 respect to Count Five.

 2. The Director Defendants' motion (Dkt. No. 258)
 is GRANTED with respect to Count One,
 GRANTED IN PART AND DENIED with respect
 to Count Two, and DENIED with respect to Count
 Five.

 3. Defendant Killinger's motion (Dkt. No. 262) is
 GRANTED.

 4. Defendant JPMC's motion (Dkt. No. 260) is
 GRANTED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

The Court's reasoning is set forth below.

### Procedural History

On May 7, 2008, the Court consolidated nine related ERISA actions as part of a Multi-District Litigation proceeding against Defendants. (Dkt. No. 25.) On May 20, 2008, the Court appointed co-lead counsel and, on February 18, 2009, Plaintiffs filed the operative consolidated ERISA complaint. (Dkt.Nos.45, 233.) Defendants filed their motions to dismiss on April 27, 2008, and the Court heard argument on these motions on August 6, 2009.

### Background

Plaintiffs Gregory Bushansky, Dana Mara, and Marina Ware are participants in the WaMu Savings Plan (the "Plan"), a defined contribution retirement plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). (¶¶ 14-16.) Washington Mutual, Inc. (the "Company" or "WaMu" or "WMI") filed for bankruptcy protection on September 26, 2008, the day after its banking entities, including Washington Mutual Bank ("WMB"), were seized by the Federal Deposit Insurance Corporation ("FDIC"). The FDIC sold WMB to JPMorgan Chase Bank, National Association ("JPMC" or "Chase"). (¶ 17.)

The WaMu Savings Plan is an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). (¶ 24.) The Plan was amended in 2002 to include the WaMu Savings Program ("WSP") and an Employee Stock Ownership Program ("ESOP"). (¶¶ 26-28; Rummage Decl., Ex. A (hereinafter "Plan") at § 1.1.) The ESOP is the portion of Plan that allows participants to invest in WaMu securities through the Company Stock Fund. (¶¶ 29-30; Plan § 2.23.) WaMu employees were eligible to join the Plan at any time after their hire date and, after an employee had completed at least one year of service, WaMu matched contributions dollar for dollar for the first three percent of qualifying pay contributed. (Rummage Decl., Ex. B (hereinafter "Summary Plan Description" or "SPD").) Participants also received fifty cents for each dollar for the two percent of qualifying contributions beyond their initial three percent contributions. (*Id.*) Participants could invest in thirteen "principal" investment funds, the ESOP, or a variety of other securities via Broker-

ageLink. (*Id.* at 18.)

*2 Broadly, Plaintiffs allege that WaMu securities were an imprudent investment because the Company (1) relied too heavily on subprime mortgage loans and other risky mortgage loan products, (2) allowed lax underwriting policies for its loans, (3) manipulated the property appraisal process, (4) failed to maintain adequate risk management policies, and (5) failed to accurately account for is subprime operations on its misleading financial statements. (¶ 4.) [FN2] Plaintiffs allege the Plan fiduciaries had the authority to select and revise Plan investment options at their discretion, including the WaMu Stock Fund. (¶¶ 38-39.)

> FN2. These allegations mirror Plaintiffs' claims in the Securities Litigation. (*See* Dkt. No. 277 at 5.) Plaintiffs allege that WaMu stock was an imprudent investment because the Company (1) relied heavily on high-risk loan products including subprime mortgage loans (¶¶ 101-173), (2) maintained poor underwriting standards (¶¶ 174-224), (3) pursued an illegal scheme to artificially inflate appraisals during the loan origination process (¶¶ 225-236), (4) failed to implement effective risk-management controls (¶¶ 237-240), and (5) did not account for exposure to loan losses and engaged in other questionable accounting practices (¶¶ 241-262). (¶ 99.)

The Committee Defendants are the members of the Plan Investment Committee ("PIC") and the Plan Administration Committee ("PAC"). Both PIC and PAC are named fiduciaries of the Plan. (¶ 86, Plan § 12.1(c).)

PIC, which includes Defendants Baker, Ballenger, Beck, Brouwer, David, McCarthy, Meola, Williams and Woods, had the responsibility of selecting and monitoring the investment funds in the Plan. (¶¶ 22, 75-82 (further detailing responsibilities).) The Plan provides that PIC "shall be the fiduciary responsible for selecting the investment funds for the Plan." (Plan § 10.1(a).) Though this section of the Plan does not specify whether the term "investment fund" encompasses investments in the Company Stock Fund, a later section provides that participants may "allocate contributions to their accounts to various investment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

funds, including a fund (the 'Company Stock Fund') which will be invested primarily in the common stock of the Company." (Plan § 10.3.) The Plan Summary distributed to employees, however, differentiates between "investment fund" options and the ESOP option. (SPD at 18-21.) The term "investment fund" is not a defined term in the Plan. (*See* Plan Art. II.) PIC had the authority to "review, select or remove, and monitor investment funds and fund managers." (Plan § 12.2(c)(ii); *see also* SPD at 32 ("The Plan Investment Committee is responsible for selecting investment options for the plan and for monitoring the performance of those investments.").)

PAC, which consists of Defendants Beck, Bedwell, Berens, Casey, Cathcart, David, Grau-Iverson, Jorgenson, Krahling, Longbrake, and Williams, exercised administrative control over the Plan, including determining participant eligibility. (¶¶ 23, 95-98; Plan § 12.2 .) Plaintiffs allege that, through PAC's required dissemination of Plan documents to participants, PAC incorporated by reference WaMu's misleading SEC filings. (¶ 97.) Plaintiffs pay particular attention to PAC members Casey (¶¶ 249, 282, 288) and Cathcart (¶ 138) for overseeing WaMu's heightening risk position.

The Director Defendants are all members of the Human Resources Committee of the Board of Directors. (¶ 21.) The HR Committee was charged with overseeing the management of the Plan and "periodically review[ing] the performance of the funds and the investment managers of the funds." (¶ 75 (quoting HR Committee charter).) The Director Defendants appointed the members of PIC and PAC and had a duty to monitor both, though there is some ambiguity in the appointment provisions of the Plan. (¶¶ 78-80, 81-82.) The Board of Directors had the power to delegate amendment authority to PIC or PAC as long as "the delegate reasonably believes that the amendment will not have the impact of significantly increasing the cost or potential liability exposure of the Plan." (Plan § 13.1(c) .)

**\*3** Defendant Kerry Killinger is a former Director, Chairman of the Board, Chief Executive Officer, and President of WaMu and an alleged de facto Plan fiduciary by virtue of the Board's ability to supervise PIC and his attendance at HR Committee meetings. (¶¶ 20, 71-73.) Plaintiffs allege Killinger "made numerous statements, many of which were incomplete

and inaccurate" to Plan participants. (¶ 72.) In particular, Plaintiffs point to statements Killinger made in the press (¶¶ 137, 156, 164-67, 169, 278, 283, 295, 303, 335, 340, 362, 367-68), at various corporate meetings (¶¶ 170-71, 296-97, 310, 320-21), and in SEC filings (¶¶ 282, 285-86, 288, 291, 293, 300, 307, 313, 318, 333).

Plaintiffs identify WMI, a bank holding company, as a "party" in the Complaint, though they do not name WMI as a Defendant. (¶ 17.) Plaintiffs name JPMC as a Defendant because it acquired WMB, a depository bank, from the FDIC. (¶ 42.) Defendant JPMC is not sued as a fiduciary, but is named as a Defendant based on its alleged assumption of liability through the purchase of WMB. Although WMI was not a named fiduciary of the plan, Plaintiffs argue WMI was a de facto fiduciary because it "had the responsibility to appoint, and hence to monitor and remove, the Trustee." (¶ 63.)

Plaintiffs assert six causes of action:

1. *Count One* against PIC, the Director Defendants, and JPMC for failure to prudently and loyally manage the Plan's assets. (¶¶ 391-410.) Plaintiffs allege these Defendants had the discretion to remove WaMu common stock as an investment option from the Plan and breached their duty of prudence by preserving the stock as an investment option. Plaintiffs have indicated they withdraw this claim with respect to the Director Defendants. (*See* Dkt. No. 288 at 70.)

2. *Count Two* against the Director Defendants and JPMC for failure to monitor the Plan's named fiduciaries. (¶¶ 411-20.) Plaintiffs argue the HR Committee failed to evaluate the fiduciaries' analysis of WaMu stock.

3. *Count Three* against JPMC and Killinger for breach of the duty of disclosure to co-fiduciaries. (¶¶ 421-27.)

4. *Count Four* against PAC, JPMC, and Killinger for the failure to provide complete and accurate information to plan participants. (¶¶ 428-39.)

5. *Count Five* against all Defendants for co-fiduciary liability. (¶¶ 440-51.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

6. *Count Six* against JPMC for knowing participation in a breach of fiduciary duty. (¶¶ 452-55.)

Plaintiffs seek to certify a class of Plan participants and, ultimately, declaratory relief, reformation of the trust, and damages. (Compl.§ XIV.)

### Discussion

### I. Standard of Review on a Motion to Dismiss

On a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the Court must assess the legal feasibility of the Complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Dismissal is appropriate where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint withstands the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal,* ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556) (further noting that plausibility lies somewhere between allegations that are "merely consistent" with liability and a "probability requirement"); *see also Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009) (citing *Iqbal* 129 S.Ct. at 1949) ("In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.").

*\*4* The Court accepts Plaintiffs' factual allegations as true, but need not accord the same deference to legal conclusions. *Iqbal,* 129 S.Ct. at 1949-150 (citing *Twombly,* 550 U.S. at 555). To the extent documents referenced in a complaint contradict a plaintiff's conclusory allegations, the Court is not required to accept those allegations as true. *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th Cir.1998).

### II. Judicial Notice

When deciding a motion to dismiss, a court may "generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007). Consistent with Fed.R.Evid. 201(b), a court may take judicial notice of facts that are "not subject to reasonable dispute," as well as documents that are referred to in the complaint, that are central to plaintiff's claims, and whose authenticity is undisputed. *See, e.g., Branch v. Tunell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1127 (9th Cir.2002). A court may also take judicial notice of public documents filed with the SEC, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 n. 7 (9th Cir.2008), records and reports of administrative bodies, *Mack v. S. Bay Beer Distrib.,* 798 F.2d 1279, 1282 (9th Cir.1986), *overruled on other grounds by Astoria Fed. Sav. and Loan Ass'n v. Solimino,* 501 U.S. 104, 110-11, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), and conference call transcripts, *In re Pixar Sec. Litig.,* 450 F.Supp.2d 1096, 1100 (N.D.Cal.2006).

Defendant Killinger moves for judicial notice of several documents and Plaintiffs do not object. (Dkt. No. 263; Dkt. No. 288 at 69.) The Court takes judicial notice of various SEC filings (Davis Decl., Exs. A, B, C, E, G, L, N, O), public records (*Id.,* Exs. P, Q), and transcripts of WaMu conference calls and presentations (*Id.,* Exs. D, F, H, I, J, K, M). The Court does not draw any inferences in favor of either party on the basis of judicially noticed facts.

### III. ERISA Fiduciary Status

"In every case charging breach of ERISA fiduciary duty ... the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), an individual is a plan fiduciary "to the extent" she exercises discretionary control over the management or administration of the plan. *See also* 29 C.F.R. § 2509.75-8 (2009) (Answer to Question D-4) ("For example, the board of directors may be responsible for the selection and retention of plan fiduciaries ... their responsibility, and, conse-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

quently, their liability, is limited to the selection and retention of fiduciaries.").

**\*5** Courts must, therefore, distinguish between actions taken by a plan sponsor in its settlor capacity from ones taken in a fiduciary capacity. *Lockheed Corp. v. Spink,* 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (sponsor was acting in its settlor capacity when amending the terms of a pension benefit plan); *Hughes Aircraft Co. v. Jacobsen,* 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("ERISA's fiduciary requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts...."). The Court engages in a "functional" inquiry when determining whether an individual is a fiduciary. *Kayes v. Pac. Lumber Co.,* 51 F.3d 1449, 1459 (9th Cir.1995) (citing *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)).

Plan fiduciaries must discharge their duties "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity" would use. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1); *see also Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1093-94 (9th Cir.2004). Under ERISA § 409(a), 29 U.S.C. § 1109(a), fiduciaries are personally liable for plan losses resulting from breaches of their duties.

Because ERISA liability turns on Defendants' fiduciary status, the Court analyzes the Complaint as it implicates each of the four groups of Defendants.

## IV. PIC/PAC: The Committee Defendants

The Committee Defendants challenge Counts One, Four, and Five of the Complaint; all other Defendants join their challenge to Count One. (*See* Dkt. No. 265 at 14; Dkt. No. 258 at 6; Dkt. No. 262 at 5.) Though Defendants are not entitled to dismissal of Counts One and Four, Count Five must be dismissed with respect to the Committee Defendants.

### a. Count One: WaMu Plan Design

Count One asserts that PIC members failed to act in accordance with their duties of prudence and loyalty

by preserving WaMu securities as an option for Plan investment. (¶¶ 391-410.) Defendants do not dispute that PIC was a named fiduciary of the Plan. (*See* Dkt. § 12.1(c).) Defendants argue that, because the Plan expressly contemplated the creation of the Stock Fund, PIC members could not have acted as fiduciaries while preserving WaMu securities as an investment option. (Dkt. No. 265 at 16.) In their view, the Complaint is flawed because it seeks to impose liability for decisions reached by individuals acting in a settlor capacity, not a fiduciary one. *See, e.g., Hughes Aircraft,* 525 U.S. at 444.

Fiduciaries must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of" ERISA. 29 U.S.C. § 1104(a)(1)(D). Defendants point to other instances where courts have dismissed breach of fiduciary duty claims arising from plans whose language required a particular investment be offered. (Dkt. No. 265 at 17.) For instance, in *Crowley,* the court dismissed a similar claim where an ERISA plan made it "abundantly clear" that the participants would be able to select from the investment options "including" the company's stock. *Crowley v. Corning, Inc.,* No. 02-cv-6172, 2004 WL 763873, at \*7 (W.D.N.Y. Jan.14, 2004); *see also In re McKesson HBOC, Inc. ERISA Litig.,* 391 F.Supp.2d 812, 832 (N.D.Cal.2005) (plan provided a company's contributions to participants' retirement funds "shall be invested" in the corporation's stock); *In re Citicorp ERISA Litig.,* No. 09-civ-9790, 2009 U.S. Dist. LEXIS 78055, at \*25 (S.D.N.Y. Aug. 31, 2009) (dismissing claims where the "pellucid language" of the plan required a stock fund be comprised of a corporation's common stock). In contrast, the *WorldCom* court denied dismissal of a prudence claim against plan fiduciaries because:

> **\*6** [e]ven in the context of an ESOP, which is designed to offer employees the opportunity to solely invest in the employer's stock, a fiduciary may be liable for continuing to offer an investment in the employer's securities, at least where the plaintiff can show that circumstances arose which were not known or anticipated by the settlor of the trust that made a continued investment in the company's stock imprudent.

*In re WorldCom, Inc. ERISA Litig.,* 263 F.Supp.2d 745, 764 (S.D.N.Y.2003) (citing *Moench v. Robert-*

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

son, 62 F.3d 553, 571 (3d Cir.1995)); *see also In re J.D.S. Uniphase Corp. ERISA Litig.,* No. C 03-04743, 2005 WL 1662131, at *6 (N.D.Cal. Jul.14, 2005) (dismissal inappropriate even where plan articulated availability of several mutual funds as well as a company stock fund; *Shanehchian v. Macy's, Inc.,* No. 1:07-cv-00828, 2009 WL 2524562, at *5 (S.D.Ohio Aug.14, 2009) (denying dismissal where defendants argued plans gave no discretion to remove the company stock fund from the list of investment funds).

Defendants assert the *Crowley* line of cases is consistent with *Wright,* where the Ninth Circuit affirmed dismissal of a claim that plan fiduciaries violated ERISA's diversification requirement by failing to allow participants to sell higher percentages of employer securities. (Dkt. No. 305 at 12 (citing *Wright,* 360 F.3d at 1100).) The *Wright* plaintiffs' claims that their plan should have been more diversified ran contrary to the ERISA provision exempting Eligible Individual Account Plans ("EIAPs") from diversification requirements. 360 F.3d at 1097-99 (Plaintiffs sought to capture "a rise in the share value following a major, though not necessarily unique, corporate development."). The present Complaint does not, by its terms, advance a diversification claim. Plaintiffs' allegations more closely reflect those in *Syncor,* where plaintiffs asserted a claim for breach of fiduciary duty based on the selection of company stock as an investment option. *In re Syncor ERISA Litig.,* 516 F.3d 1095, 1102 (9th Cir.2008) (differentiating prudence claims based on the selection of investments from diversification claims). In rejecting the lower court's entry of summary judgment, the Ninth Circuit observed an ERISA violation could arise where defendants participated in an illegal scheme while simultaneously preserving those aspects of a plan that invested in Syncor stock. *Id.* at 1102-03.

Like the plans in *Crowley* and *WorldCom*-and every other ESOP plan for that matter-the Plan specifically contemplates that employees will have the opportunity purchase the company's securities. The Plan provides the "ESOP is designed to invest primarily in qualifying employer securities ..." through the Stock Fund. (Plan § 1.1.) The Court is not persuaded that the language creating the ESOP is enough to immunize Defendants from any potential liability as fiduciaries. Rather, the relevant question for the Court's functional inquiry is whether PIC had any discretionary authority to remove the WaMu se-

curities option after it had been created. *See Kayes,* 51 F.3d at 1459. There is no question that PIC had the authority to "review, select or remove, and monitor investment funds and fund managers." (Plan § 12.2(c) (ii).) While Defendants would have the Court read this provision to mean PIC only had the authority to replace non-ESOP funds, another section of the Plan suggests that the term "investment fund" encompasses the WaMu Stock Fund. Specifically, the section of the Plan describing initial elections provides: "[t]he Participants in the Plan are allowed to allocate contributions to their accounts to various investment funds, *including* a fund (the "Company Stock Fund") which will be invested primarily in the common stock of the Company...." (*Id.* § 10.3 (emphasis added).) Plaintiffs' allegation that "[n]othing in the Plan required the WaMu Company Stock Fund as an investment option or limited the ability of the Plan fiduciaries to remove the options" appears sufficient in light of the Plan's embrace use of "investment fund." (¶ 40.) The terms of the Plan create some ambiguity as to whether the PIC's discretion to select funds would include the selection of the Company Stock Fund. Resolving this ambiguity in Plaintiffs' favor at the motion to dismiss phase, the Court finds a plausible claim that PIC members were fiduciaries with the discretion to remove WaMu securities from the menu of investment options.

*7 Because the Court can settle the question on the language of the Plan, it need not reach the more difficult issue of whether a fiduciary must disregard the unequivocal language of a plan in order to protect participants. *See* Amended Brief of the Secretary of Labor as Amicus Curiae at 34, *In re Enron Corp.,* No. 4:01-cv-3913 (S.D.Tex. Sept. 03, 2002) (Department of Labor arguing "even if the Plan purported to limit the fiduciaries' discretion to some extent ... Defendants had a duty to disregard the plan where following it would be an imprudent act.").

**b. Count One: ERISA Section 404(c) Safe Harbor**

Defendants also claim that Claim One-and by extension all claims-fails by virtue of a statutory exception for participant-directed investments. (Dkt. No. 265 at 21.) Pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c), in situations where participants control the funds in their accounts, "no person who is otherwise a fiduciary shall be liable ... for any loss, or by reason of any breach, which results from such participant's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

or beneficiary's exercise or control." To fall within the ambit of the safe harbor, a defendant must demonstrate (1) participants could choose from a broad range of investment alternatives, (2) participants could give investment instructions with reasonable frequency, and (3) participants had access to sufficient information to make informed decisions. *See* Nell Hennessy & Frank Daniele, *ERISA Fiduciary Law* 406 (Susan P. Serota & Frederick Brodie eds.2006) (citing 29 C.F.R. § 2550.404c-1).

In most cases, defendants raise § 404(c) as an affirmative defense and are not entitled to a Rule 12(b)(6) dismissal based on the defense. *See In re Sprint Corp. ERISA Litig.,* 388 F.Supp.2d 1207, 1234 (D.Kan.2004) ("Defendants will need to prove they are entitled to invoke this defense on the facts of this case."); *WorldCom,* 263 F.Supp.2d at 764 n. 12 ("the existence of independent control is an affirmative defense and, in any event, a question of fact ..."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 578-79 (S.D.Tex.2003). However, when a plaintiff's complaint includes allegations that seek to defeat a potential affirmative defense and when those allegations demonstrate the defense's validity, the defendant may test the validity of the defense. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1276 (3d ed.2004) (collecting cases); *see also Hecker v. Deere & Co.,* 556 F.3d 575, 588 (7th Cir.2009) ("Plaintiffs here chose to anticipate the § 1104(c) defense in their Complaint explicitly and thus put it in play.").

In *Hecker,* participants had the option of investing in the fiduciaries' selected funds and in 2,500 other available funds through BrokerageLink. 556 F.3d at 587. The *Hecker* plaintiffs complained the defendants failed to disclose the fee arrangements for each of the available investments. *Id.* at 584-85. The Seventh Circuit determined that the § 404(c) defense could serve as the basis for dismissal because the funds available through BrokerageLink had fees ranging from 0.07% to 1.00% and this range of fees made it implausible to succeed on a claim that the plan presented an insufficient number of investment options. *Id.* at 589-90 (declining to decide the question of whether the safe harbor applies to the selection of investment options).[FN3] Other circuits and the Department of Labor have determined that the § 404(c) safe harbor does not apply to the fiduciary's selection of investment options. *See DiFelice v. U.S. Airways,*

*Inc.,* 497 F.3d 410, 418 n. 3 (4th Cir.2007) ("... although section 404(c) does limit the fiduciary's liability for losses that occur when participants make poor choices from a satisfactory menu of options, it does not insulate a fiduciary from liability for assembling an imprudent menu in the first instance."); Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 Fed.Reg. 46906, 46924 n. 27 (Oct. 13, 1992) ("limiting or designing investment options ... is a fiduciary function ..."); *Langbecker v. Elec. Data Sys. Corp.,* 476 F.3d 229, 310 (5th Cir.2007) (noting the narrow construction of "resulting from" language in § 404(c)).

