IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                  :
BORIS GOLDENBERG et. al.,         :        HON. JEROME B. SIMANDLE
                                  :
              Plaintiffs,         :        Civil No. 09-5202 (JBS/AMD)
                                  :
      v.                          :
                                  :             OPINION
INDEL, INC.  et. al.,             :
                                  :
              Defendants.         :
                                  :
```

APPEARANCES:

Arnold Carl Lakind, Esq.
Robert Lawrence Lakind, Esq.
Robert E. Lytle, Esq.
SZAFERMAN, LAKIND, BLUMSTEIN, BLADER & LEHMANN , PC
Quakerbridge Executive Center
101 Grovers Mill Road
Suite 200
Lawrenceville, NJ 08648
     -and-
Moshe Maimon, Esq.
LEVY, PHILIPS & KONIGSBERG, LLP
101 Grovers Mill Road
Suite 200
Lawrenceville, NJ 08648
     Counsel for Plaintiffs

Matthew Steven Barndt, Esq.
Vincent E. Gentile, Esq.
DRINKER, BIDDLE & REATH, LLP
105 College Road East
Suite 300
Princeton, NJ 08542
     Counsel for Inductotherm Defendants

Craig Carpenito, Esq.
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
     Counsel for FSC Defendants and SunAmerica Defendants

**SIMANDLE,** District Judge:

## I.   INTRODUCTION

This putative class action involving an allegedly mismanaged employee retirement plan is before the Court on three separate motions to dismiss [Docket Items 15, 17, & 19].  The motions, filed pursuant to Rule 12(b)(6), Fed. R. Civ. P., challenge each of the twenty-two counts contained in the 136-page Complaint.[1]  As discussed in this Opinion, some but not all of the claims will be dismissed.

## II.   BACKGROUND

This case involves the alleged financial mismanagement of the Inductotherm Companies Master Profit Sharing Plan ("Plan"), a pension plan designed to provide retirement benefits to Inductotherm employees.  (Compl. ¶ 54.)  Plaintiffs and the putative class are or were participants in the defined contribution plan which is sponsored by Inductotherm Industries, Inc., also known as Indel Inc., "a privately owned company that acts as the management service company for a group of engineering and technology-based companies."  (Compl. ¶ 12.)  Contributions

---

[1] Since the filing of the motions, pursuant to Rule 15(a)(1)(B), Fed. R. Civ. P., Plaintiffs filed an Amended Complaint which the parties agree does not materially alter the allegations at issue in the motions.  Consequently, the Court refers to the paragraphs contained in the original Complaint as the parties have in the briefing.

to the Plan are deposited into an investment fund that is invested under the supervision of the Plan's Trustees.  The Complaint contains twenty-two claims, including sixteen claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 - § 1461 for breach of fiduciary duties and self-dealing, two common law claims of fraudulent concealment, three claims involving violations of federal and state laws regulating securities, and a federal claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1963.

There are three sets of named Defendants in this case. First, there are the Inductotherm Defendants, who constitute the company itself and the trustees to the Plan.[2]  The second group is the FSC Defendants, entities who were allegedly involved in advising the Plan's trustees as to how to invest the Plan's assets: Financial Services Corporation, FSC Securities Corporation, and the Wharton Business Group.  The third set of Defendants are the SunAmerica Defendants, who are related to the SunAmerica Money Market Fund in which Plan assets were invested. They are the American International Group (AIG), Sunamerica Asset Management Corp., Sunamerica Capital Services, Inc., and Sunamerica Fund Services, Inc.

---

[2]  The Trustees are David L. Braddock, Laurence A. Krupnick, Thomas P. Mcshane, Henry M. Rowan, Manning J. Smith, and Harry G. Trefz.  (Compl. ¶ 15.)

According to Plaintiffs, the Inductotherm Defendants retained the assistance of the FSC Defendants around 2005 to invest the Plan assets, including the purchase of shares of the SunAmerica Money Market Fund.  Plaintiffs allege that the investments performed poorly, partly because the fiduciaries failed to perform their duties, misled Plaintiffs about various aspects of the investments, failed to act in the interests of the Plan, and violated various securities laws and regulations.  Each set of Defendants has filed a separate motion to dismiss.  The factual allegations underlying each individual claim are discussed, as relevant, in the sections that follow.

**III.  DISCUSSION**

   **A.  Standard of Review**

The sufficiency of the pleadings for the non-fraud claims contained in this Complaint is governed by Rule 8, Fed. R. Civ. P., a rule that is designed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).[3]  The rule provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing

_____

   [3]  Where a heightened pleading standard applies and is relevant, it will be discussed below.

that the pleader is entitled to relief." Fed. R. Civ. P.
8(a)(2).

The "complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on
its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009);
Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  The
requirement to provide the grounds for relief "requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (quoting Papasan v. Allain, 478
U.S. 265, 286 (1986)).

In reviewing whether each count in the Complaint states a
claim showing that the pleader is entitled to relief, the Court
must "accept all factual allegations as true and construe the
complaint in the light most favorable to the plaintiff."
Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)
(quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d
Cir. 2002)).

On this procedural posture, "courts generally consider only
the allegations in the complaint, exhibits attached to the
complaint, matters of public record, and documents that form the
basis of a claim."  Lum v. Bank of America, 361 F.3d 217, 222 n.3
(3d Cir. 2004) (citation omitted).  This Complaint relies,
directly or indirectly, upon a number of public documents or

documents referenced in the Complaint.  The Court will consider
these documents about which there is no dispute as to
authenticity, and to the extent they contradict the Complaint's
factual allegations, the documents will control.
ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 n.8 (3d Cir. 1994)
("Where there is a disparity between a written instrument annexed
to a pleading and an allegation in the pleading based
thereon, the written instrument will control.").

### B.  ERISA Claims

#### 1.  Fiduciaries

##### a.  Standard

Plaintiffs' claims pursuant to 29 U.S.C. § 1104 and § 1106
require a showing that each Defendant subject to the claims was
acting in a fiduciary capacity.  29 U.S.C. § 1104, § 1106; In re
Unisys Corp. Retiree Medical Benefits ERISA Litigation, 579 F.3d
220, 228 (3d Cir. 2009).  The Inductotherm Defendants do not
dispute their role as fiduciaries, but the FSC Defendants argue
that none of them played a fiduciary role.

ERISA provides three ways in which one can acquire fiduciary
status: (i) exercising discretionary authority or control over
management of the plan or disposition of its assets; (ii)
rendering investment advice for a fee or other compensation, or
having authority to do so; or (iii) exercising discretionary

authority in the administration of the plan.  29 U.S.C. §
1002(21)(A).  Under the investment advice prong, an individual
may become a fiduciary by (1) providing individualized investment
advice; (2) given pursuant to a mutual understanding; (3) on a
regular basis; (4) that serves as a primary basis for investment
decisions with respect to plan assets; (5) pertains to the value
of the property or consists of recommendations as to the
advisability of investing in certain property; and (6) is
rendered for a fee.[4]  29 C.F.R. § 2510.3-21(c); see Thomas, Head
& Greisen Employees Trust v. Buster, 24 F.3d 1114, 1117 (9th Cir.
1994), cert. denied, 513 U.S. 1127 (1995).

If the factual allegations in a complaint do not
sufficiently support a claim that a defendant was a fiduciary,
then the claim may be dismissed on a Rule 12(b)(6) motion.  See
Pegram v. Herdrich, 530 U.S. 211 (2000).  If, on the other hand,
fiduciary status is based on disputed facts — which is often the
case because of the functional nature of the test — then the
issue cannot be decided on a motion to dismiss.  See Smith v.
Provident Bank, 170 F.3d 609, 613 (6th Cir. 1999).  As explained
below, accepting all factual allegations as true and construing
the Complaint and documents upon which it is based in the light
most favorable to Plaintiffs, the alleged facts are sufficient to

---

[4]     Id.

establish that the Wharton Business Group and FSC Securities are fiduciaries, but not the Financial Services Corporation.

### b.  Allegations Regarding FSC Defendants

The Complaint alleges that in 2006 and 2007, the FSC Defendants, through the Wharton Business Group, caused the Plan's assets to be invested in various ways.  (E.g., Compl. ¶¶ 130, 138.)  The Complaint alleges that a letter sent to Plaintiffs from the Trustees of the Plan stated, "These funds are invested in various funds and equities that are recommended by the Wharton Business Group, a company which monitors to a high degree of precision the various investment opportunities."  (Compl. ¶ 142.) Another letter stated that "the Plan is invested in accordance with the adopted investment policy statement between the Trustees and their professional investment advisor, the Wharton Business Group."  (Compl. ¶ 145.)

