# Exhibit F

391388.1

SZAFERMAN, LAKIND,
    BLUMSTEIN & BLADER, P.C.
101 GROVERS MILL ROAD, SUITE 200
LAWRENCEVILLE, NEW JERSEY 08648
BY: Robert L. Lakind, Esquire
    Arnold C. Lakind, Esquire
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
101 GROVERS MILL ROAD, SUITE 200
LAWRENCEVILLE, NEW JERSEY 08648
BY: Moshe Maimon, Esquire
    Theresa Vitello, Esquire
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BORIS GOLDENBERG, REINALDO PACHECO, and ANDREW LOEW as representatives of a class of similarly situated persons and on behalf of THE INDUCTOTHERM COMPANIES MASTER PROFIT SHARING PLAN #001,<br><br>    Plaintiffs,<br><br>vs.<br><br>INDEL, INC., individually and a/k/a INDUCTOTHERM INDUSTRIES, INC. and INDUCTOTHERM CORPORATION; AMERICAN INTERNATIONAL GROUP, INC.; FSC SECURITIES CORPORATION; SUNAMERICA ASSET MANAGEMENT CORP.; SUNAMERICA CAPITAL SERVICES, INC.; SUNAMERICA FUND SERVICES, INC.;  WHARTON BUSINESS GROUP; HENRY M. ROWAN, JOHN H. | **Docket No. 1:09-cv-05202-JBS-AMD**<br><br><br><br><br><br><br>**Civil Action**<br><br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

599049.2

MORTIMER, DAVID L. BRADDOCK,
THOMAS P. MCSHANE, MANNING J.
SMITH, LAURENCE A. KRUPNICK,
AND HARRY G. TREFZ, as
Trustees to the Inductotherm
Companies Master Profit
Sharing Plan  #001; JOHN DOES
1-25 (Individuals Serving on
the Board of Directors of
Indel, Inc. whose names are
not currently known); JOHN
DOES 26-50 (Individuals
Serving on the Board of
Directors of Inductotherm
Industries Inc.  whose names
are not currently known);
JOHN DOES 51-75 (Individuals
Serving on the Board of
Directors of Inductotherm
Corporation whose names are
not currently known); JOHN
DOES 75-125 (Members of the
Committee for the
Inductotherm Companies Master
Profit Sharing Plan  #001,
whose names are not currently
known); and John Does 126-200
(Other fiduciaries for the
Inductotherm Companies Master
Profit Sharing Plan  #001 and
parties whose names and
identities are not presently
known to Plaintiffs that were
enriched by the receipt of
the Plan's assets),

    Defendants.

## I.  NATURE OF ACTION

1.  This action involves the Inductotherm Companies Master

Profit Sharing Plan  #001 (the "Plan"), which is sponsored by

Indel, Inc., a/k/a Inductotherm Industries, Inc. and Inductotherm

Corporation. Plaintiffs, Boris Goldenberg, Reinaldo Pacheco, and Andrew Loew, allege, on behalf of themselves, similarly situated participants of the Plan and the Plan, that Defendants, through their collective actions, violated provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

## II.   JURISDICTION AND VENUE

2.   This Court has jurisdiction over Plaintiffs' claims that arise under ERISA pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

3.   This Court has personal jurisdiction over the Defendants because this Court has subject matter jurisdiction under ERISA.

4.   Venue with respect to this action lies in the District of New Jersey pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2).

## III.   THE PARTIES

### A.   Plaintiffs

5.   Plaintiffs and all Class members are, or were, participants within the meaning of ERISA §3(7), 29 U.S.C. §1002(7), and beneficiaries within the meaning of ERISA §3(8), 29 U.S.C. §1002(8) of the Plan.

6.   Plaintiff Boris Goldenberg resides at 12342 Heritage Circle, Feasterville, Pennsylvania, 19053-7677.

7.   Plaintiff Reinaldo Pacheco resides at 1202 North 26th

Street, Camden, New Jersey, 08105-3838.

8.   Plaintiff Andrew Loew resides at 1750 Westgate Drive
Defiance, Ohio, 43512.

9.   The principal place of business of the Plan is 10 Indel
Drive, Rancocas, New Jersey 08073-0157.

**B.   Defendants**

10.   Indel, Inc., a/k/a Inductotherm Industries, Inc. and
Inductotherm Corporation ("Inductotherm"), is a privately owned
company that acts as the management service company for a group
of engineering and technology-based companies. These companies
are located at various locations throughout the world.  The
principal place of business of Indel, Inc., a/k/a Inductotherm
Industries, Inc. and Inductotherm Corporation is 10 Indel Drive,
Rancocas, New Jersey 08073-0157.

11.   The names of the individuals serving on Inductotherm's
Board of Directors (the "Board of Directors Defendants"), are not
currently known to the Plaintiffs.  Plaintiffs requested this
information on November 24, 2009 from counsel for Inductotherm,
but are yet to receive a response. On February 25, 2011
Plaintiffs again requested this information from counsel for
Inductotherm, but are yet to receive a response.

12.   The individuals serving on the Plan's Committee (the
"Committee Defendants"), are appointed by Inductotherm's Board of
Directors to manage the administration of the Plan.  The names

and addresses of the Committee Defendant members are not currently known to the Plaintiffs.  Plaintiffs requested this information on November 24, 2009 from counsel for Inductotherm, but are yet to receive a response.  On February 25, 2011 Plaintiffs again requested this information from counsel for Inductotherm, but are yet to receive a response.

13.  Henry M. Rowan, John H. Mortimer, David L. Braddock, Thomas P. McShane, Manning J. Smith, Laurence A. Krupnick and Harry G. Trefz (the "Trustee Defendants"), serve as Trustees to the Plan.  According to counsel for Inductotherm, in response to Plaintiffs' first set of Interrogatories to Inductotherm, as of February 22, 2011: Henry M. Rowan is the President of Inductotherm; John H. Mortimer is a former Vice President of Inductotherm; David L. Braddock is a former Vice President of Inductotherm; Laurence A. Krupnick is Secretary and Corporate Counsel to Inductotherm; Manning J. Smith is a Vice President of Inductotherm; Harry G. Trefz is a former employee of Inductotherm; and Thomas P. McShane is a current employee of Inductotherm. The business addresses of the Trustee Defendants is 10 Indel Drive, Rancocas, New Jersey 08073-0157.

14.  American International Group, Inc. ("AIG") is a Delaware corporation with its principal place of business located at 70 Pine Street, New York, New York, 10270.

15.  FSC Securities Corporation is a wholly owned subsidiary

of AIG. FSC Securities Corporation is a Delaware corporation with its principal place of business located at 2300 Windy Ridge Parkway, Suite 1100, Atlanta, Georgia, 30339.

16.   The Wharton Business Group is a branch office of FSC Securities Corporation ("Wharton").  Wharton is a Pennsylvania corporation with its principal place of business located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341.

17.  SunAmerica Asset Management Corp., is a wholly owned subsidiary of AIG.  SunAmerica Asset Management Corp., is a Delaware corporation with its principal place of business located at Harborside Financial Center, 3200 Plaza 5, Jersey City, New Jersey.  Prior to April 1, 2009, Defendant SunAmerica Asset Management Corp., was previously named AIG SunAmerica Asset Management Corp.

18.  SunAmerica Capital Services, Inc. is a wholly owned subsidiary of AIG.  SunAmerica Capital Services, Inc., is a Delaware corporation.  On information and belief, SunAmerica Capital Services, Inc.'s principal place of business is located at 21650 Oxnard Street, Woodland Hills, California 91367.

19.  SunAmerica Fund Services, Inc., is a wholly owned subsidiary of AIG.  Prior to March 17, 2009, SunAmerica Funds Services Inc. was named AIG SunAmerica Fund Services, Inc. On information and belief, SunAmerica Funds Services, Inc.'s principal place of business is located at 330 W 9th Street,

Kansas City, Missouri, 64105.

20.   JOHN DOES 1-25 are individuals serving on the Board of Directors of Inductotherm Corporation whose names and addresses are not currently known.

21.   JOHN DOES 26-50 are individuals serving on the Board of Directors of Inductotherm Industries Inc., whose names and addresses are not currently known.

22.   JOHN DOES 51-75 are individuals serving on the Board of Directors of Inductotherm Corporation whose names and addresses are not currently known.

23.   JOHN DOES 75-125 are members of the Committee for the Plan whose names and addresses are not currently known.

24.   JOHN DOES 126-200 are other fiduciaries to the Plan and parties whose names and addresses are not currently known who were enriched by the receipt of the Plan's assets.

## IV.   BACKGROUND

### A.   ERISA

25.   The Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. §1001, *et seq.*, was enacted, in part, to ensure "the soundness and stability of plans with respect to adequate funds to pay promised benefits." ERISA §2(a), 29 U.S.C. §1001(a). In order to protect pension investments, ERISA requires that those who manage plan assets to act (A) with loyalty to the interests of plan participants, (B)

prudently, (C) to diversify plan investments so as to minimize the risk of large losses and (D) in accordance with plan documents. See ERISA §§404(a)(1)(A), (B), (C) and (D), 29 U.S.C. §§1104(a)(1)(A), (B), (C) and (D).  Additionally, under ERISA §406, 29 U.S.C. §1106, those who manage plan assets must refrain from engaging in certain transactions, known as "prohibited transactions."

26.   Pursuant to ERISA §502(a)(3), 29 U.S.C. 1132(a)(3), a civil action may be maintained against a non-fiduciary that participates in a fiduciary's violation.

27. When ERISA's strict standards are not met, plan participants have the right to seek relief under ERISA §§409 and 502(a)(2) and (3), 29 U.S.C. §§1109 and 1132(a)(2) and (3), to redress violations and restore plan losses.  Participants may also seek injunctions to prevent those who have violated ERISA in the past from managing or providing services to an employee benefit plan in the future.

### V.   STATEMENT OF FACTS

### A.   The Plan in General

28. The Plan is a defined contribution pension plan designed to provide retirement benefits to Inductotherm employees.  Under the terms of the Plan, participants can contribute up to 10% of their salary and, in addition, Inductotherm may make discretionary employer contributions.

29.   "Defined contribution plans 'provide[ ] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses ... which may be allocated to such participant's account. ERISA § 3(34), 29 U.S.C. § 1002(34). Because the benefits received under a defined contribution plan are determined in part by the rate of return on investments made by the plan, a plan's chosen investments can have a substantial impact on the account balance." Vaughn v. Bay Envtl. Mgmt., Inc.  567 F.3d 1021, 1023 (9th Cir. 2009).

30. Plan participants generally receive their benefit upon retirement; however, they may receive their benefit prior to retirement by any of the following means (A) by rolling over their benefit to an eligible retirement plan (as defined in the Plan), (B) if the participant is age 55 or over, by withdrawing up to 15% of their benefit annually, (C) by making an emergency withdrawal (as defined in the Plan) or (D) for use in purchasing the participant's first principal residence.

31. Inductotherm is the "plan sponsor" of the Plan pursuant to ERISA §3(16)(B), 29 U.S.C. §1002(16)(B). Further, as an entity (A) responsible for selecting, monitoring and removing fiduciaries of the Plan, (B) that is a "named fiduciary" of the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (C) that is the "administrator" of the Plan within the meaning of ERISA

599049.2                              -9-

§3(16)(A)(ii), 29 U.S.C. §1002(16)(A)(ii), (D) with the discretion to make any amendments to the Plan or its trust agreement, (E) that is responsible for ensuring that all employer contributions are provided to the Trustee and (F) with the discretion to terminate the Plan, Inductotherm is a fiduciary of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

32. Since the Board of Directors Defendants are (A) responsible for selecting, monitoring and removing fiduciaries of the Plan, (B) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a)(1), (C) responsible for providing all employer contributions to the Trustee, the Board of Directors Defendants are fiduciaries of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

33. Since the Committee Defendants are (A) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (B) responsible for directing all employee and employer contributions to any of the accounts available under the Plan's trust agreement, (C) responsible for establishing, designating and implementing the Plan's funding and investment policies with the Plan's trustees and investment managers, (D) the "administrators" of the Plan within the meaning of ERISA §3(16)(A)(i), 29 U.S.C. §1002(16)(A)(i), responsible for issuing directions to the Trustees regarding the payment of benefits

under the Plan, the Committee Defendants are fiduciaries of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

34. Since the Trustee Defendants are (A) "named fiduciaries" under the Plan pursuant to ERISA §402(a)(1), 29 U.S.C. §1102(a), (B) responsible for receiving all employee and employer contributions and depositing such contributions into the trust that holds the Plan's assets, (C) responsible for the management of the assets held under the Plan's trust agreement, (D) responsible for implementing the Committee's investment policies and (E) responsible for executing the Committee's directions with respect to the payment of benefits under the Plan, the Trustee Defendants are fiduciaries of the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

35. Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants are occasionally hereinafter collectively referred to as the "Inductotherm Defendants."

36. The Plan refers to a "Trust Agreement." The Plan provides that the investment of Inductotherm's and Plaintiffs' contributions under the Plan will be governed by the "Trust Agreement." The Plan provides that, to the extent permitted by the "Trust Agreement," the Committee Defendants and Inductotherm shall direct Plaintiffs' and Inductotherm's contributions to any

accounts available under the "Trust Agreement." The Plan provides that any losses, income or expenses to the Plaintiffs' accounts are to be determined in accordance with the "Trust Agreement." The Plan provides the Committee Defendants with the right to designate funding and investment policies under the Plan's "Trust Agreement." The Plan states that, as provided in the "Trust Agreement," the Trustee Defendants shall have the sole responsibility for the administration of the "Trust Agreement" and the management of the assets held under the "Trust Agreement." The Plan provides that Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants are responsible for the proper exercise of their duties, responsibilities and obligations under the "Trust Agreement."

According to a letter dated August 19, 2009, on Inductotherm letterhead and signed by Trustee Defendant/Inductotherm employee Thomas McShane, a Trust Agreement does not exist.

37. Specifically, in that letter, the Inductotherm Defendants stated the following:

> I have in fact provided you with the Inductotherm Profit Sharing Plan financial statements as you have indicated. You state unfortunately these documents only provide information regarding how a fraction of the Plan's assets are invested. That is not correct. It shows you an audited financial statement of the entire plan. For example, it shows that the investments totaled for 12/31/07 were $74,077,184 out of total assets (which are specifically enumerated) of $76,776,257. Members Equity, which is the total of all participants' accounts, is also

shown on that statement.

Concerning your request as to how the Plan assets were invested, the Plan is invested in accordance with the adopted investment policy statement between the Trustees and their professional investment advisor, the Wharton Business Group. For your added edification we are providing you a copy of that investment policy.

Lastly, you've asked for a copy of the Trust Agreement. There is no separate document entitled Trust Agreement. The Plan that you received is the complete document.

38.   Under ERISA §§101 and 103, 29 U.S.C. §§1021 and 1023, Inductotherm is required to file for the Plan an annual return/report (Internal Revenue Services ("IRS") Form 5500) that has attached separate schedules that reflect, among other things, the following Plan information (A) a statement of the assets and liabilities of the Plan, (B) a statement or receipts and disbursements that occurred during the Plan year, (C) a schedule of all investments held by the Plan, which shall include a notation if the investment is with a party in interest, (D) a schedule of each transaction involving a person known to be a party in interest, (E) a schedule of all loans that are in default, (F) a list of all leases that are in default, (G) if any of the Plan's assets were held in a common or collective trust of a bank during the Plan year, the annual statement of the collective trust and (H) each reportable transaction as defined under ERISA §103(b)(3)(H), 29 U.S.C. §1023(b)(3)(H).

39.   Schedule C of the Form 5500/Annual Report specifically requires a plan sponsor to disclose, among other things, the

companies that provide services to the Plan, the services such companies provide, and the compensation such companies receive for their services.

40.   Pursuant to ERISA §103, 29 U.S.C. §1023, Inductotherm must include with the Plan's annual report and attached schedules, a separate financial statement for the Plan prepared by a qualified certified/licensed independent public accountant.

41.   Pursuant to ERISA §103, 29 U.S.C. §1023, the certified/licensed qualified independent public accountant retained by Inductotherm is required to conduct an examination of any financial statements of the Plan, and of other books and records of the Plan, as the accountant may deem necessary, to enable the accountant to form an opinion as to whether the financial statements and schedules required to be included with the Plan's annual report are presented fairly in conformity with generally accepted accounting principles.  This opinion of the independent qualified certified/licensed public accountant is included in the Plan's annual report.

42.   Inductotherm retained Certified Public Accountant, Thomas W. Hartman ("Hartman"), on behalf of the Plan, to render the opinion described in the preceding paragraph and to prepare the Plan's financial statements that were submitted in conjunction with the Plan's annual reports for the Plan years ending on December 31, 2005, December 31, 2006, and December 31,

599049.2

2007.

43.    On December 26, 2006, Hartman was fined $7,000 by the New Jersey Office of the Attorney General for misrepresenting, on his certified public accountant license renewal application, that for the period from January 1, 2003 through December 31, 2005, that he had completed his required one hundred and twenty hours of continuing education courses when in fact, he had completed none of the required hours.   This record of Hartman's misrepresentation is available to the public by contacting the New Jersey State Board of Accountancy.

