**DRINKER BIDDLE & REATH LLP**
A Delaware Limited Liability Partnership
105 College Road East, Suite 300
Princeton, New Jersey  08542-0627
Tel.:  (609) 716-6500
Fax:  (609) 799-7000
Attorneys for Defendants Indel, Inc.,
Inductotherm Industries, Inc., Inductotherm
Corporation, Henry M. Rowan,
John H. Mortimer, David L. Braddock,
Thomas P. McShane, Manning J. Smith,
Lawrence A. Krupnick, Harry G. Trefz,
Gary A. Doyon, Frank D. Manley,
Virginia Smith, Joseph T. Belsh,
Satyen N. Prahbu, and Bernard Raffner

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BORIS GOLDENBERG, et al., | : Civil Action No. 1:09-cv-05202-JBS-AMD |
|  | : |
| Plaintiffs, | : CIVIL ACTION |
|  | : |
| v. | : |
|  | : **MEMORANDUM OF LAW IN** |
|  | : **SUPPORT OF THE** |
| INDEL, INC., individually and a/k/a | : **INDUCTOTHERM DEFENDANTS'** |
| INDUCTOTHERM INDUSTRIES, | : **CROSS-MOTION FOR PARTIAL** |
| INC. and INDUCTOTHERM | : **SUMMARY JUDGMENT AND** |
| CORPORATION, et al., | : **DISMISSAL OF COUNT I AND** |
|  | : **COUNT XXVI** |
| Defendants. | : |
|  | : |

**On the Brief:**

    Vincent E. Gentile, Esq.
    David R. Levin, Esq., *pro hac vice*
    Matthew S. Barndt, Esq.

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT.............................................................................. 2

ARGUMENT ...................................................................................................... 7

    I.      Summary Judgment is Appropriate on Count I.................................... 7

            A.    Count I Rests On the Mistaken Premise That There is No
                 Trust Agreement.................................................................... 7

            B.    ERISA Does Not Require a Separate Trust Agreement
                 But Only That the Terms of the Trust Be Contained in a
                 "Plan Instrument.".............................................................. 10

            C.    The Plan and the Investment Policy Contain Standards
                 That Govern the Trustees' Actions ..................................... 14

            D.    The Trustees' Construction of the Plan and Trust
                 Agreement is Entitled to Deference ...................................... 19

    II.     Summary Judgment is Appropriate on Count XXVI Because
            the Undisputed Facts Show that the Inductotherm Defendants
            Did Investigate FSC/Wharton Before Retaining Them as Plan
            Investment Advisors.......................................................................... 20

CONCLUSION ................................................................................................. 29

# <u>TABLE OF AUTHORITIES</u>

Page

**CASES**

<u>Anderson v. Liberty Lobby, Inc.</u>,
    477 U.S. 242 (1986)............................................................................ 28

<u>Armbruster v. Unisys Corp.</u>,
    32 F.3d 768 (3d Cir. 1994)................................................................. 28

<u>Board of Trs. of the Watsonville Frozen Food Welfare</u>
    <u>Trust Fund v. Cal. Coop. Creamery</u>,
    877 F.2d 1415 (9th Cir. 1989) .......................................................... 13

<u>In re Burlington Coat Factory Sec. Litig.</u>,
    114 F.3d 1410 (3d Cir. 1997)............................................................. 21

<u>Celotex Corp. v. Catrett</u>,
    477 U.S. 317 (1986)............................................................................ 28

<u>Conkright v. Frommert</u>,
    130 S.Ct. 1640 (2010)........................................................................ 20

<u>DeWitt v. Penn-Del Directory Co.</u>,
    106 F.3d 514 (3d Cir. 1997)............................................................... 20

<u>Goldenberg v. Indel, Inc.</u>,
    741 F.Supp.2d 618 (D.N.J. 2010) ................................... 5, 16, 21, 22

<u>Kaucher v. County of Bucks</u>,
    455 F.3d 418 (3d Cir. 2006)................................................................. 7

<u>Keach v. U.S. Trust Co.</u>,
    245 F. Supp. 2d 941 (C.D. Ill. 2003) ............................................... 22

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,
    475 U.S. 574 (1986)............................................................................ 28

<u>Metro. Life Ins. Co. v. Parker</u>,
    436 F.3d 1109 (9th Cir. 2006) .......................................................... 13

# TABLE OF AUTHORITIES
### (continued)

Page

Michaels v. Equitable Life Assurance Soc'y of the United States Emps.,
    Managers, and Agents Long-Term Disability Plan,
    305 Fed. Appx. 896 (3d Cir. 2009) ................................................................. 13

Moench v. Robertson,
    62 F.3d 553 (3d Cir. 1995) ............................................................................... 20

In re Unisys Savings Plan Litigation,
    1997 WL 732473 (E.D. Pa. Nov. 24, 1997) ................................................ 19, 20

Vaughn v. Bay Envtl. Mgmt., Inc.,
    567 F.3d 1021 (9th Cir. 2009) ........................................................................ 22

**FEDERAL STATUTES**

ERISA § 3(3) ..................................................................................................... 10

ERISA § 3(34) ..................................................................................................... 3

ERISA § 3(35) ..................................................................................................... 3

ERISA § 301(a)(8) ............................................................................................... 3

ERISA § 402 ...................................................................................................... 10

ERISA § 402(b) ............................................................................................. 10, 11

ERISA § 402(c) .................................................................................................. 12

ERISA § 403 ...................................................................................................... 10

ERISA § 403(a) .................................................................................................. 10

ERISA § 404 ...................................................................................................... 22

ERISA § 404(a)(1)(B) ........................................................................................ 20

ERISA § 404(a)(1)(D) .......................................................................... 1, 7, 12, 13

## TABLE OF AUTHORITIES
(continued)

Page

ERISA § 409(a) ................................................................................................ 19

**FEDERAL REGULATIONS**

29 C.F.R. § 2550.403a-1(b) ............................................................................ 18

I.R.C. § 412(e) ................................................................................................. 3

