IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
───────────────────────────
                            :
BORIS GOLDENBERG, et al., as :     HON. JEROME B. SIMANDLE
representatives of a class of :
similarly situated persons and :   Civil No. 09-5202 (JBS/AMD)
on behalf of THE INDUCTOTHERM :
COMPANIES MASTER PROFITS     :
SHARING PLAN #001,           :
                            :
            Plaintiffs,      :        **OPINION**
                            :
       v.                   :
                            :
INDEL, INC., et al.,        :
                            :
            Defendants.      :
                            :
───────────────────────────
```

APPEARANCES:

Arnold Carl Lakind, Esq.
Robert Lawrence Lakind, Esq.
Robert E. Lytle, Esq.
SZAFERMAN, LAKIND, BLUMSTEIN, BLADER & LEHMANN , PC
Quakerbridge Executive Center
101 Grovers Mill Road
Suite 200
Lawrenceville, NJ 08648
     Attorneys for Plaintiffs

Matthew Steven Barndt, Esq.
Vincent E. Gentile, Esq.
David R. Levin, Esq.
DRINKER, BIDDLE & REATH, LLP
105 College Road East
Suite 300
Princeton, NJ 08542
     Attorneys for Inductotherm Defendants

Craig Carpenito, Esq.
H. Douglas Hinson, Esq.
Theodore J. Sawicki, Esq.
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
     Counsel for FSC Defendants and SunAmerica Defendants

**SIMANDLE,** Chief Judge:

## Table of Contents

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 2
II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   The Defendants. . . . . . . . . . . . . . . . . . . 3
     B.   The Plan . . . . . . . . . . . . . . . . . . . . . . 6
     C.   The Claims . . . . . . . . . . . . . . . . . . . . . 7
III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . 15
     A.   Inductotherm's Motion for Partial Summary Judgment. 15
          1.   Standard of Review. . . . . . . . . . . . . . 15
          2.   Count I - Failure to Adopt a Trust Agreement.. 16
          3.   Count XXIV - Failure to Investigate. . . . . . 24
     B.   <u>Daubert</u> Motions.. . . . . . . . . . . . . . . . . 28
          1.   Standard of Review.. . . . . . . . . . . . . . 29
          2.   Defendants' <u>Daubert</u> Motion.. . . . . . . . . 31
          3.   Plaintiffs' <u>Daubert</u> Motion.. . . . . . . . . 42
     C.   Class Certification.. . . . . . . . . . . . . . . . 44
          1.   Standard of Review. . . . . . . . . . . . . . . 44
          2.   Numerosity.. . . . . . . . . . . . . . . . . . 47
          3.   Adequacy.. . . . . . . . . . . . . . . . . . . 48
          4.   Commonality and Typicality.. . . . . . . . . . 52
          5.   Rule 23(b)(1).. . . . . . . . . . . . . . . . . 60
          6.   Classwide Damages. . . . . . . . . . . . . . . 61
IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 63

## I.   INTRODUCTION

This matter is before the Court on four separate but interconnected motions.  First, Plaintiffs Boris Goldenberg, Reinaldo Pacheco, and Andrew Loew have moved [Docket Item 160] to certify four separate sub-classes of similarly situated participants in a profit-sharing plan for employees created by the Inductotherm Companies, which is known as the Inductotherm Companies Master Profit Sharing Plan ("the Plan").

All remaining Defendants oppose class certification.  In addition, one group of Defendants (the Inductotherm Defendants)

also filed a motion for partial summary judgment as to certain counts in Plaintiffs' Amended Complaint [Docket Item 182].

Additionally, the parties have also filed dueling Daubert motions with respect to proposed class certification expert testimony.  All Defendants joined in filing a motion to preclude Plaintiffs' expert, Dr. Steven Pomerantz, Ph.D.  [Docket Item 183], and Plaintiffs filed a cross-motion to preclude Defendants' expert, Ms. Lucy Allen [Docket Item 185].

## II.  BACKGROUND

Plaintiffs seek damages and injunctive relief on behalf of the Plan pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., for the alleged mismanagement of the Plan by the Defendants.  Plaintiffs and the members of the putative sub-classes are or were participants in the defined contribution plan which is sponsored by Inductotherm Industries, Inc., also known as Indel Inc., "a privately owned company that acts as the management service company for a group of engineering and technology-based companies."  Second Amended Compl. ("SAC") ¶ 10.

### A.  Defendants

The Defendants in this action fall into three categories. The first category of Defendants are the administrators and trustees of the Plan (the "Inductotherm Defendants").  This group

3

of Defendants includes Indel, Inc. (also known as Inductotherm Industries, Inc. and Inductotherm Corp.), the corporate entity that sponsors the plan. Also included are the trustees of the Inductotherm Plan ("the Trustees"),[1] members of the Committee to the Plan ("the Committee members"),[2] and the members of the Board of Directors of Indel and Inductotherm Corp. ("the Board of Directors").[3] The Board of Directors appoint the Committee members to manage the administration of the Plan. SAC ¶ 12.

The second group of Defendants are the FSC Defendants. These entities were hired by the Inductotherm Defendants to provide investment advice for the Plan. On December 12, 2005, the Inductotherm Defendants retained the services of Defendant Wharton Business Group, which is alleged to be a branch office of Defendant FSC Securities Corporation. SAC ¶ 54. Wharton replaced the previous investment advisory firms of Hewitt Investment Group, Charlotte Capital LLC and State Street Global

_____

[1] This group of Defendants includes Henry M. Rowan, John H. Mortimer, David L. Braddock, Thomas P. McShane, Manning J. Smith, Laurence A Krupnick, and Harry G. Trefez.

[2] This group of Defendants contains exactly the same individuals as the Trustees.

[3] these groups of Defendants includes some of the same individuals as the Trustees and Committee, but also some differences. The group includes new individuals Joseph T. Belsh, Gary A. Doyon, Frank D. Manley, Satyen N. Prahbu, Bernard Raffner, and Virginia Smith, and includes overlapping individuals David L. Braddock, John H. Mortimer, Henry M. Rowan, and Manning J. Smith.

Advisors.  SAC ¶ 53.  FSC employees Marc Hembrough and B.J.
Webster were the primary investment advisory representatives of
Wharton.  Id. ¶ 54.  Notably, Defendant FSC Securities Corp. is a
wholly owned subsidiary of Defendant American International
Group, Inc. ("AIG").  Id. ¶ 15, 58-59.

The third group of Defendants are the SunAmerica Defendants.
The principal Defendant in this group is Defendant AIG.  Also
included are Defendants SunAmerica Asset Management Corp.,
SunAmerica Capital Services, Inc., and Sunamerica Fund Services,
Inc., which are all wholly owned subsidiaries of AIG.  These
entities are primarily related to the action due to their
affiliation with and management of the SunAmerica Money Market
Fund (SAMMF), which is a particular fund that FSC/Wharton advised
the Plan to invest more than $7 million of Plan assets beginning
in 2005, rather than in a money market fund managed by Vanguard.
SAC ¶ 106-07; 122-33.  Plaintiffs allege that by investing Plan
assets in the SAMMF rather than the Vanguard fund, the FSC
Defendants caused the Plan to pay unnecessarily high management
fees and suffer from inferior returns.  Id. ¶ 122-141.[4]

All Defendants in both the FSC/Wharton group and the

---

[4] As will be discussed below, Plaintiffs name the SunAmerica
Defendants in only one of the twelve remaining counts in their
Second Amended Complaint: Count XI.  However, on June 27, 2012,
the Court granted summary judgment as to this Count.  [Docket
Item 211.]  Accordingly, it would appear that the SunAmerica
Defendants are no longer active parties to the action.

SunAmerica group are represented by the same counsel, and filed their briefs in the instant motions jointly; accordingly, the Court will refer to them collectively as the FSC/SunAmerica Defendants.

### B. The Plan

The Inductotherm Companies Master Profit Sharing Plan is a defined contribution pension plan governed by ERISA, and is sponsored by Inductotherm Corp. and Indel, Inc.  SAC ¶ 31. Defendant Inductotherm created the plan in 1956 by investing a percentage of company profits into a fund for the benefit of employees who chose to participate in, and invest in, the Plan. McShane Cert. ¶ 3.  The company's contributions to the Plan are discretionary, but generally are in an amount equal to approximately 15% of salaries and wages.  Id. ¶ 4.  Over the more than fifty years of contributions, the company has invested more than $70 million into the Plan.  Id. ¶¶ 3-4.  Employees also are permitted to invest their own after-tax income into the Plan, up to 10% of their salary.  Barndt Cert. ¶ 2.

The Plan is not a 401(k) plan or a defined benefit plan. Employees are not required to invest in the Plan, and the employee participants have no ability to select particular investment options for their contributions to the Plan.  Barndt Cert. Ex. B, Plan § 4.4.  Indeed, participants to the Plan do not hold individual assets in their accounts; their "accounts" merely

reflect the participant's individual fractional interest in the Plan's assets.  Id. § 5.1.  Therefore, investment decisions made on behalf of the Plan are, necessarily, made for the benefit of all participant/shareholders in the Plan, which includes most of the approximately 250 employees of Indel/Inductotherm.

Once an employee/participant in the Plan reaches the age of 55, he or she can withdraw cash equal to 15% of the employee's share of the Plan per year.  Plan § 6.12.  Participants can also request withdrawals for other approved purposes such as education, medical care, or hardship.  Id. §§ 6.10, 6.11.  When an employee retires or is terminated from employment, he or she must withdraw the balance of his or her account.  Id. § 6.1.

