1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW JERSEY

3    _____
     BORIS GOLDENBERG, REINALDO
4    PACHECO, ANDREW LOEW and
     GERALD COMEAU, as representative
5    of a class of similarly situated
     Persons and on behalf of
6    THE INDUCTOTHERM COMPANIES MASTER
     PROFITS SHARING PLAN #001,

7
                  Plaintiffs,
8
         vs.                          CIVIL ACTION
9                                     NO. 09-5202 (JBS)

10   INDEL, INC., individually and
     A/k/a INDUCTOTHERM INDUSTRIES,
11   INC., and INDUCTOTHERM
     CORPORATION, et al.,
12

13                Defendants.
14   _____

                           UNITED STATES COURTHOUSE
15                         ONE JOHN F. GERRY PLAZA
                           4TH AND COOPER STREETS
16                         CAMDEN, NEW JERSEY 08101
                           (856) 968-4986
17                         AUGUST 14, 2012

18

19
     B E F O R E:      THE HONORABLE JEROME B. SIMANDLE,
20                          CHIEF JUDGE
                      UNITED STATES DISTRICT JUDGE
21

22

23

24
                           LISA MARCUS, C.S.R.
25                         CERTIFICATE # 1492
                           OFFICIAL U.S. REPORTER

1  A P P E A R A N C E S:

2

3  SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
   BY:  ARNOLD C. LAKIND, ESQUIRE
            -AND-
4        ROBERT C. LAKIND, ESQUIRE
   101 Grovers Mill Road, Suite 200
5  Lawrenceville, New Jersey 08648
   ATTORNEYS FOR PLAINTIFFS
6
   ALSTON & BIRD
7  BY:  TOD J. SAWICKI, ESQUIRE
            -AND-
8        DOUGLAS H. HINSON, ESQUIRE
   1201 West Peachtree Street, ACP 21
9  Atlanta, Georgia  30309-3424
   ATTORNEYS FOR DEFENDANTS FSC/SUNAMERICA
10
   DRINKER, BIDDLE & REATH, LLP
11 BY:  VINCENT E. GENTILE, ESQUIRE
            -AND-
12       DAVID R. LEVIN, ESQUIRE
            -AND-
13       MATTHEW S. BARNDT, ESQUIRE
   105 College Road East, Suite 300
14 Princeton, New Jersey  08542-0627
   ATTORNEYS FOR DEFENDANTS INDUCTOTHERM INDUSTRIES AND
15 INDIVIDUAL TRUSTEES

16

17

18

19

20

21

22

23

24

25

1          DEPUTY CLERK:  All rise.

2          THE COURT:  Good afternoon.  Be seated, please.

3      This is the case of Goldenberg, et al. vs. Indel, Inc.,

4  et al., Civil No. 09-5202, and today is the oral argument date

5  of various motions including motion for class certification,

6  the motion for partial summary judgment by the Inductotherm

7  defendants, and the *Daubert* motions filed by both sides.

8      So I'll ask counsel to please enter your appearances

9  for the record beginning with plaintiff.

10          MR. A. LAKIND:  Thank you, your Honor.  Good

11  afternoon.  Arnold Lakind from the law firm of Szaferman,

12  Lakind for plaintiffs.

13          MR. R. LAKIND:  Good afternoon, your Honor.  Robert

14  Lakind from the law firm of Szaferman, Lakind on behalf of

15  plaintiffs.

16          MR. SAWICKI:  Good afternoon, your Honor.  Todd

17  Sawicki, Alston & Bird, for the FSC SunAmerica defendants.

18  And I'd like to introduce Mr. B.J. Webster who is one of the

19  principal investment advisors as part of the Wharton Group.

20          THE COURT:  Okay.

21          MR. HINSON:  Your Honor, Doug Hinson with Alston &

22  Bird, also on behalf of the FSC defendants.

23          MR. GENTILE:  Your Honor, Vincent Gentile, Drinker,

24  Biddle & Reath, on behalf of the Inductotherm defendants,

25  including the individual trustees.  I'd like to introduce two

1   of them, Mr. Krupnick, Lawrence Krupnick, and Mr. Manning

2   Smith.

3           THE COURT:  Good afternoon.

4           MR. LEVIN:  Your Honor, I'm David Levin with the firm

5   of Drinker, Biddle & Reath representing the Inductotherm

6   defendants.

7           MR. BARNDT:  Matthew Barndt, your Honor, also on

8   behalf of Drinker, Biddle & Reath on behalf of the

9   Inductotherm defendants.

10          THE COURT:  Okay.  I thought that we would hear the

11  motions in the following order, unless you have a better

12  preference, and that is to have the motions for class

13  certification first and then the motion for partial summary

14  judgment by the Inductotherm defendants argued second, and

15  then, if time permits, argument on the *Daubert* motions filed

16  by each side.

17      Does that make sense?

18      MR. A. LAKIND:  Does to the plaintiffs, your Honor.

19          THE COURT:  Okay.  Then, Mr. Lakind, you may proceed

20  with the class certification motion.

21          MR. A. LAKIND:  Thank you, your Honor.

22      May it please the Court, I would like to address three

23  issues in connection with the class certification motion.

24      The first is the relevant substantive law that is

25  dispositive of the merits of this case insofar as that's legal

1    to the commonality typicality in the federal civil procedure

2    23(b) standards; secondly, the application of those standards;

3    and, third, the argument that there's a conflict among the

4    participants.

5         Let me first turn, if I might very briefly, to the

6    merits of the ERISA claims brought by plaintiff because the

7    merits of those claims and the elements of those claims bear

8    upon the disposition of a class certification motion.

9         In general terms we have filed a complaint under ERISA

10   404 essentially alleging that defendants are fiduciaries and

11   they failed to discharge their duty of prudence by use of an

12   Excessive Equity Allocation in Indel's selection of FSC.  In

13   connection with the merits of this case, plaintiffs have the

14   burden of proof on that issue.

15        Secondly, we have alleged that defendants failed to

16   discharge their duties to administer the Plan in accordance

17   with the Plan documents by virtue of the absence of a trust

18   agreement in a decision to invest in Long-Short Funds.  Once

19   again, plaintiffs have the burden of proof on those issues.

20        Secondly, we have the burden to propose to the Court

21   what *Donovan vs. Bierwirth,* a Second Circuit case endorsed in

22   the Third Circuit, has held, it's a plausible alternative

23   investment strategy.  If on the merits we surmount those

24   burdens, the *Donovan* court teaches us that the Court is to

25   presume that the funds would have been invested in the most

1  profitable manner and, number two, the burden to prove that

2  these funds would have earned less under the proposal made by

3  plaintiffs, shifts to defendant in the nature of a mitigation

4  type claim.

5       Finally, *Donovan* teaches that any doubt is to be

6  resolved against the fiduciaries with regard to these issues.

7       So our burdens are to demonstrate liability, provide a

8  plausible alternative investment model, and defendant then has

9  the burden to show that no damages would have resulted if that

10  model were implemented.

11       The following principles overlay the law of class

12  certification, and they're derived from two recent decisions

13  from the Third Circuit Court of Appeals, the *Behrend* case and

14  the *Sullivan* case.

15       First, merits are to be considered to the extent

16  necessary in order to make a Rule 23 determination and no

17  more.  Secondly, under *Hydrogen Peroxide*, the merits are to be

18  rigorously analyzed.  However, in considering liability, it is

19  the Court's -- the Court's assessment is limited to a

20  determination as to whether defendants' conduct was common to

21  all members of the class, and the *Sullivan* decision teaches us

22  not on whether each plaintiff has a colorable claim.

23       Secondly, in considering damages, the Court's role is

24  to address only whether the plaintiffs have provided a method

25  to measure damages on a classwide basis, that is the holding

1  of *Behrend*, the Court need not determine whether that method

2  is just, is reasonable, or speculative.

3      Therefore, the first question before the Court is

4  whether or not defendants' conduct was common to all members

5  of the class.  This in turn implicates two questions, what is

6  the conduct about which we complain and was it common to the

7  class?

8      First, one aspect of the alleged misconduct is the

9  failure to have a trust agreement, clearly that failure has

10 classwide implications.

11     A second allegation of wrongdoing stems from Indel's

12 failure to conduct an adequate investigation of FSC's

13 experience before retaining them, clearly that has classwide

14 implications.

15     Third, the use of Long-Short Funds, once again,

16 impacted the Plan in its entirety and that, too, had classwide

17 implications.

18     The fourth element was was the equity concentration of

19 the portfolio excessive given the Plan demographics,

20 particularly the age of the participants.  That in turn

21 implicates two questions, was age considered and, if not,

22 should it have been?

23     First, the evidence --

24     And again, that, too, implicates a general question of

25 classwide implication.  Insofar as the Court is inclined to

1  agree that all four of those claims implicate classwide

2  questions, we've surmounted the burden set forth by *Behrend*

3  with regard to commonalty.

4        And I'll move on to the other elements.

5        But defendants' briefs are largely addressed to issues

6  that are more appropriate to a motion for summary judgment, to

7  a motion directed to admissibility on the merits, to a motion

8  far beyond one for classwide certification.  In excess of --

9  excuse me, class certification.  In our brief we addressed the

10 different arguments advanced by defendants, and I'd like to

11 spend just a few minutes addressing them now before I turn to

12 the Rule 23 requirements.

13       First of all, we allege that age was not considered

14 when the asset allocation was developed.  It's clear in the

15 course of depositions that Messrs. Webster and Hembrough

16 testified they didn't have any reliable information on age.

17 In response to our document request we were provided with no

18 documents that Indel claimed to have given to FSC with regard

19 to age.  The one document that did refer to age reported that

20 75 percent of the Plan participants were within four years of

21 retirement, yet their average age was 46.  So it was not --

22 whatever information was provided was not even consistent.

23 Even in their briefs, Inductotherm at Page 32 says 65 of 241

24 participants over 56 in 2009 and FSC at Page 12 only 12 of 241

25 in 2008.  It's conceivable that a large number of people reach

 1   56 at that age, but suffice -- excuse me, in 2009, but suffice

 2   it to say even if defendants were to allege they considered

 3   age, they simply didn't have accurate information.

 4        Whether age is to be considered or not relates to the

 5   viability of a claim and not a classwide issue.  Suffice it to

 6   say, however, B.J. Webster testified, the 30(b)(6) witness,

 7   that asset allocation should be based on the individual

 8   circumstances of the Plan, that entails age.

 9        The Third Circuit in the *Bogosian* case said that a

10   fiduciary is called upon to employ proper measures to evaluate

11   structures of the Plan.  The Third Circuit in the *Unisys* case

12   said a fiduciary's duty is to avoid large losses, without

13   consideration of age that cannot be accomplished.  Defendants'

14   expert Lucy Allen acknowledged age can be important but other

15   factors, she testified in her deposition, are also important.

16   The SEC, FINRA, and SunAmerica all have commented on the

17   importance of age.

18        A decision outside this circuit in *GIW Industries* found

19   that a fiduciary was liable for failure to consider age in the

20   acquisition of assets.  The Code of Federal Regulations, when

21   it discusses safe harbors for a variety of investment

22   vehicles, says consideration of age allows qualification for a

23   safe harbor.

24        Defendants in a reply brief cited an excerpt from the

25   Federal Register from October 2007, which talks about balanced

1   funds.  But at Page 60462 of the Federal Register the

2   Department of Labor says that a fiduciary is to require -- is

3   required to consider age of the participant population, the

4   whole population.

5        Suffice it to say, that plaintiffs have alleged that

6   age should have been considered and was not.  That is a common

7   question.

8        Second common question -- all these questions are

9   outcome determinative when measured by the *Dukes* standard, is

10  was FSC a fiduciary?  The investment policy statement

11  indicates that FSC gave advice on allocation.  What were the

12  different investment vehicles into which they were to invest

13  and what percentage?  The FSC Vision 2020 Form describes FSC

14  as an investment advisor.  I.R.S. Form 5500 describes them as

15  an investment manager.

16       Mr. Hembrough and Mr. Webster testified they viewed

17  themselves as fiduciaries.  In the course of their depositions

18  both witnesses acknowledged they made recommendations as to

19  percentage of portfolio to be devoted to stocks, to bonds,

20  into a host of investment vehicles.  They provided monthly

21  reports in which they undertook to set asset allocation and

22  rebalance the portfolio.

23       Again, it is not our burden to demonstrate that we will

24  prevail at trial; it is our burden to demonstrate a common

25  question under *Behrend* and *Sullivan*, and clearly FSC's status

1    as a fiduciary raises a common question.

2        The second burden which plaintiffs have in an ERISA

3    case and which informs the class certification analysis, is

4    our obligation to offer a plausible investment strategy.  And

5    as the *Sullivan* and *Behrend* court said, that strategy need not

6    be a final strategy, it need not be a perfect strategy, it can

7    have flaws, but it has to demonstrate the ability to allocate

8    damages on a classwide basis.

9        The 44 percent equity, 56 percent fixed income strategy

10   proposed by Dr. Pomerantz is, frankly, quite close to the

11   50 percent strategy used by this Plan in 2002.  It's quite

12   close to the 50/50 strategy referred to in their -- in

13   defendants' brief and employed in 2009.  At Footnote 8 they

14   indicate they've adopted a new investment policy statement

15   that permits a 50/50 strategy.  It's close to the 50/50 --

16   excuse me.  The 44/56 strategy is close to the 50/50 strategy

17   FSC recommended to the Plan in March 2009, and it's a bit more

18   aggressive than what FINRA describes as a moderate portfolio.

19       Using this methodology, Dr. Pomerantz reviewed the

20   Plan's performance for each month, and in those situations

21   where the Plan performance exceeded his strategy, he awarded

22   FSC a credit and those in which it did not exceed that of his

23   strategy, he included that in his damage calculations.  This

24   methodology can be applied on a classwide basis because

25   Dr. Pomerantz essentially testified at his deposition "If I

1    can do it for a Plan, it's very easy to do it for each

2    individual in the Plan."  It is the same model that Indel uses

3    in the allocation of its performance and in the allocation of

4    losses in every monthly statement.  In fact, there's evidence

5    before the Court that this very strategy was used when FSC

6    repaid the Plan for the money associated with the prohibited

7    transaction and instructed Indel you make the allocation.  So,

8    clearly, that methodology can be applied on a classwide basis.

9         With this background in mind, if I might, let me turn

10   to the Rule 23 criteria.  In the application of this criteria

11   the Third Circuit in *In Re: Schering Plough* advises ERISA

12   502 cases, which this is, are paradigmatic examples of cases

13   appropriate for the class certification.  The Third Circuit in

14   *Eisenberg* says if the case is doubtful, it should be

15   certified.

16        Here, your Honor, are the common questions:  The

17   existence of a Trust Agreement or its absence and the need for

18   a Trust Agreement; the adequacy of FSC's investigation; the

19   propriety of the Long-Short Fund investment, the propriety of

20   not considering age in the asset allocation.  Each of these

21   questions is outcome determinative and meets the *Dukes* test.

22        Second element is typicality, which the Third Circuit

23   in *Eisenberg* held ERISA cases are derivative by their very

24   nature.  Any recovery belongs to the Plan, it doesn't enrich

25   any specific individual.  Since the recovery is allocated in

 1   the single manner to the Plan, the plaintiffs' claims are of

 2   necessity typical.

 3        With regard to adequacy, your Honor, I outlined the

 4   experience of Levy, Phillips & Konigsberg and my experience in

 5   the brief.  If your Honor wishes, I can run through it or I

 6   can move beyond that.

 7        THE COURT:  No, I don't think that you need to repeat

 8   what's in the brief.

 9        MR. A. LAKIND:  Okay.  Thank you, your Honor.

10        With regard to the adequacy of the clients, defendants

11   advance several arguments.

12        First, they assert that my firm reached out to

13   Mr. Goldenberg and essentially manufactured this case.  We

14   provided a certification for Mr. Goldenberg indicating that

15   he contacted Leonard Whitman, an ERISA attorney, who asked if

16   we would look at the case.  We made no effort to find

17   Mr. Goldenberg.  We frankly didn't know that Indel even

18   existed or FSC even existed.

19        Secondly, with regard to Mr. Pacheco, he provided a

20   certification indicating that once the case was filed, he

21   attended a meeting where certain criticisms were made of the

22   case and that prompted him to reach out to us to see if we

23   would be involved -- if he could be involved in the class

24   action.

25        Third, defendants advance the argument that

1    Mr. Goldenberg is not fluent in English and because he is not

2    fluent in English, he is not an appropriate class

3    representative.  In *Turkcell* and in a whole slew of cases, the

4    courts have held that there is no obligation for a class

5    representative to be fluent in English.  Defendants cite not a

6    single case that holds otherwise, and we could find none.

7         Defendants also point out that the class

8    representatives, Mr. Pacheco and Mr. Goldenberg with regard to

9    the Excessive Equity claim, skimmed the complaint or didn't

10   have a fundamental knowledge of the concepts which underlay

11   it.  Your Honor, this is a highly complex area, ERISA is

12   terribly complicated and to try and hold plaintiffs to that

13   standard is simply inconsistent with the law.  As this Court

14   held in the *Dupler* case, courts do not require plaintiff to be

15   the best possible or especially knowledgeable or especially

16   intelligent or understanding.  As long as they have an

17   incentive to maximize recovery, they are adequate class

18   representatives.  And that is all that is required under our

19   law, otherwise, common laborers who have been taken advantage

20   of as a consequence of sophisticated financial schemes, would

21   not have the possibility of participating as class

22   representatives in cases, and clearly that is not the goal of

23   our class jurisprudence.

24        Next we have to satisfy one of the 23(b) requirements.

25   And under 23(b), one, is there a possibility of inconsistent

1    or incompatible results?  Because of that possibility, the

2    *Schering* case held that ERISA class actions are paradigmatic

3    examples of those that should be brought as class actions.

4    This Plan can have but a single equity allocation and if

5    multiple actions were brought, it's conceivable courts could

6    make determinations that different equity allocations are

7    appropriate.  As a consequence, there is a possibility of

8    inconsistent or incompatible results, one court could find

9    that the investment in the Long-Short Funds were appropriate,

10   another that they were not.

11       And, finally, in *Stanford* the courts held in the ERISA

12   trust context that because you seek to essentially restore

13   money to a trust, there could be incompatible decisions of

14   different people who are beneficiaries of that trust took

15   different positions.  So we respectfully submit that we

16   satisfy the Rule 23(b)(1) requirements.

17       In connection with 23(b)(3) there's a four-part test.

18       Number one, is there an interest of class members in

19   individually controlling prosecution of the litigation?  This

20   is an extensive type of litigation requiring sophisticated

21   experts, individuals do not have the ability to control the

22   litigation.  Secondly, even were an individual incentivized to

23   do so, any recovery belongs to the Plan as a whole, so, as a

24   consequence, there'd be minimal benefit to doing so.

25       The second test is are there other actions already

1   begun?  Certainly we are aware of none and defendants have

2   cited none.

3        The third is desirability of concentrating claims in a

4   single forum.  Clearly it's desirable given the fact that

5   there's just one recovery for the Plan, which must have one

6   asset allocation to have one court make that determination.

7        Finally, the difficulties in management, case

8   management.  None are cited.

9        Measured by the 23(b) --

10          THE COURT:  Let me ask a question on that point.

11          MR. A. LAKIND:  Yes, your Honor.

12          THE COURT:  This case, from the day that it was filed

13  until the day the class certification motion is actually being

14  heard, extends almost three years, that's the slowest in my

15  tenure on the bench that I can recall.  Does that suggest that

16  this case is not manageable as a class action?  It seems that

17  there's been more motion practice, more fighting just about

18  with everything, or would that happen in individual cases as

19  well?

20          MR. A. LAKIND:  I think, your Honor, taking in

21  reverse, I think that would happen in individual cases because

22  some of the same issues that precipitated the disagreements

23  would happen -- it's not that we all have a bad relationship,

24  we actually have a good relationship, but that precipitated

25  these issues would arise.

1        And with regard to the issues that delayed the case,

2    number one, in the course of the case the Supreme Court

3    decided a case that we thought was significant with regard to

4    the need to demonstrate reliance in an equitable claim under

5    ERISA, so we made a motion to amend our complaint to add that.

6    Now, and we did not prevail on that motion, but there had been

7    a change of the law in the course of the litigation.

8        Secondly, both the *Behrend* and the *Sullivan* cases are

9    relatively recent origin and the application of that law

10   changed.

11       Third, because these cases tend to be expert intensive,

12   we felt, and I think defendants felt as well, it was incumbent

13   upon us to complete all fact and deposition discovery before

14   we asked an expert to render an opinion.

15           THE COURT:  Do you think all fact and expert

16   discovery is completed now?

17           MR. A. LAKIND:  With one exception.  I think both

18   parties have not submitted their merits expert report.  We

19   have not received the most -- I don't think we received the

20   most recent statements from defendants.  But other than that,

21   this case will be complete once the expert reports and

22   depositions are done.

23           THE COURT:  Okay.

24           MR. A. LAKIND:  Your Honor, if I might, I'd like to

25   spend just a few minutes talking about the allegation that

1   there are conflicts among class members, and that will then

2   conclude my argument.

3          THE COURT:  Okay.

4          MR. A. LAKIND:  Your Honor, much is made in

5   defendants' brief of the notion that there are conflicts among

6   class members, some members would prefer a more aggressive

7   equity allocation, others less aggressive.  We respectfully

8   submit that that, number one, is not accurate and, number two,

9   certainly does not undermine the application for class

10  certification.

11         First, this action is brought on behalf of the Plan as

12  a whole.  So the issue before the Court is what is the optimal

13  asset allocation for the Plan as a whole taking into

14  consideration the demographic of the participant population.

15  So it's not what each individual prefers, it's what the Plan

16  prefers.  And whether or not this case were to proceed on a

17  class action -- excuse, as a class action, that determination

18  would nonetheless have to be made, what is the appropriate

19  asset allocation.  The benefit of proceeding as a class

20  action, is it permits greater court oversight of the

21  resolution of this case, should it be resolved amicably, and

22  an opportunity for participants, if they choose to do so, to

23  weigh in on the propriety of different proposed asset

24  allocations.

25         Secondly, the assumption of a conflict is based on a

1   notion that younger people prefer a more aggressive equity

2   allocation than older people.  However, the question is not --

3   and here, incidentally, but 3 percent of the participants are

4   under age 40.  But the question is not what is the asset

5   allocation a younger person would prefer, the question is what

6   is the allocation that a younger person would prefer knowing

7   that that same allocation would continue throughout their work

8   career until they become an older person.  It's not just a

9   snapshot what somebody wants as a youth, it's what is the

10  propriety or the appropriateness of an asset allocation

11  throughout the history of one's employment.

12        Third, it is always the fiduciary's role to develop an

13  investment strategy that is optimal for the Plan.  When

14  defendants developed their 80/20 proposal, clearly they sought

15  to reconcile the interests of every Plan participant.  We

16  believe they did it erroneously but, suffice it to say, in

17  that instance they're always called upon to act for the Plan

18  as a whole.

19        Fourth, any conflict, to the extent there is one, and

20  we submit there is not, is attributable to the decision of the

21  defendants to employ a single investment strategy rather than

22  provide plaintiffs with the opportunity to choose their

23  investments or to provide individualized investment strategies

24  or a handful of separate strategies.  It's the defendants that

25  insisted on having a single investment strategy and, as a

1    consequence, it's necessary to reconcile the interests of all

2    the participants in the implementation of that strategy.

3          THE COURT:  Could there have been separate investment

4    strategies for the benefit of the participants --

5          MR. A. LAKIND:  I appreciate --

6          THE COURT:  -- under -- legally under this structure

7    of a Plan?

8          MR. A. LAKIND:  We made the application -- in fact

9    one of the reasons that caused the delay is we made an

10   application to the court to say that there should be separate

11   investment strategies and we did not prevail on that.  The

12   court ruled, and I think in retrospect we were probably wrong,

13   the court ruled that the Plan document allows Indel and FSC

14   the option to have a single strategy, and because that's

15   allowed it's not our position that it do anything different.

16   That is, frankly, what we thought.  Now, that's not to say

17   they couldn't if they elected to do so but they could not be

18   mandated to do so.  That again was one of the other amendments

19   that we sought to file in this case.

20         But, suffice it to say, the issue before the Court is

21   there must be a single investment strategy, the question

22   becomes what is the most appropriate for the Plan as a whole,

23   be it 80/20 or 50/50.  Mr. -- excuse me.  Dr. Pomerantz made a

24   suggestion of a plausible approach.  It certainly is not the

25   only and the exclusive approach but it's an approach that

1   could be applied on a classwide basis.

2        Next, the *Unisys* court teaches that the fiduciary's

3   duty is to avoid large losses.  So the question isn't what

4   necessarily is better for each individual but is the asset

5   allocation adopted by the defendants sufficient to avoid large

6   losses.  We submit that Dr. Pomerantz's and other strategies

7   are preferable.

8        Finally, Lucy Allen, in the course of her expert

9   report, says that there might be disagreements among how

10  damages are allocated were we to prevail.  However, the Plan

11  document, which we cannot impact, essentially states that

12  damages are allocated as a function of account balances, which

13  in turn is dictated that salaries that made the contribution,

14  so it's not that the younger people get one set of money and

15  the older people get another.

16       Your Honor, in advancing this argument I addressed a

17  number of issues that, frankly, go to the merits of the claim,

18  but *Behrend* and *Sullivan* do not require that.  The inquiry on

19  commonality and typicality is simply limited to answering the

20  question is there a classwide wrong and can a methodology be

21  developed, whether that methodology is the best or reasonable

22  or speculative but can it be developed to allocate damages on

23  a classwide basis.  By virtue of the contents of the Plan,

24  which provide how profits are to be allocated, that can be

25  accomplished.  So we respectfully submit that plaintiffs have

1    met the burden to award class certification.

2         Unless the Court has any questions, that concludes my

3    argument.

4         THE COURT:  You've moved for certification under

5    23(b)(1) and 23(b)(3), are they incompatible with each other?

6         MR. A. LAKIND:  I'm sorry, your Honor, I didn't hear.

7         THE COURT:  Are they incompatible with each other

8    because of the way that the two types of classes would be

9    managed?  For instance, opt outs.

10        MR. A. LAKIND:  I don't know so much that they are

11   incompatible but if we failed to meet one standard, I mean,

12   the courts have held that -- the district court has held in

13   *Smilow* that the 23(b)(3) standard is an easier standard for a

14   plaintiff to meet.  So I think if we qualified under both, and

15   we seek to qualify in the alternative, we would have to adhere

16   to the most protective of the class in order to proceed.

17        THE COURT:  And so if you qualified under both, you'd

18   go for 23(b)(3)?

19        MR. A. LAKIND:  If that would be the most -- I think

20   that would be the most protective.  Whatever would be -- yeah.

21   But we are advancing alternative arguments, your Honor.

22        THE COURT:  Yes, I understand.

23        MR. A. LAKIND:  Yes.

24        THE COURT:  It just doesn't seem it could be both.  I

25   mean, if you hit a home run here and qualify under both in all

```
 1   four classes, that itself would have a degree of complexity --
 2           MR. A. LAKIND:  Yes.
 3           THE COURT:  -- that I don't think is necessary.
 4           MR. A. LAKIND:  Right.
 5           THE COURT:  And there would be an opting then of one
 6   or the other, and it sounds like you would be opting for
 7   23(b)(3).
 8           MR. A. LAKIND:  I think one of the complexities is
 9   that under 23(b)(1) the possibility of incompatible standards
10   is so high if it's not certified as a class, because any
11   participant could bring an action and get a different result
12   on all four of the criteria -- excuse me, all four of the
13   claims.
14           THE COURT:  When I used the word incompatibility, I
15   wasn't speaking to it in the 23(b)(1) sense.  I was saying if
16   you have the same group of people and the same pension fund
17   and you have two competing theories of what this class is, one
18   under 23(b)(1) and the other under 23(b)(3), are those
19   theories in the end compatible when it comes to administering
20   the class?  The notice requirements are quite different.  The
21   consequences of being a member of a (b)(3) are different from
22   (b)(1).  I think the Supreme Court has suggested, at least in
23   Wal-Mart, and that was a 23(b)(2) class, that those class
24   members aren't bound by the results if they didn't receive
25   actual notice.  I mean, there's all kinds of problems --
```

1          MR. A. LAKIND:  Right.

2          THE COURT:  -- depending which avenue you go down.

3          MR. A. LAKIND:  Right.

4          THE COURT:  And so I just wanted to nail down,

5    assuming that you were successful on both, of which one the

6    plaintiffs think would actually be the best to achieve

7    justice.

8          MR. A. LAKIND:  I would like to say 23(b)(1).  But I

9    think if we meet both, I can't say that because in order to

10   qualify for 23(b)(3) there's certain prerequisites and I don't

11   think they can be ignored.

12         THE COURT:  Okay.

13         MR. A. LAKIND:  Okay.

14         THE COURT:  Thank you very much.

15         MR. A. LAKIND:  Thank you, your Honor.

16         THE COURT:  Okay.  And, Mr. Sawicki?

17         MR. SAWICKI:  Yes, your Honor.

18         THE COURT:  Good afternoon again.

19         MR. SAWICKI:  Thank you for the opportunity to argue

20   before you, we very much appreciate it.

21         May it please the Court, I'm here on behalf of

22   defendants FSC and Wharton.  Given the Courts ruling on

23   prohibited transaction claims, the other AIG related

24   defendants, SunAmerica entities and AIG, are essentially out

25   of the case, there is no substantive claim remaining against

 1     them.  So the focus of this class certification and the

 2     remaining litigation in this case as to the merits relates

 3     solely to FSC Securities Corporation and the Wharton Business

 4     Group.

 5          What I'd like to do, Judge, is provide some important

 6     factual context and also expand upon the snippets of the law

 7     that plaintiffs' counsel referred you to, and then I would

 8     like to address the commonality prong of 23(a)(2) and the

 9     existence of interclass conflicts that come up in the analysis

10     of 23(a)(3) and (a)(4), primarily (a)(4), which is the

11     adequacy requirement under class actions.  Then Mr. Gentile,

12     who is counsel for the Indel defendants, will address Plan

13     structure in a little more detail and focus on the named

14     plaintiffs and their typicality and adequacy problems.

15          THE COURT:  Okay.  Sounds good.

16          MR. SAWICKI:  Because of time constraints, of course,

17     we are not abandoning any of the arguments we make in our

18     briefs, we are simply focusing on what we think are the most

19     valuable for your consideration.

20          Now, we respectfully submit that the *Wal-Mart vs. Dukes*

21     case constitutes a substantive important change in the law of

22     commonality in evaluating class action certification

23     questions.  Some of the key principles enunciated in *Wal-Mart*

24     *vs. Dukes* include that the class actions are the exception to

25     the usual rule that litigation is conducted on behalf of

1   individual named parties only.  And, indeed, the Court just

2   harkened on that very issue when it asked questions related to

3   whether (b)(1) or (b)(3) would be the most appropriate means

4   to certify the class.  It's our position that it seems plain

5   that certification under both is directly incompatible because

6   (b)(1) is a not opt out class, (b)(3) contemplates opt outs.

7   If you permit opt outs but you also certified the class under

8   (b)(1), you are inviting inconsistent results by those absent

9   class members.  I just don't see how you can have both and why

10  one would select (b)(3) in this circumstance.  And I'll come

11  back to those issues a little later in my argument, if I may.

12       *Dukes* changes the landscape of class certification law

13  because it requires, under the commonality prong of 23(a)(2),

14  that the plaintiff demonstrate the class members suffered the

15  same injury.  There must be at least one common contention

16  that must be of such a nature that it is capable of classwide

17  resolution and, most importantly, the court said what matters

18  to class certification is not the raising of common questions

19  but rather the capacity of a classwide proceeding to generate

20  common answers apt to drive the resolution of the litigation.

21       In addition to these important principles under the

22  commonality prong, the law is well established under adequacy

23  23(a)(4), that the purpose of that investigation is to uncover

24  conflicts of interest between the named parties and the class

25  they seek to represent.  And I would note for the Court that

 1   there is indeed a Constitutional component to that inquiry.

 2   Absentee members of a class will not be bound by the final

 3   result if they were represented by someone who you had a

 4   conflict of interest with them or who was otherwise

 5   inadequate.  That proposition was most recently included in

 6   the *Spano vs. Boeing* case, a Seventh Circuit case in 2011.

 7          In addition to those legal principles, the *Hydrogen*

 8   *Peroxide* Third Circuit decision from 2009 instructs us that

 9   the class certification decision requires findings, not merely

10   threshold showings.  Indeed, that is precisely why the parties

11   were permitted and, indeed, encouraged to provide the Court

12   with evidence rather than merely an evaluation of the

13   allegations of the complaint.  And I think the evidence,

14   especially weighing the party's respective positions, will

15   lead the Court to the right result.

16          This Court must resolve all factual and legal disputes

17   relevant to class certification even if they overlap with the

18   merits, including disputes touching on the elements of the

19   causes of action.  And the Court's obligation is to consider

20   all relevant evidence and that argument extends to -- excuse

21   me.  The Court's obligation is to consider all relevant

22   evidence and argument and that obligation extends to expert

23   testimony.

24          Your Honor, if you --

25             THE COURT:  Would you agree that the record that's

 1   been developed over these two-and-a-half years is about as

 2   full as a class certification record can be?

 3        MR. SAWICKI:  Absolutely.  We have completed fact

 4   discovery.  And as Mr. Lakind noted, all we have left to do is

 5   the exchange of merits expert disclosures and the depositions

 6   on those expert opinions.

 7        THE COURT:  Is the part of Rule 23(b) that says that

 8   class certification motions should be presented and decided at

 9   the earliest opportunity a dead letter?  The rule makers saw a

10   benefit in presenting class questions early.

11        MR. SAWICKI:  Understood.  Well, as a practical

12   matter in this case, we are where we are.  So I think we need

13   to go ahead and address class certification at this stage,

14   we're happy for the opportunity to do so.  And, indeed, I

15   think the Court is benefited by the full record that you have

16   before you, you don't have to guess where the claims are

17   going, and I think it will give you a more informed decision

18   about whether this case is appropriate for class treatment,

19   which, of course, we say no.

20        THE COURT:  Well, it certainly does, it gives a more

21   complete picture, and I'm certainly dealing with much more

22   than what's just inscribed in the pleading and all of that is

23   for the good.  But let's say that the defendant were to

24   prevail in the class certification motion, it means that

25   you've gone to two-and-a-half years of effort that may not

1    have been necessary if this motion had been made much earlier

2    because it, you know, would have reached the same result, I

3    would think.

4        MR. SAWICKI:  Well, obviously, my client regrets the

5    amount of time and litigation expense we've incurred in

6    dealing with this case.  But again, we are where we are.

7        THE COURT:  Right.  And by my question, sir, I don't

8    mean to be critical.  This is a very complicated case, it has

9    a lot of facets to it, I'm being asked to look at four

10   different class certifications, and so it's been deserving of

11   the time.  And certainly I've given it a lot of time and I'll

12   give it more time going forward, I don't regret that either.

13       But I, like any federal judge, I'm interested in our

14   rules, in the rules of civil procedure.  And although it was

15   softened about ten years ago when it used to say class

16   certification motions should essentially be the first order of

17   business in the case, so there's a little more flexibility

18   now, there still seems to be a preference that it be done

19   lickety-split despite what the circuit courts and the Supreme

20   Court are saying I have to be doing in terms of peeking at the

21   motions, at the merits.

22       MR. SAWICKI:  Well, your Honor, all I can say is

23   that, as you well know, plaintiffs bear the burden on class

24   certification, it's their motion to bring.  They had an

25   important hand, indeed, a leading hand in the course of this

1   case and when and how motion for class certification was

2   filed.  They chose to wait till the end, maybe they thought it

3   was to their benefit or maybe, as I will show you, it was

4   because they continued to cast about for a potentially

5   relevant and viable theory, which we think they haven't even

6   yet done now.  But -- and they've certainly had three years to

7   do so, so it makes one wonder about the viability of this case

8   as a class action for that reason as well.

9        Despite all this passage of time, your Honor, the

10  evidence that plaintiffs have submitted in support of their

11  motion for class certification consists of mere snippets of

12  the record.  They rely almost entirely on the expert opinion

13  of Mr. -- or Dr. Pomerantz.  They cite to a portion of the

14  Inductotherm Plan's Investment Policy Statement that

15  recommends an 80 percent equity, 20 percent fixed income

16  long-term target but they ignore the rest.

17       They gave you a couple citations out of context to the

18  depositions of Mr. Webster and Hembrough of Wharton Business

19  Group about whether age was considered.  And then they also

20  included in their brief, but didn't even mention today, yet

21  another out of context sentence about whether manager

22  performance information was included in the monthly meeting

23  minutes.

24       In contrast to those snippets, your Honor, we have

25  submitted in opposition to the motion the full text of the

1    Investment Policy Statement, all of the monthly meeting

2    materials from all of the meetings that the trustees in

3    Wharton Business Group held during the five years relevant to

4    the claim in this case.  We've shown what the actual asset

5    allocations changes were over time.  And through Ms. Allen we

6    have given you a detailed analysis of the actual impact of

7    plaintiff's alternative approaches on each Plan participant's

8    account.  On top of that we gave you extensive citations to

9    the testimony of the named plaintiffs themselves who are

10   purported to assume the mantle of class representatives.  But,

11   as Mr. Gentile will explain to you, they full woefully short

12   on that score.

13        Judge, the first thing I wanted to show you is the rest

14   of the Investment Policy Statement.  In part this bears on the

15   merits, but it's important to understand what this claim is

16   and what it is not and the disconnect between plaintiffs'

17   claim and what actually happened in this case.

18        First of all, part of the Investment Policy Statement

19   sets forth the Plan's investment objectives.  Plaintiffs do

20   not challenge, and nor does Dr. Pomerantz make any opinion,

21   that these are invalid or inappropriate investment objectives.

22   I point the Court's attention particularly to No. 3, to

23   position the portfolio with longer term risk/return

24   orientation, thereby taking advantage of the higher expected

25   returns historically associated with investing the stocks.

1    There is nothing wrong with that as an investment objective

2    for an ERISA plan and plaintiffs do not contend otherwise.

3         By the way, that last few -- WBG and so forth, that's

4    the Bates number to that particular document.

5         The Investment Policy Statement continues on the next

6    page after it sets out the 80/20 long-term target that

7    plaintiff has referenced with this specific allocation

8    parameters that the investment managers and the trustees were

9    permitted to follow.  So this was not a situation where the

10   trustees chose and FSC/Wharton implemented a static 80/20

11   asset allocation for the duration of the claim.  The

12   Investment Policy Statement contemplated and these defendants

13   implemented a very active management.  In fact we submit that

14   the attention paid and the active management undertaken by

15   these defendants exceeds the processes of virtually any other

16   fiduciary that may come before this Court.  They met monthly.

17   The reams of materials that were provided to the trustees are

18   substantial.  There was, even in between those monthly

19   meetings, there was calls and changes to the investment

20   allocations as we went along.

21        Now, these investment objectives they constitute the

22   aims of this Plan.  And, as the Court well knows, Section

23   404(a)(1)(B) of ERISA provides that the fiduciary must act

24   with the care, skill, prudence, and diligence under the

25   circumstances then prevailing that a prudent man acting in a

 1  like capacity and familiar with such matters would use in the

 2  conduct of an enterprise of like character and with like aims.

 3  And, as you well know, also, Judge, as a matter of law, ERISA

 4  claims cannot be based on hindsight.  And we submit, your

 5  Honor, that plaintiffs miss the mark entirely on both of these

 6  cardinal rules.

 7       As I showed you with the Investment Policy Statement

 8  excerpts, the defendants engaged in active management of this

 9  Plan.  Plaintiffs would have you believe that the investment

10  strategy undertaken during the 2006 through 2007 time frame

11  was static of 80 percent equities, 20 percent -- excuse me,

12  80 percent equities, 20 percent fixed income.  Fixed income is

13  represented by the blue section, equities by the red.

14       This is in fact what happened, Judge.  Every month

15  there was a meeting between the trustees and Wharton Business

16  Group and every month there was active evaluation of the

17  investments, the economic outlook, the markets, everything

18  they can conceive of that was relevant to deciding whether the

19  asset allocation should be changed to anticipate changes in

20  the market.  This line here is what the S&P 500 was doing

21  during the same period of time.

22       Plaintiffs make some suggestion that the reason that

23  the actual allocations changes over time was simply because

24  the value of equities went up and down.  That is demonstrably

25  not the case.  We have provided the Court with --

```
 1              THE COURT:  Well, it has a tendency to be the case,

 2   though, where the lines are converging.  You have the S&P

 3   dropping down in early 2009, it looks like, and so just

 4   mathematically, I guess, the non-equity share peaks at

 5   50 percent.

 6              MR. SAWICKI:  But that's necessarily true, Judge, I

 7   mean, that's just --

 8              THE COURT:  But it's not the product of making a

 9   different investment decision every month.  You could have the

10   exact same amount invested in equities and when the portfolio,

11   the stock portfolio drops, the equity share goes up.

12              MR. SAWICKI:  It would look like this.  But that's

13   not what these defendants were doing.  Here is one excerpt

14   from one of the board of trustees monthly meetings, "After

15   reviewing the performance of the investments and the stock

16   market, Wharton Business Group recommended a more defensive

17   position of 60/40 rather than 70/30."  That's what happened

18   here.  The stock market is going up and the defendants made

19   the affirmative decision to get more defensive because of

20   their evaluation of what was going on.

21              THE COURT:  Right, that portion of the chart supports

22   what you said.  Beginning about early 2008, though --

23              MR. SAWICKI:  Sure.

24              THE COURT:  -- I think things change, don't they?

25              MR. SAWICKI:  Of course they do.  I mean, this is
```

1   what the stock market did, but that didn't mean that the

2   defendants stopped being active managers.  Before that time,

3   they, again, got more defensive, that's evidenced by the 2007

4   October meeting.  August 2006, that's indeed before the stock

5   market took its big tumble, we again got more defensive based

6   on our analysis, we remained partially invested in equities.

7   And of course when the stock market goes down, the value of

8   those equities went down.  Then again in 2009, even though the

9   market had bottomed here, we made the affirmative decision to

10  be more defensive, uncertain as to what was going to happen

11  next.  The plaintiffs are using purely using hindsight to

12  invite the Court to second guess what the defendants were

13  doing at the time each month.

14       As I said, what I've shown you from the monthly meeting

15  minutes are merely examples.  If you read them carefully, you

16  would see very active and careful management, attention to

17  grave detail, and a Herculean effort to do the right thing and

18  make it through this incredibly unusual and difficult stock

19  market period.

20       THE COURT:  So as of March 11, 2009, in fact what was

21  recommended was a 50/50 split.

22       MR. SAWICKI:  Yes, indeed.  And plaintiffs would have

23  you believe we were at 80/20 the entire time.

24       Plaintiffs' theory is contrived on several levels.

25  First of all, as Mr. Lakind admitted to you, the Plan's theory

1  is a static one.  It is divorced from any market

2  considerations.  It's divorced from any of the other factors

3  that a seasoned or reasonable investment advisor might take

4  into consideration in deciding how to invest.  And it is

5  driven purely as a function of one age calculation at one

6  point in time.  They chose December 31, 2007, looked at the

7  demographics and Dr. Pomerantz said that the asset weighted

8  average age of this group of Plan participants is 56, and he

9  pulls out of thin air this 100 minus age approach and wants

10 the Court to impose this asset allocation strategy going

11 forward.  From this point going forward.  Not to stop here but

12 going forward.

13         Now, one of the things that the Court -- the plaintiffs

14 said that we don't want multiple actions and that's why a

15 class action is appropriate.  This theory, your Honor, may not

16 invoke multiple actions but it certainly would invoke serial

17 actions.  What's to stop one of the Plan participants at this

18 point in time when the stock market is going up, from coming

19 to the Court and saying this decision to remain at 44/56 under

20 these market conditions was a breach of fiduciary duty, it was

21 imprudent, we should have been more heavily invested in

22 equities.  There's nothing to stop that sort of claim if you

23 accept this proposition.  This theory also eliminates or does

24 not consider any of the active management that took place and

25 continues to take place as Wharton and the trustees continue

1   to manage this Plan in accordance with the investment policy

2   that they have adopted.

3       And certainly one of the most unnerving contrivances is

4   the period of time they've selected.  Even though we

5   implement -- even though FSC came on board January 1, 2006,

6   and was operating under the same investment policy throughout

7   this period, plaintiff wants you to start at January 1, 2008,

8   and not take into consideration all the benefits that the Plan

9   garnered by virtue of the equity allocation during this period

10  of time.  That is pure hindsight driven.  It's litigation

11  driven.  It is not process driven in any sense.  And it is not

12  a conventional fiduciary duty claim.

13      THE COURT:  Would it be appropriate to enlarge the

14  class retrospective to January 1st, assuming for purposes of

15  this question that all the other requirements for the class

16  certification are met?

17      MR. SAWICKI:  No, because --

18      THE COURT:  If the harm occurred on January 1st of

19  2006 --

20      MR. SAWICKI:  Yes, your Honor.

21      THE COURT:  -- you cited several cases for the

22  proposition that harm gain or loss is to be measured from the

23  date of the harm, so if there is to be a class, wouldn't it

24  have to start January 1, 2006?

25      MR. SAWICKI:  We acknowledge that the cases say that

1    if there was a harm, it's a single harm and you would take the

2    entire class period.  And in fact plaintiffs' theory

3    highlights, and their decision to cut off this group is one

4    example of the class conflicts they're creating by eliminating

5    the people who are in this, who participated in the Plan

6    during this period of time but not this period of time.

7         THE COURT:  Well, can I remedy that in certifying the

8    class then that evens out what you say is the conflict by

9    extending the class back to January '06?

10        MR. SAWICKI:  You could, but that would not help you

11   deal with all the other problems and conflicts that

12   plaintiffs' theory arises or creates.  And let me speak to

13   those, if I may.

14        First of all, Judge, every case that the plaintiffs

15   cite in support of this optimal prudence date or to support

16   their theory predates *Dukes*.  They continue to look for common

17   questions and they ignore the fact that they cannot find

18   common answers.

19        We've cited two ERISA investment cases post *Dukes*, that

20   is the *Groussman vs. Motorola* and the *Spano vs. Boeing* case

21   where the court -- the courts specifically denied class

22   certification on a finding that there were no common answers,

23   there was not a common contention that drove the resolution of

24   litigation, but a certified class would devolve into a myriad

25   of individualized issues involving all of the participants in

1       the Plan, not just a class representative or two.  And the

2       reason that this myriad of individualized issues arises is

3       because plaintiffs' theory is predicated on the considerations

4       of a proxy individual.  Plaintiffs give you no information, no

5       evidence to support the notion that what is proper for a 56

6       year old person has any application to an ERISA Plan that has

7       a long-term and in fact infinite life.

8               This Plan is not set up for Mr. Goldenberg or Mr. Loew

9       or Mr. Pacheco, it is set up for all Indel employees past,

10      present and future.  For the trustees to begin to consider

11      Mr. Goldenberg's individual circumstances and preferences

12      necessarily causes them to disregard or fail to consider the

13      individual interests of other people, those then existing in

14      the Plan and certainly anyone going forward.  Plaintiffs want

15      this Court to simply say as of December 31, 2007, the average

16      out weighted age is 56 and we're going to apply that going

17      forward no matter what happens in the Plan, no matter what

18      happens in the stock market.

19              THE COURT:  Well, it may not be the greatest theory

20      but isn't it a plausible theory that a Plan may be managed to

21      average age of its beneficiaries?

22              MR. SAWICKI:  No, your Honor, because plaintiff and

23      Dr. Pomerantz offer no support for that proposition.  They

24      can't cite any other Plan that was managed that way.  They

25      ignore the conventional wisdom related to the long-term asset

1    allocation of Plan assets and they want to impose this theory

2    created out of whole cloth.  It is something they made up and

3    it's something, indeed, Judge, that they had three years to

4    cast about to find.  They started with a morning star

5    concerted allocation theory; that didn't work because our Plan

6    did better.  They then went to target day funds SunAmerica

7    20/15 and 20/20, those are all in their complaint, those

8    didn't work because the Plan beat the performance of that

9    asset allocation approach.  They then went to these three --

10   these two theories that Pomerantz comes up with and they've

11   now settled on the 44/56.  The 44/56 approach --

12        First of all, Judge, think of it this way, they've now

13   posited a 56 year old individual who is going to retire, if

14   not ten years, nine years, 15 years from now.  That has

15   nothing to do with the Plan and it takes no consideration of

16   what the younger participants in the Plan want who are going

17   to be in it beyond the nine years or the 15 years that the

18   plaintiffs' theory posits should be taken into consideration,

19   that is there is no basis for that proposition other than

20   Pomerantz's own theory.

21        Now, contrasting --

22        THE COURT:  You've mentioned that there's a myriad

23   of individualized determinations to be made and that

24   Mr. Goldenberg wants to pull the Plan in his direction, but I

25   don't see that that's what the plaintiffs are actually

1   arguing.  They're arguing not for individual recoveries but

2   for a Plan wide recovery that maximizes the assets of the

3   Plan, they'll be able one day to have a little bit more money

4   in the Plan if they win this suit.

5          MR. SAWICKI:  But that approach necessarily creates

6   conflicts between the class members because many of the class

7   members during this very period of time would be harmed if

8   this approach were put in place retrospectively.  There were

9   several -- and let me jump to that point, if I may.

10          We provided the Court with Lucy Allen's report and what

11   she did was analyze the participants' individual accounts.

12   Now, plaintiffs would have the Court believe that this is

13   simply one pot of money and it's sitting there and you can add

14   to it and that makes one class issue that can be resolved in

15   this litigation.  But even though it's one plan and one

16   account for investment purposes, the portions of that plan

17   account are allocated among the individuals and the

18   individuals have the opportunity to make contributions on

19   their own, to make withdrawals on their own, and their

20   individual accounts change as time goes by.  This analysis by

21   Ms. Allen demonstrates that our Plan, when you consider what

22   the actual participants were actually doing in their

23   individual notional accounts, 20 of the people 60 years of age

24   or over out of 38 did better with the Plan than under

25   Pomerantz's 44 percent equity theory.  In the group of 50 to

1    59 year olds, 38 percent did better under the Plan than under

2    Pomerantz's theory, and so on down the list.  The total is of

3    all the 347 participants in the Plan during the periods 2006

4    through 2010, and we ended there because we only had year-end

5    information for 2010 when the accounts are trued up, fully

6    40 percent of that group did better under the Plan's actual

7    investment approach than Pomerantz's theory applied during the

8    same period to the same amounts.  That is a fundamental

9    conflict.

10         This is not a situation where there are few class

11   members that could be defined out in order to achieve a class

12   resolution, that's almost half of the group.  To look at it

13   another way, this shows --

14         THE COURT:  Well, do the figures change if you use

15   2008 as the base year?  Wouldn't it flip --

16         MR. SAWICKI:  Yes.

17         THE COURT:  -- pretty much?

18         MR. SAWICKI:  But, Judge, this creates the problem of

19   them starting in 2008 versus 2006, which is the other conflict

20   we just discussed a moment ago.  If you're going to say it's a

21   single breach, you must -- benefits and losses of the trustees

22   alleged breach and you come up with a result like this.  If

23   you start in 2008, you're excluding the group that was in

24   place in 2006 to 2008 and that's an inappropriate conflict as

25   well.  They can't have it both ways, they can't have it either

1 way.

2          THE COURT:  Well, it sounds like the way you'd rather

3 have it, and I'm not saying I disagree, is that any

4 calculation relevant to the plausibility of their theory ought

5 to start in 2006, which is when the alleged harm occurred.

6 The harm that's being alleged against the defendants generally

7 is that a flawed and inflexible strategy was launched in 2006

8 by people who weren't competent to know what they were doing

9 because they hadn't been properly vetted.  If that's so, then

10 these numbers by Lucy Allen have special relevance.

11          MR. SAWICKI:  Yes, your Honor, because they point up

12 that there is not a common answer to the question.  By

13 imposing by judicial fiat this revised and wholly new asset

14 allocation approach, you will have harmed almost half of the

15 class that you're seeking to certify and there's no basis in

16 the law for that.  And that's precisely why *Dukes* is now

17 focusing our attention on common answers, and that's why the

18 *Spano* case and the *Groussman* case went into detail -- went

19 into the analysis of what happened in each individual's 401 or

20 their Plan accounts to see whether they were harmed or

21 benefited by the investments at issue at the time.  And this

22 is precisely the same analysis and this is why you can't have

23 the class action.

24          THE COURT:  But, sir, if every number on that chart

25 is correct, it doesn't mean that those people are going to get

1   a bill to send money back to the fund, it just means it's

2   going to diminish the recovery for the fund overall compared

3   to what it would have been, wouldn't it?

4           MR. SAWICKI:  And that directly harms those other

5   individuals in this purported class who lost money because of

6   the way the assets were invested and the way their withdrawals

7   and contributions occurred.

8           Let me give you a prime example --

9           THE COURT:  Are you really concerned about those

10  people?

11          MR. SAWICKI:  I think the Court needs to be concerned

12  with those people because --

13          THE COURT:  Everybody doesn't necessarily win when a

14  class is certified.  The standard isn't that 100 percent of

15  the class members are demonstrably going to benefit.  But the

16  defendant does have the opportunity to show that this Plan,

17  this plausible Plan that's been put forward by the plaintiffs

18  won't result in a net gain to the class, and you're close to

19  doing that.  But if the plaintiffs do succeed, if there is

20  class certification, if they do prevail on the merits, it's

21  not like these people are going to be disadvantaged, the

22  40 percent, in fact they're going to be better off because

23  they're going to have a little bit more money in the fund than

24  they otherwise would have had were it not for this class

25  certification.

```
 1              MR. SAWICKI:  Judge, if you certified the class on

 2   that basis and impose this unilateral static asset allocation

 3   theory, this is not a case where they're just not benefiting,

 4   they are being harmed, either they or the other participants

 5   in the Plan who did suffer losses, they're getting less than

 6   they should get because you're giving that money to the person

 7   who had the net benefit already, that's a windfall.  And you

 8   just cannot reconcile those issues in this case context, it's

 9   just too complicated, too many individual issues.

10         Let me give you a prime example, and plaintiffs

11   themselves provided it --

12              THE COURT:  But again, it's the fund that gets the

13   money, not the individuals, if the plaintiffs prevail.  So if

14   nothing is done, then nobody benefits at all.  If something is

15   done and the plaintiffs prevail, then some people are slightly

16   better off and some people are a lot better off, isn't that

17   correct?

18              MR. SAWICKI:  I think that -- but what the Court will

19   have done in that case is it will have harmed -- it will be

20   harming those who should be getting more under that theory and

21   providing windfalls to others for which there's no

22   justification.

23         Let me give you prime example, and that is --

24              THE COURT:  But isn't the tension in that argument

25   the fact that individuals who might stand to gain a couple
```

1    thousand dollars from prevailing here aren't going to be

2    lining up at the courthouse door and filing lawsuits, they

3    can't afford to.  And so to say it's not a perfect remedy

4    doesn't really say much, it's really this or nothing for the

5    class members, isn't it?  Isn't that true with most classes?

6         MR. SAWICKI:  Whether it's true of most classes or

7    not I'm not sure, but this class action would also affect

8    future investments on a go forward basis.  And in fact this

9    ruling by this Court would not be viewed only by these

10   parties, but I'm told by my colleagues that there are 171,000

11   plans like this around the country.  We would have a court

12   pronounced new method of asset allocation that because there's

13   no support for it that Dr. Pomerantz could find would create a

14   breach by every fiduciary for all 171,000 of those plans.

15        THE COURT:  Well, that's quite a few jumps down the

16   board before you get to some sort of court ordered remedy.

17   The plaintiffs could win on class certification and lose on

18   the merits.

19        MR. SAWICKI:  Yes, they could.

20        THE COURT:  You could well prevail either on summary

21   judgment or to a fact-finder at a trial.

22        MR. SAWICKI:  By certifying the class you have

23   guaranteed, the Court will have guaranteed that there are a

24   class full of conflicts and a number of individualized issues

25   as to who benefits by how much and who has to give money back.

1   Or if they don't give money back, from whose pocket are they

2   taking it, from their fellow participants?  That's why we're

3   addressing these issues at the class certification stage.

4   Considering those issues at this point should lead the Court

5   to conclude that class certification is not appropriate.

6        This is not like the prohibited transaction claim that

7   was in this case originally and that you recently granted

8   summary judgment in our favor on, that's an example of an

9   appropriate ERISA class action claim because the Plan account

10  suffered one loss in the form of excessive fees and the

11  restoration of those excessive fees to the Plan is a single

12  issue that can be resolved on a class basis and the benefits

13  can be allocated appropriately among the class members.

14       This is substantively different because you're creating

15  an investment strategy through hindsight that has the effect

16  of -- that is based on not the consideration of the Plan's

17  aims, the Plan's goals, the Plan's structure, or the Plan's

18  time horizon, but rather on the aims, goals, time horizon, and

19  risk tolerance of a proxy individual who, by the plaintiffs'

20  calculation, is 56 years old.  There is no one, virtually no

21  one in the Plan who is 56 years old.  Mr. Goldenberg is 73, by

22  plaintiffs' own theory this 44/56 is inappropriate for him.

23  Likewise, Mr. Loew is 38, he should have a 61 percent or

24  62 percent equity allocation, according to their theory, yet

25  class certification would impose upon him a 44/56.

1          Plaintiffs do not dispute the basic premise of the

2     asset allocation models, that is, younger people should be

3     more heavily invested in equities because, based on historical

4     information, everything that Mr. Webster and everybody could

5     gather, that is the best long-term strategy regardless of

6     these unusual market gyrations.  And that's proven

7     empirically.  It's undisputed by plaintiffs.  And the Court

8     would be superseding that by adopting this theory out of whole

9     cloth that harms those younger people and it likely harms the

10    older people as well.

11         The problem with this class action, Judge, is the way

12    the plaintiffs have approached it.  They have not -- this is

13    not a case, for example, that trustees decided to take all the

14    Plan money and buy lottery tickets.  They haven't alleged that

15    it is a breach of fiduciary duty for an ERISA Plan to buy

16    lottery tickets.  First of all, that's not in the sole

17    interest of participants because it's benefiting the lottery

18    system or the education system, whatever it is, and nobody has

19    done that.  It is demonstrably true that that is a breach of

20    fiduciary duty.  This is a case where plaintiffs are not

21    disputing the investments that were made, the types of

22    investments that were made, they make no allegations that the

23    process that the individual defendants went through was

24    inadequate or inappropriate, that they did not consider the

25    right information, that they failed to meet or they failed to

```
 1   make rational decisions in real time rather, they're simply

 2   quibbling using hindsight with how they invested the money

 3   during a specific period of time.

 4        Now --

 5        THE COURT:  Now, you've suggested that any remedy

 6   really that the plaintiffs come up with is going to be

 7   arbitrary because it's going to benefit some people more than

 8   others in the Plan.  What is it that the fiduciaries do every

 9   month when they have a single investment strategy that they

10   put into place, doesn't that benefit some more than others?

11   And no one would say that that's --

12        MR. SAWICKI:  Yes.

13        THE COURT:  -- antithetical to their duties.

14        MR. SAWICKI:  Yes, but they did so on the basis of a

15   reasoned, rational process that was fully informed and

16   undertaken in real time.  It was not a static 80/20 for all

17   time no matter what was happening in the market.  Plaintiffs

18   cannot really say that this process was a breach of fiduciary

19   duty or invalid, they don't say that at all.  They simply want

20   to take advantage of this market gyration to say that we would

21   have done something better.

22        Your Honor, that is true at every step of the way.  You

23   and I could find an investment better than S&P 500 here and

24   here and here.  That's not the Court's job.  And I don't --

25        THE COURT:  We can certainly look backwards and say
```

1    what could have been done.

2          MR. SAWICKI:  Of course.  And that's what the

3    plaintiffs are doing here, you see?  And the reason it's a

4    problem is because they want it driven by an individual's age.

5    A Plan is not an individual.  A Plan is a long-term investment

6    vehicle for the benefit of all participants.  Looking at any

7    individual, whether it be a proxy or an average or

8    Mr. Goldenberg himself, would necessarily compromise the

9    interests of all the other individuals.  That's why it's

10   inappropriate and that's why conflicts are created.

11         Let me finish with Mr. Loew.  Remember him?  One of

12   plaintiffs' representatives.  He was in the Plan for only four

13   months, Judge.  During that four months, his individual

14   account gained 10 percent, then he stopped participation in

15   the Plan.  Plaintiffs initially put him forward as a class

16   representative on all claims, but then they withdrew him as a

17   class representative for the excessive equities class because

18   for the obvious reason he has no injury in fact.  Yet they

19   want him to remain a class member, they haven't excluded him

20   from the class or excluded any group that made money.  And for

21   the Court to pick those winners and losers and give a benefit

22   to someone like Mr. Loew who actually gained money during his

23   four months in participation in the Plan, is inequitable and

24   harms the interests of the other Plan participants or the

25   proposed class members.

1          There are no common answers to either what is a prudent

2     allocation for Plan participants if based on age, because this

3     age concept creates the conflicts among all the other members

4     who are not of the same age, and each class member was harmed

5     or benefited by the alleged breach and the Plan's proposed

6     remedy for it, and the interclass conflicts render the

7     plaintiffs inadequate to represent this class.

8          Your Honor, I should stop there so Mr. Gentile has a

9     moment to address some of the other issues we raise.

10          THE COURT:  Thank you very much.

11          Mr. Gentile, good afternoon.

12          MR. GENTILE:  Good afternoon, your Honor.

13          Good afternoon, your Honor.  It's good to be here.

14          Let me give -- I first want to start with some

15     background into the Inductotherm Plan just to put all of these

16     issues in context, because then I think it will be a little

17     more clearer what conflicts are being promoted by the

18     plaintiffs' theory.

19          This Plan is a plan from Inductotherm, which, as you

20     know, is a privately held company started by Mr. Henry Rowan

21     back in the '50s.  It's one of the leading producers of

22     induction furnace technology in the world.  Mr. Rowan has been

23     very successful in his business, and early on he started a

24     profit sharing plan for his employees, which is, I'm told, one

25     of the longest such plans in the country.  That profit sharing

1    plan has been remarkably successful over its now 55 or so

2    years of existence.  The performance has been outstanding.

3    The Plan from the very beginning has been managed for the

4    benefit all participants.  Participants are employees of the

5    Inductotherm companies.

6         The Plan is funded out of profits from the companies.

7    Every year there is a maximum contribution of 15 percent.

8    Those contributions have been made from the beginning.

9    They're discretionary with the company but they have been

10   consistently made.

11        The Plan is managed by trustees who are authorized to

12   make investments.  They place the company's contributions into

13   a trust account.  It's now held at PNC.  Originally it was

14   Provident Savings Bank.  The moneys placed in trust are then

15   invested in other assets, including stocks, bonds, and other

16   financial vehicles.

17        Other significant elements of the Plan, as I've said,

18   it's not a self-directed Plan in the sense that the individual

19   participants have any ability to own or control the

20   investments.  The individuals simply take a fractional

21   percentage of the total Plan assets and they get a, for record

22   keeping purposes, a notional account which shows them every

23   year what their percentage ownership interest in the Plan

24   assets is.

25        The goal of the Plan, as we saw from the Investment

1    Policy Statement, is essentially to keep the Plan assets

2    growing so that they will be there to pay retirement benefits

3    to the participants on an ongoing basis into the indefinite

4    future.  So, in other words, as the Investment Policy

5    Statement says, the idea is to take advantage of the

6    risk/reward orientation, the higher expected returns

7    historically from the stock market to take advantage of the

8    appreciation of those assets over time.  So, in other words,

9    it's distinctly unlike a 401(k) plan, which was tailored for

10   an individual and it essentially has the time horizon that

11   ends with the individual's retirement from the work force.

12   Unlike the individual case, the Plan is an entity that is

13   meant to support and provide retirement benefits to the

14   employees of the Inductotherm companies.

15        The present population of the Plan in terms of

16   participants is roughly 250.  Over the class period from 2006

17   until the present there are, I think, 347 participants because

18   people come and go, they retire, they leave the company, and

19   so forth, but the Plan assets are managed for the benefit of

20   all of those participants.

21        The participants in terms of demographics span the

22   spectrum, as we've seen from Ms. Allen's chart, from those who

23   are under age 30 and those who are over age 80.  And notably

24   in the Inductotherm company, forward looking as it is, it has

25   no mandatory retirement date.  So there's a number of

1    individuals in the Inductotherm companies who are over 65 and,

2    again, the Plan assets have to be managed for their benefit as

3    well.

4         Now, other key elements of the Plan, one of the other

5    key elements is that at age 55 the participants have the

6    option to start withdrawals from their Plan accounts, and they

7    can take up to 15 percent from their Plan account per year

8    once they hit age 55.  And the trustee minutes, when this

9    amendment was adopted back in the '90s or early 2000's,

10   intentionally was designed to allow participants to withdraw

11   funds so they could invest them in whatever manner they wanted

12   as they approached retirement age.  So in a sense the target

13   80/20 allocation of the Investment Policy Statement is

14   really -- you have to look at the off ramp that lets people

15   withdraw their money and invest it however they want.  So, for

16   example, Mr. Goldenberg, who, by the way, began work at

17   Inductotherm in 1989 at age 50 and enjoyed a number of years

18   of very successful appreciation in his Plan assets, including

19   all of the years after age 60, and he didn't retire until age

20   71, he could have taken out of the Plan 15 percent of his Plan

21   account every year after age 55.  Now, of course, he chose not

22   to do that, and he chose to retire when he did, and I'll get

23   into that when I discuss Mr. Goldenberg more particularly a

24   little bit later.  But I think it's important for the Court to

25   note in terms of how the Plan was managed and what the options

1    that are for the beneficiaries or the participants, that this

2    option to take funds out at age 55 exists.

3          Now, one other thing that I wanted to mention about the

4    Plan, the structure of the Plan was the subject of motion

5    practice before Judge Donio back in November.  The plaintiffs

6    sought to amend their complaint.  And one of the reasons this

7    case has taken so long, your Honor, is there have been several

8    motions to amend the complaint.  The motion to amend the

9    complaint back in November was opposed.  The count that we

10   opposed, or one of the counts that we opposed, was a count

11   that would have asserted a claim that the trustees had to set

12   up segregated accounts in the names of each of the individual

13   members so that assets -- each of the individual participants,

14   so that assets could be individually managed and age, the age

15   of those participants should be taken into account.

16         Now, we opposed that and we challenged it, saying that

17   this is essentially a dispute over how the Plan operates.  The

18   Plan does not have separate accounts for participants who own

19   their own assets.  It simply -- it has an aggregate class of

20   assets that is managed for the entirety of the participant

21   class.  And Judge Donio agreed with us and said, and I'm just

22   quoting here from Page 18 of Judge Donio's Opinion, "To the

23   extent plaintiffs allege that the Plan should have been

24   divided into different categories by age with a different

25   investment strategy for each age group and that this failure

1    to do so constitutes a breach of fiduciary duty, such an

2    allegation challenges the Plan's form and/or structure and it

3    does not implicate the fiduciary duty requirement set forth in

4    ERISA."  So that claim was not made.  But here we are today

5    and the plaintiffs are trying to do exactly the same thing in

6    a different guise.  Through the back door they're asserting

7    that your Honor should impose a similar age based investment

8    strategy on all the participants even though the structure of

9    the Plan contemplates that those assets will be managed for

10   everyone's benefit, young and old, those with large Plan

11   accounts, those with small Plan accounts.

12          So, your Honor, that's by way of background and that's

13   by way of suggesting that this is not an appropriate case for

14   a class certification because the very nature of the theory

15   that the Plan should be taken to be similar to an IRA account

16   for an individual 56 year old worker, that is definitely --

17   it's totally incongruous.  You cannot have a plan that

18   requires the trustees who have a class of 250 participants to

19   manage the plan as though all of those 250 participants are

20   now averaged into some kind of an avatar worker and you manage

21   those assets as if all the participants were an imaginary

22   being.  It is not workable, it is not logical, and it really

23   defies the way the Plan was set up.

24          THE COURT:  Do we know whether the Plan itself is

25   aging?  Is the average age increasing each year in the Plan?

1          MR. GENTILE:  Your Honor, we have some information on

2    that.  I don't think that's the case.  We have Mr. McShane's

3    certification in support of the -- in opposition to the

4    plaintiffs' motion for class certification, has divided the

5    account balances by age and it shows you, at least as of the

6    end of 2009 that those under 50 -- well, there are 241 total

7    participants as of that date, those under 50 number 128, those

8    over 50 number 113, and that excludes all of the individual

9    defendants in this case.  I don't think the percentages have

10   changed over the last few years, your Honor.  I don't think

11   it's aging, at least that's my information.

12          THE COURT:  If there were that dynamic feature of the

13   Plan as each year went by, then would you agree age ought to

14   be a consideration of the fiduciaries?

15          MR. GENTILE:  Well, your Honor, I guess I could

16   imagine a company in which the work force was entirely --

17   entirely consisted of workers who are 60 years old and over.

18   Harness manufacturers, cooper manufacturers, maybe, some

19   business that's dying as an industry, and in that case perhaps

20   you might then take into account age but the age would be --

21          THE COURT:  Well, you wouldn't have to go that far.

22   It could be a casino where everyone under 40 gets laid off

23   because it's done by seniority and business is down.  It's not

24   a farfetched example.

25          MR. GENTILE:  True, your Honor, and I think you need

1    to -- I guess there are two things.  One is what is the

2    horizon of these people to the point they retire and what are

3    the liquidity needs of the plan.  Obviously, the plan would

4    have to consider the age of people.  If the work force will

5    largely retire in the short-term, you want to make sure your

6    plan investments are liquid enough to pay them out, pay the

7    distributions that will be necessary.

8         And then the other point is what happens to people who

9    take their plan assets out, how do you guarantee that those

10   assets are used reasonably over the rest of their life until

11   they die?  Okay?  And that is really something that the Plan

12   and the trustees have no control over.  The Plan here gives

13   the option, affords the option to participants to take up to

14   15 percent of their assets out but it doesn't mandate what

15   they can do with those assets.

16        THE COURT:  And did you say that it is mandatory,

17   though, that they withdraw all of their money upon retirement?

18        MR. GENTILE:  Yes.

19        THE COURT:  And so you know that there's no retired

20   people in the Plan itself.

21        MR. GENTILE:  That's true, your Honor.

22        THE COURT:  Okay.

23        MR. GENTILE:  As far as I know.

24        Now, if we -- now, of course, what they do after they

25   retire with the money is totally unknown, it's not in our

1   control.  If you look at the -- and I'll examine the named

2   plaintiffs in that regard.  Mr. Goldenberg took all of his

3   money, he retired in the depths of the stock market decline,

4   he took all of his money and on the advice of his

5   daughter-in-law, who is a financial planner, he put all of

6   those Plan assets into an annuity so he's essentially locked

7   in those gains for the rest of his life and I think he's

8   earning 5 percent or something a year, whatever he testified

9   to in his deposition.

10          There are other people like Mr. Loew who left the Plan,

11  he was only briefly in the Plan -- briefly employed by the

12  company.  When he left, he took his Plan distribution and he

13  spent it, and in his deposition he admitted he has no

14  retirement savings whatsoever.

15          So again, your Honor, there's -- the Plan and the Plan

16  trustees, once the person retires and takes their money out,

17  there's really nothing we can do about how they spend it.

18          THE COURT:  So setting up individual accounts, in

19  other words, is not the answer because it defies the structure

20  of the Plan itself.

21          MR. GENTILE:  Correct.

22          THE COURT:  But would you agree that the way that the

23  Plan is set up within the structure that it does have, that

24  the trustees have their hand on a lever, if you can picture it

25  in concrete terms, and that lever swings between 0 percent and

1   100 percent and they can choose to adjust it each month

2   consistent with the objectives of the Plan, is it not a

3   plausible theory for the plaintiffs to say that the way that

4   that lever has been managed is a breach of duty because it

5   hasn't come close to maximizing returns, it hasn't looked at

6   the real conditions in the market, any of the other criticisms

7   that should be leveled, and why should the plaintiffs be

8   required to do something more than what the fiduciaries

9   themselves are expected to do, which is identify where on this

10  lever you want the answer to be each month?

11          MR. GENTILE:  Well, your Honor, I think the trustees

12  have done more here and, as Mr. Sawicki briefly outlined, the

13  management of the Plan assets is really a dynamic model.  It

14  is constrained and there are standards on what they can do,

15  and it's not 0 and 100, it's up to 20 percent in cash and

16  fixed income assets, up to 80 percent in equity instruments.

17  The actual ratio is set as the trustees determine according to

18  market conditions and investment opportunities on

19  recommendations of professional investment advisors.  And I

20  think that is a -- in terms of the discretion that the Plan

21  trustees have, that's an appropriate model.  And I think the

22  question here is given that the trustees have an instrument

23  that sets forth standards, the plaintiffs are saying we've got

24  a better idea and the better idea works during this period of

25  historic market declines but it doesn't work over the lifetime

1    of the Plan, it doesn't work over Mr. Goldenberg's 22 year

2    period of employment.

3            THE COURT:  Well, that may be, but isn't that

4    something it is determined at the time of trial?

5            MR. GENTILE:  Your Honor, we could have -- you know,

6    every time there's a market decline, somebody through the

7    benefit of hindsight wants to say we should have invested in,

8    you know, one of four different models, the courts would be

9    deluged with those claims.  It cannot simply be in hindsight

10   you could have done something different to increase the

11   returns.  And I think especially you should not be able to do

12   that when you're doing it only in the period of time during

13   historic market collapse, historic financial meltdown in late

14   2008 and 2009.  And I think that's really a fundamental issue

15   in this case.  If the plaintiffs are right that they have the

16   ability to challenge discretionary determinations made by the

17   trustees, and there is no allegation of fraud here, there's no

18   allegation of self-dealing here, the only allegation is I've

19   got a guy who has a better theory of how these should be

20   managed.  And it seems to me that if once we go down that road

21   and permit claims based on hindsight analysis where the court

22   is having to second guess what the trustees did in terms of

23   picking various investments and allocating over fixed income

24   or equity investments over a period of time, then that

25   converts the courts into essentially being fund managers or

1    investment advisors, and I submit that's really not

2    appropriate and it's not what this case is about.

3         But let me turn to the individual plaintiffs here.  I

4    did want to talk, because it's not simply commonality, we've

5    been talking about those, I want to talk about typicality and

6    adequacy.

7         Mr. Goldenberg.  Mr. Goldenberg, as I say, is a -- he

8    retired at age 71 and, as I say, there's no mandatory

9    retirement.  When he wanted to retire, he was advised by the

10   human resources manager at Inductotherm not to retire because

11   they told Mr. Goldenberg the stock market decline has been so

12   profound you should wait, you don't have to retire now, why

13   don't you wait a few months, wait six months or so, see if the

14   markets bounce back, because once you take your Plan assets

15   out you're not going to benefit from that rebound.

16   Mr. Goldenberg did not take that advice, he said his wife

17   wanted him to retire and take care of his grandchildren, he

18   had to retire.  He didn't take, as I alluded to before, he

19   didn't take advantage of the 15 percent per year option to

20   withdraw from the Plan, so he retired at the rock bottom of

21   the stock market.  As far as I know, no one else in the

22   company did retire.  So Mr. Goldenberg has an aim that is

23   different from other participants and that's because, A, he

24   has a lot to make up for and he's more interested in

25   maximizing his financial recovery and, two, he's retired, he's

1    no longer in the Plan, so he could really care less about how

2    the Plan is managed in the future.  And in that respect he's

3    markedly different than most of the other members of his

4    class.  And, of course, he locked in his losses so he doesn't

5    really have the benefit of the Plan appreciation, which, as

6    the chart on the easel shows, did recover after the depths of

7    early 2009.

8         Why is Mr. Goldenberg an inadequate representative?

9    Even if he were -- well, first of all, he needs a translator

10   and we could not take his deposition without one.  He has a

11   very limited ability to communicate.  He relies on his wife to

12   do most of the analysis of written documents for him.  His

13   wife -- his affidavit -- his wife's affidavit show were key in

14   interfacing between Mr. Goldenberg and his attorneys.  His

15   daughter-in-law was the one who recommended his annuity.  And

16   his involvement with the lawsuit is really remote, I would

17   say, because everything gets filtered through his wife and his

18   wife does most of the communicating.  Mr. Goldenberg has a

19   very limited knowledge of financial matters in general.  He

20   can't explain really what a stock is, what a bond is.  His

21   view of what makes sense for the Plan is that it should avoid

22   stocks altogether because Mr. Goldenberg views those as much

23   too risky, so he prefers a very extreme allocation.  And

24   again, the typicality requirement, the adequacy requirement

25   are intended to protect the absent members of the class.  All

1  those beneficiaries who are still in the Plan, who can

2  communicate, who understand financial matters, who remain in

3  the Plan and would like their Plan assets to be diversified.

4        THE COURT:  Well, are you suggesting that a class

5  representative in order to be adequate has to be sophisticated

6  and understand the ins and outs of the market?

7        MR. GENTILE:  Not at all, your Honor.  Your Honor was

8  absolutely correct that the named representatives do not have

9  to be the best representatives, and that is not my point.  My

10  point is these named representatives of this class are

11  distinctly inadequate as compared to an average fellow, an

12  average laborer in the plant, someone who can communicate in

13  English who has a basic familiarity with rudimentary financial

14  matters.  And Mr. Goldenberg I think fails either one of those

15  tests.

16        Now, Mr. Loew is another special case, even though he's

17  not an equity class representative, he is a representative on

18  some of the other -- or he was initially.  And Mr. Loew was

19  briefly employed by Inductotherm, he left shortly after his

20  Plan contribution was made, I think four months after the

21  Plan -- the contribution was made to his account.  He gained

22  10 percent in those four months so he had no injury whatsoever

23  under the Indel allocation or asset allocation.  And in fact

24  Mr. Loew testified that given his age and his risk tolerance,

25  he is more likely to favor more aggressive investments than

1   the consecutive allocation that the Plan proposed.  And in

2   fact his investment -- his risk tolerance is so extreme that,

3   after leaving Inductotherm, he embarked on a career as a

4   commodities futures option trader.  And so we talked to him

5   about that, and he managed to lose a little bit of money and

6   he went on to another business.  But he conceded at his

7   deposition his risk tolerance is not typical of the alleged

8   44/56 allocation that the plaintiffs would like to impose on

9   the class.

10          And this is the rest of why Mr. Loew is not adequate.

11  He's not in the -- he's not participating in the Plan at all.

12  He doesn't care how the Plan is managed in the future.  He has

13  no stake in that outcome.  Or, as Mr. Sawicki likes to say, he

14  doesn't have a dog in the hunt.  So his interest again is in

15  maximizing the dollars he can take out.

16          Mr. Pacheco is perhaps the most interesting of the

17  three.  He is the only one of the three named representatives

18  who is still employed by Inductotherm and is still a

19  participant in the Plan.  And what makes Mr. Pacheco unique is

20  his age, of course, is at variance with the 44/56 allocation

21  the plaintiffs say should be mandated for everyone because he

22  really falls outside of those parameters.  And since he has

23  been in the Plan, he has not used the Plan as a source of

24  retirement funds.  In fact, what he has done is used it as a

25  basis to supplement his income.  And every time there is a

1  contribution of his Plan account, he withdraws it, as he is

2  allowed to do, using a medical -- for medical purposes or for

3  hardship reasons, and so he has no retirement funds in the

4  Plan whatsoever.  And again, Mr. Pacheco could care less

5  whether the Plan is invested consecutively or not

6  consecutively, whether the trustees invest it under the

7  Investment Policy Statement or whether it's invested under the

8  Plan Mr. Pomerantz -- the theory Mr. Pomerantz has.  So again,

9  Mr. Pacheco is not a typical plaintiff representative of a

10  class, most of whom are participants in the Plan, most of

11  which use the Plan as a source of their retirement income.

12       What else does Mr. Pacheco have -- why is he not

13  adequate?  Well, aside from the fact that he really has no

14  familiarity with financial matters, he has grievances with his

15  employer and has been disciplined, suspended.  And if you read

16  his affidavit, which the plaintiffs have submitted in support

17  of their motion, you'll see that Mr. Pacheco has a series of

18  issues with his employer.  Why does that not make him a

19  typical or adequate representative?  Well, it's because the

20  class representatives, assuming he were their representative,

21  would not want Mr. Pacheco to be impeached, would not want his

22  credibility or his motivations questioned.  They're entitled,

23  as a matter of fairness, to have a representative act for them

24  who is not likely to be susceptible to either of those, whose

25  incentives, when this case is resolved either through

1    settlement or matters of strategy, are not simply to maximize

2    what he can get out of the next Plan contribution, who has

3    some other incentive than to stick it to his employer because

4    of his grievances.

5         So all of those points, your Honor, I think counsel

6    strongly against the certification of a class that has these

7    named representatives at the head.  And again, it's not that

8    we need to find the best representatives for the class, but we

9    need to find representatives who are adequate, who are not on

10   their face likely to be susceptible to these kinds of attacks.

11        That's all I was going to say, your Honor, unless you

12   had some questions for me.

13         THE COURT:  No, I think you answered my questions.

14   Thank you.

15        Mr. Lakind, do you want the last word on this?

16         MR. A. LAKIND:  Yes, if I could, your Honor.

17        Your Honor, could I ask counsel to put the investment

18   policy back on the screen, the one that showed the 50 percent

19   allocation?

20        Your Honor, if I might, let me begin by saying that

21   much of what was addressed in argument today goes to the

22   merits of the claims, not to their plausibility under Rule 23

23   analysis.  And let me start by illustrating some of the

24   difficulties with the approach that defendants have taken.

25         First of all, defendants noted that in 2009 the Plan

1   experienced a 20 percent appreciation.  They also stated that

2   in March 2009 they changed the asset allocation to be much

3   closer to that proposed by Dr. Pomerantz than the 80/20

4   allocation which was in the Investment Policy Statement.  So

5   to the extent that there was appreciation and remedial conduct

6   that occurred in 2009 after much of the loss was sustained,

7   suffice it to say that from 2006, '7, and '8, until 2009 the

8   Investment Policy Statement called for a 20 percent allocation

9   to fixed income in cash and 80 percent to equities.  As a

10  consequence, there's a period of time where there was a loss

11  until they came to a more appropriate asset allocation of

12  50/50.

13       Secondly, your Honor was shown a spreadsheet prepared

14  by Ms. Allen, and that spreadsheet was designed to demonstrate

15  that the proposal of Dr. Pomerantz was not in fact likely to

16  lead to an award of damages.  In the course of her deposition

17  Ms. Allen acknowledged that that spreadsheet was prepared with

18  information provided by counsel and was inconsistent with the

19  brokerage statements that underlay the performance of the fund

20  and that explained the performance of the fund.  As a

21  consequence, it's awfully difficult to consider the merits in

22  conjunction with a document that was prepared on the basis of

23  information provided by counsel which was not provided in

24  discovery.

25       Third, at Page 31 of her report, Ms. Allen acknowledges

1    that if the damage period were extended from January 2006 to

2    October 2011, plaintiffs would sustain damages of between

3    4.7 million and 6.8 million, which seems to be inconsistent

4    with the chart that was shown to your Honor.

5         Your Honor, I'm sorry this is a bit disjointed, but

6    your Honor inquired as to the reasons for the delay in the

7    prosecution of this action.  One reason for the delay was when

8    we were prepared to proceed with class certification, we had

9    determined that expert testimony would likely not be required.

10   Defendants indicated to the magistrate judge that they were of

11   the view that expert testimony would be required.  In view of

12   that, a determination was made on our end, given the holding

13   in *Hydrogen Peroxide*, that we did not want to proceed where

14   there was only one expert.  So the reason for the delay or

15   much of the delay in recent times was attributable not only to

16   amendments but to defendants' decision to proceed with expert

17   testimony, which, frankly, given the scope of the inquiry we

18   felt was unnecessary.

19        In addition, defendants showed to your Honor an

20   Investment Policy Statement which listed the three goals of

21   the Plan.  Goal number one was the preservation of capital and

22   liquidity.  Clearly that did not happen in 2008.  Clearly that

23   goal is not compatible with an 80/20 asset allocation.

24        One of the counsel indicated that there's a difficulty

25   in allocating damages should they be recovered, this is

1   different than the prohibited transaction claim.  However, the

2   damages in the prohibited transaction claim are identical to

3   what the damages would be here but for a different theory and

4   a different amount, they can be allocated in the same fashion.

5   The Third Circuit in *McMahon vs. McDowell* made it very clear

6   that actions of this nature against a fiduciary result in

7   recoveries that belong to the Plan as a whole.  Inasmuch as

8   the recovery belongs to the Plan as a whole, it's up to the

9   Plan to make that allocation, not the Court.  Insofar as the

10  Court would be called upon to make that allocation, the Court

11  has available the very Plan itself which says how it should be

12  done, which is a function of the amount in each account, not a

13  function of age.

14         THE COURT:  Well, do you accept that there are a

15  substantial number of members of the class who would not be

16  benefited by the 44/56?

17         MR. A. LAKIND:  No, that suggestion was incorrect.

18  Every single member except the few that left would be

19  benefited.  And the reason for that is as follows, between --

20  let's go back to the 2006 date and use Ms. Allen's numbers.

21  Between 2006 and 2009 or '10, I forget, I think it's 2010 she

22  used in her report, she said there was $4.7 million in

23  damages.  That $4.7 million would then become a Plan asset.

24  That Plan asset would then be distributed to all the Plan

25  members, not as a function of age but under the Plan document

1   itself as a function of the account balance.  So there may be

2   a few that left but there's no more than 38, according to

3   their numbers, that some left when the market was high and

4   some low.  But, suffice it to say, that when the Plan -- were

5   the Plan to recover either the 4.7 million or a different

6   amount, that would be allocated to every Plan member.  Age is

7   absolutely irrelevant to the allocation.  Absolutely

8   irrelevant.

9        Then you come to March 2009 and their argument is

10  contradictory.  Because they say, well, in March 2009 some

11  Plan members might want a more aggressive allocation than

12  that proposed by Dr. Pomerantz.  But they provided exhibits to

13  the Court which said they essentially reverted to the

14  Dr. Pomerantz model in March of 2009 or fairly close to it.

15  So the damage period probably spans a period between either

16  2006 and 2008 or 2009, but there's one absolute recovery for

17  the Plan as a whole and that recovery is allocated to every

18  single member as the function of the amount they had in the

19  Plan at the pertinent time.  It is simply inaccurate for

20  defendants to suggest that a large portion of Plan members

21  would not be benefited.

22        Now, what Dr. Pomerantz did is exactly what defendants

23  did, he proposed a possible, what he referred to as a prudent

24  standard for an asset allocation.  It's not definitive.  It's

25  not suggested that this is the only asset allocation, but that

1   age should be considered and taken into account and here is

2   one way in which to do it.

3       What your Honor didn't hear is what methodology

4   defendants used.  The defendants have not throughout the

5   entirety of this case suggested how they came to that 80/20

6   methodology.  They didn't have anything -- any information on

7   Plan demographics, which they're required to consider when

8   developing a methodology, so there's no basis before the Court

9   now to even suggest that another methodology is better or

10  different.

11      Your Honor inquired of counsel what percent of the

12  members are below certain ages.  I don't know the answer but I

13  do know based upon the reports 3 percent of the assets are

14  held by individuals under 30 years of age.  3 percent.

15      Insofar as defendants contest the --

16      THE COURT:  Well, let's look at those members of the

17  class, they're the 3 percent that are under age 30.  And

18  you're proposing a certain mix of equities and non-equity

19  investments.  What's the answer to the argument that's been

20  made that you are going to be disadvantaging the younger

21  members of the class?

22      MR. A. LAKIND:  Okay.  I think the following.  Number

23  one, as an individual if I were to invest and I were

24  significantly younger, I would be comfortable with an

25  aggressive equity allocation.  But if someone said to me as

1    part of this plan, the price I pay for that aggressive equity

2    allocation when I'm young is that when I'm old, I get that

3    same aggressive equity allocation, I'm much less comfortable

4    with that.  So the question isn't --

5            THE COURT:  But 30 year olds don't think they're ever

6    going to grow old.

7            MR. A. LAKIND:  Happens so fast.  You'll see.

8            (Points to Robert Lakind)

9            MR. A. LAKIND:  So the question really I don't

10   think -- this is isn't as if they had private investments on

11   the side, this is a situation where once they sign onto an

12   equity allocation, that allocation was going to stay with the

13   plan until they got out, so it's a little bit different than

14   saying what the young prefer.

15           THE COURT:  Well, you've also criticized the

16   fiduciaries for being inflexible, for seizing upon a certain

17   answer, 80/20, and rigidly keeping it.  And there is a defense

18   to that that says, no, it was adjusted periodically and here's

19   the proof.  But let's say that you're correct and that it was

20   rigid, what's been proposed is a rigid solution of 44/56.

21           MR. A. LAKIND:  It is not -- I'm sorry, your Honor.

22   Dr. Pomerantz didn't describe it as a rigid solution, he said

23   it's a prudent allocation, it's an approach to show that

24   damages can be allocated.  We are not suggesting that it's got

25   to be 56/44 from here on out, we're suggesting that if age

1   were considered, this would be a starting point and the

2   allocation would inevitably vary as it has here to some

3   extent.

4            THE COURT:  But what would color the exercise of

5   discretion, what would change the 44/56?

6            MR. A. LAKIND:  Well, one of the things they said in

7   one of the reports, for instance, if the market is

8   particularly tumultuous, they might consider departing from

9   the equity allocation they developed.  I think at times when

10  the market seems to have appreciated rather rapidly it's

11  probably prudent to the begin to reallocate to bonds.  I mean,

12  the fact of the matter is over the last ten years, statistics

13  show bonds have been a better investment than stock.  I mean,

14  one of the things the fiduciary has to do is bring their

15  judgment to it.  But a fiduciary cannot exercise that judgment

16  unless it has information, and this fiduciary had none.

17           THE COURT:  Well, they had information about the

18  performance of the financial markets.

19           MR. A. LAKIND:  Right.

20           THE COURT:  And met each month to address those.  Do

21  you accept that?

22           MR. A. LAKIND:  Oh, I think they did, but they knew

23  very little or nothing about the demographics of the Plan.  I

24  mean, Ms. Allen suggested a broader inquiry than that of

25  Dr. Pomerantz, she said you look at years to retirement, risk

1    tolerance, and assets outside the Plan.  So there was a whole

2    slew of information as to -- that should have and could have

3    been gotten.  Dr. Pomerantz lacked the ability to develop that

4    other information because in the context of preparing a

5    report, the only thing he had was the age, which he said was a

6    surrogate for other variables, but a fiduciary should rely on

7    demographics and they did not.

8         THE COURT:  Well, has Pomerantz relied on whether the

9    fund is aging or growing more youthful?

10        MR. A. LAKIND:  Yes, he prepared a draft in which he

11   showed the concentration of wealth and age in different

12   strata, so that is what he considered.

13        THE COURT:  But did he do a comparison, I don't

14   recall one, that would compare the age of the fund, the

15   average age of the fund in '06 versus in subsequent years?

16        MR. A. LAKIND:  No, he did not, your Honor.

17        THE COURT:  Because if age is so important and if the

18   average age is what we should use to manage the fund, wouldn't

19   it be important to know whether the fund itself is aging or

20   the fund itself is tending to get younger because there's more

21   younger hires entering?

22        MR. A. LAKIND:  Yes, I think the answer to that is it

23   would be.  But it's something that an outside expert would

24   have difficulty doing because we don't know who left, what

25   their age was when they left, and things of that nature, we

1    only have the composition of information we're given.  So we

2    don't know who left in 2006, who could have left in 2007, et

3    cetera.  In fact -- I won't mention that now.

4          Your Honor, finally, with regard to the adequacy of the

5    class representatives, I don't think there's much to add with

6    Mr. Goldenberg, he does rely on his wife and his daughter who

7    is a financial planner, and there's no case law that says

8    that's inappropriate.  And although it wasn't briefed in

9    defendants' brief, the case law is extensive, every single

10   circuit that's examined the issue has held that even when you

11   leave a plan, you still have standing to sue on behalf of that

12   plan because when the plan recovers, the plan can allocate and

13   consider your participation at the time when you were in the

14   plan.  We didn't brief it, defendant didn't brief it, but I'm

15   familiar with the law and that is clearly what the law is.

16         Mr. Loew, he is --

17         THE COURT:  He may have standing to bring his

18   individual suit, but is he typical of the class members?  It

19   seems that someone who's no longer in the plan would be more

20   indifferent to the plan's performance, wouldn't they?

21         MR. A. LAKIND:  I think he would be more indifferent

22   once he left the plan.  But insofar as he takes the position

23   that the starting point should have been 56/44 while he was in

24   the Plan, he has the same stake as everybody else and that's

25   what he's advocating for.  And he's not saying there should be

1    a different stake once I leave, but he has -- he clearly,

2    under the -- and again, I don't have the cases off the top of

3    my head but the circuits have been pretty standard in holding

4    you retain standing to bring a class certification even after

5    you leave the plan.

6         THE COURT:  Well, isn't he at the other end of the

7    spectrum really from Mr. Pacheco in terms of risk tolerance

8    and what they would like to see the Plan doing?

9         MR. A. LAKIND:  He is, but I think that's important

10   in having different class representatives.  Again, it was not

11   briefed, but some of the case law is that if you have a broad

12   spectrum of interest, you're more likely to get an adequate

13   class representation.

14        I think I indicated Mr. Loew is not proposed as the

15   representative of the equity Plan.  And with regard to

16   Mr. Pacheco, counsel indicated that he had withdrawn much of

17   his money from the Plan.  That was done when he had some

18   medical issues and his nephew had some medical issues.  There

19   was nothing improper about that.  It was done on notice.  He

20   was instructed that's how to proceed.  That certainly does not

21   make him different than any other representative.

22        Your Honor also inquired of me and I gave an inartful

23   answer as to which of the 23(b) prongs is appropriate for this

24   case.  In *Schering Plough* the Third Circuit at 589 Fed.3d 604

25   said that in a 502(h) claim, which this is, the claim is most

1    appropriate as a 23(b)(1) class.

2          Your Honor, I believe I mentioned that -- I think I've

3    covered everything unless the Court has any other questions.

4          THE COURT:  Just a moment while I've got you here.

5          I think one of the important points of the defendants'

6    argument is that the theory put forward by your expert is one

7    of looking backward and second guessing decisions that had to

8    be made especially during a financial crisis.  What would be

9    your response to that?

10          MR. A. LAKIND:  My response, your Honor, is that age

11    is relevant whenever an allocation is made, Plan demographics

12    have to be considered.  And while it happened that the market

13    deteriorated in 2008, the report of my expert -- of our expert

14    says that age should have been considered at the outset when

15    an allocation was made because that's the best way to preserve

16    the capital, which is the principal goal of this Plan.

17          Another advantage of considering age, which the federal

18    regulations indicate should be done and principally pretty

19    much every authority, is that unlike the 80/20 goal age is

20    going to vary as younger employees are hired, the equity fixed

21    income allocation will change.  So not only will it change --

22    could it be changed as a consequence of conditions in the

23    market, but it will change as a consequence of the

24    demographics of the Plan members, something that defendants

25    did not consider.

1        In closing, let me just return to the burden upon us in

2   this class action certification, which is to essentially put

3   forth a plausible theory of liability, not necessarily a

4   colorable claim.

5        THE COURT:  In considering what those two terms mean,

6   plausible and colorable, where's the line between it?  How

7   will I know what's plausible if the adversary has a pretty

8   strong answer to all of it?

9        MR. A. LAKIND:  Your Honor, I think, at least reading

10  from case law, it's hard for me to know where the line between

11  plausible and colorable is, but the notion that age should be

12  considered and was not is far more implausible.  That's the

13  basis of our liability claim, that there is an obligation to

14  consider age in developing a Plan allocation, and that

15  assertion is consistent with the *Bogosian* case, it's

16  consistent with the *GIW* case, it's consistent with the goal

17  *Unisys* articulates to preserve capital.  If age is not

18  considered, how can capital be preserved in a Plan if people

19  are going to retire and take their money.  It's consistent

20  with the federal regulations.  It's consistent with what the

21  SEC says, it's consistent with what FINRA says.

22       I mean, I would submit, your Honor, not only is the

23  notion that age should be considered plausible, but to suggest

24  otherwise, defendants to suggest otherwise is simply improper.

25  Mr. Webster in his deposition said we have to consider the

1    individual circumstances.  Ms. Allen in her report and

2    deposition acknowledged age should be considered.  FSC didn't

3    have the age and certainly didn't have the right age.  So I

4    would respectfully submit that our claim is far more than

5    plausible.

6          THE COURT:  No other questions on class

7    certification.

8          MR. A. LAKIND:  Thank you very much, your Honor.

9          THE COURT:  Okay.  Thank you.

10         All right.  I'd like to move on in the time that's

11   remaining.  I'm going to reserve decision on the class

12   certification motions, and I appreciate your arguments on both

13   sides, they're provocative.

14         We have a little bit of time if you would like to speak

15   to the issue of the motions for partial summary judgment as to

16   the several counts of the amended complaint, and so we're

17   speaking of Count One and Count 26, is that right?

18         MR. GENTILE:  That's correct, your Honor.

19         THE COURT:  Okay.  So as to Count One, failure to

20   adopt a Trust Agreement in accordance with the Plan.  Seems

21   like I've been here before, but what would you like to add?

22         MR. GENTILE:  Well, your Honor, our original motion

23   was one to dismiss.  And, in accordance with the motion to

24   dismiss standards, we didn't have the opportunity to submit

25   material outside the record.  And in fact I reread your

1    Opinion denying our motion and chastising us somewhat for

2    trying to include something that was not in the pleadings or

3    on the face of the pleadings, so --

4              THE COURT:  It must have been a mild chastisement

5    because I --

6              MR. GENTILE:  It was a very mild --

7              THE COURT:  -- reread it and I didn't pick that up.

8              MR. GENTILE:  Very mild.

9         We're here today, we have a complete record, the claim

10   is that the Plan does not have a Trust Agreement and that the

11   absence of a Trust Agreement leaves the trustees without

12   standards for exercising their investment discretion.  So

13   there are two answers to that, and the simple answer is that

14   they're wrong on both counts.

15        First, there is a Trust Agreement and the Plan has

16   always had a Trust Agreement.  The Plan back at its inception

17   in 1956 had a single integrated document, which was both a

18   Trust Agreement and a Plan and it was so captioned as Profit

19   Sharing Plan and Trust Agreement of the Inductotherm

20   Engineering Corporation in 1956.  These documents are all

21   attached to the certification of Mr. Barndt in support of the

22   motion.  The first sentence reads "This Trust Agreement."

23   Article H of that document refers to trustees of the trust

24   established pursuant to the provisions hereof.  The document

25   is replete with language that reinforces the idea that the

1   Trust Agreement is contained in that document.  From 1956

2   onward the Plan and Trust Agreement have been treated

3   consistently as an integrated whole.  When the Plan and trust

4   went to get letters from the Internal Revenue Service, the

5   Internal Revenue Service responded saying the Trust and the

6   Plan comport with their Internal Revenue Code regulations.

7   1976 there was a restatement and amendment of the existing

8   Profit Sharing Plan and Trust Agreement into another document.

9   The Profit Sharing Plan and Trust Agreement has continued from

10  that date forward.  The recent -- the more recent Plan that's

11  the subject of this action is the 2002 version, which is

12  captioned Profit Sharing Plan but refers in it to the Trust

13  Agreement that predated that Plan.

14       So if you go back in time, I think it's clear that

15  there is a Trust Agreement historically.  The Trust Agreement

16  allowed for the creation of a trust account at Provident

17  National Bank, which through various iterations of the

18  financial community is now PNC.  So the original trust account

19  is at PNC, the contributions that are made from the company go

20  into that trust account, and from the trust account the funds

21  are disseminated or distributed by the trustees to various

22  investment vehicles.  So that's how it operates.

23       The fact that Mr. McShane in August of 2009 answered

24  Mr. Goldenberg's inquiry with the -- about where the Trust

25  Agreement is, he said there is no separate Trust Agreement,

1  which is absolutely true, there is a single integrated

2  document that is both the Plan and the Trust Agreement.

3       So all of that is factually true and is supported by

4  the documents that we've assembled.  ERISA does not mandate

5  that the standards for trustee discretion be contained in a

6  Trust Agreement.  And we've recited the relevant provisions of

7  ERISA under Section 402(b).  Procedures for establishing a

8  funding policy are provided for in the Plan.  Procedures for

9  allocating responsibilities among those operating and

10  administering the Plan are set forth in Plan Section 8.2.  The

11  procedure for amending the Plan is set forth in Plan Article

12  10.  The basis on which payments are made to the Plan and from

13  the Plan are set forth in Articles 4, 5, and 6 of the Plan.

14  All of those written documents constitute Plan instruments and

15  satisfy ERISA.

16       THE COURT:  Well, by saying that the Trust Agreement

17  exists although it's not a separate document, and you refer to

18  the PNC bank account, if the PNC bank account is the

19  manifestation of the Trust Agreement because it's a trust

20  account, then that doesn't explain the language in Section 5.2

21  of the Plan that I previously examined, and it said

22  investments of contributions is governed by the provisions of

23  the Trust Agreement and it says that in the Plan.

24       MR. GENTILE:  Yes.

25       THE COURT:  I took that to mean that there's another

1   document called a Trust Agreement that would say how

2   investment of contributions is to be done, and the reason I

3   did that is because otherwise the language of the Plan

4   wouldn't make sense.  And so if a Trust Agreement is nothing

5   more than a bank account that holds things in trust, then that

6   doesn't direct the way that contributions are to be invested.

7   So where is the Trust Agreement, where would one find it?  Or

8   are you saying as a matter of law it's just not necessary to

9   have a document called a Trust Agreement?

10              MR. GENTILE:  Well, I'm making both of those

11  arguments, your Honor.  I'm making both of those arguments.

12  One, there is a Trust Agreement and historically the document

13  that is the Trust Agreement I think is a 1956 or '57 document,

14  which is attached to Mr. Barndt's certification.  Thereafter,

15  it was incorporated by reference into the Plan, carried

16  forward from that date and amended, as I say, in 1976.  So

17  that document is there, it is part of the Profit Sharing Plan

18  today.  Does it set forth the terms that govern the trustees'

19  discretion in terms of investments?  I would say the bank

20  account is the place that is the repository of the

21  contributions made by the company and the bank account is the

22  source of proceeds that go into the various investment

23  vehicles.  So in the sense it does satisfy Section 5.2 but

24  ERISA doesn't require that the Trust Agreement provide those

25  precise standards to guide the trustees' discretion.

1        And here the Plan itself is very specific and detailed

2   and sets forth every requirement that is necessary under ERISA

3   Section 404.  And even if -- and, of course, the Investment

4   Policy Statement, which governs the trustees' conduct during

5   the class period, and it was adopted in December of 2005 at

6   the very inception of FSC/Wharton's role as an investment

7   advisor, so it's continuously been in effect.  That investment

8   policy statement, as your Honor knows from the documents we've

9   put up on the screen and the documents we've submitted to you,

10  has very carefully drawn sets of asset allocation standards

11  and provisions covering what investments can and cannot be

12  made by the trustees.  So that document, in addition, would

13  satisfy the investment standards and make clear that there are

14  standards for the trustees to exercise their discretion.

15       And if nothing else, the whole issue of whether there

16  is a Trust Agreement, what it says is, I think, put to rest by

17  the Plan provision, which gives the trustees the authority to

18  resolve any possible conflict in interpretation.  And they're

19  authorized to do that in Section 8.9 of the Inductotherm Plan,

20  which basically -- it basically says if there is a conflict or

21  a question of how do you interpret these documents, the

22  trustees have the power to do that.  And there's really

23  nothing untoward about their construction of the Plan to

24  incorporate by reference the Trust Agreement, the Investment

25  Policy Statement has all of the standards.  And, moreover,

1    your Honor, I fail to see what damage whatsoever would befall

2    the class as a result of the fact that there is no Trust

3    Agreement.

4         So for all those reasons I think we've sufficiently

5    proven that there is a Trust Agreement under our investment

6    guidelines.

7         THE COURT:  Okay.

8         MR. GENTILE:  Let me turn to lack of prudent

9    investigation, Count 26.

10        So the Third Circuit standard is whether the

11   fiduciaries have engaged in the appropriate methods to reach a

12   decision.  And it's not whether the Court could imagine there

13   would be more thorough or different means of investigation or

14   different investigation or the plaintiffs as attorneys and

15   class representatives could imagine a different scenario.

16        But here the record is quite clear the trustees went

17   through a very careful process when they selected a new Plan

18   investment advisor in 2005.  They carefully vetted a number of

19   candidates, most of whom were very large financial firms.

20   They had a very comprehensive series of meetings where people

21   came in and made presentations to them about their investment

22   strategies and how they would manage the Plan.  The trustees

23   narrowed down that list to two finalists.  Wharton Business

24   Group and FSC were one of the finalists and ultimately they

25   were selected.

1    I would note that all of the potential candidates

2 presented an investment allocation model that is far different

3 from the ones proposed by the plaintiffs here and is more akin

4 to the one -- the target allocations and the actual

5 allocations that were adopted by the trustees.

6    So the selection of Wharton was made.  In addition to

7 the meetings and screenings, Wharton presented a three ring

8 binder full of materials.  They sat down with the trustees

9 over two sessions and were questioned about their investment

10 philosophy, how they would manage the Plan, how they would

11 communicate.  They manifested their willingness to hold

12 monthly meeting with the trustees.  Their target allocation

13 was not very different from the one that the prior investment

14 manager Hewitt had recommended.  And when Hewitt left, I think

15 the investment allocation at the time was 73/27, 73 percent

16 equities, 27 percent fixed assets.

17    Mr. Krupnick's testimony about what he did in terms of

18 due diligence on Wharton Business Group and FSC is in the

19 record.  His testimony was that he vetted them by reviewing

20 materials on the Internet and on the SEC website to see

21 whether there were any adverse reports or disciplinary

22 infractions, he found none for Mr. Webster and Mr. Hembrough

23 who are the Wharton Business Group representatives.  The only

24 support the plaintiffs have that this was an inadequate

25 investigation are a series of emails that Mr. Krupnick wrote

1    and exchanged with Wharton Business Group in the summer of

2    2009 that they say means he didn't do an investigation

3    beforehand.  Mr. Krupnick testified about those emails and his

4    certification, which is submitted in support of our motion,

5    states that what he wanted was to update his files because

6    Wharton -- he had learned that Wharton Business Group was

7    thinking about a reorganization or some kind of corporate

8    restructuring, he wanted to know the facts concerning that and

9    whether he might have to change any Plan documents as a

10   result.  So those were the impetus -- that was the impetus for

11   the communications, and the plaintiffs' inference that they

12   suggest a lack of any prior due diligence is simply not there

13   on the record.

14        THE COURT:  Well, his emails don't specifically

15   mention update or seeking update.  Isn't it just as inferable,

16   this being a summary judgment motion the plaintiff gets the

17   benefit of reasonable inferences, that what Mr. Krupnick was

18   doing was asking for information that he didn't already have?

19        MR. GENTILE:  Yes, your Honor, that's exactly what

20   they will infer.  And the inference by itself would be

21   plausible were it not for Mr. Krupnick's deposition testimony

22   and his certification, both of which explain what the emails

23   meant.  And he wrote the emails, there's no other source of

24   that information.  Plaintiffs had the opportunity to take his

25   deposition.  They've taken the deposition of Mr. Webster and

 1  Hembrough, had the opportunity to ask them whatever they

 2  wanted about those.  They can't now in response to a summary

 3  judgment motion rely simply on inference and speculation about

 4  what a document means, especially when the document was

 5  authored by Mr. Krupnick and he's given the testimony about

 6  what it meant.

 7          THE COURT:  Okay.  Thank you.

 8      Mr. Lakind?

 9      MR. R. LAKIND:  May it please the Court, your Honor,

10  Robert Lakind on behalf of plaintiffs.

11      First, your Honor, I'd like to address Count One, which

12  is plaintiffs' claim that the defendant breached their

13  fiduciary duty by not adopting a Trust Agreement.

14      It is respectfully submitted that in the course of this

15  litigation defendants have taken three positions with regard

16  to the existence of a Trust Agreement.  First -- I apologize,

17  Judge, which was prior to this litigation.  In August of 2009

18  the defendants sent Mr. Goldenberg a letter which stated that

19  there is no separate document entitled a Trust Agreement.

20  Then with their motion to dismiss in December of 2009, in

21  their papers they said that there is a Plan and Trust

22  Agreement and attached a document claiming to be a -- a

23  separate document claiming to be the Trust Agreement.  Now

24  their position is that the Plan and Trust Agreement are one

25  integrated document.

1          For two reasons it is respectfully submitted that the

2     Plan and Trust Agreement are not an integrated document.

3     First, the defendants state on Page 8 of their motion since

4     the inception of the Plan in 1956, the Plan has been a single

5     integrated document.  They cite to Exhibit B of their

6     declaration to support their position that it is a single

7     integrated document.  Exhibit B is a document that is first

8     dated in 1957 and on the last page of that document, which

9     presumably is a, maybe a draft document, reflects that that

10    document was never executed and signed, thus, that document

11    was never in effect.

12         Secondly, the current Plan, which is the 2002 version

13    of the Plan, specifically states that it is the Inductotherm

14    Company's Master Profit Sharing Plan and it is an amendment

15    and restatement of a Plan that was originally adopted in April

16    of 1976.  Therefore, the defendants' current position is that

17    they were integrating an unexecuted 1957 document into a Plan,

18    the 2002 version of the Plan, which specifically states it's

19    an amendment and restatement of a Plan originally adopted in

20    1976.

21         Additionally, for one other reason plaintiffs disagree

22    with the defendants' position.  First it is contradicted by

23    the plain meaning of the Plan.  The Plan specifically states

24    in Section 8.1, on numerous occasions it refers to a Plan and

25    Trust Agreement.  And as your Honor noted in Section 5.2(a),

1   the Plan specifically states that the investment of

2   contributions will be governed by a Trust Agreement.  Thus,

3   the plain language of the Plan and the fact that the

4   defendants have previously attached a document claiming to be

5   the Trust Agreement clearly suggests that there is a separate

6   document entitled Trust Agreement.  In fact, this Court has

7   previously ruled that the language of the Plan implies that

8   there is a separate document entitled a Trust Agreement.

9        I would just like to briefly address the arguments that

10  were raised by counsel, which were that ERISA does not require

11  a Trust Agreement, that the Wharton Business Group Investment

12  Policy Statement suffices in place of the Trust Agreement,

13  that there was no loss on account of a failure to adopt the

14  Trust Agreement, and that deference is owed to the

15  fiduciaries' current interpretation.

16       First, with respect to the argument that ERISA does not

17  require a Trust Agreement, the Plan specifically states that

18  the investment of contributions will be governed by a Trust

19  Agreement.  ERISA 404(a)(1)(D) explicitly provides that a

20  fiduciary must operate a Plan in accordance with its Plan

21  documents.  Therefore, if the Plan states there shall be a

22  Trust Agreement to comply with ERISA 404(a)(1)(D), there

23  needed to be a Trust Agreement.

24       The importance of a Trust Agreement in this Plan should

25  not go unrecognized.  First, this is not a pension plan, it is

1    inured to the participants, are they allowed to direct their

2    investments in this Plan.  And as FSC stated, unlike the more

3    common 401(k) plan, participants cannot direct their

4    investments, therefore, investment guidelines were of crucial

5    importance to this Plan.

6         Next, the defendants have suggested that the Wharton

7    Business Group Investment Policy Statement may take the place

8    of the Trust Agreement.  First, as noted, the Wharton Business

9    Group Investment Policy Statement is not a Trust Agreement, it

10   is a document produced by the service provider.

11        Secondly, as noted earlier, the 2002 version of the

12   Plan specifically states that it is amending and restating a

13   Plan previously adopted in 1976.  Exhibit Y to the defendants'

14   declaration is a copy of that 1976 version of the Plan.  That

15   specifically requires the diversification of investments of

16   the Trust so as to minimize the risk of large losses, and

17   that's in Section 4.34, your Honor.  I respectfully submit an

18   80/20 allocation is not an allocation that's diversifying the

19   risk of large losses.

20        Additionally, in the same provision of the Plan that

21   requires the adoption of a Trust Agreement with investment

22   guidelines, the Plan states at least annually the committee

23   shall review all pertinent employee information and Plan data

24   in order to establish the funding policy of the Plan.  The

25   Wharton Business Group Investment Policy has nothing in it

 1    about the employees.

 2         Further, Section 5.2 of the Plan also states that there

 3    shall be accounts in the Trust Agreement under which the

 4    participants may direct their investments.  There is nothing

 5    in the Wharton Business Group Investment Policy Statement that

 6    contains accounts for the participants to direct their

 7    investments.

 8         Further, the defendants also suggest in their papers

 9    that a Trust Agreement -- the Wharton Business Group

10    Investment Policy Statement can service as the Trust Agreement

11    because it contains the following language, and this is the

12    quote from their brief, your Honor, "The investment

13    advisor/representative do have the ability to recommend a

14    holding of up to 50 percent of the portfolio in cash or short

15    term bonds."  Not only is that provision very close to what

16    Dr. Pomerantz is recommending, that provision was added to the

17    Investment Policy Statement after this case was initiated.

18    That is a statement in the 2009 version of the Investment

19    Policy Statement, not the Investment Policy Statement that was

20    in effect prior to the initiation of this case.

21         Additionally, your Honor, the Investment -- Wharton

22    Business Group Investment Policy Statement was adopted in

23    2005.  The Plan, which requires a Trust Agreement, took effect

24    in 2002.  It seems impractical to believe that a 2005 document

25    could control for a Trust Agreement that was supposed to be in

1    existence in 2002.

2         Finally, your Honor, I believe that this is a matter

3    more for expert testimony as to whether the Wharton Business

4    Group Investment Policy Statement suffices as the Trust

5    Agreement.  Plaintiffs have their merits expert report ready

6    to go and they could provide it to the Court or the defendants

7    and their expert witness who -- their merits expert witness

8    who formerly managed all the retirement plans for American

9    Airlines, has opined in that report that this Investment

10   Policy Statement would not suffice as a Trust Agreement

11   because a Plan of this type you would have age -- something in

12   the Trust Agreement that age of the participants needed to be

13   considered.

14        Next, your Honor --

15        THE COURT:  Is that part of the record that's before

16   me today?

17        MR. R. LAKIND:  No, your Honor, I apologize, it's not

18   before you.

19        THE COURT:  So I really can't consider it.

20        MR. R. LAKIND:  No, that's correct, your Honor.

21        THE COURT:  Okay.

22        MR. R. LAKIND:  Next, your Honor, the defendants have

23   suggested that the absence of a Trust Agreement does not in

24   any way incur a loss to the participants.  First, that

25   argument was made for the first time in their reply and,

1   therefore, it's respectfully submitted it should not be

2   considered by the Court.

3        THE COURT:  It's actually one of my questions, and

4   I'll give you the opportunity to respond to it, is there --

5   how would you go about reckoning the loss from the failure to

6   have a Trust Agreement?

7        MR. R. LAKIND:  Your Honor, if there was a Trust

8   Agreement, there would have been investment Guidelines in

9   place.  And since we are here on a motion for summary judgment

10  where inferences are supposed to be construed most favorable

11  to the plaintiffs, I think that's more an issue for expert

12  testimony.  And, as I said and as you know, your Honor, it's

13  not currently before your Honor, our expert would testify to

14  the fact that the Trust Agreement, had it existed for this

15  type of Plan, a prudently drafted Trust Agreement would have

16  stated the age of the participants should have been considered

17  in implementing the Plan's investment strategy.  While our

18  expert testimony is not yet before the Court, there is well

19  established case law in our brief which sets forth the fact

20  that a motion for summary judgment should not be resolved in

21  advance of the submission of expert testimony.

22        Finally, your Honor, the next argument raised by the

23  defendants is that their interpretation --

24        THE COURT:  I'm sorry, let me interrupt for a second.

25        I thought that the record was complete on these motions

1    for summary judgment, I didn't receive a 56(d) application

2    from the plaintiffs saying let's wait, it's premature, or soon

3    we'll have an expert report and we want to submit that.  Isn't

4    the briefing complete?

5           MR. R. LAKIND:  Your Honor, in our brief we explain

6    that we believe the motion was premature because merits

7    experts reports had not yet been exchanged.  We may have

8    faulted there not doing it through the formal 56(d) process.

9           THE COURT:  Well, often that kind of statement would

10   be accompanied by a proffer at least like a 56(d) affidavit

11   would read this is what we would be adducing or this is what

12   we would like to do.  But just to have a general statement

13   saying expert discovery is not concluded, it doesn't tie the

14   knot that 56(d) requires of you, does it?

15          MR. R. LAKIND:  No, your Honor.  I guess if possible

16   if we could ask for leave, within a week we could have that

17   affidavit to you.

18          THE COURT:  Well, I already have a great deal to

19   consider here.  What was the date of the expert's report?  Do

20   you know how recently it was prepared?

21          MR. R. LAKIND:  The expert who was going to opine on

22   the Trust Agreement, his report was complete a few months

23   back, and then what happened, an Order was issued that delayed

24   the exchange of merits expert reports until the completion of

25   the class certification motion.

1          THE COURT:  Well, that only set a deadline for you.

2     Nothing said you couldn't supply it before the deadline or

3     supply it as part of your summary judgment opposition.  I'm

4     just reluctant to let the record float along, I hope you'll

5     understand.

6          MR. R. LAKIND:  Yes, your Honor.

7          THE COURT:  Also, your submitting it just about

8     guarantees that I get an equal and opposite request then for

9     leave to submit the defendants' response to your expert's

10    report.  So I'd say that it's too late to submit the report

11    for purposes of this notion and that, you know, I'll decide it

12    based upon the record that does exist, bearing in mind, of

13    course, the inferences that you're entitled to as the party

14    opposing the motion.

15         MR. R. LAKIND:  Yes, your Honor.  If I could then

16    fall back on my position that it was an argument raised in

17    reply, it wasn't in the moving papers regarding loss.

18         The final argument I'd like to address, your Honor, is

19    that the defendants have suggested that their interpretation

20    that they have an integrated document is entitled to

21    deference.  The Supreme Court in *Cartwright vs. Frummer* has

22    stated that fiduciaries are entitled to deference so long as

23    their interpretation is reasonable.  I respectfully submit

24    that the defendants' interpretation is not reasonable because

25    they have taken three different positions; first in August of

1   2009 there was no separate document entitled a Trust Agreement

2   with the filing of their motion to dismiss, then there was a

3   separate document entitled Trust Agreement, and now with their

4   current motion the Plan and Trust Agreement are an integrated

5   document with the defendants seeking to integrate a draft

6   Plan, which the last page of that Plan reflects was never

7   executed or placed into effect.

8        Unless your Honor has any questions, I was going to

9   move on to the next count if that's acceptable.

10        THE COURT:  Let's move on.

11        MR. R. LAKIND:  Okay.  Count 26 of plaintiffs'

12   complaint alleges that the Indel defendants breached their

13   fiduciary duties in not first conducting an investigation of

14   FSC, and then also it imposes liability stating had they

15   conducted that investigation they would not have retained FSC.

16   The two FSC employees who were responsible for managing the

17   assets of the Plan were a Mr. Hembrough and a Mr. Webster.

18   It's not disputed that the deal requires that a fiduciary,

19   prior to retaining a service provider, look into the

20   experience and skill -- experience of those individuals in

21   managing retirement plans of similar size and complexity.

22        The defendants with Exhibits B, C, and D to

23   Mr. Krupnick's declaration have attached various documents

24   claiming that this demonstrates that they conducted a

25   sufficient investigation.  Exhibit B, your Honor, is just

1   simply minutes saying that they interviewed Wharton Business

2   Group.  Exhibit C and D are the Wharton Business Group's

3   proposal for how the assets of the Plan should be managed.

4   That's very different than investigating whether that service

5   provider is qualified to manage the Plan.  While it's a

6   rudimentary analysis, I think it's the equivalent of allowing

7   a doctor to do a complex treatment without checking to see

8   whether the doctor is qualified to render that treatment.

9          The defendants claim that we are misinterpreting the

10  email from Mr. Krupnick to Mr. Webster.  And what the email

11  does state is "What I would like to address now and annually

12  hereafter is information from Wharton along the following

13  lines, information about the firm itself and information about

14  personnel including the qualifications."  They claim that we

15  are misinterpreting this email and that these questions were

16  asked at the onset when FSC was retained.  However, in

17  Mr. Krupnick's declaration -- Mr. Krupnick's deposition, which

18  is attached as Exhibit K to my declaration on Page 189, Lines

19  15 to 17, he testified as follows when asked about these

20  questions.

21         Had you asked these questions of either of them in the

22  past?

23         No, I relied on FINRA's website and the information on

24  the website for FSC and Marc and B.J.

25         That clearly suggests that these questions were not

1    asked in advance of FSC's retention.

2         Additionally, Mr. Krupnick's testimony contains other

3    evidence that these questions were not asked.

4         THE COURT:  Well, if he's saying he relied on their

5    website, why wouldn't that suffice?

6         MR. R. LAKIND:  I think a website is more of an

7    advertisement and I think to manage a Plan with 250

8    participants with over $50 million, I think the investigation

9    would have to go beyond what would be that of just simply the

10   website.  And the website is not going to give information

11   about Mr. Hembrough's and Webster's experience in managing

12   plans of a similar complexity -- a retirement plan of similar

13   complexity and size.

14        THE COURT:  Do you know what the website showed that

15   he looked at?

16        MR. R. LAKIND:  We do have pages of what the -- the

17   website, I do know, although it's not in the record, did not

18   reflect anything about managing a plan such as this one.

19        But one thing that suggests that maybe that review of

20   the website wasn't so in-depth is Mr. Krupnick here is

21   testifying that he relied on FINRA's website and FSC's

22   website.  Through FINRA's website he should have discovered

23   that the Wharton Business Group is not registered with the

24   SEC, and it seems that might have raised a red flag that would

25   have been placed in the trustees' minutes, and there was

1    nothing to suggest that fact was discovered.

2        Additionally, there's other evidence with respect to

3    Mr. Krupnick's testimony.  When he was asked do you recall

4    asking Mr. Webster and Hembrough for their educational

5    background, he stated I don't recall doing that.  When asked

6    do you recall asking them about their work history, he says I

7    don't recall the work history.  When asked did you ask them

8    about their experience representing other plans, he stated no.

9        Similarly, in Mr. Hembrough's deposition, the employee

10   of FSC, when he was asked were you asked for your customer

11   list, he said I don't believe so.  When he was asked were you

12   asked for your references, he stated I don't know.

13       Regarding the experience, both Mr. Hembrough and

14   Webster testified that they had no experience managing

15   nonparticipant plans in which investments were not directed by

16   the participants.  In fact in the past ten years prior to the

17   retention, they had only managed five 401(k) plans.  They were

18   mostly managers of individuals' money which is very different

19   than managing a complex retirement plan with over 250

20   participants.

21       Some evidence about the lacking of experience,

22   Mr. Hembrough testified as to having never seen the investment

23   proposal that was prepared for the Plan until his deposition

24   in this case.  Additionally, when he was asked what was the

25   purpose of the restricted investment section in the Investment

1    Policy Section, he stated I don't know.  These quotes were all

2    provided for your Honor in our papers.

3         THE COURT:  Yes.

4         MR. R. LAKIND:  One other, counsel suggested that the

5    Wharton Business Group may have been an adequate investment

6    advisor because their competitors had put forth similar equity

7    allocations.  All of their competitors' equity allocations

8    were below that of what Wharton proposed.

9         Additionally, we don't know what information was

10   provided to those service providers or what information was

11   requested.  But what we do know is after Wharton started

12   working with the Plan, rather than this 80/20 asset equity

13   allocation, in March of 2009 they recommended a 50 -- an

14   allocation of 50/50, meaning 50 invested in fixed income, 50

15   invested in equities.  Similarly, after the initiation of this

16   litigation, they amended the Wharton Business Group Investment

17   Policy Statement, I believe it's on Page 2, to state that an

18   equity to fixed income allocation of 50/50 is permissible.

19        Your Honor, for the foregoing reasons I believe that

20   there is a genuine dispute of material facts, especially when

21   the facts are construed in the light most favorable to the

22   nonmoving party.

23        Unless your Honor has any additional questions I have

24   nothing further.

25        THE COURT:  No, I don't, not on that.

```
 1              MR. R. LAKIND:  Thank you.

 2              THE COURT:  Okay.  Anything else?

 3              MR. GENTILE:  Your Honor, if I can say one thing?

 4              THE COURT:  Okay.  One minute.

 5              MR. GENTILE:  First in response to the assertion that

 6   we had not made the argument about no damage from the absence

 7   of a Trust Agreement, in our original brief at Page 19 there's

 8   an extensive footnote in which we made that argument that the

 9   Count One would fail for the independent reason that

10   plaintiffs cannot show any causal relationship between the

11   failure to adopt a Trust Agreement and the claimed damages.

12   And then we cite in support of that several cases and Judge

13   Donio's ruling in February of 2012.  So I think that argument

14   was made, and if the plaintiffs haven't responded to it or

15   chose not to, that's not our fault.

16          The other argument I would respond to is the

17   investigation argument.  The plaintiffs would have your Honor

18   believe that there was no investigation at all done of

19   FSC/Wharton's capabilities.  Obviously these same two

20   individuals, Mr. Webster and Hembrough, were managing

21   Mr. Henry Rowan's investments, his personal investments and a

22   number of his family and portfolio companies since the late

23   1990's.  So there was an extensive track record of their work

24   managing very substantial funds on behalf of one of the

25   trustees.
```

1      Secondly, Mr. Krupnick testified, and the record is

2   really not contradicted in any way, Mr. Krupnick went to the

3   FINRA website, which would have any reports of adverse

4   disciplinary, any disciplinary infractions, disciplinary

5   history, criminal prosecutions, and so forth, and found none.

6   And he went on the website of FSC and Wharton Business Group

7   to investigate the backgrounds and find out what the website

8   said with respect to their qualifications.  So in both of

9   those respects there was an investigation.  The plaintiffs

10  would have had your Honor believe that if there were some

11  additional investigation done, the trustees would not have

12  selected FSC and Wharton Business Group and there's nothing at

13  all in the records to support that, your Honor.

14       THE COURT:  There's no allegation that the trustees

15  were somehow duped into thinking that the fiduciaries that

16  they were hiring had prior experience, is there?

17       MR. GENTILE:  No, not at all, your Honor.

18       THE COURT:  All right.  I'm going to reserve decision

19  then on the partial summary judgment motions.

20       On the defendants' motion to preclude Dr. Pomerantz and

21  the plaintiffs' cross-motion to preclude Lucy Allen, certainly

22  both sides have touched on what they perceive as the

23  shortcomings of those experts' reports even in your oral

24  arguments.  Are you content to rest on your briefs in those

25  regards?

1          MR. A. LAKIND:  Plaintiffs are content, your Honor,

2     we submit on our briefs.

3          THE COURT:  Okay.

4          MR. LEVIN:  Your Honor, I would just -- my name is

5     David Levin and I represent the defendants with respect to the

6     *Daubert* motion.

7          And the Court asked whether or not -- earlier about

8     whether or not a plausible theory had been advanced.  In the

9     complaint itself, both in the first complaint and then in the

10    second -- the first amended complaint and the second amended

11    complaint there are five different theories that are advanced

12    by the plaintiffs with respect to what's appropriate for

13    investing.  The range, and we've provided the Court with the

14    material, the range of investment ranged from 0 percent in

15    equities to 70 percent in equities.

16         So the only theory that's now coming forward to you is

17    a theory that's only been advanced by Dr. Pomerantz.  When you

18    asked whether it was plausible, the first question always is

19    is the enunciator of the theory one who can actually provide

20    that theory.  And under 702, the first element is

21    qualification.  And Mr. Pomerantz has -- Dr. Pomerantz has

22    stated that he has no experience and no education and no

23    familiarity with the kind of plan that's at issue in this

24    case, that's the nonparticipant directed Plan.  And he -- so

25    he doesn't satisfy the qualification level even with respect

1    to it, so we don't even get to the questions of methodology

2    and fit.

3         But were you to get to the questions of methodology and

4    fit, the method that's been proposed by Dr. Pomerantz, as you

5    yourself said, your Honor, calls for something that's fixed.

6    And in fact in his report it is fixed, he used a fixed figure

7    56 and 44 using the hypothetical age weighted participant

8    subtracted from 100 and he applied that to every year.

9    There's nothing, no hint even in his report that it was

10   something that should be changed on a yearly basis, and that

11   information, the demographics were provided.

12        So even as to the methodology itself, we've never said,

13   the defendants have never said that age isn't a factor, I

14   don't know where that floats from, nor that the allocation was

15   80/20.  In fact if you look at the Investment Policy

16   Statement, you'll see that it's a range.  Dr. Pomerantz stated

17   that he didn't consider the actual investments that were made

18   by the Plan.  He didn't test it and he didn't know the

19   percentages.  His methodology, this creation of the

20   hypothetical participant based on age weighting and then

21   subtracting from 100, he himself has said he's never

22   recommended it to anybody who is administering a private

23   sharing -- a profit sharing plan.  In fact, he's never

24   recommended it to anyone.

25        And when you look through methodology and the elements,

1  which are stated in our brief and I don't want to repeat them

2  for you, but when you look at that, when you see that there's

3  a theory that's been advanced by no one, that has no basis

4  whatsoever in the literature or the case law and that's

5  actually inconsistent with the regulations issued by the

6  Department of Labor.  Why?  Because the Department of Labor

7  has said what's consideration of the Plan, the participants as

8  a whole, which is what the Department of Labor says a

9  fiduciary of a nonparticipant directed investment plan is

10  supposed to do.  They describe it and it has nothing to do

11  with taking every single participant and adding them up and

12  dividing it.  In fact there's a separate, if you will, safe

13  harbor that allows for that, but that's not the way that the

14  Department of Labor says funds in this kind of plan are to be

15  invested.

16       So we have somebody who's proposed a methodology that

17  has no basis in the literature, that he's never recommended,

18  that he's never used outside of this litigation that's being

19  proposed to you.  And the whole basis for the statement that

20  this is something that you have had to consider is the idea

21  that Wharton didn't know anything about the demographics.  But

22  Wharton didn't pick the target allocation.  In fact if you

23  look in the record that we've presented to you, Hewitt, who

24  was the investment advisor through 2005, had already

25  recommended 70/30 as the allocation.  Wharton recommended even

1    as the target, and, as you saw, there's ranges, it's not

2    fixed.  Wharton recommended 70/30 or 80/20.  The trustees

3    picked the 80/20.  And there's nothing in the record that

4    demonstrates that the trustees weren't aware of the

5    demographics of their plan.  In fact to the contrary, the

6    record reflects that they knew all about their employees.

7         And when Dr. Pomerantz was asked that question in his

8    deposition, first of all, do you know who picked, he didn't

9    know who picked the allocation, and he didn't know whether it

10   was Wharton or whether or not it was -- whether it was the

11   trustees, and he didn't know what the trustees knew or didn't

12   know.  So you're being asked to accept a methodology that's

13   never been used, that doesn't fit the facts because the

14   fact -- the whole basis for proposing this theory is that age

15   wasn't considered, when the record shows that it was the

16   trustees who decided and the trustees did know.

17        And the issue of age is something that was discussed

18   repeatedly in the minutes of the trustees.  Why?  Because age

19   is a consideration that deals with liquidity, do you have

20   enough money to pay out the money that needs to come out of

21   the Plan in the particular month.  In fact plaintiffs like to

22   cite the *GIW* case.  In *GIW* all of the plan's assets were

23   invested in long-term bonds, they couldn't be liquidated.  And

24   what the Court found is you have to consider age with respect

25   to liquidity needs.  This was something that the trustees

1  considered, it's in the minutes of the meeting on a regular

2  basis because it was they, they who decided on behalf of the

3  people they worked with what should be the allocation.

4      So his report is one, first of all, authored by

5  somebody who doesn't satisfy the qualifications.  And for

6  qualifications, if you look at 404(a)(1)(B) of ERISA,

7  404(a)(1)(B) says that you're supposed to measure prudence,

8  which is a legal determination, not one that is made by the

9  expert, the measure of prudence is to look and see what

10  somebody in a like capacity, in that instance either making

11  the decision or advising about the decision, would use in the

12  conduct of an enterprise with like character and like aims.

13  And that's -- what's the enterprise?  The enterprise is the

14  employee benefit plan that was not participant directed.  And

15  we don't have that here.  We have, if you will, we have

16  proposed an expert who actually doesn't satisfy the

17  qualifications level that's in 702 where you have to plug in

18  the statutory provision, which is 29 U.S.C. 1104(a)(1)(B).

19      THE COURT:  Well, let's start with qualifications.

20  Pomerantz is not without qualifications, doesn't he have a

21  Ph.D. and pretty wide experience in the investment field

22  generally?  He may not have managed an employee benefit fund,

23  but he's done a lot of things, hasn't he?

24      MR. LEVIN:  But the fact that he knows how to invest

25  with respect to other plans, doesn't mean he has a clue what's

1  an appropriate method for advising this Plan.  So the fact

2  that he has -- that he's a mathematician and he has a Ph.D. in

3  mathematics was support for Dr. Pomerantz to be able to

4  compare fees in other cases but not to present what an

5  allocation method is.  He has no qualification for that,

6  there's none that's been presented.  He wrote an article about

7  401(k) plans and doesn't mention the method that he's

8  proposing here.

9        So if the qualification -- the qualification isn't just

10  does he know a lot of stuff and does he have a degree and does

11  he have a Ph.D. or does he know mathematics.  In fact the

12  subject matter on which he wrote his thesis about which he

13  testified, his thesis did not deal with this issue.  And in

14  fact this issue can be related to that subject matter, but

15  he's never learned any of it.  So the question you asked about

16  doesn't he have -- he doesn't have the knowledge, he doesn't

17  purport to have the skill, he certainly doesn't have the

18  experience, he has no training, and he has no education in any

19  of this.

20        So I'm not saying that he doesn't know mathematics,

21  what I'm saying is that in order to give an expert opinion on

22  this particular issue, the opinion of an expert, he has to be

23  qualified, and the qualification that he needs is one set out

24  in 29 U.S.C. 1104(a)(1)(B), which requires that it be someone

25  who's dealt with a like enterprise, that like enterprise is

1   this Plan.  And realize his response to, well, you've never

2   done it for this kind of a Plan and plaintiffs' response is

3   that this kind of Plan, their words, extremely rare.  I think

4   Pomerantz said that in his deposition and the plaintiffs said

5   it's unique, and there are over 171,000 plans of this sort.

6   As we pointed out in our papers, I mean, that's not what I

7   would call extremely rare or unique.  He's just never seen

8   them before.  He doesn't know about them.

9         And that's why I start out with the first line of 702,

10  is that it's supposed to be somebody who's qualified.

11  Because, if you will, your Honor, the expert is supposed to

12  help you, that's what experts are really supposed to do.  I

13  know each side hires experts and whatnot, but in the end the

14  role of the expert is to help the Court.  So you would turn to

15  this expert and say, well, in your experience of selecting

16  allocations for nonparticipant investment plans, what's your

17  experience, how is it done, how did you think at about it,

18  when did you recommend it?  They're all questions he would

19  have to answer you I don't know, I don't know, I don't know,

20  because he's not qualified in this particular area.  And with

21  171,000 -- he even said that people who were familiar with it

22  would not color his opinion, he stated it in his deposition,

23  it's repeated again in the brief.  And yet if you don't have

24  any experience, and the standard is one of someone in a like

25  capacity administering -- dealing with a like plan, wouldn't

1   you consider what the others did?  And in this instance if you

2   looked and see, you'll see that nobody did what he says you

3   should do.

4        So when you asked is it plausible, I think the answer

5   is no, it's not plausible.  And I submit to you that you don't

6   need to -- forgive me.  The idea of having an expert come,

7   somebody who purports to be an a expert who couldn't answer

8   any of those questions to you, I don't think is helpful to you

9   and that's what 702 is all about.

10       THE COURT:  Is his biggest shortcoming that he's

11  taking investment advice that's supplied to individuals, like

12  invest in accordance with your age, and he's applying it to a

13  group of almost 300 beneficiaries of all ages?

14       MR. LEVIN:  The flaw in that -- I mean, that is his

15  theory and --

16       THE COURT:  We know that Social Security gives this

17  sort of advice.  And, according to the papers, TD AmeriTrade

18  would give this sort of advice about how an individual should

19  invest, and so he's borrowed that formula and he's applied it

20  here.  Is that what make the methodologically unsound?

21       MR. LEVIN:  What makes it methodologically unsound is

22  more than one.  The first is the notion that he's advanced the

23  theory to calibrate by participant and then add it up and

24  divide, which, as you'll see, in ours -- we presented in our

25  papers the Department of Labor says that's not the way

1    fiduciaries of nonparticipant directed funds invest, it says

2    they look at the universe as a -- the participants as a whole.

3    And then in the preamble to the regulation, which we also

4    cited and quoted from, they explain -- the Department of Labor

5    explained what that meant, and it wasn't add up the separate

6    pieces and divide.  There is a method of doing that but that

7    method is used for individual account plans where each

8    individual has his or her own separate investments.

9        But there's more in terms of the methodological issue.

10   If his concept even were one that were accepted, whatever it

11   is that forms the basis for his methodology, in applying it

12   you would do two things.  One is you would, for the period,

13   even the limited period that he did it for, you would need to

14   change that method each year because the demographic changes,

15   people get older, they get more money, they have less money,

16   they withdraw money, so the demographic and the account

17   balances, all of which information was available and we've

18   provided so much demographic information.  But he didn't do

19   that, he lockstep and his report is lockstep 56/44 for every

20   single year.

21       Not only that, the methodology that he used he then

22   applied for calculating damages.  But we know that the

23   question of damages requires you to determine the date of the

24   breach and he didn't do that.  In fact he said that he kept

25   that out because he knew that the Plan was -- the bad approach

1  that the trustees were using wasn't appropriate and they were

2  getting gains.  So his methodology even for calculating

3  damages fails on the whole notion you offset gains against

4  losses.

5       So what you have here also is independently, since he

6  calls his method the most prudent method, I mean, his words,

7  recognizing that prudence is an issue of law but that's what

8  he called it, the most prudent method, one of the elements of

9  testing the satisfaction of the *Daubert* criteria is to see how

10 would you have applied -- how do you apply this method when

11 you're doing it outside of court.  Well, he never used it

12 outside of court.  And even in court he didn't go back and say

13 I wonder what, as long as Goldenberg was in the Plan from 1989

14 currently, what would this have done.  That doesn't

15 demonstrate prudence, that's to say it's not hindsight, you

16 can't say, well, it was prudent because you made money or it

17 was imprudent because you lost money, that's not the test.

18 But wouldn't you have gone back to test your theory as far

19 back as you could to see what the impact would be on the

20 participants so you could know whether or not there really

21 were gains or losses, since his notion was that age wasn't

22 considered and he had before him evidence that demonstrated

23 that age was considered.

24      So I submit to you that's not what you call testing a

25 theory.  The method has to be one that bears scrutiny by the

1    alleged expert himself.  And his theories, both the

2    calculation of damage and the notion of how the investments

3    should have been allocated, don't comply with anybody's theory

4    but his own.

5             THE COURT:  Was he ever able -- maybe it's a question

6    I'll save for the plaintiffs.

7         I have no other questions.

8             MR. LEVIN:  Thank you.

9             MR. HINSON:  Your Honor, may I be heard briefly on

10   this issue?

11            THE COURT:  I'm afraid we're running out of time.

12            MR. HINSON:  Thank you, your Honor.

13            THE COURT:  I want to give Mr. Lakind some --

14            MR. A. LAKIND:  Your Honor, I had a lengthy argument

15   prepared, but I'll just confine it to addressing the issues

16   raised on oral argument and rely on my brief with regard to

17   the balance.

18        With regard to Dr. Pomerantz's experience, he was head

19   of asset allocation for many years at a Wall Street firm,

20   Weiss, Peck & Greer.  He was vice president for Morgan --

21            THE COURT:  He has no experience with managing or

22   advising pension funds, does he?

23            MR. A. LAKIND:  Yes.

24            THE COURT:  Of this sort of nonparticipant directed

25   pension fund?

1        MR. A. LAKIND:  Yes, he does, because pension funds

2   tend to be nonparticipant directed, you know, they invest

3   enough money and there's a defined benefit at the end and he's

4   advised pension funds, and he named the pension funds he

5   advised during the course of his deposition.  He's been an

6   investment advisor for assets in ERISA plans.  He's been a

7   consultant to companies on asset management.  He's hired and

8   fired investment management.  And he wrote or contributed to

9   investment polices for retirement plans.

10       Now, what makes this Plan unique, and to the extent

11   there's an argument this is a profit sharing plan, he has no

12   experience with a profit sharing plan, Mr. Hembrough explained

13   in his deposition what makes a profit sharing plan unique is

14   the source of the funding, nothing else.  Nothing else.

15       Number three, there was an interesting comment made by

16   counsel that said the following:  Age should be considered.

17       THE COURT:  Well, what also makes this one unique is

18   that the employees don't get to choose where the investment

19   goes --

20       MR. A. LAKIND:  Right.

21       THE COURT:  -- unlike most plans.

22       MR. A. LAKIND:  Right.  Which makes it so difficult

23   and which requires a reconciliation of a broad set of

24   interests.

25       THE COURT:  Does he have experience or book learning

1    on how to do that?

2         MR. A. LAKIND:  Just in connection with defined

3    benefit plans, which are designed, obviously, you know, to

4    include certain benefit at the end, not with regard to plans

5    specifically like this.  But I think *Holbrook* and many of our

6    cases deal with situations where, I think it was *Holbrook*, you

7    had a fellow that sold automative supplies, taught automotive

8    repair in a high school, and the Court held, well, he's

9    qualified to testify in a products liability case.  If you

10   look at *Penata* and every other case we cite, I'm sure your

11   Honor has, they all have far less direct qualifications than

12   this.  He has been involved in making asset allocations to

13   achieve goals and the context in which it's done is not

14   terribly relevant.

15        THE COURT:  Well, is he able to point to this

16   methodology being used by any other fund of this type?

17        MR. A. LAKIND:  He could not, but here's why.  Two

18   reasons.  Number one is one of the cases we cite talks about

19   the difficulty in economic cases of finding identical examples

20   or similar examples because everything is so unique.  But one

21   of the things counsel said to the Court was age is important

22   because it's an indicator of liquidity.  And if I might just

23   go through perhaps the following hypothetical to tell why

24   Dr. Pomerantz derived this methodology because he had to

25   consider liquidity, the case law says he did.

1       If we have a situation where you have ten 24 year olds

2  that each have $1,000 and then you have one 60 year old with

3  $150,000 and you do not consider account balances in doing an

4  asset allocation, that asset allocation will be skewed so much

5  more towards the younger people with smaller investments that

6  the plan could not achieve its desire to protect capital or

7  liquidity because the money being invested is the money of

8  people that have more money in the plan, the older people.  So

9  if the goal is to conserve assets, the question is whose

10  assets are you conserving, and they need to consider where

11  those assets are and what the age is.  If you simply average

12  age or simply focus on the fact that you have ten people who

13  are young and have $1,000, it would be impossible for FSC to

14  achieve its goal of protecting liquidity and conserving

15  assets.

16       And the issue, once again, is not is Dr. Pomerantz

17  right or is he wrong, it's not the quality of whether --

18       THE COURT:  Not whether it's reliable, whether this

19  is a testable theory outside of the litigation context.  And

20  often we can find the answer in something that's been

21  published or in the experience of what's actually being done

22  in the market.  And other than his saying this is done for

23  individuals and so I'm just going to apply that thinking to a

24  group, I don't see any basis for it.  Is there one?  Has he

25  ever applied this himself?

 1          MR. A. LAKIND:  He has not.

 2          THE COURT:  And does it come from any book or any

 3   other experience that he's familiar with?

 4          MR. A. LAKIND:  Well, the 100 minus age, I think

 5   that's fairly common.  I think your Honor is more interested

 6   in the age weight.

 7          THE COURT:  No, I'm not interested in the 100 minus

 8   age because at least, according to the papers, the examples

 9   that are given are for individuals.

10          MR. A. LAKIND:  Yes, the 100 minus age is a metric

11   used for individuals.  Because this Plan is unique, because

12   you have a collection of individuals that have no control over

13   their investment policies essentially, the question becomes

14   what is the methodology to employ if you have to consider age

15   because all the case law says you have to consider age, what

16   is the methodology to employ to consider age.  And

17   Dr. Pomerantz said you can't simply average age because that

18   will not take account of liquidity.  What he does is he uses

19   the weighted average of age times the account balance.  While

20   there are not comparable studies of people who have done that,

21   that is certainly a plausible methodology to achieve the

22   liquidity and conserve assets.

23          THE COURT:  Well, it is if it's admissible, but it's

24   only admissible if it's reliable, if it's a reliable

25   methodology.  He could spin out something that looks nice and

1    produces damages, but it does have to have its footing in the

2    way that actual fiduciaries are meeting these responsibilities

3    in the real world, doesn't it?

4            MR. A. LAKIND:  I think the only thing that needs to

5    have a footing in that is the liability issue, which is is age

6    a relevant criteria, because there we have to show a plausible

7    claim.  With regard to damages, the goal is not the quality of

8    the model under the *Sullivan* case, it's whether or not the

9    model has a classwide impact.  And *Sullivan* makes it clear

10   that at this stage of the litigation a court is not to

11   consider whether the model is reasonable, speculative or

12   inferential, it's simply whether or not the model can be

13   applied on a classwide basis, and you have not heard a thing

14   from defendants to suggest that it can.  Insofar as we say it

15   can be applied on a classwide basis, that's testable, they can

16   determine, just as they -- in fact it was tested when they

17   returned the prohibitive transaction claims.  They could

18   determine if there's error rates, measurable error rates by

19   just replicating what we can do.  The use of a weighted

20   average is certainly a standard, it's a generally accepted

21   standard and it's recognized as a reliable measure.

22           So with regard to the issue before the Court once again

23   is not whether or not on the damage model this in fact is

24   reasonable, improper, or the best, it's whether or not this

25   damage model can be applied on a classwide basis and there's

1   no suggestion that it cannot.

2          THE COURT:  Okay.

3          MR. A. LAKIND:  Your Honor, I'll rely on my brief, I

4   realize it's late and I appreciate all the time your Honor has

5   extended to us.

6          THE COURT:  Thank you very much.

7          MR. A. LAKIND:  Thank you, your Honor.

8          THE COURT:  As to the other motion pertaining to

9   precluding Lucy Allen, I'll handle that based on the papers

10  and reserve decision.

11         And so I've reserved decision with regard to four

12  motions in all, Docket Item 160, which is class certification,

13  Docket Item 182, which is the motion for partial summary

14  judgments on Counts One and 27.

15         MR. A. LAKIND:  26, I believe.

16         THE COURT:  26.  And the *Daubert* motions at Dockets

17  183 and 185.

18         If I have any other questions, I'll write to counsel, I

19  don't think that I do, and you should expect an Opinion by the

20  end of that the month.

21         Thank you, everybody.  Good night.

22                (Proceedings Concluded)

23

24

25

1
2
3
4
5
6
                    C E R T I F I C A T E
7
8
9
10
            I, LISA MARCUS, Official Court Reporter for the
11   United States District Court for the District of New Jersey,
     Certified Shorthand Reporter and Notary Public of the State of
12   New Jersey, do hereby certify that the foregoing is a true and
     accurate transcription of my original stenographic notes to
13   the best of my ability of the matter hereinbefore set forth.

14
                         S/Lisa Marcus, CSR
15                       LISA MARCUS
                         Official U. S. Reporter
16                       N.J. Certificate No. XIO1492

17
     DATE:  September 10, 2012
18
19
20
21
22
23
24
25

# #

**#001** [1] - 1:6

# $

**$1,000** [2] - 118:2, 118:13
**$150,000** [1] - 118:3
**$50** [1] - 100:8

# '

**'06** [2] - 38:9, 75:15
**'10** [1] - 70:21
**'50s** [1] - 51:21
**'57** [1] - 84:13
**'90s** [1] - 54:9

# 0

**0** [3] - 59:25, 60:15, 105:14
**08101** [1] - 1:16
**08542-0627** [1] - 2:14
**08648** [1] - 2:5
**09-5202** [2] - 1:9, 3:4

# 1

**1** [3] - 37:5, 37:7, 37:24
**10** [4] - 50:14, 64:22, 83:12, 122:17
**100** [9] - 36:9, 44:14, 60:1, 60:15, 106:8, 106:21, 119:4, 119:7, 119:10
**101** [1] - 2:4
**105** [1] - 2:13
**11** [1] - 35:20
**1104(a)(1)(B** [1] - 110:24
**1104(a)(1)(B** [1] - 109:18
**113** [1] - 57:8
**12** [2] - 8:24
**1201** [1] - 2:8
**128** [1] - 57:7
**14** [1] - 1:17
**1492** [1] - 1:25
**15** [8] - 40:14, 40:17, 52:7, 54:7, 54:20, 58:14, 62:19, 99:19
**160** [1] - 121:12
**17** [1] - 99:19
**171,000** [4] - 46:10, 46:14, 111:5, 111:21
**18** [1] - 55:22
**182** [1] - 121:13
**183** [1] - 121:17
**185** [1] - 121:17
**189** [1] - 99:18
**19** [1] - 103:7
**1956** [5] - 81:17, 81:20, 82:1, 84:13,

90:4
**1957** [2] - 90:8, 90:17
**1976** [6] - 82:7, 84:16, 90:16, 90:20, 92:13, 92:14
**1989** [2] - 54:17, 114:13
**1990's** [1] - 103:23
**1st** [2] - 37:14, 37:18

# 2

**2** [1] - 102:17
**20** [7] - 30:15, 33:11, 33:12, 41:23, 60:15, 68:1, 68:8
**20/15** [1] - 40:7
**20/20** [1] - 40:7
**200** [1] - 2:4
**2000's** [1] - 54:9
**2002** [7] - 11:11, 82:11, 90:12, 90:18, 92:11, 93:24, 94:1
**2005** [5] - 85:5, 86:18, 93:23, 93:24, 107:24
**2006** [17] - 33:10, 35:4, 37:5, 37:19, 37:24, 42:3, 42:19, 42:24, 43:5, 43:7, 53:16, 68:7, 69:1, 70:20, 70:21, 71:16, 76:2
**2007** [6] - 9:25, 33:10, 35:3, 36:6, 39:15, 76:2
**2008** [11] - 8:25, 34:22, 37:7, 42:15, 42:19, 42:23, 42:24, 61:14, 69:22, 71:16, 78:13
**2009** [27] - 8:24, 9:1, 11:13, 11:17, 27:8, 34:3, 35:8, 35:20, 57:6, 61:14, 63:7, 67:25, 68:2, 68:6, 68:7, 70:21, 71:9, 71:10, 71:14, 71:16, 82:23, 88:2, 89:17, 89:20, 93:18, 98:1, 102:13
**2010** [3] - 42:4, 42:5, 70:21
**2011** [2] - 27:6, 69:2
**2012** [3] - 1:17, 103:13, 122:17
**2020** [1] - 10:13
**21** [1] - 2:8
**22** [1] - 61:1
**23** [4] - 6:16, 8:12, 12:10, 67:22
**23(a)(2** [2] - 25:8, 26:13
**23(a)(3** [1] - 25:10
**23(a)(4** [1] - 26:23
**23(b** [6] - 5:2, 14:24, 14:25, 16:9, 28:7, 77:23
**23(b)(1** [6] - 15:16, 22:5, 23:9, 23:15, 23:18, 78:1
**23(b)(1)** [1] - 24:8
**23(b)(2** [1] - 23:23
**23(b)(3** [6] - 15:17, 22:5, 22:13, 22:18, 23:18, 24:10
**23(b)(3)** [1] - 23:7
**24** [1] - 118:1
**241** [3] - 8:23, 8:24, 57:6
**250** [5] - 53:16, 56:18, 56:19, 100:7, 101:19
**26** [5] - 80:17, 86:9, 98:11, 121:15,

121:16
**27** [2] - 87:16, 121:14
**29** [2] - 109:18, 110:24

# 3

**3** [5] - 19:3, 31:22, 72:13, 72:14, 72:17
**30** [4] - 53:23, 72:14, 72:17, 73:5
**30(b)(6** [1] - 9:6
**300** [2] - 2:13, 112:13
**30309-3424** [1] - 2:9
**31** [3] - 36:6, 39:15, 68:25
**32** [1] - 8:23
**347** [2] - 42:3, 53:17
**38** [4] - 41:24, 42:1, 47:23, 71:2

# 4

**4** [1] - 83:13
**4.34** [1] - 92:17
**4.7** [4] - 69:3, 70:22, 70:23, 71:5
**40** [4] - 19:4, 42:6, 44:22, 57:22
**401** [1] - 43:19
**401(k** [4] - 53:9, 92:3, 101:17, 110:7
**402(b** [1] - 83:7
**404** [2] - 5:10, 85:3
**404(a)(1)(B** [3] - 32:23, 109:6, 109:7
**404(a)(1)(D** [2] - 91:19, 91:22
**44** [3] - 11:9, 41:25, 106:7
**44/56** [11] - 11:16, 36:19, 40:11, 47:22, 47:25, 65:8, 65:20, 70:16, 73:20, 74:5
**46** [1] - 8:21
**4TH** [1] - 1:15

# 5

**5** [2] - 59:8, 83:13
**5.2** [3] - 83:20, 84:23, 93:2
**5.2(a** [1] - 90:25
**50** [12] - 11:11, 34:5, 41:25, 54:17, 57:6, 57:7, 57:8, 67:18, 93:14, 102:13, 102:14
**50/50** [9] - 11:12, 11:15, 11:16, 20:23, 35:21, 68:12, 102:14, 102:18
**500** [2] - 33:20, 49:23
**502** [1] - 12:12
**502(h** [1] - 77:25
**55** [5] - 52:1, 54:5, 54:8, 54:21, 55:2
**5500** [1] - 10:14
**56** [11] - 8:24, 9:1, 11:9, 36:8, 39:5, 39:16, 40:13, 47:20, 47:21, 56:16, 106:7
**56(d** [4] - 96:1, 96:8, 96:10, 96:14
**56/44** [2] - 73:25, 76:23, 113:19
**589** [1] - 77:24
**59** [1] - 42:1

## 6

**6** [1] - 83:13
**6.8** [1] - 69:3
**60** [4] - 41:23, 54:19, 57:17, 118:2
**60/40** [1] - 34:17
**604** [1] - 77:24
**60462** [1] - 10:1
**61** [1] - 47:23
**62** [1] - 47:24
**65** [2] - 8:23, 54:1

## 7

**7** [1] - 68:7
**70** [1] - 105:15
**70/30** [1] - 34:17, 107:25, 108:2
**702** [4] - 105:20, 109:17, 111:9, 112:9
**71** [2] - 54:20, 62:8
**73** [2] - 47:21, 87:15
**73/27** [1] - 87:15
**75** [1] - 8:20

## 8

**8** [3] - 11:13, 68:7, 90:3
**8.1** [1] - 90:24
**8.2** [1] - 83:10
**8.9** [1] - 59:14
**80** [6] - 30:15, 33:11, 33:12, 53:23, 60:16, 68:9
**80/20** [17] - 19:14, 20:23, 32:6, 32:10, 35:23, 49:16, 54:13, 68:3, 69:23, 72:5, 73:17, 78:19, 92:18, 102:12, 106:15, 108:2, 108:3
**856** [1] - 1:16

## 9

**968-4986** [1] - 1:16

## A

**a)(4** [2] - 25:10
**a/k/a** [1] - 1:10
**abandoning** [1] - 25:17
**ability** [8] - 11:7, 15:21, 52:19, 61:16, 63:11, 75:3, 93:13, 122:13
**able** [5] - 41:3, 61:11, 110:3, 115:5, 117:15
**absence** [5] - 5:17, 12:17, 81:11, 94:23, 103:6
**absent** [2] - 26:8, 63:25
**absentee** [1] - 27:2
**absolute** [1] - 71:16
**absolutely** [5] - 28:3, 64:8, 71:7, 83:1

**accept** [4] - 36:23, 70:14, 74:21, 108:12
**acceptable** [1] - 98:9
**accepted** [2] - 113:10, 120:20
**accompanied** [1] - 96:10
**accomplished** [2] - 9:13, 21:25
**accordance** [5] - 5:16, 37:1, 80:20, 80:23, 91:20, 112:12
**according** [5] - 47:24, 60:17, 71:2, 112:17, 119:8
**account** [35] - 21:12, 31:8, 41:16, 41:17, 47:9, 50:14, 52:13, 52:22, 54:7, 54:21, 55:15, 56:15, 57:5, 57:20, 64:21, 66:1, 70:12, 71:1, 72:1, 82:16, 82:18, 82:20, 83:18, 83:20, 84:5, 84:20, 84:21, 91:13, 113:7, 113:16, 118:3, 119:18, 119:19
**accounts** [13] - 41:11, 41:20, 41:23, 42:5, 43:20, 54:6, 55:12, 55:18, 56:11, 59:18, 93:3, 93:6
**accurate** [3] - 9:3, 18:8, 122:12
**achieve** [6] - 24:6, 42:11, 117:13, 118:6, 118:14, 119:21
**acknowledge** [1] - 37:25
**acknowledged** [4] - 9:14, 10:18, 68:17, 80:2
**acknowledges** [1] - 68:25
**ACP** [1] - 2:8
**acquisition** [1] - 9:20
**act** [3] - 19:17, 32:23, 66:23
**acting** [1] - 32:25
**action** [18] - 13:24, 16:16, 18:11, 18:17, 18:20, 23:11, 25:22, 27:19, 30:8, 36:15, 43:23, 46:7, 47:9, 48:11, 69:7, 79:2, 82:11
**ACTION** [1] - 1:8
**actions** [10] - 15:2, 15:3, 15:5, 15:25, 25:11, 25:24, 36:14, 36:16, 36:17, 70:6
**active** [7] - 32:13, 32:14, 33:8, 33:16, 35:2, 35:16, 36:24
**actual** [10] - 23:25, 31:4, 31:6, 33:23, 41:22, 42:6, 60:17, 87:4, 106:17, 120:2
**add** [6] - 17:5, 41:13, 76:5, 80:21, 112:23, 113:5
**added** [1] - 93:16
**adding** [1] - 107:11
**addition** [5] - 26:21, 27:7, 69:19, 85:12, 87:6
**additional** [2] - 102:23, 104:11
**additionally** [7] - 90:21, 92:20, 93:21, 100:2, 101:2, 101:24, 102:9
**address** [6] - 4:22, 6:24, 25:8, 25:12, 28:13, 51:9, 74:20, 89:11, 91:9, 97:18, 99:11
**addressed** [4] - 8:5, 8:9, 21:16, 67:21
**addressing** [3] - 8:11, 47:3, 115:15
**adducing** [1] - 96:11
**adequacy** [9] - 12:18, 13:3, 13:10, 25:11, 25:14, 26:22, 62:6, 63:24, 76:4

**adequate** [9] - 7:12, 14:17, 64:5, 65:10, 66:13, 66:19, 67:9, 77:12, 102:5
**adhere** [1] - 22:15
**adjust** [1] - 60:1
**adjusted** [1] - 73:18
**administer** [1] - 5:16
**administering** [4] - 23:19, 83:10, 106:22, 111:25
**admissibility** [1] - 8:7
**admissible** [2] - 119:23, 119:24
**admitted** [2] - 35:25, 59:13
**adopt** [3] - 80:20, 91:13, 103:11
**adopted** [10] - 11:14, 21:5, 37:2, 54:9, 85:5, 87:5, 90:15, 90:19, 92:13, 93:22
**adopting** [2] - 48:8, 89:13
**adoption** [1] - 92:21
**advance** [4] - 13:11, 13:25, 95:21, 100:1
**advanced** [6] - 8:10, 105:8, 105:11, 105:17, 107:3, 112:22
**advancing** [2] - 21:16, 22:21
**advantage** [7] - 14:19, 31:24, 49:20, 53:5, 53:7, 62:19, 78:17
**adversary** [1] - 79:7
**adverse** [2] - 87:21, 104:3
**advertisement** [1] - 100:7
**advice** [6] - 10:11, 59:4, 62:16, 112:11, 112:17, 112:18
**advised** [3] - 62:9, 116:4, 116:5
**advises** [1] - 12:11
**advising** [3] - 109:11, 110:1, 115:22
**advisor** [7] - 10:14, 36:3, 85:7, 86:18, 102:6, 107:24, 116:6
**advisor/representative** [1] - 93:13
**advisors** [3] - 3:19, 60:19, 62:1
**advocating** [1] - 76:25
**affect** [1] - 46:7
**affidavit** [5] - 63:13, 66:16, 96:10, 96:17
**afford** [1] - 46:3
**affords** [1] - 58:13
**afraid** [1] - 115:11
**afternoon** [9] - 3:2, 3:11, 3:13, 3:16, 4:3, 24:18, 51:11, 51:12, 51:13
**age** [107] - 7:20, 7:21, 8:13, 8:16, 8:19, 8:21, 9:1, 9:3, 9:4, 9:8, 9:13, 9:14, 9:17, 9:19, 9:22, 10:3, 10:6, 12:20, 19:4, 30:19, 36:5, 36:8, 36:9, 39:16, 39:21, 41:23, 50:4, 51:2, 51:3, 51:4, 53:23, 54:5, 54:8, 54:12, 54:17, 54:19, 54:21, 55:2, 55:14, 55:24, 55:25, 56:7, 56:25, 57:5, 57:13, 57:20, 58:4, 62:8, 64:24, 65:20, 70:13, 70:25, 71:6, 72:1, 72:14, 72:17, 73:25, 75:5, 75:11, 75:14, 75:15, 75:17, 75:18, 75:25, 78:10, 78:14, 78:17, 78:19, 79:11, 79:14, 79:17, 79:23, 80:2, 80:3, 94:11, 94:12, 95:16, 106:7, 106:13, 106:20, 108:14, 108:17, 108:18, 108:24, 112:12, 114:21, 114:23, 116:16, 117:21, 118:11, 118:12, 119:4, 119:6, 119:8, 119:10, 119:14, 119:15,

119:16, 119:17, 119:19, 120:5
**ages** [2] - 72:12, 112:13
**aggregate** [1] - 55:19
**aggressive** [9] - 11:18, 18:6, 18:7, 19:1, 64:25, 71:11, 72:25, 73:1, 73:3
**aging** [4] - 56:25, 57:11, 75:9, 75:19
**ago** [2] - 29:15, 42:20
**agree** [4] - 8:1, 27:25, 57:13, 59:22
**agreed** [1] - 55:21
**agreement** [2] - 5:18, 7:9
**Agreement** [77] - 12:17, 12:18, 80:20, 81:10, 81:11, 81:15, 81:16, 81:18, 81:19, 81:22, 82:1, 82:2, 82:8, 82:9, 82:13, 82:15, 82:25, 83:2, 83:6, 83:16, 83:19, 83:23, 84:1, 84:4, 84:7, 84:9, 84:12, 84:13, 84:24, 85:16, 85:24, 86:3, 86:5, 89:13, 89:16, 89:19, 89:22, 89:23, 89:24, 90:2, 90:25, 91:2, 91:5, 91:6, 91:8, 91:11, 91:12, 91:14, 91:17, 91:19, 91:22, 91:23, 91:24, 92:8, 92:9, 92:21, 93:3, 93:9, 93:10, 93:23, 93:25, 94:5, 94:10, 94:12, 94:23, 95:6, 95:8, 95:14, 95:15, 96:22, 98:1, 98:3, 98:4, 103:7, 103:11
**ahead** [1] - 28:13
**AIG** [2] - 24:23, 24:24
**aim** [1] - 62:22
**aims** [5] - 32:22, 33:2, 47:17, 47:18, 109:12
**air** [1] - 36:9
**Airlines** [1] - 94:9
**akin** [1] - 87:3
**al** [3] - 1:11, 3:3, 3:4
**allegation** [7] - 7:11, 17:25, 56:2, 61:17, 61:18, 104:14
**allegations** [2] - 27:13, 48:22
**allege** [3] - 8:13, 9:2, 55:23
**alleged** [5] - 5:15, 7:8, 10:5, 42:22, 43:5, 43:6, 48:14, 51:5, 65:7, 115:1
**alleges** [1] - 98:12
**alleging** [1] - 5:10
**Allen** [12] - 9:14, 21:8, 31:5, 41:21, 43:10, 68:14, 68:17, 68:25, 74:24, 80:1, 104:21, 121:9
**Allen's** [3] - 41:10, 53:22, 70:20
**allocate** [3] - 11:7, 21:22, 76:12
**allocated** [11] - 12:25, 21:10, 21:12, 21:24, 41:17, 47:13, 70:4, 71:6, 71:17, 73:24, 115:3
**allocating** [3] - 61:23, 69:25, 83:9
**allocation** [82] - 8:14, 9:7, 10:11, 10:21, 12:3, 12:7, 12:20, 15:4, 16:6, 18:7, 18:13, 18:19, 19:2, 19:5, 19:6, 19:7, 19:10, 21:5, 32:7, 32:11, 33:19, 36:10, 37:9, 40:1, 40:5, 40:9, 43:14, 45:2, 46:12, 47:24, 48:2, 51:2, 54:13, 63:23, 64:23, 65:1, 65:8, 65:20, 67:19, 68:2, 68:4, 68:8, 68:11, 69:23, 70:9, 70:10, 71:7, 71:11, 71:24, 71:25, 72:25, 73:2, 73:3, 73:12, 73:23, 74:2, 74:9, 78:11,

78:15, 78:21, 79:14, 85:10, 87:2, 87:12, 87:15, 92:18, 102:13, 102:14, 102:18, 106:14, 107:22, 107:25, 108:9, 109:3, 110:5, 115:19, 118:4
**Allocation** [1] - 5:12
**allocations** [11] - 15:6, 18:24, 31:5, 32:20, 33:23, 87:4, 87:5, 102:7, 111:16, 117:12
**allow** [1] - 54:10
**allowed** [4] - 20:15, 66:2, 82:16, 92:1
**allowing** [1] - 99:6
**allows** [3] - 9:22, 20:13, 107:13
**alluded** [1] - 62:18
**almost** [5] - 16:14, 30:12, 42:12, 43:14, 112:13
**Alston** [2] - 3:17, 3:21
**ALSTON** [1] - 2:6
**alternative** [5] - 5:22, 6:8, 22:15, 22:21, 31:7
**altogether** [1] - 63:22
**amend** [4] - 17:5, 55:6, 55:8
**amended** [5] - 80:16, 84:16, 102:16, 105:10
**amending** [2] - 83:11, 92:12
**amendment** [4] - 54:9, 82:7, 90:14, 90:19
**amendments** [2] - 20:18, 69:16
**American** [1] - 94:8
**AmeriTrade** [1] - 112:17
**amicably** [1] - 18:21
**amount** [6] - 29:5, 34:10, 70:4, 70:12, 71:6, 71:18
**amounts** [1] - 42:8
**analysis** [11] - 11:3, 25:9, 31:6, 35:6, 41:20, 43:19, 43:22, 61:21, 63:12, 67:23, 99:6
**analyze** [1] - 41:11
**analyzed** [1] - 6:18
**AND** [6] - 1:15, 2:3, 2:7, 2:11, 2:12, 2:14
**ANDREW** [1] - 1:4
**annually** [2] - 92:22, 99:11
**annuity** [2] - 59:6, 63:15
**answer** [14] - 43:12, 59:19, 60:10, 72:12, 72:19, 73:17, 75:22, 77:23, 79:8, 81:13, 111:19, 112:4, 112:7, 118:20
**answered** [2] - 67:13, 82:23
**answering** [1] - 21:19
**answers** [6] - 26:20, 38:18, 38:22, 43:17, 51:1, 81:13
**anticipate** [1] - 33:19
**antithetical** [1] - 49:13
**apologize** [2] - 89:16, 94:17
**Appeals** [1] - 6:13
**appearances** [1] - 3:8
**application** [8] - 5:2, 12:10, 17:9, 18:9, 20:8, 20:10, 39:6, 96:1
**applied** [12] - 11:24, 12:8, 21:1, 42:7, 106:8, 112:19, 113:22, 114:10, 118:25, 120:13, 120:15, 120:25

**apply** [3] - 39:16, 114:10, 118:23
**applying** [2] - 112:12, 113:11
**appreciate** [4] - 20:5, 24:20, 80:12, 121:4
**appreciated** [1] - 74:10
**appreciation** [5] - 53:8, 54:18, 63:5, 68:1, 68:5
**approach** [13] - 20:24, 20:25, 36:9, 40:9, 40:11, 41:5, 41:8, 42:7, 43:14, 67:24, 73:23, 113:25
**approached** [2] - 48:12, 54:12
**approaches** [1] - 31:7
**appropriate** [23] - 8:6, 12:13, 14:2, 15:7, 15:9, 18:18, 20:22, 26:3, 28:18, 36:15, 37:13, 47:5, 47:9, 56:13, 60:21, 62:2, 68:11, 77:23, 78:1, 86:11, 105:12, 110:1, 114:1
**appropriately** [1] - 47:13
**appropriateness** [1] - 19:10
**April** [1] - 90:15
**apt** [1] - 26:20
**arbitrary** [1] - 49:7
**area** [2] - 14:11, 111:20
**argue** [1] - 24:19
**argued** [1] - 4:14
**arguing** [2] - 41:1
**argument** [28] - 3:4, 4:15, 5:3, 13:25, 18:2, 21:16, 22:3, 26:11, 27:20, 27:22, 45:24, 67:21, 71:9, 72:19, 78:6, 91:16, 94:25, 95:22, 97:16, 97:18, 103:6, 103:8, 103:13, 103:16, 103:17, 115:14, 115:16, 116:11
**arguments** [9] - 8:10, 13:11, 22:21, 25:17, 80:12, 84:11, 91:9, 104:24
**arise** [1] - 16:25
**arises** [2] - 38:12, 39:2
**Arnold** [1] - 3:11
**ARNOLD** [1] - 2:3
**article** [2] - 81:23, 110:6
**Article** [1] - 83:11
**Articles** [1] - 83:13
**articulates** [1] - 79:17
**aside** [1] - 66:13
**aspect** [1] - 7:8
**assembled** [1] - 83:4
**assert** [1] - 13:12
**asserted** [1] - 55:11
**asserting** [1] - 56:6
**assertion** [2] - 79:15, 103:5
**assessment** [1] - 6:19
**asset** [8] - 8:14, 9:7, 10:21, 12:20, 16:6, 18:13, 18:19, 18:23, 19:4, 19:10, 21:4, 31:4, 32:11, 33:19, 36:7, 36:10, 39:25, 40:9, 43:13, 45:2, 46:12, 48:2, 64:23, 68:2, 68:11, 69:23, 70:23, 70:24, 71:24, 71:25, 85:10, 102:12, 115:19, 116:7, 117:12, 118:4
**assets** [39] - 9:20, 40:1, 41:2, 44:6, 52:15, 52:21, 52:24, 53:1, 53:8, 53:19, 54:2, 54:18, 55:13, 55:14, 55:19,

55:20, 56:9, 56:21, 58:9, 58:10, 58:14, 58:15, 59:6, 60:13, 60:16, 62:14, 64:3, 72:13, 75:1, 87:16, 98:17, 99:3, 108:22, 116:6, 118:9, 118:10, 118:11, 118:15, 119:22

**associated** [2] - 12:6, 31:25
**assume** [1] - 31:10
**assuming** [3] - 24:5, 37:14, 66:20
**assumption** [1] - 18:25
**Atlanta** [1] - 2:9
**attached** [6] - 81:21, 84:14, 89:22, 91:4, 98:23, 99:18
**attacks** [1] - 67:10
**attended** [1] - 13:21
**attention** [4] - 31:22, 32:14, 35:16, 43:17
**attorney** [1] - 13:15
**attorneys** [2] - 63:14, 86:14
**ATTORNEYS** [3] - 2:5, 2:9, 2:14
**attributable** [2] - 19:20, 69:15
**AUGUST** [1] - 1:17
**August** [4] - 35:4, 82:23, 89:17, 97:25
**authored** [2] - 89:5, 109:4
**authority** [2] - 78:19, 85:17
**authorized** [2] - 52:11, 85:19
**automative** [1] - 117:7
**automotive** [1] - 117:7
**available** [2] - 70:11, 113:17
**avatar** [1] - 56:20
**avenue** [1] - 24:2
**average** [14] - 8:21, 36:8, 39:15, 39:21, 50:7, 56:25, 64:11, 64:12, 75:15, 75:18, 118:11, 119:17, 119:19, 120:20
**averaged** [1] - 56:20
**avoid** [4] - 9:12, 21:3, 21:5, 63:21
**award** [2] - 22:1, 68:16
**awarded** [1] - 11:21
**aware** [2] - 16:1, 108:4
**awfully** [1] - 68:21

**B**

**b)(1** [3] - 26:3, 26:6, 26:8
**b)(1)** [1] - 23:22
**b)(3** [4] - 23:21, 26:3, 26:6, 26:10
**B.J** [3] - 3:18, 9:6, 99:24
**background** [4] - 12:9, 51:15, 56:12, 101:5
**backgrounds** [1] - 104:7
**backward** [1] - 78:7
**backwards** [1] - 49:25
**bad** [2] - 16:23, 113:25
**balance** [3] - 71:1, 115:17, 119:19
**balanced** [1] - 9:25
**balances** [4] - 21:12, 57:5, 113:17, 118:3
**Bank** [2] - 52:14, 82:17
**bank** [5] - 83:18, 84:5, 84:19, 84:21
**BARNDT** [2] - 2:13, 4:7

**Barndt** [2] - 4:7, 81:21
**Barndt's** [1] - 84:14
**base** [1] - 42:15
**based** [13] - 9:7, 18:25, 33:4, 35:5, 47:16, 48:3, 51:2, 56:7, 61:21, 72:13, 97:12, 106:20, 121:9
**basic** [2] - 48:1, 64:13
**basis** [29] - 6:25, 11:8, 11:24, 12:8, 21:1, 21:23, 40:19, 43:15, 45:2, 46:8, 47:12, 49:14, 53:3, 65:25, 68:22, 72:8, 79:13, 83:12, 106:10, 107:3, 107:17, 107:19, 108:14, 109:2, 113:11, 118:24, 120:13, 120:15, 120:25
**Bates** [1] - 32:4
**bear** [2] - 5:7, 29:23
**bearing** [1] - 97:12
**bears** [2] - 31:14, 114:25
**beat** [1] - 40:8
**become** [2] - 19:8, 70:23
**becomes** [2] - 20:22, 119:13
**befall** [1] - 86:1
**beforehand** [1] - 88:3
**began** [1] - 54:16
**begin** [3] - 39:10, 67:20, 74:11
**beginning** [4] - 3:9, 34:22, 52:3, 52:8
**begun** [1] - 16:1
**behalf** [13] - 1:5, 3:14, 3:22, 3:24, 4:8, 18:11, 24:21, 25:25, 76:11, 89:10, 103:24, 109:2
**Behrend** [7] - 6:13, 7:1, 8:2, 10:25, 11:5, 17:8, 21:18
**belong** [1] - 70:7
**belongs** [3] - 12:24, 15:23, 70:8
**below** [2] - 72:12, 102:8
**bench** [1] - 16:15
**beneficiaries** [5] - 15:14, 39:21, 55:1, 64:1, 112:13
**benefit** [24] - 15:24, 18:19, 20:4, 28:10, 30:3, 44:15, 45:7, 49:7, 49:10, 50:6, 50:21, 52:4, 53:19, 54:2, 56:10, 61:7, 62:15, 63:5, 88:17, 109:14, 109:22, 116:3, 117:3, 117:4
**benefited** [6] - 28:15, 43:21, 51:5, 70:16, 70:19, 71:21
**benefiting** [2] - 45:3, 48:17
**benefits** [7] - 37:8, 42:21, 45:14, 46:25, 47:12, 53:2, 53:13
**best** [9] - 14:15, 21:21, 24:6, 48:5, 64:9, 67:8, 78:15, 120:24, 122:13
**better** [16] - 4:11, 21:4, 40:6, 41:24, 42:1, 42:6, 44:22, 45:16, 49:21, 49:23, 60:24, 61:19, 72:9, 74:13
**between** [14] - 26:24, 31:16, 32:18, 33:15, 41:6, 59:25, 63:14, 69:2, 70:19, 70:21, 71:15, 79:6, 79:10, 103:10
**beyond** [4] - 8:8, 13:6, 40:17, 100:9
**BIDDLE** [1] - 2:10
**Biddle** [3] - 3:24, 4:5, 4:8
**Bierwirth** [1] - 5:21
**big** [1] - 35:5

**biggest** [1] - 112:10
**bill** [1] - 44:1
**binder** [1] - 87:8
**Bird** [2] - 3:17, 3:22
**BIRD** [1] - 2:6
**bit** [8] - 11:17, 41:3, 44:23, 54:24, 65:5, 69:5, 73:13, 80:14
**BLADER** [1] - 2:2
**blue** [1] - 33:13
**BLUMSTEIN** [1] - 2:2
**board** [3] - 34:14, 37:5, 46:16
**Boeing** [2] - 27:6, 38:20
**Bogosian** [2] - 9:9, 79:15
**bond** [1] - 63:20
**bonds** [6] - 10:19, 52:15, 74:11, 74:13, 93:15, 108:23
**book** [2] - 116:25, 119:2
**BORIS** [1] - 1:3
**borrowed** [1] - 112:19
**bottom** [1] - 62:20
**bottomed** [1] - 35:9
**bounce** [1] - 62:14
**bound** [2] - 23:24, 27:2
**breach** [7] - 36:20, 42:21, 42:22, 46:14, 48:15, 48:19, 49:18, 51:5, 56:1, 60:4, 113:24
**breached** [2] - 89:12, 98:12
**brief** [18] - 8:9, 9:24, 11:13, 13:5, 13:8, 18:5, 30:20, 76:9, 76:14, 93:12, 95:19, 96:5, 103:7, 107:1, 111:23, 115:16, 121:3
**briefed** [2] - 76:8, 77:11
**briefing** [1] - 96:4
**briefly** [7] - 5:5, 59:11, 60:12, 64:19, 91:9, 115:9
**briefs** [5] - 8:5, 8:23, 25:18, 104:24, 105:2
**bring** [5] - 23:11, 29:24, 74:14, 76:17, 77:4
**broad** [2] - 77:11, 116:23
**broader** [1] - 74:24
**brokerage** [1] - 68:19
**brought** [4] - 5:6, 15:3, 15:5, 18:11
**burden** [12] - 5:14, 5:19, 5:20, 6:1, 6:9, 8:2, 10:23, 10:24, 11:2, 22:1, 29:23, 79:1
**burdens** [2] - 5:24, 6:7
**business** [5] - 29:17, 51:23, 57:19, 57:23, 65:6
**Business** [25] - 25:3, 30:18, 31:3, 33:15, 34:16, 86:23, 87:18, 87:23, 88:1, 88:6, 91:11, 92:7, 92:8, 92:25, 93:5, 93:9, 93:22, 94:3, 99:1, 99:2, 100:23, 102:5, 102:16, 104:6, 104:12
**buy** [2] - 48:14, 48:15
**BY** [3] - 2:3, 2:7, 2:11

## C

**C.S.R** [1] - 1:24
**calculating** [2] - 113:22, 114:2
**calculation** [4] - 36:5, 43:4, 47:20, 115:2
**calculations** [1] - 11:23
**calibrate** [1] - 112:23
**CAMDEN** [1] - 1:16
**candidates** [2] - 86:19, 87:1
**cannot** [13] - 9:13, 21:11, 33:4, 38:17, 45:8, 49:18, 56:17, 61:9, 74:15, 85:11, 92:3, 103:10, 121:1
**capabilities** [1] - 103:19
**capable** [1] - 26:16
**capacity** [4] - 26:19, 33:1, 109:10, 111:25
**capital** [5] - 69:21, 78:16, 79:17, 79:18, 118:6
**captioned** [2] - 81:18, 82:12
**cardinal** [1] - 33:6
**care** [5] - 32:24, 62:17, 63:1, 65:12, 66:4
**career** [2] - 19:8, 65:3
**careful** [2] - 35:16, 86:17
**carefully** [3] - 35:15, 85:10, 86:18
**carried** [1] - 84:15
**Cartwright** [1] - 97:21
**case** [83] - 3:3, 4:25, 5:13, 5:21, 6:13, 6:14, 9:9, 9:11, 11:3, 12:14, 13:13, 13:16, 13:20, 13:22, 14:6, 14:14, 15:2, 16:7, 16:12, 16:16, 17:1, 17:2, 17:3, 17:21, 18:16, 18:21, 20:19, 24:25, 25:2, 25:21, 27:6, 28:12, 28:18, 29:6, 29:8, 29:17, 30:1, 30:7, 31:4, 31:17, 33:25, 34:1, 38:14, 38:20, 43:18, 45:3, 45:8, 45:19, 47:7, 48:13, 48:20, 53:12, 55:7, 56:13, 57:2, 57:9, 57:19, 61:15, 62:2, 64:16, 66:25, 72:5, 76:7, 76:9, 77:11, 77:24, 79:10, 79:15, 79:16, 93:17, 93:20, 95:19, 101:24, 105:24, 107:4, 108:22, 117:9, 117:10, 117:25, 119:15, 120:8
**cases** [18] - 12:12, 12:23, 14:3, 14:22, 16:18, 16:21, 17:8, 17:11, 37:21, 37:25, 38:19, 77:2, 103:12, 110:4, 117:6, 117:18, 117:19
**cash** [3] - 60:15, 68:9, 93:14
**casino** [1] - 57:22
**cast** [2] - 30:4, 40:4
**categories** [1] - 55:24
**causal** [1] - 103:10
**caused** [1] - 20:9
**causes** [2] - 27:19, 39:12
**certain** [6] - 13:21, 24:10, 72:12, 72:18, 73:16, 117:4
**certainly** [17] - 16:1, 18:9, 20:24, 28:20, 28:21, 29:11, 30:6, 36:16, 37:3, 39:14, 49:25, 77:20, 80:3, 104:21, 110:17, 119:21, 120:20

**CERTIFICATE** [1] - 1:25
**Certificate** [1] - 122:16
**certification** [54] - 3:5, 4:13, 4:20, 4:23, 5:8, 6:12, 8:8, 8:9, 11:3, 12:13, 13:14, 13:20, 16:13, 18:10, 22:1, 22:4, 25:1, 25:22, 26:5, 26:12, 26:18, 27:9, 27:17, 28:2, 28:8, 28:13, 28:24, 29:16, 29:24, 30:1, 30:11, 37:16, 38:22, 44:20, 44:25, 46:17, 47:3, 47:5, 47:25, 56:14, 57:3, 57:4, 67:6, 69:8, 77:4, 79:2, 80:7, 80:12, 81:21, 84:14, 88:4, 88:22, 96:25, 121:12
**certifications** [1] - 29:10
**certified** [6] - 12:15, 23:10, 26:7, 38:24, 44:14, 45:1
**Certified** [1] - 122:11
**certify** [3] - 26:4, 43:15, 122:12
**certifying** [2] - 38:7, 46:22
**cetera** [1] - 76:3
**challenge** [2] - 31:20, 61:16
**challenged** [1] - 55:16
**challenges** [1] - 56:2
**change** [11] - 17:7, 25:21, 34:24, 41:20, 42:14, 74:5, 78:21, 78:23, 88:9, 113:14
**changed** [6] - 17:10, 33:19, 57:10, 68:2, 78:22, 106:10
**changes** [6] - 26:12, 31:5, 32:19, 33:19, 33:23, 113:14
**character** [2] - 33:2, 109:12
**chart** [5] - 34:21, 43:24, 53:22, 63:6, 69:4
**chastisement** [1] - 81:4
**chastising** [1] - 81:1
**checking** [1] - 99:7
**CHIEF** [1] - 1:20
**choose** [4] - 18:22, 19:22, 60:1, 116:18
**chose** [6] - 30:2, 32:10, 36:6, 54:21, 54:22, 103:15
**Circuit** [13] - 5:21, 5:22, 6:13, 9:9, 9:11, 12:11, 12:13, 12:22, 27:6, 27:8, 70:5, 77:24, 86:10
**circuit** [3] - 9:18, 29:19, 76:10
**circuits** [1] - 77:3
**circumstance** [1] - 26:10
**circumstances** [4] - 9:8, 32:25, 39:11, 80:1
**citations** [2] - 30:17, 31:8
**cite** [9] - 14:5, 30:13, 38:15, 39:24, 90:5, 103:12, 108:22, 117:10, 117:18
**cited** [6] - 9:24, 16:2, 16:8, 37:21, 38:19, 113:4
**civil** [2] - 5:1, 29:14
**Civil** [1] - 3:4
**CIVIL** [1] - 1:8
**claim** [29] - 6:4, 6:22, 9:5, 14:9, 17:4, 21:17, 24:25, 31:4, 31:15, 31:17, 32:11, 36:22, 37:12, 47:6, 47:9, 55:11, 56:4, 70:1, 70:2, 77:25, 79:4, 79:13, 80:4, 81:9, 89:12, 99:9, 99:14, 120:7

**claimed** [2] - 8:18, 103:11
**claiming** [4] - 89:22, 89:23, 91:4, 98:24
**claims** [15] - 5:6, 5:7, 8:1, 13:1, 16:3, 23:13, 24:23, 28:16, 33:4, 50:16, 61:9, 61:21, 67:22, 120:17
**class** [145] - 1:5, 3:5, 4:12, 4:20, 4:23, 5:8, 6:11, 6:21, 7:5, 7:7, 8:9, 11:3, 12:13, 13:23, 14:2, 14:4, 14:7, 14:17, 14:21, 14:23, 15:2, 15:3, 15:18, 16:13, 16:16, 18:1, 18:6, 18:9, 18:17, 18:19, 22:1, 22:16, 23:10, 23:17, 23:20, 23:23, 25:1, 25:11, 25:22, 25:24, 26:4, 26:6, 26:7, 26:9, 26:12, 26:14, 26:18, 26:24, 27:2, 27:9, 27:17, 28:2, 28:8, 28:10, 28:13, 28:18, 28:24, 29:10, 29:15, 29:23, 30:1, 30:8, 30:11, 31:10, 36:15, 37:14, 37:15, 37:23, 38:2, 38:4, 38:8, 38:9, 38:21, 38:24, 39:1, 41:6, 41:14, 42:10, 42:11, 43:15, 43:23, 44:5, 44:14, 44:15, 44:18, 44:20, 44:24, 45:1, 46:5, 46:7, 46:17, 46:22, 46:24, 47:3, 47:5, 47:9, 47:12, 47:13, 47:25, 48:11, 50:15, 50:17, 50:19, 50:20, 50:25, 51:4, 51:7, 53:16, 55:19, 55:21, 56:14, 56:18, 57:4, 63:4, 63:25, 64:4, 64:10, 64:17, 65:9, 66:10, 66:20, 67:6, 67:8, 69:8, 70:15, 72:17, 72:21, 76:5, 76:18, 77:4, 77:10, 77:13, 78:1, 79:2, 80:6, 80:11, 85:5, 86:2, 86:15, 96:25, 121:12
**classes** [4] - 22:8, 23:1, 46:5, 46:6
**classwide** [20] - 6:25, 7:10, 7:13, 7:16, 7:25, 8:1, 8:8, 9:5, 11:8, 11:24, 12:8, 21:1, 21:20, 21:23, 26:16, 26:19, 120:9, 120:13, 120:15, 120:25
**clear** [6] - 8:14, 70:5, 82:14, 85:13, 86:16, 120:9
**clearer** [1] - 51:17
**clearly** [13] - 7:9, 7:13, 10:25, 12:8, 14:22, 16:4, 19:14, 69:22, 76:15, 77:1, 91:5, 99:25
**CLERK** [1] - 3:1
**client** [1] - 29:4
**clients** [1] - 13:10
**close** [8] - 11:10, 11:12, 11:15, 11:16, 44:18, 60:5, 71:14, 93:15
**closer** [1] - 68:3
**closing** [1] - 79:1
**cloth** [2] - 40:2, 48:9
**clue** [1] - 109:25
**Code** [2] - 9:20, 82:6
**collapse** [1] - 61:13
**colleagues** [1] - 46:10
**collection** [1] - 119:12
**College** [1] - 2:13
**color** [2] - 74:4, 111:22
**colorable** [4] - 6:22, 79:4, 79:6, 79:11
**COMEAU** [1] - 1:4
**comfortable** [2] - 72:24, 73:3
**coming** [2] - 36:18, 105:16

**comment** [1] - 116:15
**commented** [1] - 9:16
**committee** [1] - 92:22
**commodities** [1] - 65:4
**common** [21] - 6:20, 7:4, 7:6, 10:6, 10:8, 10:24, 11:1, 12:16, 14:19, 26:15, 26:18, 26:20, 38:16, 38:18, 38:22, 38:23, 43:12, 43:17, 51:1, 92:3, 119:5
**commonality** [7] - 5:1, 21:19, 25:8, 25:22, 26:13, 26:22, 62:4
**commonalty** [1] - 8:3
**communicate** [4] - 63:11, 64:2, 64:12, 87:11
**communicating** [1] - 63:18
**communications** [1] - 88:11
**community** [1] - 82:18
**companies** [6] - 52:5, 52:6, 53:14, 54:1, 103:22, 116:7
**COMPANIES** [1] - 1:6
**company** [9] - 51:20, 52:9, 53:18, 53:24, 57:16, 59:12, 62:22, 82:19, 84:21
**Company's** [1] - 90:14
**company's** [1] - 52:12
**comparable** [1] - 119:20
**compare** [2] - 75:14, 110:4
**compared** [2] - 44:2, 64:11
**comparison** [1] - 75:13
**compatible** [2] - 23:19, 69:23
**competent** [1] - 43:8
**competing** [1] - 23:17
**competitors** [1] - 102:6
**competitors'** [1] - 102:7
**complain** [1] - 7:6
**complaint** [14] - 5:9, 14:9, 17:5, 27:13, 40:7, 55:6, 55:8, 55:9, 80:16, 98:12, 105:9, 105:10, 105:11
**complete** [7] - 17:13, 17:21, 28:21, 81:9, 95:25, 96:4, 96:22
**completed** [2] - 17:16, 28:3
**completion** [1] - 96:24
**complex** [3] - 14:11, 99:7, 101:19
**complexities** [1] - 23:8
**complexity** [4] - 23:1, 98:21, 100:12, 100:13
**complicated** [3] - 14:12, 29:8, 45:9
**comply** [2] - 91:22, 115:3
**component** [1] - 27:1
**comport** [1] - 82:6
**composition** [1] - 76:1
**comprehensive** [1] - 86:20
**compromise** [1] - 50:8
**conceded** [1] - 65:6
**conceivable** [2] - 8:25, 15:5
**conceive** [1] - 33:18
**concentrating** [1] - 16:3
**concentration** [2] - 7:18, 75:11
**concept** [2] - 51:3, 113:10
**concepts** [1] - 14:10
**concerned** [2] - 44:9, 44:11

**concerning** [1] - 88:8
**concerted** [1] - 40:5
**conclude** [2] - 18:2, 47:5
**Concluded** [1] - 121:22
**concluded** [1] - 96:13
**concludes** [1] - 22:2
**concrete** [1] - 59:25
**conditions** [4] - 36:20, 60:6, 60:18, 78:22
**conduct** [8] - 6:20, 7:4, 7:6, 7:12, 33:2, 68:5, 85:4, 109:12
**conducted** [3] - 25:25, 98:15, 98:24
**conducting** [1] - 98:13
**confine** [1] - 115:15
**conflict** [10] - 5:3, 18:25, 19:19, 27:4, 38:8, 42:9, 42:19, 42:24, 85:18, 85:20
**conflicts** [12] - 18:1, 18:5, 25:9, 26:24, 38:4, 38:11, 41:6, 46:24, 50:10, 51:3, 51:6, 51:17
**conjunction** [1] - 68:22
**connection** [4] - 4:23, 5:13, 15:17, 117:2
**consecutive** [1] - 65:1
**consecutively** [2] - 66:5, 66:6
**consequence** [8] - 14:20, 15:7, 15:24, 20:1, 68:10, 68:21, 78:22, 78:23
**consequences** [1] - 23:21
**conserve** [1] - 118:9, 119:22
**conserving** [2] - 118:10, 118:14
**consider** [30] - 9:19, 10:3, 27:19, 27:21, 36:24, 39:10, 39:12, 41:21, 48:24, 58:4, 68:21, 72:7, 74:8, 76:13, 78:25, 79:14, 79:25, 94:19, 96:19, 106:17, 107:20, 108:24, 112:1, 117:25, 118:3, 118:10, 119:14, 119:15, 119:16, 120:11
**consideration** [12] - 9:13, 9:22, 18:14, 25:19, 36:4, 37:8, 40:15, 40:18, 47:16, 57:14, 107:7, 108:19
**considerations** [2] - 36:2, 39:3
**considered** [24] - 6:15, 7:21, 8:13, 9:2, 9:4, 10:6, 30:19, 72:1, 74:1, 75:12, 78:12, 78:14, 79:12, 79:18, 79:23, 80:2, 94:13, 95:2, 95:16, 108:15, 109:1, 114:22, 114:23, 116:16
**considering** [6] - 6:18, 6:23, 12:20, 47:4, 78:17, 79:5
**consisted** [1] - 57:17
**consistent** [8] - 8:22, 60:2, 79:15, 79:16, 79:19, 79:20, 79:21
**consistently** [2] - 52:10, 82:3
**consists** [1] - 30:11
**constitute** [3] - 32:21, 83:14
**constitutes** [2] - 25:21, 56:1
**Constitutional** [1] - 27:1
**constrained** [1] - 60:14
**constraints** [1] - 25:16
**construction** [1] - 85:23
**construed** [2] - 95:10, 102:21
**consultant** [1] - 116:7

**contacted** [1] - 13:15
**contained** [2] - 82:1, 83:5
**contains** [3] - 93:6, 93:11, 100:2
**contemplated** [1] - 32:12
**contemplates** [2] - 26:6, 56:9
**contend** [1] - 32:2
**content** [2] - 104:24, 105:1
**contention** [2] - 26:15, 38:23
**contents** [1] - 21:23
**contest** [1] - 72:15
**context** [7] - 15:12, 25:6, 30:17, 30:21, 45:8, 51:16, 75:4, 117:13, 118:19
**continue** [3] - 19:7, 36:25, 38:16
**continued** [2] - 30:4, 82:9
**continues** [2] - 32:5, 36:25
**continuously** [1] - 85:7
**contradicted** [2] - 90:22, 104:2
**contradictory** [1] - 71:10
**contrary** [1] - 108:5
**contrast** [1] - 30:24
**contrasting** [1] - 40:21
**contributed** [1] - 116:8
**contribution** [6] - 21:13, 52:7, 64:20, 64:21, 66:1, 67:2
**contributions** [11] - 41:18, 44:7, 52:8, 52:12, 82:19, 83:22, 84:2, 84:6, 84:21, 91:2, 91:18
**contrivances** [1] - 37:3
**contrived** [1] - 35:24
**control** [6] - 15:21, 52:19, 58:12, 59:1, 93:25, 119:12
**controlling** [1] - 15:19
**conventional** [2] - 37:12, 39:25
**converging** [1] - 34:2
**converts** [1] - 61:25
**cooper** [1] - 57:18
**COOPER** [1] - 1:15
**copy** [1] - 92:14
**corporate** [1] - 88:7
**CORPORATION** [1] - 1:11
**Corporation** [2] - 25:3, 81:20
**correct** [7] - 43:25, 45:17, 59:21, 64:8, 73:19, 80:18, 94:20
**counsel** [15] - 3:8, 25:7, 25:12, 67:5, 67:17, 68:18, 68:23, 69:24, 72:11, 77:16, 91:10, 102:4, 116:16, 117:21, 121:18
**count** [4] - 55:9, 55:10, 98:9, 98:11
**Count** [6] - 80:17, 80:19, 86:9, 89:11, 103:9
**country** [2] - 46:11, 51:25
**Counts** [1] - 121:14
**counts** [3] - 55:10, 80:16, 81:14
**couple** [2] - 30:17, 45:25
**course** [20] - 8:15, 10:17, 17:2, 17:7, 21:8, 25:16, 28:19, 29:25, 34:25, 35:7, 50:2, 54:21, 58:24, 63:4, 65:20, 68:16, 85:3, 89:14, 97:13, 116:5
**court** [19] - 5:24, 11:5, 15:8, 16:6, 18:20,

20:10, 20:12, 20:13, 21:2, 22:12, 26:17, 38:21, 46:11, 46:16, 61:21, 114:11, 114:12, 120:10

**Court** [62] - 4:22, 5:20, 5:24, 6:13, 7:1, 7:3, 7:25, 12:5, 14:13, 17:2, 18:12, 20:20, 22:2, 23:22, 24:21, 26:1, 26:25, 27:11, 27:15, 27:16, 28:15, 29:20, 32:16, 32:22, 33:25, 35:12, 36:10, 36:13, 36:19, 39:15, 41:10, 41:12, 44:11, 45:18, 46:9, 46:23, 47:4, 48:7, 50:21, 54:24, 70:9, 70:10, 71:13, 72:8, 78:3, 86:12, 89:9, 91:6, 94:6, 95:2, 95:18, 97:21, 105:7, 105:13, 108:24, 111:14, 117:8, 117:21, 120:22, 122:10, 122:11

**COURT** [132] - 1:1, 3:2, 3:20, 4:3, 4:10, 4:19, 13:7, 16:10, 16:12, 17:15, 17:23, 18:3, 20:3, 20:6, 22:4, 22:7, 22:17, 22:22, 22:24, 23:3, 23:5, 23:14, 24:2, 24:4, 24:12, 24:14, 24:16, 24:18, 25:15, 27:25, 28:7, 28:20, 29:7, 34:1, 34:8, 34:21, 34:24, 35:20, 37:13, 37:18, 37:21, 38:7, 39:19, 40:22, 42:14, 42:17, 43:2, 43:24, 44:9, 44:13, 45:12, 45:24, 46:15, 46:20, 49:5, 49:13, 49:25, 51:10, 56:24, 57:12, 57:21, 58:16, 58:19, 58:22, 59:18, 59:22, 61:3, 64:4, 67:13, 70:14, 72:16, 73:5, 73:15, 74:4, 74:17, 74:20, 75:8, 75:13, 75:17, 76:17, 77:6, 78:4, 79:5, 80:6, 80:9, 80:19, 81:4, 81:7, 83:16, 83:25, 86:7, 88:14, 89:7, 94:15, 94:19, 94:21, 95:3, 95:24, 96:9, 96:18, 97:1, 97:7, 98:10, 100:4, 100:14, 102:3, 102:25, 103:2, 103:4, 104:14, 104:18, 105:3, 109:19, 112:10, 112:16, 115:5, 115:11, 115:13, 115:21, 115:24, 116:17, 116:21, 116:25, 117:15, 118:18, 119:2, 119:7, 119:23, 121:2, 121:6, 121:8, 121:16

**Court's** [7] - 6:19, 6:23, 27:19, 27:21, 31:22, 49:24

**courthouse** [1] - 46:2

**COURTHOUSE** [1] - 1:14

**courts** [9] - 14:4, 14:14, 15:5, 15:11, 22:12, 29:19, 38:21, 61:8, 61:25

**Courts** [1] - 24:22

**covered** [1] - 78:3

**covering** [1] - 85:11

**create** [1] - 46:13

**created** [2] - 40:2, 50:10

**creates** [4] - 38:12, 41:5, 42:18, 51:3

**creating** [2] - 38:4, 47:14

**creation** [2] - 82:16, 106:19

**credibility** [1] - 66:22

**credit** [1] - 11:22

**criminal** [1] - 104:5

**crisis** [1] - 78:8

**criteria** [5] - 12:10, 23:12, 114:9, 120:6

**critical** [1] - 29:8

**criticisms** [2] - 13:21, 60:6

**criticized** [1] - 73:15

**cross** [1] - 104:21

**cross-motion** [1] - 104:21

**crucial** [1] - 92:4

**CSR** [1] - 122:14

**current** [4] - 90:12, 90:16, 91:15, 98:4

**customer** [1] - 101:10

**cut** [1] - 38:3

# D

**damage** [8] - 11:23, 69:1, 71:15, 86:1, 103:6, 115:2, 120:23, 120:25

**damages** [20] - 6:9, 6:23, 6:25, 11:8, 21:10, 21:12, 21:22, 68:16, 69:2, 69:25, 70:2, 70:3, 70:23, 73:24, 103:11, 113:22, 113:23, 114:3, 120:1, 120:7

**data** [1] - 92:23

**DATE** [1] - 122:17

**date** [10] - 3:4, 37:23, 38:15, 53:25, 57:7, 70:20, 82:10, 84:16, 96:19, 113:23

**dated** [1] - 90:8

**Daubert** [5] - 3:7, 4:15, 105:6, 114:9, 121:16

**daughter** [3] - 59:5, 63:15, 76:6

**daughter-in-law** [2] - 59:5, 63:15

**DAVID** [1] - 2:12

**David** [2] - 4:4, 105:5

**dead** [1] - 28:9

**deadline** [2] - 97:1, 97:2

**deal** [5] - 38:11, 96:18, 98:18, 110:13, 117:6

**dealing** [4] - 28:21, 29:6, 61:18, 111:25

**deals** [1] - 108:19

**dealt** [1] - 110:25

**December** [4] - 36:6, 39:15, 85:5, 89:20

**decide** [1] - 97:11

**decided** [5] - 17:3, 28:8, 48:13, 108:16, 109:2

**deciding** [2] - 33:18, 36:4

**decision** [20] - 5:18, 6:21, 9:18, 19:20, 27:8, 27:9, 28:17, 34:9, 34:19, 35:9, 36:19, 38:3, 69:16, 80:11, 86:12, 104:18, 109:11, 121:10, 121:11

**decisions** [6] - 6:12, 15:13, 49:1, 78:7

**declaration** [5] - 90:6, 92:14, 98:23, 99:17, 99:18

**decline** [3] - 59:3, 61:6, 62:11

**declines** [1] - 60:25

**defendant** [6] - 6:3, 6:8, 28:23, 44:16, 76:14, 89:12

**Defendants** [1] - 1:13

**DEFENDANTS** [2] - 2:9, 2:14

**defendants** [64] - 3:7, 3:17, 3:22, 3:24, 4:6, 4:9, 4:14, 5:10, 5:15, 8:10, 9:2, 9:24, 13:10, 13:25, 14:5, 14:7, 16:1,

17:12, 17:20, 19:14, 19:21, 19:24, 21:5, 24:22, 24:24, 25:12, 32:12, 32:15, 33:8, 34:13, 34:18, 35:2, 35:12, 43:6, 48:23, 57:9, 67:24, 67:25, 69:10, 69:19, 71:20, 71:22, 72:4, 72:15, 78:24, 79:24, 89:15, 89:18, 90:3, 91:4, 92:6, 93:8, 94:6, 94:22, 95:23, 97:19, 98:5, 98:12, 98:22, 99:9, 105:5, 106:13, 120:14

**defendants'** [15] - 6:20, 7:4, 8:5, 9:13, 11:13, 18:5, 69:16, 76:9, 78:5, 90:16, 90:22, 92:13, 97:9, 97:24, 104:20

**defense** [1] - 73:17

**defensive** [5] - 34:16, 34:19, 35:3, 35:5, 35:10

**deference** [3] - 91:14, 97:21, 97:22

**defies** [2] - 56:23, 59:19

**defined** [3] - 42:11, 116:3, 117:2

**definitely** [1] - 56:16

**definitive** [1] - 71:24

**degree** [2] - 23:1, 110:10

**delay** [5] - 20:9, 69:6, 69:7, 69:14, 69:15

**delayed** [2] - 17:1, 96:23

**deluged** [1] - 61:9

**demographic** [4] - 18:14, 113:14, 113:16, 113:18

**demographics** [11] - 7:19, 36:7, 53:21, 72:7, 74:23, 75:7, 78:11, 78:24, 106:11, 107:21, 108:5

**demonstrably** [3] - 33:24, 44:15, 48:19

**demonstrate** [8] - 6:7, 10:23, 10:24, 11:7, 17:4, 26:14, 68:14, 114:15

**demonstrated** [1] - 114:22

**demonstrates** [3] - 41:21, 98:24, 108:4

**denied** [1] - 38:21

**denying** [1] - 81:1

**departing** [1] - 74:8

**Department** [7] - 10:2, 107:6, 107:8, 107:14, 112:25, 113:4

**deposition** [21] - 9:15, 11:25, 17:13, 59:9, 59:13, 63:10, 65:7, 68:16, 79:25, 80:2, 88:21, 88:25, 99:17, 101:9, 101:23, 108:8, 111:4, 111:22, 116:5, 116:13

**depositions** [5] - 8:15, 10:17, 17:22, 28:5, 30:18

**depth** [1] - 100:20

**depths** [2] - 59:3, 63:6

**DEPUTY** [1] - 3:1

**derivative** [1] - 12:23

**derived** [2] - 6:12, 117:24

**describe** [2] - 73:22, 107:10

**describes** [3] - 10:13, 10:14, 11:18

**deserving** [1] - 29:10

**designed** [3] - 54:10, 68:14, 117:3

**desirability** [1] - 16:3

**desirable** [1] - 16:4

**desire** [1] - 118:6

**despite** [2] - 29:19, 30:9

**detail** [3] - 25:13, 35:17, 43:18

**detailed** [2] - 31:6, 85:1
**deteriorated** [1] - 78:13
**determination** [6] - 6:16, 6:20, 16:6, 18:17, 69:12, 109:8
**determinations** [3] - 15:6, 40:23, 61:16
**determinative** [2] - 10:9, 12:21
**determine** [5] - 7:1, 60:17, 113:23, 120:16, 120:18
**determined** [2] - 61:4, 69:9
**develop** [2] - 19:12, 75:3
**developed** [6] - 8:14, 19:14, 21:21, 21:22, 28:1, 74:9
**developing** [2] - 72:8, 79:14
**devolve** [1] - 38:24
**devoted** [1] - 10:19
**dictated** [1] - 21:13
**die** [1] - 58:11
**different** [39] - 8:10, 10:12, 15:6, 15:14, 15:15, 18:23, 20:15, 23:11, 23:20, 23:21, 29:10, 34:9, 47:14, 55:24, 56:6, 61:8, 61:10, 62:23, 63:3, 70:1, 70:3, 70:4, 71:5, 72:10, 73:13, 75:11, 77:1, 77:10, 77:21, 86:13, 86:14, 86:15, 87:2, 87:13, 97:25, 99:4, 101:18, 105:11
**difficult** [3] - 35:18, 68:21, 116:22
**difficulties** [2] - 16:7, 67:24
**difficulty** [3] - 69:24, 75:24, 117:19
**diligence** [3] - 32:24, 87:18, 88:12
**diminish** [1] - 44:2
**direct** [6] - 84:6, 92:1, 92:3, 93:4, 93:6, 117:11
**directed** [9] - 8:7, 52:18, 101:15, 105:24, 107:9, 109:14, 113:1, 115:24, 116:2
**direction** [1] - 40:24
**directly** [2] - 26:5, 44:4
**disadvantaged** [1] - 44:21
**disadvantaging** [1] - 72:20
**disagree** [2] - 43:3, 90:21
**disagreements** [2] - 16:22, 21:9
**discharge** [2] - 5:11, 5:16
**disciplinary** [4] - 87:21, 104:4
**disciplined** [1] - 66:15
**disclosures** [1] - 28:5
**disconnect** [1] - 31:16
**discovered** [2] - 100:22, 101:1
**discovery** [5] - 17:13, 17:16, 28:4, 68:24, 96:13
**discretion** [7] - 60:20, 74:5, 81:12, 83:5, 84:19, 84:25, 85:14
**discretionary** [2] - 52:9, 61:16
**discuss** [1] - 54:23
**discussed** [2] - 42:20, 108:17
**discusses** [1] - 9:21
**disjointed** [1] - 69:5
**dismiss** [4] - 80:23, 80:24, 89:20, 98:2
**disposition** [1] - 5:8
**dispositive** [1] - 4:25

**dispute** [3] - 48:1, 55:17, 102:20
**disputed** [1] - 98:18
**disputes** [2] - 27:16, 27:18
**disputing** [1] - 48:21
**disregard** [1] - 39:12
**disseminated** [1] - 82:21
**distinctly** [2] - 53:9, 64:11
**distributed** [2] - 70:24, 82:21
**distribution** [1] - 59:12
**distributions** [1] - 58:7
**District** [2] - 122:11
**district** [1] - 22:12
**DISTRICT** [3] - 1:1, 1:1, 1:20
**diversification** [1] - 92:15
**diversified** [1] - 64:3
**diversifying** [1] - 92:18
**divide** [1] - 112:24, 113:6
**divided** [2] - 55:24, 57:4
**dividing** [1] - 107:12
**divorced** [2] - 36:1, 36:2
**Docket** [2] - 121:12, 121:13
**Dockets** [1] - 121:16
**doctor** [2] - 99:7, 99:8
**document** [44] - 8:17, 8:19, 20:13, 21:11, 32:4, 68:22, 70:25, 81:17, 81:23, 81:24, 82:1, 82:8, 83:2, 83:17, 84:1, 84:9, 84:12, 84:13, 84:17, 85:12, 89:4, 89:19, 89:22, 89:23, 89:25, 90:2, 90:5, 90:7, 90:8, 90:9, 90:10, 90:17, 91:4, 91:6, 91:8, 92:10, 93:24, 97:20, 98:1, 98:3, 98:5
**documents** [12] - 5:17, 8:18, 63:12, 81:20, 83:4, 83:14, 85:8, 85:9, 85:21, 88:9, 91:21, 98:23
**dog** [1] - 65:14
**dollars** [2] - 46:1, 65:15
**done** [28] - 17:22, 29:18, 30:6, 45:14, 45:15, 45:19, 48:19, 49:21, 50:1, 57:23, 60:12, 61:10, 65:24, 70:12, 77:17, 77:19, 78:18, 84:2, 103:18, 104:11, 109:23, 111:2, 111:17, 114:14, 117:13, 118:21, 118:22, 119:20
**Donio** [2] - 55:5, 55:21
**Donio's** [2] - 55:22, 103:13
**Donovan** [3] - 5:21, 5:24, 6:5
**door** [2] - 46:2, 56:6
**doubt** [1] - 6:5
**doubtful** [1] - 12:14
**Doug** [1] - 3:21
**DOUGLAS** [1] - 2:8
**down** [12] - 24:2, 24:4, 33:24, 34:3, 35:7, 35:8, 42:2, 46:15, 57:23, 61:20, 86:23, 87:8
**Dr** [30] - 11:10, 11:19, 11:25, 20:23, 21:6, 30:13, 31:20, 36:7, 39:23, 46:13, 68:3, 68:15, 71:12, 71:14, 71:22, 73:22, 74:25, 75:3, 93:16, 104:20, 105:17, 105:21, 106:4, 106:16, 108:7, 110:3, 115:18, 117:24, 118:16, 119:17

**draft** [3] - 75:10, 90:9, 98:5
**drafted** [1] - 95:15
**drawn** [1] - 85:10
**Drinker** [3] - 3:23, 4:5, 4:8
**DRINKER** [1] - 2:10
**drive** [1] - 26:20
**driven** [4] - 36:5, 37:10, 37:11, 50:4
**dropping** [1] - 34:3
**drops** [1] - 34:11
**drove** [1] - 38:23
**due** [2] - 87:18, 88:12
**Dukes** [6] - 10:9, 12:21, 25:20, 25:24, 26:12, 38:16, 38:19, 43:16
**duped** [1] - 104:15
**Dupler** [1] - 14:14
**duration** [1] - 32:11
**during** [16] - 31:3, 33:10, 33:21, 37:9, 38:6, 41:7, 42:3, 42:7, 49:3, 50:13, 50:22, 60:24, 61:12, 78:8, 85:4, 116:5
**duties** [2] - 5:16, 49:13, 98:13
**duty** [12] - 5:11, 9:12, 21:3, 36:20, 37:12, 48:15, 48:20, 49:19, 56:1, 56:3, 60:4, 89:13
**dying** [1] - 57:19
**dynamic** [2] - 57:12, 60:13

**E**

**earliest** [1] - 28:9
**early** [6] - 28:10, 34:3, 34:22, 51:23, 54:9, 63:7
**earned** [1] - 6:2
**earning** [1] - 59:8
**easel** [1] - 63:6
**easier** [1] - 22:13
**East** [1] - 2:13
**easy** [1] - 12:1
**economic** [2] - 33:17, 117:19
**education** [3] - 48:18, 105:22, 110:18
**educational** [1] - 101:4
**effect** [6] - 47:15, 85:7, 90:11, 93:20, 93:23, 98:7
**effort** [3] - 13:16, 28:25, 35:17
**Eisenberg** [2] - 12:14, 12:23
**either** [12] - 29:12, 42:25, 45:4, 46:20, 51:1, 64:14, 66:24, 66:25, 71:5, 71:15, 99:21, 109:10
**elected** [1] - 20:17
**element** [3] - 7:18, 12:22, 105:20
**elements** [8] - 5:7, 8:4, 27:18, 52:17, 54:4, 54:5, 106:25, 114:8
**eliminates** [1] - 36:23
**eliminating** [1] - 38:4
**email** [2] - 99:10, 99:15
**emails** [5] - 87:25, 88:3, 88:14, 88:22, 88:23
**embarked** [1] - 65:3
**empirically** [1] - 48:7
**employ** [4] - 9:10, 19:21, 119:14, 119:16

**employed** [4] - 11:13, 59:11, 64:19, 65:18
**employee** [4] - 92:23, 101:9, 109:14, 109:22
**employees** [9] - 39:9, 51:24, 52:4, 53:14, 78:20, 93:1, 98:16, 108:6, 116:18
**employer** [3] - 66:15, 66:18, 67:3
**employment** [2] - 19:11, 61:2
**encouraged** [1] - 27:11
**end** [10] - 23:19, 30:2, 42:4, 57:6, 69:12, 77:6, 111:13, 116:3, 117:4, 121:20
**ended** [1] - 42:4
**endorsed** [1] - 5:21
**ends** [1] - 53:11
**engaged** [2] - 33:8, 86:11
**Engineering** [1] - 81:20
**English** [4] - 14:1, 14:2, 14:5, 64:13
**enjoyed** [1] - 54:17
**enlarge** [1] - 37:13
**enrich** [1] - 12:24
**entails** [1] - 9:8
**enter** [1] - 3:8
**entering** [1] - 75:21
**enterprise** [6] - 33:2, 109:12, 109:13, 110:25
**entire** [2] - 35:23, 38:2
**entirely** [4] - 30:12, 33:5, 57:16, 57:17
**entirety** [3] - 7:16, 55:20, 72:5
**entities** [1] - 24:24
**entitled** [9] - 66:22, 89:19, 91:6, 91:8, 97:13, 97:20, 97:22, 98:1, 98:3
**entity** [1] - 53:12
**enunciated** [1] - 25:23
**enunciator** [1] - 105:19
**equal** [1] - 97:8
**equitable** [1] - 17:4
**equities** [16] - 33:11, 33:12, 33:13, 33:24, 34:10, 35:6, 35:8, 36:22, 48:3, 50:17, 68:9, 72:18, 87:16, 102:15, 105:15
**equity** [27] - 7:18, 11:9, 15:4, 15:6, 18:7, 19:1, 30:15, 34:4, 34:11, 37:9, 41:25, 47:24, 60:16, 61:24, 64:17, 72:18, 72:25, 73:1, 73:3, 73:12, 74:9, 77:15, 78:20, 102:6, 102:7, 102:12, 102:18
**Equity** [2] - 5:12, 14:9
**equivalent** [1] - 99:6
**ERISA** [29] - 5:6, 5:9, 11:2, 12:11, 12:23, 13:15, 14:11, 15:2, 15:11, 17:5, 32:2, 32:23, 33:3, 38:19, 39:6, 47:9, 48:15, 56:4, 83:4, 83:7, 83:15, 84:24, 85:2, 91:10, 91:16, 91:19, 91:22, 109:6, 116:6
**erroneously** [1] - 19:16
**error** [2] - 120:18
**especially** [7] - 14:15, 27:14, 61:11, 78:8, 89:4, 102:20
**ESQUIRE** [7] - 2:3, 2:4, 2:7, 2:8, 2:11, 2:12, 2:13

**essentially** [15] - 5:10, 11:25, 13:13, 15:12, 21:11, 24:24, 29:16, 53:1, 53:10, 55:17, 59:6, 61:25, 71:13, 79:2, 119:13
**establish** [1] - 92:24
**established** [3] - 26:22, 81:24, 95:19
**establishing** [1] - 83:7
**et** [4] - 1:11, 3:3, 3:4, 76:2
**evaluate** [1] - 9:10
**evaluating** [1] - 25:22
**evaluation** [2] - 27:12, 33:16, 34:20
**evens** [1] - 38:8
**evidence** [12] - 7:23, 12:4, 27:12, 27:13, 27:20, 27:22, 30:10, 39:5, 100:3, 101:2, 101:21, 114:22
**evidenced** [1] - 35:3
**exact** [1] - 34:10
**exactly** [3] - 56:5, 71:22, 88:19
**examine** [1] - 59:1
**examined** [2] - 76:10, 83:21
**example** [8] - 38:4, 44:8, 45:10, 45:23, 47:8, 48:13, 54:16, 57:24
**examples** [6] - 12:12, 15:3, 35:15, 117:19, 117:20, 119:8
**exceed** [1] - 11:22
**exceeded** [1] - 11:21
**exceeds** [1] - 32:15
**except** [1] - 70:18
**exception** [2] - 17:17, 25:24
**excerpt** [2] - 9:24, 34:13
**excerpts** [1] - 33:8
**excess** [1] - 8:8
**Excessive** [2] - 5:12, 14:9
**excessive** [4] - 7:19, 47:10, 47:11, 50:17
**exchange** [2] - 28:5, 96:24
**exchanged** [2] - 88:1, 96:7
**excluded** [2] - 50:19, 50:20
**excludes** [1] - 57:8
**excluding** [1] - 42:23
**exclusive** [1] - 20:25
**excuse** [8] - 8:9, 9:1, 11:16, 18:17, 20:23, 23:12, 27:20, 33:11
**executed** [2] - 90:10, 98:7
**exercise** [3] - 74:4, 74:15, 85:14
**exercising** [1] - 81:12
**Exhibit** [5] - 90:5, 90:7, 98:25, 99:2, 99:18
**exhibit** [1] - 92:13
**Exhibits** [1] - 98:22
**exhibits** [1] - 71:12
**exist** [1] - 97:12
**existed** [3] - 13:18, 95:14
**existence** [5] - 12:17, 25:9, 52:2, 89:16, 94:1
**existing** [2] - 39:13, 82:7
**exists** [2] - 55:2, 83:17
**expand** [1] - 25:6
**expect** [1] - 121:19

**expected** [3] - 31:24, 53:6, 60:9
**expense** [1] - 29:5
**experience** [23] - 7:13, 13:4, 98:20, 100:11, 101:8, 101:13, 101:14, 101:21, 104:16, 105:22, 109:21, 110:18, 111:15, 111:17, 111:24, 115:18, 115:21, 116:12, 116:25, 118:21, 119:3
**experienced** [1] - 68:1
**expert** [41] - 9:14, 17:11, 17:14, 17:15, 17:18, 17:21, 21:8, 27:22, 28:5, 28:6, 30:12, 69:9, 69:11, 69:14, 69:16, 75:23, 78:6, 78:13, 94:3, 94:5, 94:7, 95:11, 95:13, 95:18, 95:21, 96:3, 96:13, 96:21, 96:24, 109:9, 109:16, 110:21, 110:22, 111:11, 111:14, 111:15, 112:6, 112:7, 115:1
**expert's** [2] - 96:19, 97:9
**experts** [4] - 15:21, 96:7, 111:12, 111:13
**experts'** [1] - 104:23
**explain** [6] - 31:11, 63:20, 83:20, 88:22, 96:5, 113:4
**explained** [3] - 68:20, 113:5, 116:12
**explicitly** [1] - 91:19
**extended** [2] - 69:1, 121:5
**extending** [1] - 38:9
**extends** [3] - 16:14, 27:20, 27:22
**extensive** [5] - 15:20, 31:8, 76:9, 103:8, 103:23
**extent** [6] - 6:15, 19:19, 55:23, 68:5, 74:3, 116:10
**extreme** [1] - 63:23, 65:2
**extremely** [2] - 111:3, 111:7

# F

**face** [2] - 67:10, 81:3
**facets** [1] - 29:9
**fact** [49] - 12:4, 16:4, 17:13, 17:15, 20:8, 28:3, 32:13, 33:14, 35:20, 38:2, 38:17, 39:7, 44:22, 45:25, 46:8, 46:21, 50:18, 64:23, 65:2, 65:24, 66:13, 68:15, 74:12, 76:3, 80:25, 82:23, 86:2, 91:3, 91:6, 95:14, 95:19, 101:1, 101:16, 106:6, 106:15, 106:23, 107:12, 107:22, 108:5, 108:14, 108:21, 109:24, 110:1, 110:11, 110:14, 113:24, 118:12, 120:16, 120:23
**fact-finder** [1] - 46:21
**factor** [1] - 106:13
**factors** [2] - 9:15, 36:2
**facts** [4] - 88:8, 102:20, 102:21, 108:13
**factual** [2] - 25:6, 27:16
**factually** [1] - 83:3
**fail** [3] - 39:12, 86:1, 103:9
**failed** [5] - 5:11, 5:15, 22:11, 48:25
**fails** [2] - 64:14, 114:3
**failure** [9] - 7:9, 7:12, 9:19, 55:25, 80:19, 91:13, 95:5, 103:11

**fairly** [2] - 71:14, 119:5
**fairness** [1] - 66:23
**fall** [1] - 97:16
**falls** [1] - 65:22
**familiar** [4] - 33:1, 76:15, 111:21, 119:3
**familiarity** [3] - 64:13, 66:14, 105:23
**family** [1] - 103:22
**far** [9] - 8:8, 57:21, 58:23, 62:21, 79:12, 80:4, 87:2, 114:18, 117:11
**farfetched** [1] - 57:24
**fashion** [1] - 70:4
**fast** [1] - 73:7
**fault** [1] - 103:15
**faulted** [1] - 96:8
**favor** [2] - 47:8, 64:25
**favorable** [2] - 50:10, 102:21
**feature** [1] - 57:12
**February** [1] - 103:13
**Fed.3d** [1] - 77:24
**federal** [4] - 5:1, 29:13, 78:17, 79:20
**Federal** [3] - 9:20, 9:25, 10:1
**fees** [3] - 47:10, 47:11, 110:4
**fellow** [3] - 47:2, 64:11, 117:7
**felt** [3] - 17:12, 69:18
**few** [10] - 8:11, 17:25, 32:3, 42:10, 46:15, 57:10, 62:13, 70:18, 71:2, 96:22
**fiat** [1] - 43:13
**fiduciaries** [12] - 5:10, 6:6, 10:17, 49:8, 57:14, 60:8, 73:16, 86:11, 97:22, 104:15, 113:1, 120:2
**fiduciaries'** [1] - 91:15
**fiduciary** [25] - 9:10, 9:19, 10:2, 10:10, 11:1, 32:16, 32:23, 36:20, 37:12, 46:14, 48:15, 48:20, 49:18, 56:1, 56:3, 70:6, 74:14, 74:15, 74:16, 75:6, 89:13, 91:20, 98:13, 98:18, 107:9
**fiduciary's** [3] - 9:12, 19:12, 21:2
**field** [1] - 109:21
**fighting** [1] - 16:17
**figure** [1] - 106:6
**figures** [1] - 42:14
**file** [1] - 20:19
**filed** [6] - 3:7, 4:15, 5:9, 13:20, 16:12, 30:2
**files** [1] - 88:5
**filing** [2] - 46:2, 98:2
**filtered** [1] - 63:17
**final** [3] - 11:6, 27:2, 97:18
**finalists** [2] - 86:23, 86:24
**finally** [7] - 6:5, 15:11, 16:7, 21:8, 76:4, 94:2, 95:22
**financial** [14] - 14:20, 52:16, 59:5, 61:13, 62:25, 63:19, 64:2, 64:13, 66:14, 74:18, 76:7, 78:8, 82:18, 86:19
**finder** [1] - 46:21
**findings** [1] - 27:9
**finish** [1] - 50:11
**FINRA** [4] - 9:16, 11:18, 79:21, 104:3

**FINRA's** [3] - 99:23, 100:21, 100:22
**fired** [1] - 116:8
**firm** [6] - 3:11, 3:14, 4:4, 13:12, 99:13, 115:19
**firms** [1] - 86:19
**first** [43] - 4:13, 4:24, 5:5, 6:15, 7:3, 7:8, 7:23, 8:13, 13:12, 18:11, 29:16, 31:13, 31:18, 35:25, 38:14, 40:12, 48:16, 51:14, 63:9, 67:25, 81:15, 81:22, 89:11, 89:16, 90:3, 90:7, 90:22, 91:16, 91:25, 92:8, 94:24, 94:25, 97:25, 98:13, 103:5, 105:9, 105:10, 105:18, 105:20, 108:8, 109:4, 111:9, 112:22
**fit** [3] - 106:2, 106:4, 108:13
**five** [3] - 31:3, 101:17, 105:11
**fixed** [15] - 11:9, 30:15, 33:12, 60:16, 61:23, 68:9, 78:20, 87:16, 102:14, 102:18, 106:5, 106:6, 108:2
**flag** [1] - 100:24
**flaw** [1] - 112:14
**flawed** [1] - 43:7
**flaws** [1] - 11:7
**flexibility** [1] - 29:17
**flip** [1] - 42:15
**float** [1] - 97:4
**floats** [1] - 106:14
**fluent** [3] - 14:1, 14:2, 14:5
**focus** [3] - 25:1, 25:13, 118:12
**focusing** [2] - 25:18, 43:17
**follow** [1] - 32:9
**following** [7] - 4:11, 6:11, 72:22, 93:11, 99:12, 116:16, 117:23
**follows** [2] - 70:19, 99:19
**footing** [2] - 120:1, 120:5
**Footnote** [1] - 11:13
**footnote** [1] - 103:8
**FOR** [4] - 1:1, 2:5, 2:9, 2:14
**force** [2] - 53:11, 57:16, 58:4
**foregoing** [2] - 102:19, 122:12
**forget** [1] - 70:21
**forgive** [1] - 112:6
**Form** [2] - 10:13, 10:14
**form** [2] - 47:10, 56:2
**formal** [1] - 96:8
**formerly** [1] - 94:8
**forms** [1] - 113:11
**formula** [1] - 112:19
**forth** [16] - 8:2, 31:19, 32:3, 53:19, 56:3, 60:23, 79:3, 83:10, 83:11, 83:13, 84:18, 85:2, 95:19, 102:6, 104:5, 122:13
**forum** [1] - 16:4
**forward** [14] - 29:12, 36:11, 36:12, 39:14, 39:17, 44:17, 46:8, 50:15, 53:24, 78:6, 82:10, 84:16, 105:16
**four** [14] - 8:1, 8:20, 15:17, 23:1, 23:12, 29:9, 50:12, 50:13, 50:23, 61:8, 64:20, 64:22, 121:11
**four-part** [1] - 15:17

**fourth** [2] - 7:18, 19:19
**fractional** [1] - 52:20
**frame** [1] - 33:10
**frankly** [5] - 11:10, 13:17, 20:16, 21:17, 69:17
**fraud** [1] - 61:17
**frummer** [1] - 97:21
**FSC** [30] - 3:17, 3:22, 5:12, 8:18, 8:24, 10:10, 10:11, 10:13, 11:17, 11:22, 12:5, 13:18, 20:13, 24:22, 25:3, 37:5, 80:2, 86:24, 87:18, 92:2, 98:14, 98:15, 98:16, 99:16, 99:24, 101:10, 104:6, 104:12, 118:13
**FSC's** [5] - 7:12, 10:25, 12:18, 100:1, 100:21
**FSC/SUNAMERICA** [1] - 2:9
**FSC/Wharton** [1] - 32:10
**FSC/Wharton's** [2] - 85:6, 103:19
**full** [6] - 28:2, 28:15, 30:25, 31:11, 46:24, 87:8
**fully** [2] - 42:5, 49:15
**function** [7] - 21:12, 36:5, 70:12, 70:13, 70:25, 71:1, 71:18
**Fund** [1] - 12:19
**fund** [17] - 23:16, 44:1, 44:2, 44:23, 45:12, 61:25, 68:19, 68:20, 75:9, 75:14, 75:15, 75:18, 75:19, 75:20, 109:22, 115:25, 117:16
**fundamental** [3] - 14:10, 42:8, 61:14
**funded** [1] - 52:6
**funding** [3] - 83:8, 92:24, 116:14
**Funds** [3] - 5:18, 7:15, 15:9
**funds** [16] - 5:25, 6:2, 10:1, 40:6, 54:11, 55:2, 65:24, 66:3, 82:20, 103:24, 107:14, 113:1, 115:22, 116:1, 116:4
**furnace** [1] - 51:22
**future** [5] - 39:10, 46:8, 53:4, 63:2, 65:12
**futures** [1] - 65:4

**G**

**gain** [3] - 37:22, 44:18, 45:25
**gained** [3] - 50:14, 50:22, 64:21
**gains** [4] - 59:7, 114:2, 114:3, 114:21
**garnered** [1] - 37:9
**gather** [1] - 48:5
**general** [4] - 5:9, 7:24, 63:19, 96:12
**generally** [3] - 43:6, 109:22, 120:20
**generate** [1] - 26:19
**GENTILE** [24] - 2:11, 3:23, 51:12, 57:1, 57:15, 57:25, 58:18, 58:21, 58:23, 59:21, 60:11, 61:5, 64:7, 80:18, 80:22, 81:6, 81:8, 83:24, 84:10, 86:8, 88:19, 103:3, 103:5, 104:17
**Gentile** [5] - 3:23, 25:11, 31:11, 51:8, 51:11
**genuine** [1] - 102:20
**Georgia** [1] - 2:9

**GERALD** [1] - 1:4
**GERRY** [1] - 1:15
**given** [13] - 7:19, 8:18, 16:4, 24:22, 29:11, 31:6, 60:22, 64:24, 69:12, 69:17, 76:1, 89:5, 119:9
**GIW** [4] - 9:18, 79:16, 108:22
**goal** [10] - 14:22, 52:25, 69:21, 69:23, 78:16, 78:19, 79:16, 118:9, 118:14, 120:7
**goals** [4] - 47:17, 47:18, 69:20, 117:13
**GOLDENBERG** [1] - 1:3
**Goldenberg** [26] - 3:3, 13:13, 13:14, 13:17, 14:1, 14:8, 39:8, 40:24, 47:21, 50:8, 54:16, 54:23, 59:2, 62:7, 62:11, 62:16, 62:22, 63:8, 63:14, 63:18, 63:22, 64:14, 76:6, 89:18, 114:13
**Goldenberg's** [3] - 39:11, 61:1, 82:24
**govern** [1] - 84:18
**governed** [3] - 83:22, 91:2, 91:18
**governs** [1] - 85:4
**grandchildren** [1] - 62:17
**granted** [1] - 47:7
**grave** [1] - 35:17
**great** [1] - 96:18
**greater** [1] - 18:20
**greatest** [1] - 39:19
**Greer** [1] - 115:20
**grievances** [2] - 66:14, 67:4
**group** [11] - 23:16, 36:8, 38:3, 41:25, 42:6, 42:12, 42:23, 50:20, 55:25, 112:13, 118:24
**Group** [25] - 3:19, 25:4, 30:19, 31:3, 33:16, 34:16, 86:24, 87:18, 87:23, 88:1, 88:6, 91:11, 92:7, 92:9, 92:25, 93:5, 93:9, 93:22, 94:4, 99:2, 100:23, 102:5, 102:16, 104:6, 104:12
**Group's** [1] - 99:2
**Groussman** [3] - 38:20, 43:18
**Grovers** [1] - 2:4
**grow** [1] - 73:6
**growing** [2] - 53:2, 75:9
**guarantee** [1] - 58:9
**guaranteed** [2] - 46:23
**guarantees** [1] - 97:8
**guess** [7] - 28:16, 34:4, 35:12, 57:15, 58:1, 61:22, 96:15
**guessing** [1] - 78:7
**guide** [1] - 84:25
**guidelines** [3] - 86:6, 92:4, 92:22
**Guidelines** [1] - 95:8
**guise** [1] - 56:6
**guy** [1] - 61:19
**gyration** [1] - 49:20
**gyrations** [1] - 48:6

---

**H**

**half** [4] - 28:1, 28:25, 42:12, 43:14
**hand** [3] - 29:25, 59:24

---

**handful** [1] - 19:24
**handle** [1] - 121:9
**happy** [1] - 28:14
**harbor** [2] - 9:23, 107:13
**harbors** [1] - 9:21
**hard** [1] - 79:10
**hardship** [1] - 66:3
**harkened** [1] - 26:2
**harm** [7] - 37:18, 37:22, 37:23, 38:1, 43:5, 43:6
**harmed** [6] - 41:7, 43:14, 43:20, 45:4, 45:19, 51:4
**harming** [1] - 45:20
**harms** [4] - 44:4, 48:9, 50:24
**harness** [1] - 57:18
**head** [3] - 67:7, 77:3, 115:18
**hear** [3] - 4:10, 22:6, 72:3
**heard** [3] - 16:14, 115:9, 120:13
**heavily** [2] - 36:21, 48:3
**held** [14] - 5:22, 12:23, 14:4, 14:14, 15:2, 15:11, 22:12, 31:3, 51:20, 52:13, 72:14, 76:10, 117:8
**help** [3] - 38:10, 111:12, 111:14
**helpful** [1] - 112:8
**Hembrough** [11] - 8:15, 10:16, 30:18, 87:22, 89:1, 98:17, 101:4, 101:13, 101:22, 103:20, 116:12
**Hembrough's** [2] - 100:11, 101:9
**Henry** [2] - 51:20, 103:21
**Herculean** [1] - 35:17
**hereafter** [1] - 99:12
**hereby** [1] - 122:12
**hereinbefore** [1] - 122:13
**hereof** [1] - 81:24
**Hewitt** [3] - 87:14, 107:23
**high** [3] - 23:10, 71:3, 117:8
**higher** [2] - 31:24, 53:6
**highlights** [1] - 38:3
**highly** [1] - 14:11
**himself** [4] - 50:8, 106:21, 115:1, 118:25
**hindsight** [9] - 33:4, 35:11, 37:10, 47:15, 49:2, 61:7, 61:9, 61:21, 114:15
**HINSON** [4] - 2:8, 3:21, 115:9, 115:12
**Hinson** [1] - 3:21
**hint** [1] - 106:9
**hired** [2] - 78:20, 116:7
**hires** [2] - 75:21, 111:13
**hiring** [1] - 104:16
**historic** [2] - 60:25, 61:13
**historical** [1] - 48:3
**historically** [4] - 31:25, 53:7, 82:15, 84:12
**history** [4] - 19:11, 101:6, 101:7, 104:5
**hit** [2] - 22:25, 54:8
**Holbrook** [2] - 117:5, 117:6
**hold** [2] - 14:12, 87:11
**holding** [4] - 6:25, 69:12, 77:3, 93:14
**holds** [2] - 14:6, 84:5
**home** [1] - 22:25

---

**Honor** [118] - 3:10, 3:13, 3:16, 3:21, 3:23, 4:4, 4:7, 4:18, 4:21, 12:16, 13:3, 13:5, 13:9, 14:11, 16:11, 16:20, 17:24, 18:4, 21:16, 22:6, 22:21, 24:15, 24:17, 27:24, 29:22, 30:9, 30:24, 33:5, 36:15, 37:20, 39:22, 43:11, 49:22, 51:8, 51:12, 51:13, 55:7, 56:7, 56:12, 57:1, 57:10, 57:15, 57:25, 58:21, 59:15, 60:11, 61:5, 64:7, 67:5, 67:11, 67:16, 67:17, 67:20, 68:13, 69:4, 69:5, 69:6, 69:19, 72:3, 72:11, 73:21, 75:16, 76:4, 77:22, 78:2, 78:10, 79:9, 79:22, 80:8, 80:18, 80:22, 84:11, 85:8, 86:1, 88:19, 89:9, 89:11, 90:25, 92:17, 93:12, 93:21, 94:2, 94:14, 94:17, 94:20, 94:22, 95:7, 95:12, 95:13, 95:22, 96:5, 96:15, 97:6, 97:15, 97:18, 98:8, 98:25, 102:2, 102:19, 102:23, 103:3, 103:17, 104:10, 104:13, 104:17, 105:1, 105:4, 106:5, 111:11, 115:9, 115:12, 115:14, 117:11, 119:5, 121:3, 121:4, 121:7
**HONORABLE** [1] - 1:19
**hope** [1] - 97:4
**horizon** [4] - 47:18, 53:10, 58:2
**host** [1] - 10:20
**human** [1] - 62:10
**hunt** [1] - 65:14
**Hydrogen** [3] - 6:17, 27:7, 69:13
**hypothetical** [3] - 106:7, 106:20, 117:23

---

**I**

**I.R.S** [1] - 10:14
**idea** [6] - 53:5, 60:24, 81:25, 107:20, 112:6
**identical** [2] - 70:2, 117:19
**identify** [1] - 60:9
**ignore** [3] - 30:16, 38:17, 39:25
**ignored** [1] - 24:11
**illustrating** [1] - 67:23
**imaginary** [1] - 56:21
**imagine** [3] - 57:16, 86:12, 86:15
**impact** [4] - 21:11, 31:6, 114:19, 120:9
**impacted** [1] - 7:16
**impeached** [1] - 66:21
**impetus** [2] - 88:10
**implausible** [1] - 79:12
**implement** [1] - 37:5
**implementation** [1] - 20:2
**implemented** [3] - 6:10, 32:10, 32:13
**implementing** [1] - 95:17
**implicate** [2] - 8:1, 56:3
**implicates** [3] - 7:5, 7:21, 7:24
**implication** [1] - 7:25
**implications** [3] - 7:10, 7:14, 7:17
**implies** [1] - 91:7
**importance** [3] - 9:17, 91:24, 92:5
**important** [13] - 9:14, 9:15, 25:5, 25:21, 26:21, 29:25, 31:15, 54:24, 75:17,

75:19, 77:9, 78:5, 117:21
**importantly** [1] - 26:17
**impose** [6] - 36:10, 40:1, 45:2, 47:25, 56:7, 65:8
**imposes** - 98:14
**imposing** [1] - 43:13
**impossible** [1] - 118:13
**impractical** [1] - 93:24
**improper** [3] - 77:19, 79:24, 120:24
**imprudent** [2] - 36:21, 114:17
**in-depth** [1] - 100:20
**inaccurate** [1] - 71:19
**inadequate** [6] - 27:5, 48:24, 51:7, 63:8, 64:11, 87:24
**inappropriate** [6] - 31:21, 42:24, 47:22, 48:24, 50:10, 76:8
**inartful** [1] - 77:22
**inasmuch** [1] - 70:7
**INC** [2] - 1:10, 1:11
**Inc** [1] - 3:3
**incentive** [2] - 14:17, 67:3
**incentives** [1] - 66:25
**incentivized** [1] - 15:22
**inception** [3] - 81:16, 85:6, 90:4
**incidentally** [1] - 19:3
**inclined** [1] - 7:25
**include** [3] - 25:24, 81:2, 117:4
**included** [4] - 11:23, 27:5, 30:20, 30:22
**including** [6] - 3:5, 3:25, 27:18, 52:15, 54:18, 99:14
**income** [12] - 11:9, 30:15, 33:12, 60:16, 61:23, 65:25, 66:11, 68:9, 78:21, 102:14, 102:18
**incompatibility** [1] - 23:14
**incompatible** [8] - 15:1, 15:8, 15:13, 22:5, 22:7, 22:11, 23:9, 26:5
**incongruous** [1] - 56:17
**inconsistent** [7] - 14:13, 14:25, 15:8, 26:8, 68:18, 69:3, 107:5
**incorporate** [1] - 85:24
**incorporated** [1] - 84:15
**incorrect** [1] - 70:17
**increase** [1] - 61:10
**increasing** [1] - 56:25
**incredibly** [1] - 35:18
**incumbent** [1] - 17:12
**incur** [1] - 94:24
**incurred** [1] - 29:5
**indeed** [9] - 26:1, 27:1, 27:10, 27:11, 28:14, 29:25, 35:4, 35:22, 40:3
**indefinite** [1] - 53:3
**INDEL** [1] - 1:10
**Indel** [10] - 3:3, 8:18, 12:2, 12:7, 13:17, 20:13, 25:12, 39:9, 64:23, 98:12
**Indel's** [2] - 5:12, 7:11
**independent** [1] - 103:9
**independently** [1] - 114:5
**indicate** [2] - 11:14, 78:18
**indicated** [4] - 69:10, 69:24, 77:14,

77:16
**indicates** [1] - 10:11
**indicating** [2] - 13:14, 13:20
**indicator** [1] - 117:22
**indifferent** [2] - 76:20, 76:21
**individual** [39] - 3:25, 9:7, 12:2, 12:25, 15:22, 16:18, 16:21, 18:15, 21:4, 26:1, 39:4, 39:11, 39:13, 40:13, 41:1, 41:11, 41:20, 41:23, 45:9, 47:19, 48:23, 50:5, 50:7, 50:13, 52:18, 53:10, 53:12, 55:12, 55:13, 56:16, 57:8, 59:18, 62:3, 72:23, 76:18, 80:1, 112:18, 113:7, 113:8
**INDIVIDUAL** [1] - 2:15
**individual's** [3] - 43:19, 50:4, 53:11
**individualized** [5] - 19:23, 38:25, 39:2, 40:23, 46:24
**individually** [3] - 1:10, 15:19, 55:14
**individuals** [17] - 15:21, 41:17, 41:18, 44:5, 45:13, 45:25, 50:9, 52:20, 54:1, 72:14, 98:20, 103:20, 112:11, 118:23, 119:9, 119:11, 119:12
**individuals'** [1] - 101:18
**induction** [1] - 51:22
**Inductotherm** [21] - 3:6, 3:24, 4:5, 4:9, 4:14, 8:23, 30:14, 51:15, 51:19, 52:5, 53:14, 53:24, 54:1, 54:17, 62:10, 64:19, 65:3, 65:18, 81:19, 85:19, 90:13
**INDUCTOTHERM** [4] - 1:6, 1:10, 1:11, 2:14
**Industries** [1] - 9:18
**INDUSTRIES** [2] - 1:10, 2:14
**industry** [1] - 57:19
**inequitable** [1] - 50:23
**inevitably** [1] - 74:2
**infer** [1] - 88:20
**inferable** [1] - 88:15
**inference** [3] - 88:11, 88:20, 89:3
**inferences** [3] - 88:17, 95:10, 97:13
**inferential** [1] - 120:12
**infinite** [1] - 39:7
**inflexible** [2] - 43:7, 73:16
**information** [31] - 8:16, 8:22, 9:3, 30:22, 39:4, 42:5, 48:4, 48:25, 57:1, 57:11, 68:18, 68:23, 72:6, 74:16, 74:17, 75:2, 75:4, 76:1, 88:18, 88:24, 92:23, 99:12, 99:13, 99:23, 100:10, 102:9, 102:10, 106:11, 113:17, 113:18
**informed** [2] - 28:17, 49:15
**informs** [1] - 11:3
**infractions** [2] - 87:22, 104:4
**initiated** [1] - 93:17
**initiation** [2] - 93:20, 102:15
**injury** [3] - 26:15, 50:18, 64:22
**inquired** [3] - 69:6, 72:11, 77:22
**inquiry** [5] - 21:18, 27:1, 69:17, 74:24, 82:24
**inscribed** [1] - 28:22
**insisted** [1] - 19:25

**insofar** [6] - 4:25, 7:25, 70:9, 72:15, 76:22, 120:14
**instance** [5] - 19:17, 22:9, 74:7, 109:10, 112:1
**instructed** [2] - 12:7, 77:20
**instructs** [1] - 27:8
**instrument** [1] - 60:22
**instruments** [2] - 60:16, 83:14
**integrate** [1] - 98:5
**integrated** [9] - 81:17, 82:3, 83:1, 89:25, 90:2, 90:5, 90:7, 97:20, 98:4
**integrating** [1] - 90:17
**intelligent** [1] - 14:16
**intended** [1] - 63:25
**intensive** [1] - 17:11
**intentionally** [1] - 54:10
**interclass** [2] - 25:9, 51:6
**interest** [7] - 15:18, 26:24, 27:4, 48:17, 52:23, 65:14, 77:12
**interested** [4] - 29:13, 62:24, 119:5, 119:7
**interesting** [2] - 65:16, 116:15
**interests** [6] - 19:15, 20:1, 39:13, 50:9, 50:24, 116:24
**interfacing** [1] - 63:14
**Internal** [3] - 82:4, 82:5, 82:6
**Internet** [1] - 87:20
**interpret** [1] - 85:21
**interpretation** [6] - 85:18, 91:15, 95:23, 97:19, 97:23, 97:24
**interrupt** [1] - 95:24
**interviewed** [1] - 99:1
**introduce** [2] - 3:18, 3:25
**inured** [1] - 92:1
**invalid** [2] - 31:21, 49:19
**invest** [5] - 5:18, 10:12, 36:4, 54:11, 54:15, 66:6, 72:23, 109:24, 112:12, 112:19, 113:1, 116:2
**invested** [17] - 5:25, 34:10, 35:6, 36:21, 44:6, 48:3, 49:2, 52:15, 61:7, 66:5, 66:7, 84:6, 102:14, 102:15, 107:15, 108:23, 118:7
**investigate** [1] - 104:7
**investigating** [1] - 99:4
**investigation** [16] - 7:12, 12:18, 26:23, 86:9, 86:13, 86:14, 87:25, 88:2, 98:13, 98:15, 98:25, 100:8, 103:17, 103:18, 104:9, 104:11
**investing** [2] - 31:25, 105:13
**investment** [81] - 3:19, 5:23, 6:8, 9:21, 10:10, 10:12, 10:14, 10:15, 10:20, 11:4, 11:14, 12:19, 15:9, 19:13, 19:21, 19:23, 19:25, 20:3, 20:11, 20:21, 31:19, 31:21, 32:1, 32:8, 32:19, 32:21, 33:9, 34:9, 36:3, 37:1, 37:6, 38:19, 41:16, 42:7, 47:15, 49:9, 49:23, 50:5, 55:25, 56:7, 60:18, 60:19, 62:1, 65:2, 67:17, 74:13, 81:12, 82:22, 84:2, 84:22, 85:6, 85:7, 85:13, 86:5, 86:18, 86:21, 87:2, 87:9, 87:13, 87:15, 91:1,

91:18, 92:4, 92:21, 93:12, 95:8, 95:17, 101:22, 101:25, 102:5, 105:14, 107:9, 107:24, 109:21, 111:16, 112:11, 116:6, 116:8, 116:9, 116:18, 119:13
**Investment** [32] - 30:14, 31:1, 31:14, 31:18, 32:5, 32:12, 33:7, 52:25, 53:4, 54:13, 66:7, 68:4, 68:8, 69:20, 85:3, 85:24, 91:11, 92:7, 92:9, 92:25, 93:5, 93:10, 93:17, 93:18, 93:19, 93:21, 93:22, 94:4, 94:9, 101:25, 102:16, 106:15
**investments** [30] - 19:23, 33:17, 34:15, 43:21, 46:8, 48:21, 48:22, 52:12, 52:20, 58:6, 61:23, 61:24, 64:25, 72:19, 73:10, 83:22, 84:19, 85:11, 92:2, 92:4, 92:15, 93:4, 93:7, 101:15, 103:21, 106:17, 113:8, 115:2, 118:5
**invite** [1] - 35:12
**inviting** [1] - 26:8
**invoke** [2] - 36:16
**involved** [3] - 13:23, 117:12
**involvement** [1] - 63:16
**involving** [1] - 38:25
**IRA** [1] - 56:15
**irrelevant** [2] - 71:7, 71:8
**issue** [24] - 5:14, 9:5, 18:12, 20:20, 26:2, 41:14, 43:21, 47:12, 61:14, 76:10, 80:15, 85:15, 95:11, 105:23, 108:17, 110:13, 110:14, 110:22, 113:9, 114:7, 115:10, 118:16, 120:5, 120:22
**issued** [2] - 96:23, 107:5
**issues** [42] - 4:23, 5:19, 6:6, 8:5, 16:22, 16:25, 17:1, 21:17, 26:11, 38:25, 39:2, 45:8, 45:9, 46:24, 47:3, 47:4, 51:9, 51:16, 66:18, 77:18, 115:15
**Item** [2] - 121:12, 121:13
**iterations** [1] - 82:17
**itself** [13] - 23:1, 56:24, 58:20, 59:20, 70:11, 71:1, 75:19, 75:20, 85:1, 88:20, 99:13, 105:9, 106:12

## J

**January** [7] - 37:5, 37:7, 37:14, 37:18, 37:24, 38:9, 69:1
**JBS** [1] - 1:9
**JEROME** [1] - 1:19
**Jersey** [4] - 2:5, 2:14, 122:11, 122:12
**JERSEY** [2] - 1:1, 1:16
**job** [1] - 49:24
**JOHN** [1] - 1:15
**Judge** [15] - 25:5, 33:3, 33:14, 34:6, 38:14, 40:3, 40:12, 42:18, 48:11, 50:13, 55:5, 55:21, 55:22, 89:17, 103:12
**judge** [4] - 29:13, 31:13, 45:1, 69:10
**JUDGE** [2] - 1:20, 1:20
**judgment** [15] - 3:6, 4:14, 8:6, 46:21, 47:8, 74:15, 80:15, 88:16, 89:3, 95:9,

95:20, 96:1, 97:3, 104:19
**judgments** [1] - 121:14
**judicial** [1] - 43:13
**jump** [1] - 41:9
**jumps** [1] - 46:15
**jurisprudence** [1] - 14:23
**justice** [1] - 24:7
**justification** [1] - 45:22

## K

**keep** [1] - 53:1
**keeping** [2] - 52:22, 73:17
**kept** [1] - 113:24
**key** [4] - 25:23, 54:4, 54:5, 63:13
**kind** [7] - 56:20, 88:7, 96:9, 105:23, 107:14, 111:2, 111:3
**kinds** [2] - 23:25, 67:10
**knot** [1] - 96:14
**knowing** [1] - 19:6
**knowledge** [3] - 14:10, 63:19, 110:16
**knowledgeable** [1] - 14:15
**knows** [3] - 32:22, 85:8, 109:24
**Konigsberg** [1] - 13:4
**Krupnick** [10] - 4:1, 87:25, 88:3, 88:17, 89:5, 99:10, 100:20, 104:1, 104:2
**Krupnick's** [7] - 87:17, 88:21, 98:23, 99:17, 100:2, 101:3

## L

**Labor** [7] - 10:2, 107:6, 107:8, 107:14, 112:25, 113:4
**laborer** [1] - 64:12
**laborers** [1] - 14:19
**lack** [2] - 86:8, 88:12
**lacked** [1] - 75:3
**lacking** [1] - 101:21
**laid** [1] - 57:22
**Lakind** [12] - 3:11, 3:12, 3:14, 4:19, 28:4, 35:25, 67:15, 73:8, 89:8, 89:10, 115:13
**LAKIND** [74] - 2:2, 2:3, 2:4, 3:10, 3:13, 4:18, 4:21, 13:9, 16:11, 16:20, 17:17, 17:24, 18:4, 20:5, 20:8, 22:6, 22:10, 22:19, 22:23, 23:2, 23:4, 23:8, 24:1, 24:3, 24:8, 24:13, 24:15, 67:16, 70:17, 72:22, 73:7, 73:9, 73:21, 74:6, 74:19, 74:22, 75:10, 75:16, 75:22, 76:21, 77:9, 78:10, 79:9, 80:8, 89:9, 94:17, 94:20, 94:22, 95:7, 96:5, 96:15, 96:21, 97:6, 97:15, 98:11, 100:6, 100:16, 102:4, 103:1, 105:1, 115:14, 115:23, 116:1, 116:20, 116:22, 117:2, 117:17, 119:1, 119:4, 119:10, 120:4, 121:3, 121:7, 121:15
**landscape** [1] - 26:12
**language** [6] - 81:25, 83:20, 84:3, 91:3,

91:7, 93:11
**large** [9] - 8:25, 9:12, 21:3, 21:5, 56:10, 71:20, 86:19, 92:16, 92:19
**largely** [2] - 8:5, 58:5
**last** [6] - 32:3, 57:10, 67:15, 74:12, 90:8, 98:6
**late** [4] - 61:13, 97:10, 103:22, 121:4
**launched** [1] - 43:7
**law** [28] - 3:11, 3:14, 4:24, 6:11, 14:13, 14:19, 17:7, 17:9, 25:6, 25:21, 26:12, 26:22, 33:3, 43:16, 59:5, 63:15, 76:7, 76:9, 76:15, 77:11, 79:10, 84:8, 95:19, 107:4, 114:7, 117:25, 119:15
**Lawrence** [1] - 4:1
**Lawrenceville** [1] - 2:5
**lawsuit** [1] - 63:16
**lawsuits** [1] - 46:2
**lead** [3] - 27:15, 47:4, 68:16
**leading** [2] - 29:25, 51:21
**learned** [2] - 88:6, 110:15
**learning** [1] - 116:25
**least** [8] - 23:22, 26:15, 57:5, 57:11, 79:9, 92:22, 96:10, 119:8
**leave** [6] - 53:18, 76:11, 77:1, 77:5, 96:16, 97:9
**leaves** [1] - 81:11
**leaving** [1] - 65:3
**left** [13] - 28:4, 59:10, 59:12, 64:19, 70:18, 71:2, 71:3, 75:24, 75:25, 76:2, 76:22, 87:14
**legal** [4] - 4:25, 27:7, 27:16, 109:8
**legally** [1] - 20:6
**lengthy** [1] - 115:14
**Leonard** [1] - 13:15
**less** [8] - 6:2, 18:7, 45:5, 63:1, 66:4, 73:3, 113:15, 117:11
**letter** [2] - 28:9, 89:18
**letters** [1] - 82:4
**level** [2] - 105:25, 109:17
**leveled** [1] - 60:7
**levels** [1] - 35:24
**lever** [3] - 59:24, 59:25, 60:4, 60:10
**LEVIN** [7] - 2:12, 4:4, 105:4, 109:24, 112:14, 112:21, 115:8
**Levin** [2] - 4:4, 105:5
**Levy** [1] - 13:4
**liability** [6] - 6:7, 6:18, 79:3, 79:13, 98:14, 117:9, 120:5
**liable** [1] - 9:19
**lickety** [1] - 29:19
**lickety-split** [1] - 29:19
**life** [3] - 39:7, 58:10, 59:7
**lifetime** [1] - 60:25
**light** [1] - 102:21
**likely** [7] - 48:9, 64:25, 66:24, 67:10, 68:15, 69:9, 77:12
**likewise** [1] - 47:23
**limited** [5] - 6:19, 21:19, 63:11, 63:19, 113:13

**line** [4] - 33:20, 79:6, 79:10, 111:9
**lines** [2] - 34:2, 99:13
**Lines** [1] - 99:18
**lining** [1] - 46:2
**liquid** [1] - 58:6
**liquidated** [1] - 108:23
**liquidity** [10] - 58:3, 69:22, 108:19, 108:25, 117:22, 117:25, 118:7, 118:14, 119:18, 119:22
**LISA** [3] - 1:24, 122:10, 122:15
**list** [3] - 42:2, 86:23, 101:11
**listed** [1] - 69:20
**literature** [2] - 107:4, 107:17
**litigation** [17] - 15:19, 15:20, 15:22, 17:7, 25:2, 25:25, 26:20, 29:5, 37:10, 38:24, 41:15, 89:15, 89:17, 102:16, 107:18, 118:19, 120:10
**LLP** [1] - 2:10
**locked** [2] - 59:6, 63:4
**lockstep** [2] - 113:19
**LOEW** [1] - 1:4
**Loew** [11] - 39:8, 47:23, 50:11, 50:22, 59:10, 64:16, 64:18, 64:24, 65:10, 76:16, 77:14
**logical** [1] - 56:22
**Long-Short** [4] - 5:18, 7:15, 12:19, 15:9
**long-term** [7] - 30:16, 32:6, 39:7, 39:25, 48:5, 50:5, 108:23
**longest** [1] - 51:25
**look** [19] - 13:16, 29:9, 34:12, 38:16, 42:12, 49:25, 54:14, 59:1, 72:16, 74:25, 98:19, 106:15, 106:25, 107:2, 107:23, 109:6, 109:9, 113:2, 117:10
**looked** [4] - 36:6, 60:5, 100:15, 112:2
**looking** [3] - 50:6, 53:24, 78:7
**looks** [2] - 34:3, 119:25
**lose** [2] - 46:17, 65:5
**losers** [1] - 50:21
**loss** [8] - 37:22, 47:10, 68:6, 68:10, 91:13, 94:24, 95:5, 97:17
**losses** [11] - 9:12, 12:4, 21:3, 21:6, 42:21, 45:5, 63:4, 92:16, 92:19, 114:4, 114:21
**lost** [2] - 44:5, 114:17
**lottery** [3] - 48:14, 48:16, 48:17
**low** [1] - 71:4
**Lucy** [6] - 9:14, 21:8, 41:10, 43:10, 104:21, 121:9

**M**

**magistrate** [1] - 69:10
**makers** [1] - 28:9
**man** [1] - 32:25
**manage** [8] - 37:1, 56:19, 56:20, 75:18, 86:22, 87:10, 99:5, 100:7
**manageable** [1] - 16:16
**managed** [20] - 22:9, 39:20, 39:24, 52:3, 52:11, 53:19, 54:2, 54:25, 55:14,

55:20, 56:9, 60:4, 61:20, 63:2, 65:5, 65:12, 94:8, 99:3, 101:17, 109:22
**management** [10] - 16:7, 16:8, 32:13, 32:14, 33:8, 35:16, 36:24, 60:13, 116:7, 116:8
**manager** [4] - 10:15, 30:21, 62:10, 87:14
**managers** [4] - 32:8, 35:2, 61:25, 101:18
**managing** [9] - 98:16, 98:21, 100:11, 100:18, 101:14, 101:19, 103:20, 103:24, 115:21
**mandate** [2] - 58:14, 83:4
**mandated** [2] - 20:18, 65:21
**mandatory** [3] - 53:25, 58:16, 62:8
**manifestation** [1] - 83:19
**manifested** [1] - 87:11
**manner** [4] - 6:1, 13:1, 54:11
**Manning** [1] - 4:1
**mantle** [1] - 31:10
**manufactured** [1] - 13:13
**manufacturers** [2] - 57:18
**Marc** [1] - 99:24
**March** [7] - 11:17, 35:20, 68:2, 71:9, 71:10, 71:14, 102:13
**Marcus** [1] - 122:14
**MARCUS** [3] - 1:24, 122:10, 122:15
**mark** [1] - 33:5
**markedly** [1] - 63:3
**market** [31] - 33:20, 34:16, 34:18, 35:1, 35:5, 35:7, 35:9, 35:19, 36:1, 36:18, 36:20, 39:18, 48:6, 49:17, 49:20, 53:7, 59:3, 60:6, 60:18, 60:25, 61:6, 61:13, 62:11, 62:21, 64:6, 71:3, 74:7, 74:10, 78:12, 78:23, 118:22
**markets** [3] - 33:17, 62:14, 74:18
**Mart** [3] - 23:23, 25:20, 25:23
**MASTER** [1] - 1:6
**Master** [1] - 90:14
**material** [3] - 80:25, 102:20, 105:14
**materials** [4] - 31:2, 32:17, 87:8, 87:20
**mathematically** [1] - 34:4
**mathematician** [1] - 110:2
**mathematics** [3] - 110:3, 110:11, 110:20
**matter** [12] - 28:12, 33:3, 39:17, 49:17, 66:23, 74:12, 84:8, 94:2, 110:12, 110:14, 122:13
**matters** [7] - 26:17, 33:1, 63:19, 64:2, 64:14, 66:14, 67:1
**Matthew** [1] - 4:7
**MATTHEW** [1] - 2:13
**maximize** [2] - 14:17, 67:1
**maximizes** [1] - 41:2
**maximizing** [3] - 60:5, 62:25, 65:15
**maximum** [1] - 52:7
**McDowell** [1] - 70:5
**McMahon** [1] - 70:5
**McShane** [1] - 82:23

**McShane's** [1] - 57:2
**mean** [18] - 22:11, 22:25, 23:25, 29:8, 34:7, 34:25, 35:1, 43:25, 74:11, 74:13, 74:24, 79:5, 79:22, 83:25, 109:25, 111:6, 112:14, 114:6
**meaning** [2] - 90:23, 102:14
**means** [6] - 26:3, 28:24, 44:1, 86:13, 88:2, 89:4
**meant** [4] - 53:13, 88:23, 89:6, 113:5
**measurable** [1] - 120:18
**measure** [4] - 6:25, 109:7, 109:9, 120:21
**measured** [2] - 10:9, 16:9, 37:22
**measures** [1] - 9:10
**medical** [4] - 66:2, 77:18
**meet** [4] - 22:11, 22:14, 24:9, 48:25
**meeting** [9] - 13:21, 30:22, 31:1, 33:15, 35:4, 35:14, 87:12, 109:1, 120:2
**meetings** [5] - 31:2, 32:19, 34:14, 86:20, 87:7
**meets** [1] - 12:21
**meltdown** [1] - 61:13
**member** [6] - 23:21, 50:19, 51:4, 70:18, 71:6, 71:18
**members** [30] - 6:21, 7:4, 15:18, 18:1, 18:6, 23:24, 26:9, 26:14, 27:2, 41:6, 41:7, 42:11, 44:15, 46:5, 47:13, 50:25, 51:3, 55:13, 63:3, 63:25, 70:15, 70:25, 71:11, 71:20, 72:12, 72:16, 72:21, 76:18, 78:24
**mention** [5] - 30:20, 55:3, 76:3, 88:15, 110:7
**mentioned** [2] - 40:22, 78:2
**mere** [1] - 30:11
**merely** [3] - 27:9, 27:12, 35:15
**merits** [23] - 4:25, 5:6, 5:7, 5:13, 5:23, 6:15, 6:17, 8:7, 17:18, 21:17, 25:2, 27:18, 28:5, 29:21, 31:15, 44:20, 46:18, 67:22, 68:21, 94:5, 94:7, 96:6, 96:24
**Messrs** [1] - 8:15
**met** [4] - 22:1, 32:16, 37:16, 74:20
**method** [15] - 6:24, 7:1, 46:12, 106:4, 110:1, 110:5, 110:7, 113:6, 113:7, 113:14, 114:6, 114:8, 114:10, 114:25
**methodological** [1] - 113:9
**methodologically** [2] - 112:20, 112:21
**methodology** [25] - 11:19, 11:24, 12:8, 21:20, 21:21, 72:3, 72:6, 72:8, 72:9, 106:1, 106:3, 106:12, 106:19, 106:25, 107:16, 108:12, 113:11, 113:21, 114:2, 117:16, 117:24, 119:14, 119:16, 119:21, 119:25
**methods** [1] - 86:11
**metric** [1] - 119:10
**might** [13] - 5:5, 12:9, 17:24, 21:9, 36:3, 45:25, 57:20, 67:20, 71:11, 74:8, 88:9, 100:24, 117:22
**mild** [3] - 81:4, 81:6, 81:8
**Mill** [1] - 2:4
**million** [6] - 69:3, 70:22, 70:23, 71:5,

100:8
**mind** [2] - 12:9, 97:12
**minimal** [1] - 15:24
**minimize** [1] - 92:16
**minus** [4] - 36:9, 119:4, 119:7, 119:10
**minute** [1] - 103:4
**minutes** [9] - 8:11, 17:25, 30:23, 35:15, 54:8, 99:1, 100:25, 108:18, 109:1
**misconduct** [1] - 7:8
**misinterpreting** [2] - 99:9, 99:15
**miss** [1] - 33:5
**mitigation** [1] - 6:3
**mix** [1] - 72:18
**model** [13] - 6:8, 6:10, 12:2, 60:13, 60:21, 71:14, 87:2, 120:8, 120:9, 120:11, 120:12, 120:23, 120:25
**models** [2] - 48:2, 61:8
**moderate** [1] - 11:18
**moment** [3] - 42:20, 51:9, 78:4
**money** [37] - 12:6, 15:13, 21:14, 41:3, 41:13, 44:1, 44:5, 44:23, 45:6, 45:13, 46:25, 47:1, 48:14, 49:2, 50:20, 50:22, 54:15, 58:17, 58:25, 59:3, 59:4, 59:16, 65:5, 77:17, 79:19, 101:18, 108:20, 113:15, 113:16, 114:16, 114:17, 116:3, 118:7, 118:8
**moneys** [1] - 52:14
**month** [11] - 11:20, 33:14, 33:16, 34:9, 35:13, 49:9, 60:1, 60:10, 74:20, 108:21, 121:20
**monthly** [9] - 10:20, 12:4, 30:22, 31:1, 32:16, 32:18, 34:14, 35:14, 87:12
**months** [8] - 50:13, 50:23, 62:13, 64:20, 64:22, 96:22
**moreover** [1] - 85:25
**Morgan** [1] - 115:20
**morning** [1] - 40:4
**most** [27] - 5:25, 17:19, 17:20, 20:22, 22:16, 22:19, 22:20, 25:18, 26:3, 26:17, 27:5, 37:3, 46:5, 46:6, 63:3, 63:12, 63:18, 65:16, 66:10, 77:25, 86:19, 95:10, 102:21, 114:6, 114:8, 116:21
**mostly** [1] - 101:18
**motion** [44] - 3:5, 3:6, 4:13, 4:20, 4:23, 5:8, 8:6, 8:7, 16:13, 16:17, 17:5, 17:6, 28:24, 29:1, 29:24, 30:1, 30:11, 30:25, 55:4, 55:8, 57:4, 66:17, 80:22, 80:23, 81:1, 81:22, 88:4, 88:16, 89:3, 89:20, 90:3, 95:9, 95:20, 96:6, 96:25, 97:14, 98:2, 98:4, 104:20, 104:21, 105:6, 121:8, 121:13
**motions** [15] - 3:5, 3:7, 4:11, 4:12, 4:15, 28:8, 29:16, 29:21, 55:8, 80:12, 80:15, 95:25, 104:19, 121:12, 121:16
**motivations** [1] - 66:22
**Motorola** [1] - 38:20
**move** [5] - 8:4, 13:6, 80:10, 98:9, 98:10
**moved** [1] - 22:4
**moving** [1] - 97:17

**MR** [136] - 3:10, 3:13, 3:16, 3:21, 3:23, 4:4, 4:7, 4:18, 4:21, 13:9, 16:11, 16:20, 17:17, 17:24, 18:4, 20:5, 20:8, 22:6, 22:10, 22:19, 22:23, 23:2, 23:4, 23:8, 24:1, 24:3, 24:8, 24:13, 24:15, 24:17, 24:19, 25:16, 28:3, 28:11, 29:4, 29:22, 34:6, 34:12, 34:23, 34:25, 35:22, 37:17, 37:20, 37:25, 38:10, 39:22, 41:5, 42:16, 42:18, 43:11, 44:4, 44:11, 45:1, 45:18, 46:6, 46:19, 46:22, 49:12, 49:14, 50:2, 51:12, 57:1, 57:15, 57:25, 58:18, 58:21, 58:23, 59:21, 60:11, 61:5, 64:7, 67:16, 70:17, 72:22, 73:7, 73:9, 73:21, 74:6, 74:19, 74:22, 75:10, 75:16, 75:22, 76:21, 77:9, 78:10, 79:9, 80:8, 80:18, 80:22, 81:6, 81:8, 83:24, 84:10, 86:8, 88:19, 89:9, 94:17, 94:20, 94:22, 95:7, 96:5, 96:15, 96:21, 97:6, 97:15, 98:11, 100:6, 100:16, 102:4, 103:1, 103:3, 103:5, 104:17, 105:1, 105:4, 109:24, 112:14, 112:21, 115:8, 115:9, 115:12, 115:14, 115:23, 116:1, 116:20, 116:22, 117:2, 117:17, 119:1, 119:4, 119:10, 120:4, 121:3, 121:7, 121:15
**multiple** [3] - 15:5, 36:14, 36:16
**must** [9] - 16:5, 20:21, 26:15, 26:16, 27:16, 32:23, 42:21, 81:4, 91:20
**myriad** [3] - 38:24, 39:2, 40:22

# N

**N.J** [1] - 122:16
**nail** [1] - 24:4
**name** [1] - 105:4
**named** [10] - 25:13, 26:1, 26:24, 31:9, 59:1, 64:8, 64:10, 65:17, 67:7, 116:4
**names** [1] - 55:12
**narrowed** [1] - 86:23
**National** [1] - 82:17
**nature** [6] - 6:3, 12:24, 26:16, 56:14, 70:6, 75:25
**necessarily** [7] - 21:4, 34:6, 39:12, 41:5, 44:13, 50:8, 79:3
**necessary** [7] - 6:16, 20:1, 23:3, 29:1, 58:7, 84:8, 85:2
**necessity** [1] - 13:2
**need** [13] - 7:1, 11:5, 11:6, 12:17, 13:7, 17:4, 28:12, 57:25, 67:8, 67:9, 112:6, 113:13, 118:10
**needed** [2] - 91:23, 94:12
**needs** [7] - 44:11, 58:3, 63:9, 108:20, 108:25, 110:23, 120:4
**nephew** [1] - 77:18
**net** [2] - 44:18, 45:7
**never** [15] - 90:10, 90:11, 98:6, 101:22, 106:12, 106:13, 106:21, 106:23, 107:17, 107:18, 108:13, 110:15, 111:1, 111:7, 114:11

**new** [4] - 11:14, 43:13, 46:12, 86:17
**New** [4] - 2:5, 2:14, 122:11, 122:12
**NEW** [2] - 1:1, 1:16
**next** [10] - 14:24, 21:2, 32:5, 35:11, 67:2, 92:6, 94:14, 94:22, 95:22, 98:9
**nice** [1] - 119:25
**night** [1] - 121:21
**nine** [2] - 40:14, 40:17
**NO** [1] - 1:9
**nobody** [3] - 45:14, 48:18, 112:2
**non** [2] - 34:4, 72:18
**non-equity** [2] - 34:4, 72:18
**none** [8] - 14:6, 16:1, 16:2, 16:8, 74:16, 87:22, 104:5, 110:6
**nonetheless** [1] - 18:18
**nonmoving** [1] - 102:22
**nonparticipant** [7] - 101:15, 105:24, 107:9, 111:16, 113:1, 115:24, 116:2
**notably** [1] - 53:23
**Notary** [1] - 122:11
**note** [3] - 26:25, 54:25, 87:1
**noted** [5] - 28:4, 67:25, 90:25, 92:8, 92:11
**notes** [1] - 122:12
**nothing** [22] - 32:1, 36:22, 40:15, 45:14, 46:4, 59:17, 74:23, 77:19, 84:4, 85:15, 85:23, 92:25, 93:4, 97:2, 101:1, 102:24, 104:12, 106:9, 107:10, 108:3, 116:14
**notice** [3] - 23:20, 23:25, 77:19
**notion** [10] - 18:5, 19:1, 39:5, 79:11, 79:23, 97:11, 112:22, 114:3, 114:21, 115:2
**notional** [2] - 41:23, 52:22
**November** [2] - 55:5, 55:9
**number** [20] - 6:1, 8:25, 15:18, 17:2, 18:8, 21:17, 32:4, 43:24, 46:24, 53:25, 54:17, 57:7, 57:8, 69:21, 70:15, 72:22, 86:18, 103:22, 116:15, 117:18
**numbers** [3] - 43:10, 70:20, 71:3
**numerous** [1] - 90:24

# O

**objective** [1] - 32:1
**objectives** [4] - 31:19, 31:21, 32:21, 60:2
**obligation** [6] - 11:4, 14:4, 27:19, 27:21, 27:22, 79:13
**obvious** [1] - 50:18
**obviously** [4] - 29:4, 58:3, 103:19, 117:3
**occasions** [1] - 90:24
**occurred** [4] - 37:18, 43:5, 44:7, 68:6
**October** [3] - 9:25, 35:4, 69:2
**OF** [1] - 1:1
**offer** [2] - 11:4, 39:23
**Official** [2] - 122:10, 122:15
**OFFICIAL** [1] - 1:25
**offset** [1] - 114:3

often [2] - 96:9, 118:20
old [10] - 39:6, 40:13, 47:20, 47:21, 56:10, 56:16, 57:17, 73:2, 73:6, 118:2
older [6] - 19:2, 19:8, 21:15, 48:10, 113:15, 118:8
olds [3] - 42:1, 73:5, 118:1
once [13] - 5:18, 7:15, 13:20, 17:21, 54:8, 59:16, 61:20, 62:14, 73:11, 76:22, 77:1, 118:16, 120:22
one [104] - 3:18, 7:8, 8:8, 8:19, 14:24, 14:25, 15:8, 15:18, 16:5, 16:6, 17:2, 17:17, 18:8, 19:19, 20:9, 20:18, 21:14, 22:11, 23:5, 23:8, 23:17, 24:5, 26:10, 26:15, 30:7, 34:13, 34:14, 36:1, 36:5, 36:13, 36:17, 37:3, 38:3, 41:3, 41:13, 41:14, 41:15, 47:10, 47:20, 47:21, 49:11, 50:11, 51:21, 51:24, 54:4, 55:3, 55:6, 55:10, 58:1, 61:8, 62:21, 63:10, 63:15, 64:14, 65:17, 67:18, 69:7, 69:14, 69:21, 69:24, 71:16, 72:2, 72:23, 74:6, 74:7, 74:14, 75:14, 78:5, 78:6, 80:23, 84:7, 84:12, 86:24, 87:4, 87:13, 89:24, 90:21, 95:3, 100:18, 100:19, 102:4, 103:3, 103:4, 103:24, 105:19, 107:3, 109:4, 109:8, 110:23, 111:24, 112:22, 113:10, 113:12, 114:8, 114:25, 116:17, 117:18, 117:20, 118:2, 118:24
ONE [1] - 1:15
One [5] - 80:17, 80:19, 89:11, 103:9, 121:14
one's [1] - 19:11
ones [1] - 87:3
ongoing [1] - 53:3
onset [1] - 99:16
onward [1] - 82:2
operate [1] - 91:20
operates [2] - 55:17, 82:22
operating [2] - 37:6, 83:9
opine [1] - 96:21
opined [1] - 94:9
Opinion [3] - 55:22, 81:1, 121:19
opinion [6] - 17:14, 30:12, 31:20, 110:21, 110:22, 111:22
opinions [1] - 28:6
opportunities [1] - 60:18
opportunity [11] - 18:22, 19:22, 24:19, 28:9, 28:14, 41:18, 44:16, 80:24, 88:24, 89:1, 95:4
opposed [4] - 55:9, 55:10, 55:16
opposing [1] - 97:14
opposite [1] - 97:8
opposition [3] - 30:25, 57:3, 97:3
opt [4] - 22:9, 26:6, 26:7
optimal [3] - 18:12, 19:13, 38:15
opting [2] - 23:5, 23:6
option [7] - 20:14, 54:6, 55:2, 58:13, 62:19, 65:4
options [1] - 54:25
oral [3] - 3:4, 104:23, 115:16

Order [1] - 96:23
order [9] - 4:11, 6:16, 22:16, 24:9, 29:16, 42:11, 64:5, 92:24, 110:21
ordered [1] - 46:16
orientation [2] - 31:24, 53:6
origin [1] - 17:9
original [4] - 80:22, 82:18, 103:7, 122:12
originally [4] - 47:7, 52:13, 90:15, 90:19
otherwise [8] - 14:6, 14:19, 27:4, 32:2, 44:24, 79:24, 84:3
ought [2] - 43:4, 57:13
outcome [3] - 10:9, 12:21, 65:13
outlined [2] - 13:3, 60:12
outlook [1] - 33:17
outs [4] - 22:9, 26:6, 26:7, 64:6
outset [1] - 78:14
outside [9] - 9:18, 65:22, 75:1, 75:23, 80:25, 107:18, 114:11, 114:12, 118:19
outstanding [1] - 52:2
overall [1] - 44:2
overlap [1] - 27:17
overlay [1] - 6:11
oversight [1] - 18:20
owed [1] - 91:14
own [9] - 40:20, 41:19, 47:22, 52:19, 55:18, 55:19, 113:8, 115:4
ownership [1] - 52:23

## P

P.C [1] - 2:2
Pacheco [12] - 13:19, 14:8, 39:9, 65:16, 65:19, 66:4, 66:9, 66:12, 66:17, 66:21, 77:7, 77:16
PACHECO [1] - 1:4
Page [9] - 8:23, 8:24, 10:1, 55:22, 68:25, 90:3, 99:18, 102:17, 103:7
page [3] - 32:6, 90:8, 98:6
pages [1] - 100:16
paid [1] - 32:14
papers [9] - 89:21, 93:8, 97:17, 102:2, 111:6, 112:17, 112:25, 119:8, 121:9
paradigmatic [2] - 12:12, 15:2
parameters [2] - 32:8, 65:22
part [9] - 3:19, 15:17, 28:7, 31:14, 31:18, 73:1, 84:17, 94:15, 97:3
partial [5] - 3:6, 4:13, 80:15, 104:19, 121:13
partially [1] - 35:6
participant [11] - 10:3, 18:14, 19:15, 23:11, 55:20, 65:19, 106:7, 106:20, 107:11, 109:14, 112:23
participant's [1] - 31:7
participants [55] - 5:4, 7:20, 8:20, 8:24, 18:22, 19:3, 20:2, 20:4, 36:8, 36:17, 38:25, 40:16, 41:22, 42:3, 45:4, 47:2, 48:17, 50:6, 50:24, 51:2, 52:4, 52:19, 53:3, 53:16, 53:17, 53:20, 53:21, 54:5,

54:10, 55:1, 55:13, 55:15, 55:18, 56:8, 56:18, 56:19, 56:21, 57:7, 58:13, 62:23, 66:10, 92:1, 92:3, 93:4, 93:6, 94:12, 94:24, 95:16, 100:8, 101:16, 101:20, 107:7, 113:2, 114:20
participants' [1] - 41:11
participated [1] - 38:5
participating [2] - 14:21, 65:11
participation [3] - 50:14, 50:23, 76:13
particular [4] - 32:4, 108:21, 110:22, 111:20
particularly [4] - 7:20, 31:22, 54:23, 74:8
parties [5] - 17:18, 26:1, 26:24, 27:10, 46:10
party [2] - 97:13, 102:22
party's [1] - 27:14
passage [1] - 30:9
past [2] - 39:9, 99:22, 101:16
pay [5] - 53:2, 58:6, 73:1, 108:20
payments [1] - 83:12
Peachtree [1] - 2:8
peaks [1] - 34:4
Peck [1] - 115:20
peeking [1] - 29:20
Penata [1] - 117:10
pension [7] - 23:16, 91:25, 115:22, 115:25, 116:1, 116:4
people [38] - 8:25, 15:14, 19:1, 19:2, 21:14, 21:15, 23:16, 38:5, 39:13, 41:23, 43:8, 43:25, 44:10, 44:12, 44:21, 45:15, 45:16, 48:2, 48:9, 48:10, 49:7, 53:18, 54:14, 58:2, 58:4, 58:8, 58:20, 59:10, 79:18, 86:20, 109:3, 111:21, 113:15, 118:5, 118:8, 118:12, 119:20
per [2] - 54:7, 62:19
perceive [1] - 104:22
percent [44] - 8:20, 11:9, 11:11, 19:3, 30:15, 33:11, 33:12, 34:5, 41:25, 42:1, 42:6, 44:14, 44:22, 47:23, 47:24, 50:14, 52:7, 54:7, 54:20, 58:14, 59:8, 59:25, 60:1, 60:15, 60:16, 62:19, 64:22, 67:18, 68:1, 68:8, 68:9, 72:11, 72:13, 72:14, 72:17, 87:15, 87:16, 93:14, 105:14, 105:15
percentage [4] - 10:13, 10:19, 52:21, 52:23
percentages [2] - 57:9, 106:19
perfect [2] - 11:6, 46:3
performance [11] - 11:20, 11:21, 12:3, 30:22, 34:15, 40:8, 52:2, 68:19, 68:20, 74:18, 76:20
perhaps [5] - 57:19, 65:16, 117:23
period [23] - 33:21, 35:19, 37:4, 37:7, 37:9, 38:2, 38:6, 41:7, 42:8, 49:3, 53:16, 60:24, 61:2, 61:12, 61:24, 68:10, 69:1, 71:15, 85:5, 113:12, 113:13
periodically [1] - 73:18

**periods** [1] - 42:3
**permissible** [1] - 102:18
**permit** [2] - 26:7, 61:21
**permits** [3] - 4:15, 11:15, 18:20
**permitted** [2] - 27:11, 32:9
**Peroxide** [3] - 6:17, 27:8, 69:13
**person** [6] - 19:5, 19:6, 19:8, 39:6, 45:6, 59:16
**personal** [1] - 103:21
**personnel** [1] - 99:14
**persons** [1] - 1:5
**pertaining** [1] - 121:8
**pertinent** [2] - 71:19, 92:23
**Ph.D** [3] - 109:21, 110:2, 110:11
**Phillips** [1] - 13:4
**philosophy** [1] - 87:10
**pick** [3] - 50:21, 81:7, 107:22
**picked** [3] - 108:3, 108:8, 108:9
**picking** [1] - 61:23
**picture** [2] - 28:21, 59:24
**pieces** [1] - 113:6
**place** [10] - 36:24, 36:25, 41:8, 42:24, 49:10, 52:12, 84:20, 91:12, 92:7, 95:9
**placed** [3] - 52:14, 98:7, 100:25
**plain** [3] - 26:4, 90:23, 91:3
**plaintiff** [11] - 3:9, 5:6, 6:22, 14:14, 22:14, 26:14, 32:7, 37:7, 39:22, 66:9, 88:16
**plaintiff's** [1] - 31:7
**Plaintiffs** [1] - 1:7
**plaintiffs** [76] - 3:12, 3:15, 4:18, 5:13, 5:19, 6:3, 6:24, 10:5, 11:2, 14:12, 19:22, 21:25, 24:6, 25:14, 29:23, 30:10, 31:9, 31:19, 32:2, 33:5, 33:9, 33:22, 35:11, 35:22, 36:13, 38:14, 39:4, 39:14, 40:25, 41:12, 44:17, 44:19, 45:10, 45:13, 45:15, 46:17, 48:1, 48:7, 48:12, 48:20, 49:6, 49:17, 50:3, 50:15, 51:7, 55:5, 55:23, 56:5, 59:2, 60:3, 60:7, 60:23, 61:15, 62:3, 65:8, 65:21, 66:16, 69:2, 86:14, 87:3, 87:24, 88:24, 89:10, 90:21, 94:5, 95:11, 96:2, 103:10, 103:14, 103:17, 104:9, 105:1, 105:12, 108:21, 111:4, 115:6
**PLAINTIFFS** [1] - 2:5
**plaintiffs'** [18] - 13:1, 25:7, 31:16, 35:24, 38:2, 38:12, 39:3, 40:18, 47:19, 47:22, 50:12, 51:18, 57:4, 88:11, 89:12, 98:11, 104:21, 111:2
**plan** [40] - 32:2, 41:15, 41:16, 51:19, 51:24, 52:1, 53:9, 56:17, 56:19, 58:3, 58:6, 58:9, 73:1, 73:13, 76:11, 76:12, 76:14, 76:19, 76:22, 77:5, 91:25, 92:3, 100:12, 100:18, 101:19, 105:23, 106:23, 107:9, 107:14, 108:5, 109:14, 111:25, 116:11, 116:12, 116:13, 118:6, 118:8
**PLAN** [1] - 1:6
**Plan** [272] - 5:16, 5:17, 7:16, 7:19, 8:20,

9:8, 9:11, 11:11, 11:17, 11:21, 12:1, 12:2, 12:6, 12:24, 13:1, 15:4, 15:23, 16:5, 18:11, 18:13, 18:15, 19:13, 19:15, 19:17, 20:7, 20:13, 20:22, 21:10, 21:23, 25:12, 31:7, 32:22, 33:9, 36:8, 36:17, 37:1, 37:8, 38:5, 39:1, 39:6, 39:8, 39:14, 39:17, 39:20, 39:24, 40:1, 40:5, 40:8, 40:15, 40:16, 40:24, 41:2, 41:3, 41:4, 41:21, 41:24, 42:1, 42:3, 43:20, 44:16, 44:17, 45:5, 47:9, 47:11, 47:21, 48:14, 48:15, 49:8, 50:5, 50:12, 50:15, 50:23, 50:24, 51:2, 51:15, 51:19, 52:3, 52:6, 52:11, 52:17, 52:18, 52:21, 52:23, 52:25, 53:1, 53:12, 53:15, 53:19, 54:2, 54:4, 54:6, 54:7, 54:18, 54:20, 54:25, 55:4, 55:17, 55:18, 55:23, 56:9, 56:10, 56:11, 56:15, 56:23, 56:24, 56:25, 57:13, 58:11, 58:12, 58:20, 59:6, 59:10, 59:11, 59:12, 59:15, 59:20, 59:23, 60:2, 60:13, 60:20, 61:1, 62:14, 62:20, 63:1, 63:2, 63:5, 63:21, 64:1, 64:3, 64:20, 64:21, 65:1, 65:11, 65:12, 65:19, 65:23, 66:1, 66:4, 66:5, 66:8, 66:10, 66:11, 67:2, 67:25, 69:21, 70:7, 70:8, 70:9, 70:11, 70:23, 70:24, 70:25, 71:4, 71:5, 71:6, 71:11, 71:17, 71:19, 71:20, 72:7, 74:23, 75:1, 76:24, 77:8, 77:15, 77:17, 78:11, 78:16, 78:24, 79:14, 79:18, 80:20, 81:10, 81:15, 81:16, 81:18, 81:19, 82:2, 82:3, 82:6, 82:8, 82:9, 82:10, 82:12, 82:13, 83:2, 83:8, 83:10, 83:11, 83:12, 83:13, 83:14, 83:21, 83:23, 84:3, 84:15, 84:17, 85:1, 85:17, 85:19, 85:23, 86:17, 86:22, 87:10, 88:9, 89:21, 89:24, 90:2, 90:4, 90:12, 90:13, 90:14, 90:15, 90:17, 90:18, 90:19, 90:23, 90:24, 91:1, 91:3, 91:7, 91:17, 91:20, 91:21, 91:24, 92:2, 92:5, 92:12, 92:13, 92:14, 92:20, 92:22, 92:23, 92:24, 93:2, 93:23, 94:11, 95:15, 98:4, 98:6, 98:17, 99:3, 99:5, 100:7, 101:23, 102:12, 105:24, 106:18, 107:7, 108:21, 110:1, 111:1, 111:2, 111:3, 113:25, 114:13, 116:10, 119:11
**plan's** [2] - 76:20, 108:22
**Plan's** [12] - 11:20, 30:14, 31:19, 35:25, 42:6, 47:16, 47:17, 51:5, 56:2, 95:17
**planner** [2] - 59:5, 76:7
**plans** [19] - 46:11, 46:14, 51:25, 94:8, 98:21, 100:12, 101:8, 101:15, 101:17, 109:25, 110:7, 111:5, 111:16, 113:7, 116:6, 116:9, 116:21, 117:3, 117:4
**plant** [1] - 64:12
**plausibility** [2] - 43:4, 67:22
**plausible** [20] - 5:22, 6:8, 11:4, 20:24, 39:20, 44:17, 60:3, 79:3, 79:6, 79:7, 79:11, 79:23, 80:5, 88:21, 105:8, 105:18, 112:4, 112:5, 119:21, 120:6

**PLAZA** [1] - 1:15
**pleading** [1] - 28:22
**pleadings** [2] - 81:2, 81:3
**Plough** [2] - 12:11, 77:24
**plug** [1] - 109:17
**PNC** [5] - 52:13, 82:18, 82:19, 83:18
**pocket** [1] - 47:1
**point** [16] - 14:7, 16:10, 31:22, 36:6, 36:11, 36:18, 41:9, 43:11, 47:4, 58:2, 58:8, 64:9, 64:10, 74:1, 76:23, 117:15
**pointed** [1] - 111:6
**points** [3] - 67:5, 73:8, 78:5
**polices** [1] - 116:9
**policies** [1] - 119:13
**Policy** [31] - 30:14, 31:1, 31:14, 31:18, 32:5, 32:12, 33:7, 53:1, 53:4, 54:13, 66:7, 68:4, 68:8, 69:20, 85:4, 85:25, 91:12, 92:7, 92:9, 92:25, 93:5, 93:10, 93:17, 93:19, 93:22, 94:4, 94:10, 102:1, 102:17, 106:15
**policy** [8] - 10:10, 11:14, 37:1, 37:6, 67:18, 83:8, 85:8, 92:24
**Pomerantz** [35] - 11:10, 11:19, 11:25, 20:23, 30:13, 31:20, 36:7, 39:23, 40:10, 46:13, 66:8, 68:3, 68:15, 71:12, 71:14, 71:22, 73:22, 74:25, 75:3, 75:8, 93:16, 104:20, 105:17, 105:21, 106:4, 106:16, 108:7, 109:20, 110:3, 111:4, 117:24, 118:16, 119:17
**Pomerantz's** [6] - 21:6, 40:20, 41:25, 42:2, 42:7, 115:18
**population** [4] - 10:3, 10:4, 18:14, 53:15
**portfolio** [9] - 7:19, 10:19, 10:22, 11:18, 31:23, 34:10, 34:11, 93:14, 103:22
**portion** [3] - 30:13, 34:21, 71:20
**portions** [1] - 41:16
**posited** [1] - 40:13
**position** [10] - 20:15, 26:4, 31:23, 34:17, 76:22, 89:24, 90:6, 90:16, 90:22, 97:16
**positions** [4] - 15:15, 27:14, 89:15, 97:25
**posits** [1] - 40:18
**possibility** [5] - 14:21, 14:25, 15:1, 15:7, 23:9
**possible** [4] - 14:15, 71:23, 85:18, 96:15
**post** [1] - 38:19
**pot** [1] - 41:13
**potential** [1] - 87:1
**potentially** [1] - 30:4
**power** [1] - 85:22
**practical** [1] - 28:11
**practice** [2] - 16:17, 55:5
**preamble** [1] - 113:3
**precipitated** [2] - 16:22, 16:24
**precise** [1] - 84:25
**precisely** [3] - 27:10, 43:16, 43:22
**preclude** [2] - 104:20, 104:21
**precluding** [1] - 121:9
**predated** [1] - 82:13

**predates** [1] - 38:16
**predicated** [1] - 39:3
**prefer** [5] - 18:6, 19:1, 19:5, 19:6, 73:14
**preferable** [1] - 21:7
**preference** [2] - 4:12, 29:18
**preferences** [1] - 39:11
**prefers** [3] - 18:15, 18:16, 63:23
**premature** [2] - 96:2, 96:6
**premise** [1] - 48:1
**prepared** [8] - 68:13, 68:17, 68:22, 69:8, 75:10, 96:20, 101:23, 115:15
**preparing** [1] - 75:4
**prerequisites** [1] - 24:10
**present** [4] - 39:10, 53:15, 53:17, 110:4
**presentations** [1] - 86:21
**presented** [6] - 28:8, 87:2, 87:7, 107:23, 110:6, 112:24
**presenting** [1] - 28:10
**preservation** [1] - 69:21
**preserve** [2] - 78:15, 79:17
**preserved** [1] - 79:18
**president** [1] - 115:20
**presumably** [1] - 90:9
**presume** [1] - 5:25
**pretty** [5] - 42:17, 77:3, 78:18, 79:7, 109:21
**prevail** [9] - 10:24, 17:6, 20:11, 21:10, 28:24, 44:20, 45:13, 45:15, 46:20
**prevailing** [2] - 32:25, 46:1
**previously** [4] - 83:21, 91:4, 91:7, 92:13
**price** [1] - 73:1
**primarily** [1] - 25:10
**prime** [3] - 44:8, 45:10, 45:23
**Princeton** [1] - 2:14
**principal** [2] - 3:19, 78:16
**principally** [1] - 78:18
**principles** [4] - 6:11, 25:23, 26:21, 27:7
**private** [2] - 73:10, 106:22
**privately** [1] - 51:20
**problem** [3] - 42:18, 48:11, 50:4
**problems** [3] - 23:25, 25:14, 38:11
**procedure** [3] - 5:1, 29:14, 83:11
**Procedures** [1] - 83:7
**procedures** [1] - 83:8
**proceed** [7] - 4:19, 18:16, 22:16, 69:8, 69:13, 69:16, 77:20
**proceeding** [2] - 18:19, 26:19
**proceedings** [1] - 121:22
**proceeds** [1] - 84:22
**process** [6] - 37:11, 48:23, 49:15, 49:18, 86:17, 96:8
**processes** [1] - 32:15
**produced** [1] - 92:10
**producers** [1] - 51:21
**produces** [1] - 120:1
**product** [1] - 34:8
**products** [1] - 117:9
**professional** [1] - 60:19
**proffer** [1] - 96:10

**Profit** [6] - 81:18, 82:8, 82:9, 82:12, 84:17, 90:14
**profit** [6] - 51:24, 51:25, 106:23, 116:11, 116:12, 116:13
**profitable** [1] - 6:1
**profits** [2] - 21:24, 52:6
**PROFITS** [1] - 1:6
**profound** [1] - 62:12
**prohibited** [5] - 12:6, 24:23, 47:6, 70:1, 70:2
**prohibitive** [1] - 120:17
**promoted** [1] - 51:17
**prompted** [1] - 13:22
**prong** [3] - 25:8, 26:13, 26:22
**prongs** [1] - 77:23
**pronounced** [1] - 46:12
**proof** [3] - 5:14, 5:19, 73:19
**proper** [2] - 9:10, 39:5
**properly** [1] - 43:9
**proposal** [5] - 6:2, 19:14, 68:15, 99:3, 101:23
**propose** [1] - 5:20
**proposed** [16] - 11:10, 18:23, 50:25, 51:5, 65:1, 68:3, 71:12, 71:23, 73:20, 77:14, 87:3, 102:8, 106:4, 107:16, 107:19, 109:16
**proposing** [2] - 72:18, 108:14, 110:8
**proposition** [5] - 27:5, 36:23, 37:22, 39:23, 40:19
**propriety** [4] - 12:19, 18:23, 19:10
**prosecution** [2] - 15:19, 69:7
**prosecutions** [1] - 104:5
**protect** [2] - 63:25, 118:6
**protecting** [1] - 118:14
**protective** [2] - 22:16, 22:20
**prove** [1] - 6:1
**proven** [2] - 48:6, 86:5
**provide** [10] - 6:7, 19:22, 19:23, 21:24, 25:5, 27:11, 53:13, 84:24, 94:6, 105:19
**provided** [20] - 6:24, 8:17, 8:22, 10:20, 13:14, 13:19, 32:17, 33:25, 41:10, 45:11, 68:18, 68:23, 71:12, 83:8, 102:2, 102:10, 105:13, 106:11, 113:18
**Provident** [2] - 52:14, 82:16
**provider** [3] - 92:10, 98:19, 99:5
**providers** [1] - 102:10
**provides** [2] - 32:23, 91:19
**providing** [1] - 45:21
**provision** [5] - 85:17, 92:20, 93:15, 93:16, 109:18
**provisions** [4] - 81:24, 83:6, 83:22, 85:11
**provocative** [1] - 80:13
**proxy** [3] - 39:4, 47:19, 50:7
**prudence** [7] - 5:11, 32:24, 38:15, 109:7, 109:9, 114:7, 114:15
**prudent** [9] - 32:25, 51:1, 71:23, 73:23, 74:11, 86:8, 114:6, 114:8, 114:16

**prudently** [1] - 95:15
**Public** [1] - 122:11
**published** [1] - 118:21
**pull** [1] - 40:24
**pulls** [1] - 36:9
**pure** [1] - 37:10
**purely** [2] - 35:11, 36:5
**purport** [1] - 110:17
**purported** [2] - 31:10, 44:5
**purports** [1] - 112:7
**purpose** [2] - 26:23, 101:25
**purposes** [5] - 37:14, 41:16, 52:22, 66:2, 97:11
**pursuant** [1] - 81:24
**put** [12] - 41:8, 44:17, 49:10, 50:15, 51:15, 59:5, 67:17, 78:6, 79:2, 85:9, 85:16, 102:6

## Q

**qualification** [7] - 9:22, 105:21, 105:25, 110:5, 110:9, 110:23
**qualifications** [8] - 99:14, 104:8, 109:5, 109:6, 109:17, 109:19, 109:20, 117:11
**qualified** [8] - 22:14, 22:17, 99:5, 99:8, 110:23, 111:10, 111:20, 117:9
**qualify** [3] - 22:15, 22:25, 24:10
**quality** [2] - 118:17, 120:7
**questioned** [2] - 66:22, 87:9
**questions** [30] - 7:5, 7:21, 8:2, 10:8, 12:16, 12:21, 22:2, 25:23, 26:2, 26:18, 28:10, 38:17, 67:12, 67:13, 78:3, 80:6, 95:3, 98:8, 99:15, 99:20, 99:21, 99:25, 100:3, 102:23, 106:1, 106:3, 111:18, 112:8, 115:7, 121:18
**quibbling** [1] - 49:2
**quite** [5] - 11:10, 11:11, 23:20, 46:15, 86:16
**quote** [1] - 93:12
**quoted** [1] - 113:4
**quotes** [1] - 102:1
**quoting** [1] - 55:22

## R

**raise** [1] - 51:9
**raised** [5] - 91:10, 95:22, 97:16, 100:24, 115:16
**raises** [1] - 11:1
**raising** [1] - 26:18
**ramp** [1] - 54:14
**range** [3] - 105:13, 105:14, 106:16
**ranged** [1] - 105:14
**ranges** [1] - 108:1
**rapidly** [1] - 74:10
**rare** [2] - 111:3, 111:7
**rates** [1] - 120:18
**rather** [9] - 19:21, 26:19, 27:12, 34:17,

43:2, 47:18, 49:1, 74:10, 102:12

**ratio** [1] - 60:17

**rational** [2] - 49:1, 49:15

**Re** [1] - 12:11

**reach** [3] - 8:25, 13:22, 86:11

**reached** [2] - 13:12, 29:2

**read** [3] - 35:15, 66:15, 96:11

**reading** [1] - 79:9

**reads** [1] - 81:22

**ready** [1] - 94:5

**real** [4] - 49:1, 49:16, 60:6, 120:3

**realize** [2] - 111:1, 121:4

**reallocate** [1] - 74:11

**really** [25] - 44:9, 46:4, 49:6, 49:18, 54:14, 56:22, 58:11, 59:17, 60:13, 61:14, 62:1, 63:1, 63:5, 63:16, 63:20, 65:22, 66:13, 73:9, 77:7, 85:22, 94:19, 104:2, 111:12, 114:20

**reams** [1] - 32:17

**reason** [11] - 30:8, 33:22, 39:2, 50:3, 50:18, 69:7, 69:14, 70:19, 84:2, 90:21, 103:9

**reasonable** [8] - 7:2, 21:21, 36:3, 88:17, 97:23, 97:24, 120:11, 120:24

**reasonably** [1] - 58:10

**reasoned** [1] - 49:15

**reasons** [8] - 20:9, 55:6, 66:3, 69:6, 86:4, 90:1, 102:19, 117:18

**Reath** [3] - 3:24, 4:5, 4:8

**REATH** [1] - 2:10

**rebalance** [1] - 10:22

**rebound** [1] - 62:15

**receive** [2] - 23:24, 96:1

**received** [2] - 17:19

**recent** [6] - 6:12, 17:9, 17:20, 69:15, 82:10

**recently** [3] - 27:5, 47:7, 96:20

**recited** [1] - 83:6

**reckoning** [1] - 95:5

**recognized** [1] - 120:21

**recognizing** [1] - 114:7

**recommend** [2] - 93:13, 111:18

**recommendations** [2] - 10:18, 60:19

**recommended** [12] - 11:17, 34:16, 35:21, 63:15, 87:14, 102:13, 106:22, 106:24, 107:17, 107:25, 108:2

**recommending** [1] - 93:16

**recommends** [1] - 30:15

**reconcile** [3] - 19:15, 20:1, 45:8

**reconciliation** [1] - 116:23

**record** [22] - 3:9, 27:25, 28:2, 28:15, 30:12, 52:21, 80:25, 81:9, 86:16, 87:19, 88:13, 94:15, 95:25, 97:4, 97:12, 100:17, 103:23, 104:1, 107:23, 108:3, 108:6, 108:15

**records** [1] - 104:13

**recover** [2] - 63:6, 71:5

**recovered** [1] - 69:25

**recoveries** [2] - 41:1, 70:7

**recovers** [1] - 76:12

**recovery** [11] - 12:24, 12:25, 14:17, 15:23, 16:5, 41:2, 44:2, 62:25, 70:8, 71:16, 71:17

**red** [2] - 33:13, 100:24

**refer** [2] - 8:19, 83:17

**reference** [2] - 84:15, 85:24

**referenced** [1] - 32:7

**references** [1] - 101:12

**referred** [3] - 11:12, 25:7, 71:23

**refers** [3] - 81:23, 82:12, 90:24

**reflect** [1] - 100:18

**reflects** [3] - 90:9, 98:6, 108:6

**regard** [19] - 6:6, 8:3, 8:18, 13:3, 13:10, 13:19, 14:8, 17:1, 17:3, 59:2, 76:4, 77:15, 89:15, 115:16, 115:18, 117:4, 120:7, 120:22, 121:11

**regarding** [2] - 97:17, 101:13

**regardless** [1] - 48:5

**regards** [1] - 104:25

**Register** [2] - 9:25, 10:11

**registered** [1] - 100:23

**regret** [1] - 29:12

**regrets** [1] - 29:4

**regular** [1] - 109:1

**regulation** [1] - 113:3

**regulations** [4] - 78:18, 79:20, 82:6, 107:5

**Regulations** [1] - 9:20

**REINALDO** [1] - 1:3

**reinforces** [1] - 81:25

**related** [4] - 24:23, 26:2, 39:25, 110:14

**relates** [2] - 9:4, 25:2

**relationship** [3] - 16:23, 16:24, 103:10

**relatively** [1] - 17:9

**relevance** [1] - 43:10

**relevant** [12] - 4:24, 27:17, 27:20, 27:21, 30:5, 31:3, 33:18, 43:4, 78:11, 83:6, 117:14, 120:6

**reliable** [5] - 8:16, 118:18, 119:24, 120:21

**reliance** [1] - 17:4

**relied** [4] - 75:8, 99:23, 100:4, 100:21

**relies** [1] - 63:11

**reluctant** [1] - 97:4

**rely** [6] - 30:12, 75:6, 76:6, 89:3, 115:16, 121:3

**remain** [3] - 36:19, 50:19, 64:2

**remained** [1] - 35:6

**remaining** [3] - 24:25, 25:2, 80:11

**remarkably** [1] - 52:1

**remedial** [1] - 68:5

**remedy** [5] - 38:7, 46:3, 46:16, 49:5, 51:6

**remember** [1] - 50:11

**remote** [1] - 63:16

**render** [3] - 17:14, 51:6, 99:8

**reorganization** [1] - 88:7

**repaid** [1] - 12:6

**repair** [1] - 117:8

**repeat** [2] - 13:7, 107:1

**repeated** [1] - 111:23

**repeatedly** [1] - 108:18

**replete** [1] - 81:25

**replicating** [1] - 120:19

**reply** [5] - 9:24, 94:25, 97:17

**report** [19] - 17:18, 21:9, 41:10, 68:25, 70:22, 75:5, 78:13, 80:1, 94:5, 94:9, 96:3, 96:19, 96:22, 97:10, 106:6, 106:9, 109:4, 113:19

**reported** [1] - 8:19

**Reporter** [3] - 122:10, 122:11, 122:15

**REPORTER** [1] - 1:25

**reports** [9] - 10:21, 17:21, 72:13, 74:7, 87:21, 96:7, 96:24, 104:3, 104:23

**repository** [1] - 84:20

**represent** [3] - 26:25, 51:7, 105:5

**representation** [1] - 77:13

**representative** [16] - 1:4, 14:3, 14:5, 39:1, 50:16, 50:17, 63:8, 64:5, 64:17, 66:9, 66:19, 66:20, 66:23, 77:15, 77:21

**representatives** [17] - 14:8, 14:18, 14:22, 31:10, 50:12, 64:8, 64:9, 64:10, 65:17, 66:20, 67:7, 67:8, 67:9, 76:5, 77:10, 86:15, 87:23

**represented** [2] - 27:3, 33:13

**representing** [2] - 4:5, 101:8

**request** [2] - 8:17, 97:8

**requested** [1] - 102:11

**require** [6] - 10:2, 14:14, 21:18, 84:24, 91:10, 91:17

**required** [6] - 10:3, 14:18, 60:8, 69:9, 69:11, 72:7

**requirement** [5] - 25:11, 56:3, 63:24, 85:2

**requirements** [5] - 8:12, 14:24, 15:16, 23:20, 37:15

**requires** [11] - 26:13, 27:9, 56:18, 92:15, 92:21, 93:23, 96:14, 98:18, 110:24, 113:23, 116:23

**requiring** [1] - 15:20

**reread** [2] - 80:25, 81:7

**reserve** [3] - 80:11, 104:18, 121:10

**reserved** [1] - 121:11

**resolution** [5] - 18:21, 26:17, 26:20, 38:23, 42:12

**resolve** [2] - 27:16, 85:18

**resolved** [6] - 6:6, 18:21, 41:14, 47:12, 66:25, 95:20

**resources** [1] - 62:10

**respect** [6] - 63:2, 91:16, 101:2, 104:8, 105:5, 105:12, 105:25, 108:24, 109:25

**respectfully** [10] - 15:15, 18:7, 21:25, 25:20, 80:4, 89:14, 90:1, 92:17, 95:1, 97:23

**respective** [1] - 27:14

**respects** [1] - 104:9

**respond** [2] - 95:4, 103:16

**responded** [2] - 82:5, 103:14
**response** [8] - 8:17, 78:9, 78:10, 89:2, 97:9, 103:5, 111:1, 111:2
**responsibilities** [2] - 83:9, 120:2
**responsible** [1] - 98:16
**rest** [7] - 30:16, 31:13, 58:10, 59:7, 65:10, 85:16, 104:24
**restatement** [3] - 82:7, 90:15, 90:19
**restating** [1] - 92:12
**restoration** [1] - 47:11
**restore** [1] - 15:12
**restricted** [1] - 101:25
**restructuring** [1] - 88:8
**result** [9] - 23:11, 27:3, 27:15, 29:2, 42:22, 44:18, 70:6, 86:2, 88:10
**resulted** [1] - 6:9
**results** [4] - 15:1, 15:8, 23:24, 26:8
**retain** [1] - 77:4
**retained** [2] - 98:15, 99:16
**retaining** [2] - 7:13, 98:19
**retention** [2] - 100:1, 101:17
**retire** [14] - 40:13, 53:18, 54:19, 54:22, 58:2, 58:5, 58:25, 62:9, 62:10, 62:12, 62:17, 62:18, 62:22, 79:19
**retired** [5] - 58:19, 59:3, 62:8, 62:20, 62:25
**retirement** [18] - 8:21, 53:2, 53:11, 53:13, 53:25, 54:12, 58:17, 59:14, 62:9, 65:24, 66:3, 66:11, 74:25, 94:8, 98:21, 100:12, 101:19, 116:9
**retires** [1] - 59:16
**retrospect** [1] - 20:12
**retrospective** [1] - 37:14
**retrospectively** [1] - 41:8
**return** [1] - 79:1
**returned** [1] - 120:17
**returns** [4] - 31:25, 53:6, 60:5, 61:11
**Revenue** [3] - 82:4, 82:5, 82:6
**reverse** [1] - 16:21
**reverted** [1] - 71:13
**review** [2] - 92:23, 100:19
**reviewed** [1] - 11:19
**reviewing** [2] - 34:15, 87:19
**revised** [1] - 43:13
**rigid** [3] - 73:20, 73:22
**rigidly** [1] - 73:17
**rigorously** [1] - 6:18
**ring** [1] - 87:7
**rise** [1] - 3:1
**risk** [8] - 47:19, 64:24, 65:2, 65:7, 74:25, 77:7, 92:16, 92:19
**risk/return** [1] - 31:23
**risk/reward** [1] - 53:6
**risky** [1] - 63:23
**road** [1] - 61:20
**Road** [2] - 2:4, 2:13
**Robert** [3] - 3:13, 73:8, 89:10
**ROBERT** [1] - 2:4
**rock** [1] - 62:20

**role** [4] - 6:23, 19:12, 85:6, 111:14
**roughly** [1] - 53:16
**Rowan** [2] - 51:20, 51:22
**Rowan's** [1] - 103:21
**rudimentary** [2] - 64:13, 99:6
**Rule** [6] - 6:16, 8:12, 12:10, 15:16, 28:7, 67:22
**rule** [2] - 25:25, 28:9
**ruled** [2] - 20:12, 20:13, 91:7
**rules** [2] - 29:14, 33:6
**ruling** [3] - 24:22, 46:9, 103:13
**run** [2] - 13:5, 22:25
**running** [1] - 115:11

**S**

**S&P** [3] - 33:20, 34:2, 49:23
**S/Lisa** [1] - 122:14
**safe** [3] - 9:21, 9:23, 107:12
**salaries** [1] - 21:13
**sat** [1] - 87:8
**satisfaction** [1] - 114:9
**satisfy** [8] - 14:24, 15:16, 83:15, 84:23, 85:13, 105:25, 109:5, 109:16
**save** [1] - 115:6
**Savings** [1] - 52:14
**savings** [1] - 59:14
**saw** [3] - 28:9, 52:25, 108:1
**SAWICKI** [33] - 2:7, 3:16, 24:17, 24:19, 25:16, 28:3, 28:11, 29:4, 29:22, 34:6, 34:12, 34:23, 34:25, 35:22, 37:17, 37:20, 37:25, 38:10, 39:22, 41:5, 42:16, 42:18, 43:11, 44:4, 44:11, 45:1, 45:18, 46:6, 46:19, 46:22, 49:12, 49:14, 50:2
**Sawicki** [4] - 3:17, 24:16, 60:12, 65:13
**scenario** [1] - 86:15
**schemes** [1] - 14:20
**Schering** [3] - 12:11, 15:2, 77:24
**school** [1] - 117:8
**scope** [1] - 69:17
**score** [1] - 31:12
**screen** [2] - 67:18, 85:9
**screenings** [1] - 87:7
**scrutiny** [1] - 114:25
**seasoned** [1] - 36:3
**seated** [1] - 3:2
**SEC** [4] - 9:16, 79:21, 87:20, 100:24
**Second** [1] - 5:21
**second** [12] - 4:14, 7:11, 10:8, 11:2, 12:22, 15:25, 35:12, 61:22, 78:7, 95:24, 105:10
**secondly** [13] - 5:2, 5:15, 5:20, 6:17, 6:23, 13:19, 15:22, 17:8, 18:25, 68:13, 90:12, 92:11, 104:1
**Section** [12] - 32:22, 83:7, 83:10, 83:20, 84:23, 85:3, 85:19, 90:24, 90:25, 92:17, 93:2, 102:1
**section** [2] - 33:13, 101:25

**Securities** [1] - 25:3
**Security** [1] - 112:16
**see** [22] - 13:22, 26:9, 35:16, 40:25, 43:20, 50:3, 62:13, 66:17, 73:7, 77:8, 86:1, 87:20, 99:7, 106:16, 107:2, 109:9, 112:2, 112:24, 114:9, 114:19, 118:24
**seek** [3] - 15:12, 22:15, 26:25
**seeking** [3] - 43:15, 88:15, 98:5
**seem** [1] - 22:24
**segregated** [1] - 55:12
**seizing** [1] - 73:16
**select** [1] - 26:10
**selected** [4] - 37:4, 86:17, 86:25, 104:12
**selecting** [1] - 111:15
**selection** [2] - 5:12, 87:6
**self** [2] - 52:18, 61:18
**self-dealing** [1] - 61:18
**self-directed** [1] - 52:18
**send** [1] - 44:1
**seniority** [1] - 57:23
**sense** [8] - 4:17, 23:15, 37:11, 52:18, 54:12, 63:21, 84:4, 84:23
**sent** [1] - 89:18
**sentence** [2] - 30:21, 81:22
**separate** [15] - 19:24, 20:3, 20:10, 55:18, 82:25, 83:17, 89:19, 89:23, 91:5, 91:8, 98:1, 98:3, 107:12, 113:5, 113:8
**September** [1] - 122:17
**serial** [1] - 36:16
**series** [3] - 66:17, 86:20, 87:25
**service** [5] - 92:10, 93:10, 98:19, 99:4, 102:10
**Service** [2] - 82:4, 82:5
**sessions** [1] - 87:9
**set** [18] - 8:2, 10:21, 21:14, 39:8, 39:9, 55:11, 56:3, 56:23, 59:23, 60:17, 83:10, 83:11, 83:13, 84:18, 97:1, 110:23, 116:23, 122:13
**sets** [6] - 31:19, 32:6, 60:23, 85:2, 85:10, 95:19
**setting** [1] - 59:18
**settled** [1] - 40:11
**settlement** [1] - 67:1
**Seventh** [1] - 27:6
**several** [7] - 13:11, 35:24, 37:21, 41:9, 55:7, 80:16, 103:12
**shall** [3] - 91:21, 92:23, 93:3
**share** [2] - 34:4, 34:11
**sharing** [5] - 51:24, 51:25, 106:23, 116:11, 116:12, 116:13
**SHARING** [1] - 1:6
**Sharing** [6] - 81:19, 82:8, 82:9, 82:12, 84:17, 90:14
**shifts** [1] - 6:3
**short** [3] - 31:11, 58:5, 93:14
**Short** [4] - 5:18, 7:15, 12:19, 15:9
**short-term** [1] - 58:5

**shortcoming** [1] - 112:10
**shortcomings** [1] - 104:23
**Shorthand** [1] - 122:11
**shortly** [1] - 64:19
**show** [9] - 6:9, 30:3, 31:13, 44:16, 63:13, 73:23, 74:13, 103:10, 120:6
**showed** [5] - 33:7, 67:18, 69:19, 75:11, 100:14
**showings** [1] - 27:10
**shown** [4] - 31:4, 35:14, 68:13, 69:4
**shows** [5] - 42:13, 52:22, 57:5, 63:6, 108:15
**side** [3] - 4:16, 73:11, 111:13
**sides** [3] - 3:7, 80:13, 104:22
**sign** [1] - 73:11
**signed** [1] - 90:10
**significant** [2] - 17:3, 52:17
**significantly** [1] - 72:24
**SIMANDLE** [1] - 1:19
**similar** [7] - 56:7, 56:15, 98:21, 100:12, 102:6, 117:20
**similarly** [3] - 1:5, 101:9, 102:15
**simple** [1] - 81:13
**simply** [24] - 9:3, 14:13, 21:19, 25:18, 33:23, 39:15, 41:13, 49:1, 49:19, 52:20, 55:19, 61:9, 62:4, 67:1, 71:19, 79:24, 88:12, 89:3, 99:1, 100:9, 118:11, 118:12, 119:17, 120:12
**single** [21] - 13:1, 14:6, 15:4, 16:4, 19:21, 19:25, 20:14, 20:21, 38:1, 42:21, 47:11, 49:9, 70:18, 71:18, 76:9, 81:17, 83:1, 90:4, 90:6, 107:11, 113:20
**sitting** [1] - 41:13
**situated** [1] - 1:5
**situation** [4] - 32:9, 42:10, 73:11, 118:1
**situations** [2] - 11:20, 117:6
**six** [1] - 62:13
**size** [2] - 98:21, 100:13
**skewed** [1] - 118:4
**skill** [3] - 32:24, 98:20, 110:17
**skimmed** [1] - 14:9
**slew** [2] - 14:3, 75:2
**slightly** [1] - 45:15
**slowest** [1] - 16:14
**small** [1] - 56:11
**smaller** [1] - 118:5
**Smilow** [1] - 22:13
**Smith** [1] - 4:2
**snapshot** [1] - 19:9
**snippets** [3] - 25:6, 30:11, 30:24
**Social** [1] - 112:16
**softened** [1] - 29:15
**sold** [1] - 117:7
**sole** [1] - 48:16
**solely** [1] - 25:3
**solution** [2] - 73:20, 73:22
**someone** [7] - 27:3, 50:22, 64:12, 72:25, 76:19, 110:24, 111:24

**somewhat** [1] - 81:1
**soon** [1] - 96:2
**sophisticated** [3] - 14:20, 15:20, 64:5
**sorry** [4] - 22:6, 69:5, 73:21, 95:24
**sort** [6] - 36:22, 46:16, 111:5, 112:17, 112:18, 115:24
**sought** [3] - 19:14, 20:19, 55:6
**sounds** [3] - 23:6, 25:15, 43:2
**source** [5] - 65:23, 66:11, 84:22, 88:23, 116:14
**span** [1] - 53:21
**Spano** [3] - 27:6, 38:20, 43:18
**spans** [1] - 71:15
**speaking** [2] - 23:15, 80:17
**special** [2] - 43:10, 64:16
**specific** [4] - 12:25, 32:7, 49:3, 85:1
**specifically** [10] - 38:21, 88:14, 90:13, 90:18, 90:23, 91:1, 91:17, 92:12, 92:15, 117:5
**spectrum** [3] - 53:22, 77:7, 77:12
**speculation** [1] - 89:3
**speculative** [3] - 7:2, 21:22, 120:11
**spend** [3] - 8:11, 17:25, 59:17
**spent** [1] - 59:13
**spin** [1] - 119:25
**split** [2] - 29:19, 35:21
**spreadsheet** [3] - 68:13, 68:14, 68:17
**stage** [3] - 28:13, 47:3, 120:10
**stake** [3] - 65:13, 76:24, 77:1
**stand** [1] - 45:25
**standard** [12] - 10:9, 14:13, 22:11, 22:13, 44:14, 71:24, 77:3, 86:10, 111:24, 120:20, 120:21
**standards** [13] - 5:2, 23:9, 60:14, 60:23, 80:24, 81:12, 83:5, 84:25, 85:10, 85:13, 85:14, 85:25
**standing** [3] - 76:11, 76:17, 77:4
**Stanford** [1] - 15:11
**star** [1] - 40:4
**start** [9] - 37:7, 37:24, 42:23, 43:5, 51:14, 54:6, 67:23, 109:19, 111:9
**started** [4] - 40:4, 51:20, 51:23, 102:11
**starting** [3] - 42:19, 74:1, 76:23
**state** [3] - 90:3, 99:11, 102:17
**State** [1] - 122:11
**Statement** [29] - 30:14, 31:1, 31:14, 31:18, 32:5, 32:12, 33:7, 53:1, 53:5, 54:13, 66:7, 68:4, 68:8, 69:20, 85:4, 85:25, 91:12, 92:7, 92:9, 93:5, 93:10, 93:17, 93:19, 93:22, 94:4, 94:10, 102:17, 106:16
**statement** [8] - 10:10, 11:14, 12:4, 85:8, 93:18, 96:9, 96:12, 107:19
**statements** [2] - 17:20, 68:19
**states** [11] - 21:11, 88:5, 90:13, 90:18, 90:23, 91:1, 91:17, 91:21, 92:12, 92:22, 93:2
**STATES** [3] - 1:1, 1:14, 1:20
**States** [1] - 122:11

**static** [5] - 32:10, 33:11, 36:1, 45:2, 49:16
**stating** [1] - 98:14
**statistics** [1] - 74:12
**status** [1] - 10:25
**statutory** [1] - 109:18
**stay** [1] - 73:12
**stems** [1] - 7:11
**stenographic** [1] - 122:12
**step** [1] - 49:22
**stick** [1] - 67:3
**still** [5] - 29:18, 64:1, 65:18, 76:11
**stock** [15] - 34:11, 34:15, 34:18, 35:1, 35:4, 35:7, 35:18, 36:18, 39:18, 53:7, 59:3, 62:11, 62:21, 63:20, 74:13
**stocks** [4] - 10:19, 31:25, 52:15, 63:22
**stop** [4] - 36:11, 36:17, 36:22, 51:8
**stopped** [2] - 35:2, 50:14
**strata** [1] - 75:12
**strategies** [6] - 19:23, 19:24, 20:4, 20:11, 21:6, 86:22
**strategy** [30] - 5:23, 11:4, 11:5, 11:6, 11:9, 11:11, 11:12, 11:15, 11:16, 11:21, 11:23, 12:5, 19:13, 19:21, 19:25, 20:2, 20:14, 20:21, 33:10, 36:10, 43:7, 47:15, 48:5, 49:9, 55:25, 56:8, 67:1, 95:17
**Street** [2] - 2:8, 115:19
**STREETS** [1] - 1:15
**strong** [1] - 79:8
**strongly** [1] - 67:6
**structure** [8] - 20:6, 25:13, 47:17, 55:4, 56:2, 56:8, 59:19, 59:23
**structures** [1] - 9:11
**studies** [1] - 119:20
**stuff** [1] - 110:10
**subject** [4] - 55:4, 82:11, 110:12, 110:14
**submission** [1] - 95:21
**submit** [20] - 15:15, 18:8, 19:20, 21:6, 21:25, 25:20, 32:13, 33:4, 62:1, 79:22, 80:4, 80:24, 92:17, 96:3, 97:9, 97:10, 97:23, 105:2, 112:5, 114:24
**submitted** [9] - 17:18, 30:10, 30:25, 66:16, 85:9, 88:4, 89:14, 90:1, 95:1
**submitting** [1] - 97:7
**subsequent** [1] - 75:15
**substantial** [3] - 32:18, 70:15, 103:24
**substantive** [3] - 4:24, 24:25, 25:21
**substantively** [1] - 47:14
**subtracted** [1] - 106:8
**subtracting** [1] - 106:21
**succeed** [1] - 44:19
**successful** [4] - 24:5, 51:23, 52:1, 54:18
**sue** [1] - 76:11
**suffer** [1] - 45:5
**suffered** [2] - 26:14, 47:10
**suffice** [10] - 9:1, 9:5, 10:5, 19:16, 20:20, 68:7, 71:4, 94:10, 100:5
**suffices** [2] - 91:12, 94:4

**sufficient** [2] - 21:5, 98:25
**sufficiently** [1] - 86:4
**suggest** [9] - 16:15, 71:20, 72:9, 79:23, 79:24, 88:12, 93:8, 101:1, 120:14
**suggested** [9] - 23:22, 49:5, 71:25, 72:5, 74:24, 92:6, 94:23, 97:19, 102:4
**suggesting** [4] - 56:13, 64:4, 73:24, 73:25
**suggestion** [4] - 20:24, 33:22, 70:17, 121:1
**suggests** [3] - 91:5, 99:25, 100:19
**suit** [2] - 41:4, 76:18
**Suite** [2] - 2:4, 2:13
**Sullivan** [8] - 6:14, 6:21, 10:25, 11:5, 17:8, 21:18, 120:8, 120:9
**summary** [14] - 3:6, 4:13, 8:6, 46:20, 47:8, 80:15, 88:16, 89:2, 95:9, 95:20, 96:1, 97:3, 104:19, 121:13
**summer** [1] - 88:1
**SunAmerica** [4] - 3:17, 9:16, 24:24, 40:6
**superseding** [1] - 48:8
**supplement** [1] - 65:25
**supplied** [1] - 112:11
**supplies** [1] - 117:7
**supply** [2] - 97:2, 97:3
**support** [16] - 30:10, 38:15, 39:5, 39:23, 46:13, 53:13, 57:3, 66:16, 81:21, 87:24, 88:4, 90:6, 103:12, 104:13, 110:3
**supported** [1] - 83:3
**supports** [1] - 34:21
**supposed** [7] - 93:25, 95:10, 107:10, 109:7, 111:10, 111:11, 111:12
**Supreme** [4] - 17:2, 23:22, 29:19, 97:21
**surmount** [1] - 5:23
**surmounted** [1] - 8:2
**surrogate** [1] - 75:6
**susceptible** [2] - 66:24, 67:10
**suspended** [1] - 66:15
**sustain** [1] - 69:2
**sustained** [1] - 68:6
**swings** [1] - 59:25
**system** [2] - 48:18
**Szaferman** [2] - 3:11, 3:14
**SZAFERMAN** [1] - 2:2

## T

**tailored** [1] - 53:9
**talks** [2] - 9:25, 117:18
**target** [8] - 30:16, 32:6, 40:6, 54:12, 87:4, 87:12, 107:22, 108:1
**taught** [1] - 117:7
**TD** [1] - 112:17
**teaches** [4] - 5:24, 6:5, 6:21, 21:2
**technology** [1] - 51:22
**ten** [6] - 29:15, 40:14, 74:12, 101:16, 118:1, 118:12

**tend** [2] - 17:11, 116:2
**tendency** [1] - 34:1
**tending** [1] - 75:20
**tension** [1] - 45:24
**tenure** [1] - 16:15
**term** [10] - 30:16, 31:23, 32:6, 39:7, 39:25, 48:5, 50:5, 58:5, 93:15, 108:23
**terms** [14] - 5:9, 29:20, 53:15, 53:21, 54:25, 59:25, 60:20, 61:22, 77:7, 79:5, 84:18, 84:19, 87:17, 113:9
**terribly** [1] - 14:12, 117:14
**test** [6] - 12:21, 15:17, 15:25, 106:18, 114:17, 114:18
**testable** [2] - 118:19, 120:15
**tested** [1] - 120:16
**testified** [13] - 8:16, 9:6, 9:15, 10:16, 11:25, 59:8, 64:24, 88:3, 99:19, 101:14, 101:22, 104:1, 110:13
**testify** [2] - 95:13, 117:9
**testifying** [1] - 100:21
**testimony** [15] - 27:23, 31:9, 69:9, 69:11, 69:17, 87:17, 87:19, 88:21, 89:5, 94:3, 95:12, 95:18, 95:21, 100:2, 101:3
**testing** [2] - 114:9, 114:24
**tests** [1] - 64:15
**text** [1] - 30:25
**THE** [134] - 1:1, 1:6, 1:19, 3:2, 3:20, 4:3, 4:10, 4:19, 13:7, 16:10, 16:12, 17:15, 17:23, 18:3, 20:3, 20:6, 22:4, 22:7, 22:17, 22:22, 22:24, 23:3, 23:5, 23:14, 24:2, 24:4, 24:12, 24:14, 24:16, 24:18, 25:15, 27:25, 28:7, 28:20, 29:7, 34:1, 34:8, 34:21, 34:24, 35:20, 37:13, 37:18, 37:21, 38:7, 39:19, 40:22, 42:14, 42:17, 43:2, 43:24, 44:9, 44:13, 45:12, 45:24, 46:15, 46:20, 49:5, 49:13, 49:25, 51:10, 56:24, 57:12, 57:21, 58:16, 58:19, 58:22, 59:18, 59:22, 61:3, 64:4, 67:13, 70:14, 72:16, 73:5, 73:15, 74:4, 74:17, 74:20, 75:8, 75:13, 75:17, 76:17, 77:6, 78:4, 79:5, 80:6, 80:9, 80:19, 81:4, 81:7, 83:16, 83:25, 86:7, 88:14, 89:7, 94:15, 94:19, 94:21, 95:3, 95:24, 96:9, 96:18, 97:1, 97:7, 98:10, 100:4, 100:14, 102:3, 102:25, 103:2, 103:4, 104:14, 104:18, 105:3, 109:19, 112:10, 112:16, 115:5, 115:11, 115:13, 115:21, 115:24, 116:17, 116:21, 116:25, 117:15, 118:18, 119:2, 119:7, 119:23, 121:2, 121:6, 121:8, 121:16
**themselves** [4] - 10:17, 31:9, 45:11, 60:9
**theories** [5] - 23:17, 23:19, 40:10, 105:11, 115:1
**theory** [45] - 30:5, 35:24, 35:25, 36:15, 36:23, 38:2, 38:12, 38:16, 39:3, 39:19, 39:20, 40:1, 40:5, 40:18, 40:20, 41:25, 42:2, 42:7, 43:4, 45:3, 45:20, 47:22,

47:24, 48:8, 51:18, 56:14, 60:3, 61:19, 66:8, 70:3, 78:6, 79:3, 105:8, 105:16, 105:17, 105:19, 105:20, 107:3, 108:14, 112:15, 112:23, 114:18, 114:25, 115:3, 118:19
**there'd** [1] - 15:24
**thereafter** [1] - 84:14
**thereby** [1] - 31:24
**therefore** [5] - 7:3, 90:16, 91:21, 92:4, 95:1
**thesis** [2] - 110:12, 110:13
**they've** [6] - 11:14, 30:6, 37:4, 40:10, 40:12, 88:25
**thin** [1] - 36:9
**thinking** [3] - 88:7, 104:15, 118:23
**third** [7] - 5:3, 7:15, 13:25, 16:3, 17:11, 19:12, 68:25
**Third** [11] - 5:22, 6:13, 9:9, 9:11, 12:11, 12:13, 12:22, 27:8, 70:5, 77:24, 86:10
**thorough** [1] - 86:13
**thousand** [1] - 46:1
**three** [12] - 4:22, 16:14, 30:6, 40:3, 40:9, 65:17, 69:20, 87:7, 89:15, 97:25, 116:15
**threshold** [1] - 27:10
**throughout** [4] - 19:7, 19:11, 37:6, 72:4
**tickets** [2] - 48:14, 48:16
**tie** [1] - 96:13
**TOD** [1] - 2:7
**today** [7] - 3:4, 30:20, 56:4, 67:21, 81:9, 84:18, 94:16
**Todd** [1] - 3:16
**tolerance** [6] - 47:19, 64:24, 65:2, 65:7, 75:1, 77:7
**took** [8] - 15:14, 35:5, 36:24, 59:2, 59:4, 59:12, 83:25, 93:23
**top** [2] - 31:8, 77:2
**total** [3] - 42:2, 52:21, 57:6
**totally** [2] - 56:17, 58:25
**touched** [1] - 104:22
**touching** [1] - 27:18
**towards** [1] - 118:5
**track** [1] - 103:23
**trader** [1] - 65:4
**training** [1] - 110:18
**transaction** [6] - 12:7, 24:23, 47:6, 70:1, 70:2, 120:17
**transcription** [1] - 122:12
**translator** [1] - 63:9
**treated** [1] - 82:2
**treatment** [3] - 28:18, 99:7, 99:8
**trial** [3] - 10:24, 46:21, 61:4
**true** [10] - 34:6, 46:5, 46:6, 48:19, 49:22, 57:25, 58:21, 83:1, 83:3, 122:12
**trued** [1] - 42:5
**trust** [15] - 5:17, 7:9, 15:12, 15:13, 15:14, 52:13, 52:14, 81:23, 82:3, 82:16, 82:18, 82:20, 83:19, 84:5
**Trust** [79] - 12:17, 12:18, 80:20, 81:10,

81:11, 81:15, 81:16, 81:18, 81:19,
81:22, 82:1, 82:2, 82:5, 82:8, 82:9,
82:12, 82:15, 82:24, 82:25, 83:2, 83:6,
83:16, 83:19, 83:23, 84:1, 84:4, 84:7,
84:9, 84:12, 84:13, 84:24, 85:16,
85:24, 86:2, 86:5, 89:13, 89:16, 89:19,
89:21, 89:23, 89:24, 90:2, 90:25, 91:2,
91:5, 91:6, 91:8, 91:11, 91:12, 91:14,
91:17, 91:18, 91:22, 91:23, 91:24,
92:8, 92:9, 92:16, 92:21, 93:3, 93:9,
93:10, 93:23, 93:25, 94:4, 94:10,
94:12, 94:23, 95:6, 95:7, 95:14, 95:15,
96:22, 98:1, 98:3, 98:4, 103:7, 103:11

**trustee** [2] - 54:8, 83:5

**trustees** [48] - 3:25, 31:2, 32:8, 32:10,
32:17, 33:15, 34:14, 36:25, 39:10,
42:21, 48:13, 52:11, 55:11, 56:18,
58:12, 59:16, 59:24, 60:11, 60:17,
60:21, 60:22, 61:17, 61:22, 66:6,
81:11, 81:23, 82:21, 85:12, 85:14,
85:17, 85:22, 86:16, 86:22, 87:5, 87:8,
87:12, 103:25, 104:11, 104:14, 108:2,
108:4, 108:11, 108:16, 108:18,
108:25, 114:1

**TRUSTEES** [1] - 2:15

**trustees'** [4] - 84:18, 84:25, 85:4,
100:25

**try** [1] - 14:12

**trying** [2] - 56:5, 81:2

**tumble** [1] - 35:5

**tumultuous** [1] - 74:8

**Turkcell** [1] - 14:3

**turn** [9] - 5:5, 7:5, 7:20, 8:11, 12:9,
21:13, 62:3, 86:8, 111:14

**two** [24] - 3:25, 6:1, 6:12, 7:5, 7:21,
18:8, 22:8, 23:17, 28:1, 28:25, 38:19,
39:1, 40:10, 58:1, 62:25, 79:5, 81:13,
86:23, 87:9, 90:1, 98:16, 103:19,
113:12, 117:17

**two-and-a-half** [2] - 28:1, 28:25

**type** [5] - 6:4, 15:20, 94:11, 95:15,
117:16

**types** [2] - 22:8, 48:21

**typical** [5] - 13:2, 65:7, 66:9, 66:19,
76:18

**typicality** [6] - 5:1, 12:22, 21:19, 25:14,
62:5, 63:24

## U

**U.S** [1] - 1:25

**U.S.C** [2] - 109:18, 110:24

**ultimately** [1] - 86:24

**uncertain** [1] - 35:10

**uncover** [1] - 26:23

**under** [49] - 5:9, 6:2, 6:17, 10:25, 14:18,
14:25, 17:4, 19:4, 20:6, 22:4, 22:14,
22:17, 22:25, 23:9, 23:18, 25:11, 26:5,
26:7, 26:13, 26:21, 26:22, 32:24,

36:19, 37:6, 41:24, 42:1, 42:6, 45:20,
53:23, 57:6, 57:7, 57:22, 64:23, 66:6,
66:7, 67:22, 70:25, 72:14, 72:17, 77:2,
83:7, 85:2, 86:5, 93:3, 105:20, 120:8

**underlay** [2] - 14:10, 68:19

**undermine** [1] - 18:9

**understood** [1] - 28:11

**undertaken** [3] - 32:14, 33:10, 49:16

**undertook** [1] - 10:21

**undisputed** [1] - 48:7

**unexecuted** [1] - 90:17

**unilateral** [1] - 45:2

**unique** [8] - 65:19, 111:5, 111:7,
116:10, 116:13, 116:17, 117:20,
119:11

**Unisys** [1] - 9:11, 21:2, 79:17

**United** [1] - 122:11

**UNITED** [3] - 1:1, 1:14, 1:20

**universe** [1] - 113:2

**unknown** [1] - 58:25

**unless** [7] - 4:11, 22:2, 67:11, 74:16,
78:3, 98:8, 102:23

**unlike** [5] - 53:9, 53:12, 78:19, 92:2,
116:21

**unnecessary** [1] - 69:18

**unnerving** [1] - 37:3

**unrecognized** [1] - 91:25

**unsound** [2] - 112:20, 112:21

**untoward** [1] - 85:23

**unusual** [2] - 35:18, 48:6

**up** [30] - 25:9, 33:24, 34:11, 34:18,
36:18, 39:8, 39:9, 40:2, 40:10, 42:5,
42:22, 43:11, 46:2, 49:6, 54:7, 55:12,
56:23, 58:13, 59:18, 59:23, 60:15,
60:16, 62:24, 70:8, 81:7, 85:9, 93:14,
107:11, 112:23, 113:5

**update** [3] - 88:5, 88:15

**uses** [2] - 12:2, 119:18

**usual** [1] - 25:25

## V

**valuable** [1] - 25:19

**value** [2] - 33:24, 35:7

**variables** [1] - 75:6

**variance** [1] - 65:20

**variety** [1] - 9:21

**various** [6] - 3:5, 61:23, 82:17, 82:21,
84:22, 98:23

**vary** [2] - 74:2, 78:20

**vehicle** [1] - 50:6

**vehicles** [6] - 9:22, 10:12, 10:20, 52:16,
82:22, 84:23

**version** [6] - 82:11, 90:12, 90:18, 92:11,
92:14, 93:18

**versus** [2] - 42:19, 75:15

**vetted** [3] - 43:9, 86:18, 87:19

**viability** [2] - 9:5, 30:7

**viable** [1] - 30:5

**vice** [1] - 115:20

**view** [3] - 63:21, 69:11

**viewed** [2] - 10:16, 46:9

**views** [1] - 63:22

**Vincent** [1] - 3:23

**VINCENT** [1] - 2:11

**virtually** [2] - 32:15, 47:20

**virtue** [3] - 5:17, 21:23, 37:9

**Vision** [1] - 10:13

**vs** [10] - 1:8, 3:3, 5:21, 25:20, 25:24,
27:6, 38:20, 70:5, 97:21

## W

**wait** [5] - 30:2, 62:12, 62:13, 96:2

**Wal** [3] - 23:23, 25:20, 25:23

**Wal-Mart** [3] - 23:23, 25:20, 25:23

**Wall** [1] - 115:19

**wants** [5] - 19:9, 36:9, 37:7, 40:24, 61:7

**ways** [1] - 42:25

**WBG** [1] - 32:3

**wealth** [1] - 75:11

**website** [16] - 87:20, 99:23, 99:24,
100:5, 100:6, 100:10, 100:14, 100:17,
100:20, 100:21, 100:22, 104:3, 104:6,
104:7

**Webster** [14] - 3:18, 8:15, 9:6, 10:16,
30:18, 48:4, 79:25, 87:22, 88:25,
98:17, 99:10, 101:4, 101:14, 103:20

**Webster's** [1] - 100:11

**week** [1] - 96:16

**weigh** [1] - 18:23

**weighing** [1] - 27:14

**weight** [1] - 119:6

**weighted** [5] - 36:7, 39:16, 106:7,
119:19, 120:19

**weighting** [1] - 106:20

**Weiss** [1] - 115:20

**West** [1] - 2:8

**Wharton** [39] - 3:19, 24:22, 25:3, 30:18,
31:3, 33:15, 34:16, 36:25, 86:23, 87:6,
87:7, 87:18, 87:23, 88:1, 88:6, 91:11,
92:6, 92:8, 92:25, 93:5, 93:9, 93:21,
94:3, 99:1, 99:2, 99:12, 100:23, 102:5,
102:8, 102:11, 102:16, 104:6, 104:12,
107:21, 107:22, 107:25, 108:2, 108:10

**whatnot** [1] - 111:13

**whatsoever** [5] - 59:14, 64:22, 66:4,
86:1, 107:4

**Whitman** [1] - 13:15

**whole** [20] - 10:4, 14:3, 15:23, 18:12,
18:13, 19:18, 20:22, 40:2, 48:8, 70:7,
70:8, 71:17, 75:1, 82:3, 85:15, 107:8,
107:19, 108:14, 113:2, 114:3

**wholly** [1] - 43:13

**wide** [2] - 41:2, 109:21

**wife** [6] - 62:16, 63:11, 63:13, 63:17,
63:18, 76:6

**wife's** [1] - 63:13

**willingness** [1] - 87:11
**win** [3] - 41:4, 44:13, 46:17
**windfall** [1] - 45:7
**windfalls** [1] - 45:21
**winners** [1] - 50:21
**wisdom** [1] - 39:25
**wishes** [1] - 13:5
**withdraw** [5] - 54:10, 54:15, 58:17, 62:20, 113:16
**withdrawals** [3] - 41:19, 44:6, 54:6
**withdrawn** [1] - 77:16
**withdraws** [1] - 66:1
**withdrew** [1] - 50:16
**witness** [3] - 9:6, 94:7
**witnesses** [1] - 10:18
**woefully** [1] - 31:11
**wonder** [2] - 30:7, 114:13
**word** [2] - 23:14, 67:15
**words** [5] - 53:4, 53:8, 59:19, 111:3, 114:6
**workable** [1] - 56:22
**worker** [2] - 56:16, 56:20
**workers** [1] - 57:17
**works** [1] - 60:24
**world** [2] - 51:22, 120:3
**write** [1] - 121:18
**written** [2] - 63:12, 83:14
**wrongdoing** [1] - 7:11
**wrote** [5] - 87:25, 88:23, 110:6, 110:12, 116:8

## X

**XIO1492** [1] - 122:16

## Y

**year** [21] - 39:6, 40:13, 42:1, 42:4, 42:15, 52:7, 52:23, 54:7, 54:21, 56:16, 56:25, 57:13, 59:8, 61:1, 62:19, 73:5, 106:8, 113:14, 113:20, 118:1, 118:2
**year-end** [1] - 42:4
**yearly** [1] - 106:10
**years** [27] - 8:20, 16:14, 28:1, 28:25, 29:15, 30:6, 31:3, 40:3, 40:14, 40:17, 41:23, 47:20, 47:21, 52:2, 54:17, 54:19, 57:10, 57:17, 72:14, 74:12, 74:25, 75:15, 101:16, 115:19
**young** [4] - 56:10, 73:2, 73:14, 118:13
**younger** [13] - 19:1, 19:5, 19:6, 21:14, 40:16, 48:2, 48:9, 72:20, 72:24, 75:20, 75:21, 78:20, 118:5
**yourself** [1] - 106:5
**youth** [1] - 19:9
**youthful** [1] - 75:9