> FN3. When denying the petition for rehearing and en banc review, the Seventh Circuit was careful to note that the *Hecker* plaintiffs did not challenge the appropriateness of "any of the 26 investment alternatives." *Hecker v. Deere & Co.,* 569 F.3d 708, 711 (7th Cir.2009). Thus, the *Hecker* opinion was not to be read "as a sweeping statement that any Plan fiduciary can insulate itself from liability by the simple expedient of including a very large number of investment alternatives...." *Id.*

**\*8** The two significant similarities between *Hecker* and this matter appear to be that Plaintiffs have included a response to a potential § 404(c) attack in the body of the Complaint and Plan participants had access to BrokerageLink. (¶¶ 381-86.) These similarities are insufficient to justify dismissal based on § 404(c) at this time. The critical distinction is that Plaintiffs here challenge the decision to preserve investment alternatives, not the administrative fees associated with any particular alternative. *See Hecker,* 569 F.3d at 711. The Complaint alleges that fiduciaries failed to "ensure effective participant control by providing complete and accurate material information to participants regarding WaMu stock." (¶ 384; *see also* ¶ 349.) Before the Court can decide the applicability of § 404(c), it must engage in the factual inquiry of whether the third prong of the defense has been satisfied. Dismissal based on § 404(c) would be inappropriate at this time.

**c. Count Four: PAC**

Defendants also move to dismiss Count Four, which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

Plaintiffs assert against PAC for failure to provide accurate information to plan participants. (Dkt. No. 265 at 25; Dkt. No. 305 at 15.) The Ninth Circuit recognizes that "ERISA imposes upon fiduciaries a general duty to disclose facts material to investment issues." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d 1036, 1045 (9th Cir.2001) (no duty to disclose purchase of collateralized mortgage obligations on behalf of trust). In deciding that ERISA fiduciaries had an affirmative obligation to disclose information concerning a proposed amendment to a plan, the Ninth Circuit reasoned "that once an ERISA fiduciary has material information relevant to a plan participant ... it must provide that information whether or not it is asked a question." *Bins v. Exxon Co. U.S.A.,* 189 F.3d 929, 939 (9th Cir.1999). The employer-fiduciaries in *Bins* could satisfy this obligation by informing participants that management "is seriously considering changing benefits" and describing the proposed changes. *Id.; see also Mathews v. Chevron Corp.,* 362 F.3d 1172, 1180-81 (9th Cir.2004) (analyzing disclosure related to benefit enhancements under "serious consideration" standard); *Wayne v. Pac. Bell,* 238 F.3d 1048, 1055 (9th Cir.2001) (employer-fiduciary had "duty not to actively misinform plan participants" about changes in benefits once proposed changes were given "serious consideration"); *Barker v. Am. Mobil Power Corp.,* 64 F.3d 1397, 1403-04 (9th Cir.1995) (breach of prudent man standard for fiduciary to misleadingly represent that funds would be available upon participants' retirement). The Third Circuit has affirmed dismissal of an ERISA claim that defendants failed to inform participants about the imprudence of holding company stock because the alleged fiduciaries "did not have a duty to give investment advice or to opine on the stock's condition." *Edgar v. Avaya, Inc.,* 503 F.3d 340, 350 (3d Cir.2007) (internal quotations omitted) (no duty to disclose adverse corporate developments such as delivery difficulties prior to public earnings announcement).

**\*9** Under the Plan, PAC had the authority over ministerial management issues and could make decisions on matters such as "efficient administration," eligibility determinations, benefit calculations, authorization of disbursements, and regulatory compliance. (¶ 95; Plan § 12.2(b).) Based on these responsibilities, Plaintiffs present two parallel tracks for establishing PAC's fiduciary status. Only one is viable on the facts alleged.

First, Plaintiffs allege that PAC members were fiduciaries pursuant to ERISA § 101(a), 29 U.S.C. § 1021(a), which describes the disclosure requirements plan administrators must fulfill. (¶ 97.) PAC members allegedly ran afoul of their disclosure obligations by incorporating "WaMu's misleading SEC filings" in fiduciary communications. (*Id.*) Courts have recognized that the act of incorporating SEC filings into Plan communications may give rise to ERISA liability. *See In re First Am. Corp. ERISA Litig.,* No. 07-01357, 2008 WL 5666637, at \*6-7 (C.D.Cal. Jul.14, 2008) (collecting cases). Plaintiffs' Complaint thus presents a straightforward claim for breach of the duty of disclosure arising from PAC's fiduciary duty to disseminate Plan documents.

Second, Plaintiffs allege that PAC members were de facto fiduciaries "in that they exercised discretionary authority or discretionary control respecting management of the Plan." (¶ 98.) The common theme in Ninth Circuit law is that the duty to disclose arises in the context of a contemplated change in the nature or management Plan benefits. *See Bins,* 189 F.3d at 939 (duty to disclose change in benefits); *Mathews,* 362 F.3d at 1180-81 (benefit enhancements); *Wayne,* 238 F.3d at 1055 (changes in benefits); *Barker,* 64 F.3d at 1403-04 (participant fund availability). The Complaint, however, posits a theory of disclosure well beyond that which is established in law. Plaintiffs suggest that, by virtue of a de facto fiduciary status, PAC had an obligation to engage in a broad discussion of WaMu's stock health. (¶ 363; *see also* ¶¶ 267-74 (information PAC member Longbrake should have disclosed earlier).) For instance, Plaintiffs allege PAC Defendants "failed to provide the Plan's participants with complete and accurate information regarding the Company's unduly large and risky exposure to subprime and other highly risky loans ..." and that, as a result, participants could not understand the risk inherent in their investment in WaMu stock. (¶¶ 366-67; ¶¶ 434-35.) This broader view of disclosure is problematic because the Complaint fails to allege any predicate facts that might establish PAC's de facto fiduciary status. Without any such allegations, the Court cannot infer PAC had a duty to disclose information beyond the type imposed by *Bins. See, e.g., Avaya,* 503 F.3d at 350.

To the extent Count Four asserts a disclosure claim based on PAC's statutorily-required disclosure obli-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

gations, the claim survives dismissal. However, Plaintiffs have failed to allege PAC's de facto fiduciary status beyond what is provided for in the Plan. Allegations that PAC ought to have disclosed based on a de facto fiduciary responsibility must be dismissed.

### d. Count Five: Co-Fiduciary Liability

*10 The Committee Defendants are entitled to dismissal of Plaintiffs' co-fiduciary claim. (*See* Dkt. No. 265 at 28.) Under ERISA § 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3), a fiduciary is liable as a co-fiduciary if he (1) knowingly participates in or conceals another fiduciary's breach, (2) enables another fiduciary's breach, or (3) had knowledge of a breach and failed to take steps to remedy it. While PIC and PAC are referenced in Count Five, all the allegations in those paragraphs refer to PIC and PAC as the offenders for the underlying breach, and not as participants or enablers of another party's breach. (¶¶ 440-51.)

Plaintiffs claim the Court should infer co-fiduciary status from the PIC and PAC's composition of high-ranking employees. (Dkt. No. 288 at 59.) This section of the Complaint, however, treats all Defendants as an undifferentiated mass of wrongdoers. In other words, there are no articulated facts from which the Court can infer that PIC or PAC were guilty of failing to remedy, participating in, or enabling another fiduciary's breach. (*See* ¶¶ 440-51.) This section of the Complaint presents the type of conclusory allegations that are expressly prohibited by Rule 8, *Twombly*, and *Iqbal*. The Court grants PIC and PAC's motion with respect to Count Five.

### V. Director Defendants

Although Plaintiffs' complaint names the Director Defendants in Counts One, Two, and Five, Plaintiffs wish to voluntarily dismiss the allegations against the Director Defendants in Count One. (Dkt. No. 288 at 49.)

### a. Count Two: Failure to Monitor

When an individual has the authority to appoint a fiduciary, that individual is a fiduciary with respect to the appointment. *See, e .g., Batchelor v. Oak Hill*

*Med. Group*, 870 F.2d 1446, 1448 (9th Cir.1989) (recognizing duty to monitor selection and retention of fiduciaries). The appointing fiduciary retains the obligation to "[a]t reasonable intervals," evaluate the performance of the appointees "to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." 29 C.F.R. § 2509.75-8 at FR-17.

By virtue of their ability of appoint members of PIC and PAC, the HR Committee concedes its members were fiduciaries to the extent of their appointment and removal powers. (Dkt. No. 258 at 19 (recognizing duty to appoint).) Plaintiffs maintain the claim arises out of the Director Defendants insufficient monitoring related to their (1) failure provide appointees with information that was critical to the viability of the WaMu Stock Fund and (2) failure to remove appointees who failed to faithfully discharge their duties. (Dkt. No. 288 at 63.)

First, with respect to Defendants' failure to provide information to PIC and PAC, Plaintiffs have stated a claim. Courts recognize that this type of monitoring claim is fact-intensive requiring a significant amount of discovery. *See Lingis v. Motorola*, No. 03 C 5044, 2009 WL 1708097, at *17 (N.D.Ill. June 17, 2009) (citations omitted); *Syncor*, 351 F.Supp.2d at 986. Plaintiffs claim the Director Defendants failed to ensure PIC and PAC "appreciated the true extent of WaMu's highly risky and inappropriate business practices." (¶ 418.) Accepted as true, these allegations of fact give rise to a plausible claim.

*11 Second, Plaintiffs' allegation that the Director Defendants failed to timely review and remove appointees does not state a claim. Courts have held that a monitoring claim based on a failure to periodically review appointed fiduciaries must allege facts relating to the periodic review process. *See In re Capilene Corp.*, No. C-03-1685, 2005 WL 1431506, at *6 (N.D.Cal. Mar.31, 2005). Plaintiffs include no allegations of fact about the Board's procedures with respect to appointment and retention and merely argue this duty must have been breached by the precipitous fall of WaMu's stock price. (Dkt. No. 288 at 56; *see also* Compl. ¶ 418 .) While the Court is careful to note Defendants should not be compelled to plead a factual negative, the Complaint offers no insight into how the HR Committee's appointment and removal process was deficient. Instead, it merely observes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

that, per the Investment Committee's charter, the HR Committee was to receive reports on the status of the Plan twice a year. (¶ 76.) They do not make any claims about the type of information that the Directors reviewed or should have reviewed when supervising PIC and PAC, nor do they make any claims about individuals whose "performance was inadequate" and who should have been removed. (¶ 418.) The inference that all PIC and PAC members were necessarily under-supervised as a result of the decline in WaMu's stock price falls short of the facial plausibility standard articulated in *Iqbal.*

To the extent Plaintiffs' claim is based on the Director Defendants' failure to provide PIC and PAC with the necessary information to make informed decisions, Defendants' motion is denied. However, Plaintiffs' allegations concerning the adequacy of the HR Committee's supervisory role are dismissed.

**b. Count Five: Co-Fiduciary Liability**

As the Court has noted, a fiduciary may be liable as a co-fiduciary if she (1) knowingly participates in or conceals another fiduciary's breach, (2) enables another fiduciary's breach, or (3) had knowledge of a breach and failed to take steps to remedy it. *See* 29 U.S.C. § 1105(a). Unlike the co-fiduciary claims asserted against PIC and PAC, the claim against the Director Defendants makes direct claims of enabling and knowing participation. (¶¶ 447-48.) In particular, Plaintiffs allege "the HR Committee ... knowingly participated in the breaches of the Prudence Defendants because ... they had actual knowledge of the facts that rendered WaMu stock an imprudent retirement investment." (¶ 447.) These allegations concerning Defendants' knowledge state a claim against the Director Defendants as true co-fiduciaries rather than in their capacity as direct fiduciaries. Defendants' motion is denied with respect to Count Five.

**VI. Kerry Killinger**

Defendant Killinger challenges the Complaint on the basis (1) it fails to allege facts that would make him a de facto fiduciary and (2) the facts alleged to not constitute breaches of the various claims. Because the Court finds Plaintiffs have failed to allege facts that would make Killinger a fiduciary, it need not reach the latter issue.

*12 Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), an individual is a plan fiduciary "to the extent" she exercises discretionary control over the management or administration of the plan. Plaintiffs assert Killinger acted as a de facto fiduciary because of his position as Chairman of the Board and CEO, his attendance at HR Committee meetings and his statements to Plan participants. (Dkt. No. 288 at 70-81; Compl. ¶¶ 71-74.)

In *WorldCom,* the court dismissed claims by plaintiffs that SEC filings and a Board's inherent authority over inferior fiduciaries imposed fiduciary status on the entire Board of Directors. 263 F.Supp.2d at 760-61 (citing *Pegram,* 530 U.S. at 225-26). The court rejected plaintiffs' argument because "it would make any supervisor of an ERISA fiduciary also an ERISA fiduciary." *Id.* As in *WorldCom,* Plaintiffs here allege that WMI's duty to monitor was "necessarily exercised" by the Board, including Killinger. (Dkt. No. 288 at 71.) This appears to be precisely the sort of fiduciary-by-extrapolation analysis the court in *WorldCom* rejected. An executive title alone does not impose de facto fiduciary status on an individual and it is insufficient to allege that Killinger was a fiduciary merely because he was the Chief Executive Officer.

Killinger's attendance at HR Committee meetings, from which the Court is urged to draw "a more than reasonable inference that Killinger's position ... gave him a powerful and influential role" over the HR committee, is also insufficient to establish fiduciary status. (Dkt. No. 288 at 71.) Plaintiffs make no allegation that Killinger actually exercised any discretionary authority at those meetings over either the Plan or the Plan's management. Indeed, there are no allegations Killinger did anything at all at those meetings. (¶ 73.)

Plaintiffs also claim Killinger acted as a fiduciary by virtue of the statements he made to the Company and the public as a whole. (Dkt. No. 288 at 72.) When pressed to identify statements made to Plan participants in a fiduciary capacity, Plaintiffs point to just one paragraph complaint where Killinger made broad statements about the Company's liquidity and core business strength. (*Id.* citing ¶ 368.) The cited statement, a platitude about WaMu's "valuable and strong" brand, is not alleged to have been made under any circumstances that would lead employees to be-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

lieve Killinger was discussing the Plan. (¶ 368.) In their response, Plaintiffs do not argue that the numerous statements in the Complaint related to Killinger's certification of SEC filings or his statements to the press could have been directed at Plan participants. (*See, e.g.,* ¶¶ 282, 285, 286, 288, 291, 293, 300, 307, 313, 318, 333.) There are no factual allegations from which the Court can infer that Killinger's "direct and indirect" communications with employees could have been received as Plan-related communications. (¶ 360.) Last, Plaintiffs' reliance on *Varity* is misplaced because the employee at issue in that case was already a plan fiduciary by virtue of his other discretionary tasks. *Varity Corp. v. Howe,* 516 U.S. 489, 502, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

**\*13** The Court is aware that it must look to the sum of the allegations against a defendant when analyzing potential fiduciary status; nevertheless, none of the categories of allegations against Killinger weigh in favor of finding sufficient de facto authority. Defendants are correct that Plaintiffs have failed to allege facts that would indicate Killinger held any discretionary authority over the Plan or its managers. As such, all claims against Killinger are dismissed.

## VII. JMPC

Chase moves to dismiss all claims against it arguing that the purchase of WMB could not have included the transfer of WMI's fiduciary liability.[FN4] The Court agrees with JPMC that Plaintiffs have not advanced a plausible theory of successorship.

> FN4. In their initial motion, JPMC asserted Plaintiffs should have to join WMI under Fed.R.Civ.P. 19. (Dkt. No. 260 at 10-12.) However, at oral argument, counsel for Chase indicated they no longer challenged the Complaint for failure to join. The Court therefore does not address the Rule 19 challenge.

### a. FDIC's Authority to Transfer Liability

JPMC argues that it could not be a successor under the purchase and assumption agreement because (1) the FDIC could not have had the authority to transfer the liability given its limited authority over bank holding companies like WMI and (2) the terms of the agreement with the FDIC provide that JPMC only

assumed liabilities related to WMB. (Dkt. No. 260 at 13-16.) Plaintiffs respond that that they "do not argue Chase accepted liability of WMI's violations via Chase's Purchase and Assumption Agreement or that the FDIC otherwise transferred that liability." (Dkt. No. 288 at 83 n. 10.) Plaintiffs' footnote belies much of the language in the Complaint. (*See* ¶ 19 ("Pursuant to the Purchase and Assumption Agreement, JPMCNA also specifically assumed 'all liabilities associated with any and all employee benefit plans,' including the Plan at issue in this case."); ¶¶ 42-44 ("... the Purchase and Assumption Agreement makes clear that liability related to the Plan (including liability for fiduciary breaches alleged herein) went to JPMCNA."); ¶ 70 ("Because it assumed WaMu's Plan-related liability in the Purchase and Assumption Agreement ... JPMCNA is fully liable for WaMu's breaches of fiduciary duty, as alleged herein.").)

Allowing Plaintiffs to proceed against JPMC runs the risk of expanding the FDIC's jurisdiction well beyond its statutory reach. The statute that empowered the FDIC to take WaMu Bank into receivership refers only to failed "depository institutions." 12 U.S.C. § 1821(d)(2)(A)(i). The Ninth Circuit has noted that a purchase agreement for an institution in FDIC receivership could not "apportion the assets and liabilities of independent corporate entities, just because those entities are also assets of the failed institution." *W. Park Assocs. v. Butterfield Sav. & Loan Ass'n,* 60 F.3d 1452, 1459 (9th Cir.1995). JPMC purchased WMB, the depository institution and subsidiary of WMI, from the FDIC. (Mattson Decl., Ex. C.) If the Court permitted Plaintiffs' claims against JPMC, it would be functionally granting FDIC powers beyond what Congress contemplated. Additionally, the Court would be completely ignoring the distinction in corporate form between WMI and WMB. (*See* Dkt. No. 302 at 8-9.) It is therefore inappropriate to allow claims to proceed against JPMC on the theory it assumed fiduciary liability by purchasing WMB.

### b. Common Law Successorship

**\*14** In the alternative, Plaintiffs argue JPMC inherited WMI's liability because it is a common law successor to WaMu. (Dkt. No. 288 at 83.) Whether a company can be liable based upon a common law theory of inherited liability for breach of ERISA fiduciary duties is a question of first impression, though the Court does not believe it is a close one in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

this case. (*See* Dkt. No. 288 at 82 (acknowledging "ERISA does not set forth principles governing successor liability).) Plaintiffs' argument improperly conflates contract-dependent successor liability with successor fiduciary liability.

Courts have recognized that a company can be held liable for delinquent contributions to a benefit plan owed by a predecessor. James F. Jorden, et al., *Handbook on ERISA Litigation* § 8.01[D] [1] (3d ed.2009) (citing *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop Inc.*, 823 F.2d 289, 294 (9th Cir.1987)). The *Hawaii Carpenters* case did not involve allegations of liability based on the improper conduct of its predecessor. The functional test applied by the *Hawaii Carpenters* court and proposed by Plaintiffs looks to issues such as the continuity in work force and plant management. 823 F.3d at 294 (citations omitted).[FN5] While compelling in the context of issues like plan contributions, there is no reason to think the test encompasses the myriad of concerns present in the context of liability based on the duties of prudence and loyalty. The Court thus declines to apply the test in this matter.

> FN5. The Court's analysis asked: "[whether] (a) there has been a substantial continuity of the same business operations; (b) the new employer uses the same plant; (c) the same or substantially same work force is employed; (d) the same jobs exist under the same working conditions; (e) the same supervisors are employed ... (g) and the same ... service is offered." *Id.*

Plaintiffs' final argument for extending liability lies in an appeal to ERISA's broad remedial purpose. (Dkt. No. 288 at 89.) In *Steinbach v. Hubbard*, the Ninth Circuit recognized that extending liability to successors "will sometimes be necessary in order to vindicate important statutory policies" and concluded successor liability could exist under the Fair Labor Standards Act. 51 F.3d 843, 845 (9th Cir.1995). But Plaintiffs ignore the statutory policies embodied in ERISA's plain terms. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), limits a fiduciary's liability "to the extent" she exercises discretionary control over a plan. The provision imposing liability speaks only of fiduciaries. 29 U.S.C. § 1109(a). In addition, ERISA § 409(b), 29 U.S.C. § 1109(b), provides that fiduciaries are not liable for breaches "committed before he be-

came a fiduciary or after he ceased to be a fiduciary." (*See also* Dkt. No. 260 at 17.) Read as a whole, these provisions contemplate liability for parties with fiduciary authority for acts completed in that capacity. See *Pegram*, 530 U.S. at 226. Plaintiffs cannot avoid these statutory provisions merely be arguing that they do not allege JPMC was a fiduciary. If anything, the failure to plead JPMC's fiduciary status provides a more compelling rationale for dismissal. An appeal to ERISA's broad purpose cannot override ERISA itself.

Plaintiffs have not put forth a plausible contractual or common law theory of successorship. All claims against JPMC are dismissed. Because it dismisses JPMC on Plaintiffs' theory of liability, the Court need not reach the question of whether Plaintiffs have sufficiently alleged WMI's fiduciary status. (*See* Dkt. No. 260 at 18; Dkt. No. 288 at 97.)