The "Investment Policy Statement," referenced in the Complaint, is a December 2005 agreement between Wharton Business Group and Inductotherm regarding how the Plan's assets will be managed.  (FSC Def. Ex. B; Compl. ¶ 79.)  The five-page document sets out goals and objectives to guide decision-making with respect to investing the Plan's assets.  It provides for a set overall asset allocation (i.e. income vs. growth) as well as an adjustable specific asset allocation (i.e. bonds, large value

U.S. stocks, emerging markets), and provides the authority for an outside financial manager to rebalance the portfolio based on agreed-upon ranges.  By providing for the selection and control of investment managers outside Inductotherm, the document strongly implies that individuals at Wharton Business Group will be actively managing the Plan's assets and making specific investment decisions which will be reviewed by Inductotherm and its representatives.  (FSC Def. Ex. B at 4-5.)  This document does not mention Financial Services Corporation or FSC Securities.

Defendants also attach the "FSC Securities Corporation, Vision2020 Advisor, Investment Advisory Client Services Agreement."  (FSC Defs. Ex. C.)  It is a fourteen-page agreement between FSC Securities Corporation and the Inductotherm Companies Profit Sharing Plan.  The document is a form contract with various check boxes and empty spaces with handwritten notations. FSC Securities is filled in for the space marked "Adviser," Inductotherm Companies Profit Sharing Plan is filled in for the space marked "Client," and Marc Hembrough, who Plaintiffs allege to be a member of Wharton Business Group working for FSC Securities, is filled in for the space "Investment Adviser Representative."  The agreement opens an account with FSC Securities for the purpose of participating in the Vision2020 Advisor Program, through which a third party — in this case Marc

Hembrough of Wharton Business Group — will manage the Plan's assets on behalf of FSC Securities.

In the Investment Agreement document, under "Trading," the section marked "non-discretionary" is checked.  The section states (using the generic terms Adviser, Client, and Investment Adviser Representative):

> [Mr. Hembrough] on behalf of [FSC Securities] will make recommendations to [Inductotherm] of load and no-load mutual funds, stocks and bonds, and will purchase or sell on behalf of [Inductotherm] such investments as [Inductotherm] directs.  [Inductotherm] is under no obligation to accept any of [Mr. Hembrough's] recommendations, and [Inductotherm] retains sole discretion over the investments to be purchased and sold in the Program Account.

(FSC Defs. Ex. C. at 2-3.)  The Agreement also provides for payment of an annualized advisory fee.  Finally, it indicates that FSC Securities will not "accept the legal status of investment adviser or fiduciary for any assets of the client outside a program subject to an advisory agreement," the negative implication of which is that it will accept that designation for funds subject to this Investment Agreement.  (FSC Defs. Ex. C. at 7.)

The final documentary support for the Complaint's allegations that FSC Securities, through Wharton Business Group, held responsibility for the Plan's investments are the Annual Return/Report of Employee Benefit Plan forms for the Inductotherm

10

Profit Sharing Plan for years 2006 and 2007.  (FSC Defs. Ex. L & M; Compl. ¶ 62.; Compl. ¶ 80.)  Both IRS forms state that Financial Service Corp. served in the "Official plan position" of "Investment Management," for which it was paid $61,245 in 2006 and $64,865 in 2007, in fees and commissions.  (Ex. L at 5; Ex. M at 5.)  An attachment to Schedule H line 4i, "Did the Plan have assets held for investment?" lists Financial Service Corp. as a "borrower, lessor, or similar party," and the "description of the investment," is "funds managed by Wharton Business Group."

The explanation provided in the Complaint for the seeming interchangeable use of Wharton Business Group, FSC Securities, and Financial Services Corporation is that Wharton Business Group is just the front office for FSC Securities.  Financial Services Corporation conducts all of its investment and advisory activities through FSC Securities, (Compl. ¶¶ 17, 87), which in turn uses branch offices like Wharton Business Group to transact business.  (Compl. ¶ 19.)  Employees of Wharton Business Group are employees of FSC Securities (Compl. ¶ 172).  That is why FSC Securities is listed on all the relevant documentation as the entity providing financial advice for the Plan.  (FSC Defs. Exs. B, C, L, M.)

> c.   Wharton Business Group May be Sued as a
>       Fiduciary

The sum of these allegations and corroborating documents is that Wharton Business Group, on behalf of FSC Securities,

rendered investment advice to the Trustees who had ultimate
control over the investment decisions.  These allegations make it
plausible that Wharton Business Group was (1) providing
individualized investment advice; (2) given pursuant to a mutual
understanding; (3) on a regular basis; (4) that serves as a
primary basis for investment decisions with respect to plan
assets; (5) pertains to the value of the property or consists of
recommendations as to the advisability of investing in certain
property; and (6) is rendered for a fee.  29 C.F.R. § 2510.3-
21(c).

The FSC Defendants ignore this prong of ERISA's definition
of a fiduciary entirely, and attempt to show by case law that
advice is never sufficient.  The precedent cited by Defendants
does not stand for the proposition that advice alone can never
give rise to fiduciary status, a proposition of law which would
contradict the plain language of the statute.  29 U.S.C. §
1002(21)(A)(ii) (providing that an individual is a fiduciary when
"he renders investment advice for a fee or other compensation,
direct or indirect, with respect to any moneys or other property
of such plan, or has any authority or responsibility to do so.");
see also Ellis v. Rycenga Homes, Inc., 484 F. Supp. 2d 694, 706
(W.D. Mich. 2007) ("Although it is certainly true that the
possession of discretionary authority and control is generally
the benchmark for fiduciary status under ERISA, it is also true

that, in the special case of those providing investment advice, the existence of discretionary authority is not necessary to a finding of fiduciary status.").[5]

The FSC Defendants also argue that because the Wharton Business Group is merely the trade name of several individuals acting as investment advisors, it cannot be sued as a fiduciary. Rule 17(b), Fed. R. Civ. P., governs whether an entity has the capacity to sue and be sued. It provides in relevant part:

> Capacity to sue or be sued is determined as follows . . . [(3)] by the law of the state where the court is located, except that . . . (A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws.

---

[5] The cases Defendants cite do not contradict this proposition. Tibble held that because "[t]here is no evidence, for example, that SCE itself influenced whether to enter into the service contracts with the mutual funds or whether certain mutual funds would become investment options for the fund," that SCE was not a fiduciary for the purposes of a § 406 claim. Tibble v. Edison Intern., 639 F. Supp. 2d 1074, 1088 (C.D. Cal. 2009). Similarly, Hecker v. Deere & Co., 556 F.3d 575, 583-84 (7th Cir. 2009), merely holds that "'playing a role' or furnishing professional advice is not enough to transform a company into a fiduciary." Id. at 583. Neither holding contradicts Plaintiff's position, which is consistent with the statute and the Department of Labor's regulations, that advice that is central to investment decisions can indeed make one a fiduciary. And to the extent that Tibble or Hecker could be read to deny the possibility of fiduciary status for "rendering investment advice," as defined by the Department of Labor, the cases would clearly be in error according to the clear terms of ERISA itself. The Department of Labor Advisory Opinion to which Defendant cites clarifies that the fiduciary role is not general, and has to be involved with the particular investments about which there is controversy. Op. Dep't of Labor 97-16A (1997). That is what is alleged here.

17(b), Fed. R. Civ. P.

Defendants correctly argue that 17(b) only gives unincorporated associations the capacity to make and be subject to federal claims; it does not transform any particular group of individuals into an unincorporated association. Instead, such an association must be recognized as a legal entity by other law. Roby v. Corporation of Lloyd's, 796 F. Supp. 103, 110 (S.D.N.Y. 1992). However, federal law, not state law, determines whether a group is an unincorporated association for the purposes of 17(b)(3)(A). See Committee for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 820 (9th Cir. 1996). Under federal law, an unincorporated association is a "voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." Id.; Local 4076, United Steelworkers of America v. United Steelworkers of America, AFL-CIO, 327 F. Supp. 1400, 1402-03 (W.D. Pa. 1971). According to the allegations made by Plaintiffs, that Wharton Business Group operates as a branch office of FSC Securities Corporation, the federal definition of unincorporated association fits the Wharton Business Group. The motion to dismiss that entity as lacking the capacity to be sued will therefore be denied.