44.    The Form 5500's for Plan years 2005 and 2006 list the Plan's fiscal "plan year" as the 12 month period commencing on January 1 and ending on December 31. Contrary to the Form 5500 for Plan years 2005 and 2006, according to the Plan document, the "plan year" is the 12 month period commencing on May 1 and ending on April 30.  On the Form 5500 for the 2007 Plan year, Inductotherm failed to specify the "plan year."

45.    On January 1, 2007 the Department of Labor ("DOL") sent Inductotherm a letter, with respect to the Plan's 2005 filings, which stated the following:

> You attached an Accountant's Opinion, however the opinion doesn't meet one or more of the following Department of Labor requirements.  Please ensure all guidelines are completed or corrected. 7 [sic] Period covered by report is inconsistent with the plan year filing or the period covered is not mentioned.
>
> Please re-submit the Accountant's Opinion which meets

Department of Labor's requirements (206)

46.   Inductotherm retained the accounting firm of McClain, Smith & Wenz ("McClain") on behalf of the Plan, to render the opinion required by ERISA §103, 29 U.S.C. §1023, and to prepare the Plan's financial statements that were submitted in conjunction with the Plan's annual reports for the Plan years ending on December 31, 2008 and December 31, 2009.

47. The Form 5500 filing for Plan year ending 2009, was filed on October 13, 2010 (i.e., after the commencement of this litigation) and was signed by Trustee Defendant Thomas McShane.

48.   According to Schedule H, Part II, Line 2(b)(5)(A) of the 2009 Form 5500 filing, in 2009 the Plan held a real estate asset that appreciated in value by $10,825,948.

49.   The Independent Auditors Report, produced by McClain, for the 2009 Plan year, does not reflect that in 2009 the Plan held any real estate. The Inductotherm Defendants have confirmed that for 2009 the Plan did not hold any real estate and that the $10,825,948 entry "**probably** should have been shown on line B-Other." (emphasis added)

50.   Further complicating matters with respect to the Plan's accounting is that prior to March 10, 2009, Wharton did not provide the Inductotherm Defendants, or the accountant that rendered the opinions required by ERISA §103, 29 U.S.C. §1023, and prepared the Plan's financial statements that were submitted

in conjunction with the Plan's annual reports, with a Statement

on Auditing Standards ("SAS") 70 Report.  As stated by the DOL:

> Under ERISA section 103 and 29 CFR § 2520.103-1, the plan's
> IQPA [independent qualified accountant] is required to form
> an opinion on whether the plan's financial statements and
> schedules are presented in conformity with generally
> accepted accounting principles (GAAP) applied on a basis
> consistent with that of the preceding year. In addition, the
> examination must be conducted in accordance with generally
> accepted auditing standards (GAAP) and involve tests of the
> books and records of the plan as considered necessary by the
> IQPA. In order to conduct an audit of a plan in accordance
> with GAAP, the IQPA must obtain a sufficient understanding
> of the internal control structure necessary to arrange the
> audit and to determine the nature, timing, and extent of the
> audit procedures to be performed. To the extent that a plan
> uses a service organization, such as a TPA, to, for example,
> execute and record transactions, and process related data on
> behalf of the plan, the activities of the service
> organization may affect the plan's financial statements.
> Under these circumstances, it may be necessary for the
> plan's IQPA to contact the TPA to obtain specific
> information about the TPA's internal control structure
> and/or visit the TPA to examine its internal controls for
> handling plan assets.
>
> The American Institute of Certified Public Accountants
> (AICPA) has issued Statement on Auditing Standards 70 (SAS
> 70), Reports on the Processing of Transactions by Service
> Organizations. SAS 70 provides an alternative method for
> examining the internal controls of a service organization,
> including a TPA. Under this alternative method, a TPA may
> hire its own auditor to evaluate and report on its internal
> control structure. The report prepared by the TPA's auditor
> is then made available to the plan and the plan's IQPA who
> may use the report as a basis for evaluating the plan's
> internal control structure. Thus, ERISA's annual reporting
> provisions do not require that a TPA hire its own auditor,
> however, a TPA, in order to facilitate the audit of a plan
> which uses that TPA, may choose to comply with SAS 70.

51.  On March 10, 2009, the Inductotherm Defendants sent to

Wharton the following email, after they hired McClain:

> He [the independent qualified public accountant] has

> requested two reports that you [Wharton] may be able to help
> us with. ... The second report is a statement on Auditing
> Standards No. 70 ("SAS 70").  Apparently, the SAS 70 is a
> report issued by our service organization (Wharton Business
> Group?)

It is unclear as to whether after March 20, 2009 Wharton provided a copy of its SAS 70 Report (to the extent it has one).  However, as explained above, the Inductotherm Defendants have admitted that a $10,825,948 entry on the Plan's 2009 filing **"probably should have been shown on line B-Other."** (emphasis added).

**B.   Inductotherm Defendants Retention of FSC Securities Corporation/Wharton in Late 2005**

52.   Prior to December 12, 2005, Hewitt Investment Group, Charlotte Capital and State Street Global Advisors provided investment management/advisory services to the Plan.

53.   On the Plan's 2005 Form 5500 filing, Schedule C-Service Provider Information, Inductotherm reported the following:

| Service Provider | Official Plan Position |
|---|---|
| Hewitt Investment Group | Investment Advisory |
| Charlotte Capital, LLC | Investment Management |
| State Street Global Advisors | Investment Management |

54.   On December 12, 2005 the Inductotherm Defendants executed, on the Plan's behalf, with Wharton (a branch office of FSC Securities Corporation), the Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy.  FSC Securities Corporation employees B.J. Webster and Marc Hembrough were signatories to this agreement.

55.   Also on December 12, 2005, the Inductotherm Defendants executed, on the Plan's behalf, the FSC Securities Corporation Vision2020 Advisor Investment Advisory Client Services Agreement (the "FSC Securities Corporation Vision2020 Investment Advisory Agreement"). FSC Securities Corporation employees Marc Hembrough and Robert Gueriera were signatories to this agreement.

56.   On the Form 5500 for the Plan year commencing on January 1, 2006 and ending on December 31, 2006, the only service provider listed on Schedule C is the Financial Service Corporation. The Financial Service Corporation is listed as holding the position of Investment Management and receiving a fee in the amount of $61,245.

57.   Exhibit 21 to AIG's 2008 Annual Report (10-K) filed with the SEC on March 2, 2009, lists a number of AIG's wholly owned subsidiaries ("Exhibit 21 to AIG's 10-K"). According to Exhibit 21 to AIG's 10-K, Financial Service Corporation is a wholly owned subsidiary of AIG.

58.   According to Exhibit 21 to AIG's 10-K, Financial Service Corporation owns, as its only subsidiary, 100% of FSC Securities Corporation.

59.   According to Exhibit 21 to AIG's 10-K, FSC Securities Corporation is a wholly owned subsidiary of AIG.

60.   Financial Service Corporation is not registered with the SEC, makes no filings with the SEC, and is not registered to

transact business within the State of New Jersey. FSC Securities Corporation, which is Financial Service Corporation's 100% owned subsidiary (and its only subsidiary), is registered with the SEC as a broker dealer and a registered investment advisor and is also licensed by the self regulating agency of the Financial Industry Regulatory Authority ("FINRA"). Further, FSC Securities Corporation is licensed to transact business in all fifty states. A web search of the term "Financial Service Corporation" results in a return of FSC Securities Corporation's homepage.

61.  As the Financial Service Corporation is not a licensed entity with the SEC or licensed to transact business within the State of New Jersey, and transacts all of its business related to the Plan through FSC Securities Corporation, the entry of the Financial Service Corporation, as the Plan's service provider, on the Form 5500 for the Plan year commencing on January 1, 2006 and ending on December 31, 2006, refers to, and should have instead stated, FSC Securities Corporation.

62.  All of the entities that were providing services to the Plan during the 2005 Plan year - Hewitt Investment Group, Charlotte Capital LLC and State Street Global Advisors - were terminated as providers of services to the Plan.

63.  Therefore, after December 12, 2005, the service providers that were providing investment management services to the Plan were FSC Securities Corporation and Wharton.

C.      **FSC Securities Corporation Is/Was Responsible For**

> **Participates/Participated In, and Is Liable for, All of Wharton's and Messrs. Hembrough's, Webster's and Gueriera's Actions With respect to the Plan Since Wharton is a Branch Office of FSC Securities Corporation and Messrs. Hembrough, Webster and Gueriera are Employees of FSC Securities Corporation.**
>
> **i.   Persons Working At Wharton's Office In Exton Pennsylvania and Servicing The Plan Are Doing So In Their Capacity As Employees of FSC Securities Corporation**

64.   Wharton has two electronic web pages, http://www.whartonbusinessgroup.com/ (since the commencement of this litigation, this web page has been removed from the internet) and http://www.robertgueriera.com/.   Both electronic web pages contain the exact same business address, telephone number and fax number:

> 740 Springdale Drive, Suite 208
> Exton, PA 19341
>
> Phone: (610) 594-7205
> Fax: (610) 594-9105
> http://www.robertgueriera.com/
>
> 740 Springdale Drive, Suite 208
> Exton, PA 19341
>
> Phone: (610) 594-7205
> Fax: (610) 594-9105
> http://www.whartonbusinessgroup.com/

65.   Wharton's electronic webpage of http://www.whartonbusinessgroup.com/ states that it employs the following associates: Matthew Delaney, John Morgenthaler, Billy Joe Webster, Tony Delromano, Robert Gueriera and Marc Hembrough.

66.   Only Messrs. Delaney, Morgenthaler, Gueriera, Hembrough and Webster are registered brokers.

67.   The Exton, Pennsylvania address that Wharton lists on both of its electronic web pages is also the address the Wharton Business Group filed as its location with the New Jersey Secretary of State, Division of Corporations, and with the Pennsylvania Department of State.

68.   According to Central Registration Depository ("CRD") Reports on file with both the New Jersey Bureau of Securities and the Pennsylvania Securities Commission, Messrs. Delaney's, Morgenthaler's, Webster's, Gueriera's and Hebrough's "current employer" is FSC Securities Corporation and its main address is:

    2300 Windy Ridge Parkway, Suite 100
    Atlanta, Georgia 30339;

Further, their "office of employment " is listed as

    740 Springdale Drive, Suite 208
    Exton, Pennsylvania, 19341.

69.   According to FSC Securities Corporation ADV filing with the SEC its Principal Office and Place of Business is:

    2300 Windy Ridge Parkway, Suite 100
    Atlanta, Georgia 30339.

70.   According to Messrs. Delaney's, Morgenthaler's, Webster's, Gueriera's and Hembrough's Financial Industry Regulatory Authority ("FINRA")filings, the FSC Securities

Corporation located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341, is a branch office location of the FSC Securities Corporation that is headquartered at the Atlanta address listed above.  Furthermore, Messrs. Delaney, Morgenthaler, Webster, Gueriera and Hembrough all list, with FINRA, their employer as FSC Securities Corporation.

71.   Counsel for FSC Securities Corporation has admitted that Wharton is a branch office of FSC Securities Corporation (FSC/Sunamerica Defendants' answer to Plaintiffs' interrogatory no 1.)

72.   Mark Hembrough's 10 year employment history is as follows:

| HEMBROUGH, Mark Alexander | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 7/2003 to Present | FSC Securities Corp. | Exton, PA |
| 3/1999 to Present | Princor Financial Ser. Corp. | Malvern, PA |
| 6/1992 to Present | Principal Life Insurance Co. | Des Moines, IA |
| 5/1992 to Present | Wharton Business Group | Malvern, PA |
| 5/1992 to 07/2003 | FSC Securities Corporation | Malvern, PA |

73.   John Morgenthaler's 10 year employment history is as follows:

| MORGENTHALER, John Joseph | | |
|---|---|---|
| Employment Dates | Employer Name | Employer Location |
| 2/2005 to Present | FSC Securities Corp., Inc. | Drowingtown, PA |
| 2/2005 to Present | Principal Life Insurance Co. | Exton, PA |
| 2/2005 to Present | Princor Financial Services Corp. | Exton, PA |
| 5/1992 to Present | Wharton Business Group | Exton, PA |
| 5/1992 to 2/2005 | FSC Securities Corp., Inc. | Drownington, PA |
| 3/1999 to 3/2004 | Princor Financial Services Corp. | Malvern, PA |
| 6/1992 to 3/2004 | Principal Life Insurance Co. | Des Moines, IA |
| 7/2003 to 8/2003 | FSC Securities Corp. | Exton, PA |
| 5/1992 to 7/2003 | FSC Securities Corp. | Malvern, PA |

74.   Robert Gueriera's 10 year employment history is as follows:

| GUERIERA, JR, Robert Charles | | |
|---|---|---|
| Employment Dates | Employer Name | Employer Location |
| 7/1998 to Present | FSC Securities Corp. | Exton, PA |
| 3/1998 to Present | Wharton Business Group | Exton, PA |
| 8/1992 to Present | Principal Mutual Ins. Co. | Des Moines, IA |
| 5/1989 to Present | Union Central Life Insurance co. | Bala Cynwyd, PA |

| 3/1999 to 12/2001 | Princor Financial Services Corp. | Malvern, PA |
| 8/1992 to 1/2001 | Princor Financial Services | Des Moines, IA |
| 8/1992 to 1/2001 | Princor Financial Services Corp. | Media, PA |

75.  Matthew Delaney's 10 year employment history is as follows:

| **DELANEY,** Matthew Sullivan | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 7/2003 to Present | FSC Securities Corp. | Exton, PA |
| 10/1997 to 7/2003 | FSC Securities Corp. | Malvern, PA |

76.  Billy Joe Webster's 10 year employment history is as follows:

| **WEBSTER,** Billy Joe | | |
|---|---|---|
| **Employment Dates** | **Employer Name** | **Employer Location** |
| 2/2005 to Present | Wharton Business Group, LLC | Exton, PA |
| 7/2003 to Present | FSC Securities Corporation | Exton, PA |
| 10/1988 to Present | Connecticut General Life Ins. Co. | Cherry Hill, NJ |
| 5/1992 to 7/2003 | FSC Securities Corp. | Malvern, PA |

### ii.   Wharton's Web Pages Are AIG (Indirect Parent of FSC Securities Corporation) Web Pages

77.   FSC Securities Corporation is a wholly owned subsidiary of AIG.

78.   Numerous pages on the Wharton's website with the address of http://www.whartonbusinessgroup.com/, contain in the corners of such pages the letters of "Aig."

79.   The electronic web page located at, http://www.whartonbusinessgroup.com/ states, with respect to Wharton, among other things, that it is engaged in the business of providing "investment advisory services," and "business advisory/brokerage services," among other "fee based advisory services."  Further, this electronic webpage advertises that the Wharton Business Group provides these services to the following types of clients: business owners, affluent families, corporate funds/retirement plans, hospital foundation and endowment funds, and educational and fraternal organizations.

80.   The computer source code for Wharton's website, with the address of http://www.whartonbusinessgroup.com/, contains the letters of "Aig."

81.   Numerous pages on the Wharton's website, with the address of http://www.robertgueriera.com/ contain in the corners of such pages the letters of "Aig."

82.   The electronic web page located at http://www.robertgueriera.com/ states, with respect to Wharton,

among other things:

> Our competitive advantage is our ability to design and implement a financial roadmap that is consistent with our client's values.  This written financial strategy will become the blueprint for living the life you have always dreamed.

83.   The computer source code for the Wharton Business Group website, with the address of http://www.robertgueriera.com/, contains the letters of "Aig."

### iii. Registration Status of Wharton and FSC Securities Corporation

84.   On November 16, 2006 the State of New Jersey revoked the license of the Wharton Business Group of Pennsylvania, Inc. (with the associated name of the Wharton Business Group, Inc.), located at 740 Springdale Drive, Suite 208, Exton, Pennsylvania, 19341, to transact business in the State of New Jersey.  The license was revoked for failing to file an annual report for two consecutive years.

85.   Inductotherm is located in New Jersey and the Plan provides retirement benefits to employees that work at Inductotherm's New Jersey location.

86.   Wharton was required to be registered with the State of New Jersey while it was providing investment services to the Plan.

87.   According to the CRD Report for the a Wharton Business Group, LLC, located at 740 Springdale Drive, Suite 208

Exton, Pennsylvania 19341, its registration status with the SEC was terminated on September 21, 2005.

88.   At the time this litigation commenced, Wharton was not registered with the SEC.  After the filing of Plaintiffs' Complaint, Wharton then registered with the SEC.  Thus, from December 12, 2005 through November 13, 2009, while Wharton was providing investment management services to the Plan, it was not registered with the SEC.

89. Unlike Wharton, FSC Securities Corporation is, and has been, registered with the SEC and is licensed to transact business in the State of New Jersey.