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 56 ....................................................................................................... 1, 16

Rule 56(c) ........................................................................................................ 7

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Indel, Inc., Inductotherm Industries, Inc., Inductotherm Corporation, Henry M. Rowan, John H. Mortimer, David L. Braddock, Thomas P. McShane, Manning J. Smith, Lawrence A. Krupnick, Harry G. Trefz, Frank D. Manley, Virginia Smith, Joseph T. Belsh, Gary A. Doyon, Satyen N. Prahbu, and Bernard Raffner (collectively the "Inductotherm Defendants") move to dismiss Counts I and XXVI of the Second Amended Complaint ("SAC") (Docket No. 165). Count I alleges that the Plan Trustees failed to adopt a trust agreement, which prevented the Plan Trustees from acting "in accordance with the documents and instruments governing" the Plan as required by ERISA § 404(a)(1)(D). Count XXVI asserts that the Trustees failed to conduct proper due diligence before engaging FSC Securities Corporation ("FSC") and its Wharton Business Group office ("Wharton") (collectively, "FSC/Wharton") to act as the Plan's investment advisor in December 2005. The undisputed facts of record do not support the allegations made in these counts of the SAC and, accordingly, the Inductotherm Defendants are entitled to judgment on Counts I and XXVI as a matter of law.[1]

---

[1] The Inductotherm Defendants have not at this time moved for summary judgment on Count XXVII, which alleges a breach of fiduciary duty based on their alleged failure to invest Plan assets for the benefit of a hypothetical 56 year old participant under a "100 minus age" method of asset allocation. The Inductotherm Defendants anticipate filing such a motion upon the conclusion of expert merits discovery. The Inductotherm Defendants have submitted a separate brief opposing class

(Continued)

## PRELIMINARY STATEMENT

In 1953 Henry M. Rowan designed and built a small induction melting furnace in his home garage with the help of his wife.  From this humble beginning, he started his company (Inductotherm), and early on established a Profit Sharing Plan so that employees could participate in the company's potential earnings. Because Inductotherm was successful, the company made annual contributions to the Plan out of profits.  The company's employees are not required to make any contributions, although they have the option to do so.[2]  The Plan has continued for 56 years without interruption, resulting in total company contributions to the Plan of more than $70,000,000.  See Certification of Laurence A. Krupnick ("Krupnick Cert.") at ¶ 4.  The Company's contributions to the Plan are completely discretionary,[3] but the Company's directors have consistently approved the

---

(Continued)

certification on Count XXVII.  In the event the Court denies their motion for partial summary judgment on Counts I and XXVI, the Inductotherm Defendants have also opposed class certification of those counts as well.

[2] Participants may make after-tax contributions of up to 10% of their salary, although few participants elect to do so and none of the Plaintiffs have ever done so.  See Certification of Matthew S. Barndt ("Barndt Cert.") at ¶ 37, Exhibit KK (hereinafter "Plan") (Plan §§ 2.1, 4.4).

[3] See Plan § 4.1 ("such other amount as the Company shall determine").

maximum contribution of 15% of salaries and wages at the close of each year.[4]

See Krupnick Cert. at ¶ 5.  Since its inception, the Plan has paid out more than

$138,000,000 in benefits and, due to returns on invested assets, still held

approximately $54,600,000 in assets as of December 31, 2008, the month

before Plaintiff Goldenberg retired.  See id. at ¶ 6. Over the three years since

Plaintiff Goldenberg retired, the Plan's assets have grown to over $68,000,000 as

of February 29, 2012.  See id. at ¶ 7.

The Inductotherm Plan is not a 401(k) plan[5] or a defined benefit plan.[6]  The

participants have no ability to select particular investment options for Plan

contributions.[7]  Rather, the Trustees (or the Committee)[8] have exclusive discretion

---

[4] Neither the Internal Revenue Code nor ERISA require the company to make
annual contributions.  See I.R.C. § 412(e) and ERISA § 301(a)(8)(excluding
"profit sharing" plans from funding requirements).

[5] Unlike a 401(k) plan, the Indel Plan only permits after-tax employee
contributions.  See Plan § 2.1 "Definitions" (defining "Employee Contributions" to
means "after-tax voluntary contributions a Participant contributes to the Plan."
Indel has established a separate 401(k) plan to which Plaintiff Goldenberg
contributed; the 401(k) plan is not at issue in this case.

[6] Compare ERISA § 3(34) ("individual account plan"), with ERISA § 3(35)
("defined benefit plan").

[7] All Plan assets are held in the "Investment Fund."  See Plan § 2.1(f).  No
participant has "any right, title, or interest in any assets of the Investment Fund."
See Plan § 5.4.

[8] The individuals who have been appointed as Plan trustees serve not only as
trustees, but they also act as the Committee defined at Section 2.1.  The Plan
Trustees refer to the Committee as "the Board of Trustees" in communications

(Continued)

to determine what investments should be made.[9]  The participants do not hold

individual assets in their accounts but instead have notional accounts that simply

record their fractional interest in the Plan's assets.[10]  The Plan assets are therefore

managed for the benefit of all participants, which include virtually all of the

Company's approximately 250 employees who currently range in age from age 21

to over 80 years old.  See Krupnick Cert. at ¶ 8.

In spite of the Plan's successful track record, Plaintiff Goldenberg and two

other named plaintiffs (Andrew Loew and Reinaldo Pacheco), who were or are

participants in the Plan, assert that the Plan should have been managed differently.