Over the life of the Plan, it has paid out more than $138 million to employees, and, as of December 31, 2008, total Plan assets were approximately $55 million.  McShane Cert. ¶ 5.  As of February 29, 2012, Plan assets were approximately $68 million.  Krupnick Cert. ¶ 7.

### C.  Claims

Plaintiffs allege that the Defendants have violated several different provisions of ERISA in several different ways through their alleged mismanagement of the Plan.  In at least two previous Opinions, this Court has already dismissed or granted summary judgment against several of Plaintiffs' counts, so the Court here only describes those counts still active in the

action.

Plaintiffs seek damages and injunctive relief for several different forms of alleged wrongdoing from each of the different Defendants.[5]  The Court will briefly describe the different counts in the chronological order in which Plaintiffs allege they occurred.

First, in Count I, Plaintiffs allege that the Inductotherm Defendants breached their fiduciary duties by failing to adopt a Trust Agreement in accordance with the Plan.  Plaintiffs allege that this violates ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), which states that a fiduciary must discharge his duties with respect to the plan in accordance with the documents and instruments governing the plan.

Plaintiffs allege that the 2002 Plan document refers, in several places, to the existence of a "Trust Agreement" that would provide guidance for investment decisions regarding the Plan.  Plaintiffs allege that there is no such Trust Agreement, and that its absence constitutes the Inductotherm Defendants' breach of their duty to abide by Plan documents.

Second, In Count XXVI, Plaintiffs allege that in 2005, the Inductotherm Defendants breached their fiduciary duties by failing to adequately investigate the experience and competence of the Wharton Group and its employees/advisors prior to

_____

[5] With the caveat that the only count alleged against the SunAmerica Defendants has been dismissed via summary judgment.

retaining their services in December of 2005; and further breached their fiduciary duties by actually hiring them when a prudent fiduciary, who had done a competent investigation, would not have.  Plaintiffs allege that this failure to investigate and subsequent hiring decision violates § 1104(a)(1)(B), the requirement that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Plaintiffs allege that the Inductotherm Defendants (Trustees, primarily) failed to inquire into the experience of the Wharton Group managers, and failed to inquire into whether the FSC/Wharton Defendants had the appropriate licenses, registrations, and had not previously been accused of failing to properly manage/advise similar funds. Further, the Plaintiffs allege, had the Trustees so inquired, they would have discovered that FSC/Wharton were ill suited to the job and would not (if acting prudently) have hired them.

Plaintiffs seek to remedy these alleged breaches of fiduciary duty pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  SAC Count I ¶ 13, Count XXVI ¶ 14. Section 409(a) of ERISA establishes fiduciary liability for breaches of such duty for "any losses to the plan resulting from such breach. . ."  29 U.S.C. § 1109(a).

These two claims are the subject of the Inductotherm Defendants' pending motion for partial summary judgment [Docket Item 182].  As will be discussed below, these first two claims also constitute the sole two counts that comprise the alleged wrongdoing in the proposed sub-class one.

Next, Plaintiffs allege that the FSC/Wharton and SunAmerica Defendants violated several provisions of ERISA when, beginning in 2006, the FSC/Wharton Defendants invested Plan assets in the SAMMF instead of a comparable Vanguard money market fund. Plaintiffs allege that this investment was a breach of fiduciary duty by the FSC/Wharton Defendants for both failing to act with skill and prudence of a prudent fiduciary (§ 1104(a)(1)(B)), and for violating a duty of loyalty to the plan participants (§ 1104(a)(1)(A)).  These claims are contained in Counts V, VI, and XXIII.  Plaintiffs seek, pursuant to §§ 1109 and 1132(a)(2), both the return of management fees and damages for inferior returns due to these alleged violations.  The Court granted Defendants' motion for summary judgment as to the fees portion only of Counts V and VI in its June 27, 2012 Opinion.  The Counts are still active as to Plaintiffs' claims for damages for inferior returns.

Plaintiffs also alleged, in Counts III and XI, that the transactions by FSC/Wharton violated § 1106(b), which prohibits fiduciaries from engaging in various acts of self-dealing with plan assets, and sought the return of management fees from both

10

FSC/Wharton and the SunAmerica Defendants under these counts.
The Court granted summary judgment against these Counts on June
27, 2012, after concluding that the claims were moot because the
FSC/SunAmerica Defendants had returned all such fees in 2011.
[Docket Item 211.]  See Goldenberg v. Indel, Civ. No. 09-5202,
2012 WL 2466567 (D.N.J. June 27, 2012).

     These counts, regarding the investment in the SAMMF are the
subject of the second proposed sub-class.  Thus, the only active
counts alleged in the second proposed sub-class are Counts V, VI,
and XXIII (as to inferior returns only).

     Third, Plaintiffs claim that the FSC/Wharton Defendants
breached their fiduciary duty to abide by plan documents under §
1104(a)(1)(D) by investing Plan assets in three different funds
that engage in the practice of investing in short sales (the so-
called "Long/Short Funds").  Plaintiffs allege that an investment
policy statement (the Wharton Business Group Inductotherm Inc.,
Profit Sharing Plan Investment Policy Statement, or "IPS"),
executed by the Plan Trustees and Wharton employees in December
of 2005 when Wharton was hired, promises that FSC/Wharton would
not invest Plan assets in particular kinds of financial
instruments.  See Barndt Cert. Ex. UU, 2005 IPS Sec. VI.  It
provides that "no options and futures (except for hedging) shall
be purchased. There shall be no purchase of securities on margin
and no short sales."  Id.; SAC ¶ 150.  However, Plaintiff

alleges, FSC/Wharton, in fact, invested some assets between April of 2006 and the end of 2009 in three different funds that advertise that they will invest in short options as a way to increase leverage, but also increase risk.  Plaintiffs allege that such investments violated the Wharton Investment Policy, which Plaintiffs therefore claim is a violation of the fiduciary duty to act in accordance with the documents and instruments governing the Plan.

Counts VII, XXIV, and XXV are implicated in these allegations.  These counts comprise the claims of the third proposed sub-class.

Finally, Counts IX and XXVII allege that both FSC/Wharton and Inductotherm are liable for violating the fiduciary duty of prudence (§ 1104(a)(1)(B)) for proposing and carrying out an investment strategy that was excessively balanced toward equities rather than fixed-income or cash investments.  Plaintiffs allege that FSC/Wharton proposed and executed, and the Inductotherm Defendants approved, an investment strategy that, in 2005, set a target for an asset allocation of 80% equities and 20% fixed-income or cash.  While Plaintiffs acknowledge that after the significant losses of 2008 the asset allocation balance between equities and fixed income was temporarily moderated somewhat to a more equal balance, it was readjusted back toward the aggressive 80/20 target by September of 2009.  Plaintiffs claim that the

12

majority of the Plan participants are relatively close to
retirement age, who would benefit from a more conservative
equity/fixed-income allocation, and that it was and is therefore
imprudent of Defendants to enact and pursue the relatively
aggressive allocation that they have.  Plaintiffs allege that
this excessive focus on equities has resulted in significant
losses to the Plan and injured Plan participants by reducing the
value of their interest in the Plan assets.

Plaintiffs bring most of these claims, including the
excessive equities claims, on behalf of the Plan pursuant to §
1132(a)(2) and § 1109, meaning that Plaintiffs are not seeking
recovery of damages as to their specific account balances, but
instead are seeking recovery of the Plan's damages to be returned
to the Plan itself.

As explained above, Plaintiffs are seeking to certify four
sub-classes built around these four groups of alleged ERISA
violations.

| Subclass # | Counts | Defendants | Description |
| --- | --- | --- | --- |
| 1 | I, XXVI | Inductotherm | Trust Agreement and FSC Selection Class |
| 2 | V, VI, XXII | FSC/Wharton | Prohibited Transaction Class |
| 3 | VII, XXIV, XXV | FSC/Wharton | Long/Short Fund Class |
| 4 | IX, XXVII | FSC/Wharton, Inductotherm | Excessive Equities Class |

Plaintiffs describe the proposed sub-classes as follows:

1) The Trust Agreement and FSC Selection Class
consisting of all persons who were Plan

13

participants, other than Defendants, at any time between January 1, 2006 and September 30, 2011.

2) The Prohibited Transaction Class consisting of all persons who participated in the Plan, other than Defendants, from December 1, 2005 to March 31, 2011, when Plan assets were invested in the SAMMF.

3) The Long-Short Fund Class consisting of all persons who participated in the Plan, other than Defendants, from April 17, 2006 to February 7, 2011, when Plan assets were invested in long-short funds.

4) The Excessive Equities Class consisting of all persons who had an account balance between January 1, 2008 and December 31, 2008, other than Defendants.

Defendants oppose certification of these four sub-classes on a number of grounds. The Inductotherm Defendants oppose certifying sub-class 1, the Trust Agreement and FSC Selection Class, on the grounds that summary judgment should be entered against both of the constituent counts of that subclass. [Docket Item 182, Inductotherm Defendants' motion for partial summary judgment.] Additionally, both Defendant groups filed opposition to the motion to certify, regarding all four sub-classes, focusing primarily sub-classes 3 and 4.

Finally, the parties have moved to exclude expert testimony and reports. Defendants jointly move to exclude Plaintiffs' expert (Dr. Pomerantz) under Daubert and Rule 702 of the Federal Rules of Evidence, as an additional reason to deny certification of sub-class 4. The FSC/SunAmerica Defendants have not filed

14

any opposition to the certification of sub-class 2, specifically.