### Conclusion

**\*15** Plaintiffs' Complaint presents viable claims against PIC, PAC, and the HR Committee, but falls short of the mark with respect to Defendants Killinger and JPMC. The Court ORDERS as follows: The Committee Defendants' motion (Dkt. No. 265) is DENIED with respect to Count One, GRANTED IN PART AND DENIED IN PART with respect to Count Four, and GRANTED with respect to Count Five. The Director Defendants' motion (Dkt. No. 258) is GRANTED with respect to Count One, GRANTED IN PART AND DENIED with respect to Count Two, and DENIED with respect to Count Five. Defendant Killinger's motion (Dkt. No. 262) and JPMC's motion (Dkt. No. 260) are GRANTED.

The Court will discuss a schedule for submission of class certification motions at the upcoming status conference.

The Clerk is directed to transmit a copy of this Order to all counsel of record.

W.D.Wash.,2009.
In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation
Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2009 WL 3246994 (W.D.Wash.), 47 Employee Benefits Cas. 2505
**(Cite as: 2009 WL 3246994 (W.D.Wash.))**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2

Westlaw.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

**H**Only the Westlaw citation is currently available.

Supreme Court of the United States
Jerry N. JONES, et al., Petitioners,
v.
HARRIS ASSOCIATES L.P.
No. 08-586.

Argued Nov. 2, 2009.
Decided March 30, 2010.

**Background:** Owners of shares in mutual funds brought action against investment advisor under Investment Company Act of 1940, alleging that advisor's compensation was too high. The United States District Court for the Northern District of Illinois, Charles P. Kocoras, Senior District Judge, 2007 WL 627640, granted summary judgment for advisor. Owners appealed. The United States Court of Appeals for the Seventh Circuit, Easterbrook, Chief Judge, affirmed, 527 F.3d 627, and denied rehearing and rehearing en banc, 537 F.3d 728. Certiorari was granted.

**Holding:** The Supreme Court, Justice Alito, held that to face liability under the Investment Company Act of 1940 for breach of fiduciary duty with respect to the receipt of compensation for services, an investment advisor for a mutual fund must charge a fee that, under all of the circumstances, is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

Vacated and remanded.

Justice Thomas filed a concurring opinion.

West Headnotes

**[1] Securities Regulation 349B** 🔑**215**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and

Underwriting Contracts. Most Cited Cases
To face liability under the Investment Company Act of 1940 for breach of fiduciary duty with respect to the receipt of compensation for services, an investment advisor for a mutual fund must charge a fee that, under all of the circumstances, is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

**[2] Securities Regulation 349B** 🔑**220**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk219 Actions
                349Bk220 k. Evidence. Most Cited Cases
In an action against a mutual fund investment advisor under the Investment Company Act of 1940 for breach of fiduciary duty with respect to the receipt of compensation for services, the plaintiff has the burden of proving that the fee is outside the range that arm's length bargaining would produce. Investment Company Act of 1940, § 36(b)(1), 15 U.S.C.A. § 80a-35(b)(1).

**[3] Securities Regulation 349B** 🔑**215**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and Underwriting Contracts. Most Cited Cases
The expertise of the independent trustees of a mutual fund, whether they are fully informed about all facts bearing on the investment advisor's service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the investment advisor are liable for a breach of fiduciary duty under the Investment Company Act of 1940, with respect to the investment advisor's receipt of compensation for services. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

[4] Securities Regulation 349B ☞215

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and
Underwriting Contracts. Most Cited Cases
In determining whether an investment advisor for a
mutual fund is liable for a breach of fiduciary duty
under the Investment Company Act of 1940, with
respect to the receipt of compensation for services, no
categorical rule prohibits comparisons between the
fees that the advisor charges a captive mutual fund
and the fees that it charges its independent clients,
and courts may give such comparisons the weight
that they merit in light of the similarities and differ-
ences between the services that the clients in question
require, but courts must be wary of inapt compari-
sons. Investment Company Act of 1940, § 36(b), 15
U.S.C.A. § 80a-35(b).

[5] Securities Regulation 349B ☞215

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and
Underwriting Contracts. Most Cited Cases
The Investment Company Act of 1940, under which
an investment advisor for a mutual fund can be liable
for breach of fiduciary duty with respect to the re-
ceipt of compensation for services, does not necessar-
ily ensure fee parity between mutual funds and insti-
tutional clients. Investment Company Act of 1940, §
36(b), 15 U.S.C.A. § 80a-35(b).

[6] Securities Regulation 349B ☞215

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and
Underwriting Contracts. Most Cited Cases
In determining whether an investment advisor for a
mutual fund is liable for a breach of fiduciary duty
under the Investment Company Act of 1940, with
respect to the receipt of compensation for services,
courts should not rely too heavily on comparisons
with fees charged to mutual funds by other advisors;
these comparisons are problematic, because these
fees, like those challenged, may not be the product of

negotiations conducted at arm's length. Investment
Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-
35(b).

[7] Securities Regulation 349B ☞217

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk217 k. Administrative Proceedings
and Review. Most Cited Cases
In determining whether an investment advisor for a
mutual fund is liable for a breach of fiduciary duty
under the Investment Company Act of 1940, with
respect to the receipt of compensation for services, if
the mutual fund board of directors' process for nego-
tiating and reviewing investment advisor compensa-
tion is robust, a court should afford commensurate
deference to the outcome of the bargaining process,
and thus, if the disinterested directors considered the
relevant factors, their decision to approve a particular
fee agreement is entitled to considerable weight, even
if a court might weigh the factors differently. Invest-
ment Company Act of 1940, § 36(b), 15 U.S.C.A. §
80a-35(b).

[8] Securities Regulation 349B ☞217

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk217 k. Administrative Proceedings
and Review. Most Cited Cases
In determining whether an investment advisor for a
mutual fund is liable for a breach of fiduciary duty
under the Investment Company Act of 1940, with
respect to the receipt of compensation for services, if
the mutual fund board of directors' process for nego-
tiating and reviewing investment advisor compensa-
tion was deficient or the advisor withheld important
information, the court must take a more rigorous look
at the outcome than it would if the process was ro-
bust, and when an investment advisor fails to disclose
material information to the board, greater scrutiny is
justified because the withheld information might
have hampered the board's ability to function as an
independent check upon the management. Investment
Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-
35(b).

[9] Securities Regulation 349B ☞217

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk217 k. Administrative Proceedings
and Review. Most Cited Cases
The standard for determining whether an investment
advisor for a mutual fund is liable for a breach of
fiduciary duty under the Investment Company Act of
1940, with respect to the receipt of compensation for
services, does not call for judicial second-guessing of
informed board decisions. Investment Company Act
of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

**[10] Securities Regulation 349B ⟳215**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and
Underwriting Contracts. Most Cited Cases
In determining whether an investment advisor for a
mutual fund is liable for a breach of fiduciary duty
under the Investment Company Act of 1940, with
respect to the receipt of compensation for services,
the Act does not require courts to engage in a precise
calculation of fees representative of arm's length bar-
gaining. Investment Company Act of 1940, § 36(b),
15 U.S.C.A. § 80a-35(b).

*Syllabus* FN*

    FN* The syllabus constitutes no part of the
    opinion of the Court but has been prepared
    by the Reporter of Decisions for the conven-
    ience of the reader. See *United States v. De-*
    *troit Timber & Lumber Co., 200 U.S. 321,*
    337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 Petitioners, shareholders in mutual funds managed
by respondent investment adviser, filed this suit al-
leging that respondent violated § 36(b)(1) of the In-
vestment Company Act of 1940, which imposes a
"fiduciary duty [on investment advisers] with respect
to the receipt of compensation for services," 15
U.S.C. § 80a-35(b). Granting respondent summary
judgment, the District Court concluded that petition-
ers had not raised a triable issue of fact under the
applicable standard set forth in *Gartenberg v. Merrill
Lynch Asset Management, Inc., 694 F.2d 923, 928
(CA2):* "[T]he test is essentially whether the fee

schedule represents a charge within the range of what
would have been negotiated at arm's-length in light of
all of the surrounding circumstances .... To be guilty
of a violation of § 36(b), ... the adviser must charge a
fee that is so disproportionately large it bears no rea-
sonable relationship to the services rendered and
could not have been the product of arm's length bar-
gaining." Rejecting the *Gartenberg* standard, the
Seventh Circuit panel affirmed based on different
reasoning.

*Held:* Based on § 36(b)'s terms and the role that a
shareholder action for breach of the investment ad-
viser's fiduciary duty plays in the Act's overall struc-
ture, *Gartenberg* applied the correct standard. Pp. ----
- ----.

(a) A consensus has developed regarding the standard
*Gartenberg* set forth over 25 years ago: The standard
has been adopted by other federal courts, and the
Securities and Exchange Commission's regulations
have recognized, and formalized, *Gartenberg*-like
factors. Both petitioners and respondents generally
endorse the *Gartenberg* approach but disagree in
some respects about its meaning. Pp. ---- - ----.

(b) Section 36(b)'s "fiduciary duty" phrase finds its
meaning in *Pepper v. Litton,* 308 U.S. 295, 306-307,
60 S.Ct. 238, 84 L.Ed. 281, where the Court dis-
cussed the concept in the analogous bankruptcy con-
text: "The essence of the test is whether or not under
all the circumstances the transaction carries the ear-
marks of an arm's length bargain. If it does not, eq-
uity will set it aside." *Gartenberg's* approach fully
incorporates this understanding, insisting that all
relevant circumstances be taken into account and
using the range of fees that might result from arm's-
length bargaining as the benchmark for reviewing
challenged fees. Pp. ---- - ----.

(c) *Gartenberg's* approach also reflects § 36(b)'s
place in the statutory scheme and, in particular, its
relationship to the other protections the Act affords
investors. Under the Act, scrutiny of investment ad-
viser compensation by a fully informed mutual fund
board, see *Burks v. Lasker,* 441 U.S. 471, 482, 99
S.Ct. 1831, 60 L.Ed.2d 404, and shareholder suits
under § 36(b) are mutually reinforcing but independ-
ent mechanisms for controlling adviser conflicts of
interest, see *Daily Income Fund, Inc. v. Fox,* 464 U.S.
523, 541, 104 S.Ct. 831, 78 L.Ed.2d 645. In recogni-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

tion of the disinterested directors' role, the Act instructs courts to give board approval of an adviser's compensation "such consideration ... as is deemed appropriate under all the circumstances." § 80a-35(b)(1). It may be inferred from this formulation that (1) a measure of deference to a board's judgment may be appropriate in some instances, and (2) the appropriate measure of deference varies depending on the circumstances. *Gartenberg* heeds these precepts. See 694 F.2d, at 930. Pp. ---- - ----.

(d) The Court resolves the parties' disagreements on several important questions. First, since the Act requires consideration of all relevant factors, § 80a-35(b)(2), courts must give comparisons between the fees an investment adviser charges a captive mutual fund and the fees it charges its independent clients the weight they merit in light of the similarities and differences between the services the clients in question require. In doing so, the Court must be wary of inapt comparisons based on significant differences between those services and must be mindful that the Act does not necessarily ensure fee parity between the two types of clients. However, courts should not rely too heavily on comparisons with fees charged mutual funds by other advisers, which may not result from arm's-length negotiations. Finally, a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance. Where disinterested directors consider all of the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if the court might weigh the factors differently. Cf. *Lasker*, 441 U.S., at 486, 99 S.Ct. 1831. In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. *Id.*, at 484, 99 S.Ct. 1831. *Gartenberg*'s "so disproportionately large" standard, 694 F.2d, at 928, reflects Congress' choice to "rely largely upon [independent] 'watchdogs' to protect shareholders interests," *Lasker, supra,* at 482, 99 S.Ct. 1831. Pp. ---- - ----.

*2 (e) The Seventh Circuit erred in focusing on disclosure by investment advisers rather than on the *Gartenberg* standard, which the panel rejected. That standard may lack sharp analytical clarity, but it accurately reflects the compromise embodied in § 36(b) as to the appropriate method of testing investment adviser compensation, and it has provided a workable standard for nearly three decades. Pp. ---- - ----.

527 F.3d 627, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.
David C. Frederick, Washington, D.C., for Petitioners.

Curtis E. Gannon, for United States as amicus curiae, by special leave of the Court, supporting the Petitioners.

John D. Donovan, Jr., Boston, MA, for Respondent.

Michael J. Brickman, James C. Bradley, Nina H. Fields, Richardson, Patrick, Westbrook & Brickman, LLC, Charleston, SC, Guy M. Burns, Johnson, Pope, Bokor, Ruppel, & Burns, LLP, Tampa, Florida, David C. Frederick, Brendan J. Crimmins, Daniel G. Bird, Jennifer L. Peresie, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Ernest A. Young, Chapel Hill, NC, John M. Greabe, Hopkinton, NH, for Petitioners.

Jeffrey A. Lamken, Baker Botts L.L.P., Washington, D.C., Aaron M. Streett, Baker Botts L.L.P., Houston, TX, John D. Donovan, Jr., Robert A. Skinner, Benjamin S. Halasz, Brian R. Blais, Ropes & Gray LLP, Boston, MA, for Respondent.

For U.S. Supreme Court Briefs, see:2009 WL 1640018 (Pet.Brief)2009 WL 2777652 (Resp.Brief)2009 WL 3115800 (Reply.Brief)

Justice ALITO delivered the opinion of the Court.

*3 We consider in this case what a mutual fund shareholder must prove in order to show that a mutual fund investment adviser breached the "fiduciary duty with respect to the receipt of compensation for services" that is imposed by § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) (hereinafter § 36(b)).

I

A

The Investment Company Act of 1940 (Act), 54 Stat.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

789, 15 U.S.C. § 80a-1 *et seq.,* regulates investment companies, including mutual funds. "A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund." *Burks v. Lasker,* 441 U.S. 471, 480, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). The following arrangements are typical. A separate entity called an investment adviser creates the mutual fund, which may have no employees of its own. See *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 93, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 536, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984); *Burks,* 441 U.S., at 480-481, 99 S.Ct. 1831. The adviser selects the fund's directors, manages the fund's investments, and provides other services. See *id., at 481.* Because of the relationship between a mutual fund and its investment adviser, the fund often " 'cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.' " *Ibid.* (quoting S.Rep. No. 91-184, p. 5 (1969) (hereinafter S. Rep.)).

"Congress adopted the [Investment Company Act of 1940] because of its concern with the potential for abuse inherent in the structure of investment companies." *Daily Income Fund,* 464 U.S., at 536, 104 S.Ct. 831 (internal quotation marks omitted). Recognizing that the relationship between a fund and its investment adviser was "fraught with potential conflicts of interest," the Act created protections for mutual fund shareholders. *Id.,* at 536-538, 104 S.Ct. 831 (internal quotation marks omitted); *Burks, supra,* at 482-483, 99 S.Ct. 1831. Among other things, the Act required that no more than 60 percent of a fund's directors could be affiliated with the adviser and that fees for investment advisers be approved by the directors and the shareholders of the fund. See §§ 10, 15(c), 54 Stat. 806, 813.

The growth of mutual funds in the 1950's and 1960's prompted studies of the 1940 Act's effectiveness in protecting investors. See *Daily Income Fund,* 464 U.S., at 537-538, 104 S.Ct. 831. Studies commissioned or authored by the Securities and Exchange Commission (SEC or Commission) identified problems relating to the independence of investment company boards and the compensation received by investment advisers. See *ibid.* In response to such

concerns, Congress amended the Act in 1970 and bolstered shareholder protection in two primary ways.

*\*4 First, the amendments strengthened the "cornerstone" of the Act's efforts to check conflicts of interest, the independence of mutual fund boards of directors, which negotiate and scrutinize adviser compensation. *Burks, supra,* at 482, 99 S.Ct. 1831. The amendments required that no more than 60 percent of a fund's directors be "persons who are interested persons," *e.g.,* that they have no interest in or affiliation with the investment adviser. FN1 15 U.S.C. § 80a-10(a); § 80a-2(a)(19); see also *Daily Income Fund, supra,* at 538, 104 S.Ct. 831. These board members are given "a host of special responsibilities." *Burks,* 441 U.S., at 482-483, 99 S.Ct. 1831. In particular, they must "review and approve the contracts of the investment adviser" annually, *id.,* at 483, 99 S.Ct. 1831, and a majority of these directors must approve an adviser's compensation, 15 U.S.C. § 80a-15(c). Second, § 36(b), 84 Stat. 1429, of the Act imposed upon investment advisers a "fiduciary duty" with respect to compensation received from a mutual fund, 15 U.S.C. § 80a-35(b), and granted individual investors a private right of action for breach of that duty, *ibid.*

> FN1. An "affiliated person" includes (1) a person who owns, controls, or holds the power to vote 5 percent or more of the securities of the investment adviser; (2) an entity which the investment adviser owns, controls, or in which it holds the power to vote more than 5 percent of the securities; (3) any person directly or indirectly controlling, controlled by, or under common control with the investment adviser; (4) an officer, director, partner, copartner, or employee of the investment adviser; (5) an investment adviser or a member of the investment adviser's board of directors; or (6) the depositor of an unincorporated investment adviser. See § 80a-2(a)(3). The Act defines "interested person" to include not only all affiliated persons but also a wider swath of people such as the immediate family of affiliated persons, interested persons of an underwriter or investment adviser, legal counsel for the company, and interested broker-dealers. § 80a-2(a)(19).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

The "fiduciary duty" standard contained in § 36(b) represented a delicate compromise. Prior to the adoption of the 1970 amendments, shareholders challenging investment adviser fees under state law were required to meet "common-law standards of corporate waste, under which an unreasonable or unfair fee might be approved unless the court deemed it 'unconscionable' or 'shocking,' " and "security holders challenging adviser fees under the [Investment Company Act] itself had been required to prove gross abuse of trust." *Daily Income Fund,* 464 U.S., at 540, n. 12, 104 S.Ct. 831. Aiming to give shareholders a stronger remedy, the SEC proposed a provision that would have empowered the Commission to bring actions to challenge a fee that was not "reasonable" and to intervene in any similar action brought by or on behalf of an investment company. *Id.,* at 538, 104 S.Ct. 831. This approach was included in a bill that passed the House. H.R. 9510, 90th Cong., 1st Sess., § 8(d) (1967); see also S. 1659, 90th Cong., 1st Sess., § 8(d) (1967). Industry representatives, however, objected to this proposal, fearing that it "might in essence provide the Commission with ratemaking authority." *Daily Income Fund,* 464 U.S., at 538, 104 S.Ct. 831.

The provision that was ultimately enacted adopted "a different method of testing management compensation," *id.,* at 539, 104 S.Ct. 831 (quoting S.Rep., at 5 (internal quotation marks omitted)), that was more favorable to shareholders than the previously available remedies but that did not permit a compensation agreement to be reviewed in court for "reasonableness." This is the fiduciary duty standard in § 36(b).

B

*5 Petitioners are shareholders in three different mutual funds managed by respondent Harris Associates L.P., an investment adviser. Petitioners filed this action in the Northern District of Illinois pursuant to § 36(b) seeking damages, an injunction, and rescission of advisory agreements between Harris Associates and the mutual funds. The complaint alleged that Harris Associates had violated § 36(b) by charging fees that were "disproportionate to the services rendered" and "not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." App. 52.

The District Court granted summary judgment for Harris Associates. Applying the standard adopted in *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923 (C.A.2 1982), the court concluded that petitioners had failed to raise a triable issue of fact as to "whether the fees charged ... were so disproportionately large that they could not have been the result of arm's-length bargaining." App. to Pet. for Cert. 29a. The District Court assumed that it was relevant to compare the challenged fees with those that Harris Associates charged its other clients. *Id.,* at 30a. But in light of those comparisons as well as comparisons with fees charged by other investment advisers to similar mutual funds, the Court held that it could not reasonably be found that the challenged fees were outside the range that could have been the product of arm's-length bargaining. *Id.,* at 29a-32a.

A panel of the Seventh Circuit affirmed based on different reasoning, explicitly "disapprov[ing] the *Gartenberg* approach." 527 F.3d 627, 632 (2008). Looking to trust law, the panel noted that, while a trustee "owes an obligation of candor in negotiation," a trustee, at the time of the creation of a trust, "may negotiate in his own interest and accept what the settlor or governance institution agrees to pay." *Ibid.* (citing Restatement (Second) of Trusts § 242, and Comment *f* ). The panel thus reasoned that "[a] fiduciary duty differs from rate regulation. A fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation." 527 F.3d, at 632. In the panel's view, the amount of an adviser's compensation would be relevant only if the compensation were "so unusual" as to give rise to an inference "that deceit must have occurred, or that the persons responsible for decision have abdicated." *Ibid.*

The panel argued that this understanding of § 36(b) is consistent with the forces operating in the contemporary mutual fund market. Noting that "[t]oday thousands of mutual funds compete," the panel concluded that "sophisticated investors" shop for the funds that produce the best overall results, "mov[e] their money elsewhere" when fees are "excessive in relation to the results," and thus "create a competitive pressure" that generally keeps fees low. *Id.,* at 633-634. The panel faulted *Gartenberg* on the ground that it "relies too little on markets." 527 F.3d, at 632. And the panel firmly rejected a comparison between the fees that Harris Associates charged to the funds and the fees that Harris Associates charged other types of clients,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

observing that "[d]ifferent clients call for different commitments of time" and that costs, such as research, that may benefit several categories of clients "make it hard to draw inferences from fee levels." *Id., at 634.*

**\*6** The Seventh Circuit denied rehearing en banc by an equally divided vote. 537 F.3d 728 (2008). The dissent from the denial of rehearing argued that the panel's rejection of *Gartenberg* was based "mainly on an economic analysis that is ripe for reexamination." 537 F.3d, at 730 (opinion of Posner, J.). Among other things, the dissent expressed concern that Harris Associates charged "its captive funds more than twice what it charges independent funds," and the dissent questioned whether high adviser fees actually drive investors away. *Id., at 731.*

We granted certiorari to resolve a split among the Courts of Appeals over the proper standard under § 36(b).[FN2] 556 U.S. ----, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009).