d.   FSC Securities

FSC Securities is a fiduciary because the individual investment advisors were direct representatives of FSC

Securities.  (Compl. ¶ 176.)  FSC Securities is also named as the entity performing investment management services. (Compl. ¶ 80.) Although the Third Circuit has yet to directly address the issue,[6] most Circuits to have done so find that employer-employee agency applies to ERISA fiduciary duties.  See Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc. of the U.S., 841 F.2d 658, 665 (5th Cir. 1988); Nat'l Football Scouting Inc. v. Continental Assurance Co., 931 F.2d 646, 648-650 (10th Cir. 1991); Hamilton v. Carell, 243 F.3d 992 (6th Cir. 2001); Crosley v. Composition Roofers' Union Local 30 Employees' Pension Plan, No. Civ.A. 04-5954, 2005 WL 2405979, at *7 (E.D. Pa. Sept. 29, 2005); Kling v. Fidelity Mgmt. Trust Co., 323 F. Supp. 2d 132, 146-47 (D. Mass. 2004) (collecting federal cases that applied employer-employee agency to ERISA breach-of-fiduciary-duty claims and then itself endorsing the theory).  Indeed, without some theory of agency, an investment corporation would never be held liable for breaches of fiduciary duty since corporate liability is always ultimately a question of

---

[6]  Several district court cases cite McMahon v. McDowell, 794 F.2d 100, 109 (3d Cir. 1986), for the proposition that the Third Circuit recognizes employer-employee agency in ERISA actions.  But McMahon, and the Third Circuit case upon which it relies, applies trust principles to extend liability to a third party from whom fiduciary was to collect contributions.  This is a distinguishable situation from the application of employer-employee agency, although it does suggest the Third Circuit's willingness to apply state law agency principles to some aspects of ERISA.

imputing liability to the entity based on the conduct of a human being.

### e.   Financial Services Corporation

Unlike FSC Securities, Financial Services Corporation neither directly employs the investment advisors nor is it named as the entity providing investment advice in the Agreement.  And, counter to Plaintiffs' assertion, Financial Services Corporation is not made a fiduciary merely by being an "affiliate" of FSC Securities.  According to the regulation, even if Financial Services Corporation constitutes an "affiliate" of a "rendering investment advice" fiduciary, it would still have to independently "render[] advice to the plan as to the value of securities or other property, or make[] recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property."  29 C.F.R. § 2510.3-21(c) (requiring that, to be deemed "rendering investment advice," a person must both render advice and "directly or indirectly (e.g., through or together with any affiliate)" control the investments or render advice meeting the six prongs discussed above).

Nor does the inclusion of Financial Services Corporation on the IRS tax filings make it a fiduciary or impute liability.  As Plaintiffs themselves acknowledged, this entry was a likely typo, and in any case, listing the corporation as being involved in

16

investment management is not enough to make it a fiduciary.  This
is especially clear when the same filings reveal that Wharton is
the entity actually giving investment advice, and that neither
entity is authorized to exercise discretionary control over
investments.  (Defs. Exs. L, M.)

The only way for Financial Services Corporation to be liable
for the conduct of the investment advisors in this case is to
impute liability based solely on the fact that they are the
parent company of FSC Securities.  Defendants' position is that a
corporate parent can never be held responsible for the acts of a
fiduciary subsidiary.  Although this position goes beyond the
precedent cited by Defendants,[7] it is true that veil-piercing
would require something more than merely being the parent of the

---

[7]  In UNUM Life Ins. Co. of America v. Ward, 526 U.S. 358
(1999), the Supreme Court held that a state insurance law
imputing notice given to an employer to the fiduciary controlling
an ERISA-governed insurance policy was preempted, because it
would force "the employer, as plan administrator, to assume a
role, with attendant legal duties and consequences, that it has
not undertaken voluntarily." Id. at 379.  This was true, in
part, because the insurance policy itself stated that "[u]nder no
circumstances will the policyholder be deemed the agent of the
Company." Id. at 377.  The case does not stand for the
proposition that state laws of agency never apply in the ERISA
context.  And Reich v. Compton, 57 F.3d 270 (3d Cir. 1995),
involved a claim in which the plaintiffs had argued that the
category "party in interest" included alter egos of parties
identified by the statute.  Id. at 276; see 29 U.S.C. § 1002(14).
Rejecting this extension of § 1002(14), the Third Circuit Court
of Appeals held that the detailed definition of who constituted a
party in interest excluded the possibility that other parties not
mentioned might fall into that category.  It is unclear whether
the same reasoning would apply to the category of fiduciary.

subsidiary corporation.  See Confer v. Custom Eng. Co., 952 F.2d 34, 37 n.4 (3rd Cir. 1991) (citing Lowen v. Tower Asset Management, Inc., 829 F.2d 1209 (2d Cir. 1987)) (noting that where a corporation is a fiduciary, misuse of the corporate form can lead to a finding of individual fiduciary liability on part of corporation's officers or to piercing the corporate veil); Green v. William Mason & Co., 996 F. Supp. 394, 397 (D.N.J. 1998).

Even if the Court can pierce the corporate veil under certain factual circumstances, as yet there are no allegations made with respect to bad faith, undercapitalization, or any other factor generally used to impute liability to a parent corporation.  If discovery about Wharton Business Group and FSC Securities reveals such facts, then the new evidence may be added to a second amended Complaint.

Because Financial Services Corporation is not sufficiently alleged to be a fiduciary, Counts III-IX must be dismissed as against that entity.

2.   Failure to Adopt Trust Agreement (Count I)

ERISA § 402(a)(1) requires that every plan "shall be established and maintained pursuant to a written instrument."  29 U.S.C. § 1104(a)(1).  The 2002 version of the Master Profit Sharing Plan provides that "Investment of contributions is governed by the provisions of the Trust Agreement," a document

18

which governs where the Trustees may invest Plan contributions.
(Inductotherm Def. Ex. B Art. 5.2.)  Plaintiffs allege that,
contrary to the terms of Article 5.2, the Trustees never created
nor followed such a Trust Agreement governing investments.
(Compl. Count I.)  They allege that in failing to comply with
Article 5.2, the Plan was operated "without any investment
guidelines with respect to contributions."  (Id.)

The Inductotherm Defendants argue that this claim should be
dismissed because Plaintiffs are simply mistaken about there not
being a Trust Agreement.  They submit to the Court a one-page
document entitled "Inductotherm Profit Sharing Plan and Trust
Agreement," which adopts certain non-investment-related
amendments made in 1976 to the original 1956 Plan.  (Inductotherm
Defs. Ex. A.)

Even assuming for the sake of argument that the Court can
consider the one-page "Inductotherm Profit Sharing Plan and Trust
Agreement" on this motion to dismiss even though it is not
referenced in the Complaint and does not appear to be a matter of
public record, the document does not show that the Trustees
complied with Article 5.2 of the 2002 document because the
document does not make any provision for the investment of Plan
contributions.[8]  In the 2002 Plan, the term "Plan" is defined as

_____

[8]  Defendants essentially argue that so long as any document
labeled Trust Agreement exists, regardless of its content, the
Complaint's allegation is false and any other allegations made by

the entirety of the document, and the document refers to both "this Plan" and a separate "Trust Agreement."  (E.g., Ex. A Art. 8.1).  It is clear that the reference to the Trust Agreement is talking about a separate document altogether.  That separate "Trust Agreement" is supposed to govern the investment of contributions.  But the document submitted by Defendants is merely amending the 1976 Plan, it is not separate from the Plan, and the Plan itself contains no such guidelines for investment.

In summary, Plaintiffs' allegation that Defendants never adopted a Trust Agreement to govern investment of contributions as required by the Plan is uncontradicted by the Inductotherm Defendants' submission of the 1976 document.  As this was Defendant's sole cognizable argument for dismissal of this Count, the motion to dismiss will be denied with respect to this Count.[9]

### 3.   Excessive Fees for Charlotte Capital (Count II)

In Count II, the Complaint alleges that the Inductotherm Defendants paid excessive fees to Charlotte Capital LLC for

---

Plaintiffs are not contained in the Complaint.  This argument represents an unduly narrow reading of the Complaint.  And truth or falsity of a document is not an issue to be resolved upon this Rule 12(b)(6) motion.

[9]  The Inductotherm Defendants attempt to raise additional arguments in their reply brief, but the Court will not consider such arguments raised without the benefit of opposition.  See Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447, 458 (D.N.J. 1998) ("It is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted."); Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001).