90.   For the following reasons FSC Securities Corporation is/was responsible for, participates/participated in, and is liable for, its actions and the actions of its branch office of Wharton and Messrs. Hembrough, Webster and Gueriera (FSC Securities Corporation employees), with respect to the Plan: (a) Wharton is a branch office of FSC Securities Corporation; (b) Wharton is/was unlicensed to provide services to the Plan; (b) Wharton was not licensed to transact business in the State of New Jersey during the time period it was providing services to the Plan, (d) FSC Securities Corporation possesses all of the necessary licenses; (e) Messrs. Hembrough, Webster and Gueriera are FSC Securities Corporation employees; (f) Messrs. Hembrough and Webster are signatories to the  Wharton Business Group

Inductotherm Inc., Profit Sharing Plan Investment Policy; (g) Messrs. Hembrough and Gueriera are signatories to the FSC Securities Corporation Vision2020 Investment Advisory Agreement; (h) the FSC Securities Corporation Vision2020 Investment Advisory Agreement provides the "Investment Adviser Representative ("IAR") ...[Mr. Hembrough] is an affiliate of the Adviser [FSC Securities Corporation] and acts on behalf of the Adviser [FSC Securities Corporation]";(i) counsel for FSC Securities Corporation admitted that"[d]uring the period from December 16, 2005 –the date FSC Securities Corporation ('FSC') became the investment adviser for the...Plan, through the present..." (FSC Defendants' answers to Plaintiffs' Interrogatory No. 1), and(i) counsel for FSC Securities Corporation admitted that Wharton is the Pennsylvania branch office of FSC Securities Corporation (Id.).   Since FSC Securities Corporation is/was responsible for, participates/participated in, and is liable for, the actions of its branch office of Wharton and Messrs. Hembrough, Webster and Gueriera (FSC Securities Corporation employees), with respect to the Plan, FSC Securities Corporation and Wharton are, generally, hereinafter referred to as "FSC Securities Corporation/Wharton."

### D.   Fiduciary Status of FSC Securities Corporation, Certain of Its Employees And Wharton

91. On November 21, 2005 FSC Securities Corporation/Wharton provided to certain Inductotherm Defendants various documents.

92.  One of those documents stated that "the [Plan]

committee feels like Hewitt [the prior service provider] has assigned junior consultants to your plan who may not be as qualified as Hewitt's best.  When evaluating potential consulting alternatives, candidates should be made to agree that your plan will always have senior consultant/owners/partners assigned to your plan."

93.   Another document identifies that FSC Securities Corporation/Wharton will:

> *Develop a specific investment strategy that matches your investment objectives, time horizon and risk profile.
>
> *Reduce overall risk and enhance return through broad diversification by asset class and style.
>
> *Access top mutual fund and institutional money managers through independent research.
>
> *Provide Continuous active management and monitoring of portfolio.

94.   Monthly, FSC Securities Corporation/Wharton sent the Inductotherm Defendants documents related to the Plan and their services.  Every month for the period of December 2005 through September of 2010 a document which stated the above, regarding FSC Securities Corporation/Wharton's services to the Plan, was provided to the Inductotherm Defendants.

95.   Another document stated that "[s]erving as both manager AND consultant enables us [FSC Securities Corporation/Wharton] to manage costs more effectively and enhance returns as shown above."

96.   The November 21, 2005 presentation included two "Sample Portfolios."  One hypothetical portfolio portrayed investing 30%

of the Plan's assets in "Cash/Bonds/Income" and 70% of the Plan's assets invested in "Stocks," while another portfolio hypothetically invested 22% of the Plan's assets invested in "Cash/Bonds/Income" and 80% of the Plan's assets invested in "Stocks."

97.   Both of these portfolio allocation models listed certain mutual funds in which FSC Securities Corporation/Wharton proposed/recommended that the Plan's assets be invested.

98. On December 12, 2005 the Inductotherm Defendants executed, on the Plan's behalf, with FSC Securities Corporation/Wharton the Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy.  FSC Securities Corporation's employees Messrs. Webster and Hembrough were signatories to this agreement.

99.   Under this investment agreement, FSC Securities Corporation/Wharton, among other things, is responsible for the following with respect to the Plan's assets (a) ensuring that 5% of the portfolio is invested in cash or ultra short term bonds; (b) ensuring that no equity manager or firm manages more than 15% of the Plan's total portfolio; (c) ensuring that no one stock sector would comprise more than 30% of the total stock held by the Plan; (d) rebalancing the portfolio and (e) ensuring that none of the Plan's assets are invested in private placements, registered or unregistered stock, options and futures.  Under this policy, FSC Securities Corporation/Wharton is also obligated

to identify the Plan's portfolio's needs, set long term investment objectives, determine the asset mix appropriate to maximizing the Plan's objectives, monitor and replace poorly performing asset managers and provide detailed reports regarding the performance of the Plan's investments.  Furthermore, this policy provided/implemented a portfolio allocation such that FSC Securities Corporation/Wharton invested 80% of the Plan's assets in equities and 20% in cash/fixed income products.

100.  Also on December 12, 2005, the Inductotherm Defendants executed, on the Plan's behalf, the FSC Securities Corporation Vision2020 Investment Advisory Agreement.  FSC Securities Corporation's employees Messrs. Hembrough and Gueriera were signatories to this agreement.

101.  The FSC Securities Corporation Vision2020 Investment Advisory Agreement contains, among others, the following terms:

> Client [defined as the Plan] desires to open an account...with Adviser [FSC Securities Corporation] for the purposes of participating in the VISION2020 Advisor Program (the "Program"), thorough which IAR [Mr.Hembrough] will manage Client's assets on behalf of Adviser [FSC Securities Corporation].
>
> The Investment Adviser Representative ("IAR") undersigned below [Mr. Hembrough] is an affiliate of Adviser [FSC Securities Corporation].
>
> Client [the Plan] will be provided with a variety of investment related activities.
>
> As a participant in the Program, Client [the Plan] will pay an annualized advisory fee...The initial advisory fee is due upon execution of this Agreement.  Subsequent advisory fee payments are due and will be assessed at the beginning of each quarter based on the value of account assets (securities, cash and cash equivalents) under management....

Pension, retirement, profit sharing or other plans governed by ERISA...should not rely on advice from Adviser or IAR as investment advice in relation to any assets except those assets actually placed in a program under this Agreement....**ADVISER CANNOT AND WILL NOT ACCEPT THE LEGAL STATUS OF INVESTMENT ADVISER OR FIDUCIARY FOR ANY ASSETS OF THE CLIENT OUTSIDE A PROGRAM.** (emphasis in the original)

102.  With respect to fees, a document FSC Securities Corporation/Wharton provided to certain Inductotherm Defendants on December 6, 2005, stated "[o]ur compensation would be .10% to help you manage the entire portfolio, which is included in the .60% figure." FSC Securities Corporation Vision2020 Investment Advisory Agreement disclosed additional "Transactional Charges." Furthermore, the Plan paid additional fees on all of its investments, including, as explained below, fees that were in violation of ERISA.

103.  According to the FSC SunAmerica Defendants answers to Plaintiffs' interrogatories "During the period from December 16, 2005-the date FSC Securities Corporation ("FSC") became the investment adviser for the Inductotherm Companies Master Profit Sharing Plan #001 (the "Plan") (FSC/SunAmerica Defendants' Answer No. 1 to Plaintiffs' Interrogatories).

104.  For all of the foregoing reasons, FSC Securities Corporation, FSC Securities Corporation's employees Messrs. Hembrough, Webster and Gueriera, and the FSC Securities Corporation branch office of Wharton, are fiduciaries to the Plan pursuant to ERISA §3(21)(A), 29 U.S.C. §29 1002(21)(A), and, as stated above, are hereinafter, generally, collectively referred

to as "FSC Securities Corporation/Wharton".

**E.      FSC Securities Corporation/Wharton's Money Market Fund Investments**

105.  FSC Securities Corporation/Wharton attached as an exhibit to its motion to dismiss filed on December 21, 2009, the Brokerage Account Statements for the Plan for the period of December 14, 2005 through December 31, 2008.  Despite the Defendants representation that they will produce the Brokerage Account Statements reflecting the Plan's investments after December 31, 2008, all Defendants have yet to make that production.

106.  The Brokerage Account Statements reflect that sometime between December 14, 2005 and December 31, 2005, FSC Securities Corporation/Wharton invested $7,252,554.95 of Plan assets into the SunAmerica Money Market Fund.

107.  The Brokerage Account Statements reflect that sometime between January 1, 2006 and January 31, 2006, FSC Securities Corporation/Wharton invested $3,242,500 in the Vanguard Prime Money Market Fund Investor Shares (Ticker Symbol VMMXX).

108.  According to the Brokerage Account Statements, for the months of December 2005 through December of 2008, FSC Securities Corporation/Wharton continued to invest Plan assets in both the SunAmerica Money Market Fund and the Vanguard Prime Money Market Fund Investor Shares (Ticker Symbol VMMXX).

109.  Over the course of the period of 2005 through 2008 the

amount of the investment in each fund varied, but the investment in the SunAmerica Money Market Fund was always significant.

110.   Prior to the retention of FSC Securities Corporation/Wharton, according to a document provided by FSC Securities Corporation/Wharton to certain Inductotherm Defendants at a November 21, 2005 meeting, the only money market fund that Plan assets were invested in was the "Vanguard Money Market Prime." Thus, prior to the retention of FSC Securities Corporation/Wharton, Plan assets were not invested in the Sunamerica Money Market Fund.

111.   Mutual fund companies charge multiple fees on investments in their funds.  The total fees charged by mutual funds are generally based on a size of the investor's investment into the fund.  For example, if an investor were to make a $100 investment and the fund charged fees totaling 1%, the fee paid by the investor would be $1.00.  Commonly, the fees charged by mutual funds are expressed as basis points ("bps").  100 bps is the equivalent of 1%.

112.   Mutual funds, such as both the SunAmerica Money Market Fund and the Vanguard Prime Money Market Fund, generally have different share classes.  Each share class invests in the same diversified pool of securities, however, each share class charges different fees.  Therefore, as each share class invests in the same diversified pool of securities, the share class with the lowest fees will provide the greatest return on the investor's

599049.2                              -35-

investment.

113.   The SunAmerica Money Market Fund has four classes of shares that funds may be invested in. The lowest fee charged by any fund class is 80 bps while the highest fee is 178 bps.   While the Brokerage Account Statements disclose that FSC Securities Corporation/Wharton invested the Plan's assets in the SunAmerica Money Market Fund, they do not disclose in which of the four share class such assets were invested.

114.   The Vanguard Prime Money Market Fund has two share classes.   First, the Investor Class, which FSC Securities/Wharton invested the Plan's assets in.   The Investor Class charges annual fees equal to 28 bps.   The second share class is the Vanguard Prime Money Market Fund Institutional Class (Ticker: VMRXX) and it charges annual fees equal to 13 bps.   These fees are based on information contained in a December 29, 2008 SEC filing for these funds; however, throughout the period of December of 2005 through the present, there has always been a fee differential between the Investor Class and the Institutional Class, with the Investor Class always charging higher fees.

115.   The investment of any Plan assets in the SunAmerica Money Market Fund, at any time, violated ERISA and the failure to invest all Plan assets that were to be invested in a money market fund in the Vanguard Prime Money Market Fund Institutional Class (Ticker: VMRXX), also violated ERISA.

116. In addition to investing the Plan's assets, FSC Securities Corporation/Wharton acts as a financial advisor to one of the Trustee Defendants with respect to his investments outside of the Plan.  According to the schedule of this Trustee Defendant's investments, with respect to the money market investments of that Trustee Defendant, FSC Securities Corporation/Wharton does not use the SunAmerica Money Market Fund as this Trustee Defendant's money market investment option, rather it invests his money in the Vanguard Prime Money Market Fund.

117.  Similarly, FSC Securities Corporation/Wharton also acts as the financial advisor to an insurance company affiliated with a Trustee Defendant.  According to the schedule of investments,  with respect to the money market investments of that Trustee Defendant affiliated insurance company, FSC Securities Corporation/Wharton does not use the SunAmerica Money Market Fund as the insurance company's money market investment option, rather it relies on the Vanguard Prime Money Market Fund.

### i. SunAmerica Money Market Fund

118.  The fees charged to the Plan on account of FSC Securities Corporation/Wharton's investment of Plan assets into the SunAmerica Money Market Fund were, at a minimum 80 bps, and at a maximum of 178 bps.

119.  The returns on investments in the Vanguard Prime Money Market Fund Investor Class for 2006, 2007 and 2008 were 4.88%,

5.14% and 2.77%, respectively. The SunAmerica Money Market Fund has four classes.  Those classes are identified as A, B, C and I. Plaintiffs have only been able to locate in the public filings for this fund prior years' returns for classes A and I. According to the fund's Quarterly Report, the returns on investments in class A of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.22%, 4.32%, 1.84%, respectively. According to the fund's Quarterly Report, the returns on investments in class I of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.31%, 4.43%, 1.98%, respectively. The SunAmerica Money Market Fund prospectus or Quarterly Report does not disclose the returns on the class B and C shares; however, on information and belief, these returns were inferior to the Vanguard Prime Money Market Fund Investor and Institutional Classes.

120.  SunAmerica Money Market Funds, Inc., is an open ended investment company organized as a Maryland corporation and consists of two investment funds, one of which is the SunAmerica Money Market Fund.

121.  According to Exhibit 21 to AIG's 10-K, SunAmerica Asset Management Corp., is a wholly owned subsidiary of AIG.

122.  SunAmerica Asset Management Corp. provides SunAmerica Money Market Funds, Inc., with office space, administers its corporate affairs, maintains certain of its books and pays the

salaries and expenses of all of its employees, some, if not all, of whom are also employees of SunAmerica Asset Management Corp., or its affiliates.

123.   SunAmerica Asset Management Corp. is responsible for the continuous supervision of SunAmerica Money Market Funds, Inc.'s two funds, which includes the SunAmerica Money Market Fund.

124.   SunAmerica Money Market Funds, Inc., lists its address with the SEC as Harborside Financial Center, 3200 Plaza 5, Jersey City, New Jersey 07311.  This is the same address that SunAmerica Asset Management Corp., lists with the SEC as its address.

125.   SunAmerica Asset Management Corp.'s Senior Vice President John T. Genoy is designated with the SEC as the agent for service for SunAmerica Money Market Funds, Inc.

126.   Peter A. Harbeck, the President and CEO of SunAmerica Asset Management Corp., signed the shareholder letter that is contained in SunAmerica Money Market Funds, Inc., June 2009 Semi-Annual report, which is filed with the SEC as Form N-CSR.

127.   SunAmerica Asset Management Corp., files an ADV with the SEC.

128.   SunAmerica Asset Management Corp.'s Form ADV, dated July 20, 2009, contained affirmative responses to the following questions:

a.   In the past ten years, have you **[SunAmerica Asset**

Management Corp.] or any advisory affiliate been convicted of or plead guilty or nolo contendere in a domestic, foreign, or military court to any felony? **Yes.**

b.  In the past ten years have you **[SunAmerica Asset Management Corp.]** or any advisory affiliate been charged with a felony?  **Yes.**

c.  Has the SEC or the CFTC ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have made a false statements or omission? **Yes.**

d.  Has the SEC or the CFTC ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of SEC or CFTC regulations or statutes? **Yes.**

e.  Has the SEC or the CFTC ever entered an order against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate in connection with investment related activity? **Yes.**

f.  Has the SEC of the CFTC ever imposed a civil money penalty against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate, or ordered you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to cease and desist from any activity? **Yes.**

g.  Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have made a false statement or omission, or been dishonest, unfair, or unethical? **Yes.**

h. Has any other federal regulatory agency, any state regulatory agency, or any foreign financial regulatory authority ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of investment related regulations or statutes? **Yes.**

i. Has any self regulatory organization or commodities exchange ever found you **[SunAmerica Asset Management Corp.]** or any advisory affiliate to have been involved in a violation of its rules (other than a violation designated as a "minor violation" under a plan approved by the SEC)? **Yes.**

j. Has a domestic or foreign court in the past ten years, enjoined you **[SunAmerica Asset Management Corp.]** or any advisory affiliate in connection with any investment-related activity? **Yes.**

k. Has any domestic or foreign court ever found that you **[SunAmerica Asset Management Corp.]** or any advisory affiliate were involved in a violation of investment-related statutes or regulations? **Yes.**

l. Has any domestic or foreign court ever dismissed, pursuant to a settlement agreement, an investment related civil action brought against you **[SunAmerica Asset Management Corp.]** or any advisory affiliate by a state or foreign regulatory authority? **Yes.**

129. SunAmerica Asset Management Corp. receives fees from all investments in the SunAmerica Money Market Fund; therefore, SunAmerica Asset Management Corp. received, and continues to receive, fees on account of FSC Securities Corporation/Wharton's investment of Plan assets in the SunAmerica Money Market Fund. FSC Securities Corporation and SunAmerica Asset Management Corp. are wholly owned subsidiaries of AIG. Wharton is a branch office of FSC Securities Corporation.