The essence of their claims is that the allocation of Plan assets was inappropriate

because it was too heavily invested in equities.  Despite Plaintiffs' creative

attempts to devise a multitude of theories of liability against the Inductotherm

Defendants, only three claims have survived.  The Court has already dismissed

---

(Continued)

among themselves and in communications (including the Summary Plan
Description) with the Plan participants.  Thus, for the purposes of this motion, all
references to the "Committee" mean the "Trustees" and vice versa where the
context so requires.

[9] See Plan § 8.1; see also Plan §§ 5.2, 7.1.

[10] A "notional account is established for each Plan participant" under Plan § 5.1,
and each participant's benefit is a fractional interest in the "Investment Fund."

four counts originally asserted against the Inductotherm Defendants.[11]  Plaintiffs voluntarily dismissed another two counts, including a 27 paragraph RICO claim.[12]  Then Plaintiffs twice attempted to amend their complaint to assert yet additional claims, including claims that the Trustees were required to segregate individual Plan assets in separate participant accounts so that older participants could hold more "conservative" investments.  Magistrate Donio found proposed Counts XXVIII and XXIX to be futile, ruling that there was no support for Plaintiffs argument that "separate investing strategies for various age groups are necessary in order for a fiduciary to act prudently" or that "failure to consider the age of participants alone constitutes an independent breach of a fiduciary duty." November 16, 2011 Order (Docket No. 122) at 16-17.  The Court went on to note:

> To the extent Plaintiffs' allege that the Plan should have been divided into different categories by [participant] age, with a different investment strategy for each age group, and that this failure to do so constitutes a breach of fiduciary duty, such an allegation challenges the Plan's form and/or structure.  A challenge to the Plan's form and/or structure does not implicate the fiduciary duty requirement set forth in ERISA.

---

[11] In total, the Court has dismissed Counts II, IV, VIII, X, XII, XIII, XIV, XVI, XIX, XX and XXI, and has found proposed Counts XXVIII, XXIX and XXX deficient as a matter of law.  See Goldenberg v. Indel, Inc., supra, 741 F. Supp. 2d 618 (D.N.J. 2010); November 16, 2011 Order (Docket No. 122); February 28, 2012 Order (Docket No. 163).

[12] See SAC (confirming voluntary dismissal of Counts XV, XVII, XVIII, and XXII).

Id., p. 18.  Magistrate Judge Donio did allow Plaintiffs to add two new counts against the Inductotherm Defendants, Count XXVI ("fail[ure] to undertake a sufficient investigation prior to retaining FSC/Wharton") and Count XXVII ("[i]mplementing an investment strategy that ignores participant ages and excessively invests Plan assets in equities").  On the latter claim, Magistrate Judge Donio noted that it was substantially similar to a claim against the FSC/SunAmerica Defendants (Count IX), which the Court found stated a claim. Id., p. 13.  As to Count XXVI, although Magistrate Judge Donio denied the Inductotherm Defendants' motion to dismiss because it raised matters extraneous to the pleadings, she invited a motion for summary judgment directed to that count. Id., at p. 11.[13]

The Inductotherm Defendants believe that it is appropriate (prior to class certification) to weed out two Counts that are obviously and grossly defective as a matter of law and fact-- the claims based on the alleged absence of a trust agreement (Count I) and the alleged failure of the Trustees to investigate

---

[13] Magistrate Donio subsequently rejected Plaintiffs' proposed Count XXX, which alleged that the Inductotherm Defendants had breached their fiduciary duties by misrepresenting in Plan documents that the Plan assets were conservatively invested.  February 28, 2012 Order (Docket No. 163).  In denying the proposed amendment as futile, the Court held that "Plaintiffs have not alleged a sufficient causal connection between the alleged misrepresentations and the Plaintiffs' alleged harm," particularly "in light of Plaintiffs' inability to control the Plan." Id. at 15.

FSC/Wharton before retaining them as the Plan's investment advisor (Count XVI). As to these two counts "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule 56(c). Simply put, there is no " sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006).

**ARGUMENT**

**I.   SUMMARY JUDGMENT IS APPROPRIATE ON COUNT I.**

**A.   Count I Rests On the Mistaken Premise That There is No Trust Agreement.**

Count I alleges that Inductotherm Defendants failed to adopt a Trust Agreement. Plaintiffs assert that this failure is a breach of ERISA § 404(a)(1)(D), which embodies the fiduciary duty to act "in accordance with the documents and instruments governing the plan." According to Plaintiffs, without a Trust Agreement, the Inductotherm Defendants, including the individual Trustee Defendants, have no standards or guidelines for the exercise of their fiduciary duties. <u>See</u> SAC, Count I, ¶¶ 7-11.[14] The operative Plan documents belie this claim.

---

[14] Relevant excerpts from the SAC are attached to the Barndt Cert. at Exhibit SS.

Since the inception of the Plan in May 1956, the Plan has had a single integrated document titled "Profit Sharing Plan and Trust Agreement of Inductotherm Engineering Corporation." Inductotherm Defendants' Statement of Undisputed Material Facts (SOF), ¶¶ 2-8 and Exhibit B to the Barndt Cert. The first sentence of that document states, "*This Trust Agreement* is made and entered into . . ." between Inductotherm and three named Trustees. Article I(H) of this document defines Trustees as "the person or persons acting at any time as the Trustees *of the Trust established pursuant to the provisions hereof.*" Unquestionably, a trust was established at the same time as when the Plan was created through the adoption of the document entitled the "Profit Sharing Plan and Trust Agreement of Inductotherm Engineering Corporation."

The integrated "Plan and Trust Agreement" encompasses both a "Trust Agreement" and a "Plan." Article X(A) plainly states that there is a single document: "Neither the action of the Company in establishing this Plan . . . nor any provision of *this Trust Agreement*. . ."). Article X(C) states that "[t]he provisions of this Plan *and the Trust Agreement* shall be interpreted" in accordance with the laws of the State of New Jersey. Since the establishment of the Plan, the title and text of the governing instrument has combined the terms of the Trust Agreement as well as the terms of the Plan.