Plaintiffs, in response, have filed their own motion to exclude
Defendants' expert, Lucy Allen.

The Court held oral argument on these motions on August 14,
2012, after which the Court reserved judgment.

## III.  DISCUSSION

### A.  Inductotherm's Motion for Partial Summary Judgment

Because the bulk of the opposition to certification of sub-
class 1 revolves around whether or not the Court will grant
Inductotherm's motion for partial summary judgment, the Court
will begins by addressing that motion.  As explained below,
because the Court finds that Plaintiffs have not raised a dispute
of fact regarding the element of loss caused by a breach in Count
I, the Court will grant Defendants' motion as to that Count, but
will deny Defendants' motion as to Count XXVI.

### 1.  Summary Judgment Standard of Review

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the non-moving party."
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A
fact is "material" only if it might affect the outcome of the

suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence must be produced to support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  See also Scott v. Harris, 550 U.S. 372, 378 (2007) (The district court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.").  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

2.  Count I - Failure to Adopt a Trust Agreement

In Count I, Plaintiffs allege that the Inductotherm

16

Defendants failed to comply with the Plan Documents because they failed to adopt (or even draft) a Trust Agreement that is compliant with the requirements of the Plan.

Specifically, Plaintiffs point to one particular provision of the 2002 version of the Plan (the most recent version of the Plan).  Article 5 of the Plan is titled "Allocations to Participants' Accounts" and generally describes the duties and responsibilities of the Plan administrators to allocate and invest the Plan assets or contributions.  In Section 5.2(a), titled "Investment of Contributions," the Plan states, in part, that

> All Contributions are forwarded by the Company to the Trustee.  Investment of Contributions is governed by the provisions of the Trust Agreement.  To the extent permitted by the Trust Agreement, the parties named below shall direct the Contributions to any of the accounts available under the Trust Agreement and may request the transfer of assets resulting from those Contributions between such accounts.  To the extent that a Participant so entitled does not direct the investment of his Account, such Account shall be invested ratably in the accounts available under the Trust Agreement in the same manner as the undirected Accounts of all other Participants. . . .

2002 Plan, § 5.2(a), attached as Exhibit KK to the Barndt Cert. in support of Defs.' Motion for Summary Judgment; attached as Exhibit B to Barndt Cert. in opposition to Pltfs.' Motion for Class Cert.

Plaintiffs interpret this language of the Plan as creating a

17

duty among the Inductotherm Defendants to draft and adopt a separate trust agreement that (1) contains provisions that govern the investment of contributions, and (2) identifies specific accounts that are available for "parties named below" to direct specific contributions toward.  Plaintiffs suggest that to qualify as the trust agreement described by this section of the Plan, a document must be titled Trust Agreement, must articulate an investment policy, and must specify approved acceptable investment accounts or funds that would be the target of such investment policy.

In short, Plaintiffs claim the Inductotherm Defendants breached their fiduciary duties, and are therefore liable for losses to the Plan caused by such breach.  The Third Circuit has articulated the elements of such a claim.  "[T]he elements of a § 1132(a)(2) claim appear to be (1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." Leckey v. Stefano, 501 F.3d 212, 225-26 (3d Cir. 2007).

Defendants argue that summary judgment is warranted as to Count I for several reasons.  Primarily, Defendants argue that there is no dispute of fact on the record as to the second element of the claim -- that the Inductotherm Defendants breached any ERISA-imposed duty because the section of the Plan calling for a trust agreement has been satisfied.  Additionally, and more persuasively, Defendants argue that no dispute of fact exists as

18

to the third element -- Plaintiffs offer no proof of any plan losses caused by the alleged violation of their fiduciary duty by failing to enact a satisfactory trust agreement.

      i.  Breach of duty

As to Defendants' arguments regarding breach, the Court is not persuaded.  First, Defendants argue that there is no dispute of fact that the 2002 Plan, and its prior versions from 1957 and 1976, constitute a unified, comprehensive Plan and Trust Agreement, and that therefore Defendants were under no obligation under the Plan to enact a separate document titled Trust Agreement pursuant to the terms of § 5.2(a) of the Plan. Defendants base this argument on the fact that the prior 1957 and 1976 versions of the Plan were actually titled "Profit Sharing Plan and Trust Agreement."  From this fact, Defendants argue, the current 2002 Plan (which, the Court notes, is titled simply the "Inductotherm Companies Master Profit Sharing Plan" -- any reference to "Trust Agreement" having been removed from the title) must also be interpreted to be a trust agreement in addition to a Plan document.  This argument is unpersuasive.

In the Court's Opinion on Defendants' motions to dismiss in this action, dated September 17, 2010, the Court concluded that the Plan language in § 5.2(a) can only reasonably be referring to a document separate from the Plan itself.

           It is clear that the reference to the Trust
           Agreement is talking about a separate document

19

> altogether. That separate "Trust Agreement" is
> supposed to govern the investment of
> contributions. But the document submitted by
> Defendants is merely amending the 1976 Plan,
> it is not separate from the Plan, and the Plan
> itself contains no such guidelines for
> investment.

Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618, 630 (D.N.J.

2010). The Court continues to interpret the language of the Plan

as unambiguously suggesting that the Trust Agreement is

contemplated as a separate document.

Secondly, even were the Court to agree with Defendants'

premise that other provisions of the various Plan documents could

qualify as the "Trust Agreement" described in § 5.2(a),

Defendants do not point to any provision of the current or

previous versions of the Plan that fits the description or

accomplishes the responsibilities of such a document. There are

no provisions anywhere in the Plan that list specifically

available accounts that contributions can be invested in, and

there are no provisions of the Plan documents that provide any

meaningful "guidance" or otherwise govern where and how

contributions to the Plan should be invested.

Defendants point to a 2005, and subsequently amended 2009

Investment Policy Statement produced by the Wharton Group (the

IPS -- see Barndt Cert. Ex. UU), which was accepted and signed by

Inducotherm as satisfying the functional requirements of the

Trust Agreement. However, the IPS fails to qualify as the

described Trust Agreement for two reasons.  First, there is at least a dispute of fact over whether a document produced by the Wharton Group and merely signed by two representatives of Inductotherm (who are not identified as Trustees or administrators of the Plan anywhere on the policy statements) could qualify as a Plan instrument properly adopted to amend or be incorporated into the Plan.  Secondly, even were it to be interpreted to stand in for the Trust Agreement, it fails to articulate the details contemplated by § 5.2(a) of the Plan because the Policy Statement does not provide a list of approved accounts as required under the Plan.

Next, Defendants argue that there is no affirmative duty under ERISA to create a separate trust agreement; merely that the plan documents must articulate specific information about how the plan is to be operated.  This argument is similarly unavailing, since it does nothing to counter the fact that the Defendants' Plan itself created the obligation to implement a separate trust agreement.

Finally, Defendants argue that the Trustees' interpretation of the terms of the Plan should be given deference, citing Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520-21 (3d Cir. 1997).  That case holds that when an ERISA-governed benefits plan grants discretionary authority to the plan administrator to interpret the plan, a court reviewing the plan administrator's

21

interpretation or actions should apply an arbitrary and capricious standard of review.  Id.  Plaintiffs correctly point out that Dewitt held that when a plan administrator's interpretation of the plan is inconsistent with the plain language of the plan, that interpretation is arbitrary and capricious and therefore not entitled to deference.  Id. at 522. Similarly, here, Defendants' interpretation that no separate trust agreement that governs the investment of the plan's contributions and lists accounts for such investments is contrary to the plain language of the plan and therefore not subject to deference.  Accordingly, the Court concludes that Plaintiffs have at least pointed to a dispute of fact in the record over whether Defendants breached a fiduciary duty by failing to adopt a trust agreement that complies with the requirements of § 5.2(a) of the Plan.

ii.  Proof of losses to the Plan caused by breach

Secondly, Defendants argue that summary judgment should be granted against Count I because Plaintiffs can point to no evidence in the record of losses to the Plan caused by the Defendants' breach of fiduciary duty in failing to adopt a trust agreement.  See Leckey v. Stefano, 501 F.3d 212, 226 (3d Cir. 2007) (holding that participant plaintiff must point to proof of loss to the plan caused by fiduciary's breach); In re Unisys Savings Plan Lit., Civ. No. 91-3067, 1997 WL 732473 *27-28 (E.D.

22

Pa. Nov. 24, 1997) ("plaintiffs first must meet each element of their claim, including that [the fiduciary]'s alleged misconduct somehow caused a loss. . . . The statute expressly requires such proof.  Before liability for fiduciary breach may attach, a plaintiff must show that the fiduciaries' actions caused a loss.")

In oral argument, Plaintiffs argued that the Court should not grant summary judgment on the basis of this argument because Defendants did not raise the argument in their moving papers, but instead raised it for the first time on reply.  However, the Court notes that this is inaccurate.  Defendants raised the argument in passing in their original brief in support of the motion.  <u>See</u> Brief in Support at 19 n. 26.  Secondly, Plaintiffs argued that further discovery was needed to provide proof of damages or loss to the Plan for the breach alleged in this Count.  However, Plaintiffs have presented no Fed. R. Civ. P. 56(d) affidavit setting out specified reasons why they are unable to present evidence raising a dispute of fact on this point.  The Third Circuit has long held that without an affidavit specifying what specific information would be sought and why it has not been previously obtained, delaying or denying a properly filed motion for summary judgment is unwarranted.  <u>See</u>, <u>e.g.</u>, <u>Hancock Indus. v. Schaeffer</u>, 811 F.2d 225, 230 (3d Cir. 1987).