> FN2. See 527 F.3d 627 (C.A.7 2008) (case below); *Migdal v. Rowe Price-Fleming Int'l, Inc.,* 248 F.3d 321 (C.A.4 2001); *Krantz v. Prudential Invs. Fund Management LLC,* 305 F.3d 140 (C.A.3 2002) *(per curiam).* After we granted certiorari in this case, another Court of Appeals adopted the standard of *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923 (C.A.2 1982). See *Gallus v. Ameriprise Financial, Inc.,* 561 F.3d 816 (C.A.8 2009).

## II

### A

Since Congress amended the Investment Company Act in 1970, the mutual fund industry has experienced exponential growth. Assets under management increased from \$38.2 billion in 1966 to over \$9.6 trillion in 2008. The number of mutual fund investors grew from 3.5 million in 1965 to 92 million in 2008, and there are now more than 9,000 open- and closed-end funds.[FN3]

> FN3. Compare H.R. Rep. No. 2337, 89th Cong., 2d Sess., p. vii (1966), with Invest-

ment Company Institute, 2009 Fact Book 15, 20, 72 (49th ed.), online at http://www.icifactbook.org/pdf/2009_factbook.pdf (as visited Mar. 9, 2010, and available in Clerk of Court's case file).

During this time, the standard for an investment adviser's fiduciary duty has remained an open question in our Court, but, until the Seventh Circuit's decision below, something of a consensus had developed regarding the standard set forth over 25 years ago in *Gartenberg, supra.* The *Gartenberg* standard has been adopted by other federal courts,[FN4] and "[t]he SEC's regulations have recognized, and formalized, *Gartenberg*-like factors." Brief for United States as *Amicus Curiae* 23. See 17 CFR § 240.14a-101, Sched. 14A, Item 22, para. (c)(11)(i) (2009); 69 Fed.Reg. 39801, n.31, 39807-39809 (2004). In the present case, both petitioners and respondent generally endorse the *Gartenberg* approach, although they disagree in some respects about its meaning.

> FN4. See, *e.g., Gallus, supra,* at 822-823; *Krantz,supra*; *In re Franklin Mut. Funds Fee Litigation,* 478 F.Supp.2d 677, 683, 686 (D.N.J.2007); *Yameen v. Eaton Vance Distributors, Inc.,* 394 F.Supp.2d 350, 355 (D.Mass.2005); *Hunt v. Invesco Funds Group, Inc.,* No. H-04-2555, 2006 WL 1581846, \*2 (SD Tex., June 5, 2006); *Siemers v. Wells Fargo & Co.,* No. C 05-4518 WHA, 2006 WL 2355411, \*15-\*16 (ND Cal., Aug. 14, 2006); see also *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 340-341 (C.A.2 2006).

In *Gartenberg,* the Second Circuit noted that Congress had not defined what it meant by a "fiduciary duty" with respect to compensation but concluded that "the test is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." 694 F.2d, at 928. The Second Circuit elaborated that, "[t]o be guilty of a violation of § 36(b), ... the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Ibid.* "To make this determination," the Court stated, "all pertinent facts must be weighed," *id., at 929,* and the Court specifically men-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

tioned "the adviser-manager's cost in providing the service, ... the extent to which the adviser-manager realizes economies of scale as the fund grows larger, and the volume of orders which must be processed by the manager." *Id., at 930.*[FN5] Observing that competition among advisers for the business of managing a fund may be "virtually non-existent," the Court rejected the suggestion that "the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them," although the Court did not suggest that this factor could not be "taken into account." *Id., at 929.* The Court likewise rejected the "argument that the lower fees charged by investment advisers to large pension funds should be used as a criterion for determining fair advisory fees for money market funds," since a "pension fund does not face the myriad of daily purchases and redemptions throughout the nation which must be handled by [a money market fund]." *Id., at 930, n. 3.*[FN6]

> FN5. Other factors cited by the *Gartenberg* court include (1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation. *694 F.2d, at 929-932* (internal quotation marks omitted).

> FN6. A money market fund differs from a mutual fund in both the types of investments and the frequency of redemptions. A money market fund often invests in short-term money market securities, such as short-term securities of the United States Government or its agencies, bank certificates of deposit, and commercial paper. Investors can invest in such a fund for as little as a day, so, from the investor's perspective, the fund resembles an investment "more like a bank account than [a] traditional investment in securities." *Id., at 925.*

**B**

*7 [1] The meaning of § 36(b)'s reference to "a fiduciary duty with respect to the receipt of compensation for services"[FN7] is hardly pellucid, but based on the terms of that provision and the role that a shareholder action for breach of that duty plays in the overall structure of the Act, we conclude that *Gartenberg* was correct in its basic formulation of what § 36(b) requires: to face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

> FN7. Section 36(b) provides as follows:

> > "[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser." 84 Stat. 1429 (codified at 15 U.S.C. § 80a-35(b)).

**1**

We begin with the language of § 36(b). As noted, the Seventh Circuit panel thought that the phrase "fiduciary duty" incorporates a standard taken from the law of trusts. Petitioners agree but maintain that the panel identified the wrong trust-law standard. Instead of the standard that applies when a trustee and a settlor negotiate the trustee's fee at the time of the creation of a trust, petitioners invoke the standard that applies when a trustee seeks compensation after the trust is created. Brief for Petitioners 20-23, 35-37. A compensation agreement reached at that time, they point out, " 'will not bind the beneficiary' if either 'the trustee failed to make a full disclosure of all circumstances affecting the agreement' " which he knew or should have known or if the agreement is unfair to the beneficiary. *Id.,* at 23 (quoting Restatement (Second) of Trusts § 242, Comment *i* ). Respondent, on the other hand, contends that the term "fiduciary" is not exclusive to the law of trusts, that the phrase means different things in different contexts, and that there is no reason to believe that § 36(b) incorporates the specific meaning of the term in the law of trusts. Brief for Respondent 34-36.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

[2] We find it unnecessary to take sides in this dispute. In _Pepper v. Litton,_ 308 U.S. 295, 60 S.Ct. 238 (1939), we discussed the meaning of the concept of fiduciary duty in a context that is analogous to that presented here, and we also looked to trust law. At issue in _Pepper_ was whether a bankruptcy court could disallow a dominant or controlling shareholder's claim for compensation against a bankrupt corporation. Dominant or controlling shareholders, we held, are "fiduciar[ies]" whose "powers are powers [held] in trust." _Id., at_ 306, 60 S.Ct. 238. We then explained:

*8 "Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.... _The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain._ If it does not, equity will set it aside." _Id.,_ at 306-307[, 60 S.Ct. 238] (emphasis added; footnote omitted); see also _Geddes v. Anaconda Copper Mining Co.,_ 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425 (1921) (standard of fiduciary duty for interested directors).

We believe that this formulation expresses the meaning of the phrase "fiduciary duty" in § 36(b), 84 Stat. 1429. The Investment Company Act modifies this duty in a significant way: it shifts the burden of proof from the fiduciary to the party claiming breach, 15 U.S.C. § 80a-35(b)(1), to show that the fee is outside the range that arm's-length bargaining would produce.

The _Gartenberg_ approach fully incorporates this understanding of the fiduciary duty as set out in _Pepper_ and reflects § 36(b)(1)'s imposition of the burden on the plaintiff. As noted, _Gartenberg_ insists that all relevant circumstances be taken into account, see 694 F.2d, at 929, as does § 36(b)(2), 84 Stat. 1429 ("[A]pproval by the board of directors ... shall be given such consideration by the court as is deemed appropriate under _all the circumstances_" (emphasis added)). And _Gartenberg_ uses the range of fees that might result from arm's-length bargaining as the

benchmark for reviewing challenged fees.

2

_Gartenberg's_ approach also reflects § 36(b)'s place in the statutory scheme and, in particular, its relationship to the other protections that the Act affords investors.

Under the Act, scrutiny of investment adviser compensation by a fully informed mutual fund board is the "cornerstone of the ... effort to control conflicts of interest within mutual funds." _Burks,_ 441 U.S., at 482, 99 S.Ct. 1831. The Act interposes disinterested directors as "independent watchdogs" of the relationship between a mutual fund and its adviser. _Id.,_ at 484, 99 S.Ct. 1831 (internal quotation marks omitted). To provide these directors with the information needed to judge whether an adviser's compensation is excessive, the Act requires advisers to furnish all information "reasonably ... necessary to evaluate the terms" of the adviser's contract, 15 U.S.C. § 80a-15(c), and gives the SEC the authority to enforce that requirement. See § 80a-41. Board scrutiny of adviser compensation and shareholder suits under § 36(b), 84 Stat. 1429, are mutually reinforcing but independent mechanisms for controlling conflicts. See _Daily Income Fund,_ 464 U.S., at 541, 104 S.Ct. 831 (Congress intended for § 36(b) suits and directorial approval of adviser contracts to act as "independent checks on excessive fees"); _Kamen,_ 500 U.S., at 108, 111 S.Ct. 1711 ("Congress added § 36(b) to the [Act] in 1970 because it concluded that the shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board" (internal quotation marks omitted)).

In recognition of the role of the disinterested directors, the Act instructs courts to give board approval of an adviser's compensation "such consideration ... as is deemed appropriate under all the circumstances." § 80a-35(b)(2). Cf. _Burks,_ 441 U.S., at 485, 99 S.Ct. 1831 ("[I]t would have been paradoxical for Congress to have been willing to rely largely upon [boards of directors as] 'watchdogs' to protect shareholder interests and yet, where the 'watchdogs' have done precisely that, require that they be totally muzzled").

*9 From this formulation, two inferences may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

drawn. First, a measure of deference to a board's judgment may be appropriate in some instances. Second, the appropriate measure of deference varies depending on the circumstances.

[3] *Gartenberg* heeds these precepts. *Gartenberg* advises that "the expertise of the independent trustees of a fund, whether they are fully informed about all facts bearing on the [investment adviser's] service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors to be considered in deciding whether they and the [investment adviser] are guilty of a breach of fiduciary duty in violation of § 36(b)." 694 F.2d, at 930.

### III

While both parties in this case endorse the basic *Gartenberg* approach, they disagree on several important questions that warrant discussion.

[4][5] The first concerns comparisons between the fees that an adviser charges a captive mutual fund and the fees that it charges its independent clients. As noted, the *Gartenberg* court rejected a comparison between the fees that the adviser in that case charged a money market fund and the fees that it charged a pension fund. 694 F.2d, at 930, n. 3 (noting the "[t]he nature and extent of the services required by each type of fund differ sharply"). Petitioners contend that such a comparison is appropriate, Brief for Petitioners 30-31, but respondent disagrees. Brief for Respondent 38-44. Since the Act requires consideration of all relevant factors, 15 U.S.C. § 80a-35(b)(2); see also § 80a-15(c), we do not think that there can be any categorical rule regarding the comparisons of the fees charged different types of clients. See *Daily Income Fund, supra,* at 537, 104 S.Ct. 831 (discussing concern with investment advisers' practice of charging higher fees to mutual funds than to their other clients). Instead, courts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons. As the panel below noted, there may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund which are attributable to the greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund as-

sets, the more burdensome regulatory and legal obligations, and higher marketing costs. 527 F.3d, at 634 ("Different clients call for different commitments of time"). If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison. Even if the services provided and fees charged to an independent fund are relevant, courts should be mindful that the Act does not necessarily ensure fee parity between mutual funds and institutional clients contrary to petitioners' contentions. See *id.,* at 631. ("Plaintiffs maintain that a fiduciary may charge its controlled clients no more than its independent clients").[FN8]

> FN8. Comparisons with fees charged to institutional clients, therefore, will not "doo[m] [a]ny [f]und to [t]rial." Brief for Respondent 49; see also *Strougo v. BEA Assocs.,* 188 F.Supp.2d 373, 384 (S.D.N.Y.2002) (suggesting that fee comparisons, where permitted, might produce a triable issue). First, plaintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining. § 80a-35(b)(1). Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services. Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate. Cf. App. to Pet. for Cert. 30a; see also *In re AllianceBernstein Mut. Fund Excessive Fee Litigation,* No. 04 Civ. 4885(SWK), 2006 WL 1520222, *2 (S.D.N.Y., May 31, 2006) (citing report finding that fee differential resulted from different services and different liabilities assumed).

[6] By the same token, courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers. These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length. See 537 F.3d, at 731-732 (opinion dissenting from denial of rehearing en banc); *Gartenberg, supra,* at 929 ("Competition between money market funds for shareholder business does not support an inference that competition must therefore also exist between [investment advisers] for fund

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

business. The former may be vigorous even though the latter is virtually non-existent").

*10 [7] Finally, a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance. See 15 U.S.C. § 80a-35(b)(2) (requiring deference to board's consideration "as is deemed appropriate under all the circumstances"); cf. *Daily Income Fund*, 464 U.S., at 541, 104 S.Ct. 831 ("Congress intended security holder and SEC actions under § 36(b), on the one hand, and directorial approval of adviser contracts, on the other, to act as independent checks on excessive fees"). Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process. See *Burks*, 441 U.S., at 484, 99 S.Ct. 1831 (unaffiliated directors serve as "independent watchdogs"). Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently. Cf. *id.*, at 485, 99 S.Ct. 1831. This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg, supra*, at 928.

[8] In contrast, where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as "an independent check upon the management." *Burks, supra*, at 484, 99 S.Ct. 1831 (internal quotation marks omitted). "Section 36(b) is sharply focused on the question of whether the fees themselves were excessive." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (C.A.4 2001); see also 15 U.S.C. § 80a-35(b) (imposing a "fiduciary duty with respect to the *receipt of compensation* for services, or of payments of a material nature*" (emphasis added)). But an adviser's compliance or noncompliance with its disclosure obligations is a factor that must be considered in calibrating the degree of deference that is due

a board's decision to approve an adviser's fees.

[9][10] It is also important to note that the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions. See *Daily Income Fund, supra*, at 538, 104 S.Ct. 831; see also *Burks*, 441 U.S., at 483, 99 S.Ct. 1831 ("Congress consciously chose to address the conflict-of-interest problem through the Act's independent-directors section, rather than through more drastic remedies"). "[P]otential conflicts [of interests] may justify some restraints upon the unfettered discretion of even disinterested mutual fund directors, particularly in their transactions with the investment adviser," but they do not suggest that a court may supplant the judgment of disinterested directors apprised of all relevant information, without additional evidence that the fee exceeds the arm's-length range. *Id.*, at 481, 99 S.Ct. 1831. In reviewing compensation under § 36(b), the Act does not require courts to engage in a precise calculation of fees representative of arm's-length bargaining. See 527 F.3d, at 633 ("Judicial price-setting does not accompany fiduciary duties"). As recounted above, Congress rejected a "reasonableness" requirement that was criticized as charging the courts with rate-setting responsibilities. See *Daily Income Fund, supra*, at 538-540, 104 S.Ct. 831. Congress' approach recognizes that courts are not well suited to make such precise calculations. Cf. *General Motors Corp. v. Tracy*, 519 U.S. 278, 308, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) ("[T]he Court is institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them"); *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 539, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); see also *Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (CA1 1990) (opinion for the court by Breyer, C.J.) ("[H]ow is a judge or jury to determine a 'fair price'?"). *Gartenberg's* "so disproportionately large" standard, 694 F.2d, at 928, reflects this congressional choice to "rely largely upon [independent director] 'watchdogs' to protect shareholders interests." *Burks, supra*, at 485, 99 S.Ct. 1831.

*11 By focusing almost entirely on the element of disclosure, the Seventh Circuit panel erred. See 527 F.3d, at 632 (An investment adviser "must make full disclosure and play no tricks but is not subject to a cap on compensation"). The *Gartenberg* standard, which the panel rejected, may lack sharp analytical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.Ct. ----, 2010 WL 1189560 (U.S.)
**(Cite as: 2010 WL 1189560 (U.S.))**

clarity, but we believe that it accurately reflects the compromise that is embodied in § 36(b), and it has provided a workable standard for nearly three decades. The debate between the Seventh Circuit panel and the dissent from the denial of rehearing regarding today's mutual fund market is a matter for Congress, not the courts.

### IV

*12 For the foregoing reasons, the judgment of the Court of Appeals is vacated, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*
Justice THOMAS, concurring.
The Court rightly affirms the careful approach to § 36(b) cases, see 15 U.S.C. § 80a-35(b), that courts have applied since (and in certain respects in spite of) *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 694 F.2d 923, 928-930 (C.A.2 1982). I write separately because I would not shortchange the Court's effort by describing it as affirmation of the " *Gartenberg* standard." *Ante,* at ----, ----.

The District Court and Court of Appeals in *Gartenberg* created that standard, which emphasizes fee "fairness" and proportionality, 694 F.2d, at 929, in a manner that could be read to permit the equivalent of the judicial rate regulation the *Gartenberg* opinions disclaim, based on the Investment Company Act of 1940's "tortuous" legislative history and a handful of extrastatutory policy and market considerations, *id.,* at 928; see also *id.,* at 926-927, 929-931; *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 528 F.Supp. 1038, 1046-1050, 1055-1057 (S.D.N.Y.1981). Although virtually all subsequent § 36(b) cases cite *Gartenberg,* most courts have correctly declined its invitation to stray beyond statutory bounds. Instead, they have followed an approach (principally in deciding which cases may proceed past summary judgment) that defers to the informed conclusions of disinterested boards and holds plaintiffs to their heavy burden of proof in the manner the Act, and now the Court's opinion, requires. See, *e.g., ante,* at ---- (underscoring that the Act "modifies" the governing fiduciary duty standard "in a significant way: It shifts the burden of proof from the fiduciary to the party claiming breach, 15 U.S.C. § 80a-35(b)(1), to show that the fee is outside the range that arm's-length bargaining would produce"); *ante,* at ----

(citing the "degree of deference that is due a board's decision to approve an adviser's fees" and admonishing that "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions").

I concur in the Court's decision to affirm this approach based upon the Investment Company Act's text and our longstanding fiduciary duty precedents. But I would not say that in doing so we endorse the " *Gartenberg* standard." Whatever else might be said about today's decision, it does not countenance the free-ranging judicial "fairness" review of fees that *Gartenberg* could be read to authorize, see 694 F.2d, at 929-930, and that virtually all courts deciding § 36(b) cases since *Gartenberg* (including the Court of Appeals in this case) have wisely eschewed in the post *Gartenberg* precedents we approve.

U.S.,2010.
Jones v. Harris Associates L.P.
--- S.Ct. ----, 2010 WL 1189560 (U.S.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

3

Westlaw.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Marya J. LEBER, Sara L. Kennedy, and all others
similarly situated, Plaintiffs,
v.
CITIGROUP, INC., the Plan's Administrative Com-
mittee of Citigroup Inc., the 401(k) Plan Investment
Committee and Doe Defendants 1-20, Defendants.
**No. 07 Civ. 9329(SHS).**

March 16, 2010.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiffs, two Citigroup employees, bring this
putative class action pursuant to the Employee Re-
tirement Income Security Act ("ERISA" or "the
Act"), 29 U.S.C. § 1001 *et seq.,* against their em-
ployer, Citigroup, as well as the Administrative
Committee and the Investment Committee of Citi-
group's 401(k) retirement plan and the individual
members of those committees (collectively, "commit-
tee defendants"). The amended complaint alleges the
committee defendants, all of whom were fiduciaries
of Citigroup's 401(k) retirement plan ("the Plan"),
breached duties owed to the plaintiffs by failing to act
in the best interests of the Plan and by putting the
interests of Citigroup ahead of those of the Plan in at
least two ways: first, the committee defendants se-
lected Citigroup or Citigroup-affiliated mutual funds
as investments for the Plan that allegedly performed
less well and charged higher advisory fees than com-
parable funds offered by other companies ("mutual
fund" claims); second, the committee defendants se-
lected a Citigroup-affiliated service provider, CitiS-
treet, to provide management services for the Plan
("management services" claims). Plaintiffs allege that
the above conduct violated both section 404 of the
Act, which imposes broad duties of loyalty and care
on plan fiduciaries and section 406, which prohibits
specific conduct or transactions involving plan assets.
29 U.S.C. §§ 1104, 1106. Finally, plaintiffs allege
that Citigroup itself, while not a fiduciary, is liable

for knowingly participating in each of the alleged
breaches.

Defendants have moved to dismiss the complaint
pursuant to Fed.R.Civ.P. 12(b)(6), contending, first,
that the action is barred by ERISA's statute of limita-
tions, and alternatively, that if not time barred, plain-
tiffs' complaint fails to state a claim upon which relief
can be granted. In particular, defendants argue that
both the mutual fund and management services
claims cover conduct specifically exempted from
section 406's prohibitions by statutory or administra-
tive provisions; that plaintiffs' remaining allegations
against the committee defendants, including claims
brought pursuant to section 404, fail to state a plausi-
ble claim to relief; and finally, that plaintiffs' claims
against Citigroup similarly fail to allege with speci-
ficity knowledge of wrongdoing by it.

Plaintiffs, in response, contend the amended com-
plaint satisfies the pleading requirements as con-
strued in *Bell Atl. v. Twombly,* 550 U.S. 544 (2007)
and that defendants' specific objections-including the
applicability of the statute of limitations or statutory
or administrative exemptions to ERISA-are affirma-
tive defenses which turn on information not con-
tained in the complaint and are, accordingly, unsuit-
able for resolution on this Rule 12(b)(6) motion.