management of a small proportion of the Plan's assets, breaching their fiduciary duty.  In 2005, the Defendants paid $49,283 to Charlotte Capital, LLC to manage $5,491,717 in Plan assets, which is a .897% fee.  During the same year, the Plan paid $77,973 to two other entities ($66,345 to Hewitt Investment Group and $11,528 to State Street Global Advisors) for managing $57,027,267 in Plan assets, which is an average fee of .1367%.  Plaintiffs argue that paying a fee that is seven times greater to one investment manager is a plausible basis for a claim of breach of fiduciary duty.  Defendants argue that, in order to state a claim, Plaintiffs must offer something more than a bare comparison of fees between providers of different services.

A bare comparison of fees between different kinds of service providers is an insufficient factual basis for a claim of breach of fiduciary duty.  The Complaint indicates that the funds managed by the other two entities were invested in bonds and index funds, while the funds managed by Charlotte were more actively managed.  (Compl. ¶ 73.)  Moreover, the entity receiving the vast majority of the fees between the other two is characterized as an investment advisor rather than an investment manager. (Compl. ¶ 71.)  Without more, pointing to the fact that Charlotte was paid more for their services than the average of the other two entities does not state a plausible claim that their fee was excessive, because the Court has no way to gauge

the reasonableness of the fee without knowing the cost of providers of the same service.  It may state a plausible claim if Plaintiffs could allege, consistently with the admissible documents, that similar services could be performed at substantially lower fees, but they have not done so.  Count II must therefore be dismissed.

### 4.   Prohibited Transactions (Counts III & IV)

ERISA prohibits two kinds of transactions that Congress deemed to be transactions likely to inure to the benefit of the interests other than the Plan participants.  The first prohibition involves transactions with parties who are likely to be chosen not because they are in the best interest of the Plan but because of their affiliation with the Plan's fiduciaries, service providers, or associated parties.  29 U.S.C. § 1106(a).[10]

---

[10]  The statute provides in relevant part that: "Except as provided in section 1108 of this title: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  A party in interest is defined as, among other things, any fiduciary or "person providing services" to the Plan, any relative of such a person, and certain shareholders, partners, and joint venturers of plan service-providers.

Similarly, ERISA also prohibits fiduciaries from managing the Plan in their own interests or in the interests of a party with interests adverse to the Plan.  29 U.S.C. § 1106(b).[11] Plaintiffs argue that investing the Plan assets in the Sun America Money Market Fund was a prohibited transaction under both § 1106(a) and (b) because the Fund is associated with AIG, the parent corporation of the FSC Defendants, meaning that the AIG subsidiaries profit from the transaction.

The FSC Defendants point to the exception to the prohibited transactions provision contained in § 1108, which empowers the Secretary of the Department of Labor to "grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by sections 1106 and 1107(a) of this title." § 1108.  In 1977, the Secretary issued Prohibited Transaction Exemption 77-4, which exempts "the purchase or sale by an employee benefit plan of [mutual fund shares], the investment adviser for which is also a fiduciary with respect to

---

[11]  A fiduciary shall not "(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  § 1106(b).

the plan (or an affiliate of such fiduciary) and is not an employer of employees covered by the plan" when six conditions are met.  Class Exemption for Certain Transactions Between Investment Companies and Employee Benefit Plans, 42 Fed. Reg. 18732 (April 8, 1977).  Among the requisite conditions is a requirement that a second fiduciary approve the purchases in writing.

Defendants acknowledge that § 1108 exceptions are normally affirmative defenses, and hence the burden would rest on them to show that the general exception applies to this factual circumstance and that all six specific conditions have been met. Defendants also acknowledge that the Complaint does not plead all of the facts relevant to the defense, which is ordinarily the only circumstance under which an affirmative defense can provide the basis for a 12(b)(6) motion.  But Defendants contend that if the exception is mentioned in the Complaint, even if the Complaint does not plead all the facts necessary to establish the defense, the burden shifts to the Plaintiff to plead those facts.

Defendants' only support for this position is precedent that does not discuss why it shifted the ordinary evidentiary burdens for an affirmative defense.  Defendants rely on Mehling v. New York Life Ins. Co., 163 F. Supp. 2d 502 (E.D. Pa. 2001), which dismissed a complaint on the basis of an § 1108 exception because Plaintiffs failed to "allege that the fees paid by the Plans are

24

not in compliance with the requirements of PTE 77-3."  Id. at
510.  Mehling did not discuss or attempt to distinguish the
precedent identifying § 1108 exceptions as affirmative defenses.
The case contains no reasoning that might persuade this Court to
depart from the well-reasoned precedent, acknowledged by
Defendants, that § 1108 provides an affirmative defense, with the
burden of evidence upon the Defendants.  See Lowen v. Tower Asset
Management, Inc., 829 F.2d 1209, 1215 (2d Cir. 1987); Braden v.
Wal-Mart Stores, Inc., 588 F.3d 585, 600-02 (8th Cir. 2009).  Cf.
In re Unisys Sav. Plan Litigation, 74 F.3d 420, 446 (3d Cir.
1996) (applying affirmative defense argument from Lowen to
another ERISA exception).  Consequently, since the Complaint does
not establish on its face that the defense applies, it is an
inappropriate basis for dismissal.

Defendants' other arguments with regard to Counts III and IV
mischaracterize the nature of Plaintiffs' claims.  First,
Defendants argue that the SunAmerica Fund is not made a party in
interest solely by virtue of Plan assets having been invested in
it.  Second, Defendants argue that the Fund's payment of fees to
AIG, or investment in particular stocks, does not constitute the
spending of Plan assets, and therefore cannot be a prohibited
transaction.  Both premises are true, but irrelevant, because
Plaintiff is not arguing that the Fund is a party in interest
merely because Plan assets were invested in it, nor is Plaintiff

arguing that the Fund's payment of fees to third parties or investment decisions involve Plan assets.  Instead, Plaintiffs' position is that buying shares of the Fund, on the investment advice of FSC Securities, was itself a prohibited transaction.  The authority upon which Defendants' themselves rely recognizes that the "transactions in which plans invest in mutual funds in the first place," are not exempted.  Boeckman v. A.G. Edwards, Inc., 461 F. Supp. 2d 801 (S.D. Ill. 2006).

Since Defendants make no other arguments with respect to Count III (§ 1106(b)), that claim will proceed.  But to proceed under § 1106(a) (Count IV), the Complaint must allege facts sufficient to show that the SunAmerica Fund is a party in interest.  Plaintiffs contend that the SunAmerica Defendants are parties in interest because they are affiliates of the FSC Defendants, who are fiduciaries.  But as discussed above in Part B.1.e, the statute's provision for extending fiduciary obligations to affiliates does not apply to having a common corporate parent.  Nothing in the unpublished district court precedent cited by Plaintiffs suggests otherwise.  See Gipson v. Wells Fargo & Co., Civil No. 08-4546 (PAM/FLN), 2009 WL 702004, at *1 (D. Minn. 2009) (discussing § 406 without addressing definition of party in interest because "Defendants do not dispute that the Amended Complaint alleges a violation of § 406.").

Since the Fund is not a fiduciary by virtue of its relationship to the Plan, nor a person providing services to the Plan, in order to be a "party in interest" it must meet (G), (H), or (I) of the statute's definitions of the term, which are the provisions applying the definition to entities by virtue of corporate relationships.  29 U.S.C. § 1002(14).  But the statute does not extend "party in interest" status to corporate siblings. Part (H) covers the owners of fiduciaries and service providers — corporate parents.  That makes AIG and Financial Services Corporation Part (H) parties in interest through FSC Securities/Wharton.  But while part (G) covers entities owned by the fiduciary or service provider — in other words, corporate children of the entities described in (A) and (B), it does not extend to the corporate children of Part (H) entities. Evidently, Congress did not believe that corporate siblings had enough of an interest in each other to categorically prohibit transactions involving Plan assets between such siblings.

Section 1106(a) does not prohibit a fiduciary from investing fund assets in a corporate sibling.  This does not mean that the investment advice is not otherwise a breach of fiduciary duty or a violation of § 1106(b), but simply that it does not violate the terms of § 1106(a), according to the plain language of the statute.  Count IV will therefore be dismissed.