130. According to Exhibit 21 to AIG's 10-K, SunAmerica Capital Services, Inc. is a wholly owned subsidiary of AIG.

131. SunAmerica Capital Services, Inc. received, and continues to receive fees, from all investments in the SunAmerica

Money Market Fund; therefore, SunAmerica Capital Services, Inc. receives fees on account of FSC Securities Corporation/Wharton's investment of Plan assets in the SunAmerica Money Market Fund. Both FSC Securities Corporation and SunAmerica Capital Services, Inc. are wholly owned subsidiaries of AIG.  Wharton is a branch office of FSC Securities Corporation.

132.  According to the SunAmerica Money Market Funds, Inc. Certified Shareholder Report of Registered Investment Management Companies, dated June 30, 2009 (Form N-CSR), SunAmerica Fund Services, Inc.'s ultimate parent is AIG.

133.  SunAmerica Fund Services, Inc. receives fees from all investments into the SunAmerica Money Market Fund; therefore, SunAmerica Fund Services, Inc. receives fees due to FSC Securities Corporation/Wharton's investment of Plan assets in the SunAmerica Money Market Fund. Both FSC Securities Corporation and SunAmerica Fund Services, Inc., are wholly owned subsidiaries of AIG.  Wharton is a branch office of FSC Securities Corporation.

134. As AIG is a holding company, it receives dividends, distributions and other payments from its subsidiaries. Therefore, AIG was enriched by the fees that were received from the Plan's assets by SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc. and any other John Doe Defendants that received fees from the Plan's assets and are wholly owned subsidiaries of AIG.

ii.  **Failure to Use The Vanguard Prime Money**

**Market Fund Institutional Class, As The
Plan's Money Market Fund**

135.   The returns on investments in the Vanguard Prime Money
Market Fund Institutional Class for 2006, 2007 and 2008 were
5.08%, 5.30% and 2.93%, respectively.

136.   The returns on investments in the Vanguard Prime Money
Market Fund Investor Class for 2006, 2007 and 2008 were 4.88%,
5.14% and 2.77%, respectively. As stated above, the SunAmerica
Money Market Fund has four classes.   Those classes are identified
as A, B, C and I. Plaintiffs have only been able to locate in the
public filings for this fund prior years' returns for classes A
and I.  According to the fund's Quarterly Report, the returns on
investments in class A of the SunAmerica Money Market Fund for
2006, 2007, 2008 were 4.22%, 4.32%, 1.84%, respectively.
According to the fund's Quarterly Report, the returns on
investments in class I of the SunAmerica Money Market Fund for
2006, 2007, 2008 were 4.31%, 4.43%, 1.98%, respectively. The
SunAmerica Money Market Fund prospectus or Quarterly Report does
not disclose the returns on the class B and C shares; however, on
information and belief, these returns were inferior to either
share class of the Vanguard Prime Money Market Fund.

137.   The annual fees charged by the Vanguard Prime Money
Market Fund Institutional Class were 13bps.   Depending on which
share class of the SunAmerica Money Market Fund FSC Securities
Corporation/Wharton invested the Plan's assets in, those fees

were, at a minimum 80 bps, and at a maximum of 178 bps.

138.   Both of the November 21, 2005 portfolio models that FSC Securities Corporation/Wharton presented to certain Inductotherm Defendants, in an attempt to solicit the Plan's business, reflected that FSC Securities Corporation/Wharton proposed to use as the Plan's money market fund the "Vanguard Money Market Prime Instl".

139.   The SunAmerica Money Market Fund was not contained in the list of mutual funds that were contained in either of the portfolio models that FSC Securities Corporation/Wharton presented to certain Inductotherm Defendants on November 21, 2005.

140.   A document that was provided by FSC Securities Corporation/Wharton to certain Inductotherm Defendants in December of 2007, that listed the Plan's "12/31/07 Total Portfolio..." stated that the Plan was invested in the "Vanguard MM [Money Market] Prime Inst" and that such investment generated a 4% return for the Plan.  However, the December of 2007 Brokerage Account Statements reflect that the Plan was not invested in the Institutional Class of this mutual fund, but rather in the higher fee "Investor Class" with the ticker of "VMMXX", which performed inferior to the Institutional Class. Furthermore, the "12/31/07 Total Portfolio..." document that FSC Securities Corporation allegedly provided to the Inductotherm Defendants in December of 2007 did not list the SunAmerica Money

599049.2                                    -44-

Market Fund as one of the Plan's investments.  However, the 2007 Brokerage Account Statement (which is separate from the above document) reflected that FSC Securities Corporation/Wharton, as of "12/31/07", had invested $8,373,917.53 of Plan assets in the SunAmerica Money Market Fund.  The above described inconsistency repeatedly exists between a monthly document provided by FSC Securities Corporation/Wharton to certain Inductotherm Defendants (which reflected that the Plan's sole money market fund is the Vanguard Prime Money Market Fund Institutional Class) and the corresponding monthly Brokerage Account Statement (with the Brokerage Account Statement reflecting a large investment in the SunAmerica Money Market Fund and that the Plan was also invested in the Investor Class, not the Institutional share Class, of the Vanguard Prime Money Market Fund).  For example, Plaintiffs have identified thus far that this inconsistency exists for the following months: January of 2006, February of 2006, March of 2006, April of 2006, May of 2006, June of 2006, July of 2006, August of 2006, September of 2006, October of 2006, November of 2006, December of 2006, January of 2007, March of 2007, May of 2007, July of 2007, April of 2008 and June of 2008.  On information and belief this inconsistency exists for all months FSC Securities Corporation/Wharton was providing services to the Plan.

141.  Had FSC Securities Corporation/Wharton, as it represented to the Inductotherm Defendants on November 21, 2005,

used the Institutional Class of the Vanguard Prime Money Market Fund as the Plan's sole money market investment option, the Plan would have been charged lower fees and received higher returns on its investments.

**F.   FSC Securities Corporation's/Wharton's Investments Into Long Short Funds-The Hussman Strategic Growth Fund, the Diamond Hill Long Short Fund and the Dover Long/Short Sector Fund.**

142.   As the Brokerage Account Statements reflect, between December of 2005 and December of 2008 FSC Securities Corporation/Wharton invested Plan assets into the following funds: the Hussman Strategic Growth Fund, the Diamond Hill Long Short Fund and the Dover Long/Short Sector Fund.

143.   FSC Securities Corporation/Wharton began investing Plan assets in the Hussman Strategic Growth Fund in April of 2006.  According, to Schedule H, Line 4i, of the Plan's 2009 Form 5500 filing, as of December 31, 2009, the Plan continued to be invested in the Hussman Strategic Growth Fund and this investment had a cost basis of $3,640,059.12 and a market value of $3,165,306.35.

144.   FSC Securities Corporation/Wharton began investing in the Dover Long/Short Sector Fund in December of 2007. Schedule H, Line 4j, of the Plan's 2009 Form 5500 filing reflects that in 2009 the Plan's investment in the Dover Long/Short Sector Fund was sold for a loss in the amount of $266,760.

145.   FSC Securities Corporation/Wharton began investing Plan assets in the Diamond Hill Long Short Fund in September of 2008.  This fund is listed on the Plan's 2008 Brokerage Statements.  However, it is not listed, on Schedule H, Line 4j of the Plan's Form 5500 filing; nor is it listed on any of the pages that the accountant's for the Plan attached as supplemental materials to Schedule H, Line 4i.  Plaintiffs inquired in their interrogatories (interrogatory 14) of counsel to FSC Securities Corporation about whether FSC Securities Corporation/Wharton had liquidated the Plan's investment in this fund.  Counsel for FSC Securities Corporation did not object to his interrogatory, however, nor did Defendant provide a response to this portion of the interrogatory.

146.   The Hussman Strategic Growth Fund, the Diamond Hill Long Short Fund and the Dover/Long Short Sector Fund are all characterized by Morningstar as "long-short" funds.

147.   Long-short funds are capable of, and do, engage in leverage, taking both long and short positions in stock and stock index securities.

148.   The Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy, provides that the specific asset allocation will be in the following asset categories: Money Markets/Ultra Short-Term Bonds, Short-Term Bonds, Limited-Term Bonds, Intermediate Bonds, Other Income, US Large Value Stocks, US Large Core Stocks, US Large Growth Stocks,

599049.2                           -47-

Global/International Stocks, US Mid-Small Stocks, Selected Sectors and Emerging Markets.

149. The investment policy does not list "long-short" funds as one of the specific asset allocations in which FSC Securities Corporation/Wharton is authorized to invest.

150. The investment policy provides for the following in the Restricted Investments section:

> ....no options and futures (except for hedging) shall be purchased. There shall be no purchase of securities on margin and no short sales.

151. Leveraging, by taking both long and short positions, is sometimes done for the purpose of hedging, or lowering the risk of the portfolio. However, that is not the case with respect to "long-short" funds.  Long-short funds use leverage and short sales in an attempt to maximize profits.

### i.   Hussman Strategic Growth Fund

152.  The prospectus for the Hussman Strategic Growth Fund states:

> [T]he Fund may use options to increase its investment exposure to the market.
> *     *     *     *
> Specific strategies for 'leveraging' or increasing stock market exposure include buying call options on individual stocks or market indices and writing put options on stocks which the Fund seeks to own.  The maximum exposure of the Fund to stocks, either directly or through purchases of stock or indirectly through options positions, will be limited to 150% of its net assets.

153.   Any investment in Hussman Strategic Growth Fund was in violation of the Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy because this fund engaged in leveraging in an attempt to pursue higher profits at a greater risk.

## ii.   Diamond Hill Long Short Fund

154.   The Prospectus and Statement of Additional Information (both documents are filed as a single filing with the SEC) for the Diamond Hill Long Short Fund state:

> The Fund will also sell securities short. Short sales are effected when it is believed that the price of a particular security will decline, and involves the sale of a security which the Fund does not own in hopes of purchasing the same security at a later date at a lower price. To make delivery to the buyer, the Fund must borrow the security, and the Fund is obligated to return the security to the lender, which is accomplished by a later purchase of the security by the Fund. The frequency of short sales will vary substantially in different periods, and it is not intended that any specified portion of the Fund's assets will as a matter of practice be invested in short sales. The Fund will not make a short sale if, immediately before the transaction, the market value of all securities sold short exceeds 40% of the value of the Fund's net assets.
>
> \*       \*       \*       \*
>
> Leveraging a Fund creates an opportunity for increased net income but, at the same time, creates special risk considerations.
>
> \*       \*       \*       \*
>
> There can be no assurance that the Fund will be able to close out the short position at any particular time or at an acceptable price.  Although the Fund's gain is limited to the amount at which it sold a security short, its potential loss is not limited.

155.   Any investment in the Diamond Hill Long Short Fund was

in violation of the Wharton Business Group Inductotherm Inc.,

Profit Sharing Plan Investment Policy because this fund engaged

in leveraging and taking short positions in an attempt to pursue

higher profits at a greater risk.  Per this policy, such short

sales are explicitly prohibited.

### iii. Dover Long/Short Sector Fund

156.  The Prospectus and Statement of Additional Information

(both documents are filed as a single filing with the SEC) for

this fund state:

> The Fund seeks positive absolute return independent of
> equity market conditions.
>
>       \*     \*     \*     \*
>
> Generally, the Fund will have long positions in those stocks
> that the Adviser believes are undervalued and short
> positions in those stocks that the Adviser believes are
> overvalued.
>
>       \*     \*     \*     \*
>
> The portfolio will contain a significant number of short
> positions at all times. This means that the Fund's
> performance is likely to lag behind the broad market indices
> in very strong market environments. Short positions tend to
> perform better than the broader market in weak or declining
> markets.
>
> The Adviser expects the Fund's portfolio to include between
> 15 and 25 ideas or themes at any given point in time. The
> exact number of positions in the portfolio will depend on
> perceived market opportunities. Some ideas will be long-term
> (multi-year) in nature, others more cyclical (3 to 18
> months). Each idea could involve one or more long or short
> positions.
>
> The Adviser may implement ideas or themes in different ways.
> For example, a "move towards clean energy idea" could be
> implemented with long positions in baskets of companies with
> significant exposure to solar, wind and/or nuclear power. It
> could also be implemented with short positions in groups
> that are heavily dependent on intense consumption of fossil
> fuels such as U.S. auto manufacturers or trucking companies.

*     *     *     *

A. General The Fund may purchase or write put and call options: (1) for investment purposes to enhance the Fund's performance; or (2) to hedge against a decline in the value of the securities owned by the Fund or an increase in the price of securities that the fund Plan to purchase or in order to offset the effects of general stock market movements.

*     *     *     *

The fund may use leverage to increase potential returns. Leverage involves special risks and may involve speculative investment techniques.

157.  Any investment in the Dover Long/Short Sector Fund was in violation of the Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy because this fund engaged in leveraging and taking short positions in an attempt to pursue higher profits at a greater risk.  Per this policy, such short sales are explicitly prohibited.

**G.   Imprudent Asset Allocation**

158.  For all Plan years commencing on January 1, 2005 through January 1, 2010 (i.e., including the 2008 Plan year), the Plan had a significant number of older employees.

159.  Thus, prior to January 1, 2008 the Defendants knew, or should have known, that the Plan had a significant number of older participants.

160.  Furthermore, in 2008, on information and belief, a significant portion of the Plan's assets were attributable to the older employees' accounts.

161.   This belief is based on the following: (i) each year a participant is employed by Inductotherm, the employer makes a contribution on an employee's behalf based on the employee's salary and (ii) older employees have generally worked for Inductotherm for more years than younger employees.

162.   The Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy, dated December 12, 2005, identifies as a benchmark and risk target consistent with a portfolio that is 20% invested in cash/fixed income products and 80% invested in domestic and foreign entities.

163.   The Defendants claim that they violated their own policy in 2008 and at times reduced the amount of equity investments in favor of cash/fixed income products such that for the 12 month period in 2008 the average equity to cash/fixed income ratio was equal to 62% to 38%.

164.   This 62% equity and 38% cash/fixed income allocation, which is derived from the Defendants documents is not entirely accurate.   For six months in 2008 4% of the Plan's portfolio was being reported as invested in "income" when such investments were invested in equities and this 62%/38% allocation does not account for that discrepancy.   Additionally, on information and belief, some of the increase in the amount of the portfolio invested in cash/fixed income products was not due to an actual shift in the Plan's investments by its fiduciaries, but rather due to the fact

that in 2008 the value of the Plan's equities deteriorated, while the value of the Plan's cash/fixed income investments remained stable or increased in value.

165.  A hand written note drafted in July of 2009 stated "Age 55 Liquidity", "Updated Target to Dave."  Well before July of 2009, the Plan had a significant number of participants that were 55 years of age or older.

166.  Prior to July of 2009 FSC Securities Corporation/Wharton provided the Inductotherm Defendants with periodic memorandums (generally on a monthly basis), entitled "Discussion Points," which provided information regarding their investment strategy with respect to the Plan.   The above referenced handwritten note appears to be the only document, drafted by FSC Securities/Wharton, that in any way suggested or mentioned that the age of the Plan's participants (i.e., Plaintiffs) should be a factor in the Plan's investment strategy.

167.  Furthermore, none of the documents provided by FSC Securities Corporation/Wharton, prior to their retention, in their discussions with the Inductotherm Defendants regarding the investment strategy FSC Securities Corporation/Wharton proposed to implement, discussed, suggested or mentioned that the age of the Plan's participants (i.e., Plaintiffs) should be a factor in the Plan's investment strategy.

168.  The Inductotherm Defendants March 4, 2011 discovery

production stated that such production included the "minutes of the Plan Trustee Committee meetings" for the Plan (hereinafter the "Trustee's Minutes").

169.  The Trustee's Minutes produced for the period of December 12, 2005 through September 16, 2009 reveal that during that time period, the Trustee Defendants held only four meetings. Those meetings occurred on December 12, 2005, January 12, 2006, March 11, 2009 and September 16, 2009. In these meetings, the minutes reflect that it was never discussed, mentioned or suggested that the age of the Plan's participants (i.e., Plaintiffs) should be a factor in the Plan's investment strategy.

170.  The Inductotherm Defendants have not produce any minutes from any meetings that occurred in 2008.

171.  In 2008 the Plan suffered substantial losses.

172.  It is widely recognized among experts in the investment management field that asset allocation is the most important factor in determining how to construct a portfolio.

173.  According to the SEC, the most appropriate asset allocation is determined based on the investors time horizon and ability to tolerate risk.

174.  An investor with a shorter investment horizon seeks less risky investments.  According to the SEC "[a] portfolio heavily weighted in stock or stock mutual funds, for instance, would be inappropriate for a short-term goal...."

175.   The SEC has also stated that "most people investing for retirement hold less stock and more bonds and cash equivalents as they get closer to retirement age."

176.   The March of 2009 (i.e., after the 2008 losses)Trustee's Minutes state the following:

> After reviewing performance of the investments in the stock market, Wharton Business Group recommended moving the portfolio to 50% in equities and 50% in cash, bonds and fixed income.