Over the years, that integrated structure has continued as the combined plan and trust document was amended numerous times.  On May 27, 1976, Inductotherm Industries, Inc., the Inductotherm Corp., and the Trustees "amend[ed] and restate[d] their existing Profit Sharing Plan and Trust Agreement" by adopting and executing the "Inductotherm Profit Sharing Plan and Trust Agreement" and adopting the Inductotherm Companies Master Profit Sharing Plan, "a copy of which is or may be attached hereto and made a part" of the "Inductotherm Profit Sharing Plan and Trust Agreement."[15]  Since 1976, that document has been further amended a number of times, but the integrated document has always served as both the Trust Agreement and the Plan document. See SOF ¶¶ 26 – 45, 48, 56-57.  The only evidence Plaintiffs offer to support their claim that there is no Trust Agreement is an August 19, 2009 letter from Thomas McShane.  But that letter only says: "There is no separate document titled Trust Agreement.  The Plan that you received is the complete document."  SAC ¶ 37. Mr. McShane's response is accurate and Plaintiffs have clearly misconstrued his statement to mean that "a Trust Agreement does not exist."  Id. at ¶ 36.  Their assumption is belied by the facts.

---

[15] See Exhibit Y to the Barndt Cert.

**B.**   **ERISA Does Not Require a Separate Trust Agreement But Only That the Terms of the Trust Be Contained in a "Plan Instrument."**

No statutory or regulatory provision has ever required the Inductotherm Defendants to adopt a separate document entitled "Trust Agreement." Plaintiffs cite to no authority to support their claim.

ERISA differentiates between a "plan" and a "trust." <u>See</u> ERISA § 402 ("Establishment of Plan") and ERISA § 403 ("Establishment of Trust").[16] Similarly, ERISA differentiates between a "plan instrument" and a "trust instrument." ERISA § 403(a) provides that trustees can be named *either* "in the trust instrument" or "in the plan instrument described in section 402" of ERISA. In this regard, ERISA § 402(b) ("Requisite features of Plan") lists the four requirements of a plan instrument. As shown below, the combined Plan and Trust document satisfies each of these statutory elements:

(1) *"[A] procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan."* Section 8.1 of the Plan provides for the Committee "to designate investment policies and funding policies."

---

[16] <u>Compare</u> ERISA § 3(3) (defining "plan" as an arrangement to provide benefits), <u>with</u> ERISA § 403(a) (assets of "plan shall be held in trust").

(2)  A *"procedure under the plan for the allocation of responsibilities for the operation and administration of the plan."*  Section 8.2 of the Plan, entitled "Allocation of Duties and Responsibilities," describes the allocation of those duties and responsibilities.  Plaintiffs earlier admitted that Section 8.2 adequately met this element when – in response to the Inductotherm Defendants' Motion to Dismiss – Plaintiffs voluntarily dismissed Count XV, which had challenged the allocation of those duties and responsibilities.

(3)  A *"procedure for amending such plan, and for identifying the persons who have authority to amend the plan."*  Article X of the Plan, "Amendments and Action by Company," provides the amendment procedure.

(4)  *"[T]he basis on which payments are made to and from the plan."*  Article 4 of the Plan, "Contributions," describes the basis on which payments are made to the Plan.  Articles 5 and 6 "Allocations to Participants' Accounts" and "Payment of Benefits," respectively, describe payments made from the Plan.

As required by ERISA § 402(b), each of these statutory "plan instrument" requirements exists (and has always existed) in the Plan, which is incorporated into the combined Plan and Trust Agreement.  As noted above, ERISA imposes requirements for a "plan instrument" and has no requirement for a separate "trust instrument."

Indeed, the Plan even goes beyond these required elements and meets the optional features of a plan set forth in ERISA § 402(c):

(1) That *"any person or group of persons may serve in more than one fiduciary capacity with respect to the plan."* The last sentence of Section 8.1 of the Plan provides that a "Fiduciary may serve in more than one capacity."

(2) *For the employment of one or more persons to render advice with regard to any responsibility such fiduciary has under the plan."* Section 8.8(g) so provides.

(3) *For the appointment of "an investment manager or managers to manage (including the power to acquire and dispose of) any assets of a plan."* Section 8.1 expressly provides for such appointments and, indeed, it is undisputed that the Plan Trustees have hired investment managers over the years to assist in managing Plan assets and investments.

The terms of the Plan are therefore consistent with ERISA's "plan instrument" requirements and each of those requirements is incorporated into the combined Plan and Trust Agreement. Under ERISA § 404(a)(1)(D), fiduciaries must act "in accordance with the documents and instruments governing the plan **insofar as such documents and instruments are consistent with the provisions of this subchapter.**" (emphasis added). The Inductotherm Defendants have plainly done so.

Because ERISA commands only that the required elements be in a "plan instrument," it does not matter whether the instrument is called a plan document or a trust agreement or a combined plan and trust agreement.  Moreover, ERISA case law recognizes that the governing plan documents may refer to and incorporate other documents.  Thus, it is perfectly proper for the Trust Agreement to be incorporated into the Plan by reference.  See Michaels v. Equitable Life Assurance Soc'y of the United States Emps., Managers, and Agents Long-Term Disability Plan, 305 Fed. Appx. 896, 903, 908 n.10 (3d Cir. 2009) (relying on express incorporation by reference in plan governing documents); Metro. Life Ins. Co. v. Parker, 436 F.3d 1109, 1115 (9th Cir. 2006) ("We see nothing in ERISA that precludes incorporation by reference."); Board of Trs. of the Watsonville Frozen Food Welfare Trust Fund v. Cal. Coop. Creamery, 877 F.2d 1415, 1426 (9th Cir. 1989) ("[W]e look to the Trust Agreement and the documents incorporated by reference therein to determine whether the Board was authorized to" take action).  Thus, even if there were a legal requirement for a separate trust agreement – and there is not – the fact that the Trust Agreement here is incorporated by reference into the Plan would satisfy that requirement.  As a matter of law and fact, therefore, the allegation that there is no Trust Agreement (or no separate Trust Agreement) fails to assert a violation of ERISA § 404(a)(1)(D).