Accordingly, the Court must grant Defendants' motion for

summary judgment as to Count I.  Plaintiffs have pointed to no evidence in the record raising a dispute of fact that Defendants' alleged breach of fiduciary duty by failing to adopt a trust agreement as required under the terms of the Plan has caused any loss to the Plan, which is an element to Plaintiffs' cause of action.

### 3.   Count XXVI - Failure to Investigate FSC/Wharton

Secondly, Defendants move for summary judgment as to Count XXVI.  Defendants argue that there is no dispute of fact regarding the investigation, which they claim was sufficient. The Court will deny this portion of Defendants' motion.

Count XXVI alleges that the Inductotherm Defendants breached their fiduciary duty of prudence by hiring FSC/Wharton as investment advisors without conducting an adequate investigation into their qualifications and experience.  In a different but analogous context of assessing a claim regarding the prudence of a particular investment decision of a fiduciary, the Third Circuit has instructed that the factfinder should employ an objective reasonableness standard.

> Courts measure section [1104](a)(1)(B)'s 'prudence' requirement according to an objective standard, focusing on a fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.

In re Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996).

24

Therefore, the question on summary judgment is whether there is a dispute of fact over whether the Inductotherm Defendants' investigation of FSC/Wharton prior to hiring them was objectively reasonable.

Defendants argue only that they did not breach their fiduciary duty of prudence because they employed an adequate, "appropriate methods to investigate and determine the merits" of FSC/Wharton.  They point to evidence that the Trustees held several "due diligence" meetings and considered seven different advisory firms before selecting FSC/Wharton.  Krupnick Cert. ¶¶ 10-11.  Further, Defendants point to uncontested evidence in the record that the Trustees selected FSC/Wharton on the basis of their presentation and their proposed asset allocation models. Id. ¶¶ 12-13.  Additionally, Defendants point to uncontested evidence that the Trustees were reassured of Wharton employees Webster and Hembrough's skill and experience because of their prior and successful management of Trustee Henry Rowan's personal and family investments.  Id. ¶ 14.  Finally, another of the Trustees, Laurence Krupnick, did some independent internet searches for evidence of particular kinds of regulatory violations.  Id. ¶ 15.

Plaintiffs, in opposition, point to uncontested evidence in the record that the Trustees did not ask specific questions about the experience or qualifications of the Wharton employees.

25

Plaintiffs highlight a list of questions recommended by the SEC and the Department of Labor for ERISA fiduciaries to ask prospective investment advisors. Robert Lakind Cert. Exs. F, L. None of those questions were apparently asked of FSC/Wharton. Robert Lakind Cert. Ex. K, Krupnick Dep. 146:22-148:15; Ex. I, Webster Dep. 53:12-54:17. Further, Plaintiffs point to a series of emails sent by one of the Inductotherm Trustees (Mr. Krupnick) in the summer and fall of 2009 seeking information about the background, experiences, qualifications, and SEC registration status of Wharton. Robert Lakind Cert. Ex. G.[6] While Defendants have supplied an explanation by Mr. Krupnick regarding why he asked these questions (namely: he was only seeking <u>updated</u> information because of recent or anticipated changes in the investment advisors). However, Mr. Krupnick's email does not explicitly seek "updated" information and does not otherwise

---

[6] Specifically, the section quoted by Plaintiffs reads as follows:

> What I would like to address now, and annually hereafter, is information from Wharton, as the service provider to our plan, along the following lines:
> 1. Information about the firm itself, what are its activities in this field, what number of clients, and of what size are they servicing.
> 2. Information on personnel including the qualifications of professionals . . . .
> 3. Any litigation or inforcement [sic] action against the firm or its members.
> 4. A copy of all agreements that may exist that effect [sic] the [Plan] . . . .

Lakind Cert. Ex. G.

suggest that this information had previously been provided to him.  It is a reasonable inference from the fact that he sent this email that Mr. Krupnick was asking for this information because he did not already know it.

The Court concludes that on this record, a dispute of fact exists over whether a factfinder would conclude that Defendants' investigation into FSC/Wharton was reasonable without making any explicit inquiries into the investment advisors' experience and background.

Plaintiffs further argue that a prudent fiduciary that had conducted a reasonable investigation would not have hired FSC/Wharton based on their record and experience.  Specifically, Plaintiffs point to evidence that Wharton was not registered with the SEC at the time it was selected, that Mr. Webster and Mr. Hembrough, the principal investment advisory representatives working for Wharton, had extremely limited experience with managing an advisor-directed plan such as Inductotherm's, and FSC itself had recently been sued for ERISA violations related to its overly aggressive asset allocation recommendations in a 401(k) plan in California.  Robert Lakind Cert. Ex. H., Hembrough Dep. 125:2-5; Webster Dep. 31-34, 38; Lakind Cert. Ex. M.

Defendants argue that the mere fact that FSC, the parent organization of Wharton, had been sued is not, in itself, a basis for failing to hire an investment advisory firm.  The Court

27

finds, however, that based on the full circumstances and context, a reasonable factfinder could conclude that hiring an investment advisory firm with this collection of warning flags was imprudent.

Therefore, the Court finds that Plaintiffs have pointed to sufficient disputes of fact regarding whether Defendants breached a duty of prudence in hiring the FSC/Wharton Defendants as investment advisors in 2005.  Plaintiffs' claims for damages related to this count are established through the other counts, to be addressed below, related to the prohibited transaction claims, the long/short fund claims, and the excessive equities claims.  Because the Court concludes, as discussed below, that Plaintiffs have sufficiently pointed to a dispute of material fact regarding whether a reasonable fact finder would find a loss to the Plan related to investment decisions and advice rendered by the FSC/Wharton Defendants after they were hired, the Court concludes that Plaintiffs have satisfied their burden as to the element of loss on Count XXVI.  The Court will, therefore, deny Defendants' motion for summary judgment as to Count XXVI.

### B.  Admissibility of Expert Opinions – <u>Daubert</u> Motions

The remaining issues, including the motion to certify, turn in part on the admissibility of Plaintiffs' expert report and opinions.  Therefore, the Court will next address Defendants' joint motion to exclude the report and opinions of Dr. Pomerantz.

The Court will then briefly address Plaintiffs' motion to exclude the report and opinions of Defendants' expert, Lucy Allen.

    1.  <u>Standard of Review</u>

The admissibility of expert witness testimony is governed by Rule 702, Fed. R. Evid., and the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As the Supreme Court explained in <u>Daubert</u>, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702.  <u>Id.</u> at 590–91; <u>see also</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 146–47 (1999) (holding that <u>Daubert</u> extends to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted).

Under the law of this Circuit, when an evidentiary challenge is raised, <u>Daubert</u> and Rule 702 call upon the Court to examine

the admissibility of expert testimony in light of three factors:
the qualifications of the expert, the reliability of his or her
methodology and the application of that methodology, and whether
the testimony fits the matters at issue in the case.  In re Paoli
R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994).  With
regard to the qualifications prong, the Court of Appeals has
explained that an expert's qualifications should be assessed
"liberally," recognizing that "a broad range of knowledge,
skills, and training qualify an expert as such."  Id. at 741.

In addition to being qualified to testify in an expert
capacity, an expert witness whose testimony is offered by a party
must base her opinions on reliable methodology. The Court of
Appeals explained in Paoli that

> Daubert explains that the language of Rule 702
> requiring the expert to testify to scientific
> knowledge means that the expert's opinion must
> be based on the methods and procedures of
> science rather than on subjective belief or
> unsupported speculation; the expert must have
> good grounds for his or her belief.  In sum,
> Daubert holds that an inquiry into the
> reliability of scientific evidence under Rule
> 702 requires a determination as to its
> scientific validity.

Id. at 742 (internal quotations and citations omitted).
Recognizing that the "inquiry as to whether a particular
scientific technique or method is reliable is a flexible one,"
the Court of Appeals has identified a nonexhaustive list of eight

factors[7] that courts may address in determining whether an
expert's methodology is reliable.  Id.; see also Heller v. Shaw
Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999).

Finally, to be admissible under Rule 702, expert testimony
must "fit," or be relevant to, the facts at issue in the case.
Paoli, 35 F.3d at 743.  "Because Rule 702 demands that the expert
testimony assist the trier of fact, such testimony will be
admissible only if the research is sufficiently connected to the
facts and issues presented in a given case." Suter v. General
Acc. Ins. Co. of America, 424 F.Supp.2d 781, 787 (D.N.J. 2006)
(citing Paoli, 35 F.3d at 743).  In other words, Rule 702's
relevance standard requires that there be "a valid scientific
connection" between the expert's testimony and the facts and
issues in the case in order for the expert's testimony to be
admissible.  Paoli, 35 F.3d at 743.

2.  Defendants' Daubert Motion

Defendants have jointly filed a motion to exclude the

_____

[7] The factors identified by the Court of Appeals for
assessing the reliability of an expert's methodology are:
(1) whether a method consists of a testable hypothesis;
(2) whether the method has been subject to peer review;
(3) the known or potential rate of error; (4) the
existence and maintenance of standards controlling the
technique's operation; (5) whether the method is
generally accepted; (6) the relationship of the technique
to methods which have been established to be reliable;
(7) the qualifications of the expert witness testifying
based on the methodology; and (8) the non-judicial uses
to which the method has been put.
Paoli, 35 F.3d at 742, n. 8.