Because the Court finds that plaintiffs validly state a
plausible claim to relief pursuant to section 404 inso-
far as they allege the committee defendants acted
imprudently by steering Plan assets to Citigroup af-
filiated mutual funds with higher investment advisory
fees than those of competing funds, the motion to
dismiss the complaint is denied with regard to those
claims. While the ultimate survival of those claims
will turn in part on resolution of the timeliness of the
action, the Court agrees with plaintiffs that the issue
cannot be resolved upon this Rule 12(b)(6) motion.
However, because none of plaintiffs' other allega-
tions-including plaintiffs' remaining section 404
claims, all of plaintiffs' section 406 claims, and plain-
tiffs' claims against non-fiduciary Citigroup-states a
plausible claim to relief under any section of ERISA,
defendants' motion to dismiss the complaint in those
respects is granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

# I. BACKGROUND

**\*2** Unless otherwise noted, all of the following facts are taken from the amended complaint ("complaint") and are presumed to be true:

### A. The Parties

Citigroup, a Delaware corporation, sponsors a 401(k) retirement plan for its employees. (Am.Compl.¶ 16.) The Plan, which is available to all eligible Citigroup employees, is an "employee benefit plan" within the meaning of ERISA and, accordingly, is subject to the restrictions and regulations imposed on covered plans by the Act. (*Id.* ¶¶ 8, 21); 29 U.S.C. § § 1002(3), 1003. Citigroup, as the Plan's sponsor, is a "party in interest" to the Plan within the meaning of the Act. (Am.Compl.¶ 16); 29 U.S.C. § 1002(14).

The Plan is managed by two committees, an Administrative Committee responsible for the overall operation and administration of the plan, and an Investment Committee responsible for evaluating and selecting the investment options from which plan participants are able to choose. (*Id.* ¶¶ 17-18, 21.) Pursuant to ERISA, members of both committees are fiduciaries of the Plan. (*Id.* ¶¶ 33-37), 29 U.S.C. § 1002(21)(A).

The complaint does not name any of the committee defendants nor does it specify their roles at or relationships with Citigroup. Instead, it states simply that the "Committee Defendants are officers, employees, or agents of Citigroup" and that the "Administrative Committee and the Investment Committee are internal committees created and staffed by Citigroup." (*Id.* ¶¶ 1, 39.)

Plaintiffs Marya J. Leber and Sara L. Kennedy are Citigroup employees and plan participants. (*Id.* ¶¶ 12, 14.) During the class period-defined by the complaint only as "2001 to present" (the complaint was filed in October 2007)-plaintiffs each invested in at least one of the mutual funds alleged to have been chosen because of its affiliation with Citigroup and, in Kennedy's case, despite the affiliated fund's allegedly excessive management fees. (*Id.* ¶¶ 12, 14, 29, 51.) [FN1] Both plaintiffs contend they had no knowledge of any of the relevant facts underlying this litigation until October 2007. [FN2]

FN1. The complaint specifically alleges only that Leber invested in the "Citi Institutional Liquid Reserves Fund," an affiliated fund about which the complaint provides no additional specific information, including whether or not the investment advisory fees associated with it were higher, lower, or roughly equal to those associated with comparable unaffiliated funds. (Am.Compl.¶ 12.)

FN2. According to the amended complaint, plaintiffs did not learn of any of the relevant facts underlying this litigation until "July 2008." (*Id.* ¶¶ 13, 15.) Because the complaint was filed in October 2007, the Court will assume that the July 2008 is, as plaintiffs contend, a "drafting mistake" and that plaintiffs intended the amended complaint to read "October 2007" instead. (Pls.' Mem. of Law. in Opp. to Defs.' Mot. to Dismiss at 7.) As discussed below, the first date of plaintiffs' actual knowledge of the allegations is a factual issue that cannot be resolved at this time.

### B. ERISA's Statutory Requirements and Defendants' Alleged Violations

ERISA imposes a series of requirements on all plan fiduciaries, defined broadly by the Act as any person who "exercises discretionary authority or discretionary control respecting management of" a plan. 29 U.S.C. § 1002(21)(A). In particular, those meeting that definition are subject to broad fiduciary duties and are restricted from engaging in specified prohibited transactions. Section 404 of the Act imposes on plan fiduciaries a responsibility to "discharge his duties ... solely in the interest of" plan participants, "for the exclusive purpose of providing benefits to the participants," and "with the care, skill, prudence, and diligence under the circumstances" of a "prudent man" acting in like capacity. 29 U.S.C. § 1104(a)(1) (A)-(B).

**\*3** Section 406 supplements the requirements of section 404 by specifically prohibiting plan fiduciaries from engaging in certain transactions. Section 406(a) prohibits certain transactions between the plan and a party in interest such as the "furnishing of goods [or]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

services ... between the plan and a party in interest," while section 406(b) prohibits a fiduciary from engaging in certain forms of self-dealing, including acting "on behalf of a party ... whose interests are adverse to the interests of the plan" in any transaction. 29 U.S.C. § 1106(a)-(b).

Despite those broad general duties to put the interests of the plan and its participants first and to avoid transactions between the plan and a party in interest, plaintiffs contend the committee defendants-who are fiduciaries-"put Citigroup's interests ahead of the 401(k) Plan's interests" in violation of section 404 (Am.Compl.¶ 2) and engaged in transactions prohibited by section 406 in two ways: first, the committee defendants caused the Plan to invest assets in affiliated mutual funds rather than comparable independent or unaffiliated funds, and second, the committee defendants selected an affiliated service provider, CitiStreet, to manage the fund.

*1. The "Mutual Fund" Allegations*

In a defined contribution plan such as the one offered by Citigroup, a plan's administrators are responsible for selecting a series of investment options to make available to plan participants who are then free to choose among the selected options when investing their own assets. (*Id.* ¶ 22.) In selecting those investment options, plan administrators-as fiduciaries-are bound to adhere to the general fiduciary duties of Section 404 as well as being constrained by the more specific prohibitions contained in Section 406.

In this case, the responsibility to choose investment options for the Plan fell on the committee defendants. (*Id.* ¶ 27.) Plaintiffs contend that, over the course of the class period, the committee defendants routinely selected funds run by Citigroup or one of its affiliated entities ("affiliated funds") in lieu of funds run by outside groups ("unaffiliated funds"). (*Id.* ¶¶ 40-42.) They did so, plaintiffs allege, because directing plan assets to affiliated funds generated income for Citigroup in the form of investment advisory fees, whereas investments in unaffiliated funds did not. (*Id.* ¶ 4.)

Further evincing the committee defendants' preference for affiliated funds, plaintiffs allege that on several occasions during the course of the class period, the committee defendants shifted plan assets from unaffiliated funds to affiliated ones, doing so, in at least one instance, only after the affiliated fund was sold to an outside company. (*Id.* ¶¶ 43, 45-46.) As a result of the committee defendants' investment choices, during the course of the class period, nearly $2.5 billion in plan assets were invested annually in affiliated funds. (*Id.* ¶ 30.)

*4 Plaintiffs contend that the committee defendants' preference for affiliated funds caused injury to the Plan and its participants in two ways: first, the affiliated funds charged higher investment advisory fees than comparable unaffiliated funds, and second, during the course of the class period, those comparable, unaffiliated funds outperformed the affiliated ones selected by the committee defendants. (*Id.* ¶ 4.)

Specifically, with respect to the investment advisory fees, plaintiffs contend that during the class period, the committee defendants caused the Plan to invest in the Smith Barney U.S. Government Securities fund, an affiliated fund which they aver charged fees 111 percent higher than those associated with a "comparable" unaffiliated Vanguard fund. (*Id.* ¶ 51.) Similarly, plaintiffs allege the committee defendants caused the Plan to invest in the Salomon Brothers Investment Fund and the Salomon Brothers High Yield Bond Fund which charged fees 62 percent and 227 percent higher fees, respectively, than those associated with comparable Vanguard Funds. (*Id.*) In total, plaintiffs point to at least eight specific affiliated funds selected by the committee defendants for Plan investment, all of which charged fees at least 24 percent higher than those associated with comparable unaffiliated Vanguard funds. (*Id.*)

With respect to the performance of the affiliated funds, plaintiffs assert generally that the committee defendants overlooked many "better-performing" funds, and that the Plan's investments in affiliated funds "substantially under-performed" in comparison to "similar products available from unaffiliated investment managers." (*Id.* ¶¶ 4, 32.) While plaintiffs provide no specific factual allegations in support of that claim, they do make the following indirect allegations: first, during the class period, the Plan was "by far" the largest investor in the relevant affiliated funds and "exceeded 50%" of the total investments in some of those funds. (*Id.* ¶ 50.) Accordingly, plaintiffs conclude that "the large pension plan market did not favor [the] Affiliated Funds," and by implication,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

therefore, it was a poor investment choice for the Plan. (*Id.*) Second, as noted, plaintiffs allege that, on occasion, the committee defendants terminated participation in affiliated funds once those funds were sold off and thus were no longer affiliated with Citigroup, ostensibly because the committee defendants concluded those funds were no longer the best investment choices for the Plan. Accordingly, plaintiffs would have the Court conclude that those investments were never the best investment choices, but that the committee defendants failed to conduct an appropriately searching review of those same funds when they were affiliated-that is, when the Plan's investment in them "was generating fees for Citigroup." (*Id.* ¶ 49.)

As a result, over the course of the class period, plaintiffs contend the Plan "invest[ed] billions of dollars in Affiliated Funds" and "suffered millions of dollars a year in losses" due to the combination of the higher fees charged by the affiliated funds and their allegedly comparatively lower performance. (*Id.* ¶¶ 55.)

*2. The "Management Services" Claims*

**\*5** In addition to selecting funds for plan participants to invest in, the committee defendants, and, in particular, the administrative committee and its members, had responsibility for selecting and monitoring service providers for the Plan. (*Id.* ¶ 37.) In so doing, the committee defendants were bound by both fiduciary duties and specific prohibitions contained in the Act.

Plaintiffs allege that, during the course of the class period, certain of the Plan's administrative and recordkeeping services were provided by CitiStreet-a joint venture between Citigroup and State Street Bank & Trust. (*Id.* ¶ 29.) Plaintiffs contend the committee defendants selected CitiStreet to provide those services and retained it throughout the class period solely because of its connection to Citigroup, thereby putting the interests of Citigroup ahead of those of the Plan and its participants while also engaging in a prohibited transaction between the Plan and a party in interest.

While plaintiffs contend the committee defendants "should have known" that similar administrative services were available from unaffiliated entities (*id.* ¶ 53), they do not allege the services provided by

CitiStreet were deficient in any respect or that the fees paid to CitiStreet for those services were excessive, unwarranted, or unreasonable. Plaintiffs also do not allege any specific losses stemming from the committee defendants' selection of CitiStreet to provide administrative services for the Plan.

### C. The Complaint

Plaintiffs filed the initial complaint in October 2007 and an amended complaint in July 2008, alleging three counts of wrongdoing. Count One alleges that the committee defendants engaged in transactions prohibited by section 406(a) of the Act by causing the Plan to invest in mutual funds and to purchase services managed and provided by a party in interest, Citigroup. (*Id.* ¶ 77); 29 U.S .C. 1106(a). Count One can also be read to allege the committee defendants violated the specific prohibitions of section 406(b) through the same course of conduct by acting, in a transaction with the Plan, on behalf of another party-Citigroup-whose interests were "adverse" to those of the Plan and its participants. (Am.Compl.¶¶ 4, 77); 29 U.S.C. 1106(b). As a result of these proscribed transactions, plaintiffs contend the Plan and its participants suffered millions of dollars in losses annually during the course of the class period. (*Id.* ¶ 78.)

Count Two alleges that the committee defendants, through the same acts, violated the broad fiduciary duties imposed by section 404 of the Act by putting the interests of Citigroup and its subsidiaries ahead of those of the Plan and its participants and by failing to act with the prudence and caution required of them. (*Id.* ¶ 82 .) As a result of these breaches, plaintiffs contend the Plan and its participants suffered millions of dollars in losses annually during the course of the class period. (*Id.* ¶ 83.)

**\*6** Finally, Count Three alleges that Citigroup itself knowingly participated in each of the above breaches and ERISA violations, thereby causing the Plan and its participants millions of dollars in lost fees and investment returns. (*Id.* ¶¶ 87-88.) While Citigroup, as a non-fiduciary, cannot be liable under the Act for damages, plaintiffs instead seek disgorgement of all revenues received from the Plan. (*Id.* ¶ 89.)

### II. ANALYSIS

#### A. The Motion to Dismiss Standard

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
(Cite as: 2010 WL 935442 (S.D.N.Y.))

On a defendant's Rule 12(b)(6) motion to dismiss for failure to state a claim, a court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir.2006); S.E.C. v. Lyon, 529 F.Supp.2d 444, 449 (S.D.N.Y.2007). In so doing, a court is limited to the complaint and the facts alleged therein.

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id .; see also Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct.1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.")

To state a plausible claim to relief, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. As the U.S. Supreme Court most recently clarified, that Twombly standard "asks for more than a sheer possibility that a defendant acted unlawfully." Iqbal, --- U.S. at ----, 129 S.Ct. at 1949. Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief," and the complaint must therefore be dismissed. Id. at 1950 (quotations and citations omitted).

B. ERISA's Statute of Limitations

No ERISA action may be brought after the earlier of (1) six years from the date of the "last action which constituted a part of the breach or violation" or (2) three years after "the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. Because the Act bars actions based on the earlier of the two limitations periods, courts must consider whether either the six-year or the three-year actual knowledge period expired before the action was commenced.

Defendants maintain both the six-year and three-year windows closed before October 2007 when plaintiffs

commenced this action because most if not all of the acts giving rise to plaintiffs' claims occurred-and were fully disclosed to plan participants-no later than July 2001. Plaintiffs assert that neither the six-year nor three-year period bars this action, but in direct response to defendants' motion argue primarily that the Court, when constrained to the four corners of the complaint as it must be on a Rule 12(b) (6) motion, cannot conclusively find to the contrary at this time.

1. The Six-Year Period

*7 ERISA's six-year statutory period starts to run from the "last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1). In this case, the relevant "last actions" were the committee defendants' selections of affiliated funds as investment options for the Plan and their selection of the affiliated service provider, CitiStreet, in lieu of an outside entity. The complaint, however, is silent as to when virtually all of those actions occurred. While the complaint provides general date ranges for several of the transactions in question (e.g., Am. Compl. ¶¶ 43-46), it does not state with any specificity when the committee defendants selected for investment any of the funds specifically identified as having higher management fees than comparable unaffiliated funds or when the committee defendants selected CitiStreet to provide management and administrative services to the Plan.

The U.S. Court of Appeals for the Second Circuit has found that "[t]he pleading requirements in the Federal Rules of Civil Procedure ... do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses." Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir.2007). Dismissal of claims as barred by the statute of limitations on a Rule 12(b)(6) motion is therefore appropriate only where it is apparent from the face of the complaint that an action will be time barred. Id.

Accordingly, the Court is unable at this stage to properly determine whether or not the action is barred as untimely. While defendants in their present motion aver that many of the actions at issue in this litigation-including the challenged investment decisions and the selection of CitiStreet as a service provider-were made no later than July 2001, on a Rule 12(b)(6) motion, as noted, the Court is constrained to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

the pleadings which artfully make no mention of when most, if not all, of the relevant breaches occurred. Dismissal at this stage would therefore be improper.

Plaintiffs concede that any breaches that fully occurred more than six years before this action was commenced are barred by statute but argue instead that defendants' cumulative course of conduct amounted to a "continuing violation," and, accordingly, that no "final action" was taken more than six years before this suit was filed.

The "continuing violation" doctrine, which stems from the ongoing nature of the duty imposed on ERISA fiduciaries, allows plaintiffs to bring suit for a course of conduct dating back beyond the statutory period provided the fiduciaries engaged in some sort of repeated and ongoing conduct that stretched into the six-year period. *See Buccino v. Cont'l Assurance Co.,* 578 F.Supp. 1518, 1521-22 (S.D.N.Y.1983) (collecting cases); *see also Brown Park Estates-Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1456 (Fed.Cir.1997). By contrast, "the continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time." *Miele v. Pension Plan of N.Y. State Teamsters Confrence Pension & Ret. Fund,* 72 F.Supp.2d 88, 102 (E.D.N.Y.1999) (collecting cases).

\*8 Although the complaint's core allegations rest on the cumulative harms from single events-i.e., selection of affiliated investment options and service providers-and therefore would not appear to give rise to a "continuing violation" for statute of limitations purposes, the Court cannot conclusively find from the pleadings alone that plaintiffs' action is based on breaches or actions taken outside of the six-year statutory window. Accordingly, the Court cannot conclude at this time that the action is in fact time-barred.

*2. The Three-Year "Actual Knowledge" Period*

For purposes of ERISA's statute of limitations, a person has "actual knowledge" of the breach or violation when he has knowledge of "all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.,* 267 F.3d 181, 193 (2d

Cir.2001). As the Second Circuit has explained, "actual knowledge" does not mean knowledge of the *law* but rather of "all the facts necessary to constitute a claim." *Id.* The Circuit has expressly rejected a "constructive knowledge" standard, instructing instead that "plaintiffs must have had specific knowledge of the actual breach upon which they sued." *Id.* (internal citations, alterations omitted).

As noted, plaintiffs aver in the complaint that they had no knowledge of *any* of the relevant facts-including that Plan funds were affiliated with Citigroup, or what, if any fees those funds charged investors-until the complaint in this action was filed in October 2007. (Am.Compl.¶¶ 13, 15.) Defendants contend those claims are implausible on their face and are further belied by a series of documents sent to all plan participants explicitly revealing all the relevant facts relating to the alleged breaches as early as 2001.

In particular, defendants point to documents distributed to all plan participants as early as July 2001 disclosing that the investment options selected by the committee defendants were affiliated with Citigroup. Defendants also point to similar documents distributed as early as May 2001 revealing that CitiStreet, which had been retained to provide management services to the Plan, was a joint venture between Citigroup and the State Street Corporation. Accordingly, defendants contend that plaintiffs must have known of each of the alleged breaches or ERISA violations far more than three years before commencing this action in late 2007.

While defendants' arguments are compelling and their proffered evidence seemingly quite strong, the Court is once again unable to conclude on a Rule 12(b)(6) motion that the action is time barred because it cannot look beyond the facts as alleged in the pleadings and, in particular, cannot rely on documents not attached to or expressly relied on or quoted in the complaint. *See Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 196 (2d Cir.2005). Limited as such, and taking the facts alleged in the complaint as true, the Court must accept at this point that plaintiffs had no knowledge of the facts underlying their claims until October 2007, and accordingly, that they brought suit within the three-year window allowed by ERISA.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

*9 In sum, the Court cannot conclude on the basis of the pleadings that plaintiffs' claims are untimely.

C. Plaintiffs' Section 406 Prohibited Transaction Claims

Count One of the complaint alleges the committee defendants, by selecting affiliated mutual funds and service providers, engaged in transactions prohibited by section 406(a) and, in the process, violated 406(b) by acting "on behalf of" a party whose interests were "adverse" to those of the Plan-i.e, Citigroup. Defendants contend the transactions were exempted from the proscriptions of that section and that plaintiffs otherwise fail to state a claim under either subsection.

*1. Section 406(a) Prohibited Transactions Claims*

ERISA section 406(a) prohibits plan fiduciaries from causing a plan to engage in many types of transactions with a party in interest, including the "furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). Section 406, however, is subject to both statutory and administrative "exemptions." In particular, section 408(b) of the Act enumerates specific transactions exempted from the prohibitions of section 406 ("statutory exemptions"), while section 408(a) gives the Secretary of Labor broad authority to create additional exemptions provided they are "in the interests of" and "protective of the rights" of plan participants and beneficiaries ("administrative exemptions"). 29 U.S.C. § 1108(a)-(b).

Defendants contend two exemptions are relevant here. First, with respect to plaintiffs' mutual fund claims, defendants point to prohibited transaction exemption ("PTE") 77-3 which provides that the "restrictions of section [ ] 406 ... shall not apply" to the investment of plan assets in affiliated mutual funds provided certain conditions are met. PTE 77-3, 42 Fed.Reg. 18,734 (1977). Second, with respect to plaintiffs' management service claims, defendants point to section 408(b)(2) of the Act which similarly exempts from section 406 contracts with a party in interest for "services necessary for the establishment or operation of the plan" so long as "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2).

Defendants therefore contend that all of the transactions covered by the complaint were specifically excluded from the prohibitions of section 406 and urge that plaintiffs' complaint, which fails to allege the contrary, is fatally defective. Plaintiffs contend the exemptions are affirmative defenses which must be established by defendants through evidence and thus cannot be resolved on this Rule 12(b)(6) motion.