27

5.    Prudence and Disloyalty of Decision to Invest in
      SunAmerica Money Market Fund (Counts V & VI)

ERISA requires fiduciaries to act with loyalty to the employee benefit plan's participants and beneficiaries, and with proper prudence in making investment decisions.[12]  29 U.S.C. § 1104.  Plaintiffs contend that the FSC Defendants breached their duty of prudence by recommending that Plan assets be removed from a Vanguard mutual fund and invested in the SunAmerica Fund which charged higher fees and had lower historical returns, and because the SunAmerica Fund's investment advisor had received a variety of regulatory citations and was convicted of a felony.  They also maintain that the circumstances suggest that the only reason for the investment in the SunAmerica Fund was the Fund's relationship to the corporate parent of FSC Securities, a breach of the duty of loyalty.

Plaintiffs argue that a plausible claim of imprudence is stated by showing that Plan assets were invested in a fund with higher fees and lower returns for no appreciable reason except

---

[12]  ERISA §§ 1104(a)(1)(A) and (B) provide that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

28

that the fund was associated with the investment manager.
Defendants argue that these allegations fail to state a claim
because the fees paid were not that excessive, and because
different funds play different roles.

The Court must determine the prudence of investing in the
Fund based on the "fiduciary's conduct in arriving at an
investment decision, not on its results, and asking whether a
fiduciary employed the appropriate methods to investigate and
determine the merits of a particular investment."  In re Unisys
Sav. Plan Litigation, 74 F.3d 420, 434 (3d Cir. 1996).  The
"requirement is flexible, such that the adequacy of a fiduciary's
independent investigation and ultimate investment selection is
evaluated in light of the character and aims of the particular
type of plan he serves."  Id. (internal quotation omitted).

a.   Disputes of Fact

Defendants begin by disputing several of the factual
allegations contained in the Complaint, arguing that Plan account
statements and Fund prospectuses contradict the allegations.

The Complaint alleges that the assets kept in the Vanguard
account were withdrawn and invested in the SunAmerica fund
instead.  Defendants dispute this, pointing to several hundred
pages of account statements which they refer to collectively as
Exhibit G.  The first page of Exhibit G, showing money market

balances from December 2005 through December 2008, appears to contradict the information contained on the statement submitted to the IRS, which showed that between December 31, 2006 and December 31, 2007, the Vanguard account was emptied and the SunAmerica account was funded in a similar amount.  (FSC Defs. Ex. M).  Defendants simply assert that the IRS form is the erroneous one.  But even if this were an argument rather than an assertion, it is not for the Court to decide which document is correct on this motion to dismiss.  Plaintiffs allege that the Vanguard account was liquidated and the proceeds placed into the SunAmerica Fund.  This claim is supported by some of the documentary evidence.  It must therefore be credited as true for the purposes of testing the sufficiency of the Complaint. Defendants will have the opportunity to prove that Plaintiffs are mistaken, but now is not that time.[13]

Defendants also contend that the account statements prove that the SunAmerica Fund was used as a temporary holding account, while the Vanguard Fund was used for longer-term investment.  If there is support for this proposition beyond the Defendants' say-so in the documents cited in the several-hundred page exhibit, it is not clear to the Court.  Both accounts fluctuate fairly

---

[13]  Additionally, it would not seem to be fatal to the claim if, instead of transferring funds from Vanguard to SunAmerica, the fiduciaries merely used the SunAmerica account instead of Vanguard as a "swap account," even though there was no objective reason to select that fund instead of Vanguard for that purpose.

significantly over the relevant period; whether the greater degree of change in the SunAmerica account shows it to be a temporary hold account or not is not so obvious as to justify the Court's rejection of Plaintiff's well-pled allegations.

More importantly, the underlying premise of Defendants' argument cannot be just that the accounts were used differently. Two funds could be identical and still used differently; this would not justify the use of one objectively inferior fund. Instead, for Defendants' argument to make sense, they must be contending that the Vanguard account gives higher returns because it is not as liquid as the SunAmerica account, or that the two different funds were necessary to properly diversify the holdings, or some other real difference between the accounts such that the Vanguard fund is an improper comparator. But none of the documents submitted by Defendants demonstrate such differences in the absence of expert testimony.

Finally, the parties disagree about what fee schedule the Plan's investment in shares of each mutual fund were subject to. Defendants' attachment of the respective prospectuses does not demonstrate which schedule of fees the Plan was subject to, investor class or institutional class. In any case, even under Defendants' version of the facts, SunAmerica's fees were three to four times greater than the fees charged by Vanguard. Meanwhile,

Vanguard performed substantially better in every year from 2004-2008.

In summary, in assessing whether the Complaint states a claim for these counts, the Court takes as true the allegations that the Plan's assets could have been invested in the Vanguard Fund instead of the SunAmerica Fund, which would have resulted in significantly lower fees and better returns, which is consistent with the historical performance of the two funds prior to the 2006 reallocation.

### b.   Fees and Performance

Defendants argue that fees less than 1% are not excessive and cannot be the basis for a breach of fiduciary duty as a matter of law.  The precedent they cite does not support this kind of categorical rule.  In Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009), the Seventh Circuit Court of Appeals considered whether a Plan that offered contributors the option of choosing many different investments represented a breach of fiduciary duty because some of those options contained fees as high as 1%.  Id. at 578, 581.  The district court opinion, which the Court of Appeals upheld, reasoned that:

> Participants could choose to invest in twenty
> primary mutual funds and more than 2500 others
> through BrokerageLink. All of these funds were
> also offered to investors in the general
> public so expense ratios were necessarily set
> to attract investors in the marketplace. The

> expense ratios among the twenty primary funds
> ranges from just over 1% to as low as .07%.
> Unquestionably, participants were in a
> position to consider and adjust their
> investment strategy based in part on the
> relative cost of investing in these funds. It
> is untenable to suggest that all of the more
> than 2500 publicly available investment
> options had excessive expense ratios. The only
> possible conclusion is that to the extent
> participants incurred excessive expenses,
> those losses were the result of participants
> exercising control over their investments
> within the meaning of the safe harbor
> provision.

Id. at 581.  Thus, far from holding that fees over 1% were not

excessive, the Court of Appeals endorsed the district court's

assessment that even though the high end of the fees was perhaps

excessive, offering this menu of options did not represent a

breach of fiduciary duty because plan contributors were free to

choose from hundreds of options with a wide range of fees.

The actual test of whether fees are excessive does not

involve a categorical benchmark of whether the fees are above a

certain amount.  Whether an investment decision could have been

the result of prudent investing depends on the alternatives

available to the fiduciary to accomplish the same purpose, in

light of all the other relevant information about the

investments.  Cf. Unisys, 74 F.3d at 434.  Plaintiffs' position

is that in light of the fact that Plan assets were already

invested in a Fund with lower fees and higher returns, there is

no obvious legitimate reason for moving them to an inferior fund.

This creates a plausible inference that the selection of the SunAmerica Fund was the result of a deficient judgment process, and is therefore enough to state a claim.  Of course, there may be reasons why FSC chose the SunAmerica Fund instead of Vanguard but they are neither evident in the documents relied upon in the Complaint, alleged by Plaintiffs, or obvious as a matter of judicial common sense.  Consequently, Plaintiffs state a plausible claim.

### c.   Investment Advisor Background

The claim will also proceed for the independent reason that Defendants' brief supporting the motion raises no arguments with respect to the grounds supporting the claim related to the background of the Fund's investment advisor.  Although Defendants attempt to challenge these grounds in their reply, their attempt to raise the issue without giving Plaintiffs an opportunity to respond will not be considered.  See Elizabethtown Water Co., 998 F. Supp. at 458.

Accordingly, Counts V and VI will not be dismissed as to Defendants FSC Securities Corporation and Wharton Business Group.

### 6.   Investment in Hussman Strategic Growth Fund (Counts VII & VIII)

Fiduciaries are required to discharge their duties "in accordance with the documents and instruments governing the

plan," 29 U.S.C. § 1104(a)(1)(D), and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B).

The Complaint alleges that sometime in 2007, $4.3 million in Plan assets were placed in the Hussman Strategic Growth Fund. (Compl. ¶ 130.) According to Plaintiffs, the Hussman Fund is a so-called "long-short" fund, meaning that it uses derivatives and short positions not just to hedge risk, but to pursue higher profits at greater risk. (Compl. ¶¶ 131-135.)[14] Plaintiffs claim that the FSC Defendants breached their fiduciary duty by recommending that the Trustees invest in the HSGF because, they contend, such an investment was prohibited by the Plan's investment policy which forbids purchase of options and short sales, and because fiduciaries exercising the level of care and skill of a prudent individual in like circumstances would not have invested in HSGF. Defendants maintain that the investment does not violate the Investment Policy, and that low returns in

---

[14] A Long Short Fund is a "type of mutual fund that mimics some of the trading strategies typically employed by a hedge fund. Unlike most mutual funds, long/short funds use leverage, derivatives and short positions in an attempt to maximize total returns, regardless of market conditions." See http://www.investopedia.com/terms/l/longshortfund.asp (last visited Aug. 24, 2010)

35

the years prior to the investment do not prove that the investment was imprudent.