177.   In April of 2009 (i.e., after the 2008 losses) FSC Securities Group/Wharton changed the Plan's investment portfolio to reflect this recommendation and thus, according to FSC Securities Corporation/Wharton, in April of 2009 50% of the Plan's assets were invested in equities and 50% in cash/fixed income products.

178.   Similarly, in March of 2009(i.e., after the 2008 losses) 51% of the Plan's assets were invested in equities and the remaining 49% were invested in cash/fixed income products.

179.   Compared to 2008, in March of 2009 and April of 2009 the Plan's assets were significantly more invested in cash and fixed income investments as opposed to equities.  However, in both 2008 and March and April of 2009, the Plan had as its participants a significant number of older participants.

180.   The Trustee's Minutes for the November 2, 2002 meeting state the following:

Mr. Scotto reviewed the Asset Mix and Investment Management

Structure.  As of September 30, 2002 the Trust assets were invested 45.8% in equities and 54.2% in fixed income investments.

181.  In 2002, FSC Securities Corporation/Wharton were not the investment managers to the Plan; nor were they, on information and belief, providing any services to the Plan. On information and belief the ages of the Plan participants in 2002 was substantially similar to, or younger, than the ages of the Plan participants (i.e., Plaintiffs) in 2008.

182.  Defendant SunAmerica Asset Management Corp. is the investment advisor to the SunAmeica 2015 High Watermark Fund and the SunAmerica 2020 High Watermark Fund (the "SunAmerica 2015/2020 High Watermark Funds").  With respect to these funds, August 15, 2015 and August 15, 2020, are referred to as each of these fund's "Protected Maturity Date," because these are the dates the investor receives the return on his or her investment.

183.  According to the prospectuses for the SunAmerica 2015/2020 High Watermark Funds, each fund:

> [S]eeks to generate capital appreciation by allocating its portfolio exposure to U.S. equity markets...and to U.S. fixed income market.  Exposure to both markets are managed to minimize the risk of loss of principal and investment gains over the life of the Fund (the Investment Period) and to become generally more conservative (that is, less exposed to equity markets) as the Fund's Protected Maturity Date approaches.

184.  According to the prospectus for these funds:

> This reduction of investment risk exposure over time...is **frequently considered to be appropriate for prudent investors who are invested to provide for retirement...or other purposes that prescribe an investment time horizon.**

(Emphasis added)

185. According to the prospectus for these funds they are appropriate for investors with an investment horizon compatible with each fund's maturity date (August 15, 2015 or August 15, 2020).

186.   The prospectus for these funds state the following with respect to their equity/cash and fixed income allocations:

Table 1 below shows the targeted notional equity exposure ranges, expressed as a percent of net assets, for each of the Funds.  The Table includes an estimated range, as of the date of this Prospectus [March 1, 2011], of average notional equity exposures that the Funds might experience from the date of this Prospectus through their Protected Maturity Date on a time-weighted basis.

**Table 1**

|  | **Indicative Range of Targeted Average Notional Equity Exposures Over Time** |
|---|---|
| Fund |  |
| High Watermark 2015 Fund...........0-10% | |
| High Watermark 2020 Fund...........0-50% | |

187.   Thus, Defendant SunAmerica Asset Management Corp. has admitted that a prudent retirement investment strategy, with respect to a participant that is within approximately 4 years of retirement (March 11, 2011 to August 15, 2010) would allocate, at a maximum, 10% of their investments to equities and the remainder to cash/fixed income investments.  Similarly, with respect to a person that is within 9 years of retirement, a prudent investment strategy would allocate, at a maximum, 50% of the person's assets to equity investments and the remaining 50% to cash/fixed income

599049.2                                      -57-

investments.

188.   These Defendant-managed funds employ the same
investment strategy as would a prudently managed retirement plan.
A younger participant would have a greater portion of his or her
assets invested in equity investments (capital appreciation) over
cash/fixed income products and as the participant becomes older,
his or her allocation would shift such that he or she has a
greater portion of his or her assets invested in cash/fixed
income products (capital preservation) as opposed to equities.

189. Regardless of whether in 2008 FSC Securities
Corporation/Wharton had, for the Plan, an allocation of 80% of
its assets invested in equities and 20% invested in cash/fixed
income products or 62% of its assets invested in equities and 38%
invested in cash/fixed income products, either allocation was too
aggressive for the Plan's older participants.

190. Assuming the allocation of the Plan's investments for
2008 was, as the Defendants' claim, 62% invested in equities and
the remaining 38% in cash/fixed income products, that allocation
was imprudent/too risky for those employees over the age of 40 in
that it placed too much of their investments into equities.

191.   These older employees should have been provided with a
more conservative investment strategy than the one implemented by
the Defendants.

192.   Prior to 2008 FSC Securities Corporation/Wharton had

made numerous statements in memorandums it provided to the Inductotherm Defendants regarding the impending economic downturn as well as circulating articles about such downturn.

193.   This overly aggressive investment strategy caused the Plan's 2008 older participants to suffer significant losses.

194.   The 2008 return of approximately, a loss of 27.6%, was poorer than 97% of conservative allocation mutual funds.

195.   Despite the losses suffered in 2008, the recommendation to adjust the portfolio to a 50% equity to 50% cash and fixed income products allocation in March of 2009, the prudent investment strategy for saving for retirement as set forth in the SunAmerica 2015/2020 High Watermark Funds prospectus, the prior investment manager's more conservative investment allocation, by July of 2010 FSC Securities Corporation/Wharton had returned the Plan's portfolio allocation such that 75% of its assets were invested in equities and the remaining 25% of its assets were invested in cash/fixed income products. Additionally, in September of 2009 a new investment policy was executed which again provided that the Plan's assets would be invested as follows: 20% invested in cash/fixed income and 80% invested in domestic and foreign equities.

**H.   Failure To Adopt Different Investment Strategies That Account For Plaintiffs' Age Ranges**

196.   The Plan provides that each Plaintiff has an individual account under the Plan.

197.   The Inductotherm Defendants maintain these individual accounts to record each Plaintiff's/participant's share of Inductotherm's annual contributions to their account. Inductotherm's annual contributions to each Plaintiff's account is based on a percentage of the Plaintiff's annual salary.

198.   According to the Plan, the term "Investment Fund" means "the total assets held under the Plan for the purpose of providing benefits to Participants, resulting from contributions made under the Plan and earnings or losses thereon."

199.   While each Plaintiff has an individual account under the Plan, the investments attributable to each Plaintiff's account do not vary based on their age.   Rather, each Plaintiff receives a fractional interest in the aggregate Investment Fund. Thus, each Plaintiff's account is credited with its share of the gains and losses of the Investment Fund.

200.   As a result of the use of this uniform investment strategy for each account, each account holds the same investments, regardless of the individual Plaintiff's age.

201.   Unlike a defined benefit plan, the Plan is a defined contribution Plan and thus the amount of the Plaintiffs' benefits are not guaranteed, the benefits are based on the performance of the investments in their account.

202.   Older participants/Plaintiffs required different investments than those participants/Plaintiffs that are/were

younger.

203.  Older participants/Plaintiffs required more conservative investments than the investments of the younger participants/Plaintiffs, who required more aggressive investments.

204.  A fiduciary, acting prudently, would have considered the ages of the Plaintiffs in determining the investments for each Plaintiff's account and would not have adopted a uniform investment strategy for all participants/Plaintiffs, regardless of their age.

205. Rather, a fiduciary, acting prudently would have divided the Plan's participants into different categories, based on their ages, and would have adopted a different investment strategy for each category of ages.

206.  Even if the Plaintiffs did not have individual accounts under the Plan, which they do, a fiduciary, acting prudently, would have still segregated the Plan's investments such that Plaintiffs of different ages received different investments.

207.  The materials provided by FSC Securities Corporation/Wharton, in advance of assuming the role of managing the Plan's investments, did not suggest, imply or discuss, segregating the Plan's investments based on the Plaintiffs' age ranges.

208.  The Trustee's Minutes did not suggest, imply or

discuss, that Plaintiffs of different ages needed different investments, and nor was this topic discussed in the emails exchanged between the Inductotherm Defendants and FSC Securities Corporation/Wharton.

209. By failing to adopt different investment strategies based on the ages of the Plaintiffs, and instead implementing one uniform investment strategy for all Plaintiffs, the Defendants breached their fiduciary duties to Plaintiffs by causing the accounts under the Plan to suffer losses.

**I.    Inductotherm Defendants Failure To Investigate FSC Securities Corporation/Wharton's Ability To Manage A Large 401(k) Plan/Failure To Monitor FSC Securities Corporation/Wharton After Their Retention**

210. On August 20, 2009 (after the significant 2008 losses) Trustee Defendant Laurence Krupnick sent the following email to Marc Hembrough of FSC Securities Corporation/Wharton:

> Marc:
>
> As a separate email you have executed the revised Investment Policy Statement and I am sure you will send it back to me fully in due course.
>
> What I would like to address now, and annually thereafter, is information from Wharton Group as the service provider to our plan, along the following lines:
>
> 1.   Information about the firm itself, what are its activities in this field, what number of clients, and of what size are they servicing.
>
> 2.   Information on personnel, including the qualification of professionals, and a description of the support organization.
>
> 3.   Any litigation action against the firm or its members.
>
> 4.   A copy of any agreements that may exist that effect the Profit Sharing Plan assets, specifically the custodial

agreement presently in place including all insurance contracts and agreements retained thereto.

Additionally, while you are considering the foregoing, you are going to install a new reporting package and I believe that was mentioned a couple of meetings ago, so that some of the issues that had been raised by the Trustees would be addressed.  Please advise where that stands.

If I have left anything out please feel free to enlarge the scope of the foregoing.

211.  Mr. Hembrough did not respond to the inquiry contained in the August 20, 2009 email.

212. Trustee Defendant Laurence Krupnick sent a follow up email on October 1, 2009, which read:

Gentlemen:

Pursuant to the attached email of August 20, 2009 [see above], you have given me a verbal acknowledgment of your general plans to address these issues numbered 1-4 etc., and I understand that you are not prepared to conclusively do so at this time because you are transitioning into improved situations. However, I would appreciate you providing me with a written report indicating how you will address the issues, and the time frame we can expect a conclusive response so that we can track this matter.

Thank you in advance for your cooperation.

213.  On October 1, 2009, Mr. Webster responded with an email which stated, among other things, the following:

We are in the process of registering with the SEC as a registered investment advisory (RIA) firm.  You will receive our form ADV when this process is complete and that form will address some of the questions you pose related to personnel, size # of clients, etc.  To date, as you know, we have acted as RIA representatives of our broker/dealer, FSC Securities.

I can address that neither Marc nor I have ever had a customer complaint filed against us with any regulatory agency.  Further there is no litigation or enforcement actions against us individually or as a firm.

214.  On March 14, 2005, in the case of <u>Vaughn v. Bay</u>

Envtl., Inc., Case No. C03-5725, Northern District of California, a First Amended Complaint was filed naming FSC Securities Corporation as a Defendant for mismanaging the assets of, among other plans, a profit sharing 401(k) plan.  The Plan at issue in this case is a profit sharing 401(k) plan.

215.  In Vaughn, Plaintiffs claimed that the Defendants investment strategy was imprudent because it invested 80% of the plan's assets in equities and 20% in cash and fixed income and failed to take into account the age of the plan's participants. In that case Plaintiffs also alleged that the Defendants breached their fiduciary duties by retaining FSC Securities Corporation to manage the plan's assets.  In the instant litigation, FSC Securities Corporation invested 80% of the Plan's assets in equities and 20% in bonds and cash.

216.  On January 14, 2011, the plaintiffs in Vaughn filed their unopposed motion for final approval of class settlement.

217.  On January 18, 2010 (after the initiation of this litigation), Trustee Defendant Laurence Krupnick sent the following follow-up email to B.J. Webster of FSC Securities Corporation/Wharton regarding its qualifications:

> BJ:
>
> Attached is an email I sent to Marc Hembrough [referring to the above August 20, 2009 email] at Wharton Business Group on August 20, 2009.
>
> What I have indicated is that I would like to receive a written report to chronicle the Trust due diligence in this area.  I believe you said you would be working on it right away.  I look forward to hearing back from you.

Attached is the email I sent to Mark [above August 20, 2000 email.]

218.   None of the documents provided by FSC Securities Corporation/Wharton to the Inductotherm Defendants, prior to their retention discussed FSC Securities Corporation/Wharton's experience or qualifications to manage the assets of a profit sharing 401(k) plan. Rather, FSC Securities Corporation/Wharton emphasized that "the fact that we meet with you [Trustee Defendant Mr. Rowan] and your family could be a huge benefit to the plan."

219.   None of the Trustee's minutes, prior to the retention of FSC Securities Corporation/Wharton, discuss the experience or qualifications of FSC Securities Corporation/Wharton to manage a plan similar to the Plan.  Furthermore, the first time the names of Wharton and Messrs. Hembrough and Webster appear in the Trustee's Minutes are on December 12, 2005, which is the same day the Inductotherm Defendants executed the FSC Securities Corporation Vision2020 Investment Advisory Agreement.

220.   None of the emails sent by the Inductotherm Defendants to FSC Securities Corporation/Wharton, prior to August 20, 2009, contained any inquiries regarding FSC Securities Corporation/Wharton's experience and qualifications to manage the Plan.

221.   Had the Inductotherm Defendants made the necessary inquires at any time in advance of retaining FSC Securities Corporation/Wharton, they would have learned that with respect to

FSC Securities Corporation, that managing retirement Plan's accounted for less than 10% of its business.

222.   They would have also learned that FSC Securities Corporation, in March of 2005 (prior to the Inductotherm Defendants December of 2005 retention of FSC Securities Corporation/Wharton) was named as a defendant in a case involving allegations of imprudent investment management of the assets of a profit sharing 401(k) plan, for implementing the same investment strategy (placing 80% of the plan's assets in equities and 20% in cash/fixed income products) that FSC Securities Corporation/Wharton sought to, and did, implement with respect to the Plan.

223.   With respect to specifically Messrs. Webster and Hembrough, who the Defendants allege were the FSC Securities Corporation employees that had primary responsibility for the Plan (through the branch office of Wharton, which has since removed its web page from the internet), had this inquiry been made prior to retaining FSC Securities Corporation/Wharton, on information and belief, the Inductotherm Defendants would have learned that they had either no, or very limited, experience in managing a profit sharing plan similar in size and characteristics of the Plan at issue in this litigation.

224.   The Inductotherm Defendants lack of investigation/monitoring into the activities of FSC Securities Corporation/Wharton continued after their retention.

225.   For example, in an email from B.J. Webster, in response to an inquiry from Trustee Defendant Thomas McShane, Mr. Webster stated:

> The mutual fund manager performance data was reviewed in 2006, 2007, but not in 2008.  Don't have an explanation for this, but we will include it in future reports, including next week's.

This email was sent on December 4, 2009 (i.e., after the commencement of this litigation).

226. As another example that the Inductotherm Defendants were not monitoring the activities of FSC Securities Corporation/Wharton, on Schedule H, Part II, Line 2(b)(5)(A) of the Plan's 2009 Form 5500 filing, the Inductotherm Defendants reported that in 2009 the Plan held a real estate asset that appreciated in value by $10,825,948.  During the 2009 Plan year the Plan held no real estate.  Had the Inductotherm Defendants been monitoring the investments of FSC Securities Corporation/Wharton, they would have known that FSC Securities Corporation/Wharton had not invested any of the Plan's assets in real estate.

227.   As another example that the Inductotherm Defendants were not monitoring the activities of FSC Securities Corporation/Wharton, FSC Securities Corporation/Wharton provided to the Inductotherm Defendants numerous documents which stated that they were investing the Plan's assets in the Vanguard Prime

Money Market Fund Institutional Share Class, with no mention of the SunAmerica Money Market Fund.  According to the Brokerage Account Statements, for the months of December 2005 through December of 2008, the Plan's assets were invested by FSC Securities Corporation/Wharton in the Vanguard Prime Money Market Fund Investor Share Class, as well as the SunAmerica Money Market Fund, but not the Vanguard Prime Money Market Fund Institutional Share Class.  Both of these funds charged higher fees than the Vanguard Prime Money Market Fund Institutional Class.  The Inductotherm Defendants failed to recognize/mandate the correction of this discrepancy.

228.  As another example that the Inductotherm Defendants were not monitoring the activities of FSC Securities Corporation/Wharton, the Trustee's Minutes produced for the period of December 12, 2005 through September 16, 2009 reflect that during that time period they held only four meetings.  Those meetings occurred on December 12, 2005, January 12, 2006, March 11, 2009 and September 16, 2009. There exists no minutes for any meetings occurring in 2008.  Therefore, while the Plan was suffering large losses, the Trustee Defendants were not meeting to discuss the performance/strategy of FSC Securities Corporation/Wharton.

229. As another example that the Inductotherm Defendants were not monitoring the activities of FSC Securities Corporation/Wharton, while the Trustees Minutes for the

meetings occurring on March 11, 2009 and September 16, 2009 briefly discussed the sale of certain investments made on behalf of the Plan, during the period between March of 2006 and February of 2009, FSC Securities/Wharton sold a large amount of the Plan's investments, and none of these sales transaction were discussed/documented in any of the Trustee's Minutes.