### C.     The Plan and the Investment Policy Contain Standards That Govern the Trustees' Actions.

From their erroneous assumptions that ERISA requires a separate trust agreement and that it must contain specific standards to guide the Trustees' actions, Plaintiffs argue that the Trustees were left without any standards to govern their discretion.  But, as demonstrated below, the clear terms of the integrated Trust/Plan document rebut each of these arguments.  Were that not enough, Plaintiffs concede that the Trustees adopted an Investment Policy Statement ("IPS") in December 2005 that contains standards and guidelines on investments. We discuss each of Plaintiffs' more specific allegations in the SAC in turn below.

**Count I, ¶ 8:** *"[b]y failing to adopt a trust agreement the [Inductotherm Defendants] operated the Plan without any investment guidelines with respect to contributions."*  As noted above, the combined Plan and Trust Agreement indisputably contains terms governing the investment of Plan contributions. Section 8.1 provides, *inter alia,* "[t]he Committee also shall have the right to designate investment policies and funding policies under which the Trustees shall act."  Plaintiffs admit that the Committee did adopt investment guidelines in the Investment Policy Statement ("IPS") on December 12, 2005.  See SAC ¶ 54.[17]

---

[17] In Count VII of their complaint, Plaintiffs argue that investments in the Hussman Fund were allegedly not proper under the investment policy, a plan governing document.  Plaintiffs' allegations in Count I are thus inconsistent because they

(Continued)

That IPS has been amended several times, most recently in December 2009.  <u>See</u> Barndt Cert., Exhibit TT

According to the IPS, the Plan's stated "Investment Objectives" are to "increase principal value to provide additional capital for planned long-term capital needs" and "position the portfolio with a longer-term risk/reward orientation, thereby taking advantage of the higher expected returns historically associated with investing in stocks."[18]  In light of these goals, the IPS establishes a long-term target asset allocation for Plan investments – specifically, 80% in equities and 20% in fixed income and cash investments.[19]  The "target" allocation, however, is intended to be flexible, so the IPS identifies acceptable "range bands" for each asset category.  Thus, under the IPS, the Plan's investment advisors have the ability to recommend "rebalancing and/or structural changes to the portfolio on a regular basis as they deem appropriate," including, *inter alia*, "the ability to recommend

----

(Continued)

admit that the Plan had investment guidelines that were part of the Plan's governing documents and instruments.

[18] <u>See</u> Barndt Cert. at Ex. UU, 2005 IPS at 1 (emphasis added); <u>accord</u> Barndt Cert. at Ex. TT, 2009 IPS at 1.

[19] <u>See</u> Barndt Cert. at Ex. UU, 2005 IPS at 2; Barndt Cert. at Ex. TT, 2009 IPS at 2.

[to the Trustees] holding up to 50% of the portfolio in cash or short-term bonds during tumultuous market periods."[20]

With respect to funding policies, exercising their authority under Section 8.1 of the Plan, the Trustees routinely consider the Plan's need to make distributions to participants in evaluating the Plan's short-term and long-term investments.[21]

**Count I, ¶ 9:** *"[b]y failing to adopt a trust agreement the [Inductotherm Defendants] failed to provide the Committee Defendants and Inductotherm with a methodology for directing contributions under the Plan to accounts available under a trust agreement."*[22]   Again, the combined Plan and Trust Agreement ***does*** contain such a methodology.  Section 5.1 authorizes the Trustees to allocate the employer

---

[20] See Barndt Cert. at Ex. TT, 2009 IPS at 2; Barndt Cert. at Ex. UU, 2005 IPS at 2; see also Barndt Cert. at Exhibit VV, Pomerantz Dep. at 198:17-199:3.

[21] See Barndt Cert., Exhibit AA, Minutes of January 23, 1984 Trustee meeting (considering cash flow needs of the Plan, how to deal with the situation then and in the future); Barndt Cert., Exhibit BB, Minutes of June 25, 1990 meeting (Trustees' review of "cash projections" and "future case needs" for making distributions to participants); Minutes of March 26, 1990 meeting (same).  These funding needs continued to be discussed at Trustee meetings with FSC/Wharton after they were engaged as the Plan's investment advisor in 2005.  See, e.g., Barndt Cert., Exhibit OO.

[22] The Court's earlier opinion denying the Inductotherm Defendants' motion to dismiss Count I noted that the one page 1976 Plan and Trust Agreement did not show the Trustees complied with Section 5.2 because it did not make any provision for the investment of Plan contributions.  Goldenberg v. Indel, Inc., 741 F. Supp. 2d at 630.  The Court also noted that it could not consider certain documents on a Rule 12(b)(6) motion to dismiss and could not consider several new arguments the Inductotherm Defendants had made in their reply brief.  Id. at 630, 630 n.9. Neither of these points are impediments to this Rule 56 motion.

contributions to the notional accounts of participants and sets forth the method for such allocation.