reports and opinions of Plaintiffs' expert, Dr. Pomerantz, which concluded that Defendants should have considered the age of the participants in establishing the asset allocation, and further concluded, in part, that a more prudent asset allocation resulted in a 44% equities and 56% fixed income allocation, based on his consideration of the aggregate asset-weighted age of the plan participants.  Finally, Dr. Pomerantz concluded that, had Defendants employed his more prudent asset allocation, the Plan would have performed considerably better over the class period.

Defendants claim that (1) Dr. Pomerantz is not qualified to offer an opinion in this area, (2) Dr. Pomerantz's opinions are not based on reliable methodology, (3) that Dr. Pomerantz's report contains factual errors about the Plan sufficient to raise concerns about the reliability of his opinions, and (4) Dr. Pomaerantz's opinions are not properly fit to the Plaintiffs' claims.  Plaintiffs oppose Defendants' motion.

In brief, Dr. Pomerantz's reports reach several opinions. Defendants' motion primarily addresses his opinions related to the excessive equities claims, which are expressed in Dr. Pomerantz's third opinion, which states that

> The overall asset allocation of the Plan was excessively aggressive causing severe losses to participants in 2008, a position that remains unmitigated and a continued source of additional losses up to the present, in the range of $13 to $18 million.

Robert Lakind Cert. in support of motion to certify, Ex. V,

Pomerantz Oct. 28, 2011 Rept. at 5.  Dr. Pomerantz bases this opinion on several constituent conclusions.

First, Dr. Pomerantz concluded, based on his experience in investment advice, that the age of the investor or beneficiary is a "critical" criterion ("the most important factor") to consider when considering the proper risk exposure and asset allocation. Pomerantz Oct. 28, 2011 Rept. at 15.  Second, Dr. Pomerantz concluded that, because the Plan is a non-participant directed plan, permitting only a single asset allocation for the entire Plan, to factor in the age of the Plan's participants, he would need to identify the prudent asset allocation on a Plan-wide basis.  Id. at 20.  Therefore, Dr. Pomerantz reasoned that a reliable method to determine a single plan-wide asset allocation is to use the 100-minus-age method often recommended for individual retirement account asset allocation but apply it to the Plan as a whole.  Id.  This method, recommended for individual retirement planning by, among others, the Social Security Administration, requires the investor to subtract the investor's age from 100 to reach the target equity allocation. Therefore, an 80% equity allocation is appropriate for a 20-year-old investor, and a 30% equity allocation is appropriate for a 70-year-old investor, with the balance to be invested in fixed-income and cash assets which are more stable.

Therefore, to apply the 100-minus-age method to the Plan as

a whole, Dr. Pomerantz needed to arrive at an appropriate aggregate age that the Plan would target for its asset allocation purposes.  To determine this target age, Dr. Pomerantz averaged the optimal equity allocation for each of five different age groups comprising all Plan participants, weighted according to the respective ownership share of the Plan allocated to the participants in each age group.  Id. at 21.  Using this methodology, Dr. Pomerantz reached an asset-weighted optimal equity allocation of 44% and an asset-weighted "age" of the Plan at 56.  Id.

Finally, Dr. Pomerantz determined that, had the Plan been invested using this "prudent" equity allocation during the class period, the Plan would have performed better than it would have according to the target asset allocation of 80/20 used by Defendants.  Id. at 23-24.

Defendants challenge the admissibility of Dr. Pomerantz's opinion regarding asset allocation on the basis of his qualifications, the reliability of his methodology, and the "fit" of the opinion to the facts of this case.

As to Dr. Pomerantz's qualifications, Defendants argue that Dr. Pomerantz is not and has never been a named ERISA fiduciary, has never examined a nonparticipant directed plan like this one before, did not seek out the opinions of other experts in the field, and has never published on this specific topic before.

34

Plaintiffs argue, in opposition, that Dr. Pomerantz has wide and expansive experience in the field of retirement investment management.  He has a Ph.D. in mathematics, has held NASD series 3, 7, 24, and 63 certifications, is a FINRA trained arbitrator, has worked as an investment management consultant and the director of Quantitative Research at Weiss Peck, LLC., has served as an officer and securities trader for several investment broker-dealers, and has published articles on market volatility and investment returns.  Pomerantz Oct. 28, 2011 Rept. Ex. 1. Further, Dr. Pomerantz has worked as an investment advisor for the assets in an ERISA plan before, "advised them on how to manage their assets and ha[s] had the discretion to hire and fire investment managers within those plans."  Pomerantz Dep. at 26:16-19.

On this record, the Court concludes that Dr. Pomerantz is sufficiently qualified as an expert to offer opinions, applying the liberal standard of expert qualifications in this Circuit under Paoli.  35 F.3d at 741.

Secondly, Defendants argue that Dr. Pomerantz's methodology in reaching his opinions is unreliable.  They argue that Dr. Pomerantz's method of reaching the "prudent" age-asset-weighted equity allocation of the Plan is not commonly used by similar plans and is otherwise not recognized, and lacks the appropriate indicia of reliability required under Daubert.  More

specifically, Defendants argue that Dr. Pomerantz's application of the 100-minus-age formula is not reliable because it is not used by similar plans.  Finally, Defendants argue that Pomerantz's calculation of the damages is unreliable because it omits the first two years of significant gains (for the years 2006 and 2007) accomplished under FSC/Wharton's advice prior to the market crash of 2008.

Plaintiffs respond that the only reason that Dr. Pomerantz's arithmetically reasonable method of calculating the asset-weighted age of the Plan is not widely used by similar plans is that there are so few non-participant directed plans.  Given that some consideration of age should be made, Plaintiffs argue, this method was a reasonable approach to considering several variables at once.  They further point out that the 100-minus-age formula for calculating the appropriate allocation of equities and fixed-income assets is recommended by several investment professionals and regulators for individual investors, pointing to Social Security Administration and TD Ameritrade recommendations.  Additionally, Plaintiffs conclude that the reliability of the methodology for reaching the "prudent" 44/56 asset allocation in this case is testable by looking at the ranges of other "conservative" and "moderate" allocations, which this allocation fits neatly between, suggesting that for a group of people approaching but not yet reaching retirement age, somewhere

36

between conservative and moderate risk seems appropriate.

Considering Dr. Pomerantz's methodology under the factors articulated in Paoli, the Court concludes that the methodology is sufficiently reliable to be admissible under Fed. R. Evid. 702.

First, the Court finds that Dr. Pomerantz's hypothesis is testable by looking first at how the Plan's assets performed when invested according to the proposed allocation as compared to the more aggressive target allocation of 80/20 during a period of high market volatility such as 2008.  Alternatively, the 44% equity allocation result of Dr. Pomerantz's allocation compares reasonably with other "conservative" and "moderate" allocations.

Second, while the application of the 100-minus-age allocation method does not appear to be generally accepted among multi-participant retirement plans, it is generally accepted for individual retirement planning purposes.  And it does not seem unreasonable to apply the principles of balancing growth and risk that are embodied in the Social Security Administration's advice to individuals to a retirement plan that can only adopt a single risk/growth investment strategy.  Therefore, while the record does not support the conclusion that Dr. Pomerantz's method is generally accepted in this specific context, Defendants have not offered any principled reason why its application to this Plan is unwarranted and why the method's general acceptance to individual investment planning is inapplicable here.

While the method has not been subject to peer review in the specific context of multi-participant retirement plans, the other Paoli factors generally support the reliability of the method. In particular, in the same way that the allocation method considering investor age is generally accepted for an individual investment portfolio, similarly, the method is put to use in non-judicial contexts regularly by investors following the Social Security Administration's recommendations.  Where, as in the present case, the management of the multi-participant retirement plan is accomplished by investment decisions that must be applied to the Plan as a whole, rather than the subject of individualized investment decisions, it is not unreasonable to regard the Plan as having the characteristics of its median member, including the median age.

On a higher level of abstraction, Defendants argue that it is nonsensical to assign an age and, impliedly, a retirement horizon to a plan that does not age and will not retire or mature.  However, the Court notes that the Plan is intended to be invested "for the exclusive benefit of participants, former participants and beneficiaries . . . ."  2002 Plan § 7.1. Therefore, as the participants of the Plan, for whose benefit the Plan's assets are invested, are aging and approaching retirement, it is not irrational to consider the age and risk tolerance of the Plan's participants when devising a prudent asset allocation.

38

Logically, the investments for a fund comprised of relatively older participants may be more prudent in avoiding risky equities and favoring fixed income investments; for a relatively younger group of participants, prudence would allow greater tolerance of risk. Thus, the consideration of age in itself is not a reason to question the reliability of Dr. Pomerantz's methodology.

One aspect of Dr. Pomerantz's methodology does not appear to be reliable, however: his determination that the calculation of damages should begin in 2008, when the market began to plummet, rather than in 2006, after the Defendants implemented their allegedly "imprudent" aggressive asset allocation strategy. Dr. Pomerantz offers no convincing explanation for why the calculation of the damages to the Plan should not take into consideration the years 2006 and 2007, when the Plan was benefitting from the aggressive allocation strategy of the Defendants when calculating damages. By narrowly focusing only on the years that the Plan did badly, the methodology appears to be hindsight driven rather than reliably focused on long-term stability and growth. See Alco Indus., Inc. v. Wachovia, 527 F. Supp. 2d 399, 404 (E.D. Pa. 2007) ("Under well-settled principles of trust law, defendants are entitled to offset profits from a single, continuous breach of trust against losses flowing from that same breach.")