While the question of whether ERISA's statutory and administrative exemptions are affirmative defenses to be established by defendants or pleading requirements to be overcome by plaintiffs is not free from dispute, *compare* Mehling v. New York Life Ins. Co ., 163 F.Supp.2d 502, 510 (E.D.Pa.2001) (dismissing complaint that failed to allege ERISA exemption did not apply), *with* Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 600-01 (8th Cir.2009) (reversing dismissal for failure to allege an exemption did not apply because "the statutory exemptions established by § 1108 are defenses which must be proven by the defendant"), in light of those exemptions and on these facts, the Court finds plaintiffs' pleadings insufficient to state a plausible claim to relief.

a. PTE 77-3 and Plaintiffs' Mutual Fund Claims

*10 First adopted by the Secretary in 1977, PTE 77-3 provides that "the restrictions of section[ ] 406 ... shall not apply to the acquisition or sale of shares of an open-end investment company registered under the Investment Company of Act of 1940"-i.e., a mutual fund-"by an employee benefit plan covering only employees of such investment company." PTE 77-3, 42 Fed.Reg. 18,734 (1977). For the exemption to apply, four additional conditions must be met: first, the plan must pay no "investment management, investment advisory or similar fee" to the mutual fund, although the mutual fund itself may pay such fees to its managers; second, the plan must not pay "a redemption fee" when selling its shares; third, the plan must not pay a sales commission in connection with the sale or acquisition; and fourth, all other dealings between the plan and the affiliated fund must be "on a basis no less favorable to the plan than such dealings are with other shareholders." *Id.*

Defendants contend the allegations contained in the complaint fail to state a claim to relief because even in the light most favorable to plaintiffs, the complaint asserts nothing more than that defendants purchased

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
(Cite as: 2010 WL 935442 (S.D.N.Y.))

shares in an affiliated mutual fund, a transaction to which "the restrictions of section [ ] 406 ... shall not apply." The Court agrees.

A complaint must allege conduct that is plausibly actionable under the relevant statute and must go beyond creating a "sheer possibility that a defendant has acted unlawfully." *Iqbal,* --- U.S. at ----, 129 S.Ct. at 1949. Accordingly, where the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption and therefore that a defendant's conduct might plausibly entitle plaintiff to relief-it is deficient.

Plaintiffs' complaint here fails in just that regard. The complaint alleges the very type of activity that the exemption expressly allows to occur-the investment by a plan in its affiliated mutual funds on the terms generally available to other investors. It makes no allegations to support a finding that the conduct fell beyond the exemption and accordingly would be actionable under section 406. Indeed, plaintiffs' only specific allegations of wrongdoing with respect to those investments involve the advisory fees those funds paid their own managers, fees the exemption expressly allows to be paid. *See* PTE 77-3(a), 42 Fed.Reg. 18,735 ("This condition does not preclude the payment of investment advisory fees by the [mutual fund] under the terms of its investment advisory agreement."). Accordingly, plaintiffs provide no plausible basis for presuming their claims will be actionable under section 406 and they therefore fail to state a claim.

Plaintiffs' contention that the exemptions are affirmative defenses on which defendants carry the burden of proof misstates their own burden: while establishing that a challenged transaction meets each of the four conditions necessary for PTE 77-3 to apply might be a defendant's burden *if in dispute,* a complaint must allege a course of conduct actionable under the relevant statute. Where, as here, the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but not shown-that the pleader is entitled to relief," *Iqbal,* --- U.S. at ----, 129 S.Ct. at 1950 (quotations and citations omitted), and accordingly must be dismissed. *See also Id.* at 1949 (allegations that are "merely consistent" with conceivable liability "stop[ ] short of the line between possibility and plausibility").

*11 Plaintiffs instead point to the finding of the Second Circuit that a "fiduciary charged with a violation of Section 406(b)(3) ... must prove by a preponderance of the evidence that the transaction in question fell within an exemption." *Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1215 (2d Cir.1987); *see also Reich v. Valley Nat'l Bank,* 837 F.Supp.1259, 1272 (S.D.N.Y.1993) (same). However, the Circuit's finding in *Lowen* was in the very different context of an alleged violation of section 406(b) (3), which covers self-dealing by plan fiduciaries, an area so fraught with potential for misconduct that many courts have found that the exemptions of section 408 do not apply at all. *See, e.g., Patelco Credit Union v. Sahni,* 262 F.3d 897, 910-11 (9th Cir.2001); *Chao v. Linder,* 421 F.Supp.2d 1129, 1134-35 (N.D.Ill.2006); *Whitfield v. Tomasso,* 682 F.Supp. 1287, 1304 (S.D.N.Y.1988). Moreover, and critically, the plaintiffs in *Lowen* put applicability of the statutory exemption in dispute by expressly alleging that compensation paid in that case to plan fiduciaries had not been paid in accordance with the terms of the statutory exemption, and accordingly, that the investment was actionable pursuant to section 406. *Lowen,* 829 F.2d at 1216. Here, of course, plaintiffs allege no such thing.

b. Section 408 and Plaintiffs' Management Services Claims

Plaintiffs' pleadings with respect to its management services claims are similarly deficient. Section 408(b)(2) of the Act provides that section 406 "shall not apply" to contracts with parties in interest for the provision of "services necessary for ... operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). Here, plaintiffs make no allegations that the services provided were unnecessary to the operation of the plan or that unreasonable compensation was paid. Indeed, plaintiffs do not contend there was *anything* wrong or improper with the selection of CitiStreet other than the fact that it was an affiliated service provider furnishing services under circumstances section 408(b)(2) expressly exempts from the reach of section 406.

Accordingly, absent any allegation that defendants' conduct falls beyond the reach of the statutory exemption-and thus might plausibly be actionable under section 406-plaintiffs fail to state a valid claim.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
(Cite as: 2010 WL 935442 (S.D.N.Y.))

As was true with regard to the PTE 77-3 exemption, the Court is aware of no contrary controlling authority, and indeed, its conclusions are bolstered by the recent findings of several other courts in this district applying *Twombly* in the context of different ERISA provisions that "the 12(b)(6) 'plausibility' standard would be undercut by sustaining a complaint that does not suggest a basis for overcoming the statutorily-based presumption [against liability]." *In re Avon Products, Inc.,* No. 05-civ.-6803, 2009 WL 848083, at *10 (S.D.N.Y. Mar. 3, 2009) (magistrate's report and recommendation) (collecting cases), *adopted by* 2009 WL 884687, at *1 (S.D.N.Y. Mar. 30, 2009) ("[T]he Court agrees ... that a plaintiff must allege facts that, if true, would be sufficient to overcome that presumption in order to state a legally sufficient claim for relief.").

*12 Accordingly, the complaint fails to state a plausible claim to relief pursuant to section 406(a).

*2. "Dual Loyalty Doctrine" Section 406(b) Claims*

Plaintiffs additionally contend that the committee defendants' course of conduct violated section 406(b), and in particular, section 406(b)(2), which prohibits a fiduciary from acting "in any transaction involving the plan on behalf of a party ... whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b)(2). The section is designed to prevent a fiduciary "from being put into a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." *NLRB v. Amax Coal Co.,* 453 U.S. 322, 333-34 (1981) (quoting legislative history). Plaintiffs contend the committee defendants found themselves in just such a position when acting on transactions between the Plan and Citigroup, ultimately choosing to act for the benefit of Citigroup rather than the Plan and its participants.

While defendants concede that, as noted, neither the statutory nor administrative exemptions discussed above apply to alleged violations of section 408(b), they instead argue plaintiffs' complaint fails to adequately plead a section 406(b) violation because it fails to allege, first, that any of the committee defendants acted "on behalf of" either Citigroup or CitiStreet, or second, that Citigroup (or CitiStreet) was a party with interests "adverse" to those of the Plan.

The Court agrees in both respects.

First, plaintiffs fail to allege with any specificity whatsoever that the committee defendants acted on behalf of Citigroup or its affiliates. The complaint fails to name any of the committee defendants, to identify with specificity any ties they might have to Citigroup, or to provide any factual allegations supporting a possible motivation for why the committee defendants might have acted "on behalf of" Citigroup. The complaint, taken in the light most favorable to plaintiffs, alleges simply that the "committee defendants are officers, employees, or agents of Citigroup" and that Citigroup "created and staffed" the committees. (Am.Compl.¶ ¶ 1, 56.) Those general assertions, which do little to distinguish the Citigroup Plan and its fiduciaries from those of virtually any other plan covered by the Act, are simply insufficient to support the entirely conclusory allegation that, in making the relevant decisions, "the Committee Defendants placed Citigroup's interests ahead of the 401(k) Plan's interests." (*Id.* ¶ 42.). *See Iqbal,* --- U.S. at ----, 129. S.Ct. at 1950 ("Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Second, plaintiffs' complaint fails to allege that Citigroup was a party with interests "adverse" to those of the Plan. The Second Circuit has read section 406(b)(2) "narrowly, holding that a transaction between the plan and a party having an adverse interest is required." *Gruby v. Brady,* 838 F.Supp. 820, 833 (S.D.N.Y.1993) (citing *Donovan v. Bierwirth,* 680 F.2d 263, 270 (2d Cir.1982)). In *Donovan,* the Circuit found the section "[did] not apply" to a plan fiduciary's choice to invest in the stock of the plan's sponsor company because the plan and its sponsor company did not have "adverse" interests for purposes of the Act. *Donovan,* 680 F.2d at 270. While the Circuit did not define "adverse," it did note that section 406(b) covered "self-dealing" and saw "no reason to think Congress intended the expansive interpretation of the various specific prohibitions of § 406 urged by [the plaintiff] particularly in light of the inclusion of the sweeping requirements of prudence and loyalty contained in § 404." *Id.*

*13 Here, plaintiffs allege no facts to support a claim that Citigroup or its various affiliates were parties with "adverse interests" to those of the Plan. With respect to plaintiffs' mutual fund claims, the com-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

plaint can be read to allege at most that Citigroup sold investment securities to the Plan at prevailing market rates, conduct *Donovan* instructs is insufficient to render the Plan's interests "adverse" to those of the sponsor company. With regard to the management services claims, plaintiffs' allegations are even weaker. Plaintiffs do not contend the management services provided by CitiStreet were insufficient, unreasonably costly, or otherwise deficient. Indeed, they provide no plausible grounds for concluding the interests of CitiStreet differed from the interests of the Plan in securing professional, cost-appropriate management services.

Accordingly, the Court finds plaintiffs fail to state a plausible claim to relief pursuant to section 406(b) of the Act.

D. Plaintiffs' Section 404 Fiduciary Duty Claims

Sections 404(a)(1)(A) and (B) impose three different although overlapping standards. A fiduciary must discharge his duties "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of providing benefits to them. Finally, he must act "with the care, skill, prudence, and diligence under the circumstances then prevailing" of a "prudent man." 29 U.S.C. § 1104(a)(1)(A)-(B); *Donovan, 680 F.2d at 270.* The Second Circuit has deemed the duties of ERISA fiduciaries to be "the highest duty known to the law." *La Scala v. Scrufari,* 479 F.3d 213, 220 (2d Cir.2007) (internal quotations omitted).[FN3]

> FN3. Neither the administrative nor the statutory exclusions from section 406 discussed above are determinative of defendants' potential liability pursuant to section 404. *See, e.g.,* PTE 77-3, 42 Fed.Reg. 18,734 ("The fact that a transaction is the subject of an exemption granted under section 408(a) of the Act ... does not relieve a fiduciary ... from certain other provisions of the Act ... including ... the general fiduciary responsibility provisions of section 404 of the Act."). Accordingly, irrespective of whether such exemptions bar actions pursuant to section 406, actions for the same conduct may be brought pursuant to section 404 provided the complaint states a valid claim to relief thereunder.

Plaintiffs contend the committee defendants breached their duties in two now familiar ways: first, by causing plan assets to be invested in affiliated mutual funds that charged higher fees and performed less well than comparable unaffiliated funds, the committee defendants acted in the interests of Citigroup rather than the Plan and failed to act with the skill, prudence, and care required. Second, by selecting an affiliated service provider-CitiStreet-to provide management services to the Plan, defendants similarly breached the duties owed the Plan and its participants. Defendants contend plaintiffs' allegations are insufficient to state a plausible claim to relief.

Plaintiffs' allegations that the committee defendants breached their duties to act prudently and in the best interests of the plan by selecting affiliated mutual funds that charged higher advisory fees than comparable unaffiliated funds is sufficiently concrete and supported by sufficient factual allegations to state a valid claim. Plaintiffs make specific factual allegations that eight affiliated funds selected by the committee defendants charged higher fees than those charged by comparable Vanguard funds-in some instances fees that were more than 200 percent higher than those comparable funds-and accordingly, they nudge those claims across the line from merely conceivable to plausible. Of course, defendants will be free to argue in subsequent proceedings, as they do in their moving papers, that the higher fees were justified, that the Vanguard funds were not actually comparable, or that investment decisions were ultimately in the best interests of the Plan. But such arguments are premature at this stage. The complaint, viewed in the light most favorable to the plaintiffs, states a valid claim.

*14 All of plaintiffs' other claims brought pursuant to section 404, however, fail because plaintiffs fail to amplify them with sufficient factual allegations to nudge them across the line from conceivable to plausible. First, plaintiffs' allegation that the committee defendants breached duties of prudence and care by selecting affiliated mutual funds that "substantially under-performed similar products available from unaffiliated investment managers" is supported by nothing beyond plaintiffs' bare assertion. (Am.Compl. ¶ 32.) Plaintiffs make no specific factual allegations regarding performance of the funds selected by the committee defendants, nor do they provide any basis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

for evaluating or comparing that performance. Plaintiffs' indirect allegations-i.e., that the Plan was the largest investor in many of the affiliated funds chosen-lack specificity and alone are insufficient to state a plausible claim that the selected funds underperformed.[FN4]

> FN4. For the reasons set forth in section III.C.2 above, plaintiffs fail to state a plausible claim that the committee defendants violated duties of loyalty by putting the interests of Citigroup ahead of those of the Plan and its participants. Accordingly, any such claims brought pursuant to section 404 are similarly dismissed.

Second, plaintiffs' allegations that the committee defendants breached duties owed to the Plan and its participants by retaining CitiStreet to provide management services fails because, as discussed above, the complaint contains no allegations that the selection of CitiStreet was "imprudent," that the services provided were deficient, that the costs associated with those services were unreasonable, or that the selection was in any other respect at odds with the best interests of Plan or its beneficiaries. Accordingly, those claims must also be dismissed.

E. Citigroup's "Knowing Participation" in Fiduciaries' Breaches

Finally, plaintiffs claim that Citigroup, while not a plan fiduciary and accordingly not bound by the provisions of sections 404 or 406, knowingly participated in the fiduciaries' breaches and other ERISA violations and therefore should be liable for restitution. Section 503(a)(3) authorizes suits against non-fiduciaries who knowingly participate in transactions violative of the Act for "appropriate equitable relief" including restitution. 29 U.S.C. § 1132(a)(3); see also *Harris Trust & Sav. Bank v. Salomon Smith Barney,* 530 U.S. 238, 246-47 (2000) (non-fiduciary can be liable for knowing participation of violation of section 406(a)); *Gerosa v. Savasta & Co.,* 329 F.3d 317, 320-21 (2d Cir.2003) (non-fiduciary can be liable for knowing participation in ERISA violations and restitution available as an equitable remedy).

Defendants contend here that plaintiffs' claim must fail because plaintiffs cannot establish that Citigroup *knowingly* participated in the breach. Knowing participation turns on a showing that defendants (1) knew of the primary violator's status as a fiduciary and (2) knew that the primary violator's conduct contravened a fiduciary duty. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282-83 (2d. Cir.1992).

Here, plaintiffs fail to state a claim because their complaint contains nothing beyond a bare assertion that Citigroup "knew or should have known" that the committee defendants "were breaching their duties." (Am.Compl.¶ 56.) Plaintiffs fail to plead with any specificity how or why Citigroup knew or should have known of the alleged breaches, or who at Citigroup would have had such knowledge. Plaintiffs' only relevant allegations-that the committees "were created and staffed by Citigroup" (*id.*)-at most provide some factual basis for concluding that Citigroup knew of the primary violator's status as a fiduciary. They have no bearing, however, on the second, and far more critical element of a "knowing participation" claim-that Citigroup knew that the primary violator's conduct violated a fiduciary duty. On that second point, plaintiffs plead no specific facts at all.

*15 Accordingly, standing alone and not amplified by any specific factual allegations, plaintiffs' bare assertion is insufficient to state a plausible claim to relief and should therefore be dismissed.

III. CONCLUSION

Because the Court finds that plaintiffs validly state a plausible claim to relief pursuant to section 404 insofar as they allege that the committee defendants acted imprudently by steering Plan assets to affiliated mutual funds with higher investment advisory fees than those of competing funds, the motion to dismiss the complaint is denied with regard to those claims. As noted, however, survival of those claims will turn on resolution of the timeliness of the action, an issue that cannot be resolved on this Rule 12(b)(6) motion.

None of plaintiffs' other allegations-including plaintiffs' remaining section 404 claims, all of plaintiffs' section 406 claims, and plaintiffs' claims against non-fiduciary Citigroup-states a plausible claim to relief under any section of ERISA, and accordingly, defendants' motion to dismiss the complaint in those respects in granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2010 WL 935442 (S.D.N.Y.)
**(Cite as: 2010 WL 935442 (S.D.N.Y.))**

SO ORDERED.

S.D.N.Y.,2010.
Leber v. Citigroup, Inc.
Slip Copy, 2010 WL 935442 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

4

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Joseph PIETRANGELO, Plaintiff,
v.
NUI CORPORATION, et al., Defendants.
**No. Civ. 04-3223(GEB).**

July 20, 2005.

MEMORANDUM OPINION

BROWN, J.

**\*1** This matter comes before the Court upon the Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Fed.R.Civ.P. 78, and for the reasons set forth below, will grant Defendants' motion in part and deny in part. Plaintiff is granted thirty (30) days leave to amend the Complaint to cure the deficiencies addressed in this Memorandum Opinion.

I. BACKGROUND

A. *Parties and Allegations*

Plaintiff, Joseph Pietrangelo ("Plaintiff"), an employee of defendant NUI Corp. ("NUI"), alleges that NUI, NUI's Board of Directors ("the Board"), the Board's Investment Committee ("Committee") and certain members of the Board and the Committee ("the Individual Defendants"),[FN1] breached their fiduciary duties to participants in two NUI sponsored employee pension benefit plans-the NUI Corporation Savings and Investment Plan and Investment Plan for Collective Bargaining Employees ("the CBE Plan") and the NUI Corporation Savings and Investment Plan ("the Salaried Plan") (collectively, "the Plans")-in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132 et al.

FN1. All defendants will be referred to collectively as "Defendants ." The Individual Defendants include: John Kean ("Kean"), John Kean, Jr. ("Kean, Jr.), Mark Abramovic ("Abramovic"), James R. Van Horn, Thomas W. Williams, Charles N. Garber, James J. Forese, Vera King Farris, J. Russell Hawkins, Bernard S. Lee, R.V. Whisnand and John Winthrop. Certain of the Individual Defendants are alleged to have served in various roles and on various different committees including, *inter alia,* the Board, the Committee, the Board's Audit Committee and the the NUI Executive Committee. *See* Compl. ¶ 18.

In his seventy-seven (77) page, one hundred seventy (170) paragraph complaint ("the Complaint"), Plaintiff alleges that Defendants: (1) breached their fiduciary duties of prudence and loyalty to plan participants imposed by ERISA Section 404 by failing to diverge from plan documents and continuing to invest in NUI stock even though they knew or should have known that NUI stock was artificially inflated as a result of fraudulent activity and accounting improprieties (Count I); (2) failed to monitor the Plans and fiduciaries of the Plans and failed to provide them with material information necessary to assess whether it was prudent to continue offering NUI stock as an investment option (Count II); (3) failed to provide complete and accurate information to the Plans' participants and beneficiaries (and the investing public at large) and/or conveyed false and misleading information regarding NUI's financial vitality and the prudence of investing in NUI stock (Count III); (4) failed to act exclusively in the interests of the Plans in violation of ERISA Section 404 and 405 by, *inter alia,* failing to engage independent fiduciaries to administer the Plans, placing the interests of NUI and themselves above the interests of the Plans' participants and beneficiaries and failing to take other action necessary to protect the Plans' (Count IV); and engaged in prohibited transactions in violation of ERISA Section 406 by continuing to invest and/or allowing the Plans' fiduciaries to invest in NUI common stock despite knowledge or constructive knowledge that NUI stock was artificially inflated (Count V). Defendant brings this action on behalf of himself and a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

putative class of participants in the Plans.[FN2]

> FN2. As the Court will discuss *infra,* Plain-
> tiff does not allege, nor can he demonstrate,
> that he was a "participant" in the Salaried
> Plan.

B. *The Securities Class Action*

**\*2** This action shares many, if not most, of the same
factual allegations as the securities fraud class action
("the securities action") currently pending before this
Court, *In re NUI Securities Litigation,* Civil Action
No. 02-5220(MLC). The Court will briefly summa-
rize the allegations in the securities action to provide
a factual backdrop for the allegations in this action.

In the securities action, the plaintiffs, on behalf of a
putative class of purchasers of NUI securities be-
tween November 8, 2001, and October 17, 2002 ("the
Class Period), alleged that NUI and various other
defendants failed " 'to disclose known risks regarding
[NUI's] business and issued false and misleading
statements about its businesses, current and future
financial prospects and results, causing NUI's stock
to trade at artificially inflated levels during the Class
Period." ' *In re NUI Securities Litigation,* 314
F.Supp.2d 388, 396 (D.N.J.2004) (granting in part
and denying in part defendants' motion to dismiss)
(citing the Securities Complaint at ¶ 3). The plaintiffs
alleged, just as they do here (albeit in varying degree
and specificity), that the "defendants intentionally
inflated NUI's earnings by (1) making misleading
statements concerning, and failing to properly record,
NUI's true bad debt levels ... and (2) pursuing illegal
telecommunications billing practices ("reterminating"
or "retermination")." *In re NUI,* 314 F.Supp.2d at
396. The plaintiffs commenced the securities action
after NUI's stock price plummeted following the
company's announcement that it would sustain drasti-
cally reduced earnings in 2002, contrary to previ-
ously issued market forecasts and guidance. *Id.*

The Court notes that the Complaint in this case is not
identical to its counterpart in the securities action.
Putting aside that the claims are obviously asserted
on different legal bases, Plaintiff points out that the
Complaint in this case also includes allegations re-
garding an audit performed by the State of New Jer-
sey that allegedly revealed pervasive operative prob-
lems at NUI. *See* Pl. Opp. Br. at 3 n. 2.