a.   Violation of Investment Policy (Count VII)

The Investment Policy Statement sets a "Specific Asset Allocation" for the percentage of fund assets that can be invested in different types of direct securities, such as "US Large Growth Stocks" and "Short-Term Bonds."  (FSC Defs. Ex. B.) It also lists certain restricted investments, including "options and futures (except for hedging)," and "short sales."  (Id.)

Plaintiffs read this to mean that the Plan may not invest in any of the restricted securities directly, and also may not invest in them indirectly by purchasing shares of a fund whose portfolio includes such securities, unless, in either case, the securities are used for hedging.  Defendants read the restricted investments paragraph to prohibit only direct investment in such securities, but to allow purchase of shares of funds that include such securities.

Plaintiffs' interpretation is reasonable, while Defendants' is not, or at least not so obviously reasonable as to undermine the plausibility of Plaintiffs' claim.  Defendants' argument for why the clause would permit indirect investment is that such an investment may involve pooled risk, and therefore constitute use of the securities for hedging.  But the clause already permits

36

hedging, and the risk would be similarly diversified if the Plan directly purchased these securities as part of its overall portfolio, so there would be no reason to make an exception for indirect investments. Either the investments are used as a hedging strategy with respect to the overall portfolio of investment or they are not. If they are not, there is no reason to think that whatever motivated this prohibition on these restricted investments would not apply to giving someone else Plan assets to make such investments.

Defendants argue in the alternative that the restricted securities were used for hedging. Notwithstanding the possibility that some of the HSGF investments in these securities were used for hedging, because HSGF is designated as a "long-short" fund, it is plausible that, as Plaintiffs allege, the fund purchased derivatives for purposes other than hedging risk. Beyond that, it is impossible to determine at this stage whether shares of HSGF were themselves plausibly a hedge with respect to the overall allocation of the Plan's investments. A fair reading of the Complaint is that they were not, and in the absence of expert financial testimony, the Court is not prepared to deny Plaintiffs' well-pled allegations on the basis of its own understanding of the financial position of the Plan assets.

b.   Prudence (Count VIII)

Plaintiffs' only factual allegations regarding the imprudence of investing in the HSGF was the Fund's performance in

the one year preceding the Plan's investment in the fund.  This is an insufficient basis upon which to raise a plausible claim that the fiduciaries failed to exercise proper prudence in the selection of the Fund.  One would need to know the reason for the poor performance in order to be able to assess whether the decision to invest in the Fund was suspect.  Because there are insufficient grounds to support the claim that investment in this Fund was imprudent, Count VIII must be dismissed.

### 7.  Excessive Focus on Equities (Count IX)

Plaintiffs argue that the FSC Defendants breached their fiduciary duty by drafting and executing an Investment Policy that placed 80% of Plan assets in equities.  Plaintiffs contend that a reasonably prudent fiduciary, considering the age of the Plan participants, would never have recommended that the Plan assume so much risk and would have placed more of the Plan's assets in sources of fixed income.  Defendants do not argue that the allocation was prudent, but instead argue that they were obligated to follow the Investment Policy, and that Plaintiffs' proposed allocation would have lost even more money.  Neither of Defendants' arguments has merit.

First, Plaintiffs allege that Defendants drafted the Investment Policy, or at least played a significant role in recommending the investment approach (Compl. ¶¶ 141-145.)  As

38

fiduciaries rendering investment advice, the FSC Defendants had an obligation to draft a prudent investment policy.  There is no suggestion that the Trustees, over the contrary advice of the FSC Defendants, required that the Plan assets be placed overwhelmingly in equities.  Moreover, "While normally fiduciaries are to follow the requirements set forth in governing plan documents, fiduciaries must exercise their judgment and refuse to do so if their analysis leads them to believe that the plan-directed investment would be imprudent and inconsistent with ERISA."  Woods v. Southern Co., 396 F. Supp. 2d 1351, 1366 (N.D. Ga. 2005) (quoting Hill v. BellSouth Corp., 313 F. Supp. 2d 1361 (N.D. Ga. 2004)).  The fiduciary status of one rendering advice would be meaningless if the acceptance of that advice by other fiduciaries absolved all responsibility for overseeing the prudence of the advised investments.

Defendants' other argument is inappropriate for this motion to dismiss, as Defendants merely dispute the allegation that the investments would have fared better if they were less excessively focused in equities.  That is a question of fact that cannot be resolved merely by pointing to some other investment possibilities that would have performed more poorly.  Plaintiffs' allegation is that the disproportionate investment in equities caused the Plan losses.  It is plausible that a lower equity allocation would have been less susceptible to the recession

39

during the period of the Complaint.  Therefore, the allegation that a prudent investor of Plan assets for a Plan of this type would not have placed so many of the assets in equities is sufficient to state a claim, and the parties will be left to their proofs.

> 8.   Misrepresentation that Plan was "Conservatively" Invested (Count X)

It is a breach of fiduciary duty for a fiduciary to make a material affirmative misrepresentation to plan beneficiaries, and a fiduciary must inform beneficiaries of certain facts when silence would be harmful.  In re Unisys Corp. Retiree Medical Ben. ERISA Litigation, 57 F.3d 1255, 1261-62 (3d Cir. 1995). Plaintiffs allege that the Inductotherm Defendants breached their fiduciary duties to the Plan contributors by representing that the Plan assets were invested "conservatively," and by concealing the involvement of the AIG affiliates with the Plan. (Compl. Count X, ¶¶ 4-5.)  They claim that these misrepresentations caused at least some class members to remain as contributors to the Plan when they would have withdrawn if they had known the truth.  (Compl. Count X, ¶¶ 8-11.)

This claim, as presented, is not cognizable under ERISA because § 502(a)(2) of the statute does not permit recovery for damage to an individual that does not harm plan assets.  The Supreme Court has held that the section of statute permitting

individual claims for damages, § 502(a)(2), did not permit a participant in a disability plan to bring suit to recover consequential damages arising from delay in the processing of her claim, because ERISA was concerned with protecting employee benefits plans.  Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134 (1985).  In Russell, the Supreme Court emphasized that ERISA governs the fiduciary relationship between fiduciaries and the plan, rather than fiduciaries and beneficiaries of the plan. See id. at 140.  The Court concluded, "A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary."  Id. at 142.

An individual may recover for damage done to his individual interest in the plan.  LaRue v. DeWolff, Boberg & Associates, Inc., 552 U.S. 248 (2008).  But recovery for conduct that impairs the value of plan assets in the participant's individual account is not the same as recovery for misrepresentations that contributors to contribute in the first place.  The critical distinction is whether the action seeks to "make good to such plan any losses to the plan resulting from each such breach," as that is the action Congress authorized private individuals to take under ERISA.  29 U.S.C. § 1109(a); Russell, 473 U.S. at 142.

41

In upholding the existence of a cause of action under ERISA for misrepresentations made to beneficiaries, the Third Circuit distinguished Russell, because that decision applied to § 502(a)(2), which authorizes a participant to pursue relief under § 1109 for "losses to the plan."  Unisys, 57 F.3d at 1267. Unisys involved relief under § 502(a)(3), "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of this subchapter or the terms of the plan."  § 502(a)(3).  The Third Circuit held that while damages claims under § 502(a)(2) were foreclosed, claims for equitable relief under § 502(a)(3) were not.  Id. at 1268.  Since Plaintiffs bring the claim under § 502(a)(2) for damages, and it is unclear what equitable relief could be provided, this count must be dismissed.

### 9.  Disgorgement (Count XI)

As discussed above, § 502(a)(3) authorizes Plan participants to bring civil actions to obtain "appropriate equitable relief" to redress violations of ERISA.  29 U.S.C. § 1132(a)(3). Pursuant to that section, Plaintiffs seek to disgorge the profits of the SunAmerica Defendants that they made from the Plan's investment in the SunAmerica Money Market Fund.  The SunAmerica Defendants adopt the arguments of the FSC Defendants with respect

42

to whether those transactions were prohibited, and also maintain
that with respect to AIG, the claim must be dismissed even if the
transactions are prohibited because there is no allegation that
AIG knew about the prohibited transaction.  Since the Court has
already determined that the self-dealing claim pursuant to §
1106(b) survives the FSC Defendants' motion but that the §
1106(a) claim must be dismissed, the only remaining issue raised
by Defendants with respect to this Count is whether it adequately
states that claim against AIG.