230. As another example, in an email, dated December 17, 2009, from Trustee Defendant Thomas McShane, he states "[c]ould you please re-send the email you sent me with the historical Inductotherm plan returns we then used for the Goldenberg comparison spreadsheet." This email suggests that the Inductotherm Defendants were unaware of, and failed to monitor, the returns on the Plan's investments.

231. Due to their lack of experience and qualifications to manage the investments of a retirement plan similar in size and characteristics to the Plan, FSC Securities Corporation/Wharton caused the Plan to suffer losses through implementing an imprudent investment strategy.

### J.  Damages to Plaintiffs/Plan

232. The combined actions of the Inductotherm Defendants, FSC Securities Corporation/Wharton, SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc., AIG, and any other AIG company that received fees or money from the Plan's assets, caused the Plan and the

participants to suffer substantial losses commencing sometime in 2005 and through to the present date.

## VI. CLASS ALLEGATIONS

233. Plaintiffs, Boris Goldenberg, Reinaldo Pacheco, and Andrew Loew bring this action as representative of a class consisting of those individuals who are or were participants and beneficiaries of the Plan, at any time on or after January 1, 2006 (the "Class"), and on behalf of the Plan.

234. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice or judicial officer presiding over this matter and the members of their judicial staff.

235. The proposed Class is so numerous that individual joinder of all of its members is impracticable.  The total number of Class members is at least 200 individuals.

236. There are questions of law and fact common to the Class, among them the following:

  a. Which of the Defendants were fiduciaries responsible for selecting, evaluating, and

monitoring the investments of the plan;

b.  Whether the Inductotherm Defendants failed to adopt a Trust Agreement, as required by the Plan;

c.  Whether FSC Securities Corporation/Wharton engaged in a "prohibited transaction" by investing Plan assets in the SunAmerica Money Market Fund;

d.  Whether FSC Securities Corporation/Wharton breached their fiduciary duty by investing Plan assets in the SunAmerica Money Market Fund;

e.  Whether FSC Securities Corporation/Wharton breached their fiduciary duty by not using the Vanguard Prime Money Market Fund Institutional Class as the Plan's money market investment option;

f.  Whether FSC Securities Corporation/Wharton breached their fiduciary duties by investing Plan assets in the Hussman Strategic Growth Fund;

g.  Whether FSC Securities Corporation/Wharton breached their fiduciary duties by investing Plan assets in the Dover Long/Short Sector Fund;

h.  Whether FSC Securities Corporation/Wharton breached their fiduciary duties by investing Plan assets in the Diamond Hill Long Short Fund;

i.   Whether FSC Securities Corporation/Wharton breached their fiduciary duties by employing an imprudent investment strategy;

j.   Whether the Inductotherm Defendants breached their fiduciary duties by employing/accepting an imprudent investment strategy;

k.   Whether the Inductotherm Defendants employed the requisite level of care, skill, prudence and diligence and/or violated their fiduciary duty in retaining FSC Securities Corporation/Wharton to manage and/or advice on the Plan's investments;

l.   Whether the Inductotherm Defendants failed to adequately monitor the performance of the Plan and the FSC Defendants;

m.   Whether Defendants caused the Plan to pay excessive and unreasonable fees to AIG subsidiaries and affiliates;

n.   Whether, AIG, it subsidiaries or affiliates are liable to disgorge fees collected from the Plan and profits thereon; and

o.   Whether the Plan and its participants suffered losses as a result of the Defendants fiduciary breaches.

237.   The claims and defenses of the representative parties are typical of the claims and defenses of the Class.   The representative parties have no interests that are antagonistic to the claims of the Class, and understand that this matter cannot be settled without the Court's approval.

238.   The representative parties will fairly and adequately protect the interests of the Class, and are committed to a vigorous prosecution of this case.

239.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants.

240.   The parties opposing the Class have acted on grounds generally applicable to the Class thereby making appropriate final injunctive relief or corresponding declaratory relief.

241.   The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

242.   The Defendants were obligated to treat all Class members similarly as Plan participants under written plan documents and ERISA, which impose uniform standards of conduct on

fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.

243.  Since the damages suffered by each Class member may be relatively small, the expense and burden of individual litigation makes it impractical for class members to separately seek redress.

244.  The Class suffered, and will continue to suffer, harm as a result of Defendants' conduct.

245.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.

246.  Even if individual Class members had the resources to pursue separate litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.

247.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.

248.  The Class action device allows a single Court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum.

249.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and

protects the rights of the class members. For many, if not most, class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.

250.  This Class may be certified under Rule 23(b).

A.  23(b)(1).  As an ERISA breach of fiduciary duties action and one alleging prohibited transactions, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (a) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants opposing the Class, or (b) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.  23(b)(2).  This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive, declaratory or other

appropriate equitable relief with respect to the Class.

C.   23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VII. ERISA CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duty by Failing to Abide by Plan Documents

### (Violation of ERISA §404(a), 29 U.S.C. §1104(a))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a).

3. Pursuant to ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan.

4.   The Plan refers to a "Trust Agreement."  The Plan provides that the investment of Inductotherm's and Plaintiffs' contributions under the Plan will be governed by the "Trust Agreement." The Plan provides that, to the extent permitted by the "Trust Agreement," the Committee Defendants and Inductotherm shall direct Plaintiffs' and Inductotherm's contributions to any accounts available under the "Trust Agreement."  The Plan provides that any losses, income or expenses to the Plaintiffs'

accounts are to be determined in accordance with the "Trust Agreement."  The Plan affords the Committee Defendants with the right to designate funding and investment policies under the Plan's "Trust Agreement."  The Plan states that, as provided in the "Trust Agreement," the Trustee Defendants shall have the sole responsibility for the administration of the "Trust Agreement" and the management of the assets held under the "Trust Agreement."

5.   The Plan provides that Inductotherm, the Board of Director Defendants, the Committee Defendants and the Trustee Defendants are responsible for the proper exercise of their duties, responsibilities and obligations under the "Trust Agreement."

6.   In response to Boris Goldenberg's August 2009 letter requesting a copy of the "Trust Agreement," Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants, in a letter from Thomas P. McShane, stated that a Trust Agreement does not exist.

7.   By failing to adopt a trust agreement, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants operated the Plan without any investment guidelines with respect to contributions.

8.   By failing to adopt a trust agreement the Board of Directors Defendants, the Committee Defendants, and the Trustee

Defendants failed to provide the Committee Defendants and Inductotherm with a methodology for directing contributions under the Plan to accounts available under a trust agreement.

9.   By failing to adopt a trust agreement, the Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants failed to adopt any guidelines to be followed by the Trustee Defendants in managing/investing the Plan's assets.

10.   By failing to adopt a trust agreement, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants were unable to know/allocate their duties, responsibilities and obligations under the "Trust Agreement."

11.   By failing to adopt a Trust Agreement, Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants breached their fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to act solely in the interest of participants to the Plan and by failing to discharge their duties in accordance with the documents and instruments governing the Plan.

12.   As a direct and proximate result of Inductotherm's, the Board of Directors Defendants', the Committee Defendants', and the Trustee Defendants' breaches of fiduciary duties, in failing to discharge their duties in accordance with Plan documents, inappropriate investment strategies and inappropriate

investments were undertaken with respect to the Plan's assets and excessive fees were charged that resulted in millions of dollars in losses to the Plaintiffs and the Plan.

13.   Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), Inductotherm, the Board of Directors Defendants, the Committee Defendants, and the Trustee Defendants are liable to Plaintiffs for all losses suffered by the Plan as a result of their failure to operate the Plan in accordance with the Plan's documents.

COUNT II

**Breach of Fiduciary Duty by Causing the Plan to Pay Excessive Fees to Charlotte Capital, LLC, which Caused Losses to the Plan**

(Violation of ERISA §404(a), 29 U.S.C. §1104(a))

THIS COUNT WAS DISMISSED BY THE COURT ON SEPTEMBER 17, 2010.

## COUNT III

**Engaging in Prohibited Transactions by Causing
the Plan to Invest in the SunAmerica Money Market Fund**

**(Violation of ERISA §§406(b)(1),(2) and(3) and 29 U.S.C.
§§1106(b)(1),(2) and(3))**

1.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.    Pursuant to ERISA §406(b), 29 U.S.C. §1106(b), fiduciaries are prohibited from engaging in certain self dealing transactions.

3.    On Schedule C of the Form 5500 for the Plan year commencing on January 1, 2006 and ending on December 31, 2006, Financial Service Corporation is the only service provider listed serving in the official plan position of "Investment Management."

4.    On Schedule C of the Form 5500 for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, Financial Service Corporation is the only service provider listed serving in the official plan position of "Investment Management."

5.    The Financial Service Corporation transacts all of its investment business through its 100% wholly owned subsidiary: FSC Securities Corporation.  Both the Financial Service Corporation and FSC Securities Corporation are wholly owned  subsidiaries of AIG.

6.   As set forth in detail above, the Inductotherm Defendants' identification of the Financial Service Corporation, on Plan filings with the IRS, was an error and such listing should have instead stated FSC Securities Corporation.

7.   As also set forth in detail above, Wharton is a branch office of FSC Securities Corporation, and Messrs. Hembrough, Gueriera, and Webster are employees of FSC Securities Corporation.   FSC Securities Corporation and Wharton are hereafter referred to as FSC Securities Corporation/Wharton.

8.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

9.   According to a document provided by FSC Securities Corporation/Wharton, to the Inductotherm Defendants, the Plan's previous service provider used the Vanguard Prime Money Market Fund as the Plan's sole money market investment.

10.   According to the Plan's financial statement for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, as of December 31, 2006, approximately $8,262,500 million of Plan assets was invested in the Vanguard Prime Money Market Fund.

11.   Sometime after December 31, 2006, a financial statement of the Plan that the Inductotherm Defendants filed with the IRS, reflects that FSC Securities Corporation/Wharton liquidated that

$8,262,500 investment and, as reflected on the Plan's financial statement for the 2007 Plan year, invested $8,412,993 of Plan assets into the SunAmerica Money Market Fund.

12.  FSC Securities Corporation/Wharton, through their counsel, have claimed, that they did not actually liquidate the Plan's investment in the Vanguard Prime Money Market Fund in favor of the SunAmerica Money Market Fund, but rather, from the period of December of 2005 through December of 2008 invested Plan assets in both the Vanguard Prime Money Market Fund and the SunAmerica Money Market Fund.  In support of this argument, FSC Securities Corporation/Wharton filed, with their December 21, 2009 motion to dismiss, copies of the Plan's Brokerage Account Statements for the period December 2005 through December 2008. These statements reflect that for each month within this time period, FSC Securities Corporation/Wharton was investing Plan assets in both the SunAmerica Money Market Fund and the Vanguard Prime Money Market Fund Investor Class. However in each month the investments in the SunAmerica Money Market Fund were significant.

13.  The following wholly owned AIG subsidiaries received, and continues to receive, fees on account of FSC Securities Corporation/Wharton's investment of Plan assets into the SunAmerica Money Market Fund:  SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc.

14. Since SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc and SunAmerica Fund Services, Inc. are AIG subsidiaries and AIG receives payments from such subsidiaries, AIG is enriched by the fees received from such subsidiaries.

15. By investing Plan assets in the SunAmerica Money Market Fund, which resulted in the payment of fees to multiple wholly owned AIG subsidiaries and payment to AIG, FSC Securities Corporation/Wharton committed a prohibited transaction in violation of ERISA §§406(b)(1),(2) and (3), 29 U.S.C. §§1106(b)(1),(2) and (3).

16. The actions of FSC Securities Corporation/Wharton have been classified as prohibited transactions by the DOL in DOL Adv. Op. 2003-09A.

17. DOL regulation, 29 C.F.R. 2550.408b-2(e)(1), classifies actions, such as those committed by FSC Securities Corporation/Wharton, as a prohibited transaction under §§406(b), 29 U.S.C. 1106(b).

18. As a direct and proximate result of this prohibited transaction, the Plan paid, and continues to pay, fees that are prohibited by ERISA and suffered and suffers monetary losses.

19. Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton are liable to Plaintiffs for all losses on account of the prohibited transactions.

COUNT IV

**Engaging in Prohibited Transactions by Causing the Plan to Invest in the SunAmerica Money Market Fund**

**(Violation of ERISA §406(a)(1)(A),(C) and (D) and 29 U.S.C. §§1106(a)(A),(C) and (D))**

THIS COUNT WAS DISMISSED BY THE COURT ON SEPTEMBER 17, 2010.

### COUNT V

### Breach of Fiduciary Duty by Causing the Plan to Invest in the SunAmerica Money Market Fund

### (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.  According to a document provided by FSC Securities Corporation/Wharton to the Inductotherm Defendants, the Plan's previous service provider used the Vanguard Prime Money Market Fund as the Plan's sole money market investment.   The Vanguard Prime Money Market Fund has two different share classes, Investor and Institutional.

4.   According to the Plan's financial statement that the Inductotherm Defendants filed with the IRS, for the Plan year commencing on January 1, 2007 and ending on December 31, 2007, as of December 31, 2006, approximately $8,262,500 million of Plan assets was invested in the Vanguard Prime Money Market Fund.

5.   Sometime after December 31, 2006, a financial statement of the Plan that the Inductotherm Defendants filed with the IRS, reflects that FSC Securities Corporation/Wharton liquidated that $8,262,500 investment, and as reflected on the Plan's financial

statement for the 2007 Plan year, invested $8,412,993 of Plan assets into the SunAmerica Money Market Fund.

6. FSC Securities Corporation/Wharton, through their counsel, have claimed, that they did not actually liquidate Plan's investment in the Vanguard Prime Money Market Fund in favor of the SunAmerica Money Market Fund, but rather, from the period of December of 2005 through December of 2008 invested Plan assets in both the Vanguard Prime Money Market Fund Investor Class (VMMXX) and the SunAmerica Money Market Fund. In support of this argument, FSC Securities Corporation/Wharton filed, with their December 21, 2009 motion to dismiss, copies of the Plan's December of 2005 through December of 2008 Brokerage Account Statements. These statements reflect that for each month within this time period, FSC Securities Corporation/Wharton was investing Plan assets in both the SunAmerica Money Market Fund and the Vanguard Prime Money Market Fund Investor Class (VMMXX). However in each month the investments in the SunAmerica Money Market Fund were significant.

7. The returns on investments in the Vanguard Prime Money Market Fund Investor Class for 2006, 2007 and 2008 were 4.88%, 5.14% and 2.77%, respectively. The returns on investments in the Vanguard Prime Money Market Fund Institutional Class for 2006, 2007 and 2008 were 5.08%, 5.30% and 2.93%, respectively.

8. The SunAmerica Money Market Fund has four share

classes.  Those classes are labeled A, B, C and I. Plaintiffs have only been able to locate, in the public filings, this fund prior years' returns for classes A and I.  According to the fund's Quarterly Report the returns on investments in class A for 2006, 2007 and 2008 were, 4.22%, 4.32% and 1.84%, respectively. According to the fund's Quarterly Report, the returns on investments in class I of the SunAmerica Money Market Fund for 2006, 2007 and 2008 were 4.31%, 4.43%, and 1.98%, respectively. The SunAmerica Money Market Fund prospectus and Quarterly Report do not disclose the returns on the class B and C shares; however, as the fees on those shares are 178 bps and 172 bps, respectively, while the fee charged by the Vanguard Prime Money Market Fund Investor Class is only 28 bps, the returns for the class B and C shares were likely also lower than the returns posted by the Vanguard Prime Money Market Fund. At this time it is unclear as to which share class of the SunAmerica Money Market Fund FSC Securities Corporation/Wharton invested the Plan's assets.

9.   Prior to, and during the Plan's investment in the SunAmerica Money Market Fund, the SunAmerica Money Market Fund underperformed the Vanguard Prime Money Market Fund.

10.   The SunAmerica Money Market Fund charges fees that are, at a minimum, approximately three times, and at a maximum approximately six times, greater, than the fees charged by the

Vanguard Prime Money Market Fund Investor Class.

11.  Information regarding the SunAmerica Money Market Fund's and the Vanguard Prime Money Market Fund's performance and fees was, and continues to be, publicly available and could have been discovered by FSC Securities Corporation/Wharton through a minimal investigation.

12.  SunAmerica Asset Management Corp. is responsible for the continuous supervision of the SunAmerica Money Market Fund. The SunAmerica Money Market Fund, Inc. (A) is provided office space by SunAmerica Asset Management Corp., (B) has certain of its corporate books maintained by SunAmerica Asset Management Corp., (C) has all of its employees' salaries and expenses paid by SunAmerica Asset Management Corp., (D) is staffed by some, if not all, employees of SunAmerica Asset Management Corp. or its affiliates, (E) lists with the SEC as its principal office the address that the SunAmerica Asset Management Corp. lists with the SEC as its principal office address.