Section 5.2(a) of the Plan "Investment of Contributions" provides further standards for directing contributions. That Section provides: "[t]o the extent permitted by the Trust Agreement, the parties named below shall direct the Contributions to any of the accounts available under the Trust Agreement and may request the transfer of assets resulting from those Contributions between such accounts."[23] The undisputed facts show that the Trustees have satisfied Section 5.2. All contributions to the Plan are deposited in a PNC Bank trust account, which is the successor to a trust account originally established with Provident Trust Company (whose name has changed over the years to Provident National Bank and then to PNC Bank). See SOF ¶¶ 19, 23; October 23, 1956 letter from the Trustees to Provident; IRS Form 990-P (date of trust establishment: 7/1/57).[24] The

---

[23] The "parties named below" include the Committee and the Trustees (who are the members of the Committee). The Board of Directors of Inductotherm Corp. appointed each of the Plan trustees. Although the terms of the Inductotherm Profit Sharing Plan and Trust Agreement refer repeatedly to the Plan Trustee in the singular, Section 2.2 explains that singular "shall be deemed to include the plural (and vice versa)." In this regard the Plan has had more than one trustee since its establishment in 1956. The Profit Sharing Plan and Trust Agreement also provides that a "fiduciary may serve in more than one fiduciary capacity with respect to the Plan."

[24] At their first meeting, the Trustees "agreed to accept the Trust Plan as written" and they discussed the trust account established in the Provident National Bank to

(Continued)

undisputed facts of record therefore establish that contributions to the Plan are held as Plan assets in a trust account before they are invested by the Trustees pursuant to the IPS.[25]  Accordingly, the allegations of paragraph 9 cannot be supported.

**Count I, ¶ 10:** *"[b]y failing to adopt a trust agreement, the [Inductotherm Defendants] failed to adopt any guidelines to be followed by the Trustee Defendants in managing/investing the Plan's assets."*  Section 8.1 (discussed above in connection with Count I, ¶ 8) provides for the Committee to establish investment guidelines, "to establish the funding policy of the Plan and to determine appropriate methods of carrying out the Plan's objectives."  As discussed above, this allegation cannot stand.

**Count I, ¶ 11:** *"[b]y failing to adopt a trust agreement, the [Inductotherm Defendants] were unable to know/allocate their duties, responsibilities and obligations under the Trust Agreement."*  First, as noted above, there is nothing in ERISA or in the Plan's governing documents that requires the allocation of the Trustees' duties to be set forth in a trust agreement.  Second, those duties are, in

---

(Continued)

hold Plan assets.  See September 16, 1957 Trustee meeting minutes.  On March 25, 1975, pursuant to the Plan and Trust Agreement, the Trustees revised the trust account with Provident National Bank.  The Trustees met in December of 1998 and again revised the terms of that trust account.  SOF ¶¶ 31, 46.

[25] When the Plan assets are then invested through a brokerage account, the assets are still expressly considered to satisfy ERISA's trust requirement.  See 29 C.F.R. § 2550.403a-1(b).

fact, set out in Section 8.2 of the Plan, which – like all of the Plan's provisions – is incorporated by reference into the Trust Agreement.  Moreover, by withdrawing Count XV (alleging that "the Plan does not sufficiently designate responsibilities among the fiduciaries for the efficient and lawful operation of the Plan"), Plaintiffs have already conceded that Section 8.2 adequately describes and allocates fiduciary duties.

Accordingly, all of the specific allegations of Count I, ¶¶ 8-11 of the SAC fail because they have no factual or legal support.[26]

### D.   The Trustees' Construction of the Plan and Trust Agreement is Entitled to Deference

Under every iteration of the Plan's governing documents, the Trustees specifically retained the discretion and authority to interpret "and to decide any dispute or matter arising in connection with the operation of and administration of

---

[26] Count I would also fail for the independent reason that Plaintiffs cannot show any causal relationship between the failure to adopt a trust agreement and the claimed damages. As Magistrate Judge Donio ruled in holding proposed Count XXX to be futile, Plaintiffs must show a causal nexus between the alleged breach of fiduciary duty and the claimed loss.  February 28, 2012 Order (Docket No. 163), at 15. "Before liability for fiduciary breach may attach, a plaintiff must show that the fiduciaries' actions caused a loss." In re Unisys Savings Plan Litigation, 1997 WL 732473, at *28, (E.D. Pa. Nov. 24, 1997), aff'd, 173 F.3d 145 (3d Cir. 1999); see also ERISA § 409(a) (imposing liability for breach of fiduciary duty for any losses to the plan **resulting from each such breach**.") (emphasis added).

the Plan and Trust."[27]  Thus, even if there were an ambiguity in the provisions of the combined Plan/Trust document, the Trustees have exercised their authority to resolve any such ambiguity and determine that the terms of the Plan instrument are made a part of the Trust Agreement.  As long as the Trustees' interpretation is not arbitrary or capricious, the Court cannot overturn it.  See Conkright v. Frommert, 130 S.Ct. 1640, 1646-47, 1651 (2010), (deference owed to plan fiduciary's interpretation of plan's governing documents and instruments); Moench v. Robertson, 62 F.3d 553, 566 (3d Cir. 1995); In re Unisys Savings Plan Litig., 1997 WL 732473, at *24 (arbitrary and capricious standard "applies with equal force to fiduciary breach claims").  There is no basis to find the Trustees' interpretation of the Plan's governing documents is arbitrary or capricious as long as it is "rationally related to a valid plan purpose and is not contrary to the plain language of the plan."  DeWitt v. Penn-Del Directory Co., 106 F.3d 514, 520 (3d Cir. 1997).

## II.   SUMMARY JUDGMENT IS APPROPRIATE ON COUNT XXVI BECAUSE THE UNDISPUTED FACTS SHOW THAT THE INDUCTOTHERM DEFENDANTS DID INVESTIGATE FSC/WHARTON BEFORE RETAINING THEM AS PLAN INVESTMENT ADVISORS.