However, the Court concludes that this flaw in the

39

application of the methodology does not render the methodology itself unreliable.  As is demonstrated in Defendants' expert's report, if Dr. Pomerantz's 44% equity allocation were applied to a damages period beginning in January of 2006, the more conservative allocation still shows damages of $4.7 million as compared to the aggressive allocation method.  Allen Nov. 30, 2011 at 31.  Therefore, the Court concludes that the methodology used in Dr. Pomerantz's report is sufficiently reliable under Daubert and Fed. R. Evid. 702.

Finally, Defendants argue that Dr. Pomerantz's opinion regarding asset allocation does not "fit" Plaintiffs' claims.  Specifically, Defendants argue that Dr. Pomerantz's damages conclusions, which are based on a comparison of the "prudent" 44% equities allocation against the Defendants' target 80% equities allocation, are not well fit to the actual damages in this case because over the class period, the 80% allocation was only a "target" for the Inductotherm Plan; the Plan's assets were not actually allocated strictly according to the 80% target, but were allocated in a range above or below 80% that varied on a month-by-month basis.  Pomerantz Dep. 198:17-199:9.  Accordingly, Defendants argue, Dr. Pomerantz's damages calculations do not actually reflect the real "damages" suffered by the Plan if the factfinder were to find Defendants liable.

The Court again finds Defendants' argument unpersuasive.

Dr. Pomerantz's opinion is that the 80/20 asset allocation target
is not prudent as compared to an asset allocation target that
considers the age of the Plan participants, such as his proposed
44/56 target.  Therefore, it is an appropriate apples-to-apples
comparison for Dr. Pomerantz to judge the prudence of the
Defendants' target asset allocation by comparing it to an
alternative target allocation.  Had Dr. Pomerantz meant to
measure the actual damages caused by Defendants' actual asset
allocations, he could have compared those numbers as against a
more actively managed "prudent" allocation.  Dr. Pomerantz
addressed this issue in his report by explaining that he chose
the mathematically precise target division for the comparison of
both options as a conservative demonstration only.

> This is a very conservative damage approach,
> as I have not selected, for determining the
> Plan's damages, actively managed equity and
> bond mutual funds with superior performance.
> Rather, I have relied on unmanaged index
> funds.  Of course, FSC/Indel engaged active
> management of the Plan's portfolio . . . . If
> I had used equity and bond funds with superior
> performance (which an investment manager is
> attempts [sic] to achieve), the damages would
> significantly increase.  Instead, I used an
> unmanaged index allocation in an appropriate
> manner between equities and fixed income
> instruments, and thus relies [sic] on a very
> conservative methodology for determining
> damages.

Pomerantz Oct. 28, 2011 Rept. at 24.  Thus, the Court concludes
that Dr. Pomerantz's report is an appropriate fit to Plaintiffs'
claim, which is that the Defendants' asset allocation target was

41

imprudent.  The Court further finds that Dr. Pomerantz's report
appropriately demonstrates a reliable method for proving
classwide damages on this basis, but does not unnecessarily
attempt to actually calculate the exact amount of damages at this
class certification stage.[8]

The Court therefore concludes that Dr. Pomerantz's report
and opinion regarding asset allocation are admissible under
Daubert and Fed. R. Evid. 702 for purposes of class
certification, as Plaintiffs have demonstrated that Dr. Pomerantz
is qualified to give his opinion, his methodology is reliable,
and it is reasonably fit to the claims and procedural posture of
class certification.  Accordingly, the Court will deny
Defendants' motion to exclude the report.

3.  Plaintiffs' Daubert Motion

Plaintiffs also move to exclude the expert report and
opinion testimony of Defendants' expert Lucy Allen.  Ms. Allen
has an MBA in accounting and an M.A. and M.Phil. in economics.
She frequently testifies on topics related to plan performance
and conflicts with proposed classes of litigants in the ERISA

---

[8] As noted above, the Court makes no determination of the
admissibility of Dr. Pomerantz's expert opinion testimony for
purposes of trial.  It is apparent, for example, that any such
opinion for trial purposes must include the entire period of time
since 2006 in which the 80/20 policy at issue was in effect.
Further, any such opinion must reckon more specifically with the
variations in investment targets adopted by Defendants in which
the 80/20 allocation strategy was changed.

area.

Plaintiffs move to exclude her testimony criticizing Plaintiffs' expert Dr. Pomerantz on the sole basis that Ms. Allen is not qualified to testify on the specific topic of asset allocation.[9]  The Court will deny this motion.  Ms. Allen's qualifications are sufficient to opine about the methodology of Dr. Pomerantz's opinions, as her training and experience in the field of economics permits her to recognize logical fallacies and insufficiently supported statements, even if she is not particularly familiar with the extremely narrowly defined subfield of asset allocation itself.

Secondly, the Court is also persuaded by Defendants' opposition argument that Ms. Allen's opinion should not be excluded on the basis of her qualifications in asset allocation when the opinions themselves are focused on other topics, such as intra-class conflicts.

Accordingly, the Court will deny Plaintiff's motion to exclude the expert report of Ms. Allen, and will consider it with respect to the class certification motion.

---

[9] In Plaintiffs' reply brief, they raise several new arguments regarding new reasons and new aspects of Ms. Allen's report and opinion testimony, such as the fact that Ms. Allen's testimony regarding intra-class conflicts among the proposed excessive equities sub-class is based on unreliable methodology and is irrelevant to a claim brought on behalf of the Plan as a whole.  The Court does not consider these new arguments raised in reply.

### C.  Class Certification

As explained above, Plaintiffs move to certify four sub-classes of Plan participants, focused on four groups of claims. Sub-class One involves Counts I and XXVI.  While the Court has concluded it must grant Defendants' motion for summary judgment as to Count I, the Court will deny the motion as to Count XXVI, and therefore, the Court will determine whether Plaintiffs have satisfied their burden of proving the elements of Rule 23 as to this sub-class.  Similarly, claims in Sub-class Two, which involve the FSC Defendants' decision to direct Plan assets into the SAMMF rather than a Vanguard money market account, have partially survived the FSC/SunAmerica Defendants' motion for partial summary judgment in June, and will therefore be evaluated under the Rule 23 factors for those portions of the claims that survive.  Claims in Sub-classes Three and Four have not yet been subject to any motions for summary judgment.

### 1.  Standard of Review

"District courts have discretion under Rule 23 to certify a class."  Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). To certify a class, the Court must find that the proposed class meets the prerequisites to a class action; "plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met."  In re Chiang, 385 F.3d 256, 264 (3d Cir. 2004).

44

> [T]he requirements set out in Rule 23 are not
> mere pleading rules. The court may delve
> beyond the pleadings to determine whether the
> requirements for class certification are
> satisfied. . . . Class certification requires
> a finding that each of the requirements of
> Rule 23 has been met. See [Unger v. Amedisys
> Inc., 401 F.3d 316, 320 (5th Cir.2005)] ("The
> plain text of Rule 23 requires the court to
> 'find,' not merely assume, the facts favoring
> class certification."). Factual
> determinations necessary to make Rule 23
> findings must be made by a preponderance of
> the evidence. In other words, to certify a
> class the district court must find that the
> evidence more likely than not establishes each
> fact necessary to meet the requirements of
> Rule 23.

In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 316,
320 (3d Cir. 2008) (some internal quotations and citations
omitted). Thus, Plaintiff has the burden of introducing evidence
sufficient to meet a burden of proof by a preponderance of the
evidence that he has satisfied each element of Rule 23. The
District Court must be satisfied that "the evidence more likely
than not establishes each fact necessary to meet the requirements
of Rule 23." Id. at 320.

However, "it is not necessary for the plaintiffs to
establish the merits of their case at the class certification
stage, and ... in determining whether a class will be certified,
the substantive allegations of the complaint must be taken as
true." Chiang, 385 F.3d at 262. "Depending on the
circumstances, [however,] class certification questions are
sometimes 'enmeshed in the factual and legal issues comprising

the plaintiff's cause of action,' and 'courts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" <u>Beck</u>, 457 F.3d at 297 (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 167 (3d Cir. 2001)).

However, "a district court has limited authority to examine the merits when conducting a certification inquiry" and the "ability of the named plaintiff to succeed on his or her individual claims" is not a prerequisite to class certification. <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 305 (3d Cir. 2011). "Put another way, a district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." <u>Id.</u>

Therefore, in the instant matter, Plaintiffs must establish, as to each proposed sub-class, the four elements of Rule 23(a), and one of the elements of Rule 23(b), Fed. R. Civ. P.  Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

46

Fed. R. Civ. P. 23(a).  Additionally, Plaintiffs must establish that their proposed class meets the requirements of one of the subsections of Rule 23(b).  At oral argument in this matter, Plaintiffs clarified that their proposed subclasses should be certified as Rule 23(b)(1) classes.  That subsection covers class actions where

> (1) prosecuting separate actions by or against individual class members would create a risk of
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).

The Court will address each of these elements in turn.

2.  <u>Numerosity</u>

Plaintiffs offer evidence, which Defendants do not contest, that all sub-classes satisfy the numerosity requirement, as there have consistently been, throughout all proposed sub-class periods, well more than 200 participants in the Plan, usually more than 250.  Robert Lakind Cert. Ex. MM.  As the Court of Appeals has explained, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if

47

the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001). The Court finds that Plaintiffs have satisfied the first element of Rule 23(a) as to all four sub-classes.