C. *The Plans*

Both plans are "defined contribution plans." [FN3]
Compl. ¶ 20. Under the Plans, participants could
choose to invest their contributions among eight (8)
funds. *Id.* One of the funds, the "NUI Stock Fund,"
was comprised entirely of NUI common stock. Par-
ticipants could choose to invest in this fund but were
not required to. *Id.* Both Plans provided:

> FN3. "A defined contribution plan 'provides
> for an individual account for each partici-
> pant and for benefits based solely upon the
> amount contributed to the participants ac-
> count." ' *See Hughes Aircraft Co. v.
> Jacobsen,* 525 U.S. 432, 439 (1999) (citing
> ERISA § 3(34); 29 U.S.C. § 1002(34)). In
> contrast, a defined benefit plan "consists of a
> general pool of assets rather than individual
> dedicated accounts." *Hughes,* 525 U.S. at
> 439. With a defined benefit plan, an em-
> ployee "is entitled to a fixed periodic pay-
> ment" upon retirement. *Id.* (citations omit-
> ted). The parties are in agreement that the
> Plans are defined contribution plans.

Each participant shall be solely responsible for the
selection of his or her Investment Fund choices. No
fiduciary with respect to the Plan is empowered to
advise a Participant as to the manner in which his
or her Accounts are to be invested, and the fact that
an Investment Fund is offered shall not be con-
strued to be a recommendation for investment.
*See* Plans at Art. 7.3 (attached as Exhibits to De-
fendants' Declaration in Support of the Motion to
Dismiss). Based on participants' contributions, NUI
would contribute a certain amount of matching
funds. *Id.* at ¶ 21. NUI's matching contributions
were made exclusively in the NUI Stock Fund. *Id.*
at ¶ 22. For example, with respect to the CBE Plan,
"NUI matched 40% of each employee's contribu-
tion up to 6% of the employee's annual base salary,
on contributions invested in options other than NUI
stock, and up to 50% of the employee's contribu-
tion up to a maximum of 8% of the employee's an-
nual base salary on any contributions invested in
NUI stock." [FN4]

> FN4. Plaintiff argues that NUI's higher con-
> tribution percentage with respect to partici-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
(Cite as: 2005 WL 1703200 (D.N.J.))

district court cases to support their position: *In re McKesson HBOC, Inc. ERISA Litig., 2002 WL 31431588 (N.D.Cal. Sept. 30, 2002)* (get Lexis cite), and *Hull*, 2001 U.S. Dist. LEXIS 22343. Recent cases, however, have explicitly rejected the reasoning of *McKesson* and *Hull. See e.g. In re Enron*, 284 F.Supp.2d at 564-567 (rejecting McKesson's discussion of the interplay between ERISA and the securities laws as "misguided").

Recent decisions suggest a growing consensus that there is no conflict between the requirements of ER-ISA and federal securities laws. For example, in *Enron*, the court stated:

As a matter of public policy, [ERISA and the federal securities laws] should be construed not to cancel out the disclosure obligations under both statutes or to mandate concealment, which would only serve to make the harm more widespread; the statutes should be construed to require, as they do, disclosure by [company] officials and plan fiduciaries of [the company's] concealed, material financial status to the investing public generally, including plan participants, whether "impractical" or not, because continued silence and deceit would only encourage the alleged fraud and increase the extent of the injury.[FN6]

FN6. The Court is not persuaded by Defendants' argument that the *Enron* court's reasoning cannot be applied because this case is not a "mega-fraud case" like *Enron. See* Def. Br. at 31. For the reasons discussed above, the Court finds the *Enron* court's reasoning persuasive.

*In re Enron*, 284 F.Supp.2d at 565; *see also In re AEP ERISA Litig., 327 F.Supp.2d 812, 823-24 (E.D.Ohio 2004)* (rejecting argument that to comply with ERISA defendants would have to violate federal securities laws); *Kling v. Fidelity Mgmt. Trust Co., 323 F.Supp.2d 132, 143 n. 10 (same); In re Xcel Energy, Inc. Secs., Deriv. & ERISA Litig., 312 F.Supp.2d 1165, 1181-82 (D.Minn.2004)* (same); *In re CMS Energy ERISA Litig., 312 F.Supp.2d 898, 915 (E.D.Mich.2004)* (same); *In re Elec. Data Sys. Corp. ERISA Litig., 305 F.Supp.2d 658, 673 (E.D.Tex.2004); Rankin v. Rotts, 278 F.Supp.2d 853,*

873-78 (E.D.Mich.2003) (same). Therefore, this Court concludes that the duties imposed by ERISA and the securities laws must be construed congruently. To hold otherwise would undermine the very purposes of ERISA, i.e. encouraging employers to offer ERISA benefits and protecting participants and beneficiaries.

Further, Defendants argument that Plaintiff cannot prove damages "because there is no way in an efficient market for a fiduciary to avoid a loss following a corrective disclosure" cannot succeed. *See* Pl. Br. at 10. At this stage of the proceedings, the Court finds that Plaintiff's allegations that the Plan suffered damages as a result of Defendants' breaches are sufficient. *See e.g. In re Honeywell Intl Sec. Litig.*, 2004 U.S. Dist. LEXIS 21585, *42 (D.N.J. Sept. 14, 2004 (holding that efficient market theory arguments, "because they raise issues of causation and damages, ... are essentially fact-based arguments inappropriate on a motion to dismiss."). Moreover, Defendants' could have minimized Plan losses without disclosing adverse information by simply removing NUI stock as an investment option. *See Enron*, 284 F.Supp.2d at 566. Accordingly, this Court holds that the federal securities laws do not shield the Defendants from liability for their alleged breaches.

C. *Plaintiff Has Sufficiently Pled That The Defendants Are ERISA Fiduciaries*

*5 Under ERISA, fiduciaries may be either named by the plan or they may qualify as fiduciaries if they have discretionary authority.[FN7] See 29 U.S.C. §§ 1102(a)(1), 1002(a)(21)(A) (2005).* ERISA provides, *inter alia*, that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or control respecting management or disposition of its assets." *29 U.S.C. § 1002(21)(A)(I) (2005)*. Basically, "one is an ERISA fiduciary only to the extent that one has discretion." *In re Ikon Office Solutions, Inc. Sec. Litig., 86 F.Supp.2d 481, 490 (E.D.Pa.2000)*. Therefore, an individual may qualify as a fiduciary with respect to certain actions, but not with respect to others. *See Hull*, 2001 U.S. Dist. LEXIS at *11 (citing *Akers v. Palmer, 71 F.3d 226, 230 (6th Cir.1995)*). For this reason, determination of a defendants fiduciary status is a highly fact intensive inquiry.[FN8]

FN7. As discussed above, the Court may

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
(Cite as: 2005 WL 1703200 (D.N.J.))

consider the Plans' documents in determin-
ing the sufficiency of Plaintiff's allegations.

FN8. Plaintiff contends that fiduciary status
is not amenable to final disposition on a mo-
tion to dismiss and cites to a litany of cases
as persuasive authority. *See* Pl. Opp. Br. at 8
(citing *In re Enron,* 284 F.Supp.2d at 665; *In
re ADC Telecoms, Inc.,* 2004 U.S. Dist.
LEXIS 14383, *18 (D.Minn. July 26, 2004);
*In re AEP,* 327 F.Supp.2d at 827. The Third
Circuit has not addressed this issue. Because
this Court finds that Plaintiff's allegations
are sufficient to withstand the instant mo-
tion, the Court need not address this issue.

Defendants argue that "the Plans make clear that fi-
duciary functions under the Plans, including invest-
ment decisions, were delegated to the Savings and
Investment Plan Committee." Def. Br. at 14. The
Court will address separately whether Plaintiff has
sufficiently pled the fiduciary status of NUI Corp.,
the Committee, the Board of Directors and the Indi-
vidual Defendants.[FN9]

FN9. The Court is mindful that the circum-
stances of alleged breaches of fiduciary duty
can be difficult to identify without the bene-
fit of discovery, often because relevant facts
are in the exclusive possession of the
breaching fiduciary. *See Concha v. London,
62 F.3d 1493, 1503 (9th Cir.1995).* At this
stage of the proceedings, Plaintiff is not ex-
pected to allege all of the specifics of each
defendants breach. The Court will address
whether Plaintiff has generally pled suffi-
cient facts to demonstrate that each defen-
dant qualifies as a fiduciary. Discovery may
reveal that these defendants are only fiduci-
aries with respect to certain conduct.

1. *NUI*

Defendants, relying on *Crowley v. Corning, Inc.,* 234
F.Supp.2d 222 (W.D.N.Y.2002), contend that it is
appropriate to determine fiduciary status on a motion
to dismiss where, as here, relevant plan documents
contradict such allegations. *See* Def. Reply Br. at 4
(citing *Crowley,* 234 F.Supp.2d at 228). Defendants
argue that, although the Plan designates NUI as a
fiduciary (Art. 15.1), the Plan delegates all of NUI's

fiduciary functions-including its authority over in-
vestment decisions-to the Savings and Investment
Plan Committee (Art. 15.6). Essentially, Defendants
argue that a company's delegation of authority in Plan
documents is conclusive proof that the company may
not, under any circumstances, be considered to have
acted in a fiduciary capacity. The Court disagrees.

First, the Court notes that Plaintiff has alleged that
NUI did not sufficiently delegate its fiduciary respon-
sibilities. In paragraph 28, Plaintiff states that "NUI
did not delegate fiduciary responsibilities for the Plan
to an external provider. Instead, Defendants chose to
... internaliz[e] the fiduciary functions." Compl. ¶ 28.
Plaintiff further alleges that NUI "had the authority
and discretion to appoint, monitor, and remove" ER-
ISA fiduciaries and exercised effective control over
their activities. Compl. ¶¶ 15 and 16. These allega-
tions, construed in a light most favorable to Plaintiff,
sufficiently allege that NUI did not effectively dele-
gate its fiduciary responsibilities and exercised dis-
cretionary authority over the Plan during the class
period. *See e.g. CMS,* 312 F.Supp.2d at 909 and 911
(discussing ambiguities in the plan documents); *In re
Electronic Data Sys. Corp. ERISA Litig.,* 305
F.Supp.2d at 665-66 ("Plan documents do not effec-
tively delegate the named fiduciaries duties to other
persons or entities.").

*6 Further, as discussed above, a defendant may as-
sume a fiduciary role through his or her actions even
though they are not designated as a fiduciary by the
plan documents. Thus, allegations of functional fidu-
ciary status are sufficient to withstand a motion to
dismiss in spite of plan documents to the contrary.
For example, in *Ikon,* the court determined that, in
light of allegations that the employer made misrepre-
sentations about plan benefits, "it is premature to rule
that Ikon did not act or could not have acted as a fi-
duciary" even though the company was not named as
a plan administrator. *Ikon,* 86 F.Supp.2d at 491; *see
also Honeywell,* 2004 U.S. Dist. LEXIS 21585, *34
n. 14 ("It is true that with respect to some of the De-
fendants fiduciary capacity is alleged in very broad
terms that essentially follow the appropriate statutory
language. But at this stage such allegations, unless
squarely refuted by Plaintiffs' own pleading or by
documents essential to their claims, are sufficient.").

Specifically, Plaintiff has alleged that NUI made af-
firmative misrepresentations to the public through

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
(Cite as: 2005 WL 1703200 (D.N.J.))

SEC filings. Defendants counter that such statements were made when NUI was wearing its "publicly traded company hat," rather than its "plan administrator hat." *See* Def. Br. at 27. Addressing the "two hat" doctrine, the Third Circuit has stated:

[W]here an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by ERISA attach. Where, however, employers conduct businesses and make business decisions not regulated by ERISA, no fiduciary duties apply. And when employers wear two hats as employers and as administrators ... they assume fiduciary duties only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA (citations omitted).

*Payonk v. HMW Industries, Inc.,* 883 F.2d 221, 225 (3d Cir.1989). Further, SEC filings are not automatically to be considered ERISA communications, thereby transforming their authors into ERISA fiduciaries, simply because the statements are accessible to plan participants as members of the investing public. *See Honeywell,* 2004 U.S. Dist. LEXIS 21585 at * 30 (citing *Varity v. Howe,* 516 U.S. 489 (1996)).

In the present case, however, the Complaint alleges that NUI made direct and indirect communications with Plan participants including, but not limited to, "SEC filings, annual reports, press releases, and *Plan-related documents which incorporated and/or reiterated these statements."* Compl. ¶ 30 (emphasis added); *see Honeywell,* 2004 U.S. Dist. LEXIS 21585 at *30-34 ("Defendants' argument [that SEC filings are not necessarily ERISA fiduciary communications] is persuasive with respect to communications that were neither specifically addressed to Plan participants *nor incorporated, by reference into such communications."* ) (emphasis added). Further, the Supreme Court has made clear that once an ERISA fiduciary decides to make representations or provide information on Plan investments, it must provide true, accurate and complete information.[FN10] *See Varity,* 516 U.S. at 506-07; *see also In re Unisys Sav. Plan Litig.,* 74 F.3d 420, 440 (3d Cir.1996) (holding that a fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed under ERISA). Therefore, the Court finds that Plain-

tiff has sufficiently pled that NUI made misrepresentations as an ERISA fiduciary.

FN10. The Third Circuit has also held that a plan fiduciary has " 'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." ' *Adams v. Freedom Forge Corp.,* 204 F .3d 475, 480 (3d Cir.2000) (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255, 1262 (3d Cir.1995), *cert. denied,* 517 U.S. 1103 (1996)).

*7 Accordingly, the Court concludes that the Complaint sufficiently alleges that NUI acted as an ERISA fiduciary. However, the Court reiterates that a defendant's fiduciary status must be determined in reference to the specific fiduciary duties asserted to have been breached. Therefore, the specific contours of each defendants' fiduciary status may be more easily resolved at a later stage.

2. *The Committee, the Board of Directors and the Individual Defendants*

Paragraph 15.6 of the Plan states, in pertinent part: "The Company, as Administrator of the Plan, has by action of the Board of Directors appointed *a Committee* to administer the Plan on its behalf." Compl. ¶ 15.6 (emphasis added). The Plan itself does not specify the name of the Committee or the individual members of this Committee. As a general matter, it seems clear that *the Committee* designated to administer the Plan and its members constitute ERISA fiduciaries.

Defendants argue, however, that Plaintiff has "sued the wrong individuals and committee." Def. Reply Brief at 7. Relying on an NUI Proxy Statement, Plaintiff contends that the relevant committee of NUI's Board of Directors is the "Investment Committee." From this Proxy Statement, Plaintiff derived the names of the members of the Investment Committee, who are named as individual defendants in the Complaint.[FN11] Defendants contend that Plaintiff has improperly conflated the Investment Committee of the Board of Directors with "the Savings and Investment Plan Committee," which is the actual committee that administers the Plan. *See* Def. Reply Br. at 7. In order to cure this claimed discrepancy, the Court will grant Plaintiff leave to amend the Complaint.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

Notwithstanding this discrepancy, the Court finds that Plaintiff has sufficiently alleged that the Board of Directors and the other Individual Defendants [FN12] are functional ERISA fiduciaries. Plaintiff repeatedly alleges that the Board of Directors and the Individual Defendants exercised discretionary authority over the Plan and the Committee during the class period. This is sufficient at this stage of the proceedings. The Court reiterates that a defendant's fiduciary status must be determined in reference to the specific fiduciary duties asserted to have been breached. Therefore, the specific parameters of the fiduciary duties owed by the Board of Directors and the Individual Defendants will be better addressed at a later stage.[FN13]

FN12. To the extent that Plaintiff has sued the wrong individuals as a result of allegedly suing the wrong committee, Plaintiff is granted leave to amend.

FN13. The question whether Plaintiff has sufficiently alleged that the Board of Directors and each of the Individual Defendants breached specific ERISA fiduciary duties is a separate issue that cannot be addressed without differentiation between the parties and further specificity. For the reasons discussed *infra*, Plaintiff has been granted leave to amend the Complaint to cure these deficiencies. The Court notes that the Complaint is devoid of allegations that the Board of Directors or the Individual Directors knew or should have known of the alleged fraudulent activity.

D. *The Court Will Not Apply The Moench Presumption For The Purposes Of This Motion*

Defendants contend that where, as here, a plan offers company stock as an investment alternative and/or makes matching contributions of employer stock, plan fiduciaries continued investment in employer stock is entitled to a presumption of reasonableness under the Third Circuit's holding in *Moench v.*

*Robertson,* 62 F.3d 553, 568 (3d Cir.1995). In *Moench,* the Third Circuit held that "an ESOP ( [employee stock ownership plan] ) fiduciary who invests the assets [of the plan] in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities." *Moench,* 62 F.3d at 571.

*8 Plaintiff's first contend that the *Moench* presumption does not apply here because the Plan is not designed primarily to invest in NUI stock and, therefore, does not qualify as an ESOP. *See id.* at 568-69 ("[U]nlike the traditional pension plan governed by ERISA, ESOP assets generally are invested in securities issued by the plan's sponsoring company.") ("ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature, an ESOP places employee retirement assets at much greater risk than does the typical diversified plan."). On the other hand, Defendants contend that the presumption of prudence can be applied to non-ESOP plans that, like the Plan at issue here, provide for investment of plan assets in company stock. *See* Def. Br. at 2, citing, *inter alia, Pennsylvania Federation v. Norfolk Southern Corp. Thoroughbred Retirement Investment Plan,* 2004 U.S. Dist. LEXIS 1987, *22 (E.D.Pa. February 4, 2004) ("The Third Circuit based the *Moench* presumption on the law of trusts 'which provides where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.' ... Therefore, the distinction between ESOP and other types of EIAPs, such as profit sharing plans and savings plans, is irrelevant."); *In re Schering-Plough Corporation ERISA Litigation,* 2004 U.S. Dist. LEXIS 16265, *14 (applying *Moench* presumption to a similarly structured plan).

The Court need not reach this issue. "Generally, courts should not apply evidentiary standards at the motion to dismiss stage because doing so conflicts with Federal Rule of Civil Procedure 8(a) ." *In re Electronic Data Sys,* 305 F.Supp.2d at 669 ("The Court holds that requiring Plaintiffs to affirmatively plead facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement."); *see also Ikon,* 86 F.Supp.2d at 492 ("[I]t would be premature to dismiss even a portion of the ERISA com-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
(Cite as: 2005 WL 1703200 (D.N.J.))

plaint without giving plaintiffs an opportunity to overcome the presumption."); *see also Xcel,* 312 F.Supp.2d at 1180 ("[P]resumptions are evidentiary standards that should not be applied to motions to dismiss.") (citing *Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002)). Further, at this stage of the proceedings, "the application of the presumption of prudence ... merely requires plaintiffs to allege that continued investment in the company stock constituted an abuse of discretion in light of the circumstances." *Xcel,* 312 F.Supp.2d at 1180, n. 6 (citing *In re McKesson,* 2002 U.S. Dist. LEXIS 19473 at \*6). Count I of the Complaint states that "Defendants failed to diverge from the Plan documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Plaintiff and members of the class." Compl. at ¶ 139. Therefore, the Court concludes that, even if it were to apply the *Moench* presumption, Plaintiff has pled facts sufficient to rebut the presumption at this stage of the proceedings.

E. *Plaintiff Is Granted Leave To Amend The Complaint To Comport With Federal Rules Of Civil Procedure 8(a) And 9(b), Where Applicable*

\*9 Defendants contend that Plaintiff's ERISA breach of fiduciary claims sound in fraud and, therefore, must satisfy the heightened pleading standard of Federal Rule Civil Procedure 9(b). Federal Rule of Civil Procedure 9(b) requires allegations of fraud to be pled with particularity. *See Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004). In order to comply with Rule 9(b), plaintiff must "plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id.* at 223-24 (quotations omitted). In contrast, Rule 8(a) only requires that the complaint set forth a basis for the court's jurisdiction, a short and plain statement of the claim entitling plaintiff to relief and a demand for judgment. *See* FED. R. CIV. P. 8(a) (2005). Basically, Rule 8(a) only requires that the complaint put the defendants on notice of the claims against them. *See Swierkiewicz,* 534 U.S. at 513-14.

Generally, pleadings alleging breaches of fiduciary duties under ERISA are scrutinized under the notice pleading standard of Federal Rule of Civil Procedure

8(a). *See e.g. Concha,* 62 F.3d at 1503 ("Rule 9(b) is not applicable in cases in which the complaint alleges breaches of fiduciary duty under ERISA, and does not allege fraud or mistake."); *In re Electronic Data Sys.,* 305 F.Supp.2d at 672 ("Allegations of breach of fiduciary duty are not necessarily fraud allegations."); *Fink v. Nat'l Sav. & Trust Co.,* 772 F.2d 951, 959 (C.A.D.C.1985). However, courts have applied the heightened pleading standards of Rule 9(b) to ERISA breach of fiduciary claims that are predicated on allegations of fraudulent conduct. *See e.g., Thornton v. Evans,* 692 F.2d 1064, 1082 (7th Cir.1982); *Ikon,* 86 F.Supp.2d at 488; *Chicago District Council of Carpenters Welfare Fund v. Angulo,* 169 F.Supp.2d 880, 885-86 (N.D.Ill.2001); *Vivien v. Worldcom,* 2002 U.S. Dist. LEXIS 27666, \*20 (N.D.Cal. July 26, 2002). To be clear, when breach of fiduciary claims allege that defendants failed to act reasonably in light of adverse circumstances created by the fraudulent activity of others, rather than actually participated in the fraud, Rule 8(a) still applies. *See Xcel,* 312 F.Supp.2d at 1179 ("Here, plaintiffs' breach of fiduciary duty claims are premised on defendants' failure to act in light of the adverse circumstances that were hidden by the fraudulent conduct."). However, "when the alleged breach of the fiduciary *is* the fraudulent act," Plaintiffs are required to plead with particularity. *Xcel,* 312 F.Supp.2d 1165, 1179 (D.Minn.2004) (emphasis added); *see also In re Electronic Data Sys.,* 305 F.Supp.2d at 672 ("Only breach of fiduciary duty claims which include a fraud claim implicate Rule 9(b).").