The Supreme Court has clarified which parties may be subject
to the disgorgement of property obtained initially by a
prohibited transaction.  In Harris Trust and Sav. Bank v. Salomon
Smith Barney, Inc., 530 U.S. 238 (2000), the Court held that
common law principles of trusts, fraud, and remedies apply to §
1132(a)(3), such that property obtained by means of a prohibited
transaction is subject to disgorgement unless and until a good
faith purchaser for value takes possession without notice of the
illicit nature of the initial transaction.  Id. at 250-51.  The
point of requiring the insulated transferee to be a purchaser for
value is that it is only when the innocent party has actually
exchanged something of value that it would be inequitable to take
the property away.  To the extent that Plaintiffs bear the burden

of showing that AIG is not insulated from disgorgement,[15] it logically follows that it is sufficient for Plaintiffs to allege either that AIG had notice, or that it was not a purchaser for value.

Plaintiffs argue that the circumstances show that AIG was not a purchaser for value, since it merely reaped the profits of the deal without the exchange of any consideration.  Although it is not entirely clear how AIG may come to be in possession of the profits of the SunAmerica Fund, Plaintiffs' Complaint is sufficient to raise a plausible claim that AIG is in possession of some of the gains from the prohibited transaction, and that it came into this possession without purchasing the property for value.  Defendants do not contend otherwise, instead they only (mistakenly) maintain that lack of knowledge of the prohibited transaction is sufficient to insulate a transferee.  The motion to dismiss this count will therefore be denied.

> 10.   Breach of Duty in Selecting Advisors (Count XII-
>       XIII)

Plaintiffs contend in Counts XII and XIII that the Inductotherm Defendants breached their fiduciary duties under

---

[15]  The Supreme Court noted that there is some uncertainty as to what party bears the burden of proof on whether the transferee is a purchaser for value and without notice.  Id. at 251 n.3.

1104(a)(1)(B) by selecting FSC Securities (Count XII) and the Wharton Business Group (Count XIII) to manage Plan assets.  The basis for this allegation of breach is the fact that FSC Securities has previously violated state or federal regulations (Compl. ¶¶ 92-93), including conducting business through unregistered branch offices, and one instance in 1998 of failing to supervise a branch office that allegedly defrauded customers. (Id. ¶ 184.)

Defendants argue, among other things, that to show a breach of fiduciary duty, the Complaint must make allegations about the actual process of selecting entities to be involved with investment management.  This proposition is incorrect.  It is sufficient to allege circumstances that make it plausible that the proper process was not followed.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595 (8th Cir. 2009) ("The district court correctly noted that none of these allegations directly addresses the process by which the Plan was managed. It is reasonable, however, to infer from what is alleged that the process was flawed.").

Here, however, Plaintiffs have not alleged facts sufficient to raise a plausible inference that the selection process was deficient.  According to Plaintiffs, FSC Securities operates nationally and has done so for decades.  That there are three instances of it violating state regulations, all several years

before its involvement with the Plan, and none relating to the parts of the entity involved with the Plan, is not sufficient to plausibly suggest that the process of selecting its branch office to perform financial services was deficient.  There are simply too many reasons why a prudent fiduciary would have disregarded the regulatory history in selecting a particular financial advisor.  This is not to say that such regulatory history can never give rise to a plausible inference of a deficient selection process, but under these circumstances it is not enough. Therefore these Counts will be dismissed.

11.  Joint Liability (Count XIV)

Section 1105(a) provides for joint liability among fiduciaries when one fiduciary "knowingly undertakes to conceal an act or omission of such other fiduciary, knowing such act or omission is a breach."  § 1105(a)(1).  Plaintiffs claim that the Inductotherm Defendants concealed breaches of fiduciary duty on the part of FSC Defendants by concealing the Plan's relationship with those Defendants and misrepresenting the Plan's investments.[16]

_____

[16]  They also claim that the Inductotherm Defendants are liable under a different section because the selection of the FSC Defendants was imprudent, but that claim turns on the dismissed Counts XII and XIII.

46

Defendants argue that there is no materiality, reliance, or loss resulting from the alleged concealment, but the plain language of § 1105(a)(1) provides for liability resulting from the underlying breach, not the concealment. The concealment is just the conduct that implicated the Inductotherm Defendants in the liability stemming from the FSC Defendants' alleged breaches. Therefore, Plaintiffs need not have relied on the concealment (whatever that would mean) or have been independently damaged by it apart from the damage experienced as a result of the underlying breach.

Nevertheless, the Complaint still does not allege sufficient facts to make it plausible that Defendants knowingly undertook to conceal the acts of the FSC Defendants which Plaintiffs allege constituted breaches. Plaintiffs allege that the Inductotherm Defendants concealed the involvement of FSC Securities by listing Financial Services Corporation on the tax forms; by representing that the Plan was "conservatively invested" and doing better than equity indices; and by failing to disclose the relationship between Financial Services Corporation and AIG. The listing of Financial Services Corporation instead of FSC Securities in Schedule C of the 5500 forms has no relevance to any breach, much less does it amount to knowing concealment of breaches "knowing such act or omission is a breach." § 1105(a)(1). Similarly, the failure to gratuitously disclose, even though it is a matter of

public record, the corporate parents of financial advisors is not concealment of anything, much less knowing concealment of a known breach.

The only allegation that possibly raises an inference of active concealment of a known breach is the claim that the Inductotherm Defendants misrepresented how conservatively the Plan's assets were invested.  Conceivably, this prevented the discovery of the breach alleged in Count IX.  But Plaintiffs offer no factual allegations to support the proposition that describing the fund as being "conservatively invested," was a knowing effort to conceal the overall allocation of the fund, nor that they knew that the overall allocation itself constituted a breach of fiduciary duty.  Indeed, the allegations are just as consistent with the Inductotherm Defendants believing that the Plan's assets were indeed conservatively invested.  This Count will therefore be dismissed.

### 12.   Allocation of Fiduciary Responsibilities (Count XV)

Plaintiffs do not oppose dismissal of this Count.  As the parties agree that the Count does not state a claim, Count XV will be dismissed.

### 13.   Equitable Relief (Count XVI)

Defendants move to dismiss this Count to the extent that it attempts to state an independent claim rather than a prayer for

relief.  Plaintiffs concede that the Count does not contain
independent grounds for relief, but merely iterates another
remedy which Plaintiffs seek for the allegations made under other
Counts.  As an independent claim, therefore, this count will be
dismissed as it does not state a claim apart from the other
claims for violation of ERISA, but Plaintiffs' right to seek
equitable relief for the other violations will be preserved.

### C.  State Law Claims (Counts XVII and XVIII)

Plaintiffs consent to the dismissal of their state law
claims.  Plaintiffs only specifically identify Count XVII, but
the stated reason for their willingness to dismiss the claims
(preemption issues) and their failure to respond to Defendants'
identical arguments on Counts XVIII and XXI together convince the
Court that Plaintiffs intended to abandon all the state law
claims, as their brief's heading states.

### D.  Federal Securities Claims

#### 1.  SunAmerica Prospectus (Count XIX)

The Securities Act of 1933, 15 U.S.C. § 77l(a)(2) creates
liability for one who issues a prospectus which includes "an
untrue statement of a material fact or omits to state a material
fact necessary in order to make the statements, in the light of

the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission)."  Id. The SAMMF prospectus of April 30, 2009 contains a chart showing the annual operating expenses of the Fund.  (SunAmerica Defs. Ex. C at 13.)  Under "Distribution and/or Service (12b-1) Fees," it lists out various fees for different investor classes.  Later in the prospectus, it is revealed that the Fund pays an annual rate of .22% to a servicing agent for shareholder services. Plaintiffs argue that failing to include the .22% fee in the chart was materially misleading.  (Id.)  Among other things, Defendants contend that the .22% fee was part of "Other Expenses," in the same chart, and that, in any case, the fee was specifically identified and disclosed later in the prospectus. Defendants are correct.