13.  SunAmerica Asset Management Corp.'s Senior Vice President, John T. Genoy, is listed with the SEC as the agent for service for the SunAmerica Money Market Funds, Inc.  The President and CEO of SunAmerica Asset Management Corp., Peter A. Harbeck, signed the shareholder letter that is contained in the SunAmerica Money Market Funds, Inc. June 2009 semi-annual report.

14.  According to SunAmerica Asset Management Corp.'s ADV,

which is publically available and easily accessible from the SEC's electronic homepage, SunAmerica Asset Management Corp. and/or its affiliates have committed multiple violations of the law, including the commission of a felony.

15. By investing any amount of Plan assets in the SunAmerica Money Market Fund, a fund that (A) prior to such investment underperformed the Vanguard Prime Money Market Fund (B) charged excessive fees, and (C) was closely affiliated with SunAmerica Asset Management Corp., an entity and/or its advisory affiliates, that committed multiple violations of the law, FSC Securities Corporation/Wharton breached their fiduciary duty pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised.

16. As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs suffered losses due to (A) excessive fees and (B) inferior returns.

17. Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## COUNT VI

### Breach of Fiduciary Duty of Loyalty and Prudence by Causing the Plan to Invest in the SunAmerica Money Market Fund

### (Violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.   FSC Securities Corporation/Wharton by their actions and omissions in authorizing and causing the Plan to invest in the SunAmerica Money Market Fund and to pay fees to AIG wholly owned subsidiaries, put their and AIG's financial interests ahead of the Plan's and the Plaintiffs interest and breached their duty of loyalty and prudence pursuant to § 404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A).

4.   As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs, suffered losses on account of excessive fees and inferior returns.

5.   Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## COUNT VII

**Breach of Fiduciary Duty by Failing Abide by Plan Documents By Investing in the Hussman Strategic Growth Fund**

**(Violation of ERISA §404(a), 29 U.S.C. §1104(a))**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.   Pursuant to ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan.

4.   The Hussman Strategic Growth Fund buys call options on individual stocks and writes put options on stocks which the fund seeks to own.

5.   The Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy, dated December 12, 2005, prohibits investment in funds such as the Hussman Strategic Growth Fund.  The investment policy provides that, except for hedging, no options shall be purchased and that there shall be no purchase of securities on margin and no short sales.  The policy

also listed the specific asset categories that the Plan's funds may be invested in.  The policy does not authorize investments in "long short funds."

6.  By investing in the Hussman Strategic Growth Fund, a fund which was prohibited, due to its characteristics, by the investment policy, FSC Securities Corporation/Wharton breached their fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to discharge their duties in accordance with the documents and instruments governing the Plan.

7.  As a direct and proximate result of FSC Securities Corporation/Wharton's breaches of fiduciary duties, in failing to discharge their duties in accordance with Plan documents, inappropriate investments were undertaken that resulted in inferior returns and therefore losses to the Plan.

8.  Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton are liable to Plaintiffs for all losses suffered by the Plan as a result of their failure to operate the Plan in accordance with the Plan's documents.

COUNT VIII

**Breach of Fiduciary Duty by Causing the Plan to Invest in the Hussman Strategic Growth Fund**

**(Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))**


This Count was dismissed by the Court on September 17, 2010.

## COUNT IX

### Breach of Fiduciary Duty For Following an Imprudent Investment Strategy

### (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.    At all relevant times, FSC Securities Corporation/Wharton as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.  Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting an investment strategy of a plan.

4.    The investment policy executed with FSC Securities Corporation/Wharton provided for a portfolio allocation of the Plan's assets equal to 80% in equities and 20% in fixed income. FSC Securities Corporation/Wharton has claimed that in 2008 it altered the Plan's portfolio allocation such that for that 12 month period, the average equity to cash fixed income allocation was equal to 62% of the Plan's assets were invested in equities and 38% were invested in cash/fixed income products.

5.    For all Plan years commencing on January 1, 2005 through

529471.1                          -96-

January 1, 2010 (i.e., including the 2008 Plan year), the Plan had a significant number of older employees with large account balances.

6.   Thus, prior to January 1, 2008 the Defendants knew, or should have known, that the Plan had a significant number of older participants.

7.   A hand written note drafted by FSC Securities Corporation/Wharton in July of 2009 stated "Age 55 Liquidity", "Updated Target to Dave." Well before July of 2009, the Plan had a significant number of participants that were over the age of 55.

8.   According to the SEC that "most people investing for retirement hold less stock and more bonds and cash equivalents as they get closer to retirement age."

9.   Defendant SunAmerica Asset Management Corp. promotes as a prudent retirement investment strategy/allocation, for persons within 4 years of retirement, an equity/fixed income asset allocation equal to 10% of their assets invested in equities and the remaining 90% invested in cash/fixed income products. With respect to persons within 9 years of retirement, Defendant SunAmerica Asset Management Corp. advocates a portfolio allocation such that 50% of the person's assets are invested in equities and the remaining 50% are invested in cash/fixed income products.

10.   The March of 2009 (i.e., after the 2008 losses) Trustee's Minutes state the following:

> After reviewing performance of the investments in the stock market, Wharton Business Group recommended moving the portfolio to 50% in equities and 50% in cash, bonds and fixed income.

11.   In April of 2009 (i.e., after the 2008 losses) FSC Securities Group/Wharton invested 50% of the Plan's assets in equities and 50% in cash, bonds and fixed income. In March of 2009(i.e., after the 2008 losses) FSC Securities Corporation/Wharton invested 51% of the Plan's assets in equities and the remaining 49% were invested in cash/fixed income products.

12.   According to the Trustee's Minutes, the Plan's prior investment manager, as of September of 2002, had invested 52.4% of the Plan's assets in fixed income investments and 45.8% of the Plan's assets in equities.

13.   The investment strategy undertaken by FSC Securities Corporation/Wharton assumed risk in excess of what was prudent, and did not take into account the age and account balances of the Plan's participants.

14.   FSC Securities Corporation/Wharton breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in investing the Plan's assets.

529471.1                          -98-

15.   As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs, suffered damages and losses.

16.   Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

Count X

**Breach of Fiduciary Duty by Misrepresenting to Plaintiffs "Conservativeness" of the Plan's Investment Strategy and the Plan's True Investment Manager**

**(Violation of ERISA §404(a), 29 U.S.C. §1104(a))**

This Count was dismissed by the Court on September 17, 2010.

## COUNT XI

**SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG Violated ERISA by Knowingly Participating in Breaches of Fiduciary Duty and Prohibited Transactions**

**(Violation of ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3))**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

2.   At all relevant times SunAmerica Asset Management Corp.; SunAmerica Capital Services, Inc.; Sunamerica Fund Services, Inc.; and FSC Securities Corporation (Wharton is a branch office of FSC Securities Corporation) were all wholly owned subsidiaries of AIG.

3.   At all relevant times, AIG was a holding company that received dividends, distributions and other payments from its subsidiaries, and therefore was enriched by any payments received by SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and Sunamerica Fund Services, Inc.

4.   SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc., and AIG by participating in and/or abetting FSC Securities Corporation/Wharton's investments of Plan assets in the SunAmerica Money Market Fund, which constituted breaches of fiduciary duties and prohibited transactions, received impermissible fees/payments on account of such investments.

5.   As a direct and proximate result of SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc. and AIG improper receipt of fees/payments, the Plaintiffs suffered losses.

6.   Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., Sunamerica Fund Services, Inc. and AIG are liable to disgorge all fees/payments received from the Plan and any earnings thereon.

COUNT XII

**Breach of Fiduciary Duty For Not Selecting the Plan's Investment Manager, With the Required Care, Skill, Prudence and Diligence**

**(Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))**

This Count was dismissed by the Court on September 17, 2010.

COUNT XIII

**Breach of Fiduciary Duty For Not Selecting the Plan's Investment Manager, With the Required Care, Skill, Prudence and Diligence (Violation of ERISA §404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B))**

This Count was dismissed by the Court on September 17, 2010.

COUNT XIV

**Breach of Co-Fiduciary Duty By Knowingly Participating and/or Concealing the Financial Service Corporation's, FSC Securities Corporation's and the Wharton Business Group's Breaches of Fiduciary Duties and Prohibited Transaction**

(Violation of ERISA §405, 29 U.S.C. §1105)


This Count was dismissed by the Court on September 17, 2010.

COUNT XV

**Failure to Allocate Responsibilities for the Operation and Administration of the Plan**

**(Violation of ERISA §402(b)(2), 29 U.S.C. §1102(b)(2))**

**This Count was voluntarily dismissed by the Plaintiffs on March 10, 2010.**

## COUNT XVI

**General Award of Equitable Relief Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3)**

**This Count was dismissed by the Court on September 17, 2010.**

# VIII.  COMMON LAW COUNTS

## COUNT XVII

### Fraudulent Concealment Against All Defendants'

**This Count was voluntarily dismissed by the Plaintiffs on March 10, 2010**

## COUNT XVIII

**Fraudulent Concealment Against Defendant Wharton Business Group**

**This Count was voluntarily dismissed by the Plaintiffs on March 10, 2010**

IX.  SECURITIES LAWS CLAIMS FOR RELIEF
COUNT XIX

**Violations of the 1933 Act Against Defendant SunAmerica Capital Services, Inc. For Fraud In the Sale of a Security (15 U.S.C. § 77$l$(a)(2))**

The Court dismissed this Count on September 17, 2010.

COUNT XX

**Violations of Rule 10b-5 of the Securities Exchange Act of 1934, Against Defendant Wharton Business Group**

The Court dismissed this Count on September 17, 2010.

## COUNT XXI

**Fraud Under the New Jersey Uniform Securities Laws (Violation of <u>N.J.S.A.</u> 49.3-49(e) Against the Wharton Business Group)**

The Court dismissed this Count on September 17, 2010.

## RICO CLAIMS FOR RELIEF

### COUNT XXII

### VIOLATIONS OF RICO §§1962(c) AND 1962(d)

This Count voluntarily dismissed by the Plaintiffs, without prejudice, on March 10, 2010.

## COUNT XXIII

**Breach of Fiduciary Duty for Failing to Invest the Plan's Assets That Were Designated for a Money Market Fund In the Vanguard Prime Money Market Fund Institutional Class**

**(Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.   The returns on investments in the Vanguard Prime Money Market Fund Institutional Class for 2006, 2007 and 2008 were 5.08%, 5.30% and 2.93%, respectively.

4.   The returns on investments in the Vanguard Prime Money Market Fund Investor Class for 2006, 2007 and 2008 were 4.88%, 5.14% and 2.77%, respectively. The Investor Class charges annual fees equal to 28bps, while the Institutional Class charges annual fees equal to 13bps (these fees are based on information contained in a December 29, 2008 SEC filing for these funds; however, throughout the period of December of 2005 through the present, there has always been a fee differential between the Investor Class and the Institutional Class, with the Investor Class always charging higher fees).

5.   The SunAmerica Money Market Fund has four classes. Those classes are identified as A, B, C and I. Plaintiffs have only been able to locate in the public filings for this fund prior years' returns for classes A and I.  According to the fund's Quarterly Report, the returns on investments in class A of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.22%, 4.32%, 1.84%, respectively.  According to the fund's Quarterly Report, the returns on investments in class I of the SunAmerica Money Market Fund for 2006, 2007, 2008 were 4.31%, 4.43%, 1.98%, respectively. The SunAmerica Money Market Fund prospectus or Quarterly Report does not disclose the returns on the class B and C shares; however, on information and belief, these returns were inferior to either share class of the Vanguard Prime Money Market Fund.  At this time Plaintiffs are unable to identify which share class of the SunAmerica Money Market Fund FSC Securities Corporation/Wharton invested the Plan's assets.

6.   The annual fees charged by the Vanguard Prime Money Market Fund Institutional Class were 13bps, whereas (depending on which share class of the SunAmerica Money Market Fund, in which FSC Securities Corporation/Wharton invested) the fee charged by the SunAmerica Money Market Fund, were, at a minimum 80 bps, and at a maximum of 178 bps.

7. According to a document provided by FSC Securities Corporation/Wharton, to the Inductotherm Defendants, the Plan's

529548.1                          -115-

previous service provider used the Vanguard Prime Money Market Fund as the Plan's sole money market investment.

8.   Both of the November 21, 2005 portfolio models that FSC Securities Corporation/Wharton provided to the Inductotherm Defendants, in an attempt to solicit the Plan's business, reflected that FSC Securities Corporation/Wharton proposed to use as the Plan's money market fund the "Vanguard Money Market Prime Instl."

9.   The SunAmerica Money Market Fund was not included in the list of mutual funds that were contained in either of the portfolio models that FSC Securities Corporation/Wharton provided to the Inductotherm Defendants on November 21, 2005.

10.   A document that was provided by FSC Securities Corporation/Wharton to certain Inductotherm Defendants in December of 2007, that listed the Plan's "12/31/07 Total Portfolio..." stated that the Plan was invested in the "Vanguard MM [Money Market] Prime Inst" and that such investment generated a 4% return for the Plan.   However, the December of 2007 Brokerage Account Statements reflect that the Plan was not actually invested in the Institutional Class of this mutual fund, but rather in the higher fee "Investor Class" with the ticker of "VMMXX," which performed worse than the Institutional Class. Furthermore, the "12/31/07 Total Portfolio..." document that FSC Securities Corporation provided to the Inductotherm Defendants in

December of 2007 did not list the SunAmerica Money Market Fund as one of the Plan's investments.  However, the 2007 Brokerage Account Statement (which is separate from the above document) reflected that FSC Securities Corporation/Wharton, as of "12/31/07", had invested $8,373,917.53 of Plan assets in the SunAmerica Money Market Fund.  The above described inconsistency recurs between a monthly document provided by FSC Securities Corporation/Wharton to certain Inductotherm Defendants (which reflected that the Plan's sole money market fund is the Vanguard Prime Money Market Fund Institutional Class) and the corresponding monthly Brokerage Account Statement (with the Brokerage Account Statement reflecting a large investment in the SunAmerica Money Market Fund and that the Plan was also invested in the Investor Class, not the Institutional Class of the Vanguard Prime Money Market Fund.

11. The SunAmerica Money Market Fund charged higher fees and produced inferior returns as compared to the Vanguard Prime Money Market Fund Investor Class.  The Vanguard Prime Money Market Fund Investor Class charged higher fees and produced inferior returns as compared to the Vanguard Prime Money Market Fund Institutional Class.

12.  Had FSC Securities Corporation/Wharton, as it repeatedly represented to the Inductotherm Defendants, invested the Plan's assets that were designated for investment in a money

market fund in the Vanguard Prime Money Market Fund Institutional Class, the Plan would have been charged lower fees and received superior returns on its money market fund investments.

13.   FSC Securities Corporation/Wharton's failure to invest the Plan's assets, that were designated to be invested in a money market fund, in the Vanguard Prime Money Market Fund Institutional Class, as it represented it would do, constituted a breach of its fiduciary duty pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), because in doing so it failed to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised.

14.   As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs suffered losses due to the (A) excessive fees and (B) inferior returns.

15.   Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## COUNT XXIV

**Breach of Fiduciary Duty by Failing to Abide by Plan Documents By
Investing in the Diamond Hill Long Short Fund**

**(Violation of ERISA §404(a), 29 U.S.C. §1104(a))**

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as a fiduciary to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3. Pursuant to ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan.

4.   The Diamond Hill Long Short Fund engages in short sales. At times these short sales are implemented through the options market, which further increases the risk of these strategies.

5.   The Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy, dated December 12, 2005, prohibits investment in funds such as the Diamond Hill Long Short Fund.  The investment policy provides that, except for hedging, no options shall be purchased and that there shall be no purchase of securities on margin and no short sales.  The policy also

listed the specific asset categories that the Plan's funds may be invested in.  The policy does not authorize investments in "long short funds."

6.  By investing in the Diamond Hill Long Short Fund, a fund which was prohibited, due to its characteristics, by the investment policy, FSC Securities Corporation/Wharton breached its fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to discharge its duties in accordance with the documents and instruments governing the Plan.

7.  As a direct and proximate result of FSC Securities Corporation/Wharton's breaches of fiduciary duties, in failing to discharge its duties in accordance with Plan documents, inappropriate investments were undertaken that resulted in inferior returns and therefore losses to the Plan.

8.  Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses suffered by the Plan as a result of their failure to operate the Plan in accordance with the Plan's documents.

## COUNT XXV

### Breach of Fiduciary Duty by Failing Abide by Plan Documents By Investing in the Dover/Long Short Sector Fund

### (Violation of ERISA §404(a), 29 U.S.C. §1104(a))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3. Pursuant to ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), fiduciaries must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with documents and instruments governing the plan.

4.   The Dover/Long Short Sector Fund engages in short sales. At times these short sales are implemented through the options market, which further increases the risk of these strategies.