Count XXVI alleges a breach of the ERISA § 404(a)(1)(B) fiduciary duty of prudence based on Plaintiffs' claim that the Inductotherm Defendants did not

---

[27] See, e.g., Article VIII(E) of 1957 Profit Sharing Plan and Trust Agreement (Barndt Cert. at Exhibit B); Article VIII, § 8.9 of Inductotherm Companies Master Profit Sharing Plan (Barndt Cert. at Exhibit KK).

investigate the experience or qualifications of FSC/Wharton to manage the Plan. Had the Inductotherm Defendants done so, the SAC alleges, they would have concluded that FSC/Wharton lacked the experience and qualifications to manage the Plan. See Count XXVI at ¶¶ 8-9, 10. These allegations have been disproven by discovery in this case.

As an initial matter, the allegation that FSC/Wharton "lacked experience" is a "bald assertion" to which no presumption of truth attaches. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997). Moreover, this Court noted in its earlier opinion on defendants' motions to dismiss that Plaintiffs themselves recognized that FSC is a national, longstanding and well known firm engaged in asset management and other financial services: "According to Plaintiffs, FSC Securities operates nationally and has done so for decades" and the choice of the Wharton Business Group was no more than a "process of selecting its branch office to perform financial services." Goldenberg v. Indel, Inc., 741 F. Supp. 2d at 640.

Nevertheless, Plaintiffs persist in asserting that FSC's individual representatives had no experience in advising "non-participant directed plans." Pl. Brief in Support of Class Cert. at p. 5 ("neither Marc Hembrough nor B. J. Webster had any experience with retirement plans in which the participant did not direct their investments"). They also assert that a proper investigation would have uncovered

facts that should have disqualified FSC, namely "the fact that, in March 2005, FSC was sued for implementing an overly aggressive investment strategy for another profit sharing plan." Id. But the case Plaintiffs cite in support of those arguments, Vaughn v. Bay Envtl. Mgmt., Inc., 567 F.3d 1021, 1023 (9th Cir. 2009), in fact, concerned "non-participant-directed plan assets," and FSC was the investment advisor (as it was here).[28] See id. at 1023-24. This Court has already noted that bare allegations that FSC was involved in a prior lawsuit for claimed regulatory violations is not enough to show that its selection to provide investment advisory services to the Plan was imprudent. Goldenberg v. Indel, Inc., 741 F. Supp. 2d at 640-41. The allegations of Count XXVI say no more than this. That FSC was a defendant in a prior lawsuit cannot be the basis for any plausible claim that the Plan Trustees acted imprudently under ERISA § 404 by selecting FSC/Wharton. Keach v. U.S. Trust Co., 245 F. Supp. 2d 941, 945 (C.D. Ill. 2003) ("guilt by association is insufficient"). Nothing in ERISA prevents fiduciaries from engaging service providers who have previously been the subject of a lawsuit or even an administrative proceeding (or are subsidiaries of companies like AIG that have been the focus of adverse publicity). If that were the case, virtually every major financial institution would be disqualified from serving as a plan fiduciary or

---

[28] In addition, FSC was not an investment manager, as Plaintiffs contend.

- 22 -

advisor.  The U.S. Department of Labor has recognized these are not disqualifying factors and should not be a basis  for selecting or firing ERISA plan service providers.[29]

Here, Plaintiffs' allegation that that the Trustees did not investigate FSC/Wharton's capabilities and experience is contrary to the undisputed facts.  A fiduciary "must engage in an objective process designed to elicit information necessary to assess the qualifications of the provider, the quality of the services offered."  Count XXVI at ¶ 5 (quoting DOL Field Assistance Bulletin 2002-3).  As the undisputed contemporaneous documentation demonstrates, in the autumn of 2005, the Trustees did engage in such a process.  In fact, they held a series of meetings described as  "due-diligence by the Trustees in reviewing a number of outside investment managers to compare with Hewitt Investment Group, then the investment advisors for the Plan."  Krupnick Cert., ¶ 10, Exhibit B.  (Minutes of Trustee Meetings of October 25, 26, and 28, 2005 and of November 9 and 21, 2005, and December 5 and 6 (two meetings on the 6th), 2005).

---

[29] For example, despite the headlines about the 2004 mutual fund scandal and SEC investigations, the DOL advised fiduciaries not to use those reports as a basis to terminate investment advisors who worked for companies then under government investigation or even as a basis to terminate the companies themselves.  See Duties of Fiduciaries In Light of Recent Mutual Fund Investigations, Statement of A.L. Combs, Assistant Secretary of Labor (2/17/04) (http://www.dol.gov/ebsa/pdf/sp021704.pdf) (last visited March 30, 2012).

As the minutes show, the Trustees held meetings over a two month period with seven different nationally known, highly regarded investment advisory firms: PNC Advisors, Fund Evaluation Group, Wachovia Bank, Hewitt, Bellwether Consulting LLC, and FSC/Wharton.  See id. ¶¶ 10-11 and Exhibit B.  After the FSC/Wharton representatives completed their presentation and left the meeting, the Trustees "unanimously resolved to make a change in investment advisors" to replace Hewitt.  See id. ¶ 16 and Exhibit B (Minutes of November 21, 2005 Trustee meeting).

The Trustees discussed the presentations made by all the candidates for investment advisor and decided to have a second round of meetings with two of the candidates – one of which was FSC/Wharton – and to interview an additional candidate, Fisher Investment, Inc..  See id. ¶ 11 and Exhibit B.  (Minutes of November 21, 2005 Trustee meeting; Minutes of December 5, 2005 Trustee meeting and Minutes of two December 6, 2005 Trustee meetings).

As evidenced by the minutes of each meeting, the candidates for investment advisor presented the Trustees with written materials.  FSC/Wharton gave each Trustee "a three-ring binder summarizing their presentation."  See Krupnick Cert. ¶ 12 and Exhibits C - D.  (Minutes of November 21, 2005 Trustee meeting).  Those materials included a bullet point list of characteristics that differentiated FSC/Wharton's approach from that of the other potential investment advisors; two

different proposed asset allocation models; specific proposed investments and how they would implement changes in the Plan's existing investment portfolio; profiles of particular investment managers; performance ratings and analyses of various funds that FSC/Wharton was proposing to the Trustees; and several articles analyzing market trends and particular market sectors.  Ibid.