     3.  <u>Adequacy</u>

Plaintiffs have proposed the same three class representatives for all four sub-classes, with the exception that Plaintiff Loew is not proposed as a class representative for Sub-class Four.

In general, Rule 23(a)(4) requires that plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Third Circuit has consistently relied on two factors: "(a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and (b) the Plaintiff must not have interests antagonistic to those of the class." <u>Weiss v. York Hosp.</u>, 745 F.2d 786, 811 (3d Cir. 1984). Plaintiffs have offered evidence that Plaintiffs' counsel are sufficiently experienced to meet this threshold.

Defendants argue that Plaintiffs' counsel are not adequate because they have insufficient experience litigating ERISA class action suits, and by pointing to the fact that Plaintiffs have filed several amended pleadings. These arguments are

unpersuasive.  The Third Circuit instructs courts to assess the adequacy of class counsel under the factors of Rule 23(g) which involves assessing (i) "the work counsel has done in identifying or investigating potential claims in the action"; (ii) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (iii) "counsel's knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class".  Fed. R. Civ. P. 23(g)(1)(A).  See Sheinberg v. Sorensen, 606 F.3d 130, 132-33 (3d Cir. 2010).

The Court finds that, on balance, Plaintiffs' counsel meets these requirements.  The only factors Defendants question relate to counsel's experience, but as Plaintiffs' counsel pointed out in reply, counsel has recently successfully litigated an ERISA putative class action.  See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co., 677 F.3d 178 (3d Cir. 2012).[10] Accordingly, the Court finds that Plaintiffs' counsel is adequate.

---

[10] Defendants also argue that because Plaintiffs counsel sought out some of the named plaintiffs, counsel is rendered inadequate because such behavior suggests that the litigation is driven more by counsel than by the Plaintiffs.  However, Plaintiffs persuasively account for their actions by explaining that counsel were originally contacted by Plaintiff Goldenberg via his family members, which was the genesis of the litigation. Only after counsel had begun to construct a case in response to Mr. Goldenberg's claims did they solicit other potential lead plaintiffs via newspaper advertising out of concerns for Mr. Goldenberg's health.

Secondly, Defendants argue that the individual Plaintiffs also are inadequate for several reasons.  First, the FSC Defendants argue that by pursuing a more conservative asset allocation through the excessive equities claims, Plaintiffs' interests are antagonistic to members of the class who might have a preference for a higher-risk-higher-return asset allocation. Plaintiffs respond persuasively, however, that their excessive equities claims, brought as a derivative action on behalf of the Plan, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), are seeking a determination regarding the prudent asset allocation on behalf of the Plan itself, not on behalf of the individual plaintiffs, and that therefore the focus of the litigation is not pursuing any particular plaintiff's asset allocation preferences (not, for example, the individual plaintiffs).  Consequently, the interests of the individual plaintiffs are not directly at issue and therefore not antagonistic to the interests of other class members.[11]

Next, Defendants argue that the individual Plaintiffs do not have a sufficiently sophisticated understanding of the claims alleged in the Second Amended Complaint to adequately supervise their attorneys and represent the class.  The Court likewise

---

[11] The issue of conflicting appetites for risk in the asset allocation among Plan participants is an issue that arises in the context of the other Rule 23 elements, and it is discussed in greater depth below.

finds this line of attack unpersuasive.

> [A] class representative will be found
> inadequate due to ignorance only when they
> have so little knowledge of and involvement in
> the class action that they would be unable or
> unwilling to protect the interests of the
> class against the possibly competing interests
> of the attorneys.

In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 240

(S.D.N.Y. 2006) (internal quotation marks omitted).  While

Defendants have pointed to portions of the depositions of the

named Plaintiffs where they are unable to articulate the claims

in this action with a great deal of sophistication or precision,

the Court is persuaded on this record that Plaintiffs possess a

sufficient understanding of the nature and substance of the claim

to serve as adequate representatives.

Finally, Defendants attack the adequacy of Plaintiff

Reinaldo Pacheco on the grounds that he is involved in other

employment-related disputes with the Inductotherm Defendants, and

therefore may be inadequate because he may be motivated by

improper motives.  Smith Cert. ¶ 3-5.  However, Plaintiffs point

out that Mr. Pacheco's employment and grievance disputes with

Inductotherm arose after he became a party to this action,

ameliorating any concerns that he joined the suit for such an

improper purpose.

Accordingly, the Court finds that Plaintiffs have satisfied

the requirements of adequacy under Rule 23(a)(4) as to all four

sub-classes.

### 4.   Commonality and Typicality

The vast bulk of argument regarding class certification is focused on the fourth proposed sub-class.  Plaintiffs allege that it was a breach of Defendants' fiduciary duty of prudence to not consider the age of the Plan participants in devising the Plan's asset allocation, and that a more prudent asset allocation for the Plan, considering the collective ages of the Plan participants, would allocate a much higher proportion of the Plan's assets to fixed-income investments rather than equities.

Plaintiffs argue that because Plaintiffs bring their claims pursuant to § 1132(a), and therefore are pursuing Plan losses rather than individual recoveries, they have satisfied the commonality and typicality elements.

> Commonality requires that there are questions
> of law or fact common to the class.  The
> threshold for establishing commonality is
> straightforward: the commonality requirement
> will be satisfied if the named plaintiffs
> share at least one question of fact or law
> with the grievances of the protected class.

In re Schering Plough Corp. ERISA Lit., 589 F.3d 585, 596-97 (3d Cir. 2009) (internal quotation marks and citations omitted; quoting Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)).  The typicality requirement

> ensure[s] that the class representatives are
> sufficiently similar to the rest of the class-
> -in terms of their legal claims, factual
> circumstances, and stake in the litigation--so

> that certifying those individuals to represent
> the class will be fair to the rest of the
> proposed class.

Id. at 597.

Defendants argue that Plaintiffs cannot satisfy the commonality and typicality requirements of Rule 23(a)(2) and 23(a)(3) specifically with regard to sub-classes Three and Four. Defendants argue that Plaintiffs fail to satisfy both of these elements principally because Plaintiffs' theory of determining the prudent asset allocation, giving primacy to the median weighted age of the Plan participants, necessarily creates conflicts between class members who are of different ages.[12]  In essence, Defendants argue, assuming Plaintiffs' premise (that an individual Plan participant's asset allocation preferences will vary according to the participant's age), any change to the asset allocation on this basis automatically benefits some Plan participants and harms other younger participants who would prefer a more aggressive equity balance because they intend to invest over a longer time horizon.

Thus, Defendants argue, there are no common questions of law among the class because the answer to "what is the optimum asset allocation?" would necessarily have a different answer for each plan participant.  Additionally, no individual plan participants

---

[12] Defendants' expert Lucy Allen opined on this subject in her expert report as well.  See Allen Nov. 30, 2011 Rept. at 17-18.

53

could be typical of the class because each plan participant would

have his or her own preference for risk.

Defendants cite, for this proposition, to recent Supreme

Court precedent, which held that

> [w]hat matters to class certification is not
> the raising of common 'questions' – even in
> droves – but, rather the capacity of a
> classwide proceeding to generate common
> <u>answers</u> apt to drive resolution of the
> litigation.   Dissimilarities within the
> proposed class are what have the potential to
> impede the generation of common answers.

<u>Wal-Mart Stores, Inc. v. Dukes</u>, --- U.S. ---, 131 S. Ct. 2541,

2551 (2011) (emphasis original).

Plaintiffs respond by pointing to the fact that, because the

Inductotherm Plan is structured to only permit one asset

allocation for the entire Plan, there can be only one decision at

any given time as to what the "prudent" asset allocation is.

Thus, as to the commonality element, the central common question

of law posed by Plaintiff's excessive equities claims--is

Defendants' asset allocation target of 80% equities and 20%

fixed-income a prudent allocation given the collective age of the

Plan participants--must have only one answer; it either is

prudent or it is not.

Defendants have made the decision that the Inductotherm

Plan's investment goals should be focused on long-term growth,

suggesting that a more aggressive equities-focused balance is

appropriate and that greater short-term volatility is an

acceptable consequence in light of that goal.  Plaintiffs have alleged and seek to prove, instead, that because of the average age of the participants in the Plan, it is imprudent of the Plan's fiduciaries to accept such short-term volatility given that most plan participants are nearing their retirement age. Because the individual participants cannot all pursue their own investment goals in the Inductotherm Plan, there can be only one choice on this score, and it either is "prudent" or it is not.[13]

Secondly, Plaintiffs argue, the excessive equities claims are brought on behalf of the Plan itself, not on behalf of all the individual plan participants.  Therefore, the question of whether and how much particular plan participants benefit from Plaintiffs' proposed conservative asset allocation is not the relevant question.  When a plaintiff seeks relief on behalf of the plan under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a), the focus at the class certification stage is not on whether each individual plan participant has been injured or stands to benefit from the change.  The focus, instead, is on whether the Plan itself has been injured through a lack of prudence by the fiduciary.

_____

[13] This is not to say that there can only be one possible prudent asset allocation.  Indeed, there may be many prudent ways to allocate Plan assets between equities and fixed income, but the question of whether the current Plan's target of 80/20 is prudent given the average age of the Plan participants can have only one answer of yes or no.

> Here, the common focus is on the conduct of
> Defendants: whether they breached their
> fiduciary duties to the Plan as a whole by . .
> . [making] imprudent investment decisions. . .
> . Plaintiffs' claims do not focus on injuries
> caused to each individual account, but rather
> on how the Defendants' conduct affected the
> pool of assets that make up the Master Trust.