1. *Plaintiff Fails to Comply With Rule 8(a) Because The Complaint Fails To Differentiate Between The Defendants*

\*10 Some of Plaintiff's allegations, although premised on alleged fraudulent activity at NUI, only implicate the Defendants' actions (or inactions) arising out of the adverse circumstances created by the alleged fraudulent activity at NUI rather than their actual participation in the alleged fraudulent activity. Specifically, Plaintiff alleges that certain defendants breached their fiduciary duties of prudence and loyalty because they knew or should have known of the alleged fraudulent activity and failed to take reasonable action in their capacities as ERISA fiduciaries in light of this information. These alleged breaches are not, in and of themselves, fraudulent; they are merely premised on alleged fraudulent activity. *See e.g., In*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

*re CMS Energy ERISA Litigation,* 312 F.Supp.2d 898, 909 (E.D.Mich.2004) (holding that 9(b) did not apply to the plaintiffs' ERISA breach of fiduciary duty claims because the "general allegations ... assert[ed] a breach of fiduciary duty, not an intent to deceive, as plaintiffs contend[ed]") (citing *Concha,* 62 F.3d at 1502); *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation,* 312 F.Supp.2d 1165, 1179 (D.Minn.2004) (holding that 9(b) did not apply to plaintiff's breach of fiduciary duty claims because they were "premised on defendants' failure to act in light of the adverse circumstances that were hidden by the fraudulent conduct" and "defendants' duty to act arose as a result of the adverse conditions, not the alleged fraud"). Therefore, the Court concludes that the vast majority of Plaintiff's complaint need only satisfy the more liberal standard of Rule 8(a).

With only a few limited exceptions (discussed *infra* ), however, the Complaint fails to satisfy even the liberal notice pleading standard of Rule 8(a) because Plaintiff fails to differentiate between the defendants. Plaintiff's complaint instead lumps all of the defendants together and accuses every defendant of breaching all of the asserted fiduciary duties.[FN14] As Defendant's point out, "[i]n the more than fifty pages of the Complaint which contains the headings "Defendants' Conduct," 'Material Misleading Statements,' and 'Defendants' Post Class Period Conduct,' Plaintiff does not mention even once defendants Van Horn, Williams, Garber, Forese, Farris, Hawkins, Lee, Whisnand or Winthrop." Def. Br. at 19. More importantly, Plaintiff fails to distinguish between the defendants in the five (5) Counts of the Complaint, again referring to all defendants collectively as "Defendants." As a result, the allegations are so general that they fail to put each defendant on notice of the claims against them. *See e.g. In re Providian Fin. Corp. ERISA Litig.,* 2002 U.S. Dist. LEXIS 25676, *3-4 (N.D.Cal. Nov. 14, 2002) ("[P]laintiffs have lumped the various classes of defendants into an undifferentiated mass and alleged that all of them violated all of the fiduciary duties. The resulting cause of action is so general that it fails to put the various defendants on notice of the allegations against them."); *In re McKesson,* 2002 U.S. Dist. LEXIS 19473, *3 (N.D.Cal. Sept. 30, 2002) (dismissing with leave to amend because "the complaint is replete with overly general allegations pursuant to which nearly all defendants are generally alleged to be liable for all breaches of fiduciary duty, all the while failing to

identify specific defendants who are liable for specific breaches of specific fiduciary duties"). Therefore, the Court will grant Plaintiff leave to amend the Complaint. *See Ikon,* 86 F.Supp.2d at n. 9 ("Even if the court were to rule [that Plaintiff failed to plead with sufficient specificity], the appropriate response would be to permit plaintiffs to amend the complaint) (citing *Saporito v. Combusion Eng'g, Inc.,* 843 F.2d 666, 675 (3d Cir.1988)); *In re Providian Financial Corp. ERISA Litigation,* 2002 U.S. Dist. LEXIS 25676 at *4 (granting leave to amend).

> FN14. The Court notes that the Third Circuit, and many other circuits, have disavowed the so-called "group pleading doctrine," in the securities law context. *See In re Digital Island Sec. Litig.,* 223 F.Supp.2d 546, 553 (D.Del.2002) (collecting cases rejecting the group pleading doctrine), *aff'd,* 357 F.3d 322 (3d Cir.2004). Defendants' contention that Plaintiff cannot rely on the group pleading doctrine in the ERISA context hinges largely on their argument that this case is nothing more than a securities action masquerading as an ERISA action. *See* Def. Reply Br. at 4. As discussed *supra,* the Court finds that the obligations imposed upon fiduciaries by ERISA must be construed consistently, rather than to be in conflict with, the securities laws. This Court need not determine whether ERISA countenances group pleading. Instead, for the reasons discussed above, the Court finds that Plaintiff's allegations fail to provide Defendants with the requisite notice of their allegedly improper conduct, in contravention of Rule 8(a). The Court's holding is limited to the facts of this case.

*11 The Court notes Plaintiff's argument that, at this stage of the proceedings, he is unable to specify the conduct of each Defendant because "[m]uch of that information ... is in Defendants' exclusive possession." Pl. Opp. Br. at 6, n. 4. In *Concha,* the Ninth Circuit stated the "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage" because "[t]hese facts will frequently be in the exclusive possession of the breaching fiduciary." *Concha,* 62 F.3d at 1503 (discussing the relaxation of Rule 9(b) when ERISA breach of fiduciary duty

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
(Cite as: 2005 WL 1703200 (D.N.J.))

claims sound in fraud). However, the Court does not require Plaintiff to inject a level of specificity comparable to that required by Rule 9(b). Instead, the Court reiterates that the Complaint must be sufficient to put the Defendants' on notice of the specific claims against them. *See e.g., In re CMS Energy ERISA Litigation,* 312 F.Supp.2d 898, 904 and 911 (E.D.Mich.2004) (holding that ERISA breach of fiduciary duty allegations were sufficiently pled under Rule 8(a) where the complaint divided the named defendants into "fiduciary categories" and "each count identifies the defendants it makes allegations against" and "the heading of each cause of action describes the defendants against whom that count is asserted") (distinguishing *McKesson,* 2002 U.S. Dist. LEXIS 19473, and *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222 (W.D.N.Y.2002)).

**2. *Plaintiff's Fraud Claims Against Kean and Abramovic Satisfy Rule 9(b)***

In contrast, Plaintiff's allegations against Kean, Jr. and Abramovic sound in fraud and, therefore, must satisfy the heightened pleading standard of Rule 9(b). *See Ikon,* 86 F.Supp.2d at 488 (holding that allegations that ERISA fiduciaries misled plan participants or knowingly participated in or undertook to conceal information must comply with Rule 9(b)). Specifically, the Complaint plainly alleges that Kean, Jr. and Abramovic concealed material information and engaged in a scheme designed to inflate NUI's stock price. With respect to these allegations, the alleged breaches *are* the fraudulent acts. Therefore, the Court concludes that Rule 9(b) applies.

The Court notes, however, that "[t]he Third Circuit has repeatedly cautioned that courts should apply [Rule 9(b) ] flexibly, particularly when the information at issue may be in the defendants' control." *Ikon,* 86 F.Supp.2d at 488 (citing *Seville Indus. Mach v. Soutmost Mach.,* 742 F.2d 786, 791 n. 9 (3d Cir.1984). "The purpose of Rule 9(b) is to 'provide notice of the 'precise misconduct' with which defendants are charged and to prevent false or unsubstantiated charges." *Ikon,* 86 F.Supp.2d at 488 (quoting *Rolo v. City Investing Co.,* 155 F.3d 644, 658 (3d Cir.1998)). The Court finds that Plaintiff's fraud allegations against Kean, Jr. and Abramovic are sufficiently detailed to provided adequate notice of the claims against them. Further, for the reasons discussed *supra,* the Court finds that Plaintiff has suffi-

ciently alleged that NUI Corp. is an ERISA fiduciary with respect to the alleged fraudulent activity. To the extent that Plaintiff intends to assert that other Defendants were complicit in the fraudulent activity, the Court will grant Plaintiff leave to amend to provide greater specificity as required by Rule 9(b).

**F. *Plaintiff's Respondeat Superior Allegations Against NUI Are Sufficient***

**\*12** Despite the pleading deficiencies discussed above, the Court finds that Plaintiff has sufficiently pled that NUI may be liable under the doctrine of respondeat superior. Under ERISA, respondeat superior liability will be imposed on a principal "only when it had de facto control of its agent in order to control disposition of plan assets." *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 228 (W.D.N.Y.2002) (citing *Bannistor v. Ullman,* 287 F.3d 394, 408 (5th Cir.2002)). The Complaint states that "[d]uring the Class Period, NUI had effective control over the activities of its officers and employees, including their Plan-related activities." Compl. ¶ 15. Further, the Court has already determined that Plaintiff has sufficiently alleged that NUI acted as an ERISA fiduciary. Therefore, the Court finds that Plaintiff's respondeat superior claims survive the instant motion.

**G. *Plaintiff's Retermination Allegations Must Be Dismissed***

Defendants also seek dismissal of Plaintiff's claims arising out of the alleged retermination scheme at Telecom, an NUI subsidiary. In the securities action, the Court granted the defendants' motion to dismiss allegations arising out of this same purported retermination practice at Telecom. *See In re NUI,* 314 F.Supp.2d at 400-01. Reterminating involves routing interstate calls to lines in different states and then re-routing to an interstate line. The company would then bill the customer at the more expensive rate for intrastate calls but account for them on the books as interstate calls, thereby increasing profit margins.[FN15] *Id.* at 400. Plaintiffs allege that this practice artificially inflated NUI's stock price. The Court dismissed the retermination allegations, emphasizing that "plaintiffs have not alleged that anyone has disputed the retermination practice or instituted legal proceedings to recoup the alleged illegal charges." *Id.* at 401. Therefore, the Court concluded that plaintiff had not alleged either damages or loss causation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

FN15. The Court did not determine whether retermination is illegal. *Id.* at 401 ("Assuming arguendo that retermination is illegal and defendants intentionally concealed the practice, plaintiffs do not allege that they have suffered any resultant loss.").

This Court need not determine whether an ERISA plaintiff must demonstrate loss causation because Plaintiff has failed to allege that Defendants knew or should known of the purported practice or that the Plan suffered damages as a result of the practice. As Defendants point out, the Complaint only makes "fleeting references to the purported 'reterminating' practice at Telecom." Pl. Br. at 21. Further, this Court finds the court's reasoning in the securities action to be sound. Because the alleged reterminating practice has never been disputed, earnings were never restated to account for the alleged inflation. Thus, the Plan has not yet been harmed by the alleged retermination practice at Telecom. It is not enough to argue that the income from the retermination will someday be subject to disgorgement. *See In re NUI Sec. Litig.*, 314 F.Supp.2d at 401. The fact remains that, until that happens, Plaintiff's damages are prospective. Therefore, the Court concludes that the Plan cannot recover damages as a result of the purported retermination under any set of facts. Accordingly, Plaintiff's retermination allegations must be dismissed.

### H. *Plaintiff's Section 406 Claim Must Be Dismissed*

**\*13** In Count V of the Complaint, Plaintiff alleges that the Defendants' purchase (on behalf of the Plan) of artificially inflated NUI common stock constituted a Prohibited Transaction in violation of ERISA Section 406, 29 U.S.C. § 1106(a) (2005). Compl. ¶¶ 160-167. Defendants' argue that they are protected by the exemption provided by ERISA Section 408, 29 U.S.C. § 1108 (2005). Section 408 provides that Section 406 does not apply to the acquisition by a plan of qualifying employer securities if such acquisition is for "adequate consideration," no commission is charged, and the plan is an eligible individual account plan.[FN16] *See* 29 U.S.C. § 1108(e) (2005). Plaintiff counters that Section 408 does not apply here because the securities were purchased at artificially inflated prices, rather than for "adequate consideration." Plaintiff's argument cannot succeed.

FN16. The Court will not address Defendants argument that Section 406(a) has no applicability here because the stock was purchased on the open market, rather than from an interested party, because, for the reasons discussed above, Section 408 applies.

"[B]ecause § 406(a) characterizes *per se* violations, it should be interpreted narrowly." *Jordan v. Michigan Conference of Teamsters Welfare Fund,* 207 F.3d 854, 858 (6th Cir.2000) (citing *United Steelworkers of Am., Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 203 (6th Cir.1988)). ERISA defines "adequate consideration ... in the case of a security for which there is a generally recognized market [as] ... the price of the security prevailing on a national securities exchange." *See* 29 U.S.C. § 1002(18). In the present case, it is undisputed that the Plans purchased the NUI securities at market price from a qualifying national securities exchange. Therefore, Plaintiff's Section 406 claims must be dismissed. *See e.g. CMS,* 312 F.Supp.2d at 917 (rejecting argument that 408 exemption does not apply where securities were allegedly purchased at artificially inflated prices because it was undisputed that the shares were acquired at market price on the New York Stock Exchange).

### I. *The Court Finds That Plaintiff May Only Pursue Relief Under ERISA Section 1132(a)(2) On Behalf Of The CBE Plan And Defers Consideration Of Whether Plaintiff May Pursue Damages On Behalf Of A Class of Plan Participants*

Defendants argue that Plaintiff seeks monetary relief unavailable to him under ERISA because the alleged losses were suffered by participants rather than by the Plans. Plaintiff counters that he seeks to recover "on behalf of both the Plans and a Class of Plan participants." However, Plaintiff fails to specify which statutory sections allegedly authorize him to pursue such relief. Pl. Opp. Br. at 29 (citing Compl. ¶¶ 4-6).

ERISA Section 1132(a)(2), authorizes a participant or beneficiary to seek relief on behalf of the plan. *See* ERISA § 1132(a)(2); *see also Honeywell,* 2004 U.S. Dist. LEXIS 21585 at \*50-56 (holding that plaintiffs, participants in retirement and investment plans, may recover on behalf of the Plan under Section 1132(a)(2)); *Bona v. Barasch,* 2003 U.S. Dist. LEXIS 4186, \*27 (S.D.N.Y. Mar. 20, 2003) ("Individual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

Plaintiffs who are suing on behalf of a class of plan participants also can recover on behalf of the Funds if they represent a class made up of all Fund participants ."). Here, although the Plans are individual account plans, all NUI matching contributions were made in NUI stock. Therefore, the alleged fiduciary breaches would affect the Plans as a whole. *See Honeywell,* 2004 U.S. Dist. LEXIS 21585 at * 6-7 and *52 (holding that plaintiff may pursue claims on behalf of the plan under Section 1132(a)(2) where "Plaintiffs contributed funds to the general trust fund held by the Plan, and those funds were allocated to subfunds within the Plan's holdings in accordance with the Plaintiff's investment decisions [and] Honeywell paid matching contributions for Plaintiffs' benefit into the Stock Fund portion of the Plan's holdings."); *contra In re Schering Plough Corp. ERISA Litigation.,* 2004 U.S. Dist. LEXIS 16265, *43 (D.N.J. Sept. 14, 2004) (holding that plaintiff could not state a damages claim on behalf of the plan under Section 1132(a)(2) because the alleged fiduciary breaches did not affect the Plan as a whole where the Plan gave the Plan Participants sole discretion to invest their funds and did not make matching contributions in company stock). Further, the Supreme Court has emphasized that ERISA should be construed expansively in favor of providing a remedy for aggrieved plaintiffs. *See Varity,* 516 U.S. at 513-15 (construing Section 1132(a)(3)). Although the damages at issue may be traced directly to individual participants' accounts, the Court is unable to conclude, at this stage of the proceedings, that the assets of the participants' accounts may in no way be considered Plan assets for the purposes of Section 1132(a)(2). *See Honeywell,* 2004 U.S. Dist. LEXIS 21585 at *51-52 ("The fact that the assets at issue were earmarked or held for individual Plaintiffs does not alter the fact that they were held by the Plan. Similarly, the fact that Plaintiffs may have to show individual reliance upon misrepresentations to prevail on some claims does not imply that they do not seek recovery for the Plan: losses to the Plan may have resulted from decisions by individual participants; but that does not mean that those losses were not losses to the Plan, it simply means that some of the decisionmaking for Plan investments was conducted by the participants who contributed to it."); *see also In re Tyco Int'l, Ltd. Multidistrict Litig.,* 2004 U.S. Dist. LEXIS 24272, *30 (D.N. ("Although Defendants argue that the complaint seeks to recover for losses suffered by participants rather than by the plans, the complaint plainly seeks to recover on behalf of both the Plans

and their participants. Because the complaint seeks a form of relief that is available under ERISA, [the court] decline[s] to dismiss the complaint on this basis. Whether plaintiffs will be able to prove that the Plans suffered cognizable losses and whether ERISA also permits plaintiffs to recover for losses that were suffered only by participants are questions for another day."). Therefore, drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff may pursue the requested damages under Section 1132(a)(2).

*14 However, Plaintiff does not have standing to seek relief on behalf of the Salaried Plan under Section 1132(a)(2) because he participated only in the CBE Plan. *See* Def. Br. at 39 (citing Compl. ¶ 2); *see also Acosta v. Pacific Enterpr.,* 950 F.2d 611, 617 (9th Cir.1991) (concluding that plaintiff could bring an action for breach of fiduciary duty on behalf of a plan that he participated in but lacked standing with respect to other plans in which he did not participate). ERISA Section 1132(a)(1) restricts civil actions against plan administrators to a "participant or beneficiary." *See Miller v. Rite-Aid Corp.,* 334 F.3d 335, 340 (3d Cir.2003). In the present case, the Salaried Plan's policy language is unambiguous that Plaintiff is not eligible to participate. Specifically, "[t]he Salaried Plan specifically exempts from eligibility an employee, like Plaintiff, 'whose compensation and conditions of employment are covered by a collective bargaining agreement ..." ' Pl. Reply Br. at 14.

Plaintiff argues that, "while [he] did not invest retirement monies in the Salaried Plan," as an NUI employee he falls with a "broad view of participant standing under ERISA." *See* Pl. Opp. Br. at 35-36 (citing *Financial Inst. Retirement Fund v. Office of Thrift Supervision,* 964 F.2d 142, 147 (2d Cir.1992)). However, the Third Circuit has made it clear that standing under ERISA must be determined in reference to traditional concepts of standing. *See Miller v. Rite Aid Corp.,* 334 F.3d 335, 340-41 (3d Cir.2003) (citing *Vartanian v. Monsanto Co.,* 14 F.3d 697, 701 (1st Cir.1994) ("In determining who is a 'participant,' for purposes of standing, the definition found in 29 U.S.C. § 1002(7) must be read in the context of traditional concepts of standing ... The *ultimate question is whether the plaintiff is within the zone of interests* ERISA *was intended to protect."* ) (emphasis in original). Because Plaintiff's employment was gov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)
**(Cite as: 2005 WL 1703200 (D.N.J.))**

erned by a collective bargaining agreement, he was not eligible to participate in the Salaried Plan. Therefore, he could not prove, under any set of facts, that he suffered any injury as a participant in the Salaried Plan.[FN17] Moreover, the Complaint fails to allege that Plaintiff was a participant in the Salaried Plan. Therefore, the Court concludes that Plaintiff may not bring this action on behalf of the Salaried Plan under Section 1132(a)(2).

> FN17. It is undisputed that Plaintiff was a participant in the CBE Plan.

It is a totally different issue whether Plaintiff has standing to assert claims on behalf of the Salaried Plan as part of a class action. The Court questions whether this action may be properly commenced as a class action.[FN18] However, these issues are best resolved on a motion for class certification, particularly because the parties' briefs do not focus on these issues. See e.g. Tyco, 2004 U.S. Dist. LEXIS 24272, *8 n. 1 ("Plaintiffs plainly have standing to seek relief for their own injuries. Whether they should also be permitted to represent a class that includes participants in related plans implicates prudential concerns that must be analyzed under Fed.R.Civ.P. 23."); In re McKesson, 2002 WL 31431588 at *18 ("The propriety of the class allegations, and the suitability of this action as a class action, is better left to be decided on a motion for class certification when the class issues can be more fully briefed and considered."). Therefore, the Court will defer consideration of these issues until Plaintiff files a motion for class certification pursuant to Federal Rule of Civil Procedure 23.

> FN18. The Court declines to reach the related issue of whether Plaintiff can obtain the requested relief under ERISA Section 1132(a)(3) because it is so intertwined with the class certification issues and should be addressed concurrently. Specifically, the Court refrains from determining whether Plaintiff's requested monetary relief may be considered "equitable" relief for the purposes of Section 1132(a)(3).

## III. CONCLUSION

*15 For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted in part and denied in part. Specifically, the Court dismisses Plaintiff's

retermination allegations and Count V of the Complaint. Plaintiff is granted thirty (30) days leave to amend the Complaint to cure the pleading deficiencies discussed herein. An appropriate form of order is filed herewith.

D.N.J.,2005.
Pietrangelo v. NUI Corp.
Not Reported in F.Supp.2d, 2005 WL 1703200 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.