First, the Complaint provides no reason to think the fee was not disclosed under "Other Fees."  The category which does not include the fee is labeled as 12b-1 fees, a reference to the SEC rule permitting mutual funds to use fund assets to pay various expenses with regard to marketing of the fund and distribution of the securities.  See 17 C.F.R. Section 270.12b-1. It covers "any activity which is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to

other than current shareholders, and the printing and mailing of sales literature."  12b-1(a).  Consequently, not every shareholder service fees constitutes a 12b-1 fee, such as providing customer service contacts.  A reasonable investor would therefore expect that fees not covered by 12b-1 would be included in "Other Fees," and there is no reason to think this fee was not.

Second, a reasonable investor reads the whole prospectus. See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc., 98 F .3d 2, 5 (2d Cir. 1996).  Therefore, a reasonable investor would have known about this fee.  Even if it were not disclosed under "Other Fees," a reasonable investor would have either concluded that it is an additional fee, in which case it has been adequately disclosed, or that there was some mistake.  But under no circumstances could a reasonable investor have concluded that the fee did not exist.

In light of the later explicit disclosure of the fee, and the likely inference that the fee was included in "Other Fees," Plaintiffs fail to state a claim for violation of 15 U.S.C. § 77l(a)(2).

2. Registration of Wharton Business Group (Count XX)

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of fraudulent schemes or devices in connection

with the purchase or sale of securities.  15 U.S.C. § 78j(b).
Securities Exchange Commission Rule 10b-5 forbids, among other
things, the making of any "untrue statement of a material fact."
17 C.F.R. § 240.10b-5 (2004).  These laws create a private right
of action for the purchaser of securities, Blue Chip Stamps v.
Manor Drug Stores, 421 U.S. 723, 731-33 (1975), upon which
Congress has imposed statutory requirements. 15 U.S.C. § 78u-
4(b)(4).  The private right of action requires proof of, among
other things, a connection with the purchase or sale of a
security, id. at 730-731, a wrongful state of mind (scienter),
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976), and a
causal connection between the material misrepresentation and the
loss.  15 U.S.C. § 78u-4(b)(4).  Plaintiff argues that the
Wharton Business Group violated 15 U.S.C. § 78j(b) by falsely
claiming it was a registered broker/dealer and member of FINRA
and SIPC.

                    a.   Contributions to the Plan Constitute
                         Investments in a Security

     Only a purchaser or seller of "securities" may bring a
private action under § 10(b) and Rule 10b-5.  Blue Chip Stamps,
421 U.S. at 731-33.  Defendants argue that Plaintiffs
participation in the ERISA Plan does not constitute the purchase
of a security.

                                52

§ 77b(a)(1) provides, "The term 'security' means any . . . certificate of interest or participation in any profit-sharing agreement . . . [or] investment contract."  The phrase "investment contract," has been interpreted to encompass a "profit-sharing agreement," and the same test is applied to both potential securities.  International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558 n.11 (1979).  The test of whether a financial relationship constitutes an investment contract is whether it involves "an investment of money in a common enterprise with profits to come solely from the efforts of others."  Id. at 558 (internal quotation omitted).

The Securities and Exchange Commission has interpreted the statute to mean that the interests of employees in a pension plan "are securities only when the employees voluntarily participate in the plan and individually contribute thereto."  Release No. 6188, Release No. 33-6188, 19 S.E.C. Docket 465, 1980 WL 29482 (S.E.C. Release No.).  This interpretation is consistent with the Supreme Court's opinion in Daniel, 439 U.S. at 553, in which the Court held that a noncontributory, compulsory pension plan did not constitute a security because the only consideration offered for the interest was the employee's labor, which was offered primarily for other remuneration, and because the value of the employee's interest did not primarily depend on the successful investment of Plan assets.  Id. at 559-562.

53

Under the Plan at issue in this case, participants may contribute up to 10% of their salary and Inductotherm may make discretionary contributions. (Compl. ¶ 54.)  Such contributions are entirely voluntary, and a participant may contribute in one Plan year and not another.  (FSC Defs. Ex. A, § 4.4.)[17]  The contributions are invested by the Plan trustees, and gains or losses applied to each employee's interest.  (Id. § 5.2(b).) Plan participants may roll their benefit into an eligible retirement plan, make emergency withdrawals, and use benefits to purchase a home.  (Compl. ¶ 55.)

Defendants compare the Plan to the one considered in Black v. Payne, 591 F.2d 83 (9th Cir. 1979), and found not to be a security, but the comparison is invalid.  In that case, although the Plan was contributory, it was not voluntary; employee benefits were based on a formula, not how well the investments did; and the State of California secured the Plan, so the economic risk usually associated with investments was absent. Id. at 87-88.  In this case, the opposite is true:  contributions are voluntary; the benefits are based on the performance of the investments; and the State does not secure the Plan.

---

[17]  Defendants argue that the Plan is involuntary since all employers are enrolled regardless of whether they contribute, but the Supreme Court and the SEC have been clear that voluntariness refers to the employee's contributions to the Plan.  Daniel, 439 U.S. at 566; Release No. 6188, Release No. 33-6188, 19 S.E.C. Docket 465, 1980 WL 29482 (S.E.C. Release No.).

Defendants also argue that since the majority of contributions are from the company, most of the employees' interests in plan are not the result of a return on investment. What percentage of the benefits were profits earned from investments is a question of fact not evident in the limited record before this Court.  But even if the Court were to take as given that employer contributions represented the vast majority of the interest, the Plan would still qualify as a security because its overall value and the value of each participant's interest is ultimately determined by the success of the Trustee's investments.  See In re Enron Corp. Securities, Derivative & ERISA Litigation, 284 F. Supp. 2d 511, 641 (S.D. Tex. 2003) ("The intermingling of the employer matching contributions portion to the Savings Plan with the voluntary contributions on which the employer match depends appears to fall within Daniel's 'cases where the interest acquired had intermingled security and nonsecurity aspects' and thus 'to a very substantial degree the elements of investment contracts,' making it a 'security.'").

> b.   Insufficient Allegations With Respect to
>      Misrepresentations and Contributions

Although contributions to the Plan constitute the purchase of securities, the Complaint does not state with sufficient particularity the nature of the misrepresentations.  The Complaint merely indicates that, at some unspecified time, the

website of the Wharton Business Group stated "[a] Registered Broker/Dealer, Member FINRA and SIPC."  Without knowing when Plaintiffs encountered this alleged misrepresentation, if ever, and what context it occurred in, it is impossible to determine, among other things, whether Plaintiffs actually made contributions to the Plan after encountering the alleged misrepresentation.  See  In re Cendant Corp. Securities Litigation, 81 F. Supp. 2d 550 (D.N.J. 2000) (holding that retention of securities, as opposed to purchase, does not state a claim).  This Count therefore fails to meet even the requirements of notice pleading, much less the heightened pleading requirements applied to securities fraud claims.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).[18]

### D.  RICO Claim  (Count XXII)

Plaintiffs do not oppose dismissal of this claim.  Although Defendants ask that the claims be dismissed with prejudice, even if their motion was granted the claim would not be dismissed with prejudice under the law of this circuit.  And, any reinstatement of the claim would be upon new facts anyway, according to

---

[18]  The Court does not reach Defendants' arguments regarding scienter and causation, in part because they are moot without the particular allegations needed, and in part because those elements also cannot be assessed without allegations regarding the timing and nature of the representations.

Plaintiffs.  Thus, in the interest of judicial efficiency, the claim will be dismissed without prejudice.  If Plaintiffs should seek to reinstate the claim upon grounds that do not make Defendants present arguments irrelevant, then Defendants may object to reinstatement at that time upon the grounds alleged in their briefing on this motion.[19]

## IV.  CONCLUSION

The following claims will survive Defendants' motions to dismiss:  Count I (failure to adopt Trust agreement); Count III (self-dealing with regard to purchase of shares of SunAmerica Fund); Counts V and VI (violation of fiduciary duties with respect to investment in SunAmerica Fund); Count VII (violation of investment policy by investing in Hussman Fund); Count IX (imprudent focus on equities); and Count XI (disgorgement of profits resulting from Count III).  Financial Services Corporation will be dismissed from the action entirely.  The accompanying Order will be entered.


**September 17, 2010**          **s/ Jerome B. Simandle**
Date                           JEROME B. SIMANDLE
                               United States District Judge

---

[19]   The Inductotherm Defendants' reply brief urges the Court to sanction Plaintiffs for the allegedly frivolous claims that are being voluntarily dismissed.  The Court will address the question of sanctions along with the pending Rule 11 motion in a separate opinion.