5.   The Wharton Business Group Inductotherm Inc., Profit Sharing Plan Investment Policy, dated December 12, 2005, prohibits investment in funds such as the Diamond Hill Long Short Fund.  The investment policy provides that, except for hedging, no options shall be purchased and that there shall be no purchase of securities on margin and no short sales.  The policy also

listed the specific asset categories that the Plan's funds may be invested in.  The policy does not authorize investments in "long short funds."

6.  By investing in the Dover/Long Short Sector Fund, a fund which was prohibited, due to its characteristics, by the investment policy, FSC Securities Corporation/Wharton breached its fiduciary duties under ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D), by failing to discharge its duties in accordance with the documents and instruments governing the Plan.

7.  As a direct and proximate result of FSC Securities Corporation's and the Wharton Business Group's breaches of fiduciary duties, in failing to discharge their duties in accordance with Plan documents, inappropriate investments were undertaken that resulted in inferior returns and therefore losses to the Plan.

8.  Pursuant to §§409 and 502(a)(2) of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses suffered by the Plan as a result of their failure to operate the Plan in accordance with the Plan's documents.

## COUNT XXVI

### Breach of Fiduciary Duty For Failing To Investigate FSC Securities Corporation/Wharton Prior To Retaining It To Invest the Plan's Assets

#### (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, the Inductotherm Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21) and 1102(a)(1).

3. Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have in selecting a service provider to manage the investment of the Plan's assets.

4.   According to the DOL:

Hiring a service provider in and of itself is a fiduciary function. When considering prospective service providers, provide each of them with complete and identical information about the plan and what services you are looking for so that you can make a meaningful comparison.

Some items a fiduciary needs to consider when selecting a service provider include:

Information about the firm itself: financial condition and experience with retirement plans of similar size and complexity;

Information about the quality of the firm's services: the identity, experience, and qualifications of professionals who will be handling the plan's account; any recent litigation or enforcement action that has been taken against

the firm; and the firm's experience or performance record;

A description of business practices: how plan assets will be invested if the firm will manage plan investments or how participant investment directions will be handled; the proposed fee structure; and whether the firm has fiduciary liability insurance.

An employer should document its selection (and monitoring) process, and, when using an internal administrative committee, should educate committee members on their roles and responsibilities.

DOL Publication: Meeting Your Fiduciary Responsibilities

5.   The DOL has also stated that a fiduciary:

[M]ust engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of the services offered...

DOL Field Assistance Bulletin 2002-3 (November 5, 2002).

6.   In December of 2005 the Inductotherm Defendants retained FSC Securities Corporation/Wharton to manage the Plan's investments.

7.   On August 20, 2009, after the Plan had suffered significant losses, Trustee Defendant Laurence Krupnick sent the following email to Marc Hembrough of FSC Securities Corporation/Wharton:

Marc:

As a separate email you have executed the revised Investment Policy Statement and I am sure you will send it back to me fully in due course.

What I would like to address now, and annually thereafter, is information from Wharton Group as the service provider to our plan, along the following lines:

1.   Information about the firm itself, what are its activities in this field, what number of clients, and of what size are they servicing.

2.   Information on personnel, including the qualification of professionals, and a description of the support organization.

3.   Any litigation action against the firm or its members.

4.   A copy of any agreements that may exist that effect the Profit Sharing Plan assets, specifically the custodial agreement presently in place including all insurance contracts and agreements retained thereto.

Additionally, while you are considering the foregoing, you are going to install a new reporting package and I believe that was mentioned a couple of meetings ago, so that some of the issues that had been raised by the Trustees would be addressed.  Please advise where that stands.

If I have left anything out please feel free to enlarge the scope of the foregoing.

8.   None of the documents provided by FSC Securities Corporation/Wharton to the Inductotherm Defendants, prior to their retention, discussed FSC Securities Corporation/Wharton's experience or qualifications to manage the assets of a profit sharing 401(k) plan.

9.   None of the Trustee's minutes, prior to the retention of FSC Securities Corporation/Wharton, discussed the experience or qualifications of FSC Securities Corporation/Wharton to manage a plan similar to the Plan.  Furthermore, the first time the names of Wharton and Messrs. Hembrough and Webster appear in the Trustee's Minutes are on December 12, 2005, which is the same day the Inductotherm Defendants executed the FSC Securities Corporation Vision2020 Investment Advisory Agreement.

10.  Had the Inductotherm Defendants made the necessary investigation, at any time in advance of retaining FSC Securities Corporation/Wharton, they would have learned that FSC Securities

529548.1                           -125-

Corporation/Wharton lacked the experience and qualifications to manage a retirement plan like the Plan.

11.  As a consequence of their inexperience and lack of qualifications, FSC Securities Corporation/Wharton caused the Plan to suffer losses, when compared to the investment strategy that would have been implemented by a qualified investment manager acting prudently.

12.  The Inductotherm Defendants breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised.  A person/entity acting prudently would have conducted an investigation of FSC Securities Corporation/Wharton prior to their retention, and through such investigation would have determined that FSC Securities Corporation/Wharton lacked the necessary experience and qualifications to manage the investments of the Plan.

13.  As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs, suffered damages and losses.

14.  Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2),the Inductotherm Defendants are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

529548.1                          -126-

## COUNT XXVII

## Breach of Fiduciary Duty For Accepting/Following an Imprudent Investment Strategy

## (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2. At all relevant times, the Inductotherm Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21)(A) and 1102(a)(1).

3. Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting and implementing an investment strategy of a plan.

4. The investment policy the Inductotherm Defendants executed with FSC Securities Corporation/Wharton, in December of 2005, provided for a portfolio allocation of the Plan's assets equal to 80% in equities and 20% in fixed income.  FSC Securities Corporation/Wharton has claimed that in 2008 it altered the Plan's portfolio allocation such that for that 12 month period, the average equity to cash fixed income allocation was equal to 62% of the Plan's assets were invested in equities and 38% were invested in cash/fixed income products.

5. A hand written note drafted by FSC Securities

Corporation/Wharton in July of 2009 stated "Age 55 Liquidity", "Updated Target to Dave." At all relevant times, the Inductotherm Defendants knew, or should have known, that the Plan had a significant number of older participants with large account balances.

6. Despite the fact that the Plan had a significant number of older participants with large account balances, the Inductotherm Defendants accepted FSC Securities Corporation/Wharton's investment policy which provided for a portfolio allocation of the Plan's assets equal to 80% in equities and 20% in fixed income.

7. This portfolio allocation was too aggressive for the Plan's older participants due to the ages of those participants.

8. Acceptance of this portfolio allocation caused the Plan to suffer losses.

9. Even if FSC Securities Corporation/Wharton deviated from its own policy, such that in 2008 it reduced the equity allocation so that for that 12 month period the average amount of Plan assets invested in equities was 62% with the remaining assets were invested in cash/fixed income products, this portfolio allocation still resulted in losses to the Plan compared to the more conservative portfolio allocation that a fiduciary acting with the care, skill, prudence and diligence, and familiar with the Plan's needs, would have required.

10. The Inductotherm Defendants breached their fiduciary

duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting, accepting, monitoring and implementing an investment strategy for the Plan.

11. As a direct and proximate result of these breaches of fiduciary duty, the Plan, and indirectly the Plaintiffs, suffered damages and losses.

12. Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), the Inductotherm Defendants are liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## COUNT XXVIII

## Breach of Fiduciary Duty For Accepting/Following an Imprudent Investment Strategy

## (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.   At all relevant times, the Inductotherm Defendants acted as fiduciaries to the Plan pursuant to ERISA §§3(21) and 402(a)(1), 29 U.S.C. §§1002(21)(A) and 1102(a)(1).

3.   Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting and implementing an investment strategy of a plan.

4.   The Plan provides that each Plaintiff has an individual account under the Plan.

5.   The Inductotherm Defendants maintain these individual accounts to record each Plaintiff's/participant's share of Inductotherm's annual contributions to their account. Inductotherm's annual contributions to each Plaintiff's account are based on a percentage of the Plaintiff's annual salary.

6.   According to the Plan, the term "Investment Fund" means "the total assets held under the Plan for the purpose of providing benefits to Participants, resulting from contributions

made under the Plan and earnings or losses thereon."

7.   While each Plaintiff has an individual account under the Plan, the investments attributable to each Plaintiff's account do not vary, notwithstanding the differing ages of Plan Participants.   Rather, each Plaintiff receives a fractional interest in the Investment Fund.   Thus, each Plaintiff's account is credited with its share of the gains and losses of the aggregate Investment Fund.

8.   As a result of the use of this uniform investment strategy for each account, each account holds the same investments, regardless of the individual Plaintiff's age.

9.   Older participants/Plaintiffs required different investments than those participants/Plaintiffs that are/were younger.

10.   Older participants/Plaintiffs required more conservative investments, then the investments of the younger participants/Plaintiffs, who required more aggressive investments, as compared to the older Plaintiffs.

11.   A fiduciary, acting prudently, would have considered the ages of the Plaintiffs in determining the investments for each Plaintiff's account and would not have adopted a uniform investment strategy for all participants/Plaintiffs, regardless of their age.

12.   Rather, a fiduciary, acting prudently would have divided the Plan's participants into different categories, based

on their ages, and would have adopted a different investment strategy for each category of ages.

13. Even if the Plaintiffs did not have individual accounts under the Plan, which they did and do, a fiduciary, acting prudently, would have segregated the Plan's investments such that Plaintiffs of different ages had different investment portfolios.

14. Thus, the Inductotherm Defendants breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to adopt different investment strategies based on the ages of the Plaintiffs, and instead implementing one uniform investment strategy for all Plaintiffs.

15. As a direct and proximate result of these breaches of fiduciary duty, the Plan and the Plaintiffs, suffered damages and losses.

16. Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), the Inductotherm Defendants are liable to Plaintiffs for all losses on account of their breaches of fiduciary duty.

## COUNT XXIX

### Breach of Fiduciary Duty For Accepting/Following an Imprudent Investment Strategy

### (Violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B))

1.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

2.  At all relevant times, FSC Securities Corporation/Wharton acted as fiduciaries to the Plan pursuant to ERISA §3(21), 29 U.S.C. §1002(21).

3.  Pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), fiduciaries must exercise the level of care, skill, prudence and diligence that a prudent individual acting in like circumstances would have exercised in adopting and implementing an investment strategy of a plan.

4.  The Plan provides that each Plaintiff has an individual account under the Plan.

5.  The Inductotherm Defendants maintain these individual accounts to record each Plaintiff's/participant's share of Inductotherm's annual contributions to their account. Inductotherm's annual contributions to each Plaintiff's account are based on a percentage of the Plaintiff's annual salary.

6.  According to the Plan, the term "Investment Fund" means "the total assets held under the Plan for the purpose of providing benefits to Participants, resulting from contributions

made under the Plan and earnings or losses thereon."

7.   While each Plaintiff has an individual account under the Plan, based on FSC Securities Corporation/Wharton's investment strategy, the investments attributable to each Plaintiff's account do not vary, notwithstanding the differing ages of the Plan Participants.   Rather, each Plaintiff receives a fractional interest in the Investment Fund.   Thus, each Plaintiff's account is credited with its share of the gains and losses of the aggregate Investment Fund.

8.   As a result of the use of this uniform investment strategy for each account, each account holds the same investments, regardless of the individual Plaintiff's age.

9.   Older participants/Plaintiffs required different investments than those participants/Plaintiffs that are/were younger.

10.   Older participants/Plaintiffs required more conservative investments, then the investments of the younger participants/Plaintiffs, who required more aggressive investments, as compared to the older Plaintiffs.

11.   A fiduciary, acting prudently, would have considered the ages of the Plaintiffs in determining the investments for each Plaintiff's account and would have not have adopted/followed a uniform investment strategy for all participants/Plaintiffs, regardless of their age.

12.   Rather, a fiduciary, acting prudently would have

529548.1                                    -134-

advised the Inductotherm Defendants and implemented on behalf of the Plan, an investment strategy that accounts for the participant's of the Plan's different ages.  A fiduciary acting prudently would have accomplished this by allocating the Plan's participants into different categories, based on their ages, and then adopting/implementing different investment strategies for each category of ages.

13.  Even if the Plaintiffs did not have individual accounts under the Plan, which they did and do, a fiduciary, acting prudently, would have segregated the Plan's investments such that Plaintiffs of different ages had different investments.

14.  The materials provided by FSC Securities Corporation/Wharton, in advance of assuming the role of managing the Plan's investments, did not suggest, imply or discuss, segregating the Plan's investments based on the Plaintiffs' age ranges.

15.  After being retained by the Inductotherm Defendants on behalf of the Plan, the materials provided by FSC Securities Corporation/Wharton did not suggest, imply or discuss, that Plaintiffs of different ages needed different investments.  Nor was this topic discussed in the emails exchanged between the Inductotherm Defendants and FSC Securities Corporation/Wharton.

16.  FSC Securities Corporation/Wharton breached their fiduciary duties pursuant to ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B) by failing to recommend the adoption of, and

implement, different investment strategies based on the ages of the Plaintiffs, and instead implementing one uniform investment strategy for all Plaintiffs.

17.   As a direct and proximate result of these breaches of fiduciary duty, the Plan and the Plaintiffs, suffered damages and losses.

18.   Pursuant to §§409 and 502(a)(2), of ERISA, 29 U.S.C. §§1109 and 1132(a)(2), FSC Securities Corporation/Wharton is liable to Plaintiffs for all losses on account of their breach of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court:

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2) and 23(b)(3);

B.    Declare that the Inductotherm Defendants, FSC Securities Corporation and Wharton committed multiple breaches of their fiduciary duties pursuant to ERISA §§404(a), 29 U.S.C. §§1104(a), and order such Defendants, pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 and 1132(a)(2), to restore the losses suffered by the Plan and Class on account of their breaches;

C.    Declare that Defendant FSC Securities Corporation and Wharton engaged in transactions that violated ERISA §406(b), 29 U.S.C. §1106(b), which resulted in the charging of impermissible fees and order such Defendants, pursuant to ERISA §§409 and 502(a)(2), 29 U.S.C. §§1109 and 1132(a)(2), to restore to the Plan and the Class all fees that were charged on account of such transactions;

D.    Declare that Defendants SunAmerica Asset Management Corp., SunAmerica Capital Services, Inc., and SunAmerica Fund Services, Inc., and AIG by their actions knowingly participated in, and assisted breaches of fiduciary duties and prohibited transactions on the part of FSC Securities Corporation and Wharton and were enriched by such breaches and prohibited transactions and order such Defendants, pursuant to ERISA

529522.2

-137-

§502(a)(3) and (b), 29 U.S.C. §§1132(a)(3), to disgorge all monies received from the Plan and any earnings thereon and pay such monies to the Plan and Class;

E.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §§1132(a)(3), that FSC Securities Corporation, Wharton, AIG and any other wholly owned AIG subsidiary that received monies from the Plan disgorge all such monies, and any earnings thereon, and refund such monies to the Plan and the Class;

F.   Enjoin, pursuant to  ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the Inductotherm Defendants from contracting or investing, on behalf of the Plan, with AIG or any of its wholly owned subsidiaries;

G.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the permanent removal of the Board of Director Defendants, the Committee Defendants and the Trustee Defendants from any positions of trust with respect to the Plan;

H.   Order, pursuant to  ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the appointment of independent fiduciaries to administer the Plan;

I.   Order, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), rescission of the Plan's investments into the SunAmerica Money Market Fund, the Hussman Strategic Growth Fund, the Diamond Hill Long Short Fund and the Dover Long/Short Sector Fund, at a time deemed prudent by the newly appointed independent

fiduciaries, and any contracts that may have been entered into on behalf of the Plan with FSC Securities Corporation, Wharton, SunAmerica Asset Management Corp.,  SunAmerica Capital Services, Inc., SunAmerica Fund Services, Inc., SunAmerica Money Market Fund, Inc., AIG and any other wholly owned AIG subsidiary;

J.   Order, pursuant to ERISA 502(a)(3), 29 U.S.C. §1132(a)(3), that the newly appointed fiduciaries amend the Plan in such a manner that it provides for the specific allocation of responsibilities, among persons chosen by the new fiduciaries (none of such selected individuals shall be a Defendant), for the operation and administration of the Plan;

K.   Order, pursuant to ERISA 502(a)(3), 29 U.S.C. §1132(a)(3), that the newly appointed fiduciaries adopt a Trust Agreement that meets the requirements as listed in the Plan, including, but not limited to, setting forth guidelines for the investment of the contributions to the Plan;

L.   Order that each Defendant is jointly and severally liable to the Plan for violating the duties, responsibility and obligations imposed upon them as fiduciaries by ERISA;

M.   Order that Defendants jointly and severally pay to the Plan and the Class compensatory damages;

N.   Order Defendants to make equitable restitution and other appropriate equitable monetary relief as the Court deems just;

529522.2

O.   Order the Defendants to pay damages to the Plan and to Plaintiffs in an amount sufficient to restore them to the position they would have been in had the wrongs alleged herein not been committed; and

P.   That Plaintiffs be paid reasonable costs and attorneys fees, pursuant to ERISA §502(6)(g), 29 U.S.C. §1132(g).

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.

_____

Robert Lakind

Date:     April [], 2011