   The Trustees evaluated the written materials along with the presentations that had been made by all of the other candidate firms.  See id. ¶ 13 and Exhibit E. In addition, the Trustees also considered the fact that the individual representatives of FSC/Wharton (Messrs. Webster and Hembrough) had previous experience in managing some of Henry Rowan's personal and family investments and had done so successfully over a number of years.[30]  See, id. ¶ 14.  Trustee Laurence Krupnick also conducted some additional independent due diligence of FSC/ Wharton, including the review of the SEC docket and databases for any adverse information on the firms and the individual representatives.  Krupnick Cert. ¶ 15. As reflected in the minutes of the Trustees meeting on December 5, 2005,

> the trustees discussed and reviewed all of the firms that have made presentations in the past two months.  After careful consideration, it was unanimously resolved to engage the Wharton Business Group as the outside investment advisor for the Inductotherm Profit Sharing Plan.

---

[30] FSC/Wharton had previously been considered as a candidate to act as investment advisor but was not selected.  Instead, at that time (1999) Hewitt was chosen to act as the Plan's investment advisor.  Krupnick Cert. ¶ 14.

- 25 -

See id. ¶ 16 and Exhibit B.  (Minutes of December 6, 2005 Trustee meeting).

As demonstrated by the contemporaneous documentation, the Trustees *did* engage in due diligence prior to selecting FSC/Wharton as the investment advisor for the Plan.  The only support Plaintiffs have for their theory of inadequate investigation is a series of emails from Mr. Krupnick in the summer and fall of 2009.  Mr. Krupnick explained these communications at his deposition and he has explained them again in his certification.  See Krupnick Cert. ¶ 17 and Exhibit A. Rather than accepting that testimony and all of the documents confirming that an investigation was done in late 2005, Plaintiffs rely on insinuation and supposition based on their alternate reading of Mr. Krupnick's 2009 emails.  That does not constitute evidence that could support their claim that the Trustees did not engage in an adequate review of FSC/Wharton's qualifications.

It is telling that the asset allocation recommended by Hewitt as the Fund's investment advisor in 2005 and the asset allocations recommended by each of the prospective investment advisors interviewed by the Trustees were very similar to one another and to the "target" 80/20 allocation recommended by FSC/Wharton. Thus, for the Third Quarter 2005, Hewitt recommended a asset allocation  of 70% equities/30% fixed income.  See Krupnick Cert., ¶ 13 and Exhibit E; see also id. at 2, 4 (stating that that this target is the current asset allocation with a maximum of 80/20).  The prospective investment advisors interviewed by the Trustees

recommended the following allocations between equity and fixed assets in their

presentations:

- <u>PNC</u>:  recommendations from 58/42 to 85/15;

- <u>Fund Evaluation Group</u>:  recommendations of 73/27, 66/33, and 75/25;

- <u>Wachovia/Evergreen</u>:  recommendations of 70/30 and 60/40;

- <u>Bellwether Consulting</u>:  recommendation of 60/40 target with range from 70/30 to 55/45; and

- <u>FSC/Wharton</u>:  recommendations of 70/30 and 80/20.

<u>See</u> Krupnick Cert. at ¶ 13, Exhibit E.  All of these recommended asset allocations

are much more heavily weighted toward equities than the 44% (equities)/56%

(fixed income) allocation that Plaintiffs' expert says is required for the Plan.

Moreover, it is telling that the alleged imprudent selection of FSC/Wharton

has led to excellent financial performance by the Plan.  Plaintiffs concede that over

the first two years, FSC/Wharton's investment advice led to substantial positive

returns for the Plan.  Because that record of success is inconsistent with their

theory that FSC/Wharton was unqualified, they now want to exclude that period

from their calculation of damages.  Pl. Brief at 19.  In fact, since Wharton was

retained, the performance of the Plan has exceeded most benchmark indices.  <u>See</u>

Exhibit A to the Certification of B.J. Webster submitted by FSC/SunAmerica

Defendants in opposition to class certification.  And even during 2008, the Plan

still outperformed most of the other performance indices.  <u>See</u> Webster Cert., Exhibit A.

Plaintiffs must present "evidence on which the jury could reasonably find [in their favor]."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  If Plaintiffs "fail[] to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial," summary judgment is proper.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

Although the Court must view the facts in the light most favorable to the party opposing summary judgment, in responding to the motion that party "must do more than simply show that there is some metaphysical doubt as to material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  "[I]f the evidence is merely colorable or not significantly probative, summary judgment should be granted."  <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994).  Count XXVI is based on allegations that are contrary to the undisputed facts –which show that the Trustees exercised due diligence in reviewing FSC/Wharton's qualifications--and, therefore, it cannot withstand summary judgment.

## <u>CONCLUSION</u>

Based on the foregoing, the Inductotherm Defendants respectfully request that the Court grant their Cross-Motion and dismiss Count I and Count XXVI against the Inductotherm Defendants with prejudice.

Respectfully submitted,

**DRINKER BIDDLE & REATH LLP**
Attorneys for Defendants Indel, Inc.,
Inductotherm Industries, Inc.,
Inductotherm Corporation, Henry M.
Rowan, John H. Mortimer, David L.
Braddock, Thomas P. McShane,
Manning J. Smith, Lawrence A.
Krupnick, Harry G. Trefz, Gary A.
Doyon, Frank D. Manley, Virginia
Smith, Joseph T. Belsh, Satyen N.
Prahbu, and Bernard Raffner

Dated:  March 30, 2012          By: _s/ Vincent E. Gentile_____
                                    Vincent E. Gentile