Kanawi v. Bechtel Corp., 254 F.R.D. 102, 109 (N.D. Cal. 2008).

Defendants argue that this case is different from one where the only concern regarding typicality is that the plaintiff class members may benefit in different amounts. Here, rather, Defendants argue, the Court should be concerned that some significant percentage of the class would not only not benefit uniformly, but would, in fact, be harmed by the proposed "prudent" allocation proposed by Plaintiffs. Defendants support this argument by pointing out that many Plan participants' accounts would have performed worse over the past six years under Dr. Pomerantz's proposed allocation than they actually did under Defendants' care. The Court rejects Defendants' argument.

First, as to past performance of the individual participants' accounts, this concern is not valid, as the (net positive) damages assessed to the Plan as a whole will be returned to the Plan, and then distributed to all Plan participants according to their relative shares of the Plan assets, in the same way that the FSC/SunAmerica's returned management fees were distributed. See Stratford v. Foamex L.P., 263 F.R.D. 156, 169-70 (E.D. Pa. 2009).

Second, to the extent that Defendants' concern is that Plan participants' future benefits or account performance will suffer if Plaintiffs' proposed conservative but "prudent" asset allocation method is adopted, such a claim is not supported on the record before the Court, beyond mere speculation.  Further, the question raised by Defendants regarding potential future plan performance is, properly, analyzed as a question about the prudence of one investment strategy over another, which is not before the Court on this motion for class certification.  Whether the class of Plan participants would benefit as a group from a more aggressive risk/growth balance is precisely the issue Plaintiffs seek to prove on the merits.  Plaintiffs at the class certification stage need not prove their case on the merits, but merely prove by a preponderance the Rule 23 factors themselves.

Thus, the Court finds that Plaintiffs have demonstrated that common questions of law and fact exist that are subject to common answers for all four Sub-Classes.  As to Sub-Class One, these questions include (1) whether the Inductotherm Defendants breached their fiduciary duty under ERISA § 404 by failing to adequately investigate FSC's experience prior to retaining it on behalf of the Plan, and (2) whether the Inductotherm Defendants breached their fiduciary duty under ERISA § 404 when they retained FSC as the Plan's investment advisor.  As to Sub-Classes Two, Three and Four: whether FSC is a fiduciary to the Plan.  As

to Sub-Class Two alone, the questions include (1) whether FSC
breached its fiduciary duty under ERISA § 404 by investing Plan
assets in the SAMMF, and (2) whether FSC breached its fiduciary
duty under ERISA § 404 by not investing all Plan assets that were
designated for a Money Market Fund in the Vanguard Prime Money
Market Fund Institutional Share Class.  As to Sub-Class Three
alone, whether FSC breached its fiduciary duty under ERISA § 404
by investing Plan assets in the following long-short mutual
funds: The Hussman Strategic Growth Fund, the Diamond Hill Long
Short Fund, and the Dover/Long Short Sector Fund.  And as to Sub-
Class Four alone, the common questions include (1) whether in
light of the Plan Participants' ages, the investment strategy of
FSC and the Inductotherm Defendants allocated too great a portion
of the Plan's assets to equity investments and violate ERISA §
404, (2) whether FSC and the Inductotherm Defendants failed to
consider the age of the Plan participants when they implemented
the Plan's investment strategy, (3) whether FSC and the
Inductotherm Defendants breached their fiduciary duties when they
failed to consider the age of the Plan participants when they
implemented the Plan's investment strategy, and (4) whether, in
light of the Plan Participants' ages, the Inductotherm Defendants
breached their fiduciary duty by accepting FSC's investment
strategy.

These questions form the basis of Plaintiffs' claims, and

the claims of any participant on behalf of the Plan.  The
questions are also capable of classwide resolution, "which means
that determination of [their] truth or falsity will resolve an
issue that is central to the validity of each one of the claims
in one stroke."  Wal-Mart Stores, Inc. v. Dukes, -- U.S. --, 131
S. Ct. 2541, 2551 (2011).  Therefore, Plaintiffs have satisfied
the commonality requirement of Rule 23(a)(2) as to the excessive
equities claims.

The same result is true of the typicality requirement.
Defendants argue that because each plan participant has a
different age, and other unique factors such as amount of
investments in the Plan, period of time invested in the Plan, and
personal appetites for risk, the named Plaintiffs are not typical
of the other class members of Sub-Class Four.  However, the Court
agrees with Plaintiffs that because they are seeking relief on
behalf of the Plan itself, the individual differences of the sub-
class members, so long as they are participants in the Plan, do
not render the claims of the individual Plaintiffs atypical.
Schering Plough, at 599.  The Court finds that Plaintiffs have
demonstrated that their claims in each Sub-Class are typical of
the members of each respective Sub-Class.  Therefore, the Court
concludes that Plaintiffs have demonstrated typicality as
required in Rule 23(a)(3).

5.   <u>Rule 23(b)(1)</u>

As to the requirements of Rule 23(b), Plaintiffs need only satisfy one of the subsections.  The Court concludes that Plaintiffs have satisfied Rule 23(b)(1)(B).  That subsection applies to cases where

> prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(B).  In this case, Plaintiffs have demonstrated that there are dispositive matters, such as whether the FSC/Wharton Defendants are fiduciaries, and whether the Plan's asset allocation is prudent, that if litigated on behalf of the Plan, would be dispositive of the interests of the other Plan participants.  This is so, again, because the Plan can have only one asset allocation at a time, and adjudicating Plaintiffs' claims regarding the prudent allocation would necessarily impact the allocation of all other Plan participants' shares of the Plan.  The Court therefore finds that the excessive equities class satisfies the requirements of Rule 23(b)(1)(b).

The Third Circuit has held that when a Plaintiff brings a claim under § 1132(a)(2) on behalf of an ERISA plan, as Plaintiffs do here, such claims

> are paradigmatic examples of claims
> appropriate for certification as a Rule
> 23(b)(1) class. . . . What is relevant here is
> that the plaintiff's claims about defendants'
> conduct are sufficiently similar to those of
> the proposed class and are not based on
> "unique facts" and "individual relationships
> with the defendants." Given that this is an
> ERISA § 502(a)(2) [§ 1132(a)(2)] claim brought
> on behalf of the Plan and alleging breaches of
> fiduciary duty on the part of defendants that
> will, if true, be the same with respect to
> every class member, Rule 23(b)(1)(B) is
> clearly satisfied. . . .

Schering Plough, 589 F.3d at 604-05.

Therefore the Court finds that Plaintiffs' claims satisfy the requirements of Rule 23(b)(1)(B).

## 6. Classwide Damages

Finally, Defendants' argue that Plaintiffs cannot prove classwide damages for two reasons. First, because Plaintiffs have too narrowly defined the time period of the excessive equities sub-class, focusing only on the years 2008 through 2011, when FSC/Wharton was advising the investments of the Plan beginning in January of 2006, and the years 2006 and 2007 included significant gains. Similarly, Defendants argue, Plaintiffs should be required to include Plan performance after 2011, because FSC/Wharton continues to advise the Plan as to the 80/20 allocation target. Defendants' arguments are partially persuasive. If Plaintiffs claim that the Plan was injured by Defendants' investment strategy, Plaintiffs should be required to show that injury starting at the time of Defendants' alleged

violation of the duty of prudence in January of 2006.  See Alco
Indus., Inc. v. Wachovia, 527 F. Supp. 2d 399, 404 (E.D. Pa.
2007) ("Under well-settled principles of trust law, defendants
are entitled to offset profits from a single, continuous breach
of trust against losses flowing from that same breach.").
Therefore, the Court will certify Plaintiffs' excessive equities
sub-class for a damages period beginning in January of 2006.
However, as was explained above in the Daubert discussion,
Plaintiffs' expert's analysis still demonstrates that Plaintiffs
can prove classwide damages on behalf of the class even with the
class period beginning in 2006.

    However, the Court agrees with Plaintiffs that some
reasonable end date is necessary for determining whether or not
Plaintiffs can show damages.  The reasonable end date would seem
to be the October of 2011 when Plaintiffs' expert conducted his
analysis.  To require Plaintiffs to continue to update their
damages estimate according to the daily performance of the Plan
would potentially drag on indefinitely and offer no coherent
stopping point at which point the parties would know whether or
not damages could be proven.  At the class certification stage,
Plaintiffs need only demonstrate that they are capable of proving
classwide damages; the analysis of Plaintiffs' expert
sufficiently satisfies this requirement for this stage.

    Therefore, the Court will grant Plaintiffs' motion to

certify the excessive equities subclass, with the modification of an earlier start date for the class period.

## IV.   CONCLUSION

The Court has concluded that it will grant in part and deny in part the Inductotherm Defendants' motion for partial summary judgment [Docket Item 182], granting the motion as to Count I but denying the motion as to Count XXVI.  Additionally, the Court will deny both <u>Daubert</u> motions, the Court having concluded that both experts are sufficiently qualified under the relevant Third Circuit standard, and that Plaintiffs' expert's methodology is sufficiently reliable, and that their respective opinions fit Plaintiffs' claims and facts adequately for the current procedural posture of class certification.  Finally, the Court will grant Plaintiffs' motion to certify four sub-classes of Plaintiffs, in sub-classes as described in the accompanying Order which identifies the common class claims or issues for each sub-class, and which appoints sub-class representatives and class counsel.  The accompanying Order shall be entered.


<u>August 30, 2012</u>                          <u>s/ Jerome B. Simandle</